24-1293

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

        Defendants – Appellants,

v.

AMERICAN FINTECH COUNCIL, NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, and AMERICAN FINANCIAL SERVICES, ASSOCIATION,

        Plaintiffs – Appellees.

On Appeal from the United States District Court, District of Colorado
The Honorable Daniel D. Domenico
District Judge

District Court Case No. 1:24-cv-00812-DDD-KAS

## DEFENDANTS-APPELLANTS' APPENDIX TO OPENING BRIEF
## VOL. I OF III – PAGES 1 TO 225

PHILIP J. WEISER
Attorney General
BRIAN URANKAR*
KEVIN BURNS*
Senior Assistant Attorneys General
NIKOLAI FRANT*
First Assistant Attorney General
PHILIP SPARR*
Assistant Attorney General
MICHAEL D. McMASTER*
Assistant Solicitor General

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone:  720-508-6651
*Counsel of Record
*Attorneys for Defendants-Appellants*

ORAL ARGUMENT REQUESTED

i

# TABLE OF CONTENTS

## Volume I of III: Pages 1 to 225

1.  Civil Docket Sheet, United States District Court for the District of
    Colorado, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. August 29,
    2024 .................................................................................. 1

2.  Complaint for Declaratory Judgment and Injunctive Relief, Doc. 1,
    Case No. 1:24-cv-00812-DDD-KAS (D. Colo. March 25, 2024) ..... 12

3.  Plaintiffs' Motion for Preliminary Injunction, Doc. 24, Case No.
    1:24-cv-00812-DDD-KAS (D. Colo. April 2, 2024) ........................ 39

4.  Declaration of Cross River Bank in Support of Plaintiffs' Motion
    for Preliminary Injunction, Doc. 26, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ....................................................... 68

5.  Declaration of Bill Himpler in Support of Plaintiffs' Motion for
    Preliminary Injunction, Doc. 27, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ....................................................... 76

6.  Declaration of Bruce Bowman in Support of Plaintiffs' Motion for
    Preliminary Injunction, Doc. 28, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ....................................................... 86

7.  Declaration of Frank Pignanelli in Support of Plaintiffs' Motion
    for Preliminary Injunction, Doc. 29, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ....................................................... 95

8.  Declaration of James C. Jackson in Support of Plaintiffs' Motion
    for Preliminary Injunction, Doc. 30, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ..................................................... 105

9.  Declaration of Phil Goldfeder in Support of Plaintiffs' Motion for
    Preliminary Injunction, Doc. 31, Case No. 1:24-cv-00812-DDD-
    KAS (D. Colo. April 2, 2024) ..................................................... 114

10.   Declaration of Todd Boren in Support of Plaintiffs' Motion for Preliminary Injunction, Doc. 32, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. April 2, 2024) ........................................................ 122

11.   Federal Deposit Insurance Corporation's Unopposed Motion for Leave to File an Amicus Curiae Brief in Support of Defendants, Doc. 38, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. April 23, 2024) .......................................................................................... 129

12.   Amicus Curiae Brief of the Federal Deposit Insurance Corporation in Support of Defendants, Doc. 38-1, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. April 23, 2024) ........................................................ 142

13.   Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, Doc. 39, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. April 23, 2024) ........................................................ 167

14.   Declaration of Martha Fulford, Esq., Doc. 39-1, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. April 23, 2024) .................................. 190

15.   Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction, Doc. 45, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. May 7, 2024) ................................................................................ 205

## Volume II of III: Pages 226 to 469

16.   Amended Declaration of David M. Gossett in Support of Plaintiffs' Motion for Preliminary Injunction, Doc. 46-1, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. May 10, 2024) .................................. 226

17.   Amici Curiae Brief of American Bankers Association and Consumer Bankers Association in Support of Plaintiffs, Doc. 48, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. May 10, 2024) ....... 337

18.   Defendants' Motion to Dismiss, Doc. 52, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. May 13, 2024) .............................................. 357

19.   Courtroom Minutes, Doc. 56, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. May 16, 2024) ................................................................ 377

20.  Reporters Transcript-Plaintiffs' Motion for Preliminary
Injunction, Doc. 64, Case No. 1:24-cv-00812-DDD-KAS (D. Colo.
June 4, 2024) ................................................................................ 379

21.  Order Granting Motion for Preliminary Injunction, Doc 69, Case
No. 1:24-cv-00812-DDD-KAS (D. Colo. June 18, 2024).............. 442

## Volume III of III: Pages 470 to 591

22.  Plaintiffs' Notice of Amended Complaint, Doc. 70, Case No. 1:24-
cv-00812-DDD-KAS (D. Colo. July 2, 2024) ............................... 470

23.  Plaintiffs' First Amended Complaint for Declaratory Judgment
and Injunctive Relief, Doc. 70-1, Exhibit A, Case No. 1:24-cv-
00812-DDD-KAS (D. Colo. July 2, 2024) .................................... 474

24.  Plaintiffs' First Amended Complaint for Declaratory Judgment
and Injunctive Relief, Doc. 71, Case No. 1:24-cv-00812-DDD-KAS
(D. Colo. July 2, 2024) ................................................................ 506

25.  Notice of Appeal, Doc. 74, Case No. 1:24-cv-00812-DDD-KAS (D.
Colo. July 18, 2024) .................................................................... 536

26.  Motion for Stay of the Preliminary Injunction Pending Appeal,
Doc. 76, Case No. 1:24-cv-00812-DDD-KAS (D. Colo. July 19,
2024) ........................................................................................... 539

27.  Plaintiffs' Response to Defendants' Motion for Stay of the
Preliminary Injunction Pending Appeal, Doc. 86, Case No. 1:24-cv-
00812-DDD-KAS (D. Colo. August 9, 2024) ............................... 556

28.  Declaration of David M. Gosset in Support of Plaintiffs' Response
to Defendants' Motion for Stay of the Preliminary Injunction
Pending Appeal, Doc. 87, Case No. 1:24-cv-00812-DDD-KAS (D.
Colo. August 9, 2024) .................................................................. 574

29.  Exhibit A to Declaration of David M. Gosset in Support of
     Plaintiffs' Response to Defendants' Motion for Stay of the
     Preliminary Injunction Pending Appeal, Doc. 87-1, Case No. 1:24-
     cv-00812-DDD-KAS (D. Colo. August 9, 2024)............................577

30.  Defendants' Reply in Support of Motion for Stay of the
     Preliminary Injunction Pending Appeal, Doc. 88, Case No. 1:24-cv-
     00812-DDD-KAS (D. Colo. August 23, 2024)..............................583

ALLMTN,APPEAL,JD1,MJ CIV PP

## U.S. District Court – District of Colorado
### District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:24–cv–00812–DDD–KAS

National Association of Industrial Bankers et al v. Weiser et al
Assigned to: Judge Daniel D. Domenico
Referred to: Magistrate Judge Kathryn A. Starnella
 Case in other court:  USCA–10th Circuit, 24–01293
Cause: 28:1331ss – Fed. Question: Constitutionality of State
Statutes

Date Filed: 03/25/2024
Jury Demand: None
Nature of Suit: 950 Constitutionality of
State Statutes
Jurisdiction: Federal Question

**Plaintiff**

**National Association of Industrial
Bankers**

represented by **Chava Brandriss**
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202–973–4258
Fax: 202–973–4458
Email: chavabrandriss@dwt.com
*ATTORNEY TO BE NOTICED*

**Christopher Swift**
Davis Wright Tremaine LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
503–778–5505
Email: chrisswift@dwt.com
*ATTORNEY TO BE NOTICED*

**Christopher M. Walczyszyn**
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
212–402–4081
Email: chriswalczyszyn@dwt.com
*ATTORNEY TO BE NOTICED*

**Edwin G. Perlmutter**
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
303–974–6660
Email: ed.perlmutter@hklaw.com
*ATTORNEY TO BE NOTICED*

**Leah E. Capritta**
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
303–974–6646
Fax: 303–974–6659
Email: Leah.Capritta@hklaw.com
*ATTORNEY TO BE NOTICED*

**Matthew Earl Ladew**
Davis Wright Tremaine LLP
865 South Figueroa Street

**App. 1**

Suite 2400
Los Angeles, CA 90017–2566
213–655–9657
Email: matthewladew@dwt.com
*ATTORNEY TO BE NOTICED*

**Tyler J. Bourke**
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202–973–4200
Email: tylerbourke@dwt.com
*TERMINATED: 07/23/2024*

**David Morris Gossett**
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202–262–4156
Email: davidgossett@dwt.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **American Financial Services Association** | represented by | **Chava Brandriss** |
| --- | --- | --- |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christopher M. Walczyszyn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edwin G. Perlmutter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah E. Capritta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Earl Ladew**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Bourke**
(See above for address)
*TERMINATED: 07/23/2024*

**David Morris Gossett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **American Fintech Council** | represented by | **Leslie B. Arffa** |
| --- | --- | --- |

Sullivan & Cromwell
125 Broad Street
New York, NY 10004
202–956–7567
Email: arffal@sullcrom.com

**App. 2**

*ATTORNEY TO BE NOTICED*

**Matthew Alexander Schwartz**
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212–558–4000
Email: schwartzmatthew@sullcrom.com
*ATTORNEY TO BE NOTICED*

**Morgan L. Ratner**
Sullivan & Cromwell LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006–5215
202–956–7522
Email: ratnerm@sullcrom.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| **Philip J. Weiser** | represented by | **Brian J. Urankar** |

**Philip J. Weiser**
*Attorney General of the State of Colorado*

represented by  **Brian J. Urankar**
Colorado Department of Law
1300 Broadway
Ralph Carr Judicial Center
Denver, CO 80203
720–508–6407
Email: brian.urankar@coag.gov
*ATTORNEY TO BE NOTICED*

**Kevin James Burns**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Email: kevin.burns@coag.gov
*ATTORNEY TO BE NOTICED*

**Nikolai N. Frant**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6111
Fax: 720–508–6033
Email: nikolai.frant@coag.gov
*ATTORNEY TO BE NOTICED*

**Philip Michael Sparr**
Colorado Department of Law
1300 Broadway
6th Floor
Denver, CO 80203
720–508–6245
Email: philip.sparr@coag.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Martha Fulford**
*Administrator of the Colorado Uniform Consumer Credit Code*

represented by  **Brian J. Urankar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**App. 3**

**Kevin James Burns**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nikolai N. Frant**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Michael Sparr**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Federal Deposit Insurance Corporation**          represented by   **James Scott Watson**
*Federal Deposit Insurance Corporation*                             Federal Deposit Insurance Corporation
                                                                    Legal Division – Appellate Litigation Unit
                                                                    3501 North Fairfax Drive
                                                                    Suite D–7016
                                                                    Arlington, VA 22226
                                                                    571–243–8835
                                                                    Fax: 703–562–2496
                                                                    Email: jamwatson@fdic.gov
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Michael K. Morelli**
                                                                    Federal Deposit Insurance Corporation
                                                                    Appellate Litigation Unit
                                                                    3501 North Fairfax Drive
                                                                    Suite Vs–D7004
                                                                    Arlington, VA 22226
                                                                    571–501–4021
                                                                    Email: mmorelli@fdic.gov
                                                                    *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**American Bankers Association**          represented by   **Alan S. Kaplinsky**
                                                          Ballard Spahr LLP
                                                          1735 Market Street
                                                          51st Floor
                                                          Philadelphia, PA 19103–7599
                                                          215–864–8544
                                                          Fax: 215–864–8999
                                                          Email: kaplinsky@ballardspahr.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Burt M. Rublin**
                                                          Ballard Spahr LLP
                                                          1735 Market Street
                                                          51st Floor
                                                          Philadelphia, PA 19103–7599
                                                          215–864–8116
                                                          Fax: 215–864–9783
                                                          Email: rublin@ballardspahr.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew A. Morr**
                                                          Ballard Spahr LLP
                                                          1225 Seventeenth Street
                                                          Suite 2300
                                                          Denver, CO 80202–5596
                                                          303–292–2400
                                                          Fax: 303–296–3956
                                                          Email: morrm@ballardspahr.com

**App. 4**

*ATTORNEY TO BE NOTICED*

**Ronald K. Vaske**
Ballard Spahr LLP
80 South Eighth Street
2000 IDS Center
Minneapolis, MN 55402
612–371–3215
Email: vasker@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Consumer Bankers Association** | represented by | **Alan S. Kaplinsky**
(See above for address)
*ATTORNEY TO BE NOTICED* |
| | | **Burt M. Rublin**
(See above for address)
*ATTORNEY TO BE NOTICED* |
| | | **David R. Pommerehn**
Consumer Bankers Association
1225 New York Avenue NW
Suite 1100
Washington, DC 20005
202–207–5161
Email: dpommerehn@consumerbankers.com
*ATTORNEY TO BE NOTICED* |
| | | **Matthew A. Morr**
(See above for address)
*ATTORNEY TO BE NOTICED* |
| | | **Ronald K. Vaske**
(See above for address)
*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2024 | 1 | COMPLAINT against All Defendants (Filing fee $ 405,Receipt Number ACODC–9602961)Attorney David Morris Gossett added to party American Financial Services Association(pty:pla), Attorney David Morris Gossett added to party National Association of Industrial Bankers(pty:pla), filed by National Association of Industrial Bankers, American Fintech Council, American Financial Services Association. (Attachments: # 1 Summons Summons – Fulford, # 2 Summons Summons – Weiser, # 3 Civil Cover Sheet)(Gossett, David) (Entered: 03/25/2024) |
| 03/25/2024 | 2 | CORPORATE DISCLOSURE STATEMENT. (Gossett, David) (Entered: 03/25/2024) |
| 03/25/2024 | 3 | CORPORATE DISCLOSURE STATEMENT. (Gossett, David) (Entered: 03/25/2024) |
| 03/25/2024 | 4 | NOTICE of Entry of Appearance by Chava Brandriss on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Chava Brandriss added to party American Financial Services Association(pty:pla), Attorney Chava Brandriss added to party National Association of Industrial Bankers(pty:pla) (Brandriss, Chava) (Entered: 03/25/2024) |
| 03/25/2024 | 5 | NOTICE of Entry of Appearance by Tyler J. Bourke on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Tyler J. Bourke added to party American Financial Services Association(pty:pla), Attorney Tyler J. Bourke added to party National Association of Industrial Bankers(pty:pla) (Bourke, Tyler) (Entered: 03/25/2024) |
| 03/25/2024 | 6 | NOTICE of Entry of Appearance by Christopher M. Walczyszyn on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Christopher M. Walczyszyn added to party American Financial Services Association(pty:pla), Attorney Christopher M. Walczyszyn added to party National Association of Industrial Bankers(pty:pla) |

| | | |
|---|---|---|
| | | (Walczyszyn, Christopher) (Entered: 03/25/2024) |
| 03/25/2024 | 7 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Magistrate Judge Consent Form) (bcroc, ) (Entered: 03/25/2024) |
| 03/25/2024 | 8 | Case assigned to Magistrate Judge Kathryn A. Starnella. Text Only Entry (bcroc, ) (Entered: 03/25/2024) |
| 03/25/2024 | 9 | NOTICE of Entry of Appearance by Christopher Swift on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Christopher Swift added to party American Financial Services Association(pty:pla), Attorney Christopher Swift added to party National Association of Industrial Bankers(pty:pla) (Swift, Christopher) (Entered: 03/25/2024) |
| 03/25/2024 | 10 | NOTICE of Entry of Appearance by Matthew Alexander Schwartz on behalf of American Fintech CouncilAttorney Matthew Alexander Schwartz added to party American Fintech Council(pty:pla) (Schwartz, Matthew) (Entered: 03/25/2024) |
| 03/25/2024 | 11 | NOTICE of Entry of Appearance by Morgan L. Ratner on behalf of American Fintech CouncilAttorney Morgan L. Ratner added to party American Fintech Council(pty:pla) (Ratner, Morgan) (Entered: 03/25/2024) |
| 03/25/2024 | 12 | NOTICE of Entry of Appearance by Leslie B. Arffa on behalf of American Fintech CouncilAttorney Leslie B. Arffa added to party American Fintech Council(pty:pla) (Arffa, Leslie) (Entered: 03/25/2024) |
| 03/25/2024 | 13 | CORPORATE DISCLOSURE STATEMENT. (Schwartz, Matthew) (Entered: 03/25/2024) |
| 03/25/2024 | 14 | NOTICE of Entry of Appearance by Leah E. Capritta on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Leah E. Capritta added to party American Financial Services Association(pty:pla), Attorney Leah E. Capritta added to party National Association of Industrial Bankers(pty:pla) (Capritta, Leah) (Entered: 03/25/2024) |
| 03/26/2024 | 15 | WAIVER OF SERVICE Returned Executed by National Association of Industrial Bankers, American Financial Services Association. Philip J. Weiser waiver sent on 3/25/2024, answer due 5/24/2024. (Swift, Christopher) (Entered: 03/26/2024) |
| 03/26/2024 | 16 | WAIVER OF SERVICE Returned Executed by National Association of Industrial Bankers, American Financial Services Association. Martha Fulford waiver sent on 3/25/2024, answer due 5/24/2024. (Swift, Christopher) (Entered: 03/26/2024) |
| 03/26/2024 | 17 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiffs American Financial Services Association, National Association of Industrial Bankers All parties do not consent.. (Swift, Christopher) (Entered: 03/26/2024) |
| 03/26/2024 | 18 | NOTICE of Entry of Appearance by Edwin G. Perlmutter on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Edwin G. Perlmutter added to party American Financial Services Association(pty:pla), Attorney Edwin G. Perlmutter added to party National Association of Industrial Bankers(pty:pla) (Perlmutter, Edwin) (Entered: 03/26/2024) |
| 03/26/2024 | 19 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 3/26/2024. This matter is before the Court on the Election Concerning Consent/Non–Consent to United States Magistrate Judge Jurisdiction [# 17 ] (the "Consent/Non–Consent Form"). IT IS HEREBY ORDERED that this case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a). (dgumb, ) (Entered: 03/26/2024) |
| 03/26/2024 | 20 | CASE REASSIGNED. Pursuant to 17 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Daniel D. Domenico and drawn to Magistrate Judge Kathryn A. Starnella. All future pleadings should be designated as **24–cv–812–DDD**. (Text Only Entry) (dgumb, ) (Entered: 03/26/2024) |
| 03/26/2024 | 21 | ORDER REFERRING CASE to Magistrate Judge Kathryn A. Starnella. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and |

**App. 6**

|  |  | recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. SO ORDERED by Judge Daniel D. Domenico on 3/26/2024. Text Only Entry. (rkeec) (Entered: 03/26/2024) |
|---|---|---|
| 03/28/2024 | 22 | NOTICE of Entry of Appearance by Kevin James Burns on behalf of All Defendants Attorney Kevin James Burns added to party Martha Fulford(pty:dft), Attorney Kevin James Burns added to party Philip J. Weiser (pty:dft) (Burns, Kevin) (Entered: 03/28/2024) |
| 03/28/2024 | 23 | NOTICE of Entry of Appearance by Nikolai N. Frant on behalf of All Defendants Attorney Nikolai N. Frant added to party Martha Fulford(pty:dft), Attorney Nikolai N. Frant added to party Philip J. Weiser (pty:dft) (Frant, Nikolai) (Entered: 03/28/2024) |
| 04/02/2024 | 24 | MOTION for Preliminary Injunction by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 25 | **WITHDRAWN** DECLARATION of *David Gossett* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Gossett, David) Modified pursuant to ECF 49 on 5/13/2024 (cmadr, ). (Entered: 04/02/2024) |
| 04/02/2024 | 26 | DECLARATION of *Arlen Gelbard, Cross River Bank* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 27 | DECLARATION of *Bill Himpler, AFSA* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 28 | DECLARATION of *Bruce Bowman, Comenity Capital Bank* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 29 | DECLARATION of *Frank Pignanelli, NAIB* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 30 | DECLARATION of *James Jackson, WebBank* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 31 | DECLARATION of *Phil Goldfeder, AFC* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 32 | DECLARATION of *Todd Boren, Celtic Bank* regarding MOTION for Preliminary Injunction 24 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 33 | CORPORATE DISCLOSURE STATEMENT. (Gossett, David) (Entered: 04/02/2024) |
| 04/02/2024 | 34 | NOTICE of Entry of Appearance by Philip Michael Sparr on behalf of All Defendants Attorney Philip Michael Sparr added to party Martha Fulford(pty:dft), Attorney Philip Michael Sparr added to party Philip J. Weiser (pty:dft) (Sparr, Philip) (Entered: 04/02/2024) |
| 04/04/2024 | 35 | ORDER SETTING HEARING ON MOTION: 24 Motion for Preliminary Injunction. A Motion Hearing is SET for 5/16/2024 at 09:30 AM in Courtroom A1002 before Judge Daniel D. Domenico. The defendants' response and the plaintiffs' reply are due in accordance with Local Civil Rule 7.1(d). The parties must submit all pertinent exhibits and direct witness testimony (by affidavit or declaration) as attachments to their briefs. Live testimony at the hearing, if allowed, will be limited to cross−examination and redirect examination. |

| | | |
|---|---|---|
| | | The parties must file their witness lists for the hearing, including an estimate of the time required for their cross–examination of each witness, by 5/13/2024. Witness list forms can be found at http://www.cod.uscourts.gov/JudicialOfficers/ActiveArticleIIIJudges/HonDanielDDomenico.aspx.<br><br>Any motions affecting the hearing must be filed by 05:00 PM on 5/13/2024, with responses due by 05:00 PM on 5/14/2024, and no replies will be permitted without leave of Court.<br><br>SO ORDERED by Judge Daniel D. Domenico on 4/4/2024. Text Only Entry (dddlc1, ) (Entered: 04/04/2024) |
| 04/09/2024 | 36 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge Kathryn A. Starnella on 9 April 2024. Proposed Scheduling Order due 6/17/2024. Scheduling Conference set for 6/24/2024 09:30 AM in Courtroom C204 before Magistrate Judge Kathryn A. Starnella. (Attachments: # 1 Continuation of Main Document, # 2 Continuation of Main Document, # 3 Continuation of Main Document) (cmadr, ) Modified on 5/17/2024 to modify Proposed Scheduling Order due to 6/17/2024 (rkeec). (Entered: 04/10/2024) |
| 04/23/2024 | 37 | NOTICE of Entry of Appearance by Michael K. Morelli on behalf of Federal Deposit Insurance CorporationAttorney Michael K. Morelli added to party Federal Deposit Insurance Corporation(pty:am) (Morelli, Michael) (Entered: 04/23/2024) |
| 04/23/2024 | 38 | MOTION to File Amicus Brief by Amicus Federal Deposit Insurance Corporation. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Proposed Order)(Morelli, Michael) (Entered: 04/23/2024) |
| 04/23/2024 | 39 | RESPONSE to 24 MOTION for Preliminary Injunction filed by Defendants Martha Fulford, Philip J. Weiser. (Attachments: # 1 Exhibit Exhibit A Declaration of Martha Fulford, Esq.)(Sparr, Philip) (Entered: 04/23/2024) |
| 04/24/2024 | 40 | ORDER GRANTING 38 Unopposed Motion for Leave to File an Amicus Curiae Brief. Doc. 38–1 is accepted for filing. SO ORDERED by Judge Daniel D. Domenico on 4/24/2024. Text Only Entry (dddlc1, ) (Entered: 04/24/2024) |
| 04/29/2024 | 41 | Unopposed MOTION for Leave to File Excess Pages *for Reply ISO Motion for Preliminary Injunction* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 04/29/2024) |
| 05/01/2024 | 42 | NOTICE of Entry of Appearance by Brian J. Urankar on behalf of Martha Fulford, Philip J. Weiser Attorney Brian J. Urankar added to party Martha Fulford(pty:dft), Attorney Brian J. Urankar added to party Philip J. Weiser (pty:dft) (Urankar, Brian) (Entered: 05/01/2024) |
| 05/03/2024 | 43 | ORDER GRANTING 41 Plaintiffs' Unopposed Motion for Leave to Exceed Word Limitation. The plaintiffs' reply in support of 24 Motion for Preliminary Injunction must not exceed 4,000 words. SO ORDERED by Judge Daniel D. Domenico on 5/3/2024. Text Only Entry (dddlc1, ) (Entered: 05/03/2024) |
| 05/07/2024 | 44 | NOTICE of Entry of Appearance by Matthew Earl Ladew on behalf of American Financial Services Association, National Association of Industrial BankersAttorney Matthew Earl Ladew added to party American Financial Services Association(pty:pla), Attorney Matthew Earl Ladew added to party National Association of Industrial Bankers(pty:pla) (Ladew, Matthew) (Entered: 05/07/2024) |
| 05/07/2024 | 45 | REPLY to Response to 24 MOTION for Preliminary Injunction filed by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 05/07/2024) |
| 05/10/2024 | 46 | Unopposed MOTION for Leave to *Amend Gossett Declaration ISO Motion for Preliminary Injunction* 24 MOTION for Preliminary Injunction , 25 Declaration, by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Attachments: # 1 Proposed Document Amended Gossett Declaration of Exhibits A–G)(Gossett, David) (Entered: 05/10/2024) |
| 05/10/2024 | 47 | Unopposed MOTION to File Amicus Brief by Amicus Parties American Bankers Association, Consumer Bankers Association. (Attachments: # 1 Proposed Order (PDF Only))(Morr, Matthew) (Entered: 05/10/2024) |
| 05/10/2024 | 48 | BRIEF *Amici Curiae Brief of American Bankers Association and Consumer Bankers Association in Support of Plaintiffs* by Amicus Parties American Bankers Association, Consumer Bankers Association. (Morr, Matthew) (Entered: 05/10/2024) |

**App. 8**

| 05/13/2024 | 49 | ORDER GRANTING <u>46</u> Unopposed Motion for Leave to File Amended Gossett Declaration. Doc. 46–1 is accepted for filing, and the Clerk of Court is DIRECTED to mark Doc. <u>25</u> as WITHDRAWN. SO ORDERED by Judge Daniel D. Domenico on 5/13/2024. Text Only Entry (dddlc1, ) (Entered: 05/13/2024) |
| --- | --- | --- |
| 05/13/2024 | 50 | ORDER GRANTING <u>47</u> Unopposed Motion for Leave to File an Amici Curiae Brief. Doc. <u>48</u> is accepted for filing. SO ORDERED by Judge Daniel D. Domenico on 5/13/2024. Text Only Entry (dddlc1, ) (Entered: 05/13/2024) |
| 05/13/2024 | <u>51</u> | STATEMENT *Joint Pre–Hearing Statement re Witnesses* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 05/13/2024) |
| 05/13/2024 | <u>52</u> | MOTION to Dismiss *Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* by Defendants Martha Fulford, Philip J. Weiser. (Frant, Nikolai) (Entered: 05/13/2024) |
| 05/14/2024 | <u>53</u> | NOTICE of Entry of Appearance *James Scott Watson* by James Scott Watson on behalf of Federal Deposit Insurance CorporationAttorney James Scott Watson added to party Federal Deposit Insurance Corporation(pty:am) (Watson, James) (Entered: 05/14/2024) |
| 05/15/2024 | <u>54</u> | NOTICE of Entry of Appearance by Burt M. Rublin on behalf of American Bankers Association, Consumer Bankers AssociationAttorney Burt M. Rublin added to party American Bankers Association(pty:am), Attorney Burt M. Rublin added to party Consumer Bankers Association(pty:am) (Rublin, Burt) (Entered: 05/15/2024) |
| 05/15/2024 | <u>55</u> | NOTICE of Entry of Appearance by David R. Pommerehn on behalf of Consumer Bankers AssociationAttorney David R. Pommerehn added to party Consumer Bankers Association(pty:am) (Pommerehn, David) (Entered: 05/15/2024) |
| 05/16/2024 | <u>56</u> | MINUTE ENTRY for proceedings held before Judge Daniel D. Domenico: Motion Hearing held on 5/16/2024 re <u>24</u> MOTION for Preliminary Injunction filed by American Financial Services Association, National Association of Industrial Bankers, American Fintech Council. Taking under advisement <u>24</u> Motion for Preliminary Injunction. Court indicates a written order to follow. Court Reporter: Tammy Hoffschildt. (rkeec) (Entered: 05/16/2024) |
| 05/21/2024 | <u>57</u> | NOTICE of Entry of Appearance by Ronald K. Vaske on behalf of American Bankers Association, Consumer Bankers AssociationAttorney Ronald K. Vaske added to party American Bankers Association(pty:am), Attorney Ronald K. Vaske added to party Consumer Bankers Association(pty:am) (Vaske, Ronald) (Entered: 05/21/2024) |
| 05/22/2024 | <u>58</u> | MOTION for Extension of Time to File Response/Reply as to <u>52</u> MOTION to Dismiss *Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 05/22/2024) |
| 05/28/2024 | <u>59</u> | PRE–SCHEDULING CONFERENCE ORDER by Magistrate Judge Kathryn A. Starnella on 28 May 2024. (cmadr, ) (Entered: 05/28/2024) |
| 05/29/2024 | <u>60</u> | RESPONSE to <u>58</u> MOTION for Extension of Time to File Response/Reply as to <u>52</u> MOTION to Dismiss *Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* filed by Defendants Martha Fulford, Philip J. Weiser. (Frant, Nikolai) (Entered: 05/29/2024) |
| 05/31/2024 | <u>61</u> | STIPULATION for Extension of Time *to file Response to Motion to Dismiss* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 05/31/2024) |
| 05/31/2024 | <u>68</u> | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: <u>61</u> : Stipulation to Extend Plaintiffs' Time to File Response to Defendants' Motion to Dismiss. Pursuant to Local Civ. R. 6.1(a), parties may only stipulate to an extension of time to respond to "a pleading or amended pleading, interrogatories, requests for production of documents, or requests for admissions." Parties may not stipulate to an extension of time to respond to a motion. **DO NOT REFILE THE DOCUMENT. Action to take** – future requests to extend time to respond to or reply in support of a motion must be filed as a motion for extension of time pursuant to Local Civ. R. 6.1(b). (Text Only Entry) (dddlc1, ) (Entered: 06/17/2024) |
| 06/04/2024 | <u>62</u> | Joint MOTION to Continue *Scheduling Conference* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) (Entered: 06/04/2024) |

**App. 9**

| 06/04/2024 | 63 | ORDER REFERRING MOTION: 62 Joint Motion to Continue *Scheduling Conference*. Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Daniel D. Domenico on 6/4/2024. Text Only Entry (dddlc1, ) (Entered: 06/04/2024) |
|---|---|---|
| 06/04/2024 | 64 | TRANSCRIPT of Preliminary Injunction hearing held on May 16, 2024 before Judge Domenico. Pages: 1–63.<br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (thoff, ) (Entered: 06/04/2024) |
| 06/14/2024 | 65 | NOTICE of Entry of Appearance by Alan S. Kaplinsky on behalf of American Bankers Association, Consumer Bankers AssociationAttorney Alan S. Kaplinsky added to party American Bankers Association(pty:am), Attorney Alan S. Kaplinsky added to party Consumer Bankers Association(pty:am) (Kaplinsky, Alan) (Entered: 06/14/2024) |
| 06/17/2024 | 66 | Minute ORDER by Magistrate Judge Kathryn A. Starnella on 17 June 2024. IT IS HEREBY ORDERED that the Joint Motion to Reschedule Scheduling Conference 62 is GRANTED. The Scheduling Conference set for June 24, 2024, at 9:30 a.m. is **VACATED and RESET to August 15, 2024, at 9:30 a.m.** in Courtroom C–204 of the Byron G. Rogers United States Courthouse, 1929 Stout Street, Denver, Colorado. IT IS FURTHER ORDERED that, **no later than August 8, 2024,** the parties shall submit their proposed scheduling order.(cmadr, ) (Entered: 06/17/2024) |
| 06/17/2024 | 67 | ORDER GRANTING 58 Plaintiffs' Motion for Extension of Time to File Response. The plaintiffs' response to 52 Motion to Dismiss is due within fourteen days of the Court's ruling on 24 Motion for Preliminary Injunction. SO ORDERED by Judge Daniel D. Domenico on 6/17/2024. Text Only Entry (dddlc1, ) (Entered: 06/17/2024) |
| 06/18/2024 | 69 | ORDER GRANTING 24 Motion for Preliminary Injunction.<br><br>Pending a final determination of the plaintiffs' claims on the merits, the defendants, their officers, agents, servants, employees, attorneys, and any others who are in active concert or participation with them are PRELIMINARILY ENJOINED from enforcing the interest rates in the Colorado Uniform Consumer Credit Code with respect to any loan made by the plaintiffs' members, to the extent that (a) the applicable interest rate in 12 U.S.C. § 1831d(a) exceeds the rate that would be permitted in the absence of that subsection, and (b) the loan is not "made in" Colorado within the meaning of the Effective Date note to 12 U.S.C. § 1831d as explained above; the State may only apply its UCCC interest rates to loans made by lenders in Colorado, regardless of the location or residence of the borrower.<br><br>SO ORDERED by Judge Daniel D. Domenico on 6/18/2024. (dddlc1, ) (Entered: 06/19/2024) |
| 07/02/2024 | 70 | NOTICE of Filing Amended Pleading by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers (Attachments: # 1 Exhibit Exhibit A, Marked Up FAC)(Gossett, David) (Entered: 07/02/2024) |
| 07/02/2024 | 71 | AMENDED COMPLAINT against All Defendants, filed by American Fintech Council, American Financial Services Association, National Association of Industrial Bankers.(Gossett, David) (Entered: 07/02/2024) |
| 07/02/2024 | 72 | ORDER DENYING AS MOOT 52 Motion to Dismiss in light of 71 First Amended Complaint. By Judge Daniel D. Domenico on 7/2/2024. Text Only Entry (dddlc1, ) (Entered: 07/02/2024) |
| 07/16/2024 | 73 | STIPULATION for Extension of Time to Answer or Respond to the Complaint *FIRST AMENDED COMPLAINT* by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. American Financial Services Association answer due 8/6/2024; American Fintech Council answer due 8/6/2024; National Association of Industrial Bankers answer due 8/6/2024. (Burns, Kevin) (Entered: 07/16/2024) |
| 07/18/2024 | 74 | NOTICE OF APPEAL as to 69 Order on Motion for Preliminary Injunction,,, by Defendants Martha Fulford, Philip J. Weiser (Filing fee $ 605, Receipt Number ACODC–9780539) (Frant, Nikolai) (Entered: 07/18/2024) |

**App. 10**

| 07/19/2024 | 75 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 74 Notice of Appeal filed by Martha Fulford, Philip J. Weiser to the U.S. Court of Appeals. ( Retained Counsel, Fee paid.) (Attachments: # 1 Preliminary Record)(cmadr, ) (Entered: 07/19/2024) |
|---|---|---|
| 07/19/2024 | 76 | MOTION to Stay re 69 Order on Motion for Preliminary Injunction,,, by Defendants Martha Fulford, Philip J. Weiser. (Burns, Kevin) (Entered: 07/19/2024) |
| 07/19/2024 | 77 | MOTION to Stay *DEFENDANTS UNOPPOSED MOTION TO STAY DISTRICT COURT PROCEEDINGS PENDING RESOLUTION OF PRELIMINARY INJUNCTION APPEAL* by Defendants Martha Fulford, Philip J. Weiser. (Sparr, Philip) (Entered: 07/19/2024) |
| 07/22/2024 | 78 | USCA Case Number 24–1293 for 74 Notice of Appeal filed by Martha Fulford, Philip J. Weiser. (cmadr, ) (Entered: 07/22/2024) |
| 07/23/2024 | 79 | MOTION to Withdraw as Attorney by Plaintiffs American Financial Services Association, National Association of Industrial Bankers. (Bourke, Tyler) (Entered: 07/23/2024) |
| 07/23/2024 | 80 | ORDER GRANTING 79 Motion to Withdraw as Attorney. The Clerk of Court is instructed to terminate attorney Tyler J. Bourke as counsel of record, and to remove this name from the electronic certificate of mailing. Plaintiffs National Association of Industrial Bankers and American Financial Services Association will continue to be represented by attorneys Chava Brandriss, Christopher Swift, Christopher M. Walczyszyn, Edwin G. Perlmutter, Leah E. Capritta, Matthew Earl Ladew, and David Morris Gossett. SO ORDERED by Judge Daniel D. Domenico on 7/23/2024. Text Only Entry (dddlc1, ) (Entered: 07/23/2024) |
| 07/23/2024 | 81 | ORDER REFERRING MOTION: 77 Motion to Stay *DEFENDANTS UNOPPOSED MOTION TO STAY DISTRICT COURT PROCEEDINGS PENDING RESOLUTION OF PRELIMINARY INJUNCTION APPEAL* filed by Martha Fulford, Philip J. Weiser. Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Daniel D. Domenico on 7/23/2024. Text Only Entry (dddlc1, ) (Entered: 07/23/2024) |
| 07/25/2024 | 82 | Minute ORDER by Magistrate Judge Kathryn A. Starnella on 25 July 2024. IT IS HEREBY ORDERED that the Unopposed Motion to Stay District Court Proceedings Pending Resolution of Preliminary Injunction Appeal 77 is GRANTED. All proceedings, including current responsive pleading deadlines, are **STAYED** pending resolution by the Tenth Circuit of the notice of appeal of the preliminary injunction order entered by the District Judge. However, this stay order is intended to have **no effect** on the briefing of and the District Judge's consideration of the Motion for Stay of the Preliminary Injunction Pending Appeal 76 .(cmadr, ) (Entered: 07/26/2024) |
| 08/05/2024 | 83 | TRANSCRIPT ORDER FORM re 74 Notice of Appeal by Defendants Martha Fulford, Philip J. Weiser (Frant, Nikolai) (Entered: 08/05/2024) |
| 08/06/2024 | 84 | LETTER TO USCA and all counsel certifying the record is complete as to 74 Notice of Appeal filed by Martha Fulford, Philip J. Weiser. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 24–1293) Text Only Entry (cmadr, ) (Entered: 08/06/2024) |
| 08/09/2024 | 85 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 08/09/2024. In light of the Court's Minute Order 82 staying all proceedings pending resolution by the Tenth Circuit of the notice of appeal of the preliminary injunction order, IT IS HEREBY ORDERED that the Scheduling Conference set for August 15, 2024, at 9:30 a.m. is VACATED. (blaws) (Entered: 08/09/2024) |
| 08/09/2024 | 86 | RESPONSE to Defendants' 76 MOTION to Stay of the for Preliminary Injunction Pending Appeal, filed by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Gossett, David) Modified on 8/19/2024 linkage and title (angar, ). (Entered: 08/09/2024) |
| 08/09/2024 | 87 | DECLARATION of *David Gossett* regarding Response to Motion, 86 by Plaintiffs American Financial Services Association, American Fintech Council, National Association of Industrial Bankers. (Attachments: # 1 Exhibit A)(Gossett, David) (Entered: 08/09/2024) |
| 08/23/2024 | 88 | REPLY to Response to 76 MOTION to Stay re 69 Order on Motion for Preliminary Injunction,,, filed by Defendants Martha Fulford, Philip J. Weiser. (Frant, Nikolai) (Entered: 08/23/2024) |

**App. 11**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

---

NATIONAL ASSOCIATION OF INDUSTRIAL
BANKERS, AMERICAN FINANCIAL SERVICES
ASSOCIATION, and AMERICAN FINTECH COUNCIL,

        Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of
Colorado, and MARTHA FULFORD, Administrator of the
Colorado Uniform Consumer Credit Code,

        Defendants.

Civil Action No. 1:24-cv-00812

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.    Plaintiffs National Association of Industrial Bankers (NAIB), American Financial

Services Association (AFSA), and American Fintech Council (AFC) bring this suit on behalf of

their members for declaratory judgment and injunctive relief against Philip J. Weiser, Attorney

General of the State of Colorado, and Martha Fulford, Administrator of the Colorado Uniform

Consumer Credit Code (UCCC), in their official capacities. Plaintiffs challenge Section 3 of

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023), which became law on June 5, 2023,

is codified at Colo. Rev. Stat. § 5-13-106, and will take effect on July 1, 2024.

2.    Section 3 attempts to opt Colorado out of Section 521 of the Depository Institutions

Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132,

164-65 (1980). DIDMCA Section 521 provides that a state-chartered bank may lend nationwide

at rates up to the higher of (i) its home state's interest-rate caps, or (ii) a federal interest-rate cap

(one percent above a specific Federal Reserve discount rate). Congress authorized states to opt out

**App. 12**

of DIDMCA Section 521—meaning that the opting-out state could continue to impose its own interest-rate caps—but it limited that opt-out right to loans "made in" the opting-out state. DIDMCA § 525, 94 Stat. 167. Under federal law, a loan is only "made in" a state *other than* the state where a bank is chartered when all the key functions associated with originating the loan— including the bank's decision to lend, communication of the loan approval decision, and disbursal of loan proceeds—occur in that other state.

3.      In enacting its opt out, Colorado far exceeded the authority Congress granted it under DIDMCA. Ignoring the federal definition of where a loan is deemed to be "made," Colorado seeks to impose its state interest-rate caps on *any* "consumer credit transaction[] in" Colorado. HB 23-1229 § 3. Colorado defines this to include, among other things, any loan to a Colorado consumer by any state-chartered bank that advertises on the internet in Colorado. This does not satisfy the functional, federal definition of where a loan is "made."

4.      Colorado's law is invalid on its face. *First*, Colorado's opt out is preempted by DIDMCA and violates the Supremacy Clause of the United States Constitution by attempting to expand the federally granted opt-out right to loans not actually "made in" Colorado under federal law. *Second*, the opt out violates the Commerce Clause because it will impede the flow of interstate commerce and subject state-chartered banks to inconsistent obligations across different states, creating a significant burden on interstate commerce.

5.      Nor will the opt out even accomplish Colorado's stated goals. Colorado promoted the opt out as part of its all-fronts war against predatory, payday-style lending. But the law is an ill fit for that aim. Plaintiffs' members are not payday lenders. To the contrary, they offer a wide variety of useful, familiar, everyday credit products—like personal installment loans, store-brand credit cards, and installment loans offered by retailers at "point of sale" to fund single larger-cost

**App. 13**

consumer purchases, often called "buy now, pay later" (BNPL) loans. These products are provided at a range of rate and fee options, which sometimes—to account for credit risk—are above Colorado's rate and fee caps, but within the rate caps allowed by DIDMCA. Colorado's opt out will prevent Plaintiffs' members from offering these mainstream products to many Colorado consumers.

6.      Yet at the same time, national banks will still offer these very same loan products to Colorado residents at interest rates in excess of Colorado's interest-rate and fee caps. That is because the National Bank Act (NBA), like DIDMCA, shields national banks from state interest-rate caps. But unlike DIDMCA, the NBA does not permit states to opt out.

7.      The net result is that Coloradans will continue to be offered the same products at interest rates above Colorado's rate caps but will have far less choice in what products they can select. State-chartered banks, including Plaintiffs' members, will no longer find it economically practicable to lend to many Colorado residents. Meanwhile, the consolidation of the Colorado consumer credit market into national banks will reduce competition and inevitably lead to higher rates. Shrinking credit availability combined with rising rates will most acutely affect Colorado consumers who, because of their credit risk profiles or thin credit history, have less access to credit generally. Perversely, these are the very consumers Colorado insists it is trying to protect with the opt out.

8.      This Court should enter judgment declaring that Section 3 is void with respect to loans not "made in" Colorado as defined by applicable federal law and enjoin Colorado from taking any action to enforce or give effect to Section 3 with respect to those loans.

### PARTIES

9.      Plaintiff NAIB is a Utah-based trade association representing industrial loan companies (ILCs). ILCs, or industrial banks, have been an integral part of the U.S. financial system

**App. 14**

for over a century, providing critical access to credit opportunities for those traditionally underserved by large national financial institutions. NAIB champions innovative financial services for Americans by expanding access to credit, guaranteeing consumer choice, and providing unique banking services. A list of NAIB's members is available at https://www.industrialbankers.org/about. NAIB members include ILCs chartered by states other than Colorado that offer a wide variety of useful, familiar, consumer credit products to Colorado consumers, either directly or via partner platforms, including retailers, manufacturers, finance companies, software as a service (SaaS) providers, and financial technology (Fintech) companies. These products include, for example, personal installment loans, BNPL loans to fund single purchases at the point of sale, and store-brand credit cards. While NAIB's members offer these products at a range of rate and fee options, they sometimes include interest rates or finance charges higher than those allowed under Colorado's interest-rate caps but legal in those institutions' home states.

10.     Founded in 1916, Plaintiff AFSA is the primary trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, direct and indirect vehicle financing, mortgages, payment cards, and credit for non-vehicle retail purchases. AFSA members do not offer payday or vehicle title loans. AFSA's mission is to promote safe, ethical lending to responsible, informed borrowers and to improve and protect consumers' access to credit. AFSA's members include a variety of state-chartered and national banks, as well as many non-bank state-licensed financial institutions. AFSA believes in and supports competition among various types of financial institutions, and its members include state banks chartered in states other than Colorado that offer credit cards and a variety of other financial products to Colorado consumers—sometimes at rates higher than those allowed under Colorado's interest-rate caps but

**App. 15**

legal in those institutions' home states. A list of AFSA's Board of Directors is available at https://afsaonline.org/about-afsa/leadership/.

11.    A standards-based organization, Plaintiff AFC is the premier trade association representing the largest Fintech companies and innovative banking-as-a-service (BaaS) banks. AFC's mission is to promote a transparent, inclusive, and customer-centric financial system by supporting responsible innovation in financial services and encouraging sound public policy. AFC members foster competition in consumer finance and pioneer products to better serve underserved consumer segments and geographies. AFC's members lower the cost of financial transactions, allowing them to help meet demand for high-quality, affordable products. Like Plaintiffs NAIB and AFSA, AFC's members include state-chartered depository institutions (chartered by states other than Colorado) that make loans to Colorado consumers, sometimes at rates higher than those allowed under Colorado's interest-rate caps. A list of AFC's members is available at https://fintechcouncil.org/who-we-are#Members.

12.    Plaintiffs' members are not so-called "payday" lenders. *See* AFSA, About AFSA, https://afsaonline.org/about-afsa/ (last visited Mar. 23, 2024); AFC, Membership Standards, https://fintechcouncil.org/what-we-do (last visited Mar. 23, 2024); NAIB, Industrial Bank Members, https://www.industrialbankers.org/about (last visited Mar. 23, 2024). They do not offer high-cost, short-term, small-dollar loans at exorbitant rates—the sort of loans Colorado has claimed it is trying to target with the opt out.

13.    If it becomes effective, Colorado's purported opt out of DIDMCA Section 521 will apply Colorado interest-rate and fee laws to loans that NAIB, AFSA and AFC members extend to Colorado consumers even though those loans are, as a matter of federal law, not "made in" Colorado but rather are "made in" the lenders' home states. Plaintiffs' members are already

**App. 16**

expending considerable resources and incurring unrecoverable costs to prepare to comply with Colorado's opt out. If the opt out goes into effect during this litigation, they will also: (i) irreparably lose revenue as a direct result of needing to lower interest rates and late fees; (ii) lose both revenue and goodwill through strained or lost relationships with customers (to whom they may need to cease lending), retailers (for which they offer store cards or point-of-sale financing), and other strategic partners; (iii) lose opportunities for new customer, retailer and partner relationships, including losing customers, retailers and partners to national banks; (iv) incur ongoing compliance costs; and (v) risk consumer lawsuits and Colorado enforcement actions.

14.     Declaring HB 23-1229 Section 3 to be unlawful and void, and enjoining its application with respect to loans that are not "made in" Colorado under federal law, would avoid these harms.

15.     Plaintiffs have associational standing to challenge Section 3 because (1) some of their members have individual standing to sue in their own right, as those members are subject to Section 3; (2) challenging Section 3 is germane to Plaintiffs' organizational purposes; and (3) members' individual participation is unnecessary in this facial challenge, which presents a question of law. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023).

16.     Defendant Philip J. Weiser is the Attorney General of the State of Colorado. Defendant Weiser is responsible for designating an assistant attorney general to serve as a UCCC Administrator, who enforces the UCCC. *See* Colo. Rev. Stat. §§ 5-6-103, 5-6-111, 5-6-114. He is sued in his official capacity.

17.     Defendant Martha Fulford is the UCCC Administrator charged with enforcing the UCCC, including bringing "civil action[s] to restrain a person from violating … [the UCCC] or

**App. 17**

rules or regulations promulgated thereunder and for other appropriate relief." Colo. Rev. Stat. § 5-6-111. She is sued in her official capacity.

## JURISDICTION AND VENUE

18.     This action arises under the Commerce Clause, art. I, § 8, cl. 3, and Supremacy Clause, art. VI, cl. 2, of the U.S. Constitution, as well as under DIDMCA Sections 521 and 525. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and federal law.

19.     This lawsuit presents an actual case or controversy within the Court's jurisdiction, and the Court has authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, to decide this dispute and award relief.

20.     This Court has personal jurisdiction over defendants because they reside in and perform their official duties in Colorado. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) for the same reasons, and because Plaintiffs and their members will suffer the injuries giving rise to this action in this District.

## BACKGROUND AND LEGAL PRINCIPLES

A.      **DIDMCA**

1.      **Federal law preempts state interest-rate caps for national banks**

21.     Banks in the United States may choose to be chartered and regulated either by a state or by the federal government. This "dual-banking" system "has been a hallmark of banking in the United States for nearly 200 years." Office of the Comptroller of the Currency (OCC), *National Banks and The Dual Banking System*, at 1 (Sept. 2003), https://tinyurl.com/bdew3pzv. The current system traces back to the enactment of the NBA in 1864. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10-11 (2007). Whereas state banks are regulated both by the federal government and the state in which they are chartered, under the NBA federally chartered banks

**App. 18**

(*i.e.*, national banks) generally are "governed by Federal standards administered by … the [OCC]—and not by state authority." OCC, Final Rule Regarding Office of Thrift Supervision Integration & Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,554 (2011).

22.     The NBA specifically preempts many state consumer protection laws from applying to national banks. As relevant here, NBA Section 85 provides that national banks may charge "interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] … greater." 12 U.S.C. § 85.

23.     In 1978, the Supreme Court unanimously held that NBA Section 85 allows a national bank to "export" the interest rates permitted in the state where the national bank is "located" when making loans to consumers who reside in other states. In that case, a national bank headquartered in Nebraska was permitted to make credit card loans to residents of Minnesota without regard to Minnesota's interest-rate limits. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311-12 (1978).

24.     In determining that First of Omaha was entitled to NBA preemption because it was "located" in Nebraska, the Supreme Court first noted that the bank itself was located where it was chartered, in Nebraska. *Id.* at 309. The Court then took a more contextual approach to addressing the specific credit card program at issue. The Court held that even though the borrowers were Minnesota residents, (i) credit was "extended … in Nebraska," (ii) "[f]inance charges … [we]re assessed by the bank in Omaha," (iii) "payments … [we]re remitted to the bank in Omaha," (iv) credit cards were "issue[d] … in Omaha," and (v) "credit assessments" prior to card issuance were made in Omaha. *Id.* at 311-12. Under those circumstances, applying Nebraska law made sense, the Supreme Court explained, because "Minnesota residents were always free to visit

**App. 19**

Nebraska and receive loans in that State" and "[i]t has not been suggested that Minnesota usury laws would apply to such transactions." *Id.* at 310-11.

25.     NBA Section 85 preemption as articulated in *Marquette* extends beyond "numerical" interest rates to other fees and charges, such as late fees. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740, 745-47 (1996).

26.     Thus, under NBA Section 85, interest-rate limits and fee restrictions contained in Colorado's laws do not apply to loans issued by national banks that are not chartered in Colorado. A loan issued by a national bank located in Delaware, for example, must comply with NBA Section 85 (and thus with the higher of Delaware's interest-rate limits and 1% more than the federal discount rate), but not with Colorado's limits on interest rates.

### 2.     DIDMCA extends preemption of state interest-rate limits to state-chartered banks

27.     Shortly after *Marquette* confirmed that national banks could export their home-state interest rates nationwide, without regard to other states' interest rate cap laws, Congress chose to put state-chartered banks on an equal footing with national banks.

28.     The late 1970s saw soaring inflation, and to combat this the Federal Reserve pumped up interest rates, *see* 125 Cong. Rec. 30655 (1979)—just like the Fed is doing now. But while national banks could, under NBA Section 85, lend at rates up to the higher of (i) 1% above that increased federal discount rate, or (ii) the maximum interest rate allowed by their home state, "state lending institutions were constrained in the interest they could charge by [their home-state] state usury laws which often made loans economically unfeasible." *Greenwood Tr. Co. v. Commonwealth of Mass.*, 971 F.2d 818, 826 (1st Cir. 1992); *see also* Fed. Deposit Ins. Corp. (FDIC), Final Rule Regarding Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,147 (July 22, 2020).

**App. 20**

29.     State interest-rate limits had not significantly constrained state banks' lending activities before the 1970s; but when faced with these high Federal Reserve-imposed rates, state-chartered banks in states with low interest-rate caps saw their own cost of borrowing become higher than the state interest-rate limits, thus preventing those banks from profitably offering consumer credit. State banks thus found themselves "at a distinct competitive disadvantage with national banks" operating alongside them. 126 Cong. Rec. 6907 (1980) (Statement of Sen. Bumpers). Under increasing pressure, state banks restricted credit availability to consumers in those states, and funds flowed out of those state banks. *See id.*; *Usury Lending Limits: Hearing on S. 1988 Before the Comm. on Banking, Hous., & Urb. Affs.*, 96 Cong. 1 ( 1979) (hereinafter *Usury Lending Limits*) (Statement of Sen. Proxmire); 125 Cong. Rec. 30655 (1979) (Statements of Sens. Pryor & Bumpers).

30.     Consumers located in the affected states—and in particular consumers living in rural areas, often served only by state banks—saw their sources of credit dry up. *See* 126 Cong. Rec. 7070-71 (1980) (Statement of Sen. Proxmire) (discussing "loan money drying up in some States and funds just flowing out of the State" due to interest-rate limits); 126 Cong. Rec. 6907 (1980) (Statement of Sen. Bumpers) (discussing "concentration of capital in urban areas"); *Usury Lending Limits*, 96 Cong. 2-3 (Statement of Gov. Bill Clinton).

31.     By passing DIDMCA, Congress threw a line to state-chartered banks. DIDMCA contained an array of amendments affecting the United States financial system, but, as relevant to this lawsuit, Section 521 of DIDMCA amended the Federal Deposit Insurance Act "to prevent discrimination against State-chartered insured depository institutions," 12 U.S.C. § 1831d(a), by authorizing state-chartered banks to lend at rates up to the same levels as national banks.

**App. 21**

32.     Section 521, like NBA Section 85 for national banks, expressly "preempt[s]" "any State constitution or statute" that would interfere with a state-chartered federally insured bank's ability to "charge … interest" at the "greater" of (1) the federal rate ("not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank … is located"); or (2) "the rate allowed by the laws of the State, territory, or district where the bank is located." 12 U.S.C. § 1831d(a).

33.     In other words, Section 521 permits state-chartered banks to lend at rates up to the higher of the federal cap or their "home" state's rate cap—without regard to the restrictive interest rate cap laws that were constraining them in their own home states.[1]

34.     DIDMCA preemption, like Section 85 preemption for national banks, also applies to other fees and charges, such as late fees. *See Greenwood Tr.*, 971 F.2d at 831.

### 3.     DIDMCA allows states to opt out of preemption for loans "made in" the opting-out state

35.     Given Congress's concern that DIDMCA preemption could encroach on a state's authority to regulate interest rates *for banks chartered by that state*, Congress added Section 525 to DIDMCA, which allowed states to "opt out" of the interest-rate preemption provisions in Sections 521 through 523 for loans "made in" the opting-out state. *See* 126 Cong. Rec. 7070 (1980) (Statement of Sen. Proxmire); *see also Usury Lending Limits*, 96 Cong. 47-49 (discussing states' rights). The Section 525 opt out thus allowed states to reject Congress's lifeline to their own state banks if they chose. *Cf.* 126 Cong. Rec. 7070 (1980) (Statement of Sen. Proxmire) (discussing ability of states to reimpose interest rate cap laws).

---

[1] DIDMCA Sections 522 and 523 similarly preempted state interest rate cap laws with respect to state-chartered savings and loan associations and credit unions. *See* 94 Stat. 165-66.

**App. 22**

36.     Specifically, Section 525 of DIDMCA provides:

> The amendments made by sections 521 through 523 of this title shall apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date … on which such State adopts a law … which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to loans made in such State[.]

DIDMCA § 525, 94 Stat. 167.

37.     Section 525 does not specifically define the term "made in such State[.]" It also does not provide that the meaning of "made in" should be interpreted by reference to state law. *See* ¶¶ 53-55, *infra*.

38.     The legislative history of DIDMCA confirms that the opt-out was designed to allow states to restore their pre-DIDMCA ability to restrict *their own in-state banks* from lending above their own state interest-rate limits, without regard for the federal rate. There is no suggestion in the legislative history of Section 525 that Congress intended to allow states to restrict the interest rates that *out-of-state banks* physically operating outside a state could charge when lending "into" an opting-out state (the rate exportation issue addressed in *Marquette*). *See, e.g.*, 125 Cong. Rec. 30655 (1979) (Statements of Sens. Pryor and Bumpers) (explaining the goal of DIDMCA preemption was to rescue state-chartered banks that could not compete within their own states against national banks in a high rate environment); 126 Cong. Rec. 6906-07 (1980) (Statements of Sens. Proxmire and Bumpers) (explaining that the opt out would allow states to nonetheless retain control over their own state banks, and that DIDMCA preemption will allow for competitive equality between state-chartered and nationally-chartered banks); 126 Cong. Rec. 7070-71 (1980) (Statement of Sen. Proxmire) (explaining that "[t]he States retain authority to define the power of State-chartered banks[,]" and DIDMCA meets the needs of the national economy by enabling state banks to make loans in a high interest-rate environment).

**App. 23**

39.     Pre-DIDMCA, state banks were not yet engaged in widespread national credit card lending like the national banks (the primary form of "rate exportation" in the 1970s); thus, this was not Congress's concern. Rather, Congress's concern when enacting DIDMCA was allowing state banks to escape their own states' interest-rate limits by relying on the federal rate; and its concern when enacting the opt-out was to restore to the states (if they wished) the right to address the inflation-induced interest-rate squeeze on their own state-chartered banks—not to restrict rate exportation by out-of-state state-chartered banks.

### 4.     After DIDMCA, some states opted out of, and then back in to, DIDMCA preemption

40.     Shortly after Congress enacted DIDMCA, seven states, including Colorado, plus one U.S. territory (Puerto Rico) invoked Section 525 to opt out of DIDMCA Sections 521 through 523 preemption. *See* 1981 Colo. Sess. Laws, ch. 73, § 1 (previously codified at Colo. Rev. Stat. § 5-13-104 (1993)) (original Colorado DIDA opt-out); *see also* 1980 Iowa Acts, ch. 1156, § 32; 1981 Me. Laws, ch. 218; 1981 Mass. Acts, ch. 231; 1982 Neb. Laws, LB 623, § 2; 1983 N.C. Sess. Laws, ch. 126, § 1; P.R. Laws, tit. 10, § 998l (adopted in 1980); 1981 Wis. Laws, ch. 45, § 50.

41.     However, as inflation continued to rage into the 1980s, six of the DIDMCA opt-out states—including Colorado—thereafter rescinded their opt-outs and opted back into DIDMCA. *See, e.g.*, 1994 Colo. Sess. Laws, ch. 272, § 12 (repealing original DIDMCA opt-out).

### B.     Colorado's interest-rate caps

42.     Colorado's UCCC governs consumer credit transactions in Colorado. Colo. Rev. Stat. § 5-1-201. Consumer credit transactions include various consumer loan products, such as personal loans and certain credit cards. See *id*. § 5-1-301(12), (15)(a).

43.     Colorado's laws weave a complex web of interest-rate restrictions ranging from 8% to 45%, depending on the nature of the transaction, the type of loan, and the amount. *See* Colo.

**App. 24**

Rev. Stat. §§ 5-2-201, 5-12-102. For example, for store-brand credit cards, lenders may not charge in excess of 21%. Colo. Rev. Stat. § 5-2-201(3)(a). For most other loan products—including certain personal installment loans—lenders may not charge in excess of the greater of either (i) 21% *or* (ii) the total of 36% on the portion of the balance that is $1,000 or less, 21% on the portion of the balance that is more than $1,000 but does not exceed $3,000, and 15% on the balance that is more than $3,000. Colo. Rev. Stat. § 5-2-201(2)(a). The UCCC also limits a number of bank fees, including capping late fees for certain loans at $15. *See id.* §§ 5-2-202, 5-2-203, 5-2-212.

44.     Under the UCCC, a consumer credit transaction is "made in" Colorado, and thus covered by the UCCC, if either "(a) A written agreement evidencing the obligation or offer of the consumer is received by the creditor in this state"[2]; or "(b) A consumer who is a resident of this state enters into the transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means." Colo. Rev. Stat. § 5-1-201(1)(a)-(b).[3]

45.     Colorado has moved aggressively in recent years to combat lending the state considers to be predatory, focusing on so-called "payday" and "alternative charge" high-cost, small-dollar, short-term loans. In 2018, Colorado passed Proposition 111, which amended the UCCC to limit interest rates and fees on so-called "payday" loans to 36 percent. *See* Colo. Rev.

---

[2] Pursuant to Colo. Rev. Stat. § 5-1-201(10), "received" means "obtained as a result of physical delivery, transmission, or communication to one who has actual or apparent authority to act for the creditor in this state whether or not approval, acceptance, or ratification by any other agent or representative of such creditor in some other state is necessary to give legal consequence to the consumer credit transaction."

[3] Colo. Rev. Stat. § 5-1-201(2) clarifies that "[n]otwithstanding paragraph (b) of subsection (1) of this section, unless made subject to this code by agreement of the parties, a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state."

**App. 25**

Stat. § 5-3.1-101.5. Colorado has also brought a series of enforcement actions against lenders, alleging violations of Colorado's limits on rates and fees.

### C.   Colorado HB 23-1229 Section 3

#### 1.   Colorado reenacts its DIDMCA opt-out

46.   On June 5, 2023, Colorado enacted HB 23-1229. It will in relevant part take effect on July 1, 2024. *See* HB 23-1229 § 6(4).

47.   Colorado promoted the law as part of its efforts to address predatory lending, and HB 23-1229 does include a provision intended to curb so-called "alternative charge loans," a form of high-cost, small dollar loans not covered by Colorado's 2018 payday loan legislation. HB 23-1229 § 2 (amending Colo. Rev. Stat. § 5-2-214).

48.   Central to this lawsuit, however, is that Section 3 of HB 23-1229 includes a renewed DIDMCA opt-out provision. The bill's sponsors characterized this provision, too, as part of Colorado's push to combat high-cost, small dollar lending. *See Concerning changes to consumer lending laws to limit charges to consumers: Hearing on HB 23-1229 before H. Fin. Comm.*, 2023 Leg., 73rd Sess. (Colo. 2023) (Statements of Reps. Javier Mabrey and Mike Weissman), https://tinyurl.com/25x72u2v (last visited Mar. 24, 2024) (opt out meant to ensure "borrowers are protected by Colorado's own lending laws" and prevent out-of-state state banks from circumventing Colorado's consumer protections).

49.   Instead, Section 3 will harm Colorado borrowers.

50.   Section 3 provides:

In accordance with section 525 of [DIDMCA], the general assembly declares that the state of Colorado does not want the amendments … made by sections 521 to 523 of [DIDMCA], prescribing interest rates and preempting state interest rates to apply to consumer credit

15

**App. 26**

> transactions in this state. The rates established in articles 1 to 9 of
> this title 5 control consumer credit transactions in this state.

HB 23-1229 § 3 (codified at Colo. Rev. Stat. § 5-13-106).

51.   The wording of Colo. Rev. Stat. § 5-13-106 does not track DIDMCA Section 525 (*supra* ¶ 36) "explicitly and by its terms," as Section 525 requires. Instead of stating that Colorado "does not want the amendments … to apply *with respect to loans made in*" Colorado, as Section 525 mandates, Colorado's opt-out provides that the state "does not want the amendments … prescribing interest rates and preempting interest rates to apply *to consumer credit transactions in* this state." (emphases added).

52.   Given the UCCC's extraordinarily broad definition of when a consumer credit transaction is deemed "made in" Colorado, *see* ¶ 44, *supra*, Colorado's opt out will apply far more expansively than Congress authorized or intended through Section 525, including to (1) nearly any loan that a Colorado consumer chooses to enter into while physically in Colorado—no matter where the lender is located, or where the loan is "made" under settled federal precedent; and (2) any loan made to anyone anywhere, if the creditor "receive[s]" the loan agreement in Colorado. *See* Colo. Rev. Stat. § 5-1-201(1)(a)-(b).

### 2.   Section 3 improperly exceeds Colorado's opt-out rights under DIDMCA

53.   While Congress conferred on states the authority to *enact* opt outs from DIDMCA, Congress did not envision or authorize that the opt outs, or their scope, should be understood by reference to state law.

54.   Federal courts turn to federal law when interpreting federal statutes such as DIDMCA. *See Hill v. Whitlock Oil Servs., Inc.*, 450 F.2d 170, 173 (10th Cir. 1971) ("Federal, not local, law applies in the interpretation and application of federal statutes.") (citing *Prudence Realization Corp. v. Geist*, 316 U.S. 89, 95 (1942)). Unless Congress specifically provides that a

**App. 27**

federal law is to be interpreted with reference to state law, federal law governs a federal law's interpretation. *See, e.g.*, *Jerome v. United States*, 318 U.S. 101, 104-05 (1943) (noting that courts "generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law").

55.     Accordingly, because Section 525 is a federal statute, and Section 525 does not incorporate any state definitions, a uniform federal definition of where a loan is "made" governs DIDMCA opt outs, not Colorado's chosen definition found in UCCC Section 5-1-201(1). *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (citing *Jerome*, 318 U.S. at 104); FDIC Interp. Ltr. 88-45 (June 29, 1988), 1988 FDIC Interp. Ltr. LEXIS 46, at *4 ("Section 525 is a Federal statute. It must be interpreted as having a single meaning throughout the nation.").

56.     When Congress preserved states' rights to "opt out" from DIDMCA preemption of state interest-rate limits for loans "made in" the opting-out state, Congress meant just that: States that opted out could still impose their interest -rate limits on loans actually made in the opting-out state within the meaning of federal law. Under the plain text, that opt-out right does not look to where a *consumer* is located; it turns on where the key functions associated with originating ("mak[ing]") the *loan* take place. *See* DIDMCA § 525, 94 Stat. 167.

57.     The meaning of "made in" in DIDMCA Section 525 accords with the practical, functional analysis the Supreme Court undertook in *Marquette*, decided just two years before DIDMCA was enacted. *Marquette* held that for the purposes of determining whether a state's interest rate cap law is preempted under NBA Section 85, a national bank is located where its lending operations physically occur, not where its customers may live or use their credit cards:

> Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the

**App. 28**

> bank's honoring of the sales drafts of participating Minnesota merchants and banks. Finance charges on the unpaid balances of cardholders are assessed by the bank in Omaha, Neb., and all payments on unpaid balances are remitted to the bank in Omaha, Neb. Furthermore, the bank issues its BankAmericards in Omaha, Neb., after credit assessments made by the bank in that city.

*Marquette*, 439 U.S. at 311-12. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").

58.     Federal banking regulators and courts have long confirmed this approach to determining where a bank is located and makes its loans. Both the OCC and the FDIC, for example, have consistently explained in related contexts that under federal law a bank is "located" in the state in which it is chartered *unless all three* "non-ministerial" functions involved in making a loan all physically occur in another state: (1) loan approval; (2) disbursal of loan proceeds; and (3) communication of the credit decision. *See* OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020); FDIC General Counsel's Op. No. 11, Interest Changes by Interstate State Banks, 63 Fed. Reg. 27282 (May 18, 1998); *see also* 85 Fed. Reg. at 44,148, 44,153 (discussing when a loan is made for purposes of federal law).[4]

59.     Although the statutory terms "located" (as used in DIDMCA Section 521 and NBA Section 85) and "made in" (as used in Section 525) need not be coextensive, they do overlap significantly. And because they are both focused on functional inquiries into the extension of credit, regulators and courts have considered some of the same factors interchangeably, applying

---

[4] Loan approval occurs in the state where the person charged with approving or denying the credit is located. 63 Fed. Reg. at 27286 (*citing* OCC Interp. Ltr. No. 822, 1998 WL 121663 (Feb. 17, 1998)). The site of final approval is the state in which credit is granted. *Id*. Disbursal occurs in the state where loan proceeds are physically disbursed from the bank. *Id*. This is distinct from the *delivery* of previously disbursed funds. Loans can be disbursed in person or credited to an account at a branch. *Id*. The site that first communicates approval of a loan to a customer extends the credit. *Id*.

**App. 29**

*Marquette*'s functional approach in considering where a loan is "made." *See, e.g.*, 63 Fed. Reg. at 27286 (Congress intended courts to inquire into location of non-ministerial functions in determining "where a loan *is made* for purposes of determining the state [interest-rate] law to be applied to a loan") (emphasis added); OCC Interp. Ltr. No. 822, 1998 WL 121663, at *5 (outlining "three element test of where a loan *is made* by an interstate bank") (emphasis added)); FDIC Interp. Ltr. 88-45, 1988 FDIC Interp. Ltr. LEXIS 46, at *4 ("The determination of where a loan is made" depends on "an analysis of the facts surrounding the extension of credit."); *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 897 (N.D. Ill. 2000) ("All three of the 'non-ministerial functions' must occur at the host state branch for the loan to be considered *made* in the host state") (emphasis added), *aff'd on reconsideration*, No. 99C735, 2001 WL 1426518, at *1 (N.D. Ill. Feb. 8, 2001).

60.    This articulation of the inquiry by regulators and courts is consistent with the program-specific analysis in *Marquette*, is workable, and promotes a consistent standard for modern-day, interstate, online banking (rather than different regimes applied by each opting-out state), while still preserving the state sovereignty Congress intended to protect with Section 525.

61.    Under Section 525, states thus may choose to regulate their own state-chartered institutions. But DIDMCA Section 525 does not authorize—and Congress never intended it to authorize—a state to opt out with respect to all loans made to a consumer living in an opting-out state without regard to whether the loan was made by an out-of-state bank that has no base of operations in the opting-out State. States may not invoke the Section 525 opt out to regulate out-of-state state-chartered banks that do not engage in any lending-related decision-making or other "non-ministerial" lending operations in the opting-out state. When a consumer borrows from an out-of-state bank through the internet, via a mobile app, or by phone, that loan is not "made in" the consumer's state, and under federal law, the opt-out cannot affect the loan.

**App. 30**

### D.     Effects of Colorado's Opt-Out

#### 1.     The opt out will affect a wide variety of credit products offered by Plaintiffs' members, many of which are state-chartered banks

62.     Plaintiffs' members offer consumers in Colorado a wide variety of useful, familiar, everyday credit products, at a range of rates and fee options. These products include (i) personal installment loans, which can be used for debt consolidation, financial emergencies, to finance large purchases, family vacations, milestone events such as weddings, medical expenses, home improvements, and the like; (ii) BNPL loans offered by retailers at "point of sale" to fund single larger-cost consumer purchases, such as major appliances; (iii) general purpose credit cards that charge fees above a capped percentage of the credit line; (iv) private label, or "closed loop," store-brand, credit cards usable only at a single merchant; and (v) direct vehicle finance loans made for the purpose of purchasing certain new or used vehicles. Plaintiffs' members do not offer high-cost, short-term, small dollar loans at exorbitant rates—the sort of loans Colorado claims it is trying to target with the opt out.

63.     The ability to offer their products at rates above those permitted by the Colorado UCCC—but that are legal under DIDMCA—allows Plaintiffs' members to offer credit to consumers who would not otherwise have access to it because their credit profiles would be deemed too risky. Often, being able to charge a higher rate or fee to account for risk of default (or for purposes of deterring default) means the difference between being able to offer borrowers with higher risk profiles a loan and determining that it is too costly to offer them credit at all.

64.     Plaintiffs are committed to responsible and ethical lending, and to protecting access to credit and consumer choice. But if Colorado's opt out goes into effect as intended, and applies to loans made to Colorado consumers by Plaintiffs' members located outside Colorado, Plaintiffs'

**App. 31**

members will be forced to curtail lending to some or all Colorado residents, reducing Coloradans' access to responsible, popular, and useful consumer credit products.

## 2. National banks are not affected by Colorado's opt out but offer materially identical products, with materially identical rates and fees, as state-chartered banks

65.     Meanwhile, the opt out will have no effect on national banks that lend to Colorado consumers. They will still be shielded by NBA preemption. *See Marquette*, 439 U.S. 299; *Smiley*, 517 U.S. 735; 12 U.S.C. § 85. Many national banks currently export their rates and fees into Colorado, often charging rates in excess of the limits in the Colorado UCCC.

66.     National banks offer similar products to Colorado consumers as Plaintiffs' members, with a similar range of APRs and interest rates. For example, many national banks offer personal installment loans for amounts and loan terms similar to those offered by many of Plaintiffs' members—and at APRs ranging to over 30% APR, often including origination fees.[5] Several national banks offer "installment on card" loans, allowing consumers to split a single large credit card charge into a separate installment payment plan, also with APRs over 21%.[6] And national banks also partner with retailers to offer store-brand credit cards that exceed the UCCC's 21% rate cap, with rates often in excess of 30% APR, and late fees over $40.[7]

---

[5]  *See, e.g.*, Personal Loans, SoFi, https://tinyurl.com/3zdsme27 (last visited Mar. 23, 2024) (product descriptions and APR disclosures for SoFi Bank, N.A.); Personal Loans, TD Bank, N.A., https://tinyurl.com/4j33pv6n (last visited Mar. 23, 2024); Personal Loans, LendingClub Bank, N.A., https://tinyurl.com/mtcp4zby (last visited Mar. 23, 2024); Personal Loans, First Nat'l Bank of Omaha, https://tinyurl.com/48x7tspc (last visited Mar. 23, 2024).

[6]  *See, e.g.*, Citi Simplicity Card Terms & Conditions, Citi Bank, https://tinyurl.com/kyeck63y (last visited Mar. 23, 2024) (APR and fee information).

[7]  *See, e.g.*, Retail Credit Cards, Synchrony, https://tinyurl.com/445sxw75 (last visited Mar. 23, 2024) (explaining that Synchrony is "the leading issuer of private label credit cards"); Card Issued by TD Bank, N.A., Target, https://tinyurl.com/uca4xd5h (last visited Mar. 23, 2024) (product descriptions); Card Issued by TD Bank, N.A., Nordstrom, https://tinyurl.com/ydrjrycs (last visited

**App. 32**

67.     These national banks do not currently, nor will they ever have to, adhere to the Colorado UCCC's rate and fee caps for these products.

> **3.      Plaintiffs' members, as well as Colorado consumers, will be injured by Colorado's purported opt out**

68.     Plaintiffs' members will suffer irreparable harm if Colorado's opt out takes effect without a judicial declaration that the opt out is inapplicable for loans not "made in" Colorado as defined by federal law.

69.     Specifically, and as described *supra* ¶ 13, Plaintiffs' members have already begun to incur both compliance costs and the cost of strained relationships with partners in preparing to comply with the opt out. And once the law goes into effect, Plaintiffs' members will (i) lose revenue as a result of lower interest rates and fees; (ii) lose both revenue and goodwill through strained or lost relationships with customers, retailers, and other partners; (iii) lose opportunities for new customer and retailer relationships, including losing customers and retailers to national banks; (iv) incur ongoing compliance costs; and (v) risk consumer lawsuits and enforcement actions.

70.     The balance of equities favors injunctive relief against Colorado's opt out. Colorado consumers—whom Defendants are duty-bound to protect—will suffer harm themselves if the law goes into effect as intended. Consumers, particularly those at the low end of the credit spectrum, will have reduced access to the responsible, needed consumer credit products offered by Plaintiffs' members. These products will likely be offered by far fewer financial institutions if state-chartered institutions can no longer profitably offer them to Coloradans. Yet national banks

---

Mar. 23, 2024) (available by clicking "APR and Fee Information" hyperlink); Card Issued by Citibank, N.A., Macy's, https://tinyurl.com/mr3wu7w5 (last visited Mar. 23, 2024); Pottery Barn Card Issued by Capital One Bank, N.A., https://tinyurl.com/2c6p3fw7 (last visited Mar. 23, 2024) (rate and fee information).

**App. 33**

will be able to continue to charge the same rates for these same products. Under Colorado's new regime, state-chartered banks will simply be unable to compete with them effectively. With reduced competition from state banks, national banks will have less incentive to constrain their rates for these products.

**CLAIMS**

**COUNT ONE**
**Violation Of The Supremacy Clause Of The United States Constitution and Sections 521 and 525 of the Depository Institutions Deregulation and Monetary Control Act of 1980**

**(U.S. Const. art. VI, cl. 2; Pub. L. No. 96-221, 94 Stat. 132, 164-165, 167 (1980))**

71.     Plaintiffs incorporate all the prior paragraphs of this Complaint.

72.     Colorado's definition of when a loan is "made in" Colorado for purposes of its DIDMCA opt out goes far beyond that allowed by federal law, and thus Colorado's DIDMCA opt out violates the Supremacy Clause, is preempted by DIDMCA, and is invalid.

73.     Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," have no force or effect. *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824).

74.     Section 525 only authorizes states to opt out from DIDMCA's preemption provisions, including Section 521, "with respect to loans *made in* such State." DIDMCA § 525, 94 Stat. 167 (emphasis added). And Section 521 expressly "preempt[s]" "any State constitution or statute" that purports to limit the ability of state-chartered banks to lend at their home-state rates with respect to loans not covered by the Section 525 opt out.

75.     A loan is "made in" a state other than a bank's home state only if *all* the functions involved in making the loan, including approval and disbursal, occur in that other state. DIDMCA Section 525 incorporates that settled, federal definition of "made in," which focuses on the core functions surrounding the extension of credit.

**App. 34**

76.     Contrary to Section 525, Colorado's UCCC treats almost all loans to Colorado consumers—including all loans by an out-of-state bank that ever advertises in the state online, or where a loan agreement is received by the bank in Colorado—as "made in" Colorado regardless of where the "non-ministerial functions" occur. *See* Colo. Rev. Stat. § 5-1-201(1).

77.     Indeed, Colorado's disregard for controlling federal law is evident on the face of its opt out. Whereas Section 525 authorizes a state to opt out of DIDMCA sections 521 through 523 if the state "adopts a law … which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to *loans made in* such State," DIDMCA § 525, 94 Stat. 167 (emphasis added), Colorado's opt-out purports to apply to all "*consumer credit transactions in this state*," HB 23-1229 § 3 (emphasis added). Colorado's recipient-focused triggers, *see* Colo. Rev. Stat. § 5-1-201(1)(a)-(b), differ substantially from the functional analysis of a *bank*'s activities that the federal definition of "made in" requires.

78.     That is simply not what Section 525 permits, or what Congress intended. Rather, Congress allowed states to opt out with respect to loans "made in" a state *as defined under federal law*, not as each state may independently choose to define that term.

79.     By purporting to opt out with respect to any consumer credit transaction involving a Colorado consumer, Colorado disregards the plain terms of DIDMCA, usurps federal authority to define where a loan is made for purposes of DIDMCA, and intrudes on the ability of other states to regulate loans made within their borders.

80.     Colorado's opt out violates the Supremacy Clause and is preempted.

### COUNT TWO
### Violation Of The Commerce Clause Of The United States Constitution

### (U.S. Const. art. I, § 8, cl. 3)

81.     Plaintiffs incorporate all the prior paragraphs of this Complaint.

**App. 35**

82.     Section 3 violates the Dormant Commerce Clause because Colorado's interpretation of where a loan is made under its own laws—rather than under federal law as DIDMCA requires—subjects out-of-state banks to inconsistent obligations across states and would impede the flow of commerce.

83.     The Commerce Clause of the U.S. Constitution grants Congress the sole authority "[t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. Deriving from that grant of constitutional power, the Dormant Commerce Clause limits state action that unduly restricts interstate commerce.

84.     States lack the authority to enact protectionist state statutes that discriminate against and "burden[] out-of-state competitors." *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (discussing Dormant Commerce Clause jurisprudence). Nor can state laws contribute to "a lack of national uniformity" that impedes commerce. *Id.* at 379 n.2. And the Dormant Commerce Clause bars state laws that regulate only intrastate activities when they increase "the likelihood" for "inconsistent obligations" across states, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986), where the resultant burden exceeds local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

85.     The application of Colorado's interest-rate laws to loans that are "made in" other states as a matter of federal law—as mandated by Section 3—is unconstitutional under these principles. If each opting-out state could choose to apply its own law to any loan that bore any connection to that state, state-chartered banks would face conflicts and uncertainty in determining what law applied to any given loan. Section 3 thus increases "the likelihood" for "inconsistent obligations" across states, *Brown-Forman Distillers*, 476 U.S. at 583, and its burden on commerce plainly exceeds the putative local benefits it presumably was enacted to confer on Coloradans.

**App. 36**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that any attempt to apply or enforce the Colorado UCCC, Colo. Rev. Stat. §§ 5-1-101 *et seq.*—including the opt out contained in Colo. Rev. Stat. § 5-13-106—with respect to loans not made in Colorado (as defined by federal law), even if those loans are considered made in Colorado under Colo. Rev. Stat. § 5-1-201(1), is preempted, invalid, and a violation of the Supremacy Clause;

2.      Declare that any attempt to enforce the Colorado UCCC and Colo. Rev. Stat. § 5-13-106 with respect to loans made outside Colorado (as defined by federal law described above), even if those loans are considered made in Colorado under Colo. Rev. Stat. § 5-1-201(1), violates the Dormant Commerce Clause;

3.      Preliminarily and permanently enjoin Defendants and their agents from taking any action to enforce or give effect to the Colorado UCCC with respect to loans that, under federal law, are not made in Colorado;

4.      Enter judgment in favor of NAIB, AFSA and AFC; and

5.      Award NAIB, AFSA and AFC all other relief the Court deems just and proper.

**App. 37**

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

TYLER J. BOURKE
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 622-3150
tylerbourke@dwt.com

CHRIS SWIFT*
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

/s/ David M. Gossett
DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
Ed.Perlmutter@hklaw.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER*
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ*
LESLIE B. ARFFA*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

*\*admission to U.S. District Court for the District of Colorado pending*

*Attorneys for the American Fintech Council*

DATED: March 25, 2024

**App. 38**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA FULFORD,
Administrator of the Colorado Uniform Consumer Credit Code,

Defendants.

_____

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
_____

**App. 39**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

LOCAL RULE 7.1(a) CERTIFICATION ................................................... vii

INTRODUCTION ........................................................................................ 1

BACKGROUND .......................................................................................... 2

    A.    DIDMCA preemption and the DIDMCA "opt-out" ............................... 2

        1.    The National Bank Act preempts state rate and fee caps for national banks. ........................................................................... 2

        2.    DIDMCA extends this preemption to state-chartered banks. ..... 4

        3.    DIDMCA allows states to opt out of preemption, but only for loans "made in" the opting-out state. ................................... 5

        4.    Post-DIDMCA opt-outs ............................................................. 6

    B.    Colorado's rate and fee limits ............................................................. 6

    C.    H.B. 23-1229 Section 3 ........................................................................ 6

    D.    Section 3's effects ............................................................................... 7

ARGUMENT ................................................................................................. 9

    This Court Should Preliminarily Enjoin Section 3 As Invalid And Unenforceable With Respect To Loans Not "Made In" Colorado Under Federal Law. ....................................................................................... 9

    A.    Plaintiffs are likely to succeed on the merits because the opt-out is preempted by DIDMCA for loans that are not "made in" Colorado under federal law ........................................................................... 9

        1.    Federal law governs where a loan is "made" for purposes of Section 525 ............................................................................ 9

        2.    "Made," for purposes of Section 525, turns not on the location of the customer but on where the bank approves and extends the loan. ....... 10

            a.    The statutory text focuses on loan creation, not borrower location. ..................................................................... 11

            b.    Congressional understanding confirms a loan-creation-focused approach. ..................................................... 12

            c.    Federal regulators consistently endorse a loan-creation-focused methodology. ............................................... 13

            d.    Judicial precedent confirms this federal, loan-creation-focused methodology. ............................................... 14

**App. 40**

3.      Colorado's interpretation of "made in" is wrong and undermines DIDMCA. ................................................................................ 15

B.      Plaintiffs' members will suffer irreparable harm in the absence of a preliminary injunction. ........................................................................ 16

C.      The balance of equities favors maintaining the status quo. ................... 17

CONCLUSION ................................................................................................ 18

CERTIFICATE OF TYPE-VOLUME COMPLIANCE ............................................... 20

CERTIFICATE OF SERVICE ................................................................................ 21

**App. 41**

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Barrington v. United Airlines, Inc.*,
566 F. Supp. 3d 1102 (D. Colo. 2021)................................................................16, 17

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ..........................................................................17

*Denver Homeless Out Loud v. Denver, Colo.*,
32 F.4th 1259 (10th Cir. 2022) ..........................................................................9

*Hill v. Whitlock Oil Servs., Inc.*,
450 F.2d 170 (10th Cir. 1971) ..........................................................................9

*Jerome v. United States*,
318 U.S. 101 (1943)..........................................................................................10

*Jessup v. Pulaski Bank*,
327 F.3d 682 (8th Cir. 2003) ............................................................................14

*Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*,
31 F.3d 1536 (10th Cir. 1994) ..........................................................................17

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978).................................................................................. *passim*

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)..........................................................................................11

*Miss. Band of Choctaw Indians v. Holyfield*,
490 U.S. 30 (1989)............................................................................................10

*MorEquity, Inc. v. Naeem*,
118 F. Supp. 2d 885 (N.D. Ill. 2000), *aff'd on reconsideration*,
No. 99C735, 2001 WL 1426518 (N.D. Ill. Feb. 8, 2001)................................14, 15

*Orizon Aerostructures, LLC v. Crumley*,
No. 2:23-CV-02069-EFM, 2023 WL 3376774 (D. Kan. May 11, 2023),
*appeal dismissed*, No. 23-3110, 2023 WL 8642999 (10th Cir. Nov. 29, 2023)......................18

*Prudence Realization Corp. v. Geist*,
316 U.S. 89 (1942)............................................................................................9

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ........................................................................17

**App. 42**

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996)................................................................................4

**State Cases**

*Stoorman v. Greenwood Tr. Co.*,
    908 P.2d 133 (Colo. 1995)..............................................................4, 14

*Stoorman v. Greenwood Tr. Co.*,
    888 P.2d 289 (Colo. App. 1994), *affirmed on alternate grounds*,
    908 P.2d 133 (Colo. 1995)................................................................14

**Constitutional Provisions**

U.S. Const. Art. VI, cl. 2..........................................................................9

**Federal Statutes**

Depository Institutions Deregulation and Monetary Control Act of 1980,
    Pub. L. No. 96-221, 94 Stat. 132 (1980)....................................*passim*

Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994,
    Pub. L. No. 103-328, 108 Stat. 2338 (1994).................................12, 14

12 U.S.C. § 85............................................................................*passim*

12 U.S.C. § 1831d(a) ..............................................................................4, 9

**State Statutes**

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023)................*passim*

Colo. Rev. Stat. § 5-1-201 ......................................................*passim*

Colo. Rev. Stat. § 5-1-301 ................................................................6

Colo. Rev. Stat. § 5-2-201 ................................................................6

Colo. Rev. Stat. § 5-2-202 ................................................................6

Colo. Rev. Stat. § 5-2-203 ................................................................6

Colo. Rev. Stat. § 5-2-212 ................................................................6

Colo. Rev. Stat. § 5-3.1-101.5 ..........................................................6

Colo. Rev. Stat. § 5-13-106 ...............................................................7

1981 Colo. Sess. Laws, Ch. 73, § 1 ..................................................6

**App. 43**

1994 Colo. Sess. Laws, Ch. 272, § 12 ..............................................................6

**Rules**

Fed. R. Civ. P. 56(f)(3) ..................................................................................18

Fed. R. Civ. P. 65 ............................................................................................1

Local Rules of Practice of the United States District Court for the
    District of Colorado, Rule 7.1(a) ............................................................ vi

**Regulations**

FDIC, Federal Interest Rate Authority,
    85 Fed. Reg. 44,146 (July 22, 2020) ......................................................13

FDIC Gen. Counsel's Op. No. 11, Interest Charges by Interstate State Banks,
    63 Fed. Reg. 27,282 (May 18, 1998) ......................................................13

FDIC Interp. Ltr. 88-45, 1988 WL 583093 (June 29, 1988) ...................10, 13

OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020)................13, 14

**Legislative History**

125 Cong. Rec. 30655 (1979) .....................................................................4, 5

126 Cong. Rec. 6892-6913 (1980) .........................................................4, 5, 10

126 Cong. Rec. 6965-66 (1980) .....................................................................4

126 Cong. Rec. 7062-73 (1980) ............................................................4, 5, 10

140 Cong. Rec. 24463 (1994) ......................................................................12

Comm. Hearing on 1988 Neb. Laws, LB 913, 9335 ......................................6

*Usury Lending Limits: Hearing on S. 1988 Before the Comm.
    on Banking, Hous., & Urb. Affs.*, 96 Cong. 1 (1979) ............................4, 5

**Other Authorities**

CFPB, *What is a payday loan?* (Jan. 17, 2022), https://perma.cc/E95D-BSYW ...........................6

Ctr. Cap. Mkts. Competitiveness, *The Economic Benefits of Risk-Based Pricing for Historically
    Underserved Consumers in the United States* (Spring 2021),
    https://perma.cc/5EUG-DPZC .................................................................8

**App. 44**

Office of the Comptroller of the Currency, *National Banks and The Dual Banking System*, (Sept. 2003), https://perma.cc/AR2U-98NY .......................................................................3

Webster's New Collegiate Dictionary (1975 ed.).........................................................11

**App. 45**

## LOCAL RULE 7.1(a) CERTIFICATION

I hereby certify, pursuant to Rule 7.1(a) of the Local Rules of Practice of the United States District Court for the District of Colorado, as follows:

Plaintiffs filed their Complaint in this matter on Monday, March 25, 2024. Later that same day, the parties held a meet-and-confer by videoconference to discuss the litigation and Plaintiffs' plan to seek a preliminary injunction, after which the parties exchanged a series of follow-up emails. On Wednesday, March 27, Defendants informed Plaintiffs by email that they would not consent to a preliminary injunction.

/s/ David M. Gossett_____

DATED: April 2, 2024

## INTRODUCTION

Colorado seeks to do what Congress said it cannot—limit the interest rates and fees that out-of-state state-chartered banks may charge on loans they make *outside* Colorado's borders to Colorado residents. Plaintiffs National Association of Industrial Bankers, American Financial Services Association, and American Fintech Council challenge this law, Section 3 of H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023), which will take effect on July 1, 2024. Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs ask the Court to preliminarily enjoin enforcement of Section 3 for loans not "made in" Colorado under federal law.

*First*, Plaintiffs are likely to win on the merits. Section 3 purports to opt Colorado out of Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132, 164-65 (1980). DIDMCA Section 521 provides that a state-chartered bank may lend nationwide at rates up to the higher of (i) its home state's interest-rate caps, or (ii) a federal interest-rate cap. Congress authorized states to opt out of Section 521— allowing opting-out states to mandate compliance with their state interest-rate caps—but it limited that opt-out right to loans "made in" the opting-out state. DIDMCA § 525, 94 Stat. 167. Under federal law, a non-Colorado bank "ma[kes]" a loan "in" Colorado only when all the key functions associated with originating the loan—including the bank's decision to lend, communication of that decision, and disbursal of funds—occur in Colorado.

Colorado's purported opt-out does not adhere to the federal definition of where a loan is "made," and thus exceeds Colorado's authority to opt out under DIDMCA. Colorado seeks to impose its state interest-rate caps on *all* "consumer credit transactions in" Colorado, H.B. 23-1229 § 3, which Colorado sweepingly defines to include any loan to a Colorado resident by a bank that advertises by any means in Colorado. *See* Colo. Rev. Stat. § 5-1-201(1). DIDMCA does not authorize states to expand the opt-out in this way.

1

**App. 47**

*Second*, unless Section 3 is enjoined as to loans not "made in" Colorado, Plaintiffs' member state-chartered banks will be irreparably harmed. They are already expending considerable resources to prepare to comply with it. If it goes into effect, they stand to lose significant revenue, suffer irreparable damage to goodwill, lose opportunities for new customers and clients, incur ongoing compliance costs, and face the risk of lawsuits and enforcement actions.

*Third*, the balance of the equities weighs in favor of maintaining the status quo. Colorado promoted the opt-out as targeting "payday"-style lending, but the law is an ill fit for that aim. It will instead prevent Plaintiffs' members—who are not payday lenders—from offering a wide variety of useful, everyday credit products, such as personal installment loans and store-brand credit cards, to many Colorado consumers. These products are offered at a range of rates and fees legal under DIDMCA's home-state/federal rate cap rule—but sometimes, to account for the borrower's credit risk, above Colorado's caps. Colorado's opt-out will make it economically impracticable for Plaintiffs' members to offer these products to those Colorado consumers who, because of their credit-risk profiles or thin credit history, have less access to credit generally. At the same time, national banks will still offer these same products at rates above Colorado's caps, because the National Bank Act (NBA) shields national banks from state interest-rate caps—but unlike DIDMCA, contains no state opt-out mechanism. Coloradans will lose choice but not gain the State's supposed protections.

## BACKGROUND

**A.    DIDMCA preemption and the DIDMCA "opt-out"**

**1.    The National Bank Act preempts state rate and fee caps for national banks.**

Banks in the United States may choose to be chartered and regulated either by a state or by the federal government. This "dual-banking" system predates the enactment of the NBA in 1864.

**App. 48**

*See* Office of the Comptroller of the Currency (OCC), *National Banks and The Dual Banking System*, at 1 (Sept. 2003), https://perma.cc/AR2U-98NY. Whereas state banks are regulated by both the federal government and the state in which they are chartered, under the NBA, national banks are governed primarily by federal standards administered by the OCC.

The NBA preempts certain state laws from applying to national banks. In particular, NBA Section 85 provides that national banks may charge "interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] greater." 12 U.S.C. § 85.

In 1978, the Supreme Court unanimously held that NBA Section 85 allows a national bank to apply the interest rates permitted in the state where the bank is "located" when making loans to consumers who reside in other states. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978). *Marquette* held that a national bank headquartered in Nebraska could make credit card loans to Minnesota residents without regard for Minnesota's rate limits. *Id.* at 311-12. The Supreme Court explained that the bank was "located" where it was chartered: Nebraska. *Id.* at 309. The court then emphasized that even though the borrowers were Minnesota residents, (i) credit was "extended … in Nebraska," (ii) "[f]inance charges … [we]re assessed by the bank in Omaha," (iii) "payments … [we]re remitted to the bank in Omaha," (iv) credit cards were "issue[d] … in Omaha," and (v) "credit assessments" prior to card issuance were conducted in Omaha. *Id.* at 311-12. Under those circumstances, applying Nebraska interest rate laws made sense because "Minnesota residents were always free to visit Nebraska and receive loans in that State" and "[i]t has not been suggested that Minnesota usury laws would apply to such transactions." *Id.* at 310-11.

**App. 49**

The Court later clarified that Section 85 preemption extends beyond "numerical" rates to other fees and charges, including late fees. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 745-47 (1996). Thus, under the NBA, Colorado's rate and fee caps do not apply to loans issued by national banks with key lending operations outside Colorado.

### 2. DIDMCA extends this preemption to state-chartered banks.

Shortly after *Marquette*, Congress chose to put state-chartered banks on an equal footing with national banks. During the soaring inflation of the late 1970s, when the Fed raised interest rates (like it has done recently), state-chartered banks in states with low interest-rate caps saw their *own* cost of borrowing exceed those caps, preventing them from profitably offering consumer credit. *See* 125 Cong. Rec. 30655 (1979) (Statement of Sen. Pryor); 126 Cong. Rec. 6965-66 (1980) (Statement of Rep. Reuss). State banks thus found themselves "at a distinct competitive disadvantage with national banks" operating alongside them, which could lend at higher rates under Section 85. 126 Cong. Rec. 6907, 7070-71 (1980) (Statements of Sens. Bumpers, Proxmire); *Usury Lending Limits: Hearing on S. 1988 Before the Comm. on Banking, Hous., & Urb. Affs.*, 96 Cong. 1, 2-3 (1979) (Statements of Sen. Proxmire, Gov. Bill Clinton).

By enacting DIDMCA, Congress threw a line to state-chartered banks. *See Stoorman v. Greenwood Tr. Co.*, 908 P.2d 133, 135 (Colo. 1995) (discussing DIDMCA as "response to economic conditions affecting the banking industry"). Section 521 of DIDMCA amended the Federal Deposit Insurance Act "to prevent discrimination against State-chartered insured depository institutions," 12 U.S.C. § 1831d(a), by authorizing state-chartered banks to lend at rates up to the same levels as national banks—preempting the restrictive rate-cap laws constraining state-chartered banks in their home states. Like NBA Section 85 for national banks, Section 521 expressly "preempt[s]" any State law that would interfere with a state-chartered bank's ability to

**App. 50**

"charge … interest" at the "greater" of (1) a specified federal rate; or (2) "the rate allowed by the laws of the State … where the bank is located." *Id*.[1]

### 3.   DIDMCA allows states to opt out of preemption, but only for loans "made in" the opting-out state.

Given concerns that DIDMCA preemption would encroach on states' authority to regulate their own state-chartered banks, Congress allowed states to "opt out" of the rate preemption provisions in DIDMCA Sections 521-523, but only for loans "made in" the opting-out state according to federal law. *See* 126 Cong. Rec. 7070 (1980) (Statement of Sen. Proxmire); *Usury Lending Limits*, 96 Cong. 47-49.

Specifically, Section 525 of DIDMCA provides:

> The amendments made by sections 521 through 523 … shall apply only with respect to loans made in any State during the period beginning on April 1, 1980 [DIDMCA's effective date], and ending on the date … on which such State adopts a law … which states explicitly and by its terms that such State does not want the amendments made by such sections to apply *with respect to loans made in such State*[.]

DIDMCA § 525, 94 Stat. 167 (emphasis added).

DIDMCA's legislative history confirms Congress designed Section 525 to allow states to restore their pre-DIDMCA ability to restrict *their own in-state banks* from lending above their own state rate limits, without regard for the federal rate. *See, e.g*., 125 Cong. Rec. 30655 (1979) (Statements of Sens. Pryor, Bumpers); 126 Cong. Rec. 6906-07 (1980) (Statements of Sens. Proxmire, Bumpers); 126 Cong. Rec. 7070-71 (1980) (Statement of Sen. Proxmire). There is no suggestion in Section 525's legislative history that Congress intended to allow states to use the opt-out to restrict the rates that *out-of-state banks* physically operating outside a state could charge

---

[1] DIDMCA Sections 522 and 523 similarly preempted state interest-rate caps for state-chartered savings-and-loan associations and credit unions. *See* 94 Stat. 165-66.

**App. 51**

when lending to borrowers living in an opting-out state—that is, the issue decided in *Marquette* just two years earlier.

### 4.     Post-DIDMCA opt-outs

Shortly after Congress enacted DIDMCA, seven states (including Colorado) and Puerto Rico invoked Section 525 to opt out of DIDMCA Sections 521-523. *See, e.g.*, 1981 Colo. Sess. Laws, ch. 73, § 1. But as inflation continued to rage into the 1980s, six of those states—including Colorado—rescinded their opt-outs. *See, e.g.*, 1994 Colo. Sess. Laws, ch. 272, § 12; *see also* Comm. Hearing on 1988 Neb. Laws, LB 913, at 9335, 9342-43, 9347-48 (discussing competitive disadvantages created by opt-out).

### B.     Colorado's rate and fee limits

Colorado's Uniform Consumer Credit Code (UCCC) governs consumer credit transactions in Colorado. Colo. Rev. Stat. § 5-1-201; *see*, *e.g. id.* § 5-1-301(12), (15)(a). Most common consumer loan products are capped at a 21% "finance charge." *See id.* § 5-2-201(2)(a), (3)(a). The UCCC also limits certain loan fees. *See id.* §§ 5-2-202, 5-2-203, 5-2-212.

Colorado has moved aggressively in recent years to combat so-called "payday"[2] and "alternative-charge"—extremely high-cost, small-dollar, short-term—loans. In 2018, Colorado amended the UCCC to limit rates and fees on payday loans to 36%. *See id.* § 5-3.1-101.5.

### C.     H.B. 23-1229 Section 3

On June 5, 2023, Colorado enacted H.B. 23-1229, which will take effect in relevant part on July 1, 2024. *See* H.B. 23-1229 § 6(4). Colorado promoted the law as part of its overall efforts

---

[2] The Consumer Financial Protection Bureau explains that "[w]hile there is no set definition of a payday loan, it is usually a short-term, high cost loan, generally for $500 or less, that is typically due on your next payday." CFPB, *What is a payday loan?* (Jan. 17, 2022), https://perma.cc/E95D-BSYW.

**App. 52**

to address payday-style lending, and H.B. 23-1229 includes a provision, not at issue here, intended to curb "alternative charge loans." *Id.* § 2. Central to this lawsuit, however, H.B. 23-1229 also includes a renewed DIDMCA opt-out:

> In accordance with section 525 of [DIDMCA], the general assembly declares that the state of Colorado does not want the amendments … made by sections 521 to 523 of [DIDMCA], prescribing interest rates and preempting state interest rates to apply *to consumer credit transactions in this state*. The rates established in articles 1 to 9 of this title 5 control consumer credit transactions in this state.

*Id.* § 3 (codified at Colo. Rev. Stat. § 5-13-106) (emphasis added).

Contrary to the definition of "made in" used in federal law, *see infra* at 10-16, the UCCC defines a "consumer credit transaction" as "made in" Colorado—and hence subject to Colorado's opt-out—whenever:

> (a) A written agreement evidencing the obligation or offer of the consumer is received by the creditor in this state; or
>
> (b) A consumer who is a resident of this state enters into the transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means.

Colo. Rev. Stat. § 5-1-201(1)(a)-(b).[3]

### D.    Section 3's effects

Plaintiffs' members include state-chartered banks, chartered and headquartered in various states. *See* Boren Decl. ¶¶ 1-3; Bowman Decl. ¶¶ 1-7; Gelbard Decl. ¶¶ 1-10; Goldfeder Decl. ¶ 9; Himpler Decl. ¶¶ 1-11; Jackson Decl. ¶¶ 1-6; Pignanelli Decl. ¶ 10. None is headquartered or chartered in Colorado, and none performs key loan-origination functions there. *See id.* Plaintiffs'

---

[3] Section 5-1-201(2) clarifies that "[n]otwithstanding paragraph (b) … a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state."

**App. 53**

members do not offer payday or similar loans. *See* Boren Decl. ¶¶ 3-7; Bowman Decl. ¶¶ 3-11; Gelbard Decl. ¶¶ 3-8; Goldfeder Decl. ¶¶ 3-5; Himpler Decl. ¶¶ 8-10, 23; Jackson Decl. ¶¶ 3-10; Pignanelli Decl. ¶¶ 7-10. Rather, they offer to consumers nationwide—including in Colorado—a wide variety of useful, familiar, everyday credit products, such as personal installment loans, buy-now-pay-later loans, and store-brand cards. *Id.* These products are subject to a range of rates and fees, depending on credit, income, and other consumer-specific or product-specific factors, that are lawful under DIDMCA's home-state-or-federal-rate rule. *Id.*

Because DIDMCA permits Plaintiffs' members to offer loans at rates above the 21% UCCC cap, Plaintiffs' members currently offer credit to Colorado consumers whose credit profiles are too risky to lend to at a rate under that cap. *See* Boren Decl. ¶¶ 6-7; Bowman Decl. ¶¶ 10-11; Gelbard Decl. ¶ 8; Goldfeder Decl. ¶¶ 3-7; Himpler Decl. ¶¶ 8-10; Jackson Decl. ¶¶ 9-11; Pignanelli Decl. ¶¶ 8-9. Indeed, being able to charge a higher rate or fee to account for risk of default (or to deter default) often means the difference between being able to offer a consumer a loan and determining that doing so would be uneconomical. *See* Ctr. Cap. Mkts. Competitiveness, *The Economic Benefits of Risk-Based Pricing for Historically Underserved Consumers in the United States*, at 3-4 (Spring 2021), https://perma.cc/5EUG-DPZC. If Colorado's opt-out goes into effect as formulated, Plaintiffs' members will have to curtail lending to some or all Colorado residents, reducing Coloradans' access to responsible, popular, useful consumer credit products. *See* Boren Decl. ¶¶ 11-13; Bowman Decl. ¶¶ 15-17; Gelbard Decl. ¶¶ 15-17; Goldfeder Decl. ¶¶ 11-13; Himpler Decl. ¶¶ 22-23; Jackson Decl. ¶ 16; Pignanelli Decl. ¶ 20.

At the same time, the opt-out will not affect national banks that lend to Colorado consumers. These banks remain shielded by NBA preemption. Yet national banks offer similar

products to Colorado consumers, with comparable APRs and rates—often exceeding UCCC caps. *See* Gossett Decl. ¶¶ 5-7 (collecting examples).

## ARGUMENT

### This Court Should Preliminarily Enjoin Section 3 As Invalid And Unenforceable With Respect To Loans Not "Made In" Colorado Under Federal Law.

A plaintiff seeking a preliminary injunction must demonstrate that (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1277 (10th Cir. 2022). When, as here, the government is the opposing party, the final two factors merge. *Id.* at 1278. An injunction is warranted here.

**A.   Plaintiffs are likely to succeed on the merits because the opt-out is preempted by DIDMCA for loans that are not "made in" Colorado under federal law.**

DIDMCA Section 521 expressly "preempt[s]" "any State constitution or statute" that purports to limit the ability of state-chartered banks to lend at their home-state rates with respect to loans not covered by a Section 525 opt-out. 12 U.S.C. § 1831d(a). Section 3 does exactly that. It purports to impose Colorado rate caps on loans not "made in" Colorado according to federal law, and thus not subject to the Section 525 opt-out. As applied to that broad class of loans, Colorado's opt-out contravenes DIDMCA and the Supremacy Clause, U.S. Const. art. VI, cl. 2.[4]

**1.   Federal law governs where a loan is "made" for purposes of Section 525.**

"Federal, not local, law applies in the interpretation and application of federal statutes." *Hill v. Whitlock Oil Servs., Inc.*, 450 F.2d 170, 173 (10th Cir. 1971) (citing *Prudence Realization Corp. v. Geist*, 316 U.S. 89, 95 (1942)). Courts must "generally assume, in the absence of a plain

---

[4] Colorado's opt-out also violates the Dormant Commerce Clause. *See* Compl. ¶¶ 81-85.

**App. 55**

indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome v. United States*, 318 U.S. 101, 104-05 (1943).

Because Section 525 is a federal statute, and does not incorporate any state definitions, a uniform federal definition of where a loan is "made" governs DIDMCA opt-outs, not any state's chosen definition. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (citing *Jerome*, 318 U.S. at 104); FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *2 (June 29, 1988) ("Section 525 is a federal statute. It must be interpreted as having a single meaning throughout the nation.").

While Congress conferred on states the authority to *enact* opt-outs from DIDMCA, Congress did not authorize the *scope* of the opt-outs to be interpreted with reference to the opting-out state's laws. There is no "plain indication"—in the statutory text, its legislative history, or otherwise—suggesting that Congress intended to let states determine where a loan is "made" for purposes of Section 525, as Colorado purports to do. *See, e.g.*, 126 Cong. Rec. 6892-6913, 7062-73 (1980). Nor would such a reading make sense. Multiple states could deem a single loan "made in" their state, subjecting banks to a patchwork of inconsistent regulation.

> **2.      "Made," for purposes of Section 525, turns not on the location of the customer but on where the bank approves and extends the loan.**

The text, history, regulatory interpretations, and case-law all confirm that DIDMCA Section 525's use of the words "made in such State" requires an analysis of where the lending bank engages in the process of creating and extending a loan; it is not a reference to the state where the customer resides. This Court should not break new ground in holding otherwise.

**App. 56**

### a. The statutory text focuses on loan creation, not borrower location.

Section 525 permits states to "opt-out" of DIDMCA "with respect to loans made in such State." DIDMCA § 525, 94 Stat. 167. The critical feature of Section 525 is that it points to where *a* "*loan[ ]*" is "made," not to where the *borrower* resides.

Colorado would apply its opt-out to essentially any loan to a Colorado consumer—including by any bank that has ever advertised in the state, apparently without temporal limit. Colo. Rev. Stat. § 5-1-201(1)(a)-(b). Colorado's *recipient*-focused trigger strays far from what Congress authorized. Rather, Congress's word choice—"made"—reflects a functional focus on the core tasks associated with a *lender* creating a loan. *See Make*, Webster's New Collegiate Dictionary 694 (1975 ed.) ("[M]ake" means to "create" or "come into being"). As explained below, courts and regulators agree that the core tasks associated with a lender's acts in creating a loan—most notably approval, communication, and disbursement—do not depend on where a consumer is located.

This was the lesson of *Marquette*, decided just two years before DIDMCA's enactment, and of which Congress is presumed to have been aware. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). In *Marquette*, the Supreme Court addressed the authority of a state to restrict an out-of-state national bank's lending program. The Court determined where the bank was "located" for NBA Section 85 rate-limit-preemption purposes by assessing where the loan was made, in addition to where the bank was chartered and headquartered. And in determining where loans are made, the Court looked to where the bank's lending operations physically occurred, not where the customers lived or used their credit cards. The Court noted that "the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska," but stressed that "credit on the use of their cards is nevertheless … extended

11

**App. 57**

by Omaha Bank *in Nebraska*." 439 U.S. at 311-12 (emphasis added). Among other things, "[f]inance charges on the unpaid balances of cardholders are assessed by the bank in" Nebraska; "payments on unpaid balances are remitted to" Nebraska; "the bank issues its BankAmericards in" Nebraska; and "credit assessments [are] made by the bank" in Nebraska. *Id.* By tying the DIDMCA opt-out to where a *loan* is *made*, Congress incorporated *Marquette*'s functional, loan-creation-focused analysis into Section 525.

>    **b.    Congressional understanding confirms a loan-creation-focused approach.**

Congress later confirmed its *Marquette*-informed understanding that the phrase "made in" turns on the steps involved in offering a loan, not the borrower's residence. The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2338 (1994), sought to harmonize the ability of federally and state-chartered financial institutions to operate across state lines under a more uniform interstate banking and branching regime. The law contains a "savings clause," which specifies that its provisions do not affect DIDMCA preemption. *See* Riegle-Neal § 111. In explaining the savings clause during hearings preceding the law's passage, Senator Roth described "the widespread congressional understanding" that DIDMCA preemption is "applied on the basis of the branch *making* the loan." 140 Cong. Rec. 24463, 24487 (1994) (Statement of Sen. Roth) (emphasis added). "[M]aking" a loan in a particular location, Senator Roth explained, entails "the decision to extend credit, the extension of credit itself, and the disbursal of the proceeds of a loan." *Id.* Other functions, distinguished as merely "ministerial"—such as "providing loan applications, assembling documents, providing a location for returning documents necessary for making the loan, providing loan account information and receiving payments"—are not part of the federal calculus for where a loan is made. *Id.* at 24488.

**App. 58**

c.   **Federal regulators consistently endorse a loan-creation-focused methodology.**

For decades, federal banking regulators have confirmed a functional approach to determining where a bank is located and makes its loans—and have never equated where a loan is "made" with where the borrower resides. Both the OCC and the FDIC have consistently explained in related contexts that a bank making a loan is "located" in the state in which it is chartered *unless all three* "non-ministerial" functions involved in making that loan—(1) loan approval; (2) disbursal of loan proceeds; and (3) communication of the credit decision— physically occur in another state. *See, e.g.*, FDIC Gen. Counsel's Op. No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27,282 (May 18, 1998); *see also* FDIC, Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,148, 44,153 (July 22, 2020). Although the statutory terms "located" (as used in DIDMCA Section 521 and NBA Section 85) and "made in" (as used in Section 525) need not be coextensive, they do overlap significantly. And because they are both focused on functional inquiries into the extension of credit, regulators and courts have considered the factors interchangeably, applying *Marquette*'s functional approach in considering where a loan is "made." *See, e.g.*, FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *2; 63 Fed. Reg. at 27,285; *infra* at 14-15 (court interpretations).

In 2020, the OCC reaffirmed the utility of this functional approach to determining where a loan is made when clarifying the meaning of "loan approval" in modern lending scenarios—where individual loan underwriting decisions are often made automatically, in real time, through electronic and online systems (not in a single physical location, by a human). OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020). The OCC focused on "all the facts and circumstances," including where approval and disbursement occurred and where the policies underlying extensions of credit were devised. *Id.* But critically, it did not consider the location of the consumer applying

13

**App. 59**

for the loan even relevant to the determination where a loan is "made" for NBA Section 85 purposes.

### d.   Judicial precedent confirms this federal, loan-creation-focused methodology.

Courts, notably including Colorado's Supreme Court, have (i) confirmed that DIDMCA should be interpreted according to federal law, and (ii) adopted the functional, federal approach to determining where a loan is "made." On the former issue, in *Stoorman v. Greenwood Trust Co*., 888 P.2d 289 (Colo. App. 1994), the Colorado Court of Appeals had relied on the Colorado UCCC to determine where a loan is "made" for purposes of DIDMCA Section 525. *See id.* at 294. Although Colorado had repealed its first DIDMCA opt-out by the time *Stoorman* reached Colorado's Supreme Court, that court specifically declined to adopt the lower court's Colorado-UCCC-based analysis, *see Stoorman*, 908 P.2d at 134 ("we base our decision on different grounds"), holding that the meaning of DIDMCA is "a matter of federal law." *Id.* at 135.

On the latter, the Eighth Circuit applied the federal methodology to interpret another federal statute affecting state-law rate caps that, like DIDMCA, uses the words "made in" within its scoping provision. *Jessup v. Pulaski Bank* involved a credit card loan by an Arkansas bank to a borrower living in Texas. *See* 327 F.3d 682, 684 (8th Cir. 2003). The court focused on where the bank "approve[d] the loan, extend[ed] credit, and disburse[d] the funds" to determine that the loan was "made" in Arkansas. *Id.* at 684-85 (relying on regulatory interpretations referencing Congress's understanding of "made in" when enacting Riegle-Neal, as discussed *supra* at 12-13).

Similarly, the district court in *MorEquity, Inc. v. Naeem* interpreted DIDMCA Section 521 to determine that, even though a California-chartered thrift maintained a physical office in Illinois and the plaintiff-borrowers' mortgage broker submitted their mortgage application to that office, the thrift was not located in and therefore did not make loans in Illinois. *See* 118 F. Supp. 2d 885,

14

**App. 60**

898 (N.D. Ill. 2000), *aff'd on reconsideration*, No. 99C735, 2001 WL 1426518, at *1 (N.D. Ill. Feb. 8, 2001). Because plaintiffs had not alleged that the thrift had approved the loan, disbursed the loan proceeds, or communicated the credit decision in Illinois, the court reasoned, Illinois' rate limits were preempted under DIDMCA. *See id.*

### 3. Colorado's interpretation of "made in" is wrong and undermines DIDMCA.

The federal interpretation of "made in" set out above is workable and promotes a consistent standard for modern-day, interstate, online banking—while still preserving the state sovereignty Congress intended to protect with Section 525. By contrast, Colorado's definition of "made in" does not fall within any conceivable understanding of where a loan is "made." And it is unworkable in a world of interstate banking. If each opting-out state could apply its own interpretation of "made in" to Section 525, a single loan could be deemed "made in" multiple states, rendering it unclear which state's rate caps apply.

The Supreme Court rejected Colorado's proposed patchwork approach in *Marquette*. Marquette Bank and the State of Minnesota had argued that because Omaha Bank "systematically solicits Minnesota residents for credit cards," who then used those cards in Minnesota, Omaha Bank was located in Minnesota for purposes of NBA preemption. *See Marquette*, 439 U.S. at 310-12. But as the Supreme Court pointed out, "Minnesota residents can … use their Omaha Bank BankAmericards to purchase services in the State of New York or mail-order goods from the State of Michigan." *Id.* at 312. Under Minnesota's approach, a "national bank could never be certain whether its contacts with residents of foreign States were sufficient to alter its location for purposes of § 85." *Id.* This would "stretch[]" the meaning of "located" so far "as to throw into confusion the complex system of modern interstate banking." *Id.* So too here.

Colorado's insistence that its DIDMCA opt-out applies to virtually any transaction with a Colorado resident where the creditor's only activity in the state is advertising or customer solicitation, Colo. Rev. Stat § 5-1-201(1)(b), or to a transaction with a resident of *any* state if a "written agreement evidencing the obligation … is received by the creditor" in Colorado, *id.* § 5-1-201(1)(a), is not what Congress authorized when it enacted the DIDMCA opt-out. Like the Supreme Court in *Marquette*, this Court should "not choose to invite these difficulties by rendering so elastic," 439 U.S. at 312, DIDMCA's opt-out for loans "made in" the opting-out state.

*****

Plaintiffs are likely to demonstrate that H.B. 23-1229 Section 3 is void and unenforceable as applied to loans not "made in" Colorado as defined by federal law.

### B.   Plaintiffs' members will suffer irreparable harm in the absence of a preliminary injunction.

To show irreparable harm, a plaintiff must demonstrate injury that "cannot be adequately atoned for in money, or when the district court cannot remedy the injury following a final determination on the merits." *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113 (D. Colo. 2021) (cleaned up). Plaintiffs' members will suffer irreparable harm if Colorado's opt-out is permitted to take effect as written.

*First*, Plaintiffs' members are already incurring significant costs in preparing to comply with Colorado's opt-out—and will continue to incur these costs without an injunction. Boren Decl. ¶¶ 8-9; Bowman Decl. ¶¶ 12-13; Gelbard Decl. ¶¶ 11-12; Goldfeder Decl. ¶¶ 10-11; Himpler Decl. ¶¶ 15-16; Jackson Decl. ¶¶ 12-13; Pignanelli Decl. ¶¶ 14-15. These include costs associated with preparing updated disclosures; updating, testing, validating, and monitoring computer systems to ensure accurate integration of Colorado-specific rate and fee caps into what is currently a uniform national system; modeling the effect on revenue and operations and developing strategies to

**App. 62**

address those effects; developing new training materials; diverting employee time; and engaging outside consultants, vendors, and attorneys. *Id*. Costs of complying with a law later held to be invalid are non-recoverable and hence irreparable. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010).

*Second*, Plaintiffs' members are already experiencing strained relationships with current customers and brand and merchant clients, and face the prospect of irreparable loss of goodwill if they must determine whether and to which Colorado consumers they can profitably offer their products. *See* Boren Decl. ¶¶ 11-14; Bowman Decl. ¶¶ 15-18; Gelbard Decl. ¶¶ 15-18; Goldfeder Decl. ¶ 11; Himpler Decl. ¶ 11; Jackson Decl. ¶¶ 15-17; Pignanelli Decl. ¶ 18. Plaintiffs' members have invested significant time and resources over many years to establish that goodwill—by providing popular consumer-loan products on competitive terms. *Id.* Once lost, that goodwill will be impossible to recover. *See Barrington*, 566 F. Supp. 3d at 1113.

*Third*, if the opt-out takes effect it will result in immediate—and for some of Plaintiffs' members, business-jeopardizing—lost revenue. Boren Decl. ¶ 10; Bowman Decl. ¶ 14; Gelbard Decl. ¶¶ 13-14; Goldfeder Decl. ¶ 11; Himpler Decl. ¶¶ 17-20; Jackson Decl. ¶ 14; Pignanelli Decl. ¶¶ 16-17. The fact that lost revenue might be quantifiable does not render it reparable, because Plaintiffs could never recover it. *See Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *Edmondson*, 594 F.3d at 771.

### C.    The balance of equities favors maintaining the status quo.

The balance of equites favors a preliminary injunction. Colorado "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. And an injunction here will not harm Colorado or its citizens; it will simply maintain the status quo. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). By contrast, Colorado consumers—whom Defendants are charged with protecting—will be harmed by the law. Consumers, particularly those at the lower

**App. 63**

end of the credit spectrum, will have reduced access to the responsible, needed credit products offered by Plaintiffs' members, who will find it economically impracticable to lend to riskier consumers in Colorado. Yet national banks will continue to offer these same products at rates above what the UCCC allows. With reduced competition from state banks, national banks will have less incentive to constrain their rates. And consumers will have less choice.

## CONCLUSION

The Court should preliminarily enjoin Colorado from taking any action to enforce or give effect to H.B. 23-1229 Section 3 with respect to loans not "made in" Colorado as defined by federal law.[5]

---

[5] Alternatively, because the merits of this litigation turn entirely on questions of law, the Court could award summary judgment to Plaintiffs. *See* Fed. R. Civ. P. 56(f)(3); *e.g.*, *Orizon Aerostructures, LLC v. Crumley*, No. 2:23-CV-02069-EFM, 2023 WL 3376774, at *2 (D. Kan. May 11, 2023) (*sua sponte* granting summary judgment on preliminary injunction motion), *appeal dismissed*, No. 23-3110, 2023 WL 8642999 (10th Cir. Nov. 29, 2023).

**App. 64**

Respectfully Submitted,

/s/ David M. Gossett

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

TYLER J. BOURKE
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 622-3150
tylerbourke@dwt.com

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com
leah.capritta@hklaw.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

*Attorneys for the American Fintech Council*

DATED: APRIL 2, 2024

**App. 65**

**CERTIFICATE OF TYPE-VOLUME COMPLIANCE**

Plaintiffs hereby certify that the foregoing pleading contains 5,496 words, and thus complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

_/s/_ David M. Gossett
David M. Gossett

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of Plaintiffs' Motion For Preliminary Injunction via CM/ECF, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 67**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

NATIONAL ASSOCIATION OF INDUSTRIAL
BANKERS, AMERICAN FINANCIAL SERVICES
ASSOCIATION, and AMERICAN FINTECH
COUNCIL,

          Plaintiffs,

v.

PHIL WEISER, in his official capacity as Attorney
General of the State of Colorado, and MARTHA
FULFORD, in her official capacity as Administrator of
the Colorado Uniform Consumer Credit Code,

          Defendants.

Civil Action No.
1:24-cv-00812

---

**DECLARATION OF CROSS RIVER BANK IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

---

I, Arlen W. Gelbard, do hereby declare and state as follows:

1.      I am General Counsel of Cross River Bank (the "Bank"). The Bank is chartered in New Jersey and located at 2115 Linwood Avenue, Fort Lee, New Jersey. I have held this position since 2016. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This declaration is based on my personal knowledge, and a review of records kept in the ordinary course of business by the Bank, and I could and would competently testify to its contents if called to do so.

2.      The Bank is a member of plaintiff the American Fintech Council.

3.      The Bank offers credit (in various forms) to consumers across the United States, including to residents of the State of Colorado. These include: (i) "open-end" (or revolving

1

**App. 68**

balance) loans through general purpose credit cards); (ii) personal installment loans of up to $150,000, with terms of 3 to 360 months, which can be used for a variety of purposes, such as funding major purchases or life events, or consolidating credit card debt; and (iii) "buy now pay later" loans, used to split the cost of a single purchase into several installment payments (either through four monthly payments, or longer term monthly installment plans).

4.     Nationally, during the period 2020 through 2023, the Bank originated over 63 million loans in its personal installment loan (including buy-now-pay-later loans) programs. These Bank originations resulted in cumulative accounts receivable balances of over $104 billion.

5.     In Colorado, as of December 31, 2023, the Bank had 8,285 personal installment loan (including buy-now-pay-later loans) accounts outstanding, with corresponding accounts receivable of more than $42 million.

6.     I am familiar with CO HB23-1229, and its "opt-out" provision now codified at Colo. Rev. Stat. § 5-13-106, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b). I understand that, when read in concert with each other, upon the former's becoming effective on July 1, 2024, the Bank's personal installment loans (including buy-now-pay-later loans) are deemed by the State of Colorado to be subject to Colorado's limitations in regards to interest rates and fees.

7.     I also understand that our competitor national chartered banks will not be subject to these Colorado statutes and will remain free therefore to export the interest rates and fees of their home states under the National Bank Act, 12 U.S.C. § 85, without regard to Colorado's limitations on interest rates and fees.  Many of our competitor national banks offer personal installment loans, and "buy-now-pay-later" (single-purchase) installment loans with interest rate and fee structures similar to, and sometimes higher than, the Bank's.

**App. 69**

8.      The Bank's personal installment loans may sometimes carry APRs above 21% (but in all cases not greater than 30%), depending on a consumer's credit qualifications, the loan amount and repayment term length.  I understand that these products would also be subject to the 21% finance charge cap under the UCCC.  I am aware that the Bank's national bank competitors offer personal installment loans and buy-now-pay-later loans with APR ranges similar to, and in some cases substantially higher than, those offered by the Bank.

9.      Since before the State of Colorado passed the opt-out law last year, the Bank, alongside other state banks and trade organizations that will be affected by the opt-out, have attempted to seek a legislative solution.  On multiple occasions, representatives of the Bank met in-person with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC to advocate for amendments to HB23-1229 (and even testified before the Colorado legislature) in lieu of commencing litigation.  The last of those meetings took place on or about January 25, 2024.  While the Bank appreciates the State's representatives' willingness to meet and discuss the effect of the law on the Bank and other similarly-situated state banks, unfortunately, those meetings did not result in the legislative change the Bank and other similarly-situated state banks sought.

10.     The Bank does not: (a) approve loans, (b) make the choice to extend credit to any consumers or (c) disburse loan proceeds, in each case, within the State of Colorado.  All such activities exclusively take place within the State of New Jersey where the Bank is chartered and where its main office is located.

11.     The Bank has already incurred, and/or will incur, the following costs associated with preparation to comply with the new Colorado laws:

    a.      preparing, printing, and distributing updated required disclosure notices;

**App. 70**

b. updating the Bank's computer systems and those of its system providers, including the costs associated with engaging vendors and consultants to adjust systems; to potentially integrate new vendors and new systems; and to test, validate and monitor those systems in order to ensure accurate and seamless integration of Colorado-specific rate and fee caps into the Bank's underwriting system, and to ensure ongoing compliance;

c. training customer service agents, compliance officers, and other staff on the new rates and fees and system changes the Bank must adopt to implement those changes;

d. developing and presenting new training materials, and the associated employee time to train and be trained;

e. expenditure of employee time to engage in relationship management, and cooperation with the Bank's FinTech partners on compliance and implementation, in anticipation of Colorado's changed rate and fee allowances;

f. modeling impact on revenue and operations, and what the Bank's strategy will be to address that;

g. potential need to hire additional FTEs to assist with all of the above; and

h. engagement of outside consultants and specialist attorneys to assist with legal interpretation, application, and implementation of Colorado's rate and fee laws.

12. It is not possible at this time to accurately estimate what all of these implementation and compliance-related cost considerations will total, in terms of employee hours and cost outlay. None of these costs or time spent will be recoverable.

13. The UCCC's rate and fee limitations, once applied to the Bank, will result in immediate and unrecoverable loss of revenue, not only from the inability to offer loans in excess of 21% but also from the loss of existing FinTech partners who will either terminate agreements

**App. 71**

or opt not to renew. Even before effectiveness, the UCCC's rate and fee limitations have hurt the Bank's revenue by causing headwinds for the Bank in its conversations with new prospective FinTech partners. Having spoken to existing and prospective FinTech partners, we understand that capping the interest rate at 21% would effectively result in those partners (and thus the Bank) withdrawing from the state.

14. Based on production figures from the 2020 to 2023 timeframe, the Bank estimates that were the UCCC's rate and fee limitations in effect during such time, the Bank would have been prohibited from providing more than $582 million of credit to Coloradans and would have opened 148,466 fewer personal installment loan (including buy-now-pay-later loans) accounts (for which the Bank is currently charging more than a 21% finance charge) which all would have caused the Bank to suffer lost annual revenue.

15. The Bank, which has invested significant time and resources establishing and building up goodwill with its FinTech partners, has already experienced strain on its relationships and loss of goodwill with these partners as the Bank works toward implementation and compliance with the UCCC's rate and fee limitations. The Bank anticipates that it will continue to experience strained relationships and loss of goodwill with its FinTech partners as the July 1, 2024 effective date for the Colorado opt-out nears if the Bank must notify its FinTech partners that it will no longer be able to offer personal installment loans or BNPL payment options to their Colorado customers because it is no longer economically practicable.

16. The Bank will similarly experience strain on its consumer relationships and loss of goodwill, which it has also invested significant time and resources in establishing over decades of providing popular and useful consumer loan products, if it can no longer offer the same products to its Colorado consumers, or if it must close or restrict lending on existing consumer accounts.

**App. 72**

17.     The Bank will also experience lost opportunity and loss of customers and FinTech partners, including:

a.     potential lost opportunity for new accountholder relationships for potential new accounts the Bank cannot open because it is no longer economically practicable;

b.     potential lost accountholder relationships with customers whose accounts the Bank may determine it must close because it is no longer economically practicable to keep the accounts open, or with whom relationships will become strained;

c.     loss of customers and FinTech partners to national banks (including those that may export interest rates and fees from states with no usury restrictions), because national banks will be permitted to continue charging the same interest rates and fees they have always charged in Colorado, if and once the Bank exits that market; and

d.     loss of customers to non-bank lenders as well as other "lenders of last resort" with their attendant compliance concerns and less-robust regulatory protections – all to the detriment of hard-working Coloradans.

18.     The potential that the Bank will experience these lost opportunity costs, and potential loss of customers, is significant, though difficult to quantify at this time.

19.     If the laws are not enjoined, and despite its best efforts to comply, the Bank will also be subject to consumers' private rights of action, and to the State of Colorado's enforcement rights, with regard to the new laws.  Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

**App. 73**

20.     The Bank seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that the Bank has already incurred, and will continue to incur, as the compliance deadline nears.

I declare under penalty of perjury that the foregoing is true and accurate. Executed this 31st day of March 2024, at Fort Lee, New Jersey.

DocuSigned by:

*Arlen Gelbard*

Arlen W. Gelbard

EVP, General Counsel

7

**App. 74**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court  via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 75**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

      Defendants.

---

### DECLARATION OF BILL HIMPLER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

I, Bill Himpler, do hereby declare and state as follows:

    1.    I am the President and CEO of the American Financial Services Association ("AFSA"). AFSA is headquartered at 1750 H St. NW #650, Washington, DC 20006. I have held this position since 2019 and I have been with the association for nearly 20 years. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction seeking to enjoin Section 3 of HB23-1229, which became law in Colorado on June 5, 2023, is codified at Colo. Rev. Stat. § 5-13-106, and will take effect on July 1, 2024.

    2.    I understand that (a) Section 3 attempts to "opt Colorado out" of Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 164-65 (1980); and (b) DIDMCA Section 521 provides that state-chartered banks may lend anywhere in the country at rates up to the higher of (i) their home states' interest-rate caps, or (ii) one percent above a federal reserve average discount rate.

**App. 76**

3.      Unless otherwise stated, this declaration is based on my personal knowledge, and a review of records kept in the ordinary course of business by AFSA, and I could and would competently testify to its contents if called to do so.

**I.      AFSA's Mission**

4.      Established in 1916, AFSA is a not-for-profit, national trade association, and it is the predominant trade association for the consumer credit industry. Its mission is to protect access to credit and consumer choice.

5.      AFSA serves as a valuable resource for businesses that offer consumer credit, providing compliance resources, policy advice, and issues tracking and management at the federal and state level. AFSA and its membership have a wealth of expertise and knowledge of legal issues relating to consumer credit. The AFSA Foundation has made significant contributions to consumer welfare through, for example, providing free web-based personal finance courses. Since its inception in 2002 the AFSA Foundation's MoneySKILL® curriculum has had over 1.4 million enrolled users and it is used in more than 50% of all U.S. counties.

6.      AFSA's guiding principles include the belief that competition and innovation in the marketplace tend to reduce price, increase consumer choice, and thus benefit consumers; that regulation should be a collaborative process between regulators and the parties directly affected by the proposed regulations; that government, consumers, and the credit industry can and should work together to promote lending that helps consumers meet their financial needs through affordable credit; that the extension of credit must be affordable for both the lender and the borrower; and that risk-based pricing increases access to credit for the less creditworthy and reduces relative pricing for the more creditworthy, thus benefiting all consumers.

**App. 77**

7.      AFSA is also guided by principles surrounding consumer education and responsible lending. AFSA believes that clarity and transparency should be maximized in all credit transactions, because responsible lending is transparent lending; that responsible underwriting procedures intended to make a reasonable assessment of the customer's ability to pay should be employed in any extension of credit; that the success of a financial institution should be based on the performance of its loans and the satisfaction of its customers; that responsible lenders do not benefit from loans that fail.

## II.    AFSA's Members

8.      AFSA's 450 members span the consumer credit industry, including vehicle finance, mortgage, traditional installment lending, credit cards, and commercial lending. Its members range from small creditors operating in just one state to some of the world's largest banks. AFSA members serve customers whose credit histories place them across a wide range of the credit spectrum, from subprime to superprime. AFSA does not represent payday lenders or title lenders. AFSA does not represent credit unions. AFSA's membership includes several state-chartered banks.

9.      AFSA's members offer a wide variety of useful, familiar, consumer credit products, available at a range of rates and fee options. These rate and fee options may include APRs or finance charges higher than 21%, which I understand is the highest finance charge allowed for most consumer credit products under Colorado's Uniform Consumer Credit Code (UCCC). These offerings include:

   a.  Traditional personal installment loans, which can be used for debt consolidation, financial emergencies, to finance large purchases, family vacations, milestone events such as weddings, medical expenses, home improvements, and the like.

**App. 78**

These could be subject to a range of APRs and/or finance charges, depending on credit, the size of the loan, income or other consumer-specific or product-specific factors;

b. Private label (or "closed loop"/store-brand) credit cards, which are designed to be used at a single merchant or family of merchants. Like other credit products, these cards are offered at a range of APRs, depending on a consumer's credit profile and ability to repay;

c. General purpose credit cards, which I understand are excluded from Colorado's DIDMCA opt-out for numerical interest rates, but not for all fees;

d. Direct and indirect vehicle financing for the purpose of purchasing a vehicle; and

e. Automobile dealer financing for the purposes of financing the inventory on a vehicle dealer's lot or showroom, or for other commercial purposes, such as dealer facility construction and upgrades.

10.     The ability to offer these products at a range of rates, including above the UCCC's 21% cap, allows AFSA's members to offer credit to consumers who may not otherwise have access to it because their credit profiles would be deemed too risky. Often, being able to charge a higher rate or fee to account for risk of default (or for deterrent purposes) is the difference between being able to offer a consumer a loan and determining that it is too costly to offer credit to a borrower with a higher risk profile.

11.     To my knowledge, none of AFSA's state-chartered bank members are chartered or headquartered in the State of Colorado. I am not aware that any of AFSA's state-chartered bank members perform all three of the following activities within the borders of the State of Colorado: (a) approve loans (that is, they do not apply subjective underwriting criteria, make decisions

4

**App. 79**

regarding loan applications, develop automated electronic underwriting systems and criteria, or create credit policies), (b) make the choice to extend credit (that is, they do not subjectively make the choice to extend credit or develop automated approval processes), or (c) disburse loan proceeds.

### III.    The Effect of Colorado's DIDMCA Opt-Out Law on AFSA's Members

12.    I am familiar with Section 3 as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b), which defines how broadly the opt-out will apply in Colorado. I am advised that, when read in concert with each other, upon the former's becoming effective on July 1, 2024, many of AFSA's members' products will be deemed by the State of Colorado to be subject to Colorado's limitations in regard to interest rates and fees.

13.    I am also advised that national banks that compete with our state-chartered bank members will not be subject to the Section 3 opt-out and will remain free to export the interest rates and fees of their home states to Colorado residents, because Colorado's interest rate and fee caps cannot apply to them under the National Bank Act, 12 U.S.C. § 85. Many of those competitor national banks offer the same kinds of credit products with interest rate and fee structures similar to  AFSA's state-charted bank members' products.

14.    As President and CEO of AFSA, I have worked with our state-chartered bank members to understand how Section 3 will affect their businesses, including (a) the compliance efforts they will need to undertake; (b) the costs of those efforts; (c) effects on their revenue; (d) effect on the economic practicability of continued lending to Colorado residents, particularly those with riskier credit profiles; (e) effects on their valuable customer goodwill and relationships; and (f) loss of customers to national bank competitors, who will remain free to charge whatever rates and fees they deem fit when lending to Colorado residents.

**App. 80**

**A.** **AFSA's Members Must Incur Burdensome Compliance Costs**

15.     Some of AFSA's members have already incurred, and without an injunction will continue to incur, significant costs associated with preparation to comply with Colorado's interest rate and fee laws. These include but are not limited to costs associated with, for example, preparing updated required disclosures; reworking or creating new computer systems to account for multiple rate and fee regimes (including the costs associated with engaging vendors and consultants); testing, validating and monitoring those systems in order to ensure accurate integration of Colorado-specific rate and fee caps into what is currently a uniform national system; training customer service agents, compliance officers, and other staff; developing and presenting new training materials, and the associated employee time to train and be trained; diverting employee time to address compliance with the opt-out, and the potential need to hire additional staff to assist with all of the above; and engaging outside consultants and attorneys to assist with implementing Colorado's rate and fee laws to numerous types of consumer and commercial lending.

16.     It is not possible for AFSA's members at this time to accurately estimate what all of these implementation and compliance-related cost considerations will total, in terms of employee hours and cost outlay. But I understand that none of these costs or time spent will be recoverable from the State of Colorado or otherwise, even if a court were to enjoin enforcement of Section 3 or declare it void.

**B.** **Colorado's Opt-Out Will Harm AFSA's Members**

17.     Once the opt-out goes into effect, some of AFSA's members will have immediate, business jeopardizing revenue losses. This includes future revenue, and lost customer and client opportunities because it will no longer be economically practicable for many of AFSA's members to lend to customers with thinner or riskier credit profiles at rates below 21% APR.

**App. 81**

18.     Other members face an existential crisis about their banks' ability to offer financing and loans to Colorado consumers and businesses at all.

19.     Meanwhile, many of the current and potential customers who AFSA's members can no longer profitably serve will be lost to national banks, which will still be able to charge their current rates and fees.

20.     Beyond lost revenue, AFSA's members have already begun to experience, and will continue to experience, strained relationships with brand and merchant partners, and face the prospect of irreparable loss of customer goodwill as AFSA's members must adjust or eliminate their product offerings available to Colorado consumers.

### C.     AFSA's Members Will Be Exposed to the Risk of Enforcement Actions and Consumer Lawsuits

21.     If Section 3 is not enjoined, and despite best efforts to comply, AFSA's members may also be subject to consumers' private rights of action, and to potential enforcement by the State of Colorado, with regard to Section 3. Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

### D.     The Opt-Out Will Reduce Competition and Consumer Choice, and Will Not Lower the Cost of Consumer Credit for Coloradans

22.     If Colorado's opt-out is permitted to apply as broadly as the state intends, many of AFSA's state-chartered bank members will be forced to curtail lending to Colorado residents who they cannot profitably serve with certain products at APRs or finance charges less than 21%. Others will curtail lending to Colorado residents because they cannot risk the loss of predictability of APRs, finance charges, and fees. But because national banks will still be lending at rates they

**App. 82**

deem fit, Colorado's opt-out will do nothing more than reduce Colorado consumers' access to and choice among long-established, responsible, popular, and useful consumer credit products.

23.     I understand Colorado promoted HB23-1229, including the Section 3 opt-out provision, as part of its multi-prong effort to protect consumers from predatory, high-cost, small dollar, short term lending. But AFSA's state-chartered bank members are *not* payday lenders. If Section 3 goes into effect, Coloradans stand to lose access to the wider variety of mainstream, responsible consumer credit products offered by AFSA's members. This shrinking credit availability and consolidation of the Colorado consumer credit market into national banks—which will have less competition once  state-chartered bank lending has been reduced or eliminated—will especially affect Colorado consumers who, because of their credit risk profiles and/or thin credit history, have less access to credit generally. These are among the very consumers AFSA members proudly provide responsible credit to now, and who Colorado aims to protect.

### IV.     AFSA Unsuccessfully Sought a Legislative Solution

24.     Since the State of Colorado passed the opt-out law last year, AFSA, alongside state-chartered banks and other trade organization that will be affected by the opt-out, attempted to seek a legislative solution.  On at least six occasions since HB23-1229 was signed into law last June, representatives of AFSA met with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC to advocate for amendments to HB23-1229. Six of those meetings took place virtually on August 7, August 31st, September 1st, October, 30th, November 9th, 2023 and the last of those meetings took place on January 25, 2024. While AFSA appreciates the State's representatives' willingness to meet and discuss the effect of the law on AFSA's members and other similarly-situated state-chartered banks, unfortunately,

**App. 83**

those meetings did not result in the legislative change AFSA, its members, and other similarly-situated state-chartered banks sought.

## V.   Declaring the Opt-Out Unenforceable as Enacted, and Enjoining Its Enforcement, Would Remedy the Harm to AFSA's Members

25.    AFSA seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that its members have already incurred, and will continue to incur, as the compliance deadline nears.

26.    Ultimately declaring Section 3 void and unenforceable with respect to loans not made in Colorado under federal law, and enjoining its enforcement against AFSA's state-chartered, outside-Colorado member banks, will permanently prevent these harms.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2024, in  Washington, DC.

DocuSigned by:

*Bill Himpler*

AA3406F6904D475...

Bill Himpler

9

**App. 84**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court  via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 85**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

    Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

    Defendants.

---

## DECLARATION OF BRUCE BOWMAN IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

---

I, Bruce Bowman, do hereby declare and state as follows:

1.    I am the President of Comenity Capital Bank (the "Bank"), a subsidiary of Bread

Financial Holdings, Inc ("Bread"). The Bank is chartered in Utah and headquartered at 12921

Vista Station Blvd., Draper, Utah 84020. I have held this position since 2022. I make this

declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This declaration is based

on my personal knowledge, and a review of records kept in the ordinary course of business by

Comenity Capital Bank, and I could and would competently testify to its contents if called to do

so.

2.    The Bank is a member of plaintiff the National Association of Industrial Bankers.

3.    The Bank offers loans (in various forms) to consumers across the United States,

including to residents of the State of Colorado. These include: (i) "open-end" (or revolving

balance) loans through general purpose credit cards (a proprietary, Bread-branded credit card, and

1

**App. 86**

"co-brand" credit cards, that is, cards that are co-branded with a particular merchant, but may be used for general purposes and not just for purchases from the co-brand merchant); (ii) open-end loans through credit cards known as "private label," "store-brand" or "closed loop" credit cards, which are intended for use only for purchases from a specific merchant or group of merchants, in contrast with general purpose credit cards; (iii) personal installment loans (Bread Loans$^{TM}$) up to $35,000, with terms of 24 to 60 months, which can be used for a variety of purposes, such as funding major purchases or life events, or consolidating credit card debt; and (iv) "buy now, pay later" loans (Bread Pay$^{TM}$), used to split the cost of a single purchase into installment payments (either four monthly installment payments through Bread Pay$^{TM}$ SplitPay plans, or longer term monthly installment loans).

4.      Nationally, the Bank maintains over 21,000,000 credit card accounts in its credit card programs for qualifying customers of the Bank's clients ("Clients").  The Bank maintains hundreds of thousands of accounts in its non-credit credit programs. The Bank refers to merchants participating in Bread Pay$^{TM}$ programs as "Merchant Partners."  The Bank has a cumulative accounts receivable balance of over $9 Billion.

5.      In Colorado, as of December 31, 2023, the Bank had hundreds of thousands of accounts (the vast majority of which were private label/store-brand credit card accounts), with corresponding accounts receivable of more than $100 million.

6.      Credit cards, and in particular private label store-brand credit cards, constitute the majority of Bread's lending activity in the state of Colorado (and nationwide).  Comenity Capital Bank is the bank behind many of the most popular store-brand credit cards used by U.S. consumers.

**App. 87**

7.      The Bank does not, within the borders of the State of Colorado: (a) approve loans (that is, the Bank does not apply subjective underwriting criteria, make decisions regarding loan applications, develop automated electronic underwriting systems and criteria, or create credit policies), (b) make the choice to extend credit to any consumers (that is, the Bank does not subjectively make the choice to extend credit, nor does the Bank develop automated approval processes), or (c) disburse loan proceeds.

8.      I am familiar with CO HB23-1229, and its "opt-out" provision now codified at Colo. Rev. Stat. § 5-13-106, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b). I am advised that, when read in concert with each other, upon the former's becoming effective on July 1, 2024, the Bank's private label (store-brand) credit card loans and personal installment loans (including buy now, pay later loans) are deemed by the State of Colorado to be subject to Colorado's limitations in regards to interest rates and fees.

9.      I am also advised that our competitor national chartered banks will not be subject to the aforementioned Colorado statutes and will remain free therefore to export the interest rates and fees of their home states under the National Bank Act, 12 U.S.C. § 85, without regard to Colorado's limitations on interest rates and fees.  Many of our competitor national banks offer private label (store brand) credit cards, personal installment loans, and buy now, pay later (single-purchase installment loans) with interest rate and fee structures similar to, and sometimes higher than, the Bank's.

10.     For instance, the Bank's private label (store-brand) credit cards, which would be subject to Colorado's opt-out provision once it goes into effect, all carry APRs that are higher than the 21% finance charge that I have been informed is the highest finance charge permitted for these products under the UCCC.  Consumers' APRs can vary based on the specific private label credit

**App. 88**

card product, and the consumer's individual credit profile.  I am aware that the Bank's national bank competitors for private label credit cards also offer cards carrying APRs higher than 21%, and in some cases higher APR ranges generally as compared with those offered by the Bank. Those APRs are publicly available via disclosures published on the Bank's and its competitors' websites, and through the Consumer Financial Protection Bureau's Credit Card Agreement Database, available at https://www.consumerfinance.gov/credit-cards/agreements/ (last accessed April 1, 2024).

11.     The Bank's non-credit card loans may sometimes carry APRs above 21%, depending on a consumer's credit qualifications, the loan amount and repayment term length.  I understand that these products would also be subject to the 21% finance charge cap under the UCCC.  I am aware that the Bank's national bank competitors offer personal installment loans and buy now, pay later loans with APR ranges similar to, and in some cases substantially higher than, those offered by the Bank, as published on those national banks' consumer-facing websites.

12.     The Bank has already incurred, and/or will continue to incur, the following costs associated with preparation to comply with the new Colorado laws:

a.      preparing, printing, and distributing updated required disclosure notices;

b.      updating the Bank's computer systems and those of its system providers, including the costs associated with engaging vendors and consultants to adjust systems; to potentially integrate new vendors and new systems; and to test, validate and monitor those systems in order to ensure accurate and seamless integration of Colorado-specific rate and fee caps into what is currently a uniform national system, and to ensure ongoing compliance;

c.      training customer service agents, compliance officers, and other staff on the new rates and fees and system changes the Bank must adopt to implement those changes;

4

**App. 89**

    d.    developing and presenting new training materials, and the associated employee time to train and be trained;

    e.    expenditure of employee time to engage in relationship management, and cooperation with Clients and Merchant Partners on compliance and implementation, in anticipation of Colorado's changed rate and fee allowances;

    f.    modeling impact on revenue and operations, and what the Bank's strategy will be to address that;

    g.    potential need to hire additional FTEs to assist with all of the above;

    h.    engagement of outside consultants and specialist attorneys to assist with legal interpretation, application, and implementation of Colorado's rate and fee laws.

13.    It is not possible at this time to accurately estimate what all of these implementation and compliance-related cost considerations will total, in terms of employee hours and cost outlay. None of these costs or time spent will be recoverable.

14.    The UCCC's rate and fee limitations, once applied to the Bank, will result in immediate and unrecoverable loss of revenue. Based on 2023 figures, the Bank estimates that it will incur:

    a.    Millions of dollars in lost annual revenue on accounts/loans for which the Bank is currently charging more than a 21% finance charge, which as of today includes all private label (store-brand) credit card loans, and some buy now, pay later installment loans;

    b.    Millions of dollars in lost annual late fee income related to adhering to the required 10 day late fee grace period under the UCCC.

15.    The Bank, which has invested significant time and resources over decades establishing and building up goodwill with its Clients and Merchant Partners, has already

**App. 90**

experienced strain on its relationships and loss of goodwill with these Clients and Partners as the Bank works toward implementation and compliance with the UCCC's rate and fee limitations. The Bank anticipates that it will continue to experience strained relationships and loss of goodwill with Clients and Merchant Partners as the July 1, 2024 effective date for the Colorado opt-out nears if the Bank must close store-brand credit card accounts of the Banks' Clients' Colorado customers; must notify Clients that it will no longer be able to open new private label credit card accounts for Colorado consumers of those Clients' stores and products; and must notify Merchant Partners that it will no longer be able to offer buy now, pay later payment options to their Colorado customers because it is no longer economically practicable.

16.     The Bank will similarly experience strain on its consumer relationships and loss of goodwill, which it has also invested significant time and resources in establishing over decades of providing popular and useful consumer loan products, if it can no longer offer the same products to its Colorado consumers, or if it must close or restrict spending on existing consumer accounts.

17.     The Bank will also experience lost opportunity and loss of customers, Clients and Partners, including:

a.     potential lost opportunity for new accountholder relationships for potential new accounts the Bank cannot open because it is no longer economically practicable;

b.     potential lost accountholder relationships with customers whose accounts the Bank may determine it must close because it is no longer economically practicable to keep the accounts open, or with whom relationships will become strained;

c.     loss of Clients and Merchant Partners to national banks, because national banks will be permitted to continue charging the same interest rates and fees they have always charged in Colorado, if and once the Bank exits that market;

**App. 91**

    d.    loss of customers to national banks, including those with riskier credit profiles who the Bank may no longer be able to serve because it will not be economically practicable to do so.

18. The potential that the Bank will experience these lost opportunity costs, and potential loss of customers, is significant, though difficult to quantify at this time.

19. If the laws are not enjoined, and despite its best efforts to comply, the Bank will also be subject to consumers' private rights of action, and to the State of Colorado's enforcement rights, with regard to the new laws. Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

20. Since the State of Colorado passed the opt-out law last year, the Bank and its parent company Bread, alongside other state banks and trade organization that will be affected by the opt-out, have attempted to seek a legislative solution. On at least six occasions since HB23-1229 was signed into law last June, representatives of the Bank met with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC to advocate for amendments to HB23-1229 in lieu of commencing litigation. The last of those meetings took place on January 25, 2024. While the Bank appreciates the State's representatives' willingness to meet and discuss the effect of the law on the Bank and other similarly-situated state banks, unfortunately, those meetings did not result in the legislative change the Bank and other similarly-situated state banks sought.

21. The Bank seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that the Bank has already incurred, and will continue to incur, as the compliance deadline nears.

**App. 92**

I declare under penalty of perjury that the foregoing is true and accurate. Executed this 1st

day of April 2024, at Orem, Utah.

Bruce Bowman

**App. 93**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court  via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 94**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

      Defendants.

_____

## DECLARATION OF FRANK PIGNANELLI IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

_____

I, Frank Pignanelli, do hereby declare and state as follows:

      1.     I am the Executive Director of the National Association of Industrial Bankers

("NAIB"). NAIB is headquartered at 60 South 600 East Suite 150, Salt Lake City, Utah 84102. I

have held this position since 2007. I make this declaration in support of Plaintiffs' Motion for a

Preliminary Injunction seeking to enjoin Section 3 of HB23-1229, which became law in Colorado

on June 5, 2023, is codified at Colo. Rev. Stat. § 5-13-106, and will take effect on July 1, 2024.

      2.     I understand that (a) Section 3 attempts to opt Colorado out of Section 521 of the

Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No.

96-221, 94 Stat. 164-65 (1980); and (b) DIDMCA Section 521 provides that state-chartered banks

may lend anywhere in the country at rates up to the higher of (i) their home states' interest-rate

caps, or (ii) one percent above a federal reserve average discount rate.

**App. 95**

3.      Unless otherwise stated, this declaration is based on my personal knowledge, and a review of records kept in the ordinary course of business by NAIB, and I could and would competently testify to its contents if called to do so.

## I.      NAIB's Members and Mission

4.      NAIB is the national association for industrial banks (IBs). A form of state-chartered depository institution first chartered in 1910, industrial banks operate under several titles: industrial loan banks, industrial loan corporations, thrift and loan companies or industrial loan companies (ILCs). These banks engage in consumer and commercial lending on both a secured and unsecured basis. They do not offer demand checking accounts (that is, the ability for customers to withdraw funds immediately), but accept time deposits, savings deposit money market accounts, and NOW (negotiable order of withdrawal) accounts. Industrial banks provide a broad array of products and services to consumers and small businesses nationwide, including in some of the most underserved segments of the U.S. economy. Most of NAIB's member banks are branchless, providing specialized products and services to specific customer groups nationwide.

5.      State-chartered industrial banks are the strongest and safest banks insured by the Federal Deposit Insurance Corporation (FDIC).  This is because, among other factors, they (a) have a low overall percentage of uninsured deposits among insured depository institutions; (b) substantially use insured certificates of deposit which cannot be withdrawn before maturity (that is, cannot be withdrawn on demand); (c) have parent corporations that are required to serve as a "source of strength" for ILCs, contributing additional capital to ensure their subsidiary ILCs' solvency when needed (and these parent corporations hold assets other than the bank).  Thus, ILCs are uniquely able to provide innovative, safe credit solutions that expand access to credit for the traditionally underserved.

**App. 96**

DocuSign Envelope ID: BC801314-8034-4E7A-8341-BB0E5E932927

6.      As of 2023, there are 24 ILCs in five states (California, Hawaii, Minnesota, Nevada, and Utah) with $248 billion in total assets. ILCs account for 0.5 percent of FDIC insured institutions with 1 percent of the total assets of all institutions.

7.      ILCs fill a role in the marketplace by providing tailored financial services to small businesses and individual consumers where many other banks have not.

8.      NAIB's members offer a wide variety of useful, familiar, consumer credit products, available at a range of rates and fee options. These rate and fee options may include APRs or finance charges higher than 21%, which I understand is the highest finance charge allowed for most consumer credit products under Colorado's Uniform Consumer Credit Code (UCCC). These products targeted for individual consumers may include:

    a. Personal installment loans, which can be used for debt consolidation, financial emergencies, to finance large purchases, family vacations, milestone events such as weddings, medical expenses, home improvements, and the like. These typically carry repayment terms ranging from one to several years; and could be subject to a range of APRs and/or finance charges, depending on credit, income or other consumer-specific or product-specific factors;

    b. Buy now, pay later ("BNPL") loans, which are typically offered by retailers at the "point of sale" to fund single larger-cost consumer purchases. Depending on structure, as well as the credit profile of the consumer, BNPL products can be subject to a range of APRs; and

    c. Private label (or "closed loop"/store-brand) credit cards, which are designed to be used at a single merchant or family of merchants. Like other credit products, these

**App. 97**

cards are offered at a range of APRs, depending on a consumer's credit profile and ability to repay.

  d.  Purchase money loans for motor-vehicles and powersports vehicles, with terms that can often range from 36-48 months.

Some NAIB member banks may offer consumer credit products through partner platforms, including retailers, manufacturers, finance companies, software as a service (SaaS) and financial technology (fintech) companies.

9.  The ability to offer these products at a range of rates, including above the UCCC's 21% cap. allows NAIB's members to offer credit to consumers who may not otherwise have access to it because their credit profiles would be deemed too risky. Often, being able to charge a higher rate or fee to account for risk of default (or for deterrent purposes) is the difference between being able to offer a consumer a loan and determining that it is too costly to offer credit to a borrower with a higher risk profile.

10.  To my knowledge, none of NAIB's state-chartered ILC members are chartered or headquartered in the State of Colorado.  I am not aware that any of NAIB's state-chartered bank members perform all three of the following activities within the borders of the State of Colorado: (a) approve loans (that is, they do not apply subjective underwriting criteria, make decisions regarding loan applications, develop automated electronic underwriting systems and criteria, or create credit policies), (b) make the choice to extend credit (that is, they do not subjectively make the choice to extend credit or develop automated approval processes. or (c) disburse loan proceeds.

**App. 98**

## II.   The Impact of Colorado's DIDMCA Opt-Out Law on NAIB's Members

11.     I am familiar with Section 3, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b), which defines how broadly the opt-out will apply in Colorado. I am advised that, when read in concert with each other, upon the former's becoming effective on July 1, 2024, many of NAIB's members' products will be deemed by the State of Colorado to be subject to Colorado's limitations in regard to interest rates and fees.

12.     I am also advised that national banks that compete with NAIB's state-chartered members will not be subject to the Section 3 opt-out and will remain free therefore to export the interest rates and fees of their home states to Colorado residents, because Colorado's interest rate and fee caps cannot apply to them under the National Bank Act, 12 U.S.C. § 85. Many of those competitor national banks offer the same kinds of credit products with interest rate and fee structures similar to, and sometimes higher than, NAIB's members' products.

13.     As Executive Director of NAIB, I have worked with our state-chartered ILC members to understand how Section 3 will impact their businesses, including (a) the compliance efforts they will need to undertake; (b) the costs of those efforts; (c) impact on their revenue; (d) impact on the economic practicability of continued lending to Colorado residents, particularly those with riskier credit profiles, if NAIB's members will no longer be able to charge finance charges higher than 21%; (e) impact on their valuable customer goodwill and relationships; and (f) loss of customers to national bank competitors, who will remain free to charge whatever rates and fees they wish when lending to Colorado residents.

### A.   NAIB's Members Must Incur Burdensome Compliance Costs

14.     Some of NAIB's members have already incurred, and will continue to incur, significant costs associated with preparation to comply with Colorado's interest rate and fee laws.

**App. 99**

They will continue to incur compliance costs without an injunction. These include costs associated with, for example, preparing updated required disclosures; updating computer systems to account for multiple rate and fee regimes (including the costs associated with engaging vendors and consultants); testing, validating and monitoring those systems in order to ensure accurate integration of Colorado-specific rate and fee caps into what is currently a uniform national system; training customer service agents, compliance officers, and other staff; developing and presenting new training materials, and the associated employee time to train and be trained; diverting employee time to address compliance with the opt-out, and the potential need to hire additional staff to assist with all of the above; and engaging outside consultants and attorneys to assist with implementing Colorado's rate and fee laws.

15.     It is not possible for NAIB's members at this time to accurately estimate what all of these implementation and compliance-related cost considerations will total, in terms of employee hours and cost outlay. But I understand that none of these costs or time spent will be recoverable from the State of Colorado or otherwise, even if a court were to enjoin enforcement of Section 3or declare it void.

**B.     <u>Colorado's Opt-Out Will Harm NAIB's Members</u>**

16.     Following the opt-out, some of NAIB's members will have immediate, business jeopardizing revenue losses. This includes future revenue, lost customer and client opportunities because it will no longer be economically practicable for many of NAIB's members to lend to customers with thinner or riskier credit profiles at rates below 21% APR.

17.     Meanwhile, many of the current and potential customers who NAIB's members can no longer profitably serve will be lost to national banks, which will still be able to charge their current rates and fees.

**App. 100**

18.     Beyond lost revenue, NAIB's members have already begun to experience, and will continue to experience, strained relationships with current customers and brand and merchant partners (in the case of store-brand credit card issuers or buy-now-pay-later providers), and face the prospect of irreparable loss of customer goodwill as NAIB's members must adjust or eliminate their product offerings available to Colorado consumers.

### C.     NAIB's Members Will Be Exposed to the Risk of Enforcement Actions and Consumer Lawsuits

19.     If Section 3 is not enjoined, and despite its best efforts to comply, NAIB's members may also be subject to consumers' private rights of action, and to the State of Colorado's enforcement rights, with regard to Section 3. Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

### D.     The Opt-Out Will Reduce Competition and Consumer Choice, and Will Not Lower the Cost of Consumer Credit for Coloradans

20.     If Colorado's opt-out is permitted to apply as broadly as the state intends, many of NAIB's state-chartered ILC members will be forced to curtail lending to Colorado residents who they cannot profitably serve with certain products at APRs or finance charges less than 21%. But because national banks will still be lending at whatever rates they choose, Colorado's opt-out will do nothing more than reduce Colorado consumers' access to and choice among responsible, popular and useful consumer credit products.

21.     I understand Colorado promoted HB23-1229, including the Section 3 opt-out provision, as part of its multi-prong effort to prohibit loosely regulated, high-cost, small dollar,

**App. 101**

short term payday-type lending. NAIB members are not payday[1] lenders. Moreover, all financial products offered by the NAIB's state-chartered ILC members are regulated by the FDIC and state regulators. Thus, NAIB members do not provide such loans. If Section 3 goes into effect, Coloradans stand to lose access to the wider variety of mainstream, responsible consumer credit products offered by NAIB's members. This shrinking credit availability and consolidation of the Colorado consumer credit market into national banks—which will have even less incentive to keep their own rates and fees lower once competition from state banks has been reduced or eliminated— will especially affect Colorado consumers who, because of their credit risk profiles and/or thin credit history, have less access to credit generally. These are the very consumers NAIB members proudly provide responsible credit to now, and who Colorado claims to wish to protect.

### III.   NAIB members and allied organizations unsuccessfully sought a legislative solution

22.   Since the State of Colorado passed the opt-out law last year, NAIB supported attempts by state-chartered banks and other trade organization affected by the opt-out, to seek a legislative solution. I understand that on at least six occasions since HB23-1229 was signed into law last June, NAIB members and/or organizations to which NAIB has a formal relationship, met with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC to advocate for amendments to HB23-1229 in lieu of commencing litigation.  While NAIB appreciates the State's representatives' willingness to meet and discuss the effect of the law on NAIB's members and other similarly-situated state-chartered banks, unfortunately, those meetings did not result in the legislative change NAIB, its members, and other similarly-situated state-chartered banks sought.

---

[1] The CFPB explains that "[w]hile there is no set definition of a payday loan, it is usually a short-term, high cost loan, generally for $500 or less, that is typically due on your next payday." *See* "What is a payday loan?https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/" (last visited March 30, 2024).

**App. 102**

**IV.**   **Declaring the Opt-Out Unenforceable, and Enjoining Its Enforcement, Would Remedy the Harm to NAIB's Members**

23.     NAIB seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that its members have already incurred, and will continue to incur, as the compliance deadline nears.

24.     Ultimately declaring Section 3 void and unenforceable with respect to loans not made in Colorado under federal law, and enjoining its enforcement against NAIB's state-chartered, outside-Colorado ILC members, will permanently prevent these harms.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 1st day of April 2024, at Salt Lake City, Utah.

DocuSigned by:

*Frank Pignanelli*

099D6912C428460...

Frank Pignanelli

9

**App. 103**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 104**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS,
AMERICAN FINANCIAL SERVICES ASSOCIATION, and
AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

      Defendants.

---

## DECLARATION OF JAMES C. JACKSON IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

---

I, James ("Jim") C. Jackson, do hereby declare and state as follows:

1.    I am the Senior Vice President for Strategic Partner Oversight of WebBank. WebBank is chartered in Utah and headquartered at 215 S. State Street, Suite 1000, Salt Lake City, Utah. I have held this position since 2019. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.  This declaration is based on my personal knowledge, experience working in the banking industry, and a review of records kept in the ordinary course of business by WebBank, and I could and would competently testify to its contents if called to do so.

2.    WebBank is a member of plaintiff the National Association of Industrial Bankers.

3.    WebBank offers loans (in various forms) to consumers across the United States, including to residents of the State of Colorado.  These include: (i) "open-end" (or revolving balance) loans through general purpose credit cards under a range of brands; (ii) open-end loans

1

**App. 105**

through credit cards known as "private label" or "closed loop" credit cards, which are intended for use only for purchases from a specific merchant or group of merchants, in contrast with general purpose credit cards; (iii) consumer installment loans of various terms, which can be used for a variety of purposes, such as funding major purchases or life events, home improvements, or consolidating credit card debt; and (iv) "buy-now-pay-later" loans, used to split the cost of a single purchase into several installment payments (either through four monthly payments, or longer term monthly installment plans). WebBank makes its loan products available to consumers through its strategic partners ("Strategic Partners"), which include multiple financial technology ("fintech") companies that make WebBank's loan products available through their internet-based online platforms and/or mobile applications.

4.   Nationally, between January 1, 2019, and December 31, 2023, WebBank issued over three million credit card accounts in its general purpose consumer credit card programs, over four million accounts in its private label credit card programs, over 20 million loans in its consumer installment loan programs, and over 50 million loans in its buy-now-pay-later programs.  Across these categories listed above, between January 1, 2019, and December 31, 2023, WebBank has cumulatively funded over $41 billion in loans, including to consumers in Colorado.  WebBank estimates that, during the same five-year period, it has issued over one million loans and accounts to Colorado-based customers and provided them with access to over $700 million in credit.

5.   As illustrated above, private label credit cards, consumer installment loans, and buy-now-pay-later loans constitute a material portion of WebBank's lending activity nationwide, including in states such as Colorado.

6.    WebBank does not, within the borders of the State of Colorado: (a) approve loans (that is, WebBank does not apply subjective underwriting criteria, make decisions regarding loan

applications, develop automated electronic underwriting systems and criteria, or create credit policies), (b) make the choice to extend credit to any consumers (that is, WebBank does not subjectively make the choice to extend credit, nor does WebBank develop automated approval processes), or (c) disburse loan proceeds.

7.      I have reviewed CO HB23-1229, and its "opt-out" provision codified at Colo. Rev. Stat. § 5-13-106, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b). My understanding is that, upon such "opt out" provision becoming effective on July 1, 2024, Defendants intend to take the position that all private label credit card accounts and personal installment loans (including buy-now-pay-later loans) are subject to Colorado's limitations in regards to interest rates and fees, regardless of where those loans are made for purposes of federal law.

8.      Based on my experience working in the banking industry, I understand that nationally chartered banks will remain free to export the interest rates and fees of their home states under the National Bank Act, 12 U.S.C. § 85, without regard to Colorado's limitations on interest rates and fees or CO HB23-1229.  The market for credit is highly competitive, and WebBank's competitors include national banks.  National banks have offered, and continue to offer, private label credit cards, personal installment loans, and "buy-now-pay-later" (single-purchase installment loans) with interest rate and fee structures that, based on my understanding, would not otherwise comply with Colorado law if they were subject to the same restrictions as state-chartered banks.  Depending on the product and market segment, products offered by national banks can have higher interest rates than comparable products offered by WebBank.

9.      I understand that the majority of WebBank's private label credit card programs would become subject to Colorado's "opt-out" provision once it takes effect.  Those private label credit card programs carry APRs that can be higher than the 21% finance charge that I understand

**App. 107**

is the highest finance charge permitted for such products under the UCCC.  Consumers' APRs vary based on the specific private label credit card product, the consumer's individual credit profile, and other factors (e.g., payment history).  National banks that compete in the market for private label credit cards offer their own cards carrying APRs higher than 21% and other products that, in general, carry similar APR ranges as compared with programs offered by WebBank.  Those APRs are publicly available via disclosures published online and through the Consumer Financial Protection Bureau's Credit Card Agreement Database, *available at* https://www.consumerfinance.gov/credit-cards/agreements/ (last accessed March 21, 2024).

10.     WebBank's non-credit card loans, including consumer installment loans and buy-now-pay-later loans, may sometimes carry APRs above 21%, depending on a consumer's credit qualifications, the loan amount, repayment term length, and other factors.  I understand that Defendants take the position that these products would also become subject to the 21% finance charge cap under the UCCC, even for loans made by WebBank from Utah.  National banks compete in the market for personal installment loans and buy-now-pay-later loans; those banks offer APR ranges similar to those offered by WebBank, as reflected on those national banks' consumer-facing websites.

11.     WebBank invests substantial efforts to ensure that all its loan programs remain in compliance with all applicable laws.  WebBank often works with Strategic Partners to provide servicing, marketing, and other support functions relating to WebBank's various loan programs, and WebBank oversees all Strategic Partners to ensure that they also comply with all applicable laws.  WebBank adopts a conservative approach to compliance to avoid the potential of WebBank or a Strategic Partner of even being accused of violating the law.

**App. 108**

12.     It is not possible at this time to catalogue and estimate all the implementation and compliance-related costs WebBank and its Strategic Partners have incurred and will incur should the new Colorado laws take effect.  WebBank and its Strategic Partners have already incurred, and/or will incur, some or all of the following costs associated with preparation to comply with the new Colorado laws:

a.     preparing updated required disclosure notices;

b.     updating computer systems and testing, validating, and monitoring those computer systems to ensure accurate integration of Colorado-specific rate and fee caps, as well as ongoing compliance;

c.     training WebBank's compliance officers and other staff on the new Colorado-specific rates and fees;

d.     coordinating with Strategic Partners to ensure they are taking all necessary and appropriate steps and implementing changes to ensure their compliance and implementation;

e.     modeling the impact on revenue and operations, and developing strategies to address that impact on WebBank and its Strategic Partners; and

f.     engagement of outside consultants and attorneys to assist with legal interpretation, application, and implementation of Colorado's rate and fee laws.

13.     In my experience, the time and expense of preparing for, and implementing, Colorado's new regulatory regime are not recoverable by WebBank or its Strategic Partners. These represent additional costs that need to be accounted for when developing products.

14.     In addition to implementation and compliance costs, WebBank will experience lower revenues associated with Colorado loans.  It is difficult to estimate the full extent of the likely lost revenues at this time because of the complexity of credit markets and the variety of

WebBank's programs.  However, according to WebBank's best estimates at this time, upon the new Colorado laws taking effect, there will be an immediate negative impact on WebBank and its Strategic Partners that, over time, will cause WebBank and its Strategic Partners to lose millions of dollars of revenue.  Based on my experience, even if Colorado's new laws are set aside, WebBank and its Strategic Partners will have no way to recover those lost revenues and undo the damage to consumer relationships.

15.    WebBank has invested significant time and resources over more than 25 years establishing and building up goodwill with its Strategic Partners.  WebBank has already experienced strain on relationships and loss of goodwill with Strategic Partners as WebBank works toward implementation of, and compliance with, the UCCC's rate and fee limitations.  WebBank anticipates that it will continue to experience strained relationships and loss of goodwill with Strategic Partners as the July 1, 2024, effective date for the Colorado opt-out nears if WebBank deems it should close some or all private label credit cards and cease issuance of closed-end loan products, including buy-now-pay-later loans, for WebBank's Colorado customers.  In that event, WebBank also would need to ensure that Strategic Partners do not take steps on behalf of WebBank to open any new private label credit card accounts for Colorado consumers, absent restructuring programs to fit within the UCCC, which may not be economically viable.

16.    WebBank will similarly experience strain on its consumer relationships and loss of goodwill, which it has also invested significant time and resources to establish over decades by providing popular and useful consumer loan products on competitive terms, if it can no longer offer the same products to its Colorado consumers or if it must close or restrict spending on existing consumer accounts.  Based on my experience, consumers are likely to view WebBank negatively for terminating or limiting account features, even when WebBank does so solely to comply with a

new law or regulation.  For these and other reasons, if the new Colorado laws take effect, WebBank anticipates it will experience lost opportunities due to the loss of customers, which could negatively impact WebBank across multiple programs as consumers often enjoy the benefits of multiple offerings by WebBank.  In addition, certain consumers will not qualify for products with rates below Colorado's limits, and offering certain products exclusively for persons who would qualify for rates within Colorado's limits may not be economically practicable.

17.     It is difficult to estimate the full extent of the likely harm to WebBank's relationship with consumers should the new Colorado laws take effect.  Marketing is a major expense in WebBank's loan programs with its Strategic Partners because, as already noted, the market for credit in the U.S. is competitive, and WebBank competes against national banks.  Based on my experience, it is difficult to "win back" a consumer whose credit you revoked after the consumer has found alternative credit, even if the alternative credit is less favorable.  WebBank and/or its Strategic Partners would incur otherwise unnecessary marketing expenses in any attempts to "win back" those lost consumers and Strategic Partners due to the Colorado laws.

18.     Since the State of Colorado passed the opt-out law last year, WebBank, alongside other state banks and trade organizations that will be affected by the opt-out, have attempted to seek a legislative solution.  During the 2023 general session and following the signing of HB23-1229 into law last June, representatives of WebBank either directly or through our professional relationships have met with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC several times to advocate for amendments to HB23-1229.  While WebBank appreciates the State's representatives' willingness to meet and discuss the effect of the law on WebBank and other similarly situated state banks, unfortunately,

**App. 111**

those meetings did not result in the legislative change WebBank and other similarly situated state banks sought.

19.      WebBank supports an immediate injunction as soon as practicable, and as far in advance of July 1, 2024, as reasonably possible, to mitigate further harm to WebBank associated with the possibility of needing to revamp programs and products offered to consumers in Colorado.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and accurate. Executed this 21st day of March 2024 at Salt Lake City, Utah.

_Jim Jackson_

A87FFE4810857709F18036F6EB25726D        contractworks.

James C. Jackson

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court  via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 113**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

      Defendants.

---

### DECLARATION OF PHIL GOLDFEDER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, Phil Goldfeder do hereby declare and state as follows:

1.      I am the Chief Executive Officer of Plaintiff the American Fintech Council ("AFC"). I have held this position since March 2023. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      AFC is the premier trade association representing some of the largest financial technology (Fintech) companies and innovative BaaS banks. It is incorporated and headquartered in Washington, D.C. As the CEO of AFC, I am charged with carrying out our mission to promote a transparent, inclusive, and customer-centric financial system by supporting responsible innovation in financial services and encouraging sound public policy. AFC is committed to robust consumer industry standards, with a focus on consumer protection and regulatory compliance, in addition to advocating for and embracing appropriate government regulation. As part of its

1

**App. 114**

mission, AFC follows changes in state laws and regulations that impact its members, and will work to improve proposed laws and regulations or oppose proposals that harm AFC's members and consumers.

3.     AFC's members are located across the country and offer access to responsible financial products.  Responsible and innovative fintech companies that partner with regulated state-charted financial institutions are democratizing financial services and creating safe, accessible, transparent and affordable lending options.  AFC's members foster competition in consumer finance and pioneer products to better serve underserved consumer segments and geographies.  AFC's members lower the cost of financial transactions, creating competition in the market and meeting consumer demand for high-quality, affordable products.  Our members do not offer "payday" or "high-cost installment loans" as defined by the Consumer Financial Protection Bureau and have agreed to uphold and advocate for a 36% interest cap.  A list of AFC's members is available at https://fintechcouncil.org/who-we-are#Members.

4.     I am familiar with CO HB23-1229, and its "opt-out" provision now codified at Colo. Rev. Stat. § 5-13-106, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b).  Some of our members solicit or advertise in Colorado, or receive written obligations from consumers in Colorado.  I understand that, when read in concert with § 5-1-201(1)(a)-(b), upon § 5-13-106 becoming effective on July 1, 2024, Colorado will consider our members that solicit or advertise in Colorado, or receive written obligations from consumers in Colorado to be subject to Colorado's limitations in regards to interest rates and fees.

5.     I understand Colorado promoted HB23-1229, including the Section 3 opt-out provision, as part of its multi-prong effort to protect consumers from predatory, high-cost, small dollar, short-term lending.  But, as mentioned, AFC's state-chartered depository institution

**App. 115**

members are *not* payday lenders. If Section 3 goes into effect, Coloradans stand to lose access to the wider variety of mainstream, responsible consumer credit products offered by AFC's members. This shrinking credit availability and consolidation of the Colorado consumer credit market into national banks—which will have even less incentive to keep their own rates and fees lower once competition from state banks has been reduced or eliminated—will especially affect Colorado consumers who, because of their credit risk profiles and/or thin credit history, have less access to credit generally. These are the very consumers AFC's members proudly provide responsible credit to now, and who Colorado claims to wish to protect.

6.     Since the State of Colorado passed the opt-out law last year, AFC, alongside state-chartered banks and other trade organizations that will be affected by the opt-out, have attempted to seek a legislative solution. On at least six occasions since HB23-1229 was signed into law last June, representatives of AFC met with representatives of the Colorado legislature and those in Colorado government responsible for administering the UCCC to advocate for amendments to HB23-1229 in lieu of commencing litigation. The last of those meetings took place on January 25, 2024. While AFC appreciates the State's representatives' willingness to meet and discuss the impact of the law on AFC's members and other similarly-situated state-chartered banks, unfortunately, those meetings did not result in the legislative change AFC, its members, and other similarly-situated state-chartered banks sought.

7.     AFC's members offer a wide variety of useful, familiar, consumer credit products, available at a range of rates and fee options. These rate and fee options may include annual percentage rates (APRs) or finance charges higher than 21%, which I understand is the highest finance charge allowed for most consumer credit products under Colorado's Uniform Consumer Credit Code (UCCC). These products include:

**App. 116**

  a. Personal installment loans, which can be used for debt consolidation, financial emergencies, to finance large purchases, family vacations, milestone events such as weddings, medical expenses, home improvements, and the like. These may be offered for varying amounts and could be subject to a range of APRs and/or finance charges, depending on credit, income or other consumer-specific or product-specific factors; and

  b. Buy-now-pay-later ("BNPL") loans, which are typically offered by retailers at the "point of sale" to fund single larger-cost consumer purchases. Depending on structure, as well as the credit profile of the consumer, BNPL products can be subject to a range of APRs.

  8. I also understand that national chartered banks will not be subject to the aforementioned Colorado statutes and will remain free therefore to export the interest rates and fees of their home states under the National Bank Act, 12 U.S.C. § 85, without regard to Colorado's limitations on interest rates and fees. Many national banks offer products with interest rate and fee structures similar to, and sometimes higher than, those offered by our members that are state-chartered. For example, I am aware that our members' national bank competitors offer personal installment loans and buy-now-pay-later loans with APR ranges similar to, and in some cases higher than, those offered by our members, as published on those national banks' consumer-facing websites.

  9. To my knowledge, none of AFC's state-chartered depository institution members is chartered or headquartered in the State of Colorado. To my knowledge, none of AFC's state-chartered depository institution members perform all three of the following activities within the borders of the State of Colorado: (a) approve loans (that is, they do not apply subjective underwriting criteria, review loan applications, develop automated electronic underwriting systems and criteria, or create credit policies), (b) make the choice to extend credit (that is, they

**App. 117**

do not subjectively make the choice to extend credit or develop automated approval processes), or (c) disburse loan proceeds.

      10.    Our members have already incurred, will continue to incur, and/or will incur, the following costs associated with preparing to comply with the new Colorado laws:

      a.    preparing, printing, and distributing updated required disclosure notices;

      b.    adjusting technology systems to comply with an evolving state mandate, which places an enormous burden on our members.  These costs include updating their computer systems and those of its system providers, including the costs associated with engaging vendors and consultants to adjust systems; to potentially integrate new vendors and new systems; and to test, validate and monitor those systems in order to ensure accurate and seamless integration of Colorado-specific rate and fee caps into what is currently a uniform national system, and to ensure ongoing compliance;

      c.    training customer service agents, compliance officers, and other staff on the new rates and fees and system changes they must adopt to implement those changes;

      d.    developing and presenting new training materials, and the associated employee time to train and be trained;

      e.    expenditure of employee time to engage in relationship management, and cooperation with brand and merchant partners on compliance and implementation, in anticipation of Colorado's changed rate and fee allowances;

      f.    modeling impact on revenue and operations, and what their strategies will be to address that; and

      g.    engagement of outside consultants and specialist attorneys to assist with legal interpretation, application, and implementation of Colorado's rate and fee laws.

**App. 118**

11.     Once applied to our members, the UCCC's rate and fee limitations, will also result in immediate harm to AFC's members.

a       Many of the current and potential customers who AFC's members can no longer profitably serve will be lost to national banks, which will still be able to charge their current rates and fees.  Some customers—particularly those with less access to credit—will go unserved entirely.

b.      AFC's members have already begun to experience, and will continue to experience, strained relationships with current customers and brand and merchant partners, and face the prospect of irreparable loss of customer goodwill as AFC's members must adjust or eliminate their product offerings available to Colorado consumers.

c.      Our members will experience immediate, business jeopardizing revenue losses.  This includes future revenue, including lost customer and client opportunities because it will no longer be economically practicable for many of AFC's members to lend to customers with thinner or riskier credit profiles at rates below 21% APR.

12.     If the laws are not enjoined, and despite its best efforts to comply, AFC's members will also be subject to consumers' private rights of action, and to the State of Colorado's enforcement rights, with regard to the new laws.  Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

13.     If Colorado's opt-out is permitted to apply as broadly as the state intends, many of AFC's state-chartered depository institution members will be forced to curtail lending to Colorado residents who they cannot serve with certain products at APRs or finance charges less than 21%. But because national banks will still be lending at whatever rates they choose, Colorado's opt-out

**App. 119**

Case No. 1:24-cv-00812-DDD-KAS   Document 31   filed 04/02/24   USDC Colorado   pg 7 of 8
DocuSign Envelope ID: 2618816A-70B6-4C11-A71E-737C67C8A708

Appellate Case: 24-1293   Document: 42-1   Date Filed: 09/16/2024   Page: 125

will do nothing more than reduce Colorado consumers' access to and choice among responsible, popular and useful consumer credit products.

14.     AFC seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that its members have already incurred, and will continue to incur, as the compliance deadline nears.

15.     Ultimately declaring Section 3 void and unenforceable with respect to loans not made in Colorado under federal law, and enjoining its enforcement against AFC's state-chartered, outside-Colorado depository institution members, will permanently prevent these harms.

I declare under penalty of perjury that the foregoing is true and accurate. Executed this 1st day of April 2024, in the District of Columbia.

DocuSigned by:

*Phil Goldfeder*

Phil Goldfeder

**App. 120**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court  via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

8

**App. 121**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

     Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and
MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

     Defendants.

---

### DECLARATION OF TODD BOREN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, Todd Boren, do hereby declare and state as follows:

     1.     I am the President and COO of Celtic Bank Corporation ("the Bank"). The Bank is chartered in Utah and headquartered at 268 S. State Street, Ste. 300, Salt Lake City, UT 84111. I joined the Bank in 2016. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. This declaration is based on my personal knowledge, and a review of records kept in the ordinary course of business by the Bank, and I could and would competently testify to its contents if called to do so.

     2.     The Bank is a member of plaintiff the National Association of Industrial Bankers ("NAIB").

3.     The Bank offers loans (in various forms) to consumers across the United States, including to residents of the State of Colorado. These include: (i) "open-end" (or revolving balance) loans through general purpose credit cards (a proprietary credit card, and "co-brand" credit cards, that is, cards that are co-branded with a particular merchant, but may be used for general purposes and not just for purchases from the co-brand merchant); (ii) open-end loans through credit cards known as "private label," or "closed loop" credit cards, which are intended for use only for purchases from a specific merchant or group of merchants, in contrast with general purpose credit cards; and (iii) personal installment loans , which can be used for a variety of purposes, such as funding purchases or life events, or consolidating credit card debt..

4.     I am familiar with CO HB23-1229, and its "opt-out" provision now codified at Colo. Rev. Stat. § 5-13-106, as well as Colo. Rev. Stat. § 5-1-201(1)(a)-(b). I am advised that, when read in concert with each other, upon the former's becoming effective on July 1, 2024, a significant number of the Bank's products offered by its strategic lending partners are deemed by the State of Colorado to be subject to Colorado's limitations regarding interest rates and fees.

5.     I am also advised that our competitor national chartered banks will not be subject to the aforementioned Colorado statutes and will remain free therefore to export the interest rates and fees of their home states under the National Bank Act, 12 U.S.C. § 85, without regard to Colorado's limitations on interest rates and fees.  Many of our competitor national banks offer general purpose and private label  credit cards, personal installment loans and lines of credit   with interest rate and fee structures similar to, and sometimes higher than, the Bank's.

6.     For instance, the Bank's credit cards, which Colorado intends to be subject to Colorado's "opt-out" provision once it goes into effect, primarily carry APRs that are higher than the 21% finance charge but less than 36%.  I have been informed 21% is the highest finance charge

**App. 123**

permitted for these products under the UCCC making it difficult, if not impossible, for Bank to offer these credit products in Colorado. I am aware that the Bank's national bank competitors for private label credit cards also offer cards carrying APRs higher than 21%, and in general that carry similar, or in some cases higher, APR ranges as compared with those offered by the Bank. Those APRs are publicly available via disclosures published on the Bank's and its competitors' websites, and through the Consumer Financial Protection Bureau's Credit Card Agreement Database, available at htt s://www.consumerfinance. ov/credit-cards/a reements/ (last accessed March 21, 2024).

7.    The Bank's loans may sometimes carry APRs above 21%, but less than or equal to 36% depending on a consumer's credit qualifications, the loan amount and repayment term length. I understand that these products would also be subject to the 21% finance charge cap under the UCCC. I am aware that the Bank's national bank competitors offer personal installment loans with APR ranges similar to, and in some cases substantially higher than, those offered by the Bank, as published on those national banks' consumer-facing websites.

8.    The Bank has already incurred, and/or will continue to incur, the following costs associated with preparation to comply with the new Colorado laws:

        a.    preparing, printing, and distributing updated required disclosure notices;

        b.    updating the Bank's computer systems and those of its system providers, including the costs associated with engaging vendors and consultants to adjust systems; to potentially integrate new vendors and new systems; and to test, validate and monitor those systems in order to ensure accurate and seamless integration of Colorado-specific rate and fee caps into what is currently a uniform national system, and to ensure ongoing compliance;

**App. 124**

      c.     training customer service agents, compliance officers, and other staff on the new rates and fees and system changes the Bank must adopt to implement those changes;

      d.     developing and presenting new training materials, and the associated employee time to train and be trained;

      e.     expenditure of employee time to engage in relationship management, and cooperation with Brand and Merchant Partners on compliance and implementation, in anticipation of Colorado's changed rate and fee allowances;

      f.     modeling impact on revenue and operations, and what the Bank's strategy will be to address that;

      g.     potential need to hire additional FTEs to assist with all of the above;

      h.     engagement of outside consultants and specialist attorneys to assist with legal interpretation, application, and implementation of Colorado's rate and fee laws.

9.     It is not possible at this time to accurately estimate what all of these implementation and compliance-related cost considerations will total, in terms of employee hours and cost outlay. None of these costs or time spent will be recoverable.

10.     The UCCC's rate and fee limitations, once applied to the Bank, will result in immediate and unrecoverable loss of revenue. The Bank, which has invested significant time and resources over decades establishing and building up goodwill with its Brand and Merchant Partners, has already experienced strain on its relationships and loss of goodwill with these Partners as the Bank works toward implementation and compliance with the UCCC's rate and fee limitations. The Bank anticipates that it will continue to experience strained relationships and loss of goodwill with Brand Partners and Merchant Partners as the July 1, 2024 effective date for the Colorado opt-out nears if the Bank must close credit card accounts of the Banks' Brand Partners'

**App. 125**

Colorado customers; must notify Brand Partners that it will no longer be able to open new private label credit card accounts for Colorado consumers of those Partners' stores and products; and must notify Merchant Partners that it will no longer be able to offer personal installment loans to their Colorado customers because it is no longer economically practicable.

11.     The Bank will similarly experience strain on its consumer relationships and loss of goodwill, which it has also invested significant time and resources in establishing over decades of providing popular and useful consumer loan products, if it can no longer offer the same products to its Colorado consumers, or if it must close or restrict spending on existing consumer accounts.

12.     Because of the legal risks envisioned by the adoption of the opt-out, the Bank believes that it may not be able to offer credit to Colorado customers.

13.     The Bank will also experience lost opportunity and loss of customers and Partners, including:

        a.     potential lost opportunity for new accountholder relationships for potential new accounts the Bank cannot open because it is no longer economically practicable;

        b.     potential lost accountholder relationships with customers whose accounts the Bank may determine it must close because it is no longer economically practicable to keep the accounts open, or with whom relationships will become strained;

        c.     loss of customers and Brand and Merchant Partners to national banks, because national banks will be permitted to continue charging the same interest rates and fees they have always charged in Colorado, if and once the Bank exits that market.

14.     The potential that the Bank will experience these lost opportunity costs, and potential loss of customers, is significant, though difficult to quantify at this time.

**App. 126**

15.     If the laws are not enjoined, and despite its best efforts to comply, the Bank will also be subject to consumers' private rights of action, and to the State of Colorado's enforcement rights, with regard to the new laws. Costs associated with defense of potential consumer lawsuits and enforcement actions, and the potential for damages, are impossible to estimate at this time, but would be substantial, and not recoverable.

16.     The Bank seeks an immediate injunction, well before the effective date of July 1, 2024, to stem the harm that the Bank has already incurred, and will continue to incur, as the compliance deadline nears.

I declare under penalty of perjury that the foregoing is true and accurate. Executed this 21st day of March 2024, at Salt Lake City, Utah.

Todd Boren

6

**App. 127**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will generate notice to the following via electronic mail:

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

/s/ David M. Gossett
David M. Gossett

**App. 128**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA FULFORD,
Administrator of the Colorado Uniform Consumer Credit Code,

Defendants.

---

### FEDERAL DEPOSIT INSURANCE CORPORATION'S
### UNOPPOSED MOTION FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF
### IN SUPPORT OF DEFENDANTS

---

Dated: April 23, 2024

HARREL M. PETTWAY
General Counsel
FLOYD I. ROBINSON
Deputy General Counsel
B. AMON JAMES
Assistant General Counsel
J. SCOTT WATSON
Senior Counsel
MINODORA D. VANCEA
Counsel
MICHAEL K. MORELLI
Senior Attorney

FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 N. Fairfax Drive, VS-D7004
Arlington, VA 22226-3500
Tel: (571) 501-4021
Email: mmorelli@fdic.gov

**App. 129**

**LOCAL RULE 7.1(a) CERTIFICATION**[1]

Pursuant to Rule 7.1(a) of the Local Rules of Practice of the United States District Court for the District of Colorado, counsel for Federal Deposit Insurance Corporation consulted with counsel for the parties about their consent to the filing of the proposed amicus curiae brief. On April 18, 2024, Defendants' counsel informed FDIC counsel by phone that they consented to the FDIC's motion. On April 19, 2024, Plaintiffs' counsel informed FDIC counsel by email that they consented to the FDIC's motion, and also noted that they would likely seek a reasonable expansion of this Court's word-count limit for their reply brief.

---

[1] By its terms, Local Rule 7.1(a) may not apply to would-be amici curiae who are not "part[ies]" in the case. D.C. Colo. L. Civ. R. 7.1(a) ("Before filing a motion, counsel for the moving *party* or an unrepresented *party* shall confer or make reasonable, good faith efforts to confer with any opposing counsel or unrepresented *party* to resolve any disputed matter." (emphasis added)). Even so, counsel for the FDIC provides this certification in the interest of fairness to the parties.

i

### INTRODUCTION AND INTEREST OF AMICUS CURIAE

Non-party Federal Deposit Insurance Corporation ("FDIC") requests leave to file the attached brief as amicus curiae in support of Defendants Philip J. Weiser and Martha Fulford. This Court frequently exercises its discretion to allow amicus appearances, especially when the entity seeking permission is the United States Government or one of its agencies. *E.g.*, *Colorado v. Ace Cash Express, Inc.*, 188 F. Supp. 2d 1282 (D. Colo. 2002). It should do so again here.

Plaintiffs' Complaint and Motion for a Preliminary Injunction reference (but largely misinterpret or misapply) two prior FDIC opinion letters and several federal statutory provisions falling within the FDIC's administrative charge. ECF Nos. 1, 24. Therefore, the FDIC is well-positioned to offer its unique perspective on these issues and to help this Court in construing the statutory language on which Plaintiffs' preliminary-injunction request now turns.[2] To that effect, the FDIC has previously filed amicus briefs intended to help courts resolve such interpretive questions under the federal banking laws.[3]

The FDIC is an independent federal agency of the United States established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833e ("FDI Act").[4] Its responsibilities include administering and enforcing the FDI Act as well as prescribing rules and regulations to carry out that task. 12 U.S.C. § 1819(a) (Tenth).[5] Section 521 of the Depository Institutions

---

[2] Plaintiffs suggest that this Court could construe its motion for a preliminary injunction as a motion for summary judgment because this litigation "turn[s] entirely on questions of law." ECF No. 24 at 18 n.5. The FDIC takes no position on this issue. Instead, it requests only that this Court consider the proposed amicus brief at every stage of the litigation, where appropriate.

[3] *E.g.*, *In re Rent-Rite Superkegs West Ltd.*, 623 B.R. 335 (D. Colo. 2020).

[4] The FDIC has no parent corporation and no publicly-held corporation owns 10 percent or more of its stock.

[5] Following the stock-market crash of 1929 and the resulting Great Depression, Congress created a federal deposit insurance system for eligible banks and formed the FDIC to administer it. *See* 12 U.S.C. §§ 1811, 1819. Later legislation expanded the FDIC's role in the regulation and

1

**App. 131**

Deregulation and Monetary Control Act of 1980 ("DIDMCA") added Section 27 to the FDI Act and was later codified at 12 U.S.C. § 1831d. Section 525 of DIDMCA was also added at § 1831d's statutory note. Because these provisions lie at the heart of this dispute, the FDIC has a substantial interest in helping this Court resolve interpretive questions surrounding them—especially when those questions carry serious and imminent implications for thousands of banks and consumers across the country. *See Funbus Sys., Inc. v. State of Cal. Pub. Util. Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986) (observing how amici can help the court by "assisting in a case of general public interest, supplementing the assisting in a case of general public interest, supplementing the efforts of counsel, and drawing attention to law that might otherwise escape consideration" (citation omitted)).

Section 521 generally authorizes state banks to make loans charging interest at the maximum rate permitted by the state where the bank is "located," while Section 525 gives states the ability to opt out of these interest-rate authorities with respect to "loans made" in that state.[6] In their Motion, Plaintiffs argue that Section 3 of H.B. 23-1229, 74th Assemb., Reg. Sess. (Colo. 2023) ("H.B. 23-1229"), did not validly opt Colorado out of Section 521's interest-rate authorities because the legislation purportedly covers loans beyond those "made" in Colorado. ECF No. 24 at 10-16. In making this argument, Plaintiffs cite to two prior FDIC interpretive

---

stabilization of banks. *See, e.g.*, Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989). These responsibilities include serving as the primary federal regulator for certain state-chartered banks that are not members of the Federal Reserve System. *See* 12 U.S.C. §§ 1817(a), 1819, 1820(b). Congress has also conferred independent litigating authority on the FDIC to assist the agency in performing these responsibilities. 12 U.S.C. § 1819(a)(Fourth).

[6] Section 521 also authorizes state banks to make loans at a federal rate not exceeding the 90-day commercial paper rate plus one percent (if higher than the maximum rate permitted by the state where the bank is located).

2

**App. 132**

letters—FDIC General Counsel Opinion No. 11 ("Opinion 11") and FDIC Interpretive Letter 88-45 ("1988 Letter").  ECF No. 24 at 10, 13.

As explained in the proposed amicus brief, the FDIC believes that Plaintiffs' misinterpret these prior FDIC interpretive letters.  Plaintiffs' arguments conflate Section 521's emphasis on where a bank is "located" with Section 525's focus on where a loan is "made."  Specifically, Plaintiffs' heavy reliance on Opinion 11 is misplaced because Opinion 11 addresses only where a bank is "located" for purposes of Section 521 and does *not* address Section 525 or a state's opt-out rights.  Plaintiffs also misapprehend key aspects of the 1988 Letter, which expressly rejected the position that a loan is necessarily "made" (for purposes of Section 525) in the state where the bank was located.  Accordingly, the FDIC has a substantial interest in refining Plaintiffs' interpretation of the relevant statutory provisions and clarifying Plaintiffs' misreading of the FDIC's previous statements relating to these topics.

## ARGUMENT

### I.   District Courts Consult Federal Rule of Appellate Procedure 29 When Considering Motions to File an Amicus Brief.

Federal district courts have inherent authority to allow non-parties to participate in a case as amicus curiae and have broad discretion in deciding whether to allow such participation.  *Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1073 (D. Colo. 2020).  Neither the Tenth Circuit nor the Federal Rules of Civil Procedure set forth standards for district courts to reference when exercising this discretion.  Therefore, courts in this district often consult Federal Rule of Appellate Procedure 29.  *See, e.g.*, *Jones v. Dish Network Corp.*, No. 22-cv-00167-CMA-STV, 2022 WL 2340661, at *1 (D. Colo. June 29, 2022).  Under Rule 29(a)(2), "[t]he United States or its officer or agency . . . may file an amicus brief without the consent of the parties or leave of

3

**App. 133**

court." Fed. R. App. P. 29(a)(2). Consequently, Rule 29(a)(2) strongly supports the FDIC's

participation as amicus in this case.

## II. The Court Should Exercise Its Broad Discretion to Allow the FDIC to File Its Amicus Brief.

Even if this Court chose not to rely on Rule 29(a)(2), the FDIC's participation in this case

remains justified. Under Rule 29(a)(3), an entity may participate as amicus curiae if it "has an

interest in the case, the matters it seeks to address are relevant, and its participation is desirable."

*See Ctr. for Biological Diversity v. Jewell*, No. 16-cv-01932-MSK-STV, 2017 WL 4334071, at

*1 (D. Colo. May 16, 2017); *see also Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841,

846 (D.D.C. 1996) (allowing amicus participation where information offered is "timely and

useful" (quoting *Waste Mgmt. of Pa. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995))).

Echoing these principles, some courts in this district reference the following considerations when

determining whether to allow amicus participation:

> (1) whether the proposed amicus is a disinterested entity; (2) whether there is
> opposition to the entry of the amicus; (3) whether counsel is capable of making
> arguments without the assistance of an amicus; (4) the strength of the information
> and argument presented by the potential amicus curiae's interests; and, perhaps
> most importantly (5) the usefulness of information and argument presented by the
> potential amicus curiae to the court.

*See, e.g.*, *Or.-Cal. Trails Ass'n*, 467 F. Supp. 3d at 1073. Courts have granted amicus

participation based solely on satisfaction of the fourth or fifth factor. *See, e.g.*, *High Country*

*Conservation Advocs. v. U.S. Forest Serv.*, 333 F. Supp. 3d 1107, 1117 (D. Colo. 2018), *rev'd on*

*other grounds* 951 F.3d 1217 (10th Cir. 2020); *Sgaggio v. De Young*, No. 20-cv-01977-PAB-

NYW, 2022 WL 970008, at *4-5 (D. Colo. Mar. 31, 2022).

Of course, this Court retains "discretion to determine the extent and manner of

participation of an amicus" without resorting to this framework. *See Lomax v. Starbucks Corp.*,

No. 1:23-cv-01426-GPG-SBP, 2024 WL 554068, at *7 (D. Colo. Feb. 12, 2024) (quoting *Russell*

**App. 134**

*v. Bd. of Plumbing Exam'rs of Cty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999)).
But if this Court chose to use this framework, its considerations weigh strongly in favor of
granting the FDIC's request because the agency's "unique perspective" will prove "helpful in
understanding and analyzing the issues presented." *See High Country Conservation Advocs.*,
333 F. Supp. 3d at 1117; *see also California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153,
1163-64 (N.D. Cal. 2019) ("The 'classic role' of amicus curiae is to assist a court in a case of
public interest by 'supplementing the efforts of counsel,'" and generally "courts have 'exercised
great liberality' in permitting amicus briefs." (quoting *Miller-Wohl Co. v. Comm'r of Lab. &
Indus., State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982))).

This Court frequently welcomes similar amicus briefs from the United States, its
agencies, or other state-government entities with similar responsibilities and interests. *See
Hattell v. Pub. Svc. Co. of Colo.*, 350 F. Supp. 240, 246 (D. Colo. 1972) (permitting state utility
commission to participate as amicus because its "help and expertise would be welcome"); *Vigil
v. AT&T Co.*, No. C-1476, 1969 WL 118, at *1 (D. Colo. Sept. 9, 1969) ("The Court feels that a
brief from the agency responsible for the administration of the statute and regulations pursuant to
which this action is brought would be most helpful.").[7]  Likewise, this Court often allows amicus

---

[7] *See also, e.g.*, *US W. Commc'ns, Inc. v. Hix*, 93 F. Supp. 2d 1115 (D. Colo. 2000) (accepting
amicus brief submitted by FCC); *S. Ute Indian Tribe v. Bd. of Cty. Comm'rs*, 855 F. Supp. 1194
(D. Colo. 1994) (accepting amicus brief submitted by the United States), *rev'd on other grounds*,
61 F.3d 916 (10th Cir. 1995); *Esparza v. Valdez*, 612 F. Supp. 241 (D. Colo. 1985) (accepting
amicus brief submitted by INS); *Rohrbough v. Harris*, No. 00-cv-00808-LTB-PAC, 2007 WL
987848 (D. Colo. Apr. 2, 2007) (accepting amicus brief submitted by the National Archives and
Records Administration); *Colo. Christian Univ. v. Weaver*, No. CIV-A-O4-CV-02512-MSKNB,
2006 WL 225900 (D. Colo. Aug. 7, 2006) (accepting amicus brief submitted by the United
States); *Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship*, No. Civ. A. 96-WY-2490-
AJ, 1997 WL 33471624 (D. Colo. Mar. 3, 1997) (accepting amicus brief submitted by the United
States).

**App. 135**

participation from federal banking agencies seeking to offer their interpretive assistance on the meaning of federal banking laws.[8]  The FDIC respectfully asks that it do so again here.[9]

Other factors also support the FDIC's participation.  The FDIC's statutory responsibilities, for example, afford it "unique information [or] perspective that can help the court beyond the help that lawyers for the parties are able to provide."  *SEC v. Cetera Advisors LLC*, No. 19-cv-02461-MEH, 2020 WL 13470960, at *2 (D. Colo. Aug. 25, 2020) (internal citation omitted).  While Plaintiffs correctly argue (and the proposed amicus brief shows) that Section 525's interpretation turns on federal rather than state law, ECF No. 24 at 9-10, neither party can replicate the FDIC's expertise and experience in analyzing the FDI Act and other statutory provisions related to it (including Section 525).  As a federal banking agency, the FDIC's understanding of Section 525 and its interplay with other federal banking statutes is based on an extensive institutional history evaluating similar interpretive questions.  This understanding is not shared—indeed, cannot be shared—by the existing parties.  And while the

---

[8] *Colorado v. Ace Cash Express, Inc.*, 188 F. Supp. 2d 1282 (D. Colo. 2002) (accepting amicus brief submitted by the Office of the Comptroller of the Currency); *First Nat'l Bank of McCook v. Fulkerson*, Civ. No. 98-D-1024, 2000 WL 33914121 (D. Colo. 2000) (accepting amicus brief submitted by the Office of the Comptroller of the Currency).

[9] Unlike most other would-be amici, the FDIC's interest in this case is limited and impartial; it extends only toward ensuring that federal statutes under its administrative charge are interpreted and applied correctly.  This disinterestedness holds true even though the FDIC seeks permission to file a brief in support of Defendants rather than in support of neither party.  As a federal government agency, the FDIC is not predisposed to act in favor of any particular party.  Instead, the FDIC seeks only to offer its experience-based perspective and to help this Court resolve legal questions of nationwide significance—interests of particular importance given Plaintiffs' (incorrect) reliance on previous FDIC statements.  And that motivation does not preclude the FDIC from submitting a brief that supports a particular party when it believes the law warrants that outcome.  *See Sgaggio*, 2022 WL 970008 at *5 ("Although, historically, *amicus curiae* presented information without advocating a point of view . . . today *amicus* briefs often support a particular party." (emphasis in original)).

**App. 136**

parties can debate the scope and import of Opinion 11, the FDIC remains best positioned to expound on opinions developed in its own Office of the General Counsel.

Finally, the FDIC's proposed amicus brief will prove useful to this and other courts when confronting future opt-out scenarios. While this case ostensibly concerns H.B. 23-1229, other states and territories have exercised their rights under Section 525.[10] This Court's construction of Section 525 could therefore influence how other courts interpret the validity and scope of those states and territories' opt-out decisions. Similarly, several other legislatures are weighing opt-out legislation similar to H.B. 23-1229.[11] Although the FDIC's proposed amicus brief limits itself to questions of law at issue in *this* case, the legal principles discussed therein may nevertheless offer useful guidance to this and other courts confronting analogous questions involving loans "made" in other jurisdictions in the near- and long-term future.

## CONCLUSION

Many district courts "welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved." *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005). This permissive posture carries even more weight when the issues presented are novel and of national importance.[12] Therefore, the FDIC respectfully requests that this Court grant the FDIC's motion

---

[10] 1980 Iowa Acts, ch. 1156, § 32 (Iowa); 10 L.P.R.A. § 998*l* (Puerto Rico).

[11] Minnesota, Rhode Island, and the District of Columbia are currently considering draft legislation to opt out of DIDMCA's interest-rate authorities. S. 2275, 2024 Gen. Assemb., Jan. Sess. (R.I. 2024); H.F. 3680, 93d Leg., 2023-24 Leg. Sess. (Minn. 2024); B. 25-0609, 25th Council, 2023-24 Sess. (D.C. 2023). In Nevada, a nonprofit corporation has proposed a ballot initiative seeking to opt the state out of DIDMCA's interest-rate authorities. Kate Feldman, *Initiative Petition – Statewide Statutory Measure*, Nev. Sec'y of State (Jan. 24, 2024), https://www.nvsos.gov/sos/home/showpublisheddocument/12810/638417127094500000.

[12] *See e.g.*, *Adarand Constructors, Inc. v. Pena*, 965 F. Supp. 1556, 1558, 1573–76 (D. Colo. 1997) (noting participation by amici curiae in suit challenging race-based preferences in federal contracting), *rev'd on other grounds sub. nom.*, *Adarand Constructors, Inc. v. Slater*, 228 F.3d

7

**App. 137**

to file its proposed amicus brief.  And should this Court so direct, the FDIC is prepared to provide additional assistance either through supplemental briefing or by appearing at oral argument to answer the Court's questions.

Dated:  April 23, 2024                    Respectfully submitted,

                                          HARREL M. PETTWAY
                                          General Counsel
                                          FLOYD I. ROBINSON
                                          Deputy General Counsel
                                          B. AMON JAMES
                                          Assistant General Counsel
                                          J. SCOTT WATSON
                                          Senior Counsel
                                          MINODORA D. VANCEA
                                          Counsel
                                          /s/Michael K. Morelli
                                          MICHAEL K. MORELLI
                                          Senior Attorney
                                          Federal Deposit Insurance Corporation
                                          3501 N. Fairfax Drive, VS-D7004
                                          Arlington, VA 22226
                                          Tel: (571) 501-4021
                                          Fax: (703) 562-2496
                                          Email: mmorelli@fdic.gov

                                          *Attorneys for FDIC*

---

1147 (10th Cir. 2000); *United States v. Strandlof*, No. 09-cr-00497-REB, 2009 WL 5126540, at *3 (D. Colo. Dec. 18, 2009) (given inadequate briefing on novel issue of First Amendment law, court decided to "invite *amicus curiae* briefs" subject to certain procedural and disclosure requirements).

**App. 138**

**CERTIFICATE OF TYPE-VOLUME COMPLIANCE**

Excluding the portions of the motion excepted under DDD Civ. P.S. III(A)(3), the FDIC

hereby certifies that the foregoing pleading contains 2,769 words and thus complies with the

type-volume limitation set forth in DDD Civ. P.S. III(A)(1).

Dated:  April 23, 2024

/s/Michael K. Morelli
Michael K. Morelli
*Attorney for FDIC*

## CERTIFICATE OF SERVICE

I certify that on April 23, 2024, I electronically filed the foregoing motion on behalf of

the Federal Deposit Insurance Corporation using the Court's CM/ECF system, which will

generate notice to the following via electronic mail:

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine, LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

TYLER J. BOURKE
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 622-3150
tyler.bourke@dwt.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine, LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com\
leah.capritta@hklaw.com

*Attorneys for National Association of Industrial Bankers and the American Financial Services Federation*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcom.com
arffal@sullcom.com

*Attorneys for the American Fintech Council*

**App. 140**

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP M. SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

*Attorneys for Defendants Philip J. Weiser and Martha Fulford*

Dated: April 23, 2024

/s/Michael K. Morelli
Michael K. Morelli
*Attorney for FDIC*

**App. 141**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA FULFORD,
Administrator of the Colorado Uniform Consumer Credit Code,

Defendants.

---

## AMICUS CURIAE BRIEF OF THE
## FEDERAL DEPOSIT INSURANCE CORPORATION
## IN SUPPORT OF DEFENDANTS

---

Dated: April 23, 2024

HARREL M. PETTWAY
General Counsel
FLOYD I. ROBINSON
Deputy General Counsel
B. AMON JAMES
Assistant General Counsel
J. SCOTT WATSON
Senior Counsel
MINODORA D. VANCEA
Counsel
MICHAEL K. MORELLI
Senior Attorney

FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 N. Fairfax Drive, VS-D7004
Arlington, VA 22226-3500
Tel: (571) 501-4021
Fax: (703) 562-2496
Email: mmorelli@fdic.gov

**App. 142**

## CORPORATE DISCLOSURE STATEMENT

The Federal Deposit Insurance Corporation is a federal corporation established under 12 U.S.C. § 1811.  It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Dated:  April 23, 2024

/s/Michael K. Morelli
Michael K. Morelli
*Attorney for FDIC*

**App. 143**

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES ......................................................................... iii

INTEREST OF THE AMICUS AND SUMMARY OF ITS ARGUMENT ................................. 1

ARGUMENT ................................................................................... 2

    I.   Colorado has opted out for any loans that fall within the scope of the federal term "loans made in such State" in Section 525 of DIDMCA ................................. 2

    II.  For purposes of Section 525, loans are made in a state if either the borrower or the lender enters into the transaction in that state ....................................... 4

    III. General Counsel Opinion 11 and Plaintiffs' other authorities are inapposite ..................... 8

        A.  General Counsel Opinion 11 is inapplicable to the opt-out issue .................................. 8

           (i)    Opinion 11 only interprets Section 521, which looks at where a "bank" is "located" not where a "loan" is "made" ............................................. 8

           (ii)   By deeming banks to be located in their home states even if the loan was not made there, Opinion 11's own text shows that Opinion 11 did not equate a bank's location with where a loan was made ....................................... 10

           (iii)  The legislative history of the 1994 Riegle-Neal Act cannot control the interpretation of an earlier act such as DIDMCA .............................................. 13

        B.  Like Opinion 11, *Marquette* is inapposite because it interprets Section 85, which looks only at where a bank is located and not where a loan is made. ......................... 13

        C.  *Jessup* is similarly inapposite .................................................... 15

CONCLUSION ................................................................................ 16

CERTIFICATE OF TYPE-VOLUME COMPLIANCE ............................................. 17

CERTIFICATE OF SERVICE ................................................................. 18

App. 144

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.S. Goldmen & Co. v. N.J. Bur. Of* Sec.,
    163 F.3d 780 (3d Cir. 1999) ................................................................. 4, 6

*Bates v. United States*,
    522 U.S. 23 (1997) ................................................................................. 8

*BP Am. Prod. Co. v. Burton*,
    549 U.S. 84 (2006) ................................................................................. 4

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102 (1980) ............................................................................. 13

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
    18 F.3d 1 (1st Cir. 1994) ........................................................................ 7

*Dean Foods Co. v. Brancel*,
    187 F.3d 609 (7th Cir. 1999) ................................................................. 5

*Dickerson v. New Banner Inst., Inc.*,
    460 U.S. 103 (1983) ............................................................................... 4

*Jessup v. Pulaski Bank*,
    327 F.3d 682 (8th Cir. 2003) ......................................................... 15, 16

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978) ................................................................. 13, 14, 15

*Midwest Title Loans, Inc. v. Mills*,
    593 F.3d 660 (7th Cir. 2010) .............................................................. 4, 5

*MorEquity, Inc. v. Naeem*,
    118 F. Supp. 2d 885 (N.D. Ill. 2000) .................................................. 15

*NLRB v. Nat. Gas Util. Dist. of Hawkins Cty.*,
    402 U.S. 600 (1971) ............................................................................... 4

*O'Gilvie v. United States*,
    519 U.S. 79 (1996) ............................................................................... 13

**App. 145**

*People v. Fairfax Fam. Fund, Inc.*,
   235 Cal. App. 2d 881 (Ct. App. 1964) ................................................................ 5

*Perry v. Mount Hope Iron Co.*,
   5 A. 632 (R.I. 1886) ........................................................................................ 7

*Quik Payday Inc. v. Stork*,
   549 F.3d 1302 (10th Cir. 2008) .................................................................. 5, 7, 12

*Russello v. United States*,
   464 U.S. 16 (1983) .......................................................................................... 9

*South Dakota v. Wayfair, Inc.*,
   585 U.S. 162 (2018) ........................................................................................ 5

*Swanson v. Integrity Advance, LLC*,
   870 N.W.2d 90 (Minn. 2015) ......................................................................... 5

*Williams v. Taylor,*
   529 U.S. 420 (2000) ........................................................................................ 4

**Statutes**

Depository Institutions Deregulation and Monetary Control Act,
   Pub. L. No. 96-221, 94 Stat. 132, 164-65 (1980) ................................................ *passim*

Federal Deposit Insurance Act,
   12 U.S.C. § 1831d .......................................................................................... 2, 8

Gramm-Leach-Bliley Financial Modernization Act of 1999,
   12 U.S.C. § 1831u(f) .................................................................................. 15, 16

Colo. Rev. Stat. § 5-1-201(2) .............................................................................. 7

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Co. 2023). ........................................ 3

Kansas Uniform Consumer Credit Code (UCCC) ..................................................... 5

National Bank Act,
   12 U.S.C. § 85 ......................................................................................... 3, 11, 14, 15

Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994,
   Pub. L. No. 103-328, 108 Stat. 2338 (1994) ..................................................... 2, 13

iv

**App. 146**

## Other Authorities

Federal Interest Rate Authority,
  85 Fed. Reg. 44,146 (July 22, 2020) .................................................................. 10

General Counsel's Opinion No. 11, Interest Charges by Interstate State Banks,
  63 Fed. Reg. 27,282 (May 18, 1998) ...................................................................*passim*

FDIC Advisory Opinion 88-45, Relationship of State Usury Preemption Laws,
  1988 WL 583093 (June 29, 1988) ..................................................................... 9

H.R. Conf. Rep. No. 96-842 (1980) ......................................................................... 6

OCC, Interpretive Letter No. 822
  1998 WL 121663 (Feb. 17, 1998) .......................................................................12

Restatement (Second) of Conflict of Laws (1971) § 188 ......................................... 9

Restatement (Second) of Conflict of Laws (1971) § 203 ......................................... 10

**App. 147**

## INTEREST OF THE AMICUS AND SUMMARY OF ITS ARGUMENT

The Federal Deposit Insurance Corporation (FDIC) submits this brief as amicus curiae to address important legal issues related to the "opt-out" provision contained in Section 525 of the Depository Institutions Deregulation and Monetary Control Act (DIDMCA).[1]  Unlike the language used in Section 521 of DIDMCA—which, inter alia, authorizes state banks to make loans charging interest at the maximum rate permitted by the state where *the bank is "located"*—Section 525 permits a state to opt out of Section 521's interest-rate regime with respect to *loans "made" in that state*.  Under well-established principles of statutory construction, these different terms must be given different meanings.  This is particularly appropriate where, as here, the differences in language reflect differences in congressional intent.  Congress enacted Section 521 to enable state banks to compete with national banks.  But it balanced that economic objective with Section 525 and its objective to enable states to override the federal interest-rate preemption in Section 521 and thereby maintain a meaningful measure of control over the usury rates applicable to "loans made in such State."

Plaintiffs' challenge to Colorado's efforts to opt out turns on the meaning of Section 525's opt-out language; namely, what it means for a loan to be "made" in Colorado.  In their proposed interpretation of Section 525, Plaintiffs rely heavily on FDIC General Counsel Opinion 11 (Opinion 11),[2] which does not address opt-out or Section 525.  Plaintiffs nevertheless argue that Opinion 11's test for determining where a bank is located under Section 521 should also be applied to determine where a loan is made for Section 525 purposes.  Given Plaintiffs' significant reliance on Opinion 11, the FDIC submits this amicus brief to underscore that

---

[1] Pub. L. No. 96-221, § 525, 94 Stat. 132, 167 (1980).

[2] *See generally* General Counsel's Opinion No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27,282 (May 18, 1998).

**App. 148**

Opinion 11 is inapplicable to the opt-out issue.  As discussed more fully in Part III.A below, Plaintiffs' reliance on Opinion 11 is misplaced because where a loan is made under Section 525 cannot be equated with where a bank is located under Section 521, as demonstrated by the differing text, purpose, and history of those sections, well-established principles of statutory construction, and prior interpretive pronouncements by the FDIC.  Contrary to Plaintiffs' assertions, none of these tools of statutory construction support their interpretation.  For example, Plaintiffs' reliance on the legislative history of the 1994 Riegle-Neal Act is inapposite because such history of a later act does not control the interpretation of an earlier act such as DIDMCA. And prior pronouncements by the FDIC actually reject Plaintiffs' position that where a loan is made under Section 525 should be determined based on where a bank is located under Section 521.

Before delving into these issues, this brief first analyzes Section 525's opt-out provision and identifies the scope of loans affected when a state chooses to exercise it.  As discussed in Part II below, loans are made in a state for purposes of Section 525 if either the borrower or the lender enters into the transaction in that state.  Therefore, loans as to which a Colorado borrower enters into the transaction while physically present in Colorado fall within the scope of the federal term "loans made in such State" (Colorado) in Section 525, and Plaintiffs are incorrect in claiming otherwise.

## ARGUMENT

**I.  Colorado has opted out for any loans that fall within the scope of the federal term "loans made in such State" in Section 525 of DIDMCA**

Section 521 of DIDMCA amended the Federal Deposit Insurance Act (FDI Act) by adding Section 27 (codified at 12 U.S.C. § 1831d), which authorizes state banks to make loans charging interest at the maximum rate permitted by the state where the bank is "located," or at a

federal rate not exceeding the 90-day commercial paper rate plus one percent, whichever is greater.[3]  National banks have been permitted to charge the same rates as those allowed by Section 521 since 1864, under what is now Section 85 of the National Bank Act (12 U.S.C. § 85).  Before DIDMCA's enactment in 1980, Section 85 gave national banks a competitive advantage over state banks.  To ensure parity between state banks and national banks, DIDMCA allows state banks to charge the same rates as those allowed by Section 85.  For these reasons, the two sections are interpreted *in pari materia*.

But DIDMCA was not concerned solely with the parity between state and national banks provided by Section 521.  Rather, to preserve principles of federalism, Section 525 of DIDMCA gives states the ability to opt out of Section 521 with respect to any "loans made in such State."[4]  Colorado's H.B. 23-1229 opts out of Section 521 with respect to "consumer credit transactions in this state."[5]  Because consumer credit transactions are a category of loans, H.B. 23-1229 satisfies Section 525's requirement that the law "explicitly and by its terms" state that Colorado does not want Section 521 to apply to loans made in such State.  This legislation effects an opt out with respect to any loans falling within the scope of the federal term "loans made in such State" in Section 525.  The relevant inquiry is therefore what loans fall within the scope of the federal term "loans made in such State" in Section 525.  That issue is addressed in the next section.

---

[3] *Id*. §521.  While Section 521 of DIDMCA is the same as Section 27 of the FDI Act, for simplicity FDIC refers here to Section 521.

[4] *Id*. § 525 (emphasis added).

[5] H.B. 23-1229, Section 3, 74th Gen. Assemb., Reg. Sess. (Co. 2023).

**App. 150**

## II. For purposes of Section 525, loans are made in a state if either the borrower or the lender enters into the transaction in that state

Because the term "loans made in such State" appears in a federal statute, it must be interpreted as a matter of federal law.[6]  Such interpretation must "start, as always, with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  The statute does not define the term "loans made in such State" and no court decisions interpret it as used in Section 525.  Absent a definition provided by Congress, the statute is interpreted according to the ordinary meaning of its words.  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).

Courts have already developed a fairly consistent set of federal principles addressing where loans and other contracts are made in the context of applying the (dormant) Commerce Clause of the U.S. Constitution.  According to that jurisprudence, loans are ordinarily understood to be made in the states where the parties enter into the loan transaction.  Thus, if the parties enter into a loan transaction in the same state, the loan is made in that state.  *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010) (where Indiana borrower traveled to lender's state (Illinois) to obtain loan, "contract was, in short, made and executed in Illinois").  But when the parties enter into a loan transaction in two different states (*i.e.*, a borrower physically present in one state transacts by mail, phone, or internet with an out-of-state lender), such transaction is made in both states, and both states can regulate it.  That is, "[w]hen an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract."  *A.S. Goldmen & Co. v. N. J. Bur. of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999).

---

[6] *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *NLRB v. Nat. Gas Util. Dist. of Hawkins Cty.*, 402 U.S. 600, 603 (1971).  Plaintiffs agree that the question is one of federal law.

4

**App. 151**

Accordingly, courts have concluded that loan transactions between parties in different states are made in the state where the borrower enters into the transaction just as much as they are made in the state where the lender enters the transaction, and that the borrower's state does not violate the Commerce Clause when seeking to regulate such interstate loan transactions. For example, the Tenth Circuit agreed that the Kansas Uniform Consumer Credit Code (UCCC) did not impermissibly apply to loans involving a lender outside of Kansas because "the borrower's physical location" when entering into the transaction was in Kansas—even if the lender was outside Kansas. *Quik Payday Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008). The Tenth Circuit held that the borrower's state (Kansas) has the power to regulate such loan transactions, and that the Kansas UCCC did not apply extraterritorially in violation of the Commerce Clause. *Id.*; *see also, e.g.*, *Swanson v. Integrity Advance, LLC*, 870 N.W.2d 90, 95 (Minn. 2015) (Minnesota law applying to loans between out-of-state lenders with no physical presence in Minnesota and Minnesota borrowers who entered into the transaction "while physically located in the state of Minnesota" did not violate Commerce Clause).[7] But where a party from State A physically crosses state lines and travels to the other party's state (State B) to enter into the transaction there, the transaction is made in State B because both elements of the transaction (offer and acceptance) occur in State B.[8]

---

[7] *See also People v. Fairfax Fam. Fund, Inc.*, 235 Cal. App. 2d 881, 885 (Cal. Ct. App. 1964) (concluding that California has authority to regulate an out-of-state lender); *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 176–77 (2018) (South Dakota law applying to online retailer that lacked physical presence in South Dakota did not violate Commerce Clause).

[8] *See Midwest Title Loans*, 593 F.3d at 669; *Dean Foods Co. v. Brancel*, 187 F.3d 609, 620 (7th Cir. 1999) (where seller physically transports milk across state lines from Wisconsin to buyer in Illinois, the transaction was made in Illinois: "[t]his is not a case where 'elements of the transaction have occurred in each state'").

**App. 152**

These established federal principles for determining where a loan or contract is "made" can be applied equally to Section 525. As the cases demonstrate, it is reasonable to conclude that interstate loans are made in the state in which the borrower enters into the transaction and in the state in which the lender enters into the transaction.[9] It would be arbitrary and artificial to select *one* state when the parties enter into the transaction in *two* different states. *A.S. Goldmen & Co.*, 163 F.3d at 786-87 ("A contract between Goldmen in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur 'wholly outside' New York."). And because such loans are made in both states, either or both states can opt out with respect to such loans under Section 525. Once one state opts out, Section 521 does not apply to loans made in that state. The opt-out puts the state in the same position it would have been in had Section 521 never been enacted: to have the interest-rate applicable to loans made in that state decided under state law rather than Section 521. Congress intended that all "affected states" have a meaningful opportunity to opt out. *See* H.R. Conf. Rep. No. 96-842, at 78-79 (1980) (stating that under DIDMCA, "[s]tate usury ceilings on all loans made by Federally insured depository institutions ... will be permanently preempted, subject to the right of *affected states* to override [preemption] at any time") (emphasis added).

Plaintiffs incorrectly claim that Colorado's opt-out statute would apply to loans that are not made in Colorado because it covers transactions between Colorado borrowers and out-of-state creditors that merely advertise in the state. Pls.' Mot. Prelim. Inj., ECF 24 (Mot.) at 16. But such loans are made in Colorado under federal law if the borrower is physically present there when entering into the transaction. As discussed above, courts interpreting federal law have concluded that interstate contracts, including loans, are made both in the state in which the

---

[9] This brief discusses the most common scenario: the two-party contract. The FDIC recognizes that in some circumstances loans could involve multiple lenders or borrowers.

**App. 153**

borrower enters into the transaction and the state in which the lender enters into the transaction. Therefore, if the borrower is physically present in Colorado when entering the transaction, the transaction is made in Colorado even if the lender is outside of Colorado.  Indeed, the Tenth Circuit has already rejected the notion that a loan is made solely outside a state simply because the creditor is outside that state.  *Quik Payday,* 549 F.3d at 1308.  And the Colorado UCCC provision regarding transactions between Colorado residents and out-of-state creditors only applies if the borrower enters into the transaction while "physically present" in Colorado.[10]

Plaintiffs' related argument that the borrower's location is irrelevant to determining where a loan is made because the loan is created by the bank (Mot. at 11) not only conflicts with this caselaw, but is also misguided because a loan is made between two parties and does not exist without a borrower.  For a loan to be made, there needs to be both a borrower and a lender:  both an offer by one of these parties and an acceptance by the other.  An acceptance or offer by the borrower occurs in the state where the borrower is physically located when making that acceptance or offer, not in the state where it is received by the lender.[11]  Therefore, such acceptance/offer by the borrower necessarily occurs in the state where the borrower is physically present when entering into the transaction, which further supports the conclusion reached by the Commerce Clause cases that interstate transactions are made both in the state in which the borrower enters into the transaction and the state in which the lender enters into the transaction.

---

[10] Section 5-1-201(2) provides that a transaction between a creditor and a Colorado resident is *not* made in Colorado if "a resident of this state enters into the transaction while physically present in another state."  Colo. Rev. Stat. § 5-1-201(2).

[11] *See, e.g., Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 5 (1st Cir. 1994) (in contract made by telephone, acceptance occurs in state where the words of acceptance are spoken, not in the state where they are received); *Perry v. Mount Hope Iron Co.*, 5 A. 632, 633 (R.I. 1886) (offer accepted by telegraph will be deemed accepted where telegram is sent, not received).

**App. 154**

### III. General Counsel Opinion 11 and Plaintiffs' other authorities are inapposite

#### A.  General Counsel Opinion 11 is inapplicable to the opt-out issue

Plaintiffs suggest that Opinion 11's analysis of Section 521 provides the relevant framework for discerning the meaning of Section 525.  Mot. at 13.  But Opinion 11 is inapplicable to the opt-out analysis for at least three reasons.

##### (i)  Opinion 11 only interprets Section 521, which looks at where a "bank" is "located" not where a "loan" is "made"

First, Opinion 11 only addresses where a bank is "located" for purposes of Section 521 (12 U.S.C. § 1831d), which provides that a state bank may charge interest permitted by the state where that bank is "located."  Opinion 11 does not address or reference Section 525 or opt-out rights.  Because Opinion 11 addresses only the concept of where a bank is located under Section 521, it has no applicability to opt-out under Section 525.  The two statutory provisions use considerably different language and serve completely different goals.  Congress could have copied the language from Section 521 into Section 525 to provide that only the state where a bank is located can opt out, but it did not do so.  Instead, in Section 525, Congress allowed opt out for the state where the loan is "made," and Congress' choice to use different language should be given effect.  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Bates v. United States*, 522 U.S. 23, 29–30 (1997) (internal quotation marks omitted).

Had Congress intended to refer in Section 525 to the state where the bank was located, it presumably would have done so expressly, as it did in Section 521.  "The short answer is that Congress did not write the statute that way," and therefore courts should "refrain from concluding ... that the differing language in the two subsections has the same meaning."

**App. 155**

*Russello v. United States*, 464 U.S. 16, 23 (1983).

In light of these well-established principles of statutory construction, the FDIC has twice recognized the distinction between where a bank is located under Section 521 and where a loan is made under Section 525, and warned that the two terms should not be conflated. The FDIC did so first in an interpretive letter predating Opinion 11. *See* FDIC Advisory Opinion 88-45, Relationship of State Usury Preemption Laws, 1988 WL 583093 (June 29, 1988) ("1988 Interpretive Letter"). That letter was drafted in response to a bank's request for the FDIC to declare that only the state where a bank is located under Section 521 could opt out—*i.e.*, the same position that Plaintiffs advocate here. The 1988 Interpretive Letter emphatically rejected that position, explaining that a bank's location under Section 521 should not be equated with where a loan is made under Section 525 because the two sections use different language and serve different goals. The letter explained that "nothing on the face of the statute" indicates that the two different terms "are meant to say the same thing." *Id*. at *1. It also noted that the two terms should not be conflated because they each served a different goal: "Congress had economic objectives in mind when it adopted section 521; in particular, it was enacted in order to enable State banks to compete with national banks. By contrast, Congress adopted section 525 in an effort to preserve principles of federalism." *Id*. Plaintiffs fail to address this key part of the 1988 Interpretive Letter that refutes their reliance on authorities interpreting where a bank is located to interpret where a loan is made, while nevertheless citing the letter for the undisputed proposition that the statute must be interpreted as a matter of federal law.[12]

---

[12] On a separate issue, to the extent the 1988 Interpretive Letter could be read as implying that the six factors in Section 188 of the Restatement of the Conflict of Laws inform where a loan is made, such an inference is not justified. Section 188 looks at the state with the "most significant relationship" with the transaction at issue to determine which of two states' law should apply to a transaction. Congress could have used language allowing states to opt out if they have the "most

**App. 156**

The FDIC Board also recognized the distinction between where a bank is located and where a loan is made in a recent rulemaking.  Specifically, the Board explained that a bank would not be permitted to charge the "higher" rate permitted by the state where the bank is located with respect to loans that are made in a state that has opted out, which indicates that the opting out state can be different from the state where the bank is located.  *See* Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,153 (July 22, 2020) (Final Rule) ("[I]f a State opts out of section 27, State banks making loans in that State could not charge [under federal law] interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate.").[13]

### (ii) By deeming banks to be located in their home states even if the loan was not made there, Opinion 11's own text shows that Opinion 11 did not equate a bank's location with where a loan was made

*Second,* Opinion 11's own text further underscores that it did not equate the state where the bank was "located" with the state where the loan was made for purposes of Section 525.  Opinion 11 does not address Section 525 at all.  Rather, Opinion 11 addressed a different question, specifically an ambiguity in Section 521 arising from the fact that a bank can have many locations—a bank is considered located in any state in which it has a branch.[14]  It was

---

significant relationship" with the loan at issue, but it did not.  Instead, Congress said that states may opt out with respect to "loans made in such State."  Therefore, those two different terms should not be conflated.

[13]  In the event of an opt-out by the state where the borrower enters into the transaction, while the lender cannot charge the interest rate of the state where the lender is located under federal law, in some circumstances state-law choice-of-law rules might permit the lender to charge that rate under state law even on loans made in the opting-out state.  *See* Section 203 of the Restatement (Second) of Conflict of Laws (1971).  Again, the opt-out simply puts states in the same position they would have been in had Section 521 never been enacted, namely to have the interest-rate applicable to loans made in that state decided under state law.  This amicus brief expresses no opinion on state-law choice-of-law issues applicable after opt-out; it highlights the issue to ensure that the state choice-of-law analysis is not conflated with the analysis under Section 525.

[14] Opinion 11, 63 Fed. Reg. at 27,283.

**App. 157**

unclear which of the potential locations was intended to govern for purposes of Section 521.[15] Explaining that Section 521 is interpreted *in pari materia* with Section 85 of the National Bank Act, Opinion 11 adopts a three-part test developed in guidance letters from another federal banking regulator, the Office of the Comptroller of the Currency (OCC), interpreting Section 85 to determine a *bank's* location based on where the bank performed three lending "functions" related to a loan.[16]

While Opinion 11 suggested that the three functions help inform whether the loan was made in the home or host state,[17] a careful reading of Opinion 11 shows that Opinion 11 used "made" colloquially and did not mean to suggest that the loan was actually or exclusively made in the state in which the three functions were performed, much less that it was made in that state for purposes of Section 525.  Indeed, Opinion 11 concluded that in some cases a bank would be considered "located" in its home state even if the bank performed the three functions *outside* that state (if those functions were performed in offices, not branches).[18]  While this conclusion may be appropriate with respect to a *bank's location* under Section 521 (because a bank can always be deemed located in its home state), this conclusion makes little sense in the separate context of interpreting where the loan was made.  It is outside any possible interpretive bounds of the term "loans made in such State" to suggest that a loan is "made" in the bank's home state even if the bank performed all the lending functions *outside* the home state and the borrower resided *outside* the home state.  In such scenario, no element of the loan transaction (neither offer nor acceptance) occurred in the home state; therefore, the loan cannot be "made" in the home state.

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* at 27,285-86.

**App. 158**

More generally, Opinion 11 uses the three functions—where the bank approved the loan, where it communicated the decision to the borrower, and where it disbursed the loan—to identify the bank branches with ties to a particular loan for Section 521 purposes, not to identify the state where the loan was made for Section 525 purposes. Where all three functions occur in one state, Opinion 11 deems the bank located in that state for Section 521 purposes.[19] Where the three functions do not all occur in one state, however, Opinion 11 and related OCC interpretive letters deem the bank to be located in *any* state in which any *one* of the three functions occurs.[20] Therefore, if the three functions occur in three different host states, the bank could be considered "located" in each one of the three host states, and also in the home state, and could charge the interest rates permitted by any of these *four* states.

Accordingly, while Plaintiffs suggest that an interpretation under which "a single loan could be deemed 'made in' multiple states" is "unworkable" (Mot. at 15), Opinion 11 itself allows a bank to be located in multiple states (four states) in some circumstances, and Plaintiffs do not suggest that approach has been unworkable. In any event, as the cases discussed in Part II above show, it is reasonable to view a loan to be made both in the state where the borrower enters into the transaction and where the lender does so. By contrast, Opinion 11's test does not work in the context of Section 525 because the location of the borrower is irrelevant to the application of that test. Therefore, Opinion 11's three-part test cannot be equated with the test for where a loan is made for Section 525 purposes because Section 521 focuses on the location of only *one* party (the bank), whereas the making of the loan requires *two* parties (borrower and bank). As discussed, the location of the borrower is relevant to understanding where a loan is made between the bank *and* the borrower. *See, e.g.*, *Quik Payday*, 549 F.3d at 1308.

---

[19] *Id*.

[20] *See* OCC Interpretive Letter No. 822, February 17, 1998 at p.14; Opinion 11 at 27,285-86.

**App. 159**

### (iii) The legislative history of the 1994 Riegle-Neal Act cannot control the interpretation of an earlier act such as DIDMCA

Plaintiffs' reliance on the legislative history of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (Riegle-Neal) is also inapposite.  Just like Opinion 11, that legislative history dealt with where a bank is "located" for purposes of Section 521, not with the interpretation of Section 525.  But even if that legislative history had addressed where a loan is made for purposes of Section 525, it is a well-established rule of statutory construction that "the view of a later Congress" (such as the Riegle-Neal Congress) "cannot control the interpretation of an earlier enacted statute" (such as DIDMCA).  *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996); *see also, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc*., 447 U.S. 102, 117 (1980) (finding the Congressional views expressed in the legislative history of a 1976 Act to be irrelevant to the meaning of a 1972 act because "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

And because Opinion 11 derives its three-part test from the legislative history of the Riegle-Neal Act, that test—derived from the views of a later Congress—cannot inform, much less control, the meaning of Section 525.

### B.  Like Opinion 11, *Marquette* is inapposite because it interprets Section 85, which looks only at where a bank is located and not where a loan is made

Plaintiffs' reliance on *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978) is misplaced.  *Marquette* merely held that the location of the borrower is irrelevant to the Section 85 analysis, as that provision looks only at where a *bank* is located.  *Id*. at 310-313. Plaintiffs nevertheless argue that *Marquette* "determined where the bank was 'located' … by assessing where the loan was made."  Mot. at 11-12.  But *Marquette* did not assess where the loan was made—it did not use that term nor address that concept.  Plaintiffs' *Marquette* quotations address a different issue instead: where the *bank* performed functions relating to the

loans at issue.  *Marquette* held that "a national bank was 'located' for purposes of the section in the State named in its organization certificate" (*i.e.*, its home state) and the bank "cannot be deprived of this [home-state] location" even if it extends credit to borrowers outside its home state.  439 U.S. at 310-312.  *Marquette* listed the functions the *bank* performed in its home state as further support for the conclusion that the *bank* cannot be deprived of its home-state location:

> [Minnesota] contends that … 'In the context of a national bank which systematically solicits Minnesota residents … the bank must be deemed to be 'located' in Minnesota for purposes of this credit card program.' …
>
> We disagree…  The congressional debates surrounding the enactment of § 30 [Section 85's predecessor] were conducted on the assumption that *a national bank was 'located'* for purposes of the section in the State named in its organization certificate…. *Omaha Bank cannot be deprived of this location* merely because it is extending credit to residents of a foreign State...  Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended *by Omaha Bank* in Nebraska… Finance charges on the unpaid balances of cardholders are assessed *by the bank* in Omaha, Neb., and all payments on unpaid balances are remitted to the bank in Omaha, Neb.  Furthermore, *the bank* issues its BankAmericards in Omaha, Neb., after credit assessments made *by the bank* in that city.

*Id.* (emphases added).  Several of the functions described in *Marquette* as being performed "by the bank" in Nebraska do not relate to the making of the loan.  Rather, they involve acts that occur after the making of the loan, such as assessing finance charges.

In sum, nothing in *Marquette*, which was decided before Section 525's enactment, interprets where a loan is made.  And while *Marquette* was correct that the location of the borrower is irrelevant to the determination of where a national bank is located under Section 85, that is precisely why *Marquette* and Opinion 11 are irrelevant to the Section 525 analysis. *Marquette* and Opinion 11 interpret Section 85 and Section 521 respectively, which focus on the location of *one* party:  the bank.  By contrast, Section 525 looks at where a loan is made, which involves *two* parties: the bank and the borrower.  As discussed in Part II above, the location of

the borrower is relevant to understanding where a loan is made.  Indeed, Plaintiffs admit (Mot. at 12) that *Marquette* and the other sources on which they rely address "the steps involved in offering a loan."  Thus, these steps are not dispositive to the making of a loan, which involves not just an offer of the loan by the bank, but also an acceptance of the loan by the buyer—and that acceptance, as discussed, necessarily occurs in the state where the borrower physically enters into the transaction.

*MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885 (N.D. Ill. 2000) is also inapposite.  As Plaintiffs admit, just like Opinion 11, that decision "interpreted DIDMCA Section 521" (Mot. at 14), and is therefore distinguishable for the same reasons.

### C.  *Jessup* is similarly inapposite

For similar reasons, Plaintiffs' reliance on the Eighth Circuit's decision in *Jessup v. Pulaski Bank*, 327 F.3d 682, 685 (8th Cir. 2003) is also inapposite.  That decision interpreted a different statute—Section 731 of the Gramm-Leach-Bliley Financial Modernization Act of 1999, 12 U.S.C. § 1831u(f)—allowing Arkansas banks to charge the higher interest rates imported into Arkansas by out-of-state banks via those banks' Arkansas-based branches, but only with respect to loans "made" in Arkansas.  After explaining that "[t]he statute does not define the term 'made,' and no cases have interpreted the term," *Jessup* proceeded to apply the OCC's three-part test for determining where a bank is located under § 85.  *Id.* at 684.  The court performed no independent analysis of the statutory term "made," but instead deferred to a 2001 OCC letter that appears to be publicly unavailable.

Even if it were appropriate to equate the state where a loan is "made" with the state where a bank is located—in the context of § 1831u(f)—it is not appropriate to equate the two terms in the context of Section 525, for the three reasons discussed above.  And it might be

**App. 162**

inappropriate to equate the two terms even in the context of § 1831u(f).  Indeed, the parties did not brief the court on all possible nuances of the OCC's three-part test, and the court may not have reached the same conclusion had those nuances been highlighted and briefed.  For example, the court was not informed that applying the three-part test to a different set of facts where all three functions were performed at offices (not branches) outside Arkansas would lead to the untenable result that a loan is "made" in Arkansas even if the bank performed all three lending functions *outside* of Arkansas and the borrower entered into the transaction *outside* of Arkansas. *See* Part III.A(ii) above.

## CONCLUSION

For these reasons, Plaintiffs' reliance on Opinion 11 and other authorities interpreting Section 521 (or its national bank counterpart) is misplaced.

Dated:  April 23, 2024

Respectfully submitted,

HARREL M. PETTWAY
General Counsel
FLOYD I. ROBINSON
Deputy General Counsel
B. AMON JAMES
Assistant General Counsel
J. SCOTT WATSON
Senior Counsel
MINODORA D. VANCEA
Counsel
/s/Michael K. Morelli
MICHAEL K. MORELLI
Senior Attorney
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive, VS-D7004
Arlington, VA 22226
Tel: (571) 501-4021
Fax: (703) 562-2496
Email: mmorelli@fdic.gov

*Attorneys for FDIC*

**App. 163**

**CERTIFICATE OF TYPE-VOLUME COMPLIANCE**

Excluding the portions of the motion excepted under DDD Civ. P.S. III(A)(3), the FDIC hereby certifies that the foregoing brief contains 5,498 words and thus complies with the type-volume limitation set forth in DDD Civ. P.S. III(A)(2).

Dated:  April 23, 2024

/s/Michael K. Morelli
Michael K. Morelli
*Attorney for FDIC*

17

**App. 164**

## CERTIFICATE OF SERVICE

I certify that on April 23, 2024, I electronically filed the foregoing motion on behalf of the Federal Deposit Insurance Corporation using the Court's CM/ECF system, which will generate notice to the following via electronic mail:

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine, LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

TYLER J. BOURKE
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 622-3150
tyler.bourke@dwt.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine, LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com\
leah.capritta@hklaw.com

*Attorneys for National Association of Industrial Bankers and the American Financial Services Federation*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcom.com
arffal@sullcrom.com

*Attorneys for the American Fintech Council*

**App. 165**

KEVIN JAMES BURNS
NIKOLAI N. FRANT
PHILIP M. SPARR
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
(720) 508-6000
(720) 508-6033 (fax)
Kevin.Burns@coag.gov
Nikolai.Frant@coag.gov
Philip.Sparr@coag.gov

*Attorneys for Defendants Philip J. Weiser
and Martha Fulford*

Dated: April 23, 2024

/s/Michael K. Morelli
Michael K. Morelli
*Attorney for FDIC*

19

**App. 166**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN
FINANCIAL SERVICES ASSOCIATION and AMERICAN FINTECH COUNCIL,

      Plaintiff(s),

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA
FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

      Defendant(s),

---

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
### FOR PRELIMINARY INJUNCTION

---

Defendants Philip J. Weiser, Attorney General of the State of Colorado, and
Martha Fulford, Administrator of the Colorado Uniform Consumer Credit Code
(collectively "Defendants") respond to Plaintiffs' Motion for Preliminary Injunction
(Doc. 24, Apr. 2, 2024) as follows:

### INTRODUCTION

States, including Colorado, have a long history of protecting their citizens from
predatory interest rates. But despite its best efforts, Colorado has faced attempts by
lenders to avoid its protections. For example, EasyPay, a financial technology
company, partnered with Utah-chartered TAB Bank to offer loans to Colorado
consumers at rates of up to 199% on amounts up to $5,000, until EasyPay agreed with

**App. 167**

Defendants to stop lending in Colorado.[1] Because Colorado had not yet opted out of preemption, TAB Bank pointed to federal law to justify lending to Colorado consumers at rates permitted by Utah, which does not have rate caps.

Federal law explicitly permits the States to opt out of the preemption of their interest rate laws applicable to state-chartered banks. In 2023, Colorado's General Assembly passed an opt-out from certain interest rate preemption provisions imposed by federal statute. That law takes effect July 1, 2024. Plaintiffs seek to deny Colorado the choice expressly provided by federal law.

## FACTUAL BACKGROUND

In 2023, Colorado's General Assembly duly passed a law ("Opt-Out") opting out of certain interest rate preemption provisions of the federal Depository Institutions Deregulation and Monetary Control Act ("DIDMCA[2]"). Doc. 25-2; Doc. 25-1. DIDMCA permits state-chartered banks to charge interest on a loan at the "rate allowed by the laws of the State . . . where the bank is located" (or a specified federal rate) and preempts contrary state rate limits. Doc. 25-1, at § 521 ("Section 521"). DIDMCA, however, expressly permits the States to opt out from—that is, negate or reverse— its interest rate preemption provisions. *Id.* at § 525 ("Section 525"). Plaintiffs now ask this Court to fashion a judicial remedy in a pre-enforcement posture, attempting to protect its members' profits.

---

[1] Exhibit A, Fulford Decl. at ¶ 6.
[2] In case law, the statute is often referred to—interchangeably—as either DIDA or DIDMCA.

**App. 168**

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish: (1) a substantial likelihood-of-success-on-the-merits; (2) they will suffer irreparable injury absent the injunction; (3) the balance of equities favors the plaintiff; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff bears the burden of proving that each factor tips in its favor. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). "The [likelihood of success and irreparable harm] factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The last two factors, balance of equities and public interest, "merge when the Government is the opposing party." *Id.* at 435. Failure to establish these merged factors is sufficient to defeat preliminary injunctive relief. *Winter*, 555 U.S. at 23.

Above all, "[a] preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). And, "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

Plaintiffs face a heightened burden when seeking a disfavored injunction. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). A disfavored injunction exhibits any of three characteristics: (1) it mandates action; (2) it changes the status quo; or (3) grants all the relief that the moving party could

**App. 169**                                    3

expect at trial, and the injunction's effect cannot be undone. *Id*. at 797 n. 3. When seeking a disfavored injunction, the moving party faces a heightened burden on the "likelihood-of-success-on-the-merits and the balance-of-harms factors." *Id*. As discussed in Section III, *infra,* Plaintiffs seek a disfavored injunction because it grants all the relief that the moving party could expect at trial and its effects cannot be undone should they lose at trial.

## ARGUMENT

### I.   Colorado's Opt-Out is not preempted by federal law

#### A.   *Plaintiffs cannot overcome the presumption against preemption*

Under the Supremacy Clause's preemption doctrine, "federal law preempts contrary state law." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 917 (10th Cir. 2016) (cleaned up). Preemption can arise in three categories: express, conflict, and field preemption. *Id*. Courts must start with "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *In re MDL 2700 Genentech Herceptin Mktg. & Sales Practice Litigation*, 960 F.3d 1210, 1224–25 (10th Cir. 2020).

While Section 521 expressly preempts state rate limits, Colorado opted out of that preemption by the explicit means provided by Congress in Section 525. In this context, courts should uphold state law where the state acts within the authority delegated by Congress. *See Sheehan v. Peveich*, 574 F.3d 248, 252 (4th Cir. 2009)

**App. 170**

(cleaned up) ("There can be no preemption . . . where Congress expressly and concurrently authorizes state legislation on the subject.")

B.    _States' regulation of interest rates predates the Constitution by 150 years_

Following from antecedent—ancient—examples of strict loan pricing regulations by both religious and government institutions, the Massachusetts colony adopted the first American usury law in 1641, predating the Constitution by nearly 150 years. Stephen M. Graves & Christopher L. Peterson, _Usury Law and the Christian Right: Faith-Based Political Power and the Geography of American Payday Loan Regulation_, 57 CATHOLIC U. L. REV. 637, 648–49 and 665 (2008).

It's little wonder then that the U.S. Supreme Court has "readily accept[ed] the submission that . . . banking and related financial activities are of profound local concern. . . . [and that] sound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people." _Lewis v. BT Investment Managers, Inc._, 447 U.S. 27, 38 (2009).

In sum, state-imposed usury limits are a foundational feature of our Republic and represent the default rule, not the exception.

C.    _Structural and textual differences in the National Bank Act and DIDMCA show different tests apply_

Originally passed in 1863, the National Bank Act ("NBA") permits national banks to charge "interest at the rate allowed by the laws of the State . . . where the bank is located" to borrowers residing in a different state, superseding lower rate limits in borrower's state. 12 U.S.C. § 85. The NBA does not contain an opt-out

provision like Section 525. In *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299 (1978), the Supreme Court addressed the scope of NBA preemption where the law of the national bank's home state permitted a higher rate than allowed by the state where the borrower resided. The Court's analysis turned in large part on the meaning of "located" as used in the NBA. Consistent with the NBA's text, the Court focused on the physical location of the bank designated in its organization certificate in determining the bank's location. *Id.* at 308–11.

Following *Marquette*, Congress passed DIDMCA in 1980, preempting state law and, in Section 521, providing that state-chartered banks could lend at the rate limit provided by the law of the state where the "bank is located". In stark contrast to the NBA however, Congress explicitly provided the States with the ability to opt out of DIDMCA's rate preemption provisions, in Section 525, for loans "made in" the opting out state.[3] Key to the dispute here is the fact that Congress did not define "made in" anywhere in DIDMCA's text.

Following DIDMCA's passage, a number of States, including Colorado, opted out of Section 521 preemption via Section 525. Federal Interest Rate Authority, 85

---

[3] Plaintiffs contend Section 525 is limited to a state's own in-state banks, Doc. 24 at 13, but the structure of Section 525 in relation to Section 521, legislative history, and even Plaintiffs' arguments cut against this claim. *See* H.R. Conf. Rep. No. 96-842, at 78–79 ("State usury ceilings on all loans made by Federally insured depository institutions . . . will be permanently preempted, subject to the right of affected states to override [preemption] at any time."); Doc. 24 at 19-20 (arguing DIDMCA followed *Marquette*, which addressed loans made by out-of-state banks). The legislative history Plaintiffs cite, Doc. 24 at 13, illustrates that legislators were concerned with their own in-state banks competing with national banks through interest exportation (subject to state opt-outs).

Fed. Reg. 44146, 44148 n. 18; *see also*, Act of July 1, 1981, § 1, 1981 Colo. Sess. Laws 400 (repealed 1994). Today, Iowa and Puerto Rico remain opted out of Section 521 and Colorado will join them effective July 1, 2024. *See* Act of Apr. 30, 1980, § 32, 1980 Iowa Acts 547–48; and P.R. LAWS ANN., tit. 10, § 998*l* (1980).

D.   *Plaintiffs cannot meet their high burden of proving Colorado's Opt-Out is preempted*

i.   **Plaintiffs' reading of "made in" contravenes the federalism principles at the core of DIDMCA's opt-out**

DIDMCA's passage represented a sea change in the Nation's long-standing tradition of state-imposed rate limits. *See*, Response Sec. I(B), *supra*. In response to double-digit interest rates and high inflation, Congress passed DIDMCA, preempting state rate caps so state-chartered banks could export the higher rates permitted by the bank's home state. Importantly however, Congress provided an avenue for the States to opt out of DIDMCA's preemption in Section 525. When viewed in the context of States' extensive and historically rooted usury restrictions, Colorado's Opt-Out represents a straightforward return to the status quo ante.

Eschewing the federalism principles at the core of Section 525, Plaintiffs ask this Court to fashion—from whole cloth—a new federal test for determining where a loan is made, drawing on dicta from *Marquette. See Petrella v. Brownback*, 787 F.3d 1242, 1268 (10th Cir. 2015) ("it is manifestly not the province of a federal court to manufacture from whole cloth a novel set of rights that would upend a carefully crafted and comprehensive [statutory regime]."). The thrust of Plaintiffs' request is

that this Court should treat Section 525 as coextensive with the NBA—notwithstanding the significant daylight between the statutes' text and structure—and apply *Marquette's* definition of "located" to DIDMCA's use of "made in." But Congress is presumed to know existing law when legislating. *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1110 (10th Cir. 2019). If Congress wanted the opt-out in Section 525 to use *Marquette's* location test, it would have said so. Instead, Section 525 focuses on where the loan is "made," making a physical location framework conspicuous by its absence.

### ii.   Colorado's Opt-Out does not exceed the scope of Section 525

To create a facial conflict, Plaintiffs cite to section 5-1-201 of Colorado's Uniform Consumer Credit Code ("UCCC"), which provides that the UCCC applies to consumer credit transactions[4] made in this state. Colorado's Opt-Out however didn't reference section 5-1-201 or suggest that it intended to expand the scope of Colorado's Opt-Out beyond that authorized in Section 525. Similarly, the UCCC's definition of "consumer credit transaction" does not incorporate section 5-1-201 or otherwise reflect Colorado's intent to stray from the scope of Section 525.

To confirm this point, the Administrator has issued an administrative interpretation. Exhibit A, Fulford Decl. at ¶ 4. The Administrator publicly binds herself to the interpretation, stating that the Opt-Out applies only to those

---

[4]  An umbrella term defined in the UCCC to include consumer credit sales, consumer loans, and consumer leases. COL. REV. STAT. § 5-1-301(12).

transactions that DIDMCA authorizes. *Id.* The Administrator's interpretation has great relevance here because the Court may properly rely on it to conclude that the conflict Plaintiffs identify does not exist. *E.g., Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (in First Amendment challenge, "administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for in evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered"); *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008) (adopting administrative interpretation and denying Dormant Commerce Clause challenge to state consumer lending laws ).

### iii. *The FDIC's historical interpretation of DIDMCA supports Defendants' view on the effect of a state's Section 525 opt-out*

The Federal Deposit Insurance Corporation ("FDIC") is a federal agency and the "primary regulator of . . . federally insured, state-chartered banks". *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1366–67 (D. Utah 2014). The FDIC may issue regulations implementing the Federal Deposit Insurance Act ("FDIA"). 12 U.S.C. § 1831g(b). In 2020, the FDIC published a final rule that explicitly disclaimed Plaintiffs' proposed test. 85 Fed. Reg. 44146, 44147–48 and 44153 (July 22, 2020).

The FDIC stated that its interpretive letters on bank location patterned after interpretations of the NBA are inapplicable to loans made in an opt-out state. *Id.* at 44153. The FDIC specifically noted that General Counsel Opinion Number 11, on which Plaintiffs rely, would not apply if a state opted out. *Id.* Instead, the FDIC stated

that "if a State opts out of [Section 521], State banks making loans in that State could not charge interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate." *Id.*

The FDIC has stated that "[t]he determination of where a loan is made should be based upon an analysis of the facts surrounding the extension of credit." FDIC Interpretive Letter, 1988 WL 583093, at *2 (1988). Plaintiffs cite the FDIC's 1988 letter for the proposition that Section 525 necessitates a uniform federal definition of where a loan is made, omitting that the FDIC rejected applying the bank location test from Section 521 to interpreting where the loan is made for purposes of Section 525. What Plaintiffs describe as "federal law," however, is untethered from the statute and is inapposite—the Court would break new ground by adopting it.

iv.   *The Plain Meaning of "Made In" in Section 525 Includes the Borrower's Physical Location*

This Court need not determine the meaning of "made in" in Section 525 because it lacks a full factual record before it to make such a determination.[5] But Plaintiffs are not likely to prevail on the merits because the test they advocate violates the plain meaning of the text of Section 525 and is inconsistent with federal court decisions. The plain meaning of the textual phrase "made in any state" or "made in such State" in Section 525 includes a focus on the location of the borrower. For example, Black's Law Dictionary's definition of "Make" includes "delivering."

---

[5] Should this Court accept Plaintiffs' invitation to convert their Motion to a summary judgment motion—Doc. 24 at n. 5—Defendants request additional briefing.

BLACK'S LAW DICTIONARY (11th ed. 2019) ("To legally perform, as by executing, signing, or delivering (a document) <to make a contract>."). Plaintiffs' interpretation of the banks' location focuses too narrowly on "made" and reads out that "made" modifies "in [such] state" from the text of Section 525. Interpreting "made in the state" to mean the borrower's residence effectuates Section 525.

The Tenth Circuit, interpreting federal law, has held that where a borrower is in one state and the lender is in another, the loan is made in the state of the borrower's physical location, so that the borrower's state may regulate the loan. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008); *accord* C.R.S. § 5-1-201(2) ("Notwithstanding paragraph (b) of subsection (1) of this section, unless made subject to this code by agreement of the parties, a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state."). Because Colorado opted out under Section 525, Colorado law applies to loans made to borrowers physically present in Colorado.

### E. *The Dormant Commerce Clause does not apply when Congress acts and a nondiscriminatory local law is beneficial.*

Congress passed Section 525 authorizing states to opt out and, because it acted, the dormant commerce clause does not apply. "Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause." *Nw. Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 374 n.20 (1994). "When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the

courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action." *Id*. Congress struck this balance for state-chartered banks. It is irrelevant that Congress treated national banks differently under the NBA.

Plaintiffs' claims also fail because the Opt-Out is not discriminatory towards interstate commerce. State laws only "offend the Commerce Clause when they seek to build up domestic commerce through burdens upon the industry and business of other States, regardless of whether Congress has spoken." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). However, "absent discrimination, a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment . . . are prejudicial to the interests of its citizens." *Id*. If a state law does not discriminate, plaintiffs must show that the burden on interstate commerce is "clearly excessive" in relation to the local putative benefits. *Id*. at 377.

Plaintiffs do not make this showing, only discussing the dormant commerce clause in a footnote. Doc. 24 at 17, n. 4. Plaintiffs' Complaint alleges that Colorado's Opt-Out creates "inconsistent obligations" that burden commerce in excess of the local putative benefits Doc. 1 at ¶ 85. Plaintiffs do not assert that it is discriminatory to interstate commerce nor could they. Colorado's Opt-Out applies its interest rates equally to in-state and out-of-state banks for loans made in Colorado. That national banks are permitted to lend at higher rates is a result of Congress's action, not Colorado's.

**App. 178**                                        12

Because Plaintiffs fail to prove that the Opt-Out violates the "very core" of the dormant commerce clause, they have a substantial burden under the balancing test. They must prove that the burdens on interstate commerce are "clearly excessive" of the Opt-Out's benefits. Plaintiffs however put forth no evidence of substantial burden, do not discuss the benefits[6], and do not engage in a balancing analysis:

> any balancing approach . . . requires evidence. It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits. Exact figures are not essential . . . but it takes more than lawyers' talk to condemn a statute . . . .

*Rocky Mountain Ass'n of Recruiters v. Moss*, 541 F. Supp. 3d 1247, 1256 (D. Colo. 2021).

Finally, Plaintiffs reliance on *Brown-Forman* is misplaced. That case dealt with a discriminatory law—driven by economic protectionism—that attempted to lower prices in New York at the expense of other states. *Brown-Forman*, 476 U.S. at 580. Here, Colorado's Opt-Out is driven by consumer protection and is nondiscriminatory. It would have the same effect on in-state and out-of-state banks and apply the same rate cap to both.

---

[6] The Opt-Out's benefits are substantial in that it protects consumers against predatory lending. As noted in the Introduction, *infra*, Coloradans have faced lenders imposing rates up to 199%. After the Opt-Out however, lenders have no basis for charging predatory rates and doing so would be a clear violation of the law.

**App. 179**                                        13

E. *Plaintiffs cannot use the Supremacy Clause to graft a private right of action for preemption onto DIDMCA*

Plaintiffs' first claim for relief seeks preemption under DIDMCA and the Supremacy Clause. However, the Supreme Court has rejected efforts to use the Supremacy Clause to "graft a private right of action for preemption" onto federal statutes without a private right of action. *Armstrong v. Exceptional Child Center., Inc.*, 575 U.S. 320, 324–25 (2015). In *Armstrong*, the Court held that the Supremacy Clause merely "creates a rule of decision: Courts . . . must not give effect to state laws that conflict with federal laws." *Id.* at 324. Further, "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *Id.* at 324-25 (cleaned up).

Plaintiffs' claim is also precluded in equity. "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations" and "courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 327-28. Plaintiffs "cannot, by invoking [the court's] equitable powers, circumvent Congress's exclusion of private enforcement" because private enforcement creates the "risk of inconsistent interpretations and misincentives. . . ." *Id.* at 328–29.

Congress intended to foreclose private enforcement here, as it did in *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286 (D. Colo. 2016) under the Controlled Substances Act ("CSA" or "Act"). The *Smith* court held that the CSA did not create a private right of action. *Id.* at 1290-93. There was "nothing in the CSA which expressly permits

private enforcement of the Act's provisions" and the CSA "implicitly precludes private enforcement" because "enforcement of the Act is expressly delegated to the Attorney General . . . with criminal liability being the principal enforcement mechanism." *Id.* This structure, combined with the "judgment-laded standard" that "confers almost complete discretion on the Attorney General", precluded a private right of action. *Id.* at 1293*; see also Allco Renewable Energy Ltd. v. Massachusetts Electric Co.*, 875 F.3d 64, 70 (1st Cir. 2017) (Public Utility Regulatory Practices Act only enforcement mechanisms expressly contemplated).

The FDIA expressly and impliedly precludes private enforcement actions, primarily vesting authority with the FDIC. *See, e.g.,* 12 U.S.C. § 1818(a) (termination of status); 12 U.S.C. § 1818(b) (cease and desist orders); 12 U.S.C. § 1818(e) (removal and prohibition orders). Thus, the FDIC is vested with substantial supervision and enforcement powers that are limited to the FDIC. Private rights of action are severely circumscribed, and limited to specific and unique circumstances, such as private rights of actions by consumers to recover excess interest. 12 U.S.C. § 1831d(b).[7] These exceptions are expressly authorized by Congress, and indeed, Congress even expressly *prohibited* private actions in some statutes. *See* 12 U.S.C. §§ 1831g(c)–(d) (limiting enforcement of contracts between state-chartered banks and vendors to the FDIC and expressly prohibiting private actions). This structure makes sense because

---

[7] Notably, this section authorizes actions by consumers in states who have opted in to 12 U.S.C. § 1831d(b) when state-chartered bank charge excess interest. It does not authorize a private litigant to sue a state who has chosen to opt out.

the FDIA is a complex statute with extensive compliance requirements. Its regulation and enforcement is "centralized" with the FDIC, and gives the FDIC substantial authority and discretion, so state banks are not subject to the "risk of inconsistent interpretations and misincentives" from private litigants.

### F. *Plaintiffs lack standing and their claims are not ripe*

For standing to exist, a plaintiff must prove they have "suffered an injury . . . fairly traceable to the challenged conduct . . . that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish injury in fact, the plaintiff must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The touchstone of this inquiry is whether a plaintiff suffers concrete harm: "no concrete harm, no standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). Similarly, a case is not ripe where the harm asserted has not yet matured sufficiently to warrant judicial intervention. *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004).

In a narrow category of cases, plaintiffs fearing enforcement of a challenged law may seek pre-enforcement review, as Plaintiffs do here. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). To preserve the concrete harm requirement however, pre-enforcement challenges are limited to cases where enforcement is "certainly impending, or there is a substantial risk that the harm will occur." *Id.* at 158. To maintain a pre-enforcement challenge, a plaintiff "must typically

demonstrate (1) an intention to engage in conduct arguably affected with a constitutional interest but proscribed by the challenged statute, and (2) that there exists a credible threat of prosecution thereunder." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 545 (10th Cir. 2016) (cleaned up).

Plaintiffs do not challenge Colorado's *ability* to opt out via Section 525. Doc. 24 at 13 (acknowledging that Section 525 authorizes states to opt out). Rather, Plaintiffs claim that Colorado *exceeded* its authority by defining when a loan is "made in" Colorado more broadly than they believe Congress intended. Doc. 24 at 17–24. To show standing, Plaintiffs must therefore prove that their claimed injuries are "fairly traceable" to the loans Colorado seeks to regulate by exceeding what Plaintiffs believe DIDMCA permits. *Spokeo*, 578 U.S. at 338. Plaintiffs have not met that burden.

Plaintiffs allege they will suffer three injuries if Colorado's Opt-Out is permitted to take effect: (1) compliance costs; (2) losing customer and client goodwill; and (3) losing revenue. Doc. 24 at 24-25. But Plaintiffs may suffer those losses even if Colorado's Opt-Out comports with DIDMCA because banks will always incur compliance costs when the law changes, relationships will strain where impacted, and some prior sources of revenue may be prohibited.

Simply put, Plaintiffs' alleged harms are too conjectural to confer standing in a pre-enforcement context because determining where a loan is "made," and even what rate applies, is necessarily fact intensive, and this Court cannot determine whether Colorado has exceeded Section 525's opt-out until it has an actual loan to

**App. 183**                                      17

analyze. To illustrate, Plaintiffs claim Colorado's rate cap is 21%. Doc. 24 at 16. But Colorado's rate caps on closed-end loans are not so limited. The UCCC permits 36% on the first $1000 financed and the rate cap blends, permitting rates above 21% for loan amounts well-above $1000, depending on the loan term. C.R.S. § 5-2-201(2) (for example, Colorado would permit a 12-month closed-end loan of: $1,000 at 36%, $2,800 above 29%, and $8,950 above 21%). Plaintiffs therefore cannot claim that *every* loan made with a rate greater than 21% is prohibited because some of these loans will be legal even after the Opt-Out is effective. By ignoring the UCCC's blended rates, Plaintiffs overstate the amount of lending that would be affected by the Opt-Out.

As Plaintiffs acknowledge, banks tailor the terms of every loan to an individual consumer's credit profile. Doc. 24 at 16; Doc. 1 at ¶ 63. Many consumers will have credit profiles that make it economically practical to lend to them at a rate below Colorado's caps even absent the Opt-Out. Some consumers will have such risky credit profiles that Plaintiffs will not loan to them even if they could export higher rates. The only loans that could confer standing here are those that Plaintiffs' members would only offer if they could exceed Colorado's caps, *and* they must be loans that do not meet DIDMCA's definition of "made in" but are nonetheless subject to Colorado's caps by the Opt-Out. Even assuming there is daylight between DIDMCA and the Opt-Out, which Defendants do not concede, the number of loans affected could be a handful of loans, or none. Plaintiffs have not even attempted to quantify how many loans are affected by the Opt-Out and, therefore, Plaintiffs have failed to establish a

**App. 184**

concrete harm sufficient to confer standing, or that their asserted harm has matured sufficiently to warrant judicial intervention.

## II.    Irreparable harm is absent here.

To prevail, Plaintiffs must establish that they will suffer irreparable harm that is both certain and great, not merely serious or substantial. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). Plaintiffs who fail to demonstrate a substantial likelihood of success are not entitled to a presumption of irreparable harm. *See Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1266 (10th Cir. 2005).

As discussed in Section I(F), *supra*, Plaintiffs allege they will suffer irreparable harm in the form of compliance costs, loss of goodwill, and lost revenue. *See* Doc. 24 at 24-25. But many of those "harms" occur from Colorado's Opt-Out within the scope of Section 525. Plaintiffs have done nothing to show the degree to which these alleged harms are attributable to what they claim is an impermissible expansion of the DIDMCA opt-out. Consequently, they have failed to establish that these irreparable harms are both "certain and great" rather than "merely serious or substantial." *Potawatomi Indians,* 253 F.3d at 1250.

## III.    The balance of equities and public interest weigh heavily in Colorado's favor.

The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435 (2009). Failure to establish these merged factors is sufficient to defeat Plaintiffs' requested injunctive

**App. 185**                                    19

relief. *See Winter*, 555 U.S. at 23. Where a party seeks a disfavored injunction, they face a higher burden of proof on the balance-of-harms test. *Free the Nipple-Fort Collins*, 916 F.3d at 797.

Here, Plaintiffs must make a "strong showing" that the balance-of-harms test tilts in their favor because the injunction would grant Plaintiffs all the relief they could expect from at trial, and the effect of a preliminary injunction cannot be undone if should they lose at trial. If this Court enjoins Colorado's Opt-Out, Plaintiffs will be free to enter into contracts that include terms prohibited under the UCCC. Even if Plaintiffs later lose, Coloradans will have already paid interest at prohibited rates. Some Coloradans could default on the prohibited loans, as well as other legal loans, because of the added financial strain of unlawful rates. A judgment at trial in Defendants' favor would do nothing to remedy this harm.

Finally, Plaintiffs' requested relief would stymie the will of Coloradans, as expressed through its elected representatives and the Governor, who are in a better position than Plaintiffs or this Court to determine the public interest. *See Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("democratically elected representatives are in a better position than this Court to determine the public interest"). That is doubly true here, where the only harms Plaintiffs identify stem from their inability to offer loans at rates that the General Assembly determined are not in the interests of Coloradans.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiffs' Motion.

Dated this 23rd day of April, 2024.

PHILIP J. WEISER
Attorney General

/s/ *Philip Sparr*

PHILIP SPARR, 40053*
NIKOLAI FRANT, 38716*
KEVIN J. BURNS, 44527*
Consumer Credit Enforcement Unit
Consumer Protection Section
Attorneys for Defendant(s)
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720-508-6245
philip.sparr@coag.gov

*Counsel of Record for Defendants

## TYPE-VOLUME COMPLIANCE STATEMENT

I hereby certify that the foregoing pleading complies with the type-volume limitations set forth in Judge Domenico's Practice Standard III(A)(2).

/s/ *Philip Sparr*

**App. 187**

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of April, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/EFC system which will send notification of such filing to the following email Addresses:

Leslie B. Arffa
Sullivan & Cromwell
125 Broad Street
New York, NY 10004
202-956-7567
arffal@sullcrom.com

Tyler J. Bourke
Davis Wright Tremaine LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
206-757-8051
tylerbourke@dwt.com

Chava Brandriss
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202-973-4258
202-973-4458 (fax)
chavabrandriss@dwt.com

Leah E. Capritta
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
303-974-6646
303-974-6659 (fax)
Leah.Capritta@hklaw.com

David Morris Gossett
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202-262-4156
davidgossett@dwt.com

Edwin G. Perlmutter
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
303-974-6660
ed.perlmutter@hklaw.com

Morgan L. Ratner
Sullivan & Cromwell LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006-5215
202-956-7522
ratnerm@sullcrom.com

Matthew Alexander Schwartz
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
212-558-4000
schwartzmatthew@sullcrom.com

**App. 188**

Christopher Swift
Davis Wright Tremaine LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
503-778-5505
chrisswift@dwt.com

Christopher M. Walczyszyn
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
212-402-4081
chriswalczyszyn@dwt.com

*/s/ Mellisa Lambeth*
Mellisa Lambeth

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN
FINANCIAL SERVICES ASSOCIATION and AMERICAN FINTECH COUNCIL,

     Plaintiff(s),

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA
FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,

     Defendant(s),

---

## DECLARATION OF MARTHA FULFORD, ESQ.

---

I, Martha Fulford, pursuant to 28 U.S.C. § 1746, state as follows:

1.     I am an attorney licensed to practice law in Colorado, New York, and

Washington D.C. I graduated *magna cum laude* from Yale University and earned my

juris doctorate from Columbia University School of Law in 2010. After law school, I

clerked for U.S. District Court Judge Tucker L. Melançon and for Judge Michael A.

Chagares on the U.S. Court of Appeals for the Third Circuit. I then spent more than

five years working in the Legal Division at the Consumer Financial Protection

Bureau, where I advised agency leadership on administrative law, Dodd-Frank

authorities, and federal consumer financial law.   In 2019, I joined the Colorado

Department of Law as the First Assistant Attorney General in charge of the

Consumer Credit Unit. In 2023, I became the Assistant Deputy Attorney General

overseeing the office's civil rights work. Since 2019, I have been designated by the

**App. 190**

EXHIBIT
A

Attorney General to serve as the Administrator of the Colorado Uniform Consumer Credit Code (UCCC) pursuant to § 5-6-103, C.R.S. Finally, I am an adjunct professor at the University of Colorado School of Law, where I teach a course on consumer protection laws and policies.

2.      As the Administrator, I am generally charged with enforcement of the UCCC. *See generally* § 5-6-104, C.R.S. I am also authorized to counsel persons and groups on their rights and duties under the UCCC. § 5-6-104(1)(b), (4), C.R.S. From time to time, I issue Interpretive Opinion Letters to notify interested parties of their rights and obligations under the UCCC. Entities relying on Interpretive opinions in good faith are shielded from liability under the UCCC. §§ 5-5-202(7) and 5-6-104(4), C.R.S.

3.      Attached as **Exhibit A-1** is a true and correct copy of an Interpretive Opinion Letter I issued regarding the scope of C.R.S. §5-13-106 on April 22, 2024. My office distributed this Interpretive Letter electronically to the stakeholder list that we maintain. The Interpretive Letter is also published on the Colorado Department of Law website at https://coag.gov/app/uploads/2024/04/Administrators-Interpretive-Opinion-Letter.-Scope-of-C.R.S.-section-5-13-106.pdf.

4.      As the Administrator, I am authorized to issue Administrative Enforcement Orders.  § 5-6-109, C.R.S.

5.      Attached as **Exhibit A-2** is a true and correct copy of a Stipulation and Final Agency Order I issued on April 20, 2023 In the Matter of Duvera Billing Services, LLC dba EasyPay Finance. **Exhibit A-2** does not include the exhibits that

Exhibit A

**App. 191**

are referenced in the Stipulation and Final Agency Order. Those exhibits contain confidential borrower information and other details relevant to the implementation of the Stipulation and Final Agency Order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of April, 2024.

_____

Martha Fulford, Esq.



**PHIL WEISER**
Attorney General

**NATALIE HANLON LEH**
Chief Deputy Attorney General

**SHANNON STEVENSON**
Solicitor General

**TANJA WHEELER**
Associate Chief Deputy Attorney General

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

**RALPH L. CARR**
**COLORADO JUDICIAL CENTER**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

**Consumer Protection Section**
**Consumer Credit Unit**

April 22, 2024

FROM:      Administrator, Colorado Uniform Consumer Credit Code

TO:          Interested Parties, Licensees, Notification Filers

RE:         Administrator's Interpretive Opinion Letter: Scope of C.R.S. § 5-13-106

      In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act (DIDMCA).  Section 521 of DIDMCA preempts state law and permits state-chartered depository institutions to charge the higher of "interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located." 12 U.S.C.§ 1831d; see also 12 U.S.C. 1785 (credit unions).  However, in Section 525 of DIDMCA, Congress expressly permitted states to "opt out" of this preemption for loans "made in" their state:

> The amendments made by section 521 through 523 of this title shall apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date, on or after April 1, 1980, on which such State adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to loans made in such State, except that such amendments shall apply to a loan made on or after the date such law is adopted or such certification is made if such loan is made pursuant to a commitment to make such loan which was entered into on or after April 1, 1980, and prior to the date on which such law is adopted or such certification is made.

 Pub. L. No. 96-221, 94 Stat. 132 (1980).

      In the 2023 legislative session, the Colorado General Assembly passed House Bill 23-1229.  Section 3 of HB23-1229 will be codified as C.R.S. § 5-13-106 when it takes effect on July 1, 2024.  It provides:

**EXHIBIT**
**A-1**

**App. 193**

In accordance with section 525 of the Federal "Depository Institutions Deregulation and Monetary Control Act of 1980", Pub. L. 96-221, the General Assembly declares that the State of Colorado does not want the amendments to the "Federal Deposit Insurance Act", 12 U.S.C. 1811 et seq.; the Federal "National Housing Act", 12 U.S.C. sec. 1701 et seq.; and the "Federal Credit Union Act", 12 U.S.C. sec. 1757, made by sections 521 to 523 of the Federal "Depository Institutions Deregulation and Monetary Control Act of 1980", Pub. L. 96-221, prescribing interest rates and preempting state interest rates to apply to consumer credit transactions in this state. The rates established in articles 1 to 9 of this title 5 control consumer credit transactions in this state.

The Administrator interprets § 5-13-106 to apply only to consumer credit transactions "made in" Colorado in accordance with Section 525 of DIDMCA. Section 5-13-106 specifically cites Section 525 and expresses an intent to be "in accordance with" that section. The Administrator understands and interprets § 5-13-106's language of "in this state" to be wholly congruent and identical with the opt out authorized by Section 525 for loans "made in" the state.

The Colorado Uniform Consumer Credit Code defines "Consumer credit transaction" as "a consumer credit sale or consumer loan, or a refinancing or consolidation thereof, or a consumer lease." C.R.S. § 5-1-301(12). The Administrator understands § 5-13-106's use of the statutory term used in the Code to address the types of transactions covered by the opt out. The Code separates credit transactions in to two types: When a creditor grants credit for the purchase of goods or services, Colorado law defines that transaction as a "consumer credit sale." C.R.S. § 5-1-301(11). When the creditor grants credit separate from a purchase, the transaction is a "loan" which in turn is part of the definition of "consumer loan." C.R.S. § 5-1-301(15) and (25). Collectively, "consumer credit sales" and "consumer loans" are part of the broader "consumer credit transactions." C.R.S. § 5-1-301(12). The Administrator interprets General Assembly's use of the statutory term to clarify the type of credit transaction included in the opt out by using the Code's defined term.

Administrator will limit her enforcement, if any, of violations of the opt out, if any, to loans "made in" Colorado, pursuant to § 5-13-106 and DIDMCA section 525, which she interprets to be identical. Pursuant to C.R.S. §§ 5-5-202(7) and 5-6-104(4), entities relying on this interpretation in good faith may be shielded from liability as well.

THE ADMINISTRATOR OF THE
UNIFORM CONSUMER CREDIT CODE

Martha Fulford

**App. 194**

BEFORE THE ATTORNEY GENERAL AND
THE ADMINISTRATOR, UNIFORM CONSUMER CREDIT CODE
STATE OF COLORADO

**STIPULATION AND FINAL AGENCY ORDER**

IN THE MATTER OF:

**DUVERA BILLING SERVICES, LLC DBA EASYPAY FINANCE.**

Respondent.

THIS STIPULATION AND FINAL AGENCY ORDER is entered under C.R.S. § 5-6-109 and C.R.S. § 6-1-110 ("Stipulation" or "Order") by the Attorney General for the State of Colorado ("Attorney General") and the Administrator of the Uniform Consumer Credit Code ("Administrator"), C.R.S. § 5-1-101, *et seq.* ("UCCC") (collectively, "Administrator"). The order is agreed and stipulated to by Respondent Duvera Billing Services, LLC dba EasyPay Finance ("Respondent" or "EasyPay") to resolve the issues arising from Respondent's alleged violations of the UCCC and the Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.* ("CCPA") described herein.

SECTION I<br>Findings of Facts and Conclusions of Law

1.  The Attorney General is the Attorney General for the State of Colorado. C.R.S. § 24-31-101. The Administrator is the Administrator of the UCCC. *See* C.R.S. § 5-6-103. Among other things, she is authorized to enforce compliance with the UCCC and its rules, and conduct investigations of possible violations of them. *See* C.R.S. § 5-6-101, *et seq.* The Administrator works on behalf of the Attorney General. The Attorney General is responsible for the enforcement of the CCPA. C.R.S. § 6-1-103.

2.  Respondent EasyPay is a California company with a principal office located at 3220 Executive Ridge, Suite 200, Vista, California 92081.

3.  EasyPay is a licensed supervised lender in Colorado.

4.  The Administrator alleges that EasyPay makes loans to Colorado consumers under the Loan Program ("Loan Program" or "Program") as described in this paragraph. Under the Program, TAB Bank, a Utah state-chartered bank ("TAB Bank") is identified as the entity that originates loans to Colorado consumers and retains title of those loans. EasyPay purchases, without recourse, participation interests in the loan the first business day after the funding date for the loan.

EXHIBIT
**A-2**

5.      The Program was launched in Colorado on November 9, 2016. TAB Bank funded the first Colorado loan on December 21, 2016.

6.      Initially, EasyPay purchased from TAB Bank participation interests for ninety percent (90%) of the amount financed plus ninety percent (90%) of any accrued interest on any loans made to Colorado consumers. For purposes of this agreement, participation interests ("Participation Interests") is defined as the undivided pro-rata interest, by percentage, of each loan owned by EasyPay and TAB Bank. On December 19, 2019, EasyPay entered an agreement with TAB Bank to reduce EasyPay's Participation Interests to seventy-five percent (75%). EasyPay implemented the reduction to seventy-five percent (75%) on December 18, 2020.

7.      Colorado served a subpoena ("Subpoena") on EasyPay on May 26, 2021. EasyPay responded on July 21, 2021, and made supplemental productions on October 5, 2021, January 12, 2022, January 14, 2022, and January 21, 2022. In its responses, EasyPay identified 8,108 loans originated to Colorado consumers.

8.      Under the Program, there was a ninety (90) day interest rebate promotion ("IRP"). If the Colorado consumers paid the loan balance in full within ninety (90) days, and there were no missed, late, or returned payments during that timeframe, then EasyPay would rebate all interest accrued on the loan except for a processing fee of up to $40.

9.      If the Colorado consumers did not take advantage of the IRP by paying off the loan within the 90-day window, the consumers would then owe all interest that accrued on the loan at interest rates ranging from 29% to 199%. Of the 8,108 loans identified by EasyPay, 6,286 had an Annual Percentage Rate ("APR") of 100% or greater, and 4,476 had an APR of 168% or greater. Of these loans, 36% became more than sixty (60) days delinquent or the customer defaulted because they filed for bankruptcy.

10.     C.R.S. § 5-2-201 provides:

(2) With respect to a supervised loan or a consumer credit sale, except for a loan or sale pursuant to a revolving account, a supervised lender or seller may contract for and receive a finance charge, calculated according to the actuarial method, not exceeding the equivalent of the greater of either of the following:

(a) The total of:

(I) Thirty-six percent per year on that part of the unpaid balances of the amount financed that is one thousand dollars or less;

(II) Twenty-one percent per year on that part of the unpaid balances of the amount financed that is more than one thousand dollars but does not exceed three thousand dollars; and

2

**App. 196**

(III) Fifteen percent per year on that part of the unpaid balances of the amount financed that is more than three thousand dollars; or

(b) Twenty-one percent per year on the unpaid balances of the amount financed.

11.    The Administrator alleges that EasyPay made loans under the Program  that exceed the limits set forth in C.R.S. § 5-2-201, hereinafter ("Similar Claims").

12.    The CCPA protects Colorado consumers from unfair and deceptive trade practices. C.R.S. § 6-1-105(rrr). The Administrator alleges that EasyPay's lending practices are unfair and deceptive trade practices that violate the CCPA.

13.    EasyPay represents that, as of October 14, 2022, it stopped facilitating new loans in Colorado in collaboration with TAB Bank.

14.    EasyPay maintains it does not make loans to Colorado consumers and instead solely facilitates, purchases the Participation Interests and services loans made by TAB Bank. For this reason, EasyPay denies that C.R.S. § 5-2-201 applies to loans made to Colorado consumers by TAB Bank under the Program.

<u>SECTION II</u>
<u>Order</u>

Pursuant to C.R.S. § 5-6-109, the Administrator hereby orders as follows:

*Injunctive Terms*

15.    Respondent has performed a self-audit of all transactions with Colorado consumers that originated during the Applicable Period,[1] and identified all transactions with Colorado consumers potentially owed refunds of interest charged in excess of the rate cap in C.R.S. § 5-2-201. Additionally, Respondent has performed a self-audit identifying all Colorado consumers who had a loan that, as of February 28, 2023, was greater than sixty (60) days past due or who filed bankruptcy while TAB loan was in repayment. Respondent verifies that these self-audits are accurate and complete.

16.    For each Colorado consumer identified in paragraph 15, Respondent will provide to the Administrator within thirty (30) business days of the Effective Date the following lists in a native Microsoft Excel format

---

[1] The Applicable Period means June 1, 2017, to October 14, 2022.

3

**App. 197**

that Respondent will verify are true, accurate, and complete:

    a.    a list of accounts identifying (i) the name, last known address, and last known contact information (e-mail address and phone number if available) for each consumer, and (ii) the amount of the interest paid by the consumer above 36% APR as of February 28, 2023.

    b.    a list identifying the subset of accounts as to which consumers: (i) paid $100 or more in interest above 36% APR, (ii) did not pay off their loan in full during the ninety (90) day IRP window, and (iii) have paid off their loan in full (this subset of accounts shall be referred to as the "Restitution Accounts"). **Exhibit A** hereto lists the Restitution Accounts and the amount of restitution each account shall receive.

    c.    a list of Defaulted Accounts, defined here as a loan that is at least sixty (60) days past due as of February 28, 2023, and loans for those consumers who filed bankruptcy while TAB loan was in repayment, identifying (a) the name, last known address, and last known contact information for each consumer, and (b) the principal amount of debt outstanding owed on each account as of February 28, 2023, which list is attached hereto as **Exhibit B.**

17.    Respondent agrees that it, together with its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, shall cease and desist from engaging in any lending, the facilitation of lending, the participation in a lending program, or any conduct described herein that violates the UCCC or the CCPA, and Respondent shall not engage in any lending, facilitation of lending, participation in a lending program, or commit any such conduct in violation of the UCCC or the CCPA in the future.

18.    Respondent will maintain a supervised lender license (C.R.S. § 5-2-301) with Colorado for as long as it services existing loans with Colorado consumers but will reduce the APR on loans that are currently in repayment and no more than sixty (60) days past due as of the Effective Date to 36% (as calculated under the Truth in Lending Act, 15 U.S.C. §§ 1601-1667f, and its implementing regulation, Regulation Z, 12 C.F.R. § 1026.22) as of the Effective Date, and comply with the Safe-Harbor Terms as set forth on **Exhibit C** hereto.

19.    Respondent agrees not to collect, attempt to collect  or assign any right to collect payment from loans listed on Exhibit B . Respondent shall not

**App. 198**

sell, assign, or otherwise transfer the loans listed on Exhibit B or any interest therein.

20.    Respondent shall, within forty-five (45) business days of the Effective Date of this Order, request that the tradelines for those loans listed on Exhibit B be deleted from the consumer's credit reporting file with any credit reporting agency where Respondent previously reported the debt.

21.    Within forty-five (45) business days of the Effective Date of this Order, Respondent shall e-mail at the last known e-mail address each of the consumers listed on Exhibit B except for those consumers whose accounts have already been discharged in bankruptcy or are the subject of an open bankruptcy case, a written notice, in a form approved by the Administrator. If any e-mail is returned as undeliverable, or Respondent does not have an e-mail address for the Defaulted Consumer, it shall send the notice via first-class U.S. Mail. The notice will inform the Defaulted Consumer of the following:

    a.    Respondent facilitated a loan to the consumer;

    b.    Respondent has entered into an agreement with the Administrator (who works on behalf of the Colorado Attorney General) concerning this loan;

    c.    Respondent has agreed not to collect or attempt to collect any additional payments on this loan;

    d.    Respondent has agreed not to assign or transfer its right to collect payment on this loan;

    e.    Respondent requested deletion of the tradeline for the loan if it had previously reported it to any credit reporting agency; the credit reporting agencies are not obligated to honor the request and EasyPay does not control the timing of any deletion;

    f.    Respondent cannot provide any advice on the potential tax consequences of the prohibition on additional collection;

    g.    Instructions to contact the Colorado Attorney General's Office and the Administrator for questions relating to the Order.

22.    Within sixty (60) business days of the Effective Date, Respondent shall submit to the Administrator:

    a.    A list of the loans that Respondent requested be deleted from credit reporting files; and

**App. 199**

b.      Copies of each notice e-mail or mailed to the consumers pursuant to paragraph 21.

*Restitution and Attorneys' Fees*

23.    Respondent shall pay pro rata refunds to the consumers for the Restitution Accounts identified by EasyPay in paragraph 16(b) and Exhibit A. This amount along with any interest is payable, in trust, to the Attorney General, to be used in the Attorney General's sole discretion for reimbursement of attorneys' fees and costs, the payment of consumer restitution, if any, and for consumer or creditor educational purposes, for future consumer credit or consumer protection enforcement, or public welfare purposes. The Administrator and the Attorney General elect, in lieu of making the payment directly to the Attorney General in the first instance, to direct Respondent to refund to Colorado consumers, on behalf of the Administrator and the Attorney General, any refunds owed to Colorado consumers as outlined above. To the extent that Respondent is unable to locate any Colorado consumers entitled to a refund or to otherwise pay a refund to a Colorado consumer such unpaid refunds shall be paid to the Administrator in accordance with paragraph 27 below.

24.    Respondent shall attempt to make any refunds due hereunder within sixty (60) business days after the Effective Date. All refunds shall be first attempted using the last known automatic payment method linked to the account. If this is not successful, Respondent shall attempt payment using any second form of payment linked to the account. If these methods result in the funds being undeliverable, Respondent must issue the refunds by check. Respondent shall exercise reasonable efforts and due diligence to attempt the refund; provided, however, that refunds that remain unpaid one-hundred and eighty ("180") calendar days following the date the check was issued, shall be paid to the Administrator in accordance with paragraph 27 below.

25.    Concurrently with any refunds, Respondent shall send each consumer a letter, the form and contents of which has been pre-approved by the Administrator. The letter shall inform consumers that, following an investigation by the Administrator (who works on behalf of the Attorney General) that Respondent has agreed to issue a refund to the consumer for the stated amount as the result of excess interest allegedly charged on a loan the consumer received from TAB Bank and facilitated by EasyPay Finance. The letter will identify an electronic method of payment and/or an enclosed check and the amount of the refund, and state that if the consumer does not accept payment by a date to be identified that is one-hundred and eighty (180) calendar days after the refund check was issued, the check will expire and the money will be paid over to the Attorney General, in trust. A template of the transmittal letter is attached as **Exhibit D**.

6

**App. 200**

26.     Within the greater of thirty (30) business days after refund checks issued pursuant to paragraph 25 have expired or one-hundred and ninety (190) business days after the Effective Date, Respondent shall:

a.   Provide the Administrator with evidence reasonably acceptable to the Administrator, that Respondent timely sent refunds to consumers, such as copies of checks or confirmations of electronically transmitted funds;

b.   Update Exhibit A referenced in paragraph 16(b) to identifying which consumers accepted payments; and

c.   Cease all electronic payment attempts.

27.     Within thirty (30) business days after the items in paragraph 26 are due, Respondent shall pay to the Administrator the total amount of any and all refund amounts that remain outstanding, whether because they were returned as undeliverable, unclaimed, uncashed, undeposited, or otherwise.

28.     Respondent shall pay to the Office of the Attorney General one hundred thousand dollars ($100,000) in lieu of reimbursement to the Office of the Attorney General for its costs in investigating this matter. This amount shall be held, along with any interest thereon, in trust by the Colorado Attorney General to be used in the Attorney General's sole discretion for attorneys' fees and costs, restitution, for future consumer or creditor educational purposes, for future consumer credit or consumer protection enforcement, public welfare purposes. This amount shall be due upon the Effective Date.

29.     At Respondent's expense and at the Administrator's option, Respondent shall permit the Administrator to inspect its books and records of loans to Colorado consumers under the Program once, at any time within normal business hours, and to conduct a follow-up inspection upon reasonable notice to Respondent's counsel. The inspection and follow up must occur within one (1) calendar year of the Effective Date, and shall be conducted solely to enable the Administrator to determine and verify the accuracy and thoroughness of Respondent's self-audit and its compliance with this Order.

30.     All payments due the Administrator or the Attorney General hereunder shall be deemed paid upon the receipt of the payment. Respondent may pay by check of ACH transfer or check. Respondent shall endeavor to make its payment in one payment. A check shall be made payable to the "Colorado Department of Law." The check should be mailed to: "Administrator, UCCC, attn: Kevin Burns and Miriam Burnett, 1300 Broadway, 6th/7th Floor, Denver, Colorado 80203." Wire transfer instructions will be provided upon request for an ACH transfer.

**App. 201**

31.     If EasyPay enters into an agreement with any other state Attorneys General where EasyPay is currently doing business that resolves Similar Claims involving the bank partner model that existed in Colorado until October 14, 2022, then EasyPay will provide a copy of the agreement to the Administrator for review. The agreement must explicitly state that EasyPay is required to pay restitution to that state's consumers in an amount that is equal to or greater than the total amount paid to Colorado consumers. With respect to such agreements, if: (1) EasyPay had facilitated at least 10,000 loans in the state or states as to which the agreement is reached and (2) the state interest rate cap (as defined by the state's usury laws) at issue is 21% per annum or greater and (3) terms of the agreement provide for greater restitution on a per loan basis for those consumers who had paid their loan in full (i.e., restitution amount divided by the number of loans receiving restitution) than provided for in paragraph 23, then EasyPay will amend paragraph 23 of this Stipulation to match the per loan restitution amount, and pay any additional restitution to Colorado consumers on a pro rata basis as provided for in this Stipulation. This provision, and EasyPay's obligations hereunder, will expire two (2) years after the Effective Date. If an agreement satisfies the criteria set forth above, EasyPay will be capped to one and half (1.5) times the total restitution amount referenced in paragraph 23 of this Stipulation.

<u>SECTION III</u>
<u>Stipulation and Release</u>

32.     Respondent agrees and stipulates to this Order and all requirements contained herein.

33.     It is the intent and purpose of this Order to resolve fully the particular issues, allegations, or charges raised by the Administrator's investigation of Respondent's activities as set forth above, and only those issues. Further, the omission from this Stipulation of other acts, conduct, or practices which might constitute violations of the Act shall not be deemed or construed to be approval by the Administrator of such acts, conduct, or practices.

34.     Respondent acknowledges that it has a right to request an evidentiary hearing in this matter, present evidence, examine witnesses, and appeal from any adverse action and waives those rights.

35.     Respondent agrees that this Order contains the entire agreement with the Administrator and is binding upon all the officers, directors, employees, shareholders, managers, members, principals, affiliates, agents, trade names, heirs, and successors of the Respondent.

**App. 202**

36.     This Order shall be disclosed in any application to the Administrator and in response to any question from the Administrator regarding state disciplinary or administrative action.

37.     Colorado law governs this Order. Any claims or causes of action arising out of or based upon this Order shall be commenced before the Colorado Office of Administrative Courts or in Denver District Court for the State of Colorado, as appropriate. Respondent hereby consents to the jurisdiction, venue and process of the Colorado Office of Administrative Courts and the Denver District Court for such an action brought by the Administrator. In the event of any action or proceeding alleging or asserting a violation of or failure to comply with this Order, this Order shall be admissible in full, and shall be evidence that prior to this Order, Respondents engaged in the acts and practices described herein.

38.     This Order shall be effective on the later of the date it is signed by the Administrator and the date it is signed by EasyPay ("Effective Date").

EXECUTED AND SO ORDERED by the Administrator this ___20th_ day of ____April_____, 2023.

_____
Martha Fulford
Administrator
Uniform Consumer Credit Code

[REMAINDER OF PAGE INTENTIONALLY BLANK]

9

**App. 203**

**AGREED AND STIPULATED TO BY:**

EASYPAY FINANCE

By: _Mary Jones_

    Mary Jones
    CEO
    mary.jones@easypayfinance.com

DATE: April 20, 2023

**APPROVED AS TO FORM:**

           By: _Kevin J. Burns_

           KEVIN J. BURNS
           Department of Law
           Consumer Protection Section
           Consumer Credit Unit
           Ralph L. Carr Colorado Judicial Center
           1300 Broadway, 6th Floor
           Denver, CO 80203
           Telephone: (720) 508-6110
           E-Mail: kevin.burns@coag.gov

           DATE: April 20, 2023

ADMINISTRATOR, UCCC

10

**App. 204**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL
SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

      Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA FULFORD,
Administrator of the Colorado Uniform Consumer Credit Code,

Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUNCTION**

---

**App. 205**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 1

I.    Plaintiffs' Claims Are Justiciable. ................................................................ 1

    A.    Plaintiffs have standing and their claims are ripe. ................................ 1

    B.    Plaintiffs have pled a valid cause of action. ......................................... 2

II.   Colorado's And The FDIC's Interpretations Of The Scope Of Section 525 Ignore Its Text And Are Unsupported. ........................................................... 3

    A.    Lenders "Make" Loans. ........................................................................ 4

    B.    The use of "located" in Section 521 does not change the meaning of "made," which is used in both Sections 521 and 525. ............................ 5

    C.    Dormant Commerce Clause authorities are irrelevant to interpreting DIDMCA. ............................................................................................. 7

    D.    Related statutes support Plaintiffs' interpretation. ................................ 8

    E.    Numerous regulatory statements—including the FDIC's own past statements—support Plaintiffs' interpretation. ....................................... 8

    F.    The policies underlying DIDMCA support Plaintiffs' interpretation. .................. 10

III.  Plaintiffs' Members Will Suffer Irreparable Harm Absent A Preliminary Injunction. .................................................................................................. 12

IV.   The Balance Of Equities Favors Maintaining The Status Quo. ....................... 12

CONCLUSION ................................................................................................... 13

CERTIFICATE OF TYPE-VOLUME COMPLIANCE ............................................ 15

CERTIFICATE OF SERVICE .............................................................................. 16

i

**App. 206**

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015)....................................................................................3

*A.S. Goldmen & Co. v. N. J. Bureau of Sec.,*
163 F.3d 780, (3d Cir. 1999)........................................................................7

*Borden v. United States,*
593 U.S. 420 (2021)....................................................................................4

*Consumer Data Indus. Ass'n v. King,*
678 F.3d 898 (10th Cir. 2012).....................................................................2

*Dean Foods Co. v. Brancel,*
187 F.3d 609 (7th Cir. 1999).......................................................................7

*EagleMed LLC v. Cox,*
868 F.3d 893 (10th Cir. 2017).....................................................................3

*Ex parte Young,*
209 U.S. 123 (1908)....................................................................................3

*Jessup v. Pulaski Bank,*
327 F.3d 682 (8th Cir. 2003).......................................................................8

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
439 U.S. 299 (1978)..............................................................................8, 10

*Pulsifer v. United States,*
144 S. Ct. 718 (2024)..................................................................................6

*Quik Payday, Inc. v. Stork,*
549 F.3d 1302 (10th Cir. 2008)...................................................................7

*Smith v. Hickenlooper,*
164 F. Supp. 3d 1286 (D. Colo. 2016).........................................................3

*South Dakota v. Wayfair, Inc.,*
585 U.S. 162 (2018) ...................................................................................7

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)....................................................................................2

**App. 207**

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021)................................................................................1

**Federal Statutes**

Depository Institutions Deregulation and Monetary Control Act of 1980,
    Pub. L. No. 96-221, 94 Stat. 132 (1980).......................................... *passim*

12 U.S.C. § 85 ........................................................................................6

12 U.S.C. § 371(a) ..................................................................................4

12 U.S.C. § 1757(5) ................................................................................4

12 U.S.C. § 1785(f)(1) ............................................................................4

12 U.S.C. § 1831d ..................................................................................6

12 U.S.C. § 1831d(a) ..............................................................................4

12 U.S.C. § 1831u(f) ...............................................................................4

12 U.S.C. § 2279aa(7)(c) ........................................................................4

12 U.S.C. § 2610 .....................................................................................4

12 U.S.C. § 4742(4) ................................................................................4

12 U.S.C. § 4742(10)(a) ..........................................................................4

12 U.S.C. § 5602(b)(1) ...........................................................................4

12 U.S.C. § 5701(3) ................................................................................4

12 U.S.C. § 5701(9)(a) ...........................................................................4

**State Statutes**

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023).................1, 12, 13

**Regulations**

12 C.F.R. § 215.3 ....................................................................................4

FDIC, Federal Intrest Rate Authority,
    85 Fed. Reg. 44,146 (July 22, 2020).......................................................10

FDIC Gen. Counsel's Op. No. 11, Interest Charges by Interstate State Banks,
    63 Fed. Reg. 27,282 (May 18, 1998) .......................................................9

**App. 208**

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) ........................................8

FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June 29, 1988)...........................5, 9, 10

OCC Interp. Ltr. No. 686, 1995 WL 786842 (Sept. 11, 1995) .........................................9

OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020).........................................9

OTS Letter from H. W. Quillian, 1986 WL 290314 (June 27, 1986)................................8

**Other Authorities**

Black's Law Dictionary (6th ed. 1979)..........................................................................5

Black's Law Dictionary (11th ed. 2019)........................................................................4

Webster's Third International Dictionary (1971 ed.) ......................................................5

**App. 209**

## INTRODUCTION

Section 525 applies only to loans "made in" the opting-out state. Banks "make" loans. Borrowers do not. And an out-of-state bank "makes" loans in an opting-out state only if the bank performs all key lending functions there.

Ignoring DIDMCA's text, context, and historical interpretation, Colorado and the FDIC advance two different—albeit equally novel—interpretations of "made in." Neither works. Colorado relies on Dormant Commerce Clause cases to argue that a loan is made where the borrower is located. The FDIC argues those very same cases support a different interpretation of DIDMCA: A loan is "made" where both the borrower *and* the lender are located. But those cases address constitutional limits on state action and shed no light on the statutory-construction issue here. And notably, the FDIC does not even assert its current view merits deference, presumably because it explicitly disavows its own prior statements in service of a new policy preference.

If Colorado and the FDIC wish individual states to have broader authority over other states' banks than DIDMCA provides, they must ask Congress to grant it. They cannot ask this Court to rewrite the statute. The Court should preliminarily enjoin Colorado from enforcing Section 3 according to Colorado's overbroad interpretation.

## ARGUMENT

### I.   Plaintiffs' Claims Are Justiciable.

#### A.   Plaintiffs have standing and their claims are ripe.

Colorado argues Plaintiffs lack standing by speculating—without citing any evidence—that "the number of loans affected" by the opt-out "could be a handful … or none." Opp. 18. First of all, even a "single dollar" of injury establishes standing. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021). Furthermore, Colorado at the same time concedes Plaintiffs would have standing if their members offer loans that, under Plaintiffs' construction of DIDMCA, should not be subject

**App. 210**

to Colorado's caps. Opp. 18. Plaintiffs submitted seven sworn declarations showing exactly that. They describe the types of products Plaintiffs' members offer that would become subject to Colorado's rate caps, including the affected loan volume in Colorado (hundreds of thousands), and associated revenues (millions of dollars). Mot. (Dkt. 24) 8, 16-17. Colorado inexplicably ignores this evidence, and certainly does not contest it.

Colorado also dismisses Plaintiffs' evidence regarding members' compliance costs, lost goodwill, and lost revenue, arguing "banks will always incur compliance costs when the law changes, relationships will strain where impacted, and some prior sources of revenue may be prohibited." Opp. 17. This misses the point: When the change in law is *illegal*, the costs it imposes constitute an irreparable injury that provides standing. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902-03 (10th Cir. 2012).

Finally, Colorado asserts Plaintiffs' claims are not ripe because "Plaintiffs' alleged harms are too conjectural to confer standing in a pre-enforcement context," and because Colorado will interpret the opt-out consistent with federal law. Opp. 17, 16; Fulford Decl. (Dkt. 39-1) ¶ 3 & Ex. A-1. But the "pre-enforcement nature" of this suit is not "troubling" because Plaintiffs have "alleged an actual and well-founded fear that the law will be enforced against them." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (cleaned up). Indeed, Defendants tell the Court that they explicitly interpret Section 525's opt out to apply to loans made by Plaintiffs' members— banks chartered outside Colorado—to consumers physically located in Colorado. *Compare* Opp. 11, *with* Mot. 7. This application is plainly *inconsistent* with federal law, and thus Plaintiffs' claims are ripe. *See Consumer Data*, 678 F.3d at 907.

### B.   Plaintiffs have pled a valid cause of action.

Colorado also argues that Plaintiffs have no private right of action. Opp. 14-16. But "if an individual claims federal law immunizes him from state regulation, the court may issue an

injunction upon finding the state regulatory actions preempted," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)), and may "grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* Unlike the statute in *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286 (D. Colo. 2016) (Opp. 14-15), DIDMCA grants a federal right to Plaintiffs' members to lend at rates that Colorado intends to prohibit. Plaintiffs' cause of action is thus precisely what *Ex parte Young* and *Armstrong* authorize. Compl. (Dkt. 1) 26 (Prayer for Relief).

## II.   Colorado's And The FDIC's Interpretations Of The Scope Of Section 525 Ignore Its Text And Are Unsupported.

Plaintiffs detailed how the statutory text, history, regulatory interpretations, and caselaw all confirm that the Section 525 opt-out applies only to loans "made in" the opting-out state as determined by a functional analysis focused on where the bank performs core loan-making functions. Mot. 2-6, 10-15. The borrower's physical location has never been part of the analysis.

Lacking an adequate response to Plaintiffs' textual argument, Colorado instead accuses Plaintiffs of "ask[ing] this Court to fashion—from whole cloth—a new federal test for determining where a loan is made." Opp. 7. But it is Colorado and the FDIC that seek to jettison decades of caselaw and regulatory precedent (including the FDIC's own) and ask the Court to rewrite Section 525—from "loans made in [a] State" to "loans made to borrowers physically present in" a State. Opp. 11; FDIC Br. 6-7. The Court should reject these revisionist interpretations.[1]

---

[1] Colorado suggests that a "presumption against preemption" applies here. Opp. 4. That presumption is not applicable because the question presented is the scope of preemption under a statute containing an express-preemption provision (DIDMCA Section 521), which is a matter of ordinary statutory interpretation. *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017) ("When a statute contains an express preemption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.") (cleaned up). Regardless, Colorado does not explain how a presumption would lead the Court to adopt Colorado's interpretation.

**App. 212**

### A.   Lenders "Make" Loans.

As Plaintiffs explained (Mot. 10-12), the text of Section 525 refers to where loans are "made," which necessarily focuses on the party who "makes" the loan, *i.e.*, the loan originator. "Make" means to "create"—and only banks create loans, not borrowers. Mot. 11. Just like a baker "bakes" a cake in the oven, not where the buyer buys or consumes the cake, a bank "makes" a loan where the bank conducts the core functions associated with loan creation, not where the borrower receives or uses the loan funds.

This usage of "make" is not unique to Section 525. Throughout Title 12 of the U.S. Code—which governs banking—*banks* "make" loans. *See, e.g.*, 12 U.S.C. §§ 85, 371(a), 1757(5), 1785(f)(1), 1831d(a), 1831u(f), 2610, 4742(4), 5701(3); *see also, e.g.*, 12 C.F.R. § 215.3. Borrowers, by contrast, "receive" or "obtain" loans. *See, e.g.*, 12 U.S.C. §§ 2279aa(7)(c), 4742(10)(a), 5602(b)(1), 5701(9)(a). Colorado and the FDIC offer nothing to justify treating Section 525 as an exception to this uniform rule.

Congress could have chosen to expand Section 525 "to loans made *or received* in any State." But it did not do so, and "[a] court"—or in this case a party—"does not get to … insert convenient language to yield [its] preferred meaning." *Borden v. United States*, 593 U.S. 420, 436 (2021).

Likely because their arguments are not grounded in the actual statutory text, Colorado and the FDIC do not even agree on an alternate interpretation. Does "made in" refer to where the borrower happens to be located, as Colorado argues (Opp. 10-11)? Or is the "transaction … made in both states," as the FDIC asserts (FDIC Br. 4)? Regardless, both definitions suffer from the same flaw: Making a *loan* and making a *contract for a loan* are two different things. Thus, while "'to make a 'contract'" might, depending on state law, include such acts as "'executing, signing, or delivering'" that contract," Opp. 10-11 (quoting Black's Law Dictionary (11th ed. 2019),

4

**App. 213**

DIDMCA refers only to loans, not loan contracts. *Compare Loan*, Black's Law Dictionary (6th ed. 1979) ("Anything furnished for temporary use to a person at his request, on condition that it shall be returned … with or without compensation for its use."); *Loan*, Webster's Third Int'l Dictionary (1971 ed.) ("money lent at interest") *with Contract*, Black's Law Dictionary (6th ed. 1979) ("An agreement between two or more parties which creates an obligation to do or not to do a particular thing"; "The writing which contains the agreement of parties, with the terms and conditions, and which serves as proof of the obligation."); *Contract*, Webster's Third Int'l Dictionary (1971 ed.) ("an agreement between two or more persons or parties to do or not to do something"). Moreover, the FDIC cannot explain why federal law would impose a shifting standard for "made" that turns on state law about where contracts generally are deemed "made," rather than a uniform federal standard.[2]

**B.      The use of "located" in Section 521 does not change the meaning of "made," which is used in both Sections 521 and 525.**

Colorado and the FDIC rely primarily on the canon of meaningful variation to argue that under principles of statutory construction there must be a distinction between where a loan is "made" under Section 525 and where a bank is "located" under Section 521, and that this distinction must "reflect differences in congressional intent." FDIC Br. 1; *see also id.* at 8-10; Opp. 7-8. Not so.

First, Plaintiffs are not arguing that where a bank "makes" a loan and where the bank is "located" for purposes of applying state interest-cap preemption statutes is identical in every case—though there is considerable logical overlap because identifying where a bank's loan-

---

[2] If contracting concepts governed the definition of where a loan is "made" for Section 525, governing-law provisions might also be relevant. *See* FDIC Interp. Ltr. No. 88-45, 1988 WL 583093, at *2 (June 29, 1988) ("Equally [relevant] is where the parties intend the contract to be made under the contractual provisions itself.").

making functions occur informs the determination of where a bank is "located" in connection with a particular loan. Mot. 13-14.

In any event, the "meaningful variation" argument is "'defeasible'" by other evidence. *Pulsifer v. United States*, 144 S. Ct. 718, 735 (2024) (quoting A. Scalia & B. Garner, Reading Law 170-71 (2012)), and fails here because Section 521 does not use only the word "located" when describing which state's interest-rate caps apply for preemption purposes; it *also* uses the word "made." Section 521 (like NBA Section 85) specifies the bank may "charge on any loan … *made*" interest pursuant to the cap where the bank is "located." 12 U.S.C. §1831d (emphasis added); *see also* 12 U.S.C. § 85. As courts and regulators have therefore explained, determining where a bank is "located" under Section 521 turns on where the bank performed key loan-creation functions when it "made" a particular loan. Mot. 13-15. Neither Colorado nor the FDIC explain why the analysis of where a loan is "made" should ignore the borrower's location under Section 521, but depend on it for Section 525.[3] Indeed, the consistency canon Colorado and the FDIC reference instead creates a presumption that the relevant definition of where a loan is "made" by a bank should be the same under both Section 521 and Section 525—which means the borrower's location has no bearing on where a loan is "made."

Finally, the different wording of Sections 521 and 525 reflects the different functions of the two provisions. Whereas Section 521 defines which state's interest-rate law applies to a given loan, Section 525 uses the word "made" in part to preclude retroactive application of an opt-out: "The amendments made by sections 521 through 523 … shall apply only with respect to *loans*

---

[3] While both Colorado and the FDIC argue that FDIC and OCC interpretations of where a bank is "located" under Section 521 and NBA Section 85—which focus on the three "non-ministerial functions" involved in "making" a loan—do not apply to Section 525 (Opp. 9-10; FDIC Br. 10-12), neither argues that these misinterpret Section 521 and NBA Section 85.

**App. 215**

*made* in any State *during the period* beginning on [DIDMCA's effective date], and ending on the date" the state opts out. DIDMCA § 525, Pub. L. No. 96-221, 94 Stat. 132, 167 (1980) (emphasis added). "Located" would not grammatically suit this context.

**C.   Dormant Commerce Clause authorities are irrelevant to interpreting DIDMCA.**

Running even further from the text of Section 525, Colorado and the FDIC rely on Dormant Commerce Clause cases to support their interpretations of where loans are "made" for purposes of Section 525. Opp. 11 (citing *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008)); FDIC Br. 4-6 (discussing *Quik Payday* and other cases). This caselaw is irrelevant here.[4]

*Quik Payday* and the other cited cases address only the question whether activity affects a given state sufficiently to allow that state to regulate the conduct within the bounds of the Constitution. *Quik Payday*, 549 F.3d at 1312 (characterizing question as akin to whether Kansas could exercise "specific jurisdiction" over transaction). It may generally be true that, "[w]hen an offer is made in one state and accepted in another, … both states have an interest in regulating the terms and performance of the contract" for purposes of the constitutional minimum for Due Process. FDIC Br. 4 (quoting *A.S. Goldmen & Co. v. N. J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999)). But that says nothing about the meaning of "made in" under Section 525 or the scope of federal preemption for loans by state-chartered banks. *See* Mot. 10-15; page 3-6, *supra*. Indeed, none of these cases deals with banks or bank regulation, and some do not even address lending.[5]

---

[4] Plaintiffs' PI motion is based only on their preemption claim. *See* Mot. 9 (Arg. A).

[5] *See* FDIC Br. 5 nn.7, 8 (citing *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018) (analyzing regulation requiring online sellers to collect sales tax); *Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir. 1999) (analyzing milk-sale regulations)).

**App. 216**

### D.   Related statutes support Plaintiffs' interpretation.

DIDMCA represents one strand in a web of interconnected banking statutes that all reflect the consistent congressional intent to specify whether states may regulate interest rates on loans based on where banks' key loan-making functions occur—that is, where loans are "made." Mot. 11-14 (discussing history tracing from NBA, to *Marquette*, to DIDMCA, to Riegle-Neal, to Gramm-Leach-Bliley (GLBA)).

Colorado ignores these related statutes entirely. The FDIC also offers no substantive response, arguing only that later legislation cannot "control" the meaning of Section 525 and that the Eighth Circuit misunderstood another federal banking law when it held that "a loan is made … at the location of the branch that approves the loan, extends credit, and disburses the funds," *Jessup v. Pulaski Bank*, 327 F.3d 682, 685 (8th Cir. 2003) (analyzing GLBA). FDIC Br. 13, 15-16. Plaintiffs do not contend these enactments or later legislative history *control* the interpretation of Section 525. But they show consistent congressional usage of the same terminology on the same subject to refer to the same standard—the functional loan-creation-focused standard on which Plaintiffs rely, which does not turn on the location of the borrower. Colorado fails to show why only Section 525 should be construed to deviate from this otherwise-uniform statutory framework.

### E.   Numerous regulatory statements—including the FDIC's own past statements—support Plaintiffs' interpretation.

Federal regulators have consistently adhered to a functional approach to determining where a bank makes its loans in connection with state interest-rate-cap preemption. They have never—until this litigation—equated the state where loans are "made" for preemption purposes with where borrowers reside. Mot. 13-14; *see, e.g.*, FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983); OTS Letter from H. W. Quillian, 1986 WL 290314, at *2 (June 27, 1986) (explaining lenders "may offer loans to out-of-state customers at interest rates authorized in the state where

the institution is located, even if the state where the borrower lives … has exercised its 'opt out' authority under section 525"); OCC Interp. Ltr. No. 686, 1995 WL 786842, at *3 (Sept. 11, 1995) ("the key fact in determining the permissible interest rate applicable to a loan is not where the customer resides"); OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020). Indeed, regulator emphasis on this functional lender-based approach has only increased as the modern banking system has grown more automated and decentralized. Mot. 13.

The FDIC now swims against this tide, proposing a novel framework under which loans are simultaneously made—for opt-out purposes—in both the state where the borrower is physically located and the state(s) where the bank is located. FDIC Br. 6. Try as it might, the FDIC cannot square this new framework with its past statements, which never equated where a loan is "made" with the borrower's and lender's locations.

Most notably, the FDIC seeks to distance itself from its Opinion 11, where the agency examined the three "non-ministerial" loan-making functions to determine where a loan was "made" under Section 521. FDIC Br. 8-12. The FDIC now claims it merely "used 'made' colloquially and did not mean to suggest that the loan was actually or exclusively made in the state in which the three functions were performed." FDIC Br. 11. Even if credited, the FDIC's explanation only serves to highlight that the "colloquial"—that is, ordinary—meaning of where a loan is "made" refers to the place the bank performs the functions to create a loan.

The FDIC more enthusiastically latches on to statements in Advisory Opinion 88-45, which declared that "located" in Section 521 must mean something different from "made" in Section 525.[6] FDIC Br. 9. But the FDIC's enthusiasm for this Opinion ends there. The FDIC expressly disavows *other* language in Opinion 88-45, which addressed factors to consider when determining

---

[6] Again, Plaintiffs do not treat "located" as synonymous with "made," *see* page 5-6, *supra*.

where a loan is made for purposes of Section 525. FDIC Br. 9 n.12. And the FDIC ignores that Opinion 88-45 specifically referenced *Marquette* in stating that "an analysis of all the facts surrounding a transaction must be used in determining where a loan is 'made.'" 1988 WL 583093, at *2 (citing *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311-12 (1978)). Notably, the FDIC now argues that *Marquette* should have no bearing on how "made in" should be interpreted for DIDMCA Section 525. FDIC Br. 13-15.[7]

Ultimately, the FDIC's inability to articulate statutory definitions that comport with the statutory text, relevant caselaw, and its own past pronouncements underscore the lack of deference this Court should afford the agency's current views.

### F. The policies underlying DIDMCA support Plaintiffs' interpretation.

Colorado and the FDIC also contend that the principles of federalism animating DIDMCA require adopting their interpretation. Opp. 7-8; FDIC Br. 9. But Plaintiffs' interpretation better accords with those principles.

To ensure that state banks could compete with national banks, DIDMCA imposed the same uniform federal interest-rate limitation on state banks across the country as existed for national banks. Mot. 4-5. To soften this exercise of federal power, Section 525 granted states a limited right to opt out, allowing them to cap the rates of their own state-chartered banks. Mot. 5-6. But Section 525 does not authorize states to regulate national banks, and allows opt-out states to regulate *other* states' banks only to the extent those banks actually perform key loan-making

---

[7] Colorado asserts the FDIC "explicitly disclaimed Plaintiffs' proposed test" in its 2020 valid-when-made rule. Opp. 9. The FDIC did nothing of the sort—that rulemaking does not attempt to define the term "loans made in" in Section 525, *see* FDIC, Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,153 (July 22, 2020), and the FDIC does not even claim this in its brief. FDIC Br. 10.

**App. 219**

functions in the opt-out state. *Id*. This structure balances the federal government's interest in regulating national banks with *all* states' interest in regulating their own chartered banks.

Colorado, however, demands more. It contends that under Section 525, Congress empowered Colorado to reach beyond its borders to override *other* states' interest-rate regimes and impose its own regulations on all state banks that extend credit to borrowers physically located in Colorado—even if the bank is located in and makes the loan in a different state under federal law. Opp. 11. This interpretation assumes Congress exercised federal power to grant superior rights to opt-out states, undermining both federalism and comity between the states.

Colorado also misunderstands the historical context surrounding Congress's choice to provide for interest-rate preemption in DIDMCA. *See* Opp. 7 (stating, without citation, that "[i]n response to double-digit interest rates and high inflation, Congress passed DIDMCA, preempting state rate caps so state-chartered banks could export the higher rates permitted by the bank's home state"). As the legislative history demonstrates, Congress's focus was not on rate exportation at all (although DIDMCA enabled that). Mot. 5-6. Rather, Congress's goal was to ensure, during a time of record inflation and high federal interest rates, that state banks would be on par with national banks and could lend—in their own states or elsewhere—at the greater of the federal discount rate (plus 1%) or their own states' interest-rate caps. Mot. 4-5. This history is important to understanding Congress's goal with the Section 525 opt-out—to restore states' ability to control the rates at which their own state banks loaned money by removing their ability to lend at the federal rate. Mot. 5-6. Section 525 was not intended as a tool to enable opting-out states to reach into *other* states to regulate those states' banks' interest rates.

Finally, defending Colorado's opt-out on federalism grounds not only starts from the wrong place but leads to the wrong place. If anything, its primary effect will be to prompt state banks to

**App. 220**

convert to national banks—undermining both the dual banking system and other states' ability to continue chartering banks. Neither result advances the federalism-based goals Colorado and the FDIC purport to respect.

### III.    Plaintiffs' Members Will Suffer Irreparable Harm Absent A Preliminary Injunction.

Plaintiffs have demonstrated their members face irreparable harm absent the requested injunction. Mot. 16-17. Colorado's only response is to claim these harms occur "from Colorado's Opt-Out," but that the opt-out is "within the scope of Section 525." Opp. 19. That merely restates Colorado's merits argument; it does not refute Plaintiffs' evidence of unrecoverable losses.

### IV.    The Balance Of Equities Favors Maintaining The Status Quo.

Finally, the balance of equities and public interest favor granting Plaintiffs' motion. Mot. 17-18.

First, Colorado is wrong (Opp. 3-4, 20) that Plaintiffs seek a "disfavored injunction." Injunctive relief in the pre-enforcement context is not "disfavored." *See* page 2, *supra*. The requested injunction does not mandate action—it seeks to *prevent* the opt-out taking effect, maintaining the *status quo*, Mot. 17-18. It would not grant permanent relief and could be undone at any time.

Second, although Colorado argues Section 3 is necessary to prevent "loans at rates that the General Assembly determined are not in the interests of Coloradans," Opp. 20, Colorado overlooks that national banks will continue to offer loans at rates above Colorado's caps. Mot. 18. And neither Colorado nor the FDIC attempts to justify the significant decrease in credit availability and consumer choice, as well as uncertainty about applicable law, that their novel positions would precipitate. Mot. 2, 17-18.

**App. 221**

Third, a preliminary injunction would not "stymie the will of Coloradans," Opp. 20. Yes, Section 3 was enacted by the Colorado legislature. Opp. 2. But by enacting its opt-out over-broadly, Colorado is stymying the will of the Nation, as expressed by Congress. The Supremacy Clause forbids this.

## CONCLUSION

The Court should preliminarily enjoin Colorado from taking any action to enforce or give effect to H.B. 23-1229 Section 3 with respect to loans not "made in" Colorado as defined by the federal precedent on which Plaintiffs rely.

**App. 222**

Respectfully Submitted,

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine, LLP
865 S Figueroa Street
Suite 2400
Los Angeles, CA 90017
(213) 633-6800
mattladew@dwt.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

/s/ David M. Gossett
DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com
leah.capritta@hklaw.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

*Attorneys for the American Fintech Council*

DATED: MAY 7, 2024

14

**App. 223**

**CERTIFICATE OF TYPE-VOLUME COMPLIANCE**

Plaintiffs hereby certify that the foregoing pleading contains 3,991 words, and thus

complies with the 4,000-word limit authorized by the Court's May 3, 2024, Order (Dkt. 43).


/s/ David M. Gossett
David M. Gossett

**App. 224**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of May, 2024, I filed a true and correct copy of Plaintiffs' Reply In Support Of Their Motion For Preliminary Injunction via CM/ECF, which will generate notice by electronic mail to all counsel who have appeared via CM/ECF.

*/s/* David M. Gossett

David M. Gossett

**App. 225**