No. 24-1293

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants*,

v.

AMERICAN FINTECH COUNCIL, NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, and AMERICAN FINANCIAL SERVICES ASSOCIATION,

*Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-00812-DDD-TPO, Hon. Daniel D. Domenico

## PLAINTIFFS-APPELLEES' BRIEF

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

*Attorneys for American Fintech Council*

DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

*Attorneys for National Association of Industrial Bankers and American Financial Services Association*

*Additional counsel on inside cover*

**ORAL ARGUMENT REQUESTED**

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com
leah.capritta@hklaw.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400
Los Angeles, CA 90017
(213) 633-6800
mattladew@dwt.com

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st
Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

*Attorneys for National Association of Industrial Bankers
and American Financial Services Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.........................................................................iv

STATEMENT OF RELATED CASES ....................................................x

GLOSSARY ..............................................................................................xi

INTRODUCTION......................................................................................1

ISSUES PRESENTED ..............................................................................3

STATEMENT ............................................................................................4

    A.    Statutory and regulatory background. ....................................4

        1.    The dual-banking system...............................................4

        2.    State interest-rate laws. .................................................5

        3.    National Bank Act preemption......................................6

        4.    DIDMCA precursors. .....................................................8

            a.    Brock Bill of 1974.................................................9

            b.    Borrowers Relief Act of 1979. ............................12

        5.    DIDMCA............................................................................14

        6.    Post-DIDMCA opt-outs. ................................................20

    B.    Factual background...............................................................21

        1.    Colorado opts out of DIDMCA Section 521. ................21

        2.    Effects of the opt-out on Plaintiffs' members. .............22

    C.    Procedural History. ..............................................................24

        1.    Plaintiffs' lawsuit. .......................................................24

        2.    The District Court's injunction.....................................24

SUMMARY OF ARGUMENT ................................................. 27

ARGUMENT ......................................................................... 28

I.    Plaintiffs Have Pleaded A Valid Cause Of Action........................ 28

II.   The District Court Correctly Held That Plaintiffs Are Likely
      To Succeed On The Merits. ............................................. 31

      A.    DIDMCA's statutory text and context demonstrate that
            the opt-out applies only to state-chartered banks
            performing key loan-making functions in an opting-out
            state. ..................................................... 32

            1.    DIDMCA's plain text focuses on the lender who
                  makes the loan, not the borrower who receives it....... 32

            2.    Other banking statutes consistently use the
                  words "make" or "made" when referring to actions
                  taken by banks with regard to loans. ...................... 34

            3.    DIDMCA's history confirms its plain meaning. .......... 35

            4.    Congress used the same phrasing in another
                  interest-rate parity statute to refer to the state
                  where a bank performs its loan-making functions...... 38

      B.    Colorado's alternative reading of the text of Section 525
            does not work.......................................................... 40

            1.    Colorado's "loan is made in two states" theory is
                  incoherent........................................................ 40

            2.    Loan contracts are different from loans. ..................... 42

            3.    The canon of "meaningful variation" does not
                  apply. ............................................................ 44

            4.    The use of passive voice does not carry the
                  significance Colorado assigns to it.............................. 47

      C.    Colorado misunderstands the purpose of DIDMCA
            Section 525. ........................................................... 48

1.    The opt-out was designed to allow states to decline interest-rate parity, not to encroach on other states' interests in regulating their own banks. ................................................................ 49

2.    There was no pre-DIDMCA "status quo" for state regulation of state-bank interstate lending. ............... 52

D.   Colorado's cases are irrelevant to interpreting Section 525. ......................................................................... 56

E.   Federal regulators have traditionally endorsed a lender-focused approach. .......................................... 58

III.   The District Court Did Not Issue A Disfavored Injunction, And Correctly Found That The Equities Favor Plaintiffs. ........... 62

CONCLUSION ........................................................... 64

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................... 65

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ........................................................................ 67

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Aldens, Inc. v. Packel,*
    524 F.2d 38 (3d Cir. 1975) ........................................................... 53, 56

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) .................................................................. 29, 30, 31

*Chamber of Com. v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ............................................................ 63

*Ex parte Young,*
    209 U.S. 123 (1908) ...................................................... 2, 3, 25, 27-30

*First Nat'l Bank of Logan, Utah v. Walker Bank &*
    *Tr. Co.,* 385 U.S. 252 (1966) ........................................................... 2, 5

*Fish v. Kobach,*
    840 F.3d 710 (10th Cir. 2016) ............................................................ 28

*Free the Nipple-Fort Collins v. City of Fort Collins,*
    916 F.3d 792 (10th Cir. 2019) ...................................................... 62, 63

*Greenwood Tr. Co. v. Commonwealth of Mass.,*
    971 F.2d 818 (1st Cir. 1992) ......................................................... 9, 59

*Jessup v. Pulaski Bank,*
    327 F.3d 682 (8th Cir. 2003) .................................................. 38, 39, 56

*Lewis v. Fid. & Deposit Co. of Md.,*
    292 U.S. 559 (1934) ........................................................................... 5

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ...................................................................... 57

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
    439 U.S. 299 (1978) ................................................................... passim

*Nat'l Credit Union Admin. Bd. v. Nomura Home*
    *Equity Loan, Inc.,* 764 F.3d 1199 (10th Cir. 2014) ...................... 35, 42

*Negonsott v. Samuels,*
    933 F.2d 818 (10th Cir. 1991) ............................................................ 44

iv

*Pirkey v. Hosp. Corp. of Am.*,
    483 F. Supp. 770 (D. Colo. 1980) .......................................... 55

*Planned Parenthood of Kan. v. Andersen*,
    882 F.3d 1205 (10th Cir. 2018) .......................................... 31

*Pulsifer v. United States*,
    601 U.S. 124 (2024) ............................................................. 44

*Quik Payday, Inc., v. Stork*,
    549 F.3d 1302 (10th Cir. 2008) ...................................... 56, 57

*Seeman v. Phila. Warehouse Co.*,
    274 U.S. 403 (1927) ............................................................. 54

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ................................................... 62

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) .............................................................. 4, 33

**State Cases**

*Gill v. Just. of Peace Ct. No. 2 of City & Cnty. of Denver*,
    139 P.2d 271 (Colo. 1943) ................................................... 54

*Shull v. Dain, Kalman & Quail Inc.*,
    267 N.W.2d 517 (Neb. 1978) .............................................. 55

**Constitutional Provisions**

U.S. Const. Art. I, § 8, cl. 3 ................................................... 53, 56

Ark. Const. Article 19, § 13 (1982) ........................................... 38

**Federal Statutes**

Borrowers Relief Act of 1979, Pub. L. No. 96-104,
    93 Stat. 789 (1979) ................................................... 13, 17, 37

Brock Bill of 1974, Pub. L. No. 93-501,
    88 Stat. 1557 (1974) ................................................. 10, 11, 12

Depository Institutions Deregulation and Monetary Control
    Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) ................. *passim*

    DIDMCA § 511 ...................................................... 14, 46

DIDMCA § 512 ....................................................................... 14, 46

DIDMCA § 521, 12 U.S.C. § 1831d ...................................... *passim*

DIDMCA § 522, 12 U.S.C. § 1730g ......................................... 15, 33

DIDMCA § 523, 12 U.S.C. § 1785(g) ....................................... 15, 33

DIDMCA § 525 ................................................................... *passim*

Gramm-Leach-Bliley Act (GLBA), Pub. L. 106-102,
113 Stat. 1338 (1999) ............................................................ 38, 39

National Bank Act, 12 U.S.C. § 21 *et seq* ...................................... *passim*

12 U.S.C. § 85 ................................................................... *passim*

12 U.S.C. § 83 ............................................................................ 35

12 U.S.C. § 86a .......................................................................... 33

12 U.S.C. § 143 .......................................................................... 35

12 U.S.C. § 371 .......................................................................... 35

12 U.S.C. § 1715z-13b ................................................................ 35

12 U.S.C. § 1757 ........................................................................ 35

12 U.S.C. § 1785 ...................................................... 15, 17, 33, 35

12 U.S.C. § 1828 ................................................................. 33, 35

12 U.S.C. § 1831b ...................................................................... 35

12 U.S.C. § 1831e ...................................................................... 33

12 U.S.C. § 1831f ....................................................................... 33

12 U.S.C. § 1831u ................................................................ 38, 39

12 U.S.C. § 2202 ........................................................................ 35

12 U.S.C. § 2279aa ..................................................................... 35

12 U.S.C. § 2610 ........................................................................ 35

12 U.S.C. § 3018 ........................................................................ 35

12 U.S.C. § 4742 ........................................................................ 35

12 U.S.C. § 4745 ........................................................................ 35

12 U.S.C. § 5602 ................................................................ 35

12 U.S.C. § 5704 ................................................................ 35

42 U.S.C. § 1396a .............................................................. 31

Pub. L. No. 96-161, 93 Stat. 1233 (1979) .................................. 14

**State Statutes**

H.B. 23-1229, codified at Colo. Rev. Stat. § 5-13-106 ...................... 21, 22

Colo. Rev. Stat. § 5-1-201 ................................................... 22

Colo. Rev. Stat. § 5-2-201 ................................................... 23

Colo. Rev. Stat. § 73-1-201 (1971) .......................................... 55

1981 Colo. Sess. Laws, ch. 73, § 1 .......................................... 20

1994 Colo. Sess. Laws, ch. 272, § 12 ........................................ 20

**Regulatory Materials**

FDIC Gen. Counsel's Op. No. 11, Interest Charges by
    Interstate State Banks, 63 Fed. Reg. 27,282 (May 18, 1998) ...... 60, 61

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) .............. 58

FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June 29, 1988) ....... 59-61

Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22,
    2020) ................................................................... 60

OCC, Final Rule Regarding Office of Thrift Supervision
    Integration & Dodd-Frank Act Implementation, 76 Fed.
    Reg. 43,549 (2011) ...................................................... 5

OCC Interp. Ltr. No. 686, 1995 WL 786842 (Sept. 11, 1995) ............... 60

OTS Ltr. from H. W. Quillian, 1986 WL 290314, (June 27,
    1986) ................................................................... 59

**Legislative History**

125 Cong. Rec. 30,655 (1979) ............................................. 8, 9

125 Cong. Rec. H8,344-47 (1979) ....................................... 12, 13

125 Cong. Rec. S15,257-59 (1979) ......................................... 14

Comm. Hearing on 1988 Neb. Laws, LB 913...........................................20

*Hearing on H.R. 2515 Before the Subcomm. on Fin. Insts. of the Comm. on Banking, Hous. & Urb. Affs.* 96th Cong. (Apr. 3, 1979)...............................................................8, 12, 13, 14

Maine Joint Standing Comm. on Banking & Ins., 117th Legis., Pub. Hearing L.D. 49 (Apr. 4, 1995)......................................20

N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes (Mar. 28, 1983)......................................................................21

*Problems Encountered Under State Usury Laws*, *Hearing on S. 3817 Before the Subcomm. on Fin. Insts. of the Comm. on Banking, Hous. & Urb. Affs.* 93rd Cong. (July 31, 1974).........7, 10, 11

S. Rep. No. 93-1120 (1974) .................................................10, 11

S. Rep. No. 96-364 (1979) ...................................................12, 13

*Usury Lending Limits, Hearing on S. 1988 Before the Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. (1979)....................17, 19

## Other Authorities

Jeremy Bentham, *Defence of Usury* (1787)................................................5

Black's Law Dictionary (6th ed. 1979) ................................................42, 43

Cap. Mkts. Competitiveness, *The Economic Benefits of Risk-Based Pricing for Historically Underserved Consumers in the United States* (Spring 2021) ................................................23

Lawrence M. Friedman, *A History of American Law* 412 (3d ed. 2005)...............................................................................6

Steven M. Graves & Christopher L. Peterson, *Usury Law and the Christian Right: Faith-Based Political Power and the Geography of American Payday Loan Regulation*, 57 Catholic U. L. Rev. 637 (2008))........................................5, 6

OCC, *National Banks and The Dual Banking System* (Sept. 2003)...............................................................................4

Patrick Mulloy & Cynthia Lasker, *The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994: Responding to Global Competition*, 21 J. Legis. 255 (1995) ................................... 18

Restatement (Second) of Conflict of Laws § 188 (1971) ........................ 54

Restatement (Second) of Conflict of Laws § 203 (1971) ........................ 55

Webster's Third Int'l Dictionary (1971 ed.) ........................................... 43

## STATEMENT OF RELATED CASES

We are aware of no prior or related appeals.

## GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| CSBS | Conference of State Bank Supervisors |
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) |
| FDIA | Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.* |
| FDIC | Federal Deposit Insurance Corporation |
| NBA | National Bank Act, 12 U.S.C. § 21 *et seq.* |
| OCC | Office of the Comptroller of the Currency |
| UCCC | Uniform Consumer Credit Code |

Note: We cite to Defendants-Appellants' Appendix to Opening Brief, ECF No. 42-2, as App.Vol.__[volume number].P.__[page number].

We cite to the District Court's opinion, which is attached to Colorado's brief, as Op. XX. That opinion is also contained in the Appendix at App.Vol.II.P.442-69.

## INTRODUCTION

Congress enacted Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) to place state-chartered banks on equal footing with national banks, authorizing both to charge the same interest rates and preempting state laws to the contrary. Congress did so to ensure state banks retained competitive equality with national banks operating alongside them during a time of soaring inflation.

At the same time, Congress enacted DIDMCA Section 525 to allow states to opt out of that preemption, so they could reassert control over their own state-chartered banks. Given that federalism-based purpose, the opt-out only applied to loans "made in" the opting-out state. Congress thus gave states flexibility to reject the offer of state-bank/national-bank interest-rate parity and retain control over banks operating *in* the opting-out states. But Congress did not authorize an opting-out state to tread on other states, or on the competitive equality DIDMCA Section 521 granted to banks operating *outside* the opting-out state's borders.

Now, over forty years after DIDMCA was enacted, Colorado reaches far beyond the boundaries of Section 525 to impose its interest-rate caps

on loans that other states' banks make outside Colorado, but to borrowers located in Colorado. The District Court—after extensively analyzing the text of Colorado's opt-out statute—correctly preliminarily enjoined that law as preempted.

*First*, the District Court properly rejected Colorado's argument that Plaintiffs cannot ask a court to secure the express preemption rights DIDMCA grants them. *Ex parte Young* clearly authorizes Plaintiffs' action, and nothing in DIDMCA or the Federal Deposit Insurance Act (FDIA), which DIDMCA amended, precludes it.

*Second*, the District Court correctly held that, under Section 525, a loan is "made in" the state where the lending bank performs its loan-making functions, not where the borrower happens to be. Section 525 does not authorize Colorado to limit the interest rates of loans that out-of-state state banks make *outside* Colorado, even if the loan recipient is located in Colorado.

This plain-text meaning is confirmed by the statute's context and history. Indeed, Congress, courts, and regulators have consistently—including, significantly, close in time to the statute's enactment—determined that, for purposes of interest-rate preemption laws and

corresponding opt-out rights, a loan is "made" where the bank performs its key loan-making functions, not where the borrower is located.

Colorado tries to reframe Section 525 as a consumer-protection measure—but that effort is misplaced. "Protecting" consumers from loans made by banks outside their state was not the purpose of the opt-out. Rather, Congress was simply ensuring states could reclaim control over banks within their borders, as a nod to federalism. Regardless, consumers will not be protected by Colorado's opt-out because *even if* Colorado's interpretation were correct, under the National Bank Act national banks need not abide by Colorado's interest-rate caps. By cutting off state-bank competition with national banks, Colorado's statute would only reduce Colorado consumers' credit options.

***Finally***, the District Court properly determined that the balance of the equities supports a preliminary injunction, and did not wrongly grant a "disfavored" injunction.

## ISSUES PRESENTED

1. Whether the FDIA precludes Plaintiffs from relying on *Ex parte Young* to bring an action in equity challenging a state's

imposition of interest-rate restrictions that are expressly preempted by DIDMCA.

2.    Whether, for purposes of the DIDMCA Section 525 opt-out, an opting-out state may regulate interest rates for all loans received by borrowers in the opting-out state, or only for loans where the lending bank performs key loan-making operations in the opting-out state.

3.    Whether a preliminary injunction was proper, where both the merits and the balance of equities favor Plaintiffs.

## STATEMENT

### A.    Statutory and regulatory background.

### 1.    The dual-banking system.

Banks in the United States may choose to be chartered, and primarily regulated, either by a state or by the federal government. This "dual-banking" system "has been a hallmark of banking in the United States for nearly 200 years." Office of the Comptroller of the Currency (OCC), *National Banks and The Dual Banking System*, at 1 (Sept. 2003), https://perma.cc/W7B8-MG9W; *see also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10-11 (2007). The vitality of this system depends on the "policy of equalization first adopted in the National Bank Act of 1864 [(NBA)],"

4

which seeks "to place national and state banks on a basis of 'competitive equality'" while still allowing state and federal bank regulators to make different policy choices. *First Nat'l Bank of Logan, Utah v. Walker Bank & Tr. Co.*, 385 U.S. 252, 261 (1966); *see also Lewis v. Fid. & Deposit Co. of Md.*, 292 U.S. 559, 564-65 (1934).

Under the NBA, national banks are governed primarily by federal standards administered by the OCC, not by states. *See* OCC, Final Rule Regarding Office of Thrift Supervision Integration & Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,554 (2011). State banks are regulated by both the federal government and the state in which they are chartered.

## 2.    State interest-rate laws.

As Colorado notes, American interest-rate restrictions began in the colonial era, and were historically state-imposed. Br. 6-7 (citing Steven M. Graves & Christopher L. Peterson, *Usury Law and the Christian Right: Faith-Based Political Power and the Geography of American Payday Loan Regulation*, 57 Catholic U. L. Rev. 637 (2008)).

Colorado does not mention, however, that following the 1787 publication of Jeremy Bentham's *Defence of Usury*, these early

restrictions faced growing criticism from the emerging field of economics. *Id.* at 639, 693. Indeed, in the following decades, newly admitted states "allowed far higher rates than in the East" due to settlers' greater need for access to credit—and "[a] number of states … repealed their usury laws" altogether. Lawrence M. Friedman, *A History of American Law* 412 (3d ed. 2005). Today, states continue to make different policy choices regarding interest rates, in accordance with longstanding principles of federalism. *See* D. Vandenbrink, *Usury Ceilings & DIDMCA* 25, 29 (1985) ("evolution in usury legislation has left a multiplicity of state interest rate ceilings").

### 3.    National Bank Act preemption.

The NBA preempts certain state laws, preventing them from applying to national banks. As relevant here, under Section 85 of the NBA, a national bank "may … charge on any loan … made, … interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] greater." 12 U.S.C. § 85. Section 85 preempts all other state interest-rate restrictions. National banks thus "have a choice" between these rates, which "gives advantages to national banks over their State competitors,"

which were historically limited by their state's caps. *Problems Encountered Under State Usury Laws*, *Hearing on S. 3817 Before the Subcomm. on Fin. Insts. of the Comm. on Banking, Hous. & Urb. Affs.* 93rd Cong. 114-117 (July 31, 1974) ("*State Usury Laws*").

In 1978, the Supreme Court clarified that a national bank is "located" for purposes of NBA Section 85 in either the state where it is chartered, or in the state where it actually performs its key loan-making functions—but not where the borrower resides. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978). Specifically, *Marquette* held that a national bank headquartered in Nebraska could make credit card loans to Minnesota residents at Nebraska interest rates, which were above Minnesota's caps. *Id.* at 311-12. The Supreme Court explained that the Nebraska bank was "located" where it was chartered: Nebraska. *Id.* at 309.

The Court further emphasized that even though the borrowers were Minnesota residents, the bank's loan-making functions occurred in Nebraska—cementing its location there for purposes of applying state interest-rate caps. *Id.* at 311-12. Under those circumstances, applying Nebraska interest-rate laws made sense because "Minnesota residents

7

were always free to visit Nebraska and receive loans in that State," and "[i]t has not been suggested that Minnesota usury laws would apply to such transactions." *Id.* at 310-11.

### 4. DIDMCA precursors.

Unlike national banks, state banks did not have access to an alternative federal interest-rate cap. So long as the federal discount rate remained low, this did not result in a noticeable advantage for national banks, because they had no need to rely on the rate limit tied to the federal discount rate to trump the rate limits allowed under their home state's laws. *See State Usury Ceilings, Hearing on H.R. 2515 Before the Subcomm. on Fin. Insts. of the Comm. on Banking, Hous. & Urb. Affs. 96th Cong. (Apr. 3, 1979) ("State Usury Ceilings")* at 27.

In the 1970s, this changed. To tame soaring inflation, the Federal Reserve significantly raised the interest rates that banks paid for loanable funds, driving up market rates for borrowers as well. *See, e.g.*, 125 Cong. Rec. 30,655 (1979). In particular, low interest-rate caps in certain states "constrained … the interest" all banks—but especially state banks that could not lend at the higher federal rate—could charge, "which often made loans economically unfeasible" given the banks' own

8

borrowing costs. *Greenwood Tr. Co. v. Commonwealth of Mass.*, 971 F.2d 818, 826 (1st Cir. 1992). *See also, e.g.*, 125 Cong. Rec. 30,655 (Statements of Sens. Pryor & Bumpers).

The affected states lobbied Congress to help solve this credit crunch. They asked Congress both to raise the federal rate caps for their in-state national banks, and to simultaneously give their state-chartered banks access to that higher federal cap.

In response, Congress enacted a series of statutes, initially focused on business and agricultural loans. These laws temporarily raised NBA rate caps for national banks, and permitted state-chartered banks also to make loans at those rates. These rates were available only during the effective period of each statute, and a state could choose to end that period early—that is, "opt out"—to prevent its banks from accessing these higher rates.

      *a.*    *Brock Bill of 1974.*

Congress enacted the first temporary interest-rate parity statute—the "Brock Bill," introduced by Senator Brock of Tennessee—in 1974, to address the inflation-fueled credit squeeze for businesses and farms in three states, Tennessee, Arkansas, and Montana. Those states had very

low interest-rate caps that—unlike most states'—applied not only to consumer borrowing but also to business borrowing. *See* Pub. L. No. 93-501, 88 Stat. 1557 (1974); *see also State Usury Laws* at 1.

State *and* national banks in these states were "caught in a pinch" because banks had to "pay up to 13 percent for money bought through the Federal Reserve System" at the "federal funds" rate, S. Rep. No. 93-1120 at 105 (1974), but could not charge borrowers interest above that rate. That is because the maximum interest rate for business borrowers authorized by state law in these states was 10 percent, *id.*, and the federal rate at which national banks could alternatively lend at that time pursuant to NBA Section 85 (based on the Fed's discount rate) was 9%— "no help for corporate borrowers." *State Usury Laws* at 140 (testimony of Rex Morthland, American Bankers Association).[1]

---

[1] The federal discount rate is the rate at which banks may borrow money directly from the Federal Reserve banks, if funds cannot be obtained elsewhere. *Discount Window Lending*, Bd. of Governors Fed. Rsrv. Sys., https://perma.cc/U73C-QELL. Banks otherwise borrow money from other banks at the "federal funds rate," which is typically cheaper—but economic conditions in the 1970s created anomalous circumstances. *Compare Discount Rate for United States*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/series/INTDSRUSM193N (last visited Nov. 15, 2024), *with Federal Funds Effective Rate*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/graph/?g=1B3KI (last visited Nov. 15, 2024).

To solve this, the Brock Bill temporarily amended NBA Section 85 to permit national banks to make certain business and agricultural loans at up to five percent (rather than one percent) above the federal discount rate. Pub. L. No. 93-501 § 201.

Alone, this new provision would have allowed national banks in these three states to survive, but left state banks to fail. Thus, "[i]n order to prevent discrimination against State-chartered insured banks with respect to interest rates," the Brock Bill also permitted state banks in these three states to make business and agricultural loans at the same heightened federal rate. Pub. L. No. 93-501 § 202. *See State Usury Laws* at 20 (testimony of Grady Perry, Jr., Federal Home Loan Bank Board).

As originally introduced, the new formula for calculating interest-rate caps in the Brock Bill—federal-rate-plus-5%—would have expired after three years. However, after the Conference of State Bank Supervisors (CSBS) objected to federal encroachment on their regulatory turf, the Senate amended the bill to allow covered states to choose to end access to that higher federal rate at any time during the law's effect. *State Usury Laws* at 28 (testimony by Lawrence E. Kreider); *see* S. Rep. No. 93-1120 at 18-19. As enacted, the federal interest-rate cap applied to

11

business and agricultural "***loan[s] made in any State***" between the law's effective date and *either* (1) the sunset date *or* (2) "the date … on which the State enacts a provision of law which prohibits the charging of interest at the rates provided in the amendments made by this title." Pub. L. No. 93-501 § 206 (emphasis added).

All subsequent interest-rate parity statutes—culminating in DIDMCA—followed this same structure.

### b.    *Borrowers Relief Act of 1979.*

After a brief respite, in 1978, the Federal Reserve began to raise interest rates even more aggressively. By then, the Brock Bill had expired, but Arkansas still had not amended its constitutional interest-rate restrictions.[2] S. Rep. No. 96-364 at 1-3 (1979); *see also State Usury Ceilings* at 14, 16 (testimony of Reps. Alexander & Hammerschmidt). As borrowing costs for Arkansas banks once again spiked above the state's interest-rate caps, the state legislature urged Congress to restore the Brock Bill until voters could ratify amendments to the state's

---

[2] Tennessee and Montana raised their 10-percent interest-rate caps after passage of the Brock Bill, to try to avoid the same problem in the future. 125 Cong. Rec. H8,344, H8,347 (daily ed. Sept. 24, 1979) (testimony of Rep. Alexander).

constitutionally imposed interest-rate caps in the 1980 election. *Id.* at 192-93; *see also id.* at 16-17 (testimony of Rep. Hammerschmidt).

The state's representatives co-sponsored the "Borrowers Relief Act" of 1979 to do just that. *Id.* at 17-18 (testimony of Rep. Hammerschmidt); S. Rep. No. 96-364; 125 Cong. Rec. H8346 (testimony of Rep. Alexander). The bill reinstated the Brock Bill's heightened federal limit for business and agricultural loans for both national and state banks, using identical language. Pub. L. No. 96-104, 93 Stat. 789 (1979) §§ 101-02; *see also* 125 Cong. Rec. H8347. This time, however, the bill was tailored to apply only in Arkansas. *See* Pub. L. No. 96-104 § 301 (limiting application to states with constitutional interest-rate caps identical to Arkansas').

Following the Brock Bill's model, the Borrowers Relief Act was a temporary measure containing an opt-out allowing Arkansas to end its effective period early. *Id.* § 107; *see also* page 37*, infra* (quoting § 107). The sponsors explained that a court, in upholding the constitutionality of the Brock Bill, had favorably cited its opt-out provision. The sponsors therefore believed such a provision "may be necessary in order to qualify for the constitutionality of a law of this type," even though it was unlikely Arkansas would want to opt-out after having specifically requested the

law in the first place. *State Usury Ceilings* at 23 (testimony of Rep. Alexander); *see also id.* (testimony of Rep. Hammerschmidt); 23-24 (testimony of Rep. Bethune) (citing *Stephens Sec. Bank v. Eppivic Corp.*, 411 F. Supp. 61, 62-63 (W.D. Ark. 1976), *aff'd mem.* 553 F.2d 102 (8th Cir. 1977)).

### 5. DIDMCA.

By the time the Borrowers Relief Act cleared the Senate in early October 1979, the Federal Reserve had raised rates again[3]—and the interest-rate crisis had now spread from Arkansas to more than a dozen other states with low interest-rate caps.

To provide relief to these states, the Senate amended a pending omnibus financial reform bill—which became DIDMCA—to extend the provisions of the Borrowers Relief Act to cover business and agriculture loans in all states. *See* 125 Cong. Rec. S15,257, S15,259 (1979) (testimony of Sen. Cochran). This nationwide version of the Borrowers Relief Act was ultimately enacted as Title V, Part B of DIDMCA. Pub. L. No. 96-221, 94 Stat. 132, 164 §§ 511-12. *See also* Pub. L. No. 96-161, 93 Stat. 1233 (1979) (temporarily extending Borrowers Relief Act until DIDMCA passed).

---

[3] *See Discount Rate for United States*, *supra*.

Arkansas's senators also inserted the provisions at issue in this case—Sections 521 and 525—into DIDMCA, as Title V, Part C, so that interest-rate parity would apply not only to business and agricultural loans, but also to *consumer* loans.[4]

To draft the text of these two provisions in DIDMCA, Congress spliced together the substantive rate-preemption language from NBA Section 85 and the sunset-period language from the Borrowers Relief Act (drawn, in turn, from the Brock Bill).

Section 521 of DIDMCA consists almost entirely of language that originated either in the Brock Bill or NBA Section 85. Here is Section 521, with the text coming from the ***Brock Bill*** marked in ***bold/red/italics***, from NBA Section 85 in underscore/blue, and new text in roman/black*:*

> ***In order to prevent discrimination against State-chartered insured banks,*** including insured savings banks and insured mutual savings banks, or insured branches of foreign banks ***with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank*** or insured branch of a foreign bank ***would be permitted to charge in the***

---

[4] Congress enacted similar provisions, DIDMCA §§ 522-523, preempting state interest-rate caps for state-chartered savings-and-loan associations and credit unions.

> *absence of this subsection*, such *State bank* or such insured branch of a foreign bank *may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section*, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

DIDMCA § 521, 12 U.S.C. § 1831d(a).[5]

Likewise, DIDMCA's "opt-out," Section 525, was drafted as an "Effective Date" provision based on the sunset provision in the Borrowers Relief Act—but with the sunset date deleted to make it permanent. Here is Section 525 next to the earlier provision, with identical text highlighted in **bold/green/underline**:

---

[5] Although the second half of DIDMCA Section 521 is drawn entirely from NBA § 85, the order of the two alternative interest rates is reversed.

| Borrowers Relief Act § 107 | DIDMCA § 525 |
|---|---|
| **The amendments made by this title … shall apply only with respect to loans made in any State during the period beginning on** the date of the enactment of this Act **and ending on** the earlier of—, | **The amendments made by** section 521 through 523 of **this title shall apply only with respect to loans made in any State during the period beginning on** April 1, 1980, **and ending on** |
| (1) July 1, 1981; | |
| (2) **the date**, after the date of the enactment of this Act, **on which such State adopts a law** stating in substance **that such State does not want the amendments made by** this title and the provisions of this title **to apply with respect to loans made in such State**…. | **the date**, on or after April 1, 1980, **on which such State adopts a law** … which states explicitly and by its terms **that such State does not want the amendments made by** such sections **to apply with respect to loans made in such State**…. |
| Pub. L. No. 96-104, 93 Stat. 789. | Pub. L. No. 96-221.[6] |

As with the Borrowers Relief Act and the Brock Bill, the purpose of

DIDMCA Section 521 was to "provide competitive equality among all

financial institutions with respect to State usury lending limits." *Usury*

*Lending Limits, Hearing on S. 1988 Before the Comm. on Banking, Hous.,*

---

[6] Section 525 of DIDMCA currently appears in the U.S. Code as statutory notes to 12 U.S.C. §§ 1785 & 1831d. Westlaw and LexisNexis either omit or do not accurately reflect the text of these statutory notes. The notes can be found at pages 901 and 1145 of the current official printing of Title 12, available at https://perma.cc/B7AM-49NX. App.Vol.II.P.227.

& *Urb. Affs.*, 96th Cong. 1 (1979) ("*Usury Lending Limits*") (testimony of Sen. Proxmire). *See also id.* at 19, 41-42 (testimonies of co-sponsors Sens. Pryor & Bumpers). The Senate heard extensive "testimony on the problems resulting from present unequal treatment of national banks on one hand and of other financial institutions on the other." *Id.* at 2 (testimony of Sen. Pryor); *see also id.* at 3 (testimony of Governor Bill Clinton). In short, DIDMCA Section 521—like each of its predecessors—eliminated the competitive advantage national banks enjoyed over state banks in the same state by allowing those state banks to make the same loans at the same rates.

DIDMCA Section 525—like each of its predecessors—allowed states to opt out of that offer of parity and deny their local banks access to national bank rates.[7] The Arkansas State Banking Commissioner emphasized that "the legislation is not mandatory. Each State is given a

---

[7] At the time DIDMCA and its predecessors were enacted, there was very little lending by state-chartered banks across state lines. *See, e.g.*, *Marquette*, 439 U.S. at 311; Patrick Mulloy & Cynthia Lasker, *The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994: Responding to Global Competition*, 21 J. Legis. 255 (1995) (describing emergence of interstate banking in 1980s). Accordingly, rejecting the national rate for state-chartered banks operating within a state was functionally the same as reimposing the state's interest-rate limits on banks the state itself chartered.

chance to decide whether or not it desires to receive the benefits which this legislation will confer. The various State legislatures are given the ability to curtail the operations of this legislation with respect to their own particular States and situations." *Id.*; *see also id.* at 35 (testimony of Frederick Schultz, Vice Chairman, Bd. of Governors of the Fed. Rsrv.).

There is no suggestion in Section 525's history that Congress intended to allow states to use the opt-out to restrict the rates that *out-of-state banks* functionally operating outside a state could charge when lending to borrowers living in an opting-out state. Rather, the opposite is true. The CSBS proposed deleting NBA Section 85's federal rate entirely, urging Congress to limit "an out-of-state association" to charging "interest at the rate allowed … by the laws of the State, Territory, or District *where the borrower resides*." *Usury Lending Limits* at 154 (testimony of E.D. Dunn) (emphasis added). Congress declined to adopt CSBS's proposal that interest-rate regulation should be determined by reference to the borrower's location, and neither DIDMCA nor NBA Section 85 make any reference to "where the borrower resides."

### 6.    Post-DIDMCA opt-outs.

Shortly after Congress enacted DIDMCA, seven states (including Colorado) and Puerto Rico invoked Section 525 to opt out of DIDMCA Sections 521-523. *See, e.g.*, 1981 Colo. Sess. Laws, ch. 73, § 1. But as inflation continued to rage into the 1980s, six of those states—including Colorado—rescinded their opt-outs. *See, e.g.*, 1994 Colo. Sess. Laws, ch. 272, § 12. States came to realize that opting out only hampered their state banks from remaining competitive as more banks expanded into national credit card lending. *See*, *e.g.*, Comm. Hearing on 1988 Neb. Laws, LB 913, at 9335, 9342-43, 9347-48 (discussing competitive disadvantages created by opt-out).

Opting-out states did *not*, at the time, generally understand their opt-outs to prevent out-of-state banks from lending to opt-out-state consumers at out-of-state rates. As one consumer financial services expert who testified before the Maine legislature explained, "Maine's opt out as to credit card programs has only one clear effect, disabling *Maine* banks that choose to go out of state." Maine Joint Standing Comm. on Banking & Ins., 117th Legis., Pub. Hearing L.D. 49 at 19-22 (Apr. 4, 1995) (testimony of Richard P. Hackett). When considering whether to

opt out, North Carolina's Commissioner of Banks was advised by the FDIC's General Counsel that "if a State were to override the preemption of Section 521, a State bank located in another State would still be able to charge North Carolina residents the highest rate allowed in the State bank's home state." *See* N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes (Mar. 28, 1983), at 10, https://perma.cc/8M57-U8ER.

### B.     Factual background.

### 1.     Colorado opts out of DIDMCA Section 521.

In June 2023, Colorado enacted H.B. 23-1229, opting out of DIDMCA as of July 1, 2024:

> In accordance with section 525 of [DIDMCA], the general assembly declares that the state of Colorado does not want the amendments … made by sections 521 to 523 of [DIDMCA], prescribing interest rates and preempting state interest rates to apply to consumer credit transactions in this state. The rates established in articles 1 to 9 of this title 5 control consumer credit transactions in this state.

*Id.* § 3 (codified at Colo. Rev. Stat. § 5-13-106).

Colorado currently contends that its opt-out strips DIDMCA Section 521's protections not only from loans that state banks actually make in Colorado, but also from loans that state banks make in other

states if the borrower is physically located in Colorado "when the parties agree to the loan." Br. 3.[8]

## 2. Effects of the opt-out on Plaintiffs' members.

Plaintiffs' members include state-chartered banks from across the country, none of which is headquartered or chartered in Colorado or performs its key loan-making functions there. App.Vol.I.P.53. Plaintiffs' members do not offer payday or similar loans. *Id.* at 53-54. Rather, they offer consumers nationwide—including in Colorado—a wide variety of useful, familiar, everyday credit products, such as personal installment loans, buy-now-pay-later loans, and store-brand cards. *Id.* at 54. These products are subject to a range of rates and fees—depending on credit,

---

[8] Colorado's interpretation of the reach and scope of its opt-out has shifted since it was enacted and over the course of this litigation. Colorado's interest-rate limits, as codified in Colorado's UCCC, purport to apply to all loans made by lenders who *advertise* in Colorado. Colo. Rev. Stat. § 5-1-201(1); App.Vol.I.P.13, 25, 35. After Plaintiffs filed suit, Defendant Fulford issued a letter interpreting "§ 5-13-106 to apply only to consumer credit transactions 'made in' Colorado in accordance with Section 525 of DIDMCA … [and] interpret[ing] § 5-13-106's language of 'in this state' to be wholly congruent and identical with the opt out authorized by Section 525 for loans 'made in' the state." App.Vol.I.P193-94. In its district court brief, Colorado argued that a loan is "made in" *only* the state where the borrower receives it. App.Vol.I.P.176-77. After the FDIC's district court amicus brief proposed a novel "both states" definition, Colorado adopted that new interpretation. App.Vol.II.P.363-64.

income, and other consumer-specific or product-specific factors—that are lawful under DIDMCA Section 521. *Id.*

Because DIDMCA permits Plaintiffs' members to offer loans at rates above the 21% finance charge cap found in Colorado's UCCC, *see* Colo. Rev. Stat. § 5-2-201(2)(a), (3)(a), Plaintiffs' members currently offer credit to Colorado consumers whose credit profiles are too risky to lend to at a rate under that cap. *Id.* Indeed, being able to charge higher rates to account for risk of default (or to deter default) often means the difference between being able to offer a consumer a loan and determining that doing so would not be economical. *See* Ctr. for Cap. Mkts. Competitiveness, *The Economic Benefits of Risk-Based Pricing for Historically Underserved Consumers in the United States*, at 3-4 (Spring 2021), https://perma.cc/5EUG-DPZC. Under Colorado's interpretation of DIDMCA Section 525, Plaintiffs' members would have to curtail lending to some or all Colorado residents, reducing Coloradans' access to responsible, popular, useful consumer credit products. App.Vol.III.P.527-28.

At the same time, Colorado has never disputed that the opt-out does not apply to national banks that lend to Colorado consumers, which

23

remain shielded by NBA preemption. Yet national banks offer similar products to Colorado consumers, with comparable rates that often exceed Colorado's caps. App.Vol.III.P.528-29 nn.7-9 (collecting examples). Under Colorado's interpretation, these national banks would gain a competitive advantage over state banks—including Plaintiffs' members—lending to borrowers in Colorado.

### C.    Procedural History.

#### 1.    Plaintiffs' lawsuit.

On March 25, 2024, Plaintiffs filed suit, challenging Colorado's application of its interest-rate limits to Plaintiffs' members. App.Vol.I.P.12. Plaintiffs then moved for a preliminary injunction to prevent Colorado from applying its opt-out statute to loans not "made in" Colorado as that term is defined under federal law. App.Vol.I.P.39.

After Plaintiffs' motion was fully briefed, Colorado moved to dismiss the lawsuit. App.Vol.II.P.357.

#### 2.    The District Court's injunction.

Following oral argument, the District Court granted Plaintiffs' motion and preliminarily enjoined Colorado from enforcing its interest-rate caps as to loans that are not "made in" Colorado—that is, where the

state-chartered bank does not "perform[] its loan-making functions" in Colorado. Op. 23.

First, in response to Colorado's contention that Plaintiffs sought a "disfavored injunction" subject to a "heavier burden," the court found Colorado's argument "doubtful," but held it unnecessary to decide the question because "the plaintiffs have made a showing as to their likelihood of success on the merits and threatened irreparable harm sufficient to satisfy even the heightened standard required for disfavored injunctions." *Id.* at 6-7, 23.[9]

Second, the court rejected as "unpersuasive[]" the argument that Plaintiffs lack a cause of action in equity under *Ex parte Young*, 209 U.S. 123 (1908), explaining that "[t]he statutory enforcement mechanisms the State points to [in the FDIA] … are all remedies *against* a bank for violations of applicable laws or regulations. Those are not the rules or rights that the plaintiffs seek to enforce in this suit." Op. 13.[10]

---

[9] The court also rejected Colorado's arguments that Plaintiffs lacked standing and that their claims are not ripe. *Id.* at 451-54. Colorado does not challenge those holdings on appeal.

[10] After the court granted the preliminary injunction, Plaintiffs amended their complaint to eliminate any confusion regarding the applicable cause

Third, turning to the merits, the court held that the "plain meaning of Section 1831d's opt-out provision is that what state a loan is 'made in' depends on where the bank is located and performs its loan-making functions," rather than on the borrower's location. *Id.* at 23. The court confirmed this interpretation by looking to Section 525's statutory and historical context, including consistent usage of the same words in other sections of DIDMCA and related banking statutes. *Id.* at 14-15.

Finally, the court ruled that Plaintiffs satisfied the showing necessary on the remaining preliminary injunction factors: "[W]ithout an injunction, the plaintiffs' member state-chartered banks will be at a disadvantage with respect to national banks, but Colorado consumers will have only marginally more protection from higher interest rates" because national banks could still lend at those higher rates. *Id.* at 24-25.

This appeal followed.

---

of action. App.Vol.III.P.506. The court denied Colorado's motion to dismiss as moot in light of the amended complaint. App.Vol.I.P.10.

## SUMMARY OF ARGUMENT

I.    *Ex parte Young* allows Plaintiffs to bring an action in equity to challenge the State of Colorado's attempted incursion on their rights under DIDMCA. The fact that the FDIA provides a right of action to individuals and the FDIC to sue banks is not inconsistent with banks having a cause of action in equity to prevent a state from violating the banks' rights.

II.    DIDMCA Section 525 permits an opting-out state to regulate only the interest rates on loans "made" by a state-chartered bank in the state. A bank "makes" a loan in an opting-out state only if the bank has undertaken key loan-making operations in the state. Opting out does not allow the state to regulate the interest rates of loans issued *to* a state's residents *from* banks operating in states that have *not* opted out of DIDMCA Section 521. This is clear from the text of Section 525, as well as its context, legislative history, relevant caselaw, and regulatory guidance.

III.    Finally, the equities plainly favor a preliminary injunction. Colorado cannot articulate why the District Court's preliminary injunction—which does not permanently prevent the enforcement of

Colorado's interest-rate caps—is a "disfavored injunction." Nor can it show that matters. Under any standard, the District Court correctly found that the merits of Plaintiffs' lawsuit, and the balance of the equities, strongly favor preliminarily enjoining Colorado's preempted rate caps.

This Court should affirm.

## ARGUMENT

The District Court did not abuse its discretion, *see Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016), in concluding that a preliminary injunction was appropriate.

## I.    Plaintiffs Have Pleaded A Valid Cause Of Action.

Colorado argues that Plaintiffs lack a cause of action in equity to challenge Colorado's violation of DIDMCA's preemption provision, and thus that the District Court erred in hearing this case at all. Br. 55-62. Although this argument is logically precedent to the merits, Colorado buries it in its brief—presumably realizing it is meritless.

As the District Court held, Plaintiffs' right to sue is straightforward under *Ex parte Young*. Plaintiffs seek to vindicate their members' substantive right "to charge interest at the rates specified in

28

Section 1831d"; bring an equitable cause of action under *Ex parte Young*; and "seek to use *Ex parte Young* as a shield against allegedly preempted state action." Op. 11-13. (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326, 328-29 (2015); *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 899 (10th Cir. 2017)).

Colorado counters that the FDIA implicitly precludes *Ex parte Young* suits. It first argues that because Section 525 allows borrowers to assert claims *against banks* for charging interest at prohibited rates, Congress silently intended to strip all equitable rights *from* banks to challenge the statute itself. Br. 56-57. Nonsense. As the District Court held, neither DIDMCA nor the FDIA "as a whole display congressional intent to foreclose the availability of such relief." Op. 13. Although Colorado relies on *Armstrong*, Br. 56-57, the Supreme Court there found equitable relief unavailable only because Congress provided an express administrative enforcement mechanism for the violation of *the specific obligation at issue. Armstrong*, 575 U.S. at 328. Here, DIDMCA does not create an exclusive—or, indeed, any—mechanism to address *state officials' violations* of the statute's interest-rate preemption provisions. *See* Op. 13.

Colorado next contends that the very *existence of the FDIC* is sufficient to bar *Ex parte Young* claims because the FDIC has general regulatory authority to enforce the FDIA. Br. 57. Colorado ignores that the FDIC admitted below that it lacks authority to bring a preemption claim against a state on a bank's behalf:

> THE COURT: … [H]as the FDIC ever taken enforcement action against a state?
>
> MR. MORELLI: I'm not aware of any, Your Honor, no. The FDIC's enforcement authority under the FDI Act is limited to banks and those who work for them.

App.Vol.III.P.580 (Tr. 54:15-20). Colorado not only fails to cite a single case in which the FDIC has ever brought such a claim; it cites multiple cases in which circuit courts have permitted preemption claims brought by banks. *See* Br. 57 n.10.

Nor can Colorado satisfy the second requirement under *Armstrong*—showing that preemption claims under DIDMCA are "judicially unadministrable" because they commit a "judgment-laden standard" to agency discretion. *Armstrong*, 575 U.S. at 328-29. Once again, Colorado cites only the existence of the FDIC. According to Colorado, the risk that private litigation may create "inconsistent interpretations" is sufficient to establish the necessary "judgment-laden

standard." Br. 61. But as this Court has recognized, *Armstrong* did not even foreclose an equitable right of action to enforce a different paragraph in the *same statute*. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1227 (10th Cir. 2018) (holding different provision of 42 U.S.C. § 1396a(a) was not "unadministrable" because it "is tethered to an objective benchmark"). Here, that the FDIC can enforce other provisions of DIDMCA against other parties does not create a risk of inconsistency, and certainly does not render equitable preemption claims somehow unadministrable.

## II.   The District Court Correctly Held That Plaintiffs Are Likely To Succeed On The Merits.

"In order to prevent discrimination against" state banks, DIDMCA Section 521 authorizes state banks to charge the same interest rates as national banks on "any loan … made": the "greater" of (1) the federal rate or (2) "the rate allowed by the laws of the State, territory, or district where the bank is located." 12 U.S.C. § 1831d(a). DIDMCA Section 525 allows states to reject this offer of competitive equality by opting out of federal preemption "with respect to loans made in such State"—that is, loans issued by banks chartered by, or performing their key loan-making functions in, the opting-out state. An out-of-state state-chartered bank is

unaffected by a state's opt-out unless that out-of-state bank performs its key loan-making functions in the opting-out state.

As the District Court held, Colorado improperly seeks to impose its interest-rate caps on loans that out-of-state state banks make *in other states* when the borrower is located in Colorado. DIDMCA's text, context, legislative history, and policy, along with related court rulings and regulatory guidance, all support the District Court's conclusion: the "state a loan is 'made in' depends on where the bank is located and performs its loan-making functions and does not depend on the location of the borrower." Op. 23.

> **A.  DIDMCA's statutory text and context demonstrate that the opt-out applies only to state-chartered banks performing key loan-making functions in an opting-out state.**
>
> **1.  DIDMCA's plain text focuses on the lender who makes the loan, not the borrower who receives it.**

The plain meaning of DIDMCA Section 525 is that a state may opt out of preemption with respect to state-chartered-bank loans only if the bank offering that loan performs its key loan-making functions in the opting-out state—that is, for state banks that "make" loans in that state. Critically, Section 525 looks to where a "loan[]" is "made," *not* where the

borrower is located. As the District Court explained, "Congress's use of 'made' [in Section 525] puts the focus on the act of making a loan" and on "the lender" who performs that act: "In plain parlance, it is the lender who *makes* a loan; nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card." Op. 16.

Other provisions of DIDMCA confirm that the phrase "made in such State" focuses on where the bank's loan-making functions occur. As the District Court observed, Section 521 "itself says that a 'State *bank* … may … charge on any loan or discount *made*,' interest up to the specified rates—which implies that it is the bank that 'makes' a loan." *Id.* (quoting 12 U.S.C. § 1831d(a)). Thus, the only other uses of "made" in related sections of DIDMCA, *see* 12 U.S.C. §§ 86a, 1730g, 1785(g), 1828(o)(3), 1831e, 1831f, unambiguously link the "loan … made" to the lender and its location—and make no mention of borrowers.

This is because the "State … where the bank is located" under Section 521 turns on where the bank *makes* the loan at issue. 12 U.S.C. § 1831d; *see also* 12 U.S.C. § 85. In *Marquette*, the Supreme Court determined where the bank was "located" under NBA Section 85 by

assessing where the loan was made, in addition to where the bank was chartered and headquartered. 439 U.S. at 310-13. To do so, the Court looked to where the bank's lending operations physically occurred, not where the customers lived or used their credit cards. *Id.*

The Court noted that "the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska," but stressed that "credit on the use of their cards is nevertheless … extended by Omaha Bank *in Nebraska*." *Id.* at 311-12 (emphasis added). By incorporating NBA Section 85's language into DIDMCA Section 521 verbatim, Congress adopted this lender-focused approach—based on where a bank performs its key loan-making functions—to determining where banks make loans. The same principle applies in 2024, when banks lend via "the convenience of modern" technologies, such as the internet and mobile apps.

> ### 2. Other banking statutes consistently use the words "make" or "made" when referring to actions taken by banks with regard to loans.

The District Court also correctly noted that provisions throughout Title 12 of the United States Code—which covers banks and banking and includes the FDIA— "consistently use 'make' and 'made' in the same way,

*i.e.*, a loan is 'made' *by* a bank *to* a borrower." Op. 17.[11] "In contrast, when Title 12 speaks to action by borrowers, it states that borrowers 'receive' or 'obtain'—but not 'make'—loans." *Id*. at 18.[12]

Colorado attempts to minimize this uniform use of the word "made" by citing various provisions that refer to loans "made to a borrower," arguing that "made" refers equally to both the lender and borrower. Br. 43-47; *see* FDIC Br. 10-11. But "made *to*" reflects that the borrower is the *subject* of the active verb "make"—*i.e.*, the recipient of the loan—not the *maker* of the loan.[13] Indeed, Colorado fails to cite a single statute regulating bank activity that uses the word "made" to describe a *borrower's* conduct in connection with the regulated activities.

### 3.    DIDMCA's history confirms its plain meaning.

The proper reading of the text of Section 525 is confirmed by the statute's legislative context and history. *See*, *e.g.*, *Nat'l Credit Union*

---

[11] *See, e.g.*, 12 U.S.C. §§ 83(a), 143, 371(a), 1757(5), 1785(f)(1), 1828(o)(3), 1831b(a), 2610, 4742(4).

[12] *See, e.g.*, 12 U.S.C. §§ 2279aa(7)(C), 4742(10)(A), 5602(b)(1).

[13] *See, e.g.*, 12 U.S.C. § 3018(c) ("the Bank may guarantee … any loan made by any State or federally chartered lending institution to any borrower"); 12 U.S.C. § 4745(p)(1)(C)(i) ("a participating financial institution makes a loan to a borrower"); 12 U.S.C. §§ 1715z-13b(c)(1), 2202b(a), 2202d(b), 5704(e)(7)(A).

*Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1209-17 (10th Cir. 2014) (examining legislative context surrounding Congress's enactment of law, including Congress's legislative actions).

Congress enacted each interest-rate preemption statute in the 1970s, from the Brock Bill to DIDMCA, to ensure that state banks could maintain parity with national banks in the face of record-high inflation and corresponding record-high interest rates. *See* pp. 8-19, *supra.* Congress thus increased the maximum federal interest rate at which national banks could make certain business and agricultural loans in the affected states, and then offered parity to state-chartered banks in those same states. To avoid constitutional questions about federal regulation of state banks, each DIDMCA predecessor statute allowed the affected states to decline the offer of parity in favor of retaining control over their own banks' interest-rate caps—and each predecessor statute used the same language for these opt-out provisions. *See* pp. 8-14, *supra.*

These predecessor bills were not targeting interstate consumer lending. To the contrary, these bills authorized increased interest-rate caps in only a small number of states, to address credit crunches experienced by banks lending to farms and other businesses *in those*

*states*; and their opt-out provisions correspondingly applied only to banks operating in those states.

The Borrowers Relief Act, for example, authorized only banks *in Arkansas* to lend at increased rates. *See* Pub. L. No. 96-104 § 301. Its opt-out provision terminating access to those rates for "loans made in such State," *id.* § 107, therefore, could refer only to loans made by Arkansas banks. Congress could not have intended the phrase "loans made in such state" to refer to loans that were merely *received* in Arkansas (but made by banks operating elsewhere), because no other states were covered by the Borrowers Relief Act in the first place. Nor could the language "loans made in" have reflected a congressional intent to provide opting-out states with a means to "protect" consumers from receiving "predatory" loans—given the language was initially used in the precursor statutes in connection with business and agricultural, not consumer, loans.

DIDMCA Section 521 made the offer of parity that began with the Brock Bill and Borrower's Relief Act permanent—using the same language—and extended it to encompass consumer loans. That offer was subject to each state's choice, through Section 525—also using the same language as the precursor laws—to reject preemption and prevent their

own state banks from accessing those rates. These statutes are necessarily focused on banks making loans, not on borrowers *receiving* those loans. The consistent use of "made" rather than "received" throughout these statutes is in line with the statutes' purpose.

> **4.   Congress used the same phrasing in another interest-rate parity statute to refer to the state where a bank performs its loan-making functions.**

Beyond the fact that Congress generally has understood that it is a bank's actions that determine where a loan is "made," Congress used *precisely* the same phrasing as in Section 525—"loans made in any State"—in another interest-rate preemption statute, which the Eighth Circuit has held turns on the bank's location, not the borrower's.

Once again, Arkansas's interest-rate limitations, which remained below the caps in most states even after Arkansas amended its constitution, needed preempting. *See Jessup v. Pulaski Bank*, 327 F.3d 682, 684 (8th Cir. 2003); Ark. Const. Art. 19, § 13 (1982). The Gramm-Leach-Bliley Act (GLBA), Pub. L. 106-102, 113 Stat. 1338 (1999), allowed Arkansas banks to make loans at the same interest rates as any out-of-state bank with a branch office in Arkansas. 12 U.S.C. § 1831u(f). The statute's scoping provision states that it does not "supersed[e] or affect[]"

preemption under NBA Section 85 or DIDMCA or "the authority of any insured depository institution to take, receive, reserve, and charge interest on any *loan made in any State* other than" Arkansas. 12 U.S.C. § 1831u(f)(2) (emphasis added).

In *Jessup*, an Arkansas state bank issued a credit card by mail to a Texas borrower who used the card "solely in Texas." 327 F.3d at 684. The card's interest rate exceeded Texas's cap, and the borrower argued that the GLBA did not permit the rate because the loan was "made in" Texas, where he received and used the credit card. *Id.* The Eighth Circuit rejected this argument, holding that the loan is "made in" the state where the bank performs its loan-making functions and not "where the borrower resides." *Id.* at 684-85 (quoting OCC Opinion Letter (Aug. 2001)); *see* Op. 22 n.8.

Colorado asks this Court to split with the Eighth Circuit and adopt a different interpretation of "made in" for purposes of DIDMCA Section 525 than the Eighth Circuit adopted for the GLBA, arguing that "reliance on [an OCC letter] and the bank location test may present perverse results." Br. 51 n.8; *cf.* FDIC Br. 23. Colorado does not explain what "perverse results" would be presented. Rather, it is Colorado that urges

a perverse result here—misconstruing DIDMCA to prohibit out-of-state banks from competing with national banks on the equal footing that Congress enacted DIDMCA to provide.

## B. Colorado's alternative reading of the text of Section 525 does not work.

Attempting to escape the plain meaning of the text, Colorado and its amici spend nearly 34 pages contorting canons of statutory interpretation, attempting to infuse inelegant grammatical structures with clearly unintended meaning, and making much of small textual variations. *See* Br. 25-35; FDIC Br. 6-18; CRL Br. 11-16; States Br. 24-25 & 28-31. This Court should reject these convoluted textual gymnastics.

### 1. Colorado's "loan is made in two states" theory is incoherent.

Colorado does not deny that a loan is "made in" the state where the bank performs its loan-making functions. *See* Br. 30, 46. Rather, Colorado contends that a loan is *also* "made in" Colorado if a bank makes the loan in another state, but the borrower *receives* that loan in Colorado. Br. 42-43. This theory makes no sense.

For starters, it is apparent that, to Colorado, it is only the borrower's state that matters for purposes of Section 525. Why insist that a loan is "made" in two states if only one of those states matters?

Colorado's two-state theory also fails on the plain text, because DIDMCA contemplates that the loans at issue are "made" in "*such* State"—that is, a *singular* state. Congress tied the opt-out provision to the *single* state where a loan is "made" because it was referring only to *one* state, not two.

Beyond that, Colorado declares that because "[a] bank cannot make a loan without a borrower any more than one hand can clap without the other," a loan is "made" equally where each party is located. Br. 29. But "made" is a verb describing an action *the bank* takes in a particular place, not an action jointly performed by both parties (like two clapping hands). Under Colorado's logic, a statute that applied to "loans *received in* such State" would refer equally to both the bank's location and the borrower's—after all, a borrower cannot "receive" a loan without a bank having made it. This is absurd. Words that refer to the borrower's action—*e.g.*, "received" or "obtained"—look to the borrower's location

41

(where location is relevant). And words that refer to the lender's action—*e.g.*, "made" or "originated"—look to the bank's location.

As the District Court observed, "[h]ad Congress sought to put the focus on the borrower, as the State argues, it could have done so in many ways. Most easily, for example, by allowing states to opt out as to loans 'made to borrowers in such State.'" Op. 16. In fact, Congress was presented with just such an option by CSBS—the state bank regulator group that had pressed for the original opt-out provision in the Brock Bill—during deliberations on DIDMCA. *See* page 19, *supra* (advocating limiting both state and national bank interest rates to "the rate allowed … by the laws of the State …where the borrower resides"). Congress turned down that request.

### 2. Loan contracts are different from loans.

Relatedly, Colorado faults the District Court for drawing a distinction between a loan and a loan contract under Section 525, arguing that a *loan* must be "made" by both parties because a *loan contract* is "entered" into by both parties. *See* Br. 32-33 (citing Op. 19); *see also* FDIC Br. 10. But a bank *making a loan* is different than two parties *entering a*

*contract for a loan*, and the District Court was correct to observe the distinction between the two. *See* Op. 19.

A "contract" is an "agreement between two or more parties which creates an obligation to do or not do something." *Contract*, Black's Law Dictionary (6th ed. 1979). It thus requires "executing, signing, or delivering" that contract, App.Vol.I.P.177 (quoting Black's Law Dictionary (11th ed. 2019)). By contrast, a loan is "anything furnished for temporary use to a person at his request, on condition that it shall be returned … with or without compensation for its use." *Loan*, Black's Law Dictionary (6th ed. 1979); *see also Loan*, Webster's Third Int'l Dictionary (1971 ed.) ("money lent at interest"). Congress chose to confine the opt-out to "loans made" in the opting-out state, rather than "loan contracts entered by one of the parties" there.

Banks and borrowers take different actions with regard to a loan—including applying for a loan (an action only a borrower takes); committing to make a loan (an action only a bank takes); entering into a commitment agreement regarding a loan (as Colorado refers to in its brief, Br. 32-33, an action both a bank and a borrower take); entering into

a loan agreement (an action both a bank and a borrower take); and—as relevant here—actually *making* the loan, an action only a bank takes.

### 3.   The canon of "meaningful variation" does not apply.

Colorado argues that the canon of "meaningful variation" requires that where a loan is "made" under Section 525 must differ from where a bank is "located" under Section 521. Br. 25-27; *see also* FDIC Br. 11-14; State Br. 28-31; Center Br. 14-16. According to Colorado, Congress tied Section 525 to where a loan is "made" in order "to pivot away from the location of the lender in Section 525," as interpreted in *Marquette*. Br. 27. This argument does not hold water. The canon of meaningful variation is "defeasible" by other indications of congressional intent, *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (quoting A. Scalia & B. Garner, Reading Law 170-71 (2012))—which are overwhelming here.

Fundamentally, Colorado tries to drive a wedge between Sections 521 and 525 that does not exist in the statutory text. As discussed above, *both* sections refer to "loans made" because both focus on the actions of the lender when making a loan in a particular state. Section 521 explicitly ties the applicable interest-rate limit on "any loan … made" to the state where the bank is "located,"—that is, where the

44

bank performs its loan-making functions. Section 525 also focuses on where the loan is "made." The two sections should be construed consistently, rather than forcing conflict into a statute where none exists. *See Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir. 1991) ("statutes should be construed so that their provisions are harmonious with each other"). Given the clear link between the bank's "location" and where a loan is "made," Colorado fails to show that where loan is "made" under Section 521 should differ from where it is "made" under Section 525.

History also underscores that Congress did not use the word "made" in Section 525 to "pivot away" from the "State … where the bank is located" under DIDMCA Section 521 and NBA Section 85. Br. 26-27. Indeed, that argument gets the chronology backward. Throughout the 1970s, statutes preempting state interest-rate caps for banks allowed states to opt out of a higher federal rate as to loans "made in" that state— beginning before *Marquette* was decided or DIDMCA Section 521 first authorized state banks to lend at the rates in the "State … where the bank is located." The "made in" phrase used in these predecessor statutes could not have been intended to "pivot away" from a court's future

interpretation of language (*Marquette*) in a future statute (DIDMCA Section 521).

Instead, the opt-out provisions in those statutes were designed to permit states to reject competitive equality and maintain their interest-rate caps for their own state banks. Far from "pivot[ing] away" from this purpose, DIDMCA Section 525 retained the language of prior opt-outs because it had the same effect: to allow each state to deny state banks operating *within the opting-out state* authority to make loans at national bank rates.[14]

Colorado thus places more weight on minor differences in word choice than DIDMCA can bear. DIDMCA Sections 521 and 525 were cobbled together from existing statutes enacted over a century apart. Slight variation in phrasing between language from an 1864 statute copied into Section 521 and language from a series of 1970s statutes copied into Section 525 is not "meaningful."

---

[14] Other sections of DIDMCA also refute Colorado's theory. DIDMCA Sections 511-12 extended the Borrowers Relief Act's increased rate nationwide; they therefore do not contain the "State … where the bank is located" language from NBA Section 85, but they nevertheless contain an opt-out provision with the same "made in" language as DIDMCA Section 525.

### 4.   The use of passive voice does not carry the significance Colorado assigns to it.

Colorado next argues that "Congress intentionally used the passive voice" in Section 525 to allow states to opt out of "rate exportation" under DIDMCA. Br. 39. This is plainly *not* what Congress intended. Section 525 uses the passive voice to describe *when* loans are subject to DIDMCA, not to alter the scope of the opt-out: "The amendments made by sections 521 through 523 … shall apply only with respect to *loans made* in any State *during the period* beginning on [DIDMCA's effective date], and ending on the date" the state opts out. DIDMCA § 525 (emphasis added). Congress used the word "made" only to delineate the temporal nature of *which* loans would be covered by Section 521 if a state opted out under Section 525.

Again, Congress drew the language of Section 525 directly from its predecessors' sunset provisions, which specified that their terms applied only "to loans made in any State" before the sunset date or the date the state opted out. *See* pp. 14-19, *supra*. This consistent use of "made" to describe loans "made" during a certain time period dates to the earliest version of the Brock Bill—predating both *Marquette* and DIDMCA. Just as it had in these prior statutes, Congress used this phrase in DIDMCA

47

Section 525 to refer to loans that dated to (that is, were "made" during) the period between the date of DIDMCA and the date a state opted out. By recycling this phrasing, Congress was not, as Colorado and its amici argue, *see* Br. 25-27; State Br. 28-31; Center Br. 12-14; FDIC Br. 11-14, intentionally adopting the passive voice to differentiate Sections 521 and 525.

**C.    Colorado misunderstands the purpose of DIDMCA Section 525.**

Colorado's and its amici's briefs are infused with outrage that an out-of-state bank could lend to a Colorado consumer at rates the State thinks are too high—and Colorado believes that Section 525 was designed to allow it to prevent such lending. *See* Br. 10-14; Bell Br. 4-13; Center Br. 5-11. But this position is ahistorical and based on a fundamental misunderstanding of the purposes of DIDMCA Section 525—which was instead focused on preserving states' ability to regulate their own state-chartered institutions. Regardless, Colorado's overly broad interpretation of the opt-out would not even advance Colorado's consumer-protection goals.

1. **The opt-out was designed to allow states to decline interest-rate parity, not to encroach on other states' interests in regulating their own banks.**

As explained above (at pp. 14-19), Congress enacted DIDMCA Section 521 to ensure competitive equality between national and state banks by extending the benefits of NBA Section 85 to the latter. Section 525, the opt-out provision, allows states to reject that offer of preemptive parity for its own banks. It does not permit states to interfere with *other* states' regulation of banks operating within *other states'* borders, thus undermining the competitive equality of those institutions. But that is precisely what Colorado attempts to do when it insists that under Colorado's opt-out statute, any loan *received by a borrower* in Colorado is subject to Colorado's rate caps.

Colorado concedes that NBA Section 85 preempts Colorado's interest-rate caps as applied to a loan made by an out-of-state *national* bank, even when the borrower is a Colorado resident. *See* Br. 2, 11. Yet Colorado urges the Court to adopt an interpretation of Section 525 under which state banks in a state that *chose not to opt out* would no longer be able to make loans on the same terms available to national banks *in that same non-opt-out state* under NBA Section 85. Rather than ensure parity

between state and national banks, Colorado's interpretation would drive a discriminatory wedge between them. This is not what Congress intended.

Rather, Congress drafted Section 525, in the model of its predecessor statutes, to operate as the District Court interpreted it: to permit states to reject federal intervention in their regulation of their *own* banks. Neither Section 525, nor its predecessors, permits opt-out states to reach into *other* states to regulate banks performing their loan-making functions in those other states.

As the legislative history demonstrates, *see* pp. 8-14, *supra*, the sponsors of interest-rate preemption bills in the 1970s were uncertain of the constitutionality of forcing states to allow their own chartered banks to loan at a federal rate. Their solution was to include opt-out provisions to allow states to re-prohibit their banks from making loans at the federal rate. Even the Borrower Relief Act contained an opt-out provision permitting Arkansas to reject those rates and hold its own banks to the existing state-law caps, using the same opt-out language that was later imported into DIDMCA Section 525. *See* pp. 16-17, *supra*. Yet the Borrower Relief Act was specifically requested by the state of Arkansas,

applied only in Arkansas, and could not as a practical matter have applied to banks chartered and operating in other states.

Given this history and context—and utter lack of legislative history pointing in another direction—it cannot be that Congress suddenly and silently decided, when extending interest-rate relief to banks in the rest of country through DIDMCA, to allow opting-out states to trample the rights of non-opting-out states in the manner Colorado and the FDIC now advocate.

Failing to grasp this history, Colorado objects that the District Court's interpretation of Section 525 permits only a "partial opt-out," under which Colorado cannot entirely avoid "rate exportation" into the state. Br. 40-43. Setting aside that Colorado cites nothing for the proposition that halting "rate exportation" into opting-out states was Congress's concern or purpose when it enacted Section 525 and its predecessors, Colorado's interpretation *also* would not avoid rate exportation. After all, NBA Section 85 would continue to preempt Colorado's caps for national banks lending to Colorado residents. Indeed, as noted above (at page 19), the CSBS asked Congress to expressly cap

interest rates *for all banks* at the level permitted in the state "where the borrower resides." But Congress declined.

### 2. There was no pre-DIDMCA "status quo" for state regulation of state-bank interstate lending.

Colorado also argues that "Congress crafted Section 525 so that states could reject Section 521 and return to the *status quo ante* should they choose to do so." Br. 39; *see* State Br. 27-28. According to Colorado, under this status quo "a state [could] choose to regulate interest rates charged to its residents, even if a lender ha[d] no other footprint within the forum state." Br. 9; *see also id.* 34, 40.

This argument, too, lacks historical merit. There was no uniform national "status quo" prior to DIDMCA under which only the borrower's state of residence governed the interest that state banks could charge on interstate loans. As the Supreme Court recognized in *Marquette*, it was only in the 1970s that lending began to evolve beyond face-to-face transactions—and it was primarily *national* banks that began to lend across state lines, using the mail, through credit card lending. *See* App.Vol.I.P.16-34; *Marquette*, 439 U.S. at 311.

In support of this supposed pre-DIDMCA consensus, Colorado cites (Br. 37-40) a series of 1970s cases addressing a single mail-order

merchant. That merchant, Aldens, sometimes "extended credit to customers to facilitate … purchases." *Id.* at 37. Alden's credit agreements all purported to be governed by Illinois law—where Aldens was based—but a series of courts rejected the company's choice-of-law argument and held that other states could apply their usury laws to the loans.

The Aldens cases are irrelevant here. For starters, the cases themselves expressly acknowledge "the lack of uniformity" and "extent of disparity in state treatment" of interstate credit transactions at that time, *Aldens, Inc. v. Packel*, 524 F.2d 38, 48 n.15 (3d Cir. 1975), thus defeating any notion of a clear pre-DIDMCA status quo. In any event, Aldens was not a bank, let alone one chartered by and regulated by a single state. Furthermore—as Colorado recognizes—those cases addressed only whether the application of another state's usury laws to Aldens' loans would "violat[e] … the Commerce Clause [or the] Due Process Clause." Br. 37. As the District Court explained, "Dormant Commerce Clause cases are of little value with respect to the statutory construction issue in this case, as they address the separate issue of when one state may constitutionally regulate an activity involving conduct that occurs in another state." Op. 19. Such cases shed no light on where a loan

is "made" for purposes of applying bank preemption law—only about which states may constitutionally regulate those loans *absent* a contrary federal rule.

Nor was there a clear status quo with respect to the interstate regulation of contracts more generally in the 1970s, *contra* Colorado's oversimplified chart. *See* Br. 40.

Under the traditional rule, the law of the "place of performance" applied regardless where the contract was entered: "The general principle in relation to contracts made in one place, to be executed in another, is well settled. They are to be governed by the law of the place of performance, and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest, without incurring the penalties of usury." *Seeman v. Phila. Warehouse Co.*, 274 U.S. 403, 407 (1927) (citations omitted).

Colorado law—references to which are conspicuously absent from Colorado's brief—followed this traditional rule, and specified that the place of performance was the *lender's* location: "As a general rule, in the absence of any agreement or stipulation to the contrary, a debt is payable

at the place where the creditor resides, or at his place of business … and it is ordinarily the duty of the debtor to seek the creditor for the purpose of making payment." *Gill v. Just. of Peace Ct. No. 2 of City & Cnty. of Denver*, 139 P.2d 271, 272 (Colo. 1943) (citation omitted).

Over time, some states—including Colorado—moved away from the traditional rule and adopted the factors set forth in the Restatement (Second) of Conflict of Laws §§ 188 and 203. But this meant courts applied a case-by-case analysis resulting in a variety of different outcomes. *See, e.g.*, *Pirkey v. Hosp. Corp. of Am.*, 483 F. Supp. 770, 772, 773-74 (D. Colo. 1980); *Shull v. Dain, Kalman & Quail Inc.*, 267 N.W.2d 517, 519-20 (Neb. 1978).

Nor does Colorado's adoption of the UCCC in 1971 support the existence of a halcyon "status quo" in which loans were "made" where the borrower was located. Rather, at that time, the UCCC stated just the opposite: "A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt ***is received by the _lender_ in this state*.**" Colo. Rev. Stat. § 73-1-201(1)(c) (1971) (emphasis added). The lender's location controlled until the statute was amended in 1975 to cover loans where the borrower "receives … the cash

proceeds of the loan in this state," in which case the statute specified that it "shall apply **as though** the … loan were entered into in this state." *Id*. § 73-1-201(12) (1975) (emphasis added). Neither version of Colorado's pre-DIDMCA UCCC recognized a loan as **actually** being "made in" Colorado if the borrower resided there; the borrower-focused UCCC language Colorado references was not adopted until over a decade **after** DIDMCA. Colo. H.B. 00-1185 (2000).

At bottom, Colorado provides no evidence that Congress recognized any uniform national rule governing interstate transactions when it enacted DIDMCA. Or that Congress added Section 525 to restore that supposed rule.

### D.    Colorado's cases are irrelevant to interpreting Section 525.

As discussed above (at pp. 38-40), the District Court's interpretation of Section 525 is precisely the same as the Eighth Circuit's interpretation of the exact phrase at issue here in the context of a closely related interest-rate preemption statute. *Jessup*, 327 F.3d at 684. Colorado, by contrast, is unable to find any relevant caselaw to support its interpretation of Section 525. Instead, Colorado relies on Dormant Commerce Clause cases to show where loans (or contracts generally) are

56

supposedly "made." Br. 36-39, 52-55; *see* FDIC Br. 15; State Br. 29. The District Court wisely declined to contort DIDMCA Section 525 to conform to this unrelated body of law. Op. 19.

*Quik Payday, Inc., v. Stork*, 549 F.3d 1302 (10th Cir. 2008), and the other cases Colorado cites (like *Aldens*, discussed above) address only the question whether activity affects a given state sufficiently to allow that state to regulate the conduct within the bounds of the Constitution. *Quik Payday*, 549 F.3d at 1312 (characterizing question as akin to whether Kansas could exercise "specific jurisdiction" over transaction). It may generally be true that, "when an offer is made in one state and accepted in another, ... both states have an interest in regulating the terms and performance of the contract" for purposes of the constitutional minimum for Due Process. Br. 54 (quoting *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999)). But that says nothing about the meaning of "made in" under Section 525; nor about the scope of federal preemption for loans by state-chartered banks. Indeed, none of these cases deals with banks or bank regulation. The fact that Colorado must wander so far afield exposes the weakness of its position.

### E.    Federal regulators have traditionally endorsed a lender-focused approach.

Contrary to Colorado's arguments, Br. 49-52, the pronouncements of relevant federal regulators—and in particular, those issued roughly contemporaneously with the enactment of the statute—confirm that the District Court correctly interpreted Section 525. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024) (interpretations "issued roughly contemporaneously with enactment of the statute" entitled to "respect").

The FDIC has consistently advised regulated parties that loans are "made" under DIDMCA where the lender is located. Shortly after DIDMCA's enactment, the FDIC advised state banks that they "may rely on the federal law that incorporates the interest provisions of the state where the bank is located in extending credit to the residents of its state *and of other states*"—including "when *making loans to citizens of states that have rejected the federal preemption*." FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) (emphasis added); *accord* N.C. S. Banking Comm., 1983 HB 336, *supra* p. 21 (FDIC advised North Carolina bank commissioner that "if a State were to override the preemption of Section 521, a State bank located in another State would still be able to

charge North Carolina residents the highest rate allowed in the State bank's home state"). The Office of Thrift Supervision concurred, explaining that lenders "may offer loans to out-of-state customers at interest rates authorized in the state where the institution is located, even if the state where the borrower lives … has exercised its 'opt out' authority under section 525." OTS Ltr. from H. W. Quillian, 1986 WL 290314, at *2 (June 27, 1986).

The FDIC reiterated this interpretation in one of the earliest significant cases applying DIDMCA, *Greenwood*, 971 F.2d 818. In its amicus brief there, the agency addressed whether DIDMCA permitted a Delaware state bank to charge late fees—which qualify as a component of interest—even though Massachusetts, the borrower's state, prohibited late fees. FDIC Br. in *Greenwood*, 1992 WL 12577410, at *35-36. The FDIC explained that Massachusetts' opt-out (which was eventually repealed) did not permit it to extend its prohibition on late fees to Delaware state banks because "the right to 'opt out' of Section 521, by the express terms of Section 525, 'belongs to the State where the loan is made.'" *Id.* (quoting FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June

59

29, 1988)). Because the *lender's state* had not opted out, Section 525 did

not "have any bearing on this case at all":

> Section 525 clearly does not confer on states that
> elect to opt out of Section 521 extraterritorial
> authority to apply their own lending laws to loans
> made in other states by banks chartered in other
> states, ***merely because the borrower happens
> to be a resident.***

*Id.* (emphasis added).

The FDIC has simply ignored its earlier brief throughout this

litigation, instead proposing a novel framework in the District Court—

that a loan is "made by both of its parties," FDIC Br. 2—which Colorado

embraced for the first time at oral argument below. App.Vol.II.P.407 (Tr.

29:3-14). But try as they might, neither the FDIC nor Colorado can

square this new theory with the FDIC's and other regulators' past

statements, which never equated the *borrower's* location with where a

loan is "made."[15]

---

[15] *See also, e.g.*, OCC Interp. Ltr. No. 686, 1995 WL 786842, at *3 (Sept.
11, 1995) ("the key fact in determining the permissible interest rate
applicable to a loan is not where the customer resides"); FDIC Gen.
Counsel's Op. No. 11, Interest Charges by Interstate State Banks, 63 Fed.
Reg. 27,282, 27,286 (May 18, 1998) (for purposes of DIDMCA, a loan is
"made" in the bank's home state by default and is only "governed by the
usury provisions of the host state" where it "performs all" its key loan-
making functions in that state) Federal Interest Rate Authority, 85 Fed.

The FDIC tries to distinguish other of its pronouncements, but to little effect. For instance, the FDIC approvingly cites its 1988 interpretative letter to support its current position. FDIC Br. 12-13 (citing FDIC Interp. Ltr. No. 88-45). But that letter merely rejected the suggestion that a loan is necessarily "made" in a bank's "*home state*," and instead supports adopting a functional approach to determine where a loan is "made" for purposes of DIDMCA Section 525, citing the Supreme Court's analysis in *Marquette*. *Id.* (emphasis added); *see also* App.Vol.I.P.59. That is the exact approach Appellees endorse here.

The FDIC then stridently dismisses the relevance of its 1998 General Counsel opinion because that opinion discusses where a loan is "made" in connection with Section 521, rather than Section 525. FDIC Br. 21-22 (citing Opinion 11, 63 Fed. Reg. at 27,283). But where a loan is "made" for the purposes of interest-rate preemption is certainly relevant to where a loan is "made" for purposes of opting out of that preemption. And, according to Congress, courts, and decades of regulator opinions, a

---

Reg. 44,146, 44,148 (July 22, 2020) ("If all three non-ministerial functions involved in making the loan are performed by a branch or branches located in the host State, the host State's interest provisions would apply to the loan[.]").

loan is "made" where the bank performs its loan-making functions—not where a borrower happens to receive it. Try as it might, the FDIC cannot avoid its heretofore consistent view that a loan is "made" where the lender is located. Certainly its abrupt change in position warrants no deference here.

* * * * *

The District Court correctly ruled that Plaintiffs are likely to prevail because their interpretation of DIDMCA Section 525 is supported by the text, context, legislative history, caselaw, and regulatory guidance.

## III.   The District Court Did Not Issue A Disfavored Injunction, And Correctly Found That The Equities Favor Plaintiffs.

Colorado's arguments regarding the remaining preliminary injunction factors also fail.

To start, the District Court did not issue a "disfavored injunction." That heightened standard applies only where "the issuance of an injunction will render a trial on the merits largely or partly meaningless"—such as in "a case involving the live televising of an event scheduled for the day on which preliminary relief is granted" or "the disclosure of confidential information." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 35 (2d Cir. 1995); *see also Free the Nipple-*

*Fort Collins v. City of Fort Collins*, 916 F.3d 792, 798 n.3 (10th Cir. 2019)

(citing *Tom Doherty*). In the case Colorado cites, involving a challenge to

a law criminalizing public breast exposure except for breastfeeding, this

Court noted that applying this heightened standard "was likely in error"

since "we probably *can* put the toothpaste back in the tube" by allowing

the defendant city to "enforce its ordinance" if it prevailed on the merits.

*Free the Nipple*, 916 F.3d at 798 n.3.

Same here: In the unlikely event Colorado prevails at trial, the

toothpaste can go back into the tube, and Colorado would be permitted to

enforce its interest-rate caps. *See* Br. 63 (speculating what would happen

if Plaintiffs "lose at trial"). Colorado's argument that borrowers will

continue to have access to loans with interest rates in excess of Colorado's

interest-rate caps during the pendency of the case ignores that (1) they

will be able to borrow at those rates from national banks regardless of

the outcome of this lawsuit; and (2) if the state wins, it will be able to

prevent out-of-state, state-chartered banks from so lending prospectively.

Regardless, as the District Court held, Plaintiffs are entitled to a

preliminary injunction no matter the standard. Op. 23, 25. In addition to

Plaintiffs having demonstrated a likelihood of success, the balance-of-

equities and public-interest factors favor Plaintiffs. An unconstitutional law is never in the public interest. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). And Plaintiffs did in fact present evidence that national banks offer loans to Colorado borrowers at interest rates exceeding Colorado's caps, App.Vol.II.P.226-28, and thus that the Colorado law would provide only "marginally more protection" for the public even under Colorado's view of the public interest. Op. 25; *contra* Br. 64.

Finally, Colorado is simply wrong in asserting that Plaintiffs' members are actively harming Colorado borrowers by offering loans at rates higher than Colorado would permit. Br. 63. It is Colorado's law that would harm Coloradans—particularly those at the lower end of the credit spectrum—by reducing competition and denying them access to needed credit. *See* App.Vol.III.P.529-30.

## CONCLUSION

The Court should affirm the District Court's preliminary injunction.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs agree that oral argument would be appropriate in this case, and would likely assist the Court in reaching a decision.

Respectfully Submitted,

/s/ David M. Gossett

CHRIS SWIFT
Davis Wright Tremaine LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
865 S Figueroa Street
Suite 2400
Los Angeles, CA 90017
(213) 633-6800
mattladew@dwt.com

DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
LEAH E. CAPRITTA
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com
leah.capritta@hklaw.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
LESLIE B. ARFFA
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

*Attorneys for the American Fintech Council*

November 15, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in 14-point Century Schoolbook.

<u>/s/ David M. Gossett</u>

November 15, 2024