No. 24-1293
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

PHILIP J. WEISER, et al.,

     Defendants-Appellants,

     v.

AMERICAN FINTECH COUNCIL, et al.

     Plaintiffs-Appellees.

_____

**On Appeal From the United States District Court for the
District of Colorado, No. 1:24-cv-00812**

_____

**BRIEF OF AMICI CURIAE AMERICAN BANKERS ASSOCIATION,
THE BANK POLICY INSTITUTE, AND CONSUMER BANKERS
ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES**

_____

Ronald K. Vaske
vasker@ballardspahr.com
BALLARD SPAHR, LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55401-2119
612.371.3215

Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record*

*Attorneys for American Bankers Association,
The Bank Policy Institute, and
Consumer Bankers Association*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, each amicus certifies that it does not have a parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Dated:  November 22, 2024          /s/ *Burt M. Rublin*
                                                           Burt M. Rublin

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................... i

I.    INTEREST OF AMICI CURIAE .................................................. 1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

III.  ARGUMENT ........................................................................ 6

     A.    The Legislative History of DIDMCA ................................... 6

     B.    Adoption of the Argument That a Loan is Made in the State
          Where the Borrower is Located Would Create an Unworkable
          Morass ...................................................................... 13

     C.    A Reversal Would Result in Less Competition for  National
          Banks Making Loans to Colorado Borrowers.................................. 17

     D.    No Deference is Owed to the FDIC's Amicus Brief ........................ 19

IV.   CONCLUSION........................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Been v. O.K. Indus.*,
    495 F.3d 1217 (10th Cir. 2007) ........................................................20

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..........................................................................19

*Christensen v. Harris County*,
    529 U.S. 576 (2000)....................................................................20, 21

*Christopher v. SmithKline Beecham Corp.*,
    635 F.3d 383 (9th Cir. 2011), *aff'd*, 567 U.S. 142 (2012)................21

*E.I. DuPont de Nemours & Co. v. Smiley*,
    585 U.S. 1033 (2018)..................................................................19, 20

*Efagene v. Holder*,
    642 F.3d 918 (10th Cir. 2011) .........................................................22

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987)..........................................................................22

*Garber v. Harris Trust & Savings Bank*,
    432 N.E.2d 1309 (Ill. App. 1982)...............................................14, 15

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976)..........................................................................22

*Greenwood Trust Co. v. Massachusetts*,
    971 F.2d 818 (1st Cir. 1992).....................................................8, 10, 11

*Loper Bright Enterprises v. Raimondo*,
    144 S.Ct. 2244 (2024).......................................................................19

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978)...........................................3, 4, 5, 12, 16, 17

*Sharp Elecs. v. Deutsche Fin. Servs. Corp.,*
    216 F.3d 388 (4th Cir. 2000) ...........................................................14

*Shikles v. Sprint/United Mgmt. Co.*,
   426 F.3d 1304 (10th Cir. 2005) ........................................................... 20

*Smith v. Aegon Cos. Pension Plan*,
   769 F.3d 922 (6th Cir. 2014) ............................................................... 20

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ............................................................................. 19

**Federal Statutes**

12 U.S.C. § 85 ................................................................................... *passim*

Depository Institutions Deregulation and Monetary Control Act of
   1980, Pub.L. No. 96-221,94 Stat. 132 (1980) ............................... *passim*

   DIDMCA § 521, 12 U.S.C. § 1831d ............................................. *passim*

   DIDMCA § 522, 12 U.S.C. § 1463(g) .................................................. 2, 3

   DIDMCA § 522, 12 U.S.C. § 1730g .................................................... 2, 3

   DIDMCA § 523, 12 U.S.C. § 1785(g) .................................................. 2, 3

   DIDMCA § 525, 94 Stat. 167 ....................................................... *passim*

**State Statutes**

Colo. Rev. Stat. § 5-2-201(2)(a) .............................................................. 18

Colo. Rev. Stat. § 5-2-201(3)(a) .............................................................. 18

Colo. Rev. Stat. § 5-13-106 ....................................................................... 4

63 Del. Laws, Chapter 2, § § 2-23 (1981) ............................................... 13

SL 1982 ch. 336 § 1 ................................................................................. 13

**Legislative History**

125 Cong. Rec. S30,655 (Nov. 1, 1979)............................................................7, 8, 9

126 Cong. Rec. S6,894 (March 27, 1980) ...............................................................10

126 Cong. Rec. S6,900 (March 27, 1980) ...........................................................9, 10

126 Cong. Rec. H.6,966 (March 27, 1980)..............................................................10

126 Cong. Rec. S6,907 (March 27, 1980) ...........................................................9, 10

Hearings on S. 1988 before the Senate Comm. on Banking, Housing
and Urban Affairs, 96th Congress, 1st Sess. (1979)......................................9, 10

**Other Authorities**

FDIC Amicus Brief, *Greenwood Trust Co. v. Massachusetts*, 1992
WL 12577410 (Feb. 27, 1992) ...................................................................21, 22

## I.     <u>INTEREST OF AMICI CURIAE</u> [1]

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States.  Founded in 1875, the ABA is the voice for the nation's $23.7 trillion banking industry and its 2.1 million employees.  ABA members provide banking services in each of the 50 states and the District of Columbia.  Among them are state banks and savings associations of all sizes.

The Bank Policy Institute ("BPI") is a non-partisan public policy, research and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States.  The Institute produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

The Consumer Bankers Association ("CBA") is the only national trade association focused exclusively on retail banking.  Established in 1919, the

---

[1]   The parties have consented to the filing of this brief.  No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

association is a leading voice in the banking industry and Washington, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans.

The ABA, BPI, and CBA have many state-chartered member lending institutions located outside Colorado who make loans in the states where they are located and perform their loan-making functions in conformity with those states' usury limits to borrowers who reside in Colorado. Their lending programs will be shaken up by the outcome of this litigation, and they respectfully submit that their arguments may help this Court in deciding the appeal.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), codified at 12 U.S.C. § 1831d, provides that a federally insured state-chartered bank may lend nationwide at interest rates up to the greater of (a) the rate allowed by the laws of the bank's home state; or (b) 1% above the Federal Reserve discount rate. Section 521 expressly preempts any lower interest rate limits in the borrower's state, as the federal interest rate authority conferred by Section 521 applies "notwithstanding any State constitution or statute."[2] *Id.*

---

[2]    Sections 522 and 523 of DIDMCA confer on federally insured savings associations and federally insured credit unions, respectively, the same federal interest rate authority that is conferred on federally insured state-chartered

As shown in the prefatory language of Section 521, it was enacted "[i]n order to prevent discrimination against State-chartered insured depository institutions," and it uses the same operative language contained in Section 85 of the National Bank Act (12 U.S.C. § 85). The express language of Section 521 and the legislative history confirm that it was adopted to create parity between national banks and state banks with respect to usury laws.

The legislative history shows that when Congress enacted DIDMCA, it was focused solely on *intrastate* lending and creating parity between competing state-chartered depository institutions and national banks with respect to the right to charge interest at 1% above the Federal Reserve discount rate on loans made to borrowers in their own state. There is *nothing* in the legislative history supporting the notion that Congress had *interstate* lending in mind when it enacted the "opt-out" right in Section 525 of DIDMCA. Indeed, when DIDMCA was enacted, very few national banks and even fewer, if any, state banks engaged in interstate consumer lending programs. The huge expansion in interstate credit card and consumer lending by national banks did not occur until several years after the watershed decision in *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439

---

banks by Section 521. Section 522 was originally codified at 12 U.S.C. § 1730g, but in 1989 was recodified at 12 U.S.C. § 1463(g). Section 523 is codified at 12 U.S.C. § 1785(g). Colorado's Opt-Out Legislation would apply to federally insured state banks, savings associations, and credit unions.

U.S. 299 (1978).  The *Marquette* Court held that Section 85 of the National Bank Act empowered national bank credit card issuers to export the interest allowed by their home states' laws or 1% above the Federal Reserve discount rate in their transactions with cardholders in other states with lower interest rate ceilings.  State bank interstate credit card and consumer lending did not develop until after the enactment of DIDMCA in 1980.

This appeal centers on Colorado's Opt-Out Legislation (Colo. Rev. Stat. § 5-13-106) and Section 525 of DIDMCA, which authorizes a state to adopt a law providing that the state does not want Sections 521-523 of DIDMCA "to apply with respect to loans made in such State."  94 Stat. 167. The District Court correctly held that "[t]he plain meaning of Section 1831d's opt-out provision is that what state a loan is 'made in' depends on where the bank is located and performs its loan-making functions and does not depend on the location of the borrower."  (Op. at p. 23).

Adoption of the unfounded and legally unprecedented argument by Colorado and the FDIC that a loan is made not only in the state where the bank performs its loan-making functions, but also in the state where the borrower is located when the loan is made,[3] would create a logistical morass for state banks

---

[3]  *See* Colo. Br. at p. 32 ("Since a loan cannot be 'made' without both the lender and the borrower, it is inconsistent with the text to ignore the location of the borrower when determining where the parties 'made' a loan"); FDIC Br. at p.

with respect to extensions of open-end credit and online loans.  For example, assume that the borrower takes a cross-country trip in his or her RV and uses a credit card to make purchases along the way, including in several opt-out states. State banks would have to determine the cardholder's location at the time of each transaction and determine interest rates at the transaction level, rather than the account level, so a single credit card statement could include many different interest rates.  That would be completely inconsistent with the overriding Congressional intent underlying Section 521 of DIDMCA to promote nationwide interest rate uniformity and parity with national banks by empowering federally insured state banks to export their home state interest rates or 1% above the Federal Reserve discount rate in transactions with their borrowers throughout the country, just as national banks do under *Marquette* and Section 85 of the National Bank Act.

It also bears emphasis that applying Colorado interest rate and fee limitations to loans made by out-of-state banks in the states where they are located and perform their loan-making functions will not only harm those banks, it will also harm consumers in Colorado.  The Opt-Out Legislation will place out-of-state state-chartered depository institutions at a pronounced competitive disadvantage

---

14 ("the location of the borrower determines where the loan is made just as much as the location of the bank.").

compared to out-of-state national banks located in the same state in making loans to Colorado residents, since the national banks will remain free to charge whatever interest rates are permitted by their own states' laws. Diminished competition in the marketplace will mean that credit opportunities for Colorado consumers will become more scarce and thus more expensive, particularly for those at the lower end of the credit spectrum. It is dubious that many out-of-state state banks, savings associations, and credit unions will find it economically feasible to make loans to risky Colorado borrowers under the Colorado UCCC 21% interest rate cap, especially when the country's interest rates go up. By contrast, national banks, who are unaffected by the Opt-Out Legislation, will be unconstrained by the interest rate and fee limitations of Colorado law and would also be unconstrained by state bank competition.

## III.    ARGUMENT

### A.    The Legislative History of DIDMCA

The legislative history of the usury preemption provisions in Sections 521-523 of DIDMCA demonstrates that the entire focus was on state banks and other federally-insured state depository institutions located in states with modest usury ceilings that made it economically infeasible to lend money to residents *within those same states* because of prevailing high interest rates. The sponsors of the usury provisions were Senators Pryor and Bumpers of Arkansas, which had a

10% usury ceiling established by the Arkansas Constitution on loans made to Arkansas residents. However, notwithstanding that state law limit, national banks located in Arkansas had the right under Section 85 of the National Bank Act to make loans to Arkansas residents at 1% above the Federal Reserve discount rate, which was then 12%. Inflation was soaring, and state banks in Arkansas simply could not afford to make loans to Arkansas residents within the 10% interest rate ceiling. Senator Pryor explained the dire and unfair situation confronting Arkansas' state banks and savings banks:

> Consider the situation in my State of Arkansas. We have, as the Senators well know by now, a strict 10-percent interest rate ceiling on all types of loans. *A customer seeking a loan to buy a car is unlikely to find the funds at a State bank since State banks can charge no more than 10 percent interest*, which is not enough to cover the cost of funds plus service costs. *This customer is forced to turn to a national bank which can presently charge 13 percent.* That customer is also likely to deposit his money in that bank.
>
> *        *        *
>
> This is, strictly speaking, not a "usury" issue but a matter of competitive equality … [W]hen the discount rate is higher than the usury limit, the State banks and savings and loans are placed in an impossible grossly unfair situation.
>
> *        *        *
>
> *We have 210 State banks in my State, and every one of them is going to be applying for a federal charter if something is not done.* I personally think the dual

7

> [banking] system is a good thing, but we in Arkansas
> cannot keep it unless we get some relief on this thing.

125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added).

In *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir.

1992), the First Circuit explained "the historical context" underlying the enactment

of DIDMCA:

> As the 1970s wound down, the Nation was caught in the
> throes of a devastating credit crunch.  Interest rates
> soared … Nevertheless, state lending institutions were
> constrained in the interest they could charge by state
> usury laws which often made loans economically
> unfeasible from a lender's coign of vantage … National
> banks did not share this inhibition because they could
> charge whatever interest rates were allowed under the
> National Bank Act of 1864, ch. 106, 13 Stat. 99 (1864)
> (codified, as amended, in scattered sections of 12 U.S.C.)
> (the Bank Act), and specifically, those rates which were
> permitted under Bank Act § 85, 12 U.S.C. § 85 (1988) …
> Since section 85 authorized national banks to use interest
> rates set by reference to federal discount rates, state
> institutions were at an almost insuperable competitive
> disadvantage.

*Id*. at 826 (citations omitted).

The express purpose of Section 521 was to place federally-insured

state banks in a position of parity and competitive equality with national banks,

which historically had been statutorily favored with respect to usury authority.

Indeed, the preamble of Section 521 expressly states that it was enacted "[i]n order

to prevent discrimination against State-chartered insured depository institutions."

12 U.S.C. § 1831d(a).  To effectuate this intent, Congress incorporated in Section 521 of DIDMCA the very same language used in 12 U.S.C. § 85, which governs loans made by national banks.

The legislative history of Sections 521-523 of DIDMCA demonstrates that Congress intended to confer upon all federally-insured state depository institutions the same interest rate authority long enjoyed by national banks under Section 85.  For instance, Senator Proxmire, then-Chairman of the Senate Committee on Banking, Housing and Urban Affairs, explicitly stated during floor debate that, under Sections 521-523, "State chartered institutions are given the benefits of 12 U.S.C. §85 . . . ." 126 Cong. Rec. S6,900 (March 27, 1980). Senators Bumpers and Pryor, who were co-sponsors of S.1988, the bill which served as the genesis for Sections 521-523 of DIDMCA, likewise emphasized that Sections 521-523 were based on Section 85. 125 Cong. Rec. S30,655 (Nov. 1, 1979) (Senators Pryor and Bumpers); 126 Cong. Rec. S6,907 (March 27, 1980) (Senator Bumpers).

At the commencement of hearings before the Senate Banking Committee on S. 1988, Chairman Proxmire stated, "This morning, we take testimony on legislation that will provide competitive equality among all financial institutions with respect to state usury lending limits." Hearings on S. 1988 before the Senate Comm. on Banking, Housing and Urban Affairs, 96th Congress, 1st Sess. (1979) at 1 (hereinafter "Hearings").  Several months later, during Senate

debate, Chairman Proxmire reiterated that the language of Sections 521-523 "seeks to create *a level playing field so that all institutions may compete on the same terms*." 126 Cong. Rec. S6,894 (March 27, 1980) (emphasis added). He added that "Title V also contains a provision [Section 521] which provides parity, or competitive equality, between national banks and State chartered depository institutions on lending limits." 126 Cong. Rec. S6,900 (March 27, 1980). *See also* 126 Cong. Rec. H. 6,966 (March 27, 1980) (Rep. Reuss stated that Sections 521-523 of DIDMCA conferred upon all federally insured institutions the authority "to do what national banks are already permitted.").

Senator Bumpers emphasized at the hearings on S. 1988 that "this is simply a parity bill . . . . It's an equalization bill to put the two banks [national banks and state banks] on equal footings, allow them to compete with each other." (Hearings at 43). Later, during Senate debate on DIDMCA, Senator Bumpers declared once again that "[t]his change in the law allows competitive equity among financial institutions, and reaffirms the principle that institutions offering similar products should be subject to similar rules." 126 Cong. Rec. S6,907 (March 27, 1980).

In the *Greenwood Trust* case, the First Circuit held that "Congress tried to level the playing field between federally chartered and state-chartered banks when it enacted DIDA," and "the language borrowed from Bank Act § 85

10

and incorporated into DIDA § 521 achieves parity between national banks and their state-chartered counterparts."  971 F.2d at 826, 827.

Congress was mindful of federalism concerns, and thus provided in Section 525 of DIDMCA that states could opt out of the preemption provisions in Section 521-523 "with respect to loans made in such State." (94 Stat. 167). Neither Colorado nor any of its amici have cited anything in the legislative history demonstrating that this opt-out right was intended to apply to interstate loans to borrowers in the opt-out state made in *other* states by out-of-state state banks in compliance with their home states' interest rate ceilings.  To the contrary, as discussed above, the driving force for the enactment of DIDMCA was to create parity between national banks and competing state-chartered lending institutions in their same state (*e.g*., the "210 State banks" in Arkansas referred to above by Senator Pryor).  The opt-out right in Section 525 could be exercised if states, as sovereign masters over their own state-chartered lending institutions, wanted to reimpose their usury ceilings *on loans made in their own states by their own state-chartered lending institutions*.

Nothing in the legislative history reflects a Congressional intent to "protect" consumers in an opt-out state from higher interest rates charged to them by out-of-state state-chartered banks on loans they make in their own states in conformity with their own states' usury laws.  Indeed, it is hardly surprising that

11

there is no evidence of such Congressional intent, because state bank interstate credit card lending programs and other interstate consumer lending programs did not take off until *after* the enactment of Section 521 of DIDMCA in 1980, which finally gave state-chartered depository institutions the same interest rate and exportation authority enjoyed by national banks under 12 U.S.C. § 85 and the Supreme Court's 1978 decision in *Marquette*.

Because of the considerable legal uncertainty that existed until the *Marquette* decision about whether national banks could use the interest rates allowed by Section 85 of the National Bank Act in credit card transactions with borrowers in other states, there were very few national banks that engaged in interstate consumer lending at the time that DIDMCA was enacted in 1980. Even fewer state banks engaged in interstate consumer lending before 1980 because they did not obtain the same federal interest rate and exportation authority as national banks until the enactment of DIDMCA.

Even after the *Marquette* opinion was rendered in 1978 and DIDMCA was passed into law in 1980, it still took a few years before state and national banks finally implemented robust interstate consumer lending programs. That delay resulted from the fact that most of the banks desiring to expand their interstate consumer lending programs were then located in states like New York that had relatively low usury ceilings and there were severe restrictions on a bank

chartered in one state being affiliated with a bank chartered in another state.  Those

hurdles were not overcome until 1981 and 1982, when Delaware and South

Dakota, respectively, enacted legislation deregulating their usury laws and

authorizing out-of-state banks to establish affiliated credit card banks in their

states.  63 Del. Laws, ch. 2, § § 2-23 (1981); SL 1982 ch. 336 § 1.  Various other

states then followed suit in ensuing years.

Thus, the legislative history shows that when Congress enacted

Sections 521 and 525 of DIDMCA, it was focused exclusively on local lending - -

loans "made in" the state where the state bank was located, such as the banks

making car loans in Arkansas to which Senator Pryor referred in the quotation

above.  Nothing in the legislative history shows that Congress intended to allow an

opt-out state to exercise control over out-of-state state-chartered banks by limiting

the interest rates they charged on loans they made in their own states and in

conformity with their own states' usury laws to borrowers in the opt-out state.

B.    Adoption of the Argument That a Loan is Made in the State
       Where the Borrower is Located Would Create an Unworkable Morass

Colorado and the FDIC argue that a loan is made not only in the state

where the bank is located and performs its loan-making functions, but also in the

state where the borrower is located when the loan is made.  *See, e.g*., Colorado Br.

at pp. 21, 29, 32, 33; FDIC Br. at p. 14.  As shown by the Plaintiffs-Appellees'

brief, the District Court correctly rejected that argument and properly held that "the

determination of where a loan is 'made' under Section 1831d depends on where the lender performs its loan-making functions, not the borrower's location."  (Op. at pp. 2, 19).

The notion that a loan is made in the state where the borrower is located when credit is extended is legally unfounded and would also create an unworkable morass for state-chartered banks.  Adopting this argument would require state banks (but not national banks) to apply a multitude of varying interest rates to borrowers who travel to opt-out states, and use their credit cards or obtain online loans in those states.  They would have to develop systems to determine where the borrower was located when an advance was requested and approved under a credit card, for example, or where the borrower was located when an online loan was requested and approved/funded.[4]  Interest rates would have to be

---

[4]     It is well settled that a credit card loan is made not when the parties originally enter into the cardholder agreement, but rather when a purchase is made and credit is extended.  Indeed, many credit cardholders never use certain of their credit cards, and there is no enforceable extension of credit until the card is used.  Each credit card transaction constitutes a separate loan contract.  *See, e.g., Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp*., 216 F.3d 388, 394 (4th Cir. 2000) (noting that in credit card financing, the card issuer, "through the provision of an underlying unilateral agreement, makes an offer to finance its customer's purchases of merchandise if the customer uses the card.  Until the customer uses the card, the finance company may cancel its financing offer.  But once a customer uses the card to make a purchase, the finance company becomes obligated to finance that purchase.").  *Accord Garber v. Harris Trust & Savings Bank*, 432 N.E.2d 1309, 1311 (Ill. App. 1982) ("we conclude that …

determined at the transaction level, rather than account level, so a single credit card statement could have many different rate plans.  In the case of an online loan, the borrower might apply for the loan while located in an opt-out state but the loan would be approved and funded later when the borrower is in another state. Although the bank may be able to detect where the borrower is located when the online loan is requested, if it is not instantly funded the bank would typically have no idea where the borrower is located when the loan is approved and provided up to 30 days after the application is received.

How is the bank supposed to know where the borrower is located when the credit card is used for an online transaction? The merchant might be able to detect the cardholder's location, but the bank probably can't. Or when the cardholder engages in a telephone transaction? The merchant might know the area code/prefix of the phone the cardholder is using, but that doesn't inform where the cardholder is located when using a mobile phone.  How about when the bank approves a recurring transaction each month? Neither the merchant nor the bank has any idea where the cardholder is located when this happens.  In the non-revolving context, the bank has up to 30 days to approve a loan application. How

---

a separate contract is created each time the card is used according to the terms of the cardholder agreement at the time of such use").

can the bank know where the borrower is located 30 days after the application is submitted?

These are just a few examples of the morass created by Colorado's legally unfounded approach, which would apply the usury law of any opt-out state where the borrower happens to be located at the time the loan is made.

The resulting patchwork quilt of varying state law interest limits would be inconsistent with the Congressional intent underlying Section 521 of DIDMCA to empower state banks, like their national bank counterparts, to charge the same uniform interest rate to all of their borrowers nationwide, namely, the rate allowed by the laws of their home states or 1% above the Federal Reserve discount rate, whichever is higher.

Highly instructive in this regard is the following passage from the Supreme Court's opinion in *Marquette*:

> The bank's BankAmericard enables its holder "to purchase goods and services from participating merchants and obtain cash advances from participating banks throughout the United States and the world" …Minnesota residents can thus use their Omaha Bank BankAmericards to purchase services in the State of New York or mail-order goods from the State of Michigan. *If the location of the bank were to depend on the whereabouts of each credit card transaction, the meaning of the term "located" would be so stretched as to throw into confusion the complex system of modern interstate banking.*

*Marquette*, 439 U.S. at 312 (emphasis added). Similarly, if a loan is deemed to be "made" in each state where the borrower is located at the time of a credit card transaction, the "complex system of modern interstate banking" would likewise be "throw[n] into confusion." *Id.*

## C. A Reversal Would Result in Less Competition for National Banks Making Loans to Colorado Borrowers

A recurring theme of the briefs filed by Colorado and its amici curiae is that the Opt-Out Legislation was enacted "to protect [Colorado] residents from predatory interest rates." (Colo. Br. at p. 1). But that argument ignores the important fact that national banks will remain unaffected by the Opt-Out Legislation and will still be able to charge Colorado residents whatever interest rates are permitted by the laws of the national banks' home states, which in many states are uncapped. The District Court correctly pointed out as follows:

> The State and the public certainly have an interest in preventing usurious loans to Coloradans. But as the plaintiffs note, even if the State prevails and its asserted scope of the opt-out is found to be valid, it will not be able to prevent national banks from making loans to Coloradans at above-UCCC rates, because the National Bank Act does not contain any opt-out provision with respect to its preemptive federal interest-rate caps. See 12 U.S.C. § 85. So without an injunction, the plaintiffs' member state-chartered banks will be at a disadvantage with respect to national banks, but Colorado consumers will have only marginally more protection from higher interest rates.

(Op. at p. 25).

Colorado law provides that lenders may not charge interest greater than 21% on store-brand credit cards. Colo. Rev. Stat. § 5-2-201(3)(a). For most other loan products – including certain personal installment loans – lenders may not charge in excess of the greater of either (i) 21% *or* (ii) the total of 36% on the portion of the balance that is $1,000 or less, 21% on the portion of the balance that is more than $1,000 but does not exceed $3,000, and 15% on the balance that is more than $3,000. Colo. Rev. Stat. § 5-2-201(2)(a).

It is economically infeasible for lenders to make loans at the foregoing Colorado interest rate limits to marginalized consumers deemed to pose too much of a credit risk. Because of Section 521 of DIDMCA, these consumers have the opportunity to obtain the credit they want and need from out-of-state state banks located in states with higher interest rate limits.[5] As pointed out by the District Court, national banks are unaffected by the Opt-Out Legislation. If the District Court's opinion is reversed, national banks would face less competition in Colorado from state banks and thus would have far greater latitude to charge even higher interest rates and fees to credit-challenged Colorado consumers.

---

[5] The amici's members provide myriad useful, familiar consumer credit products to Colorado borrowers with a broad range of interest rates and fees that conform to their home states' laws and that are far below the "predatory" 199% interest rate invoked by Colorado as justification for the Opt-Out Legislation. (Colo. Br. at pp. 14-15).

D.    No Deference is Owed to the FDIC's Amicus Brief

In its amicus brief, the FDIC has argued that "the location of the borrower determines where the loan is made just as much as the location of the bank."  (FDIC Br. at p. 14). Significantly, the FDIC does not point to *any* prior FDIC regulation, rule, or opinion letter where it has adopted that novel interpretation of Section 525 of DIDMCA, nor could it do so. In fact, as correctly pointed out by Plaintiffs-Appellees, the FDIC's newly-adopted argument set forth in its amicus brief is contrary to its past opinion letters and those issued by other Federal banking agencies as well.  (Pl. Br. at 58-62)

No deference should be given to the FDIC's amicus brief concerning where a loan is made for purposes of Section 525.  Even putting *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), to the side, the Supreme Court, this Court and other appellate courts have repeatedly held that no deference is owed to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988).  *Accord United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("near indifference" is accorded to an agency "interpretation advanced for the first time in a litigation brief"); *E.I. DuPont de Nemours & Co. v. Smiley*, 585 U.S. 1033, 1034 (2018) (Concurrence by Justice Gorsuch, joined by Chief Justice Roberts and Justice Thomas respecting denial of certiorari) (questioning whether

according deference to an agency position expressed for the first time in an amicus brief would "undermine the Administrative Procedure Act's structure by incentivizing agencies to regulate by amicus brief" and noting that "some agencies (including the one before us) have apparently become particularly aggressive in 'attempt[ing] to mold statutory interpretation and establish policy by filing 'friend of the court' briefs in private litigation'""); *Been v. O.K. Indus.*, 495 F.3d 1217, 1227 (10th Cir. 2007) ("we afford the USDA's position as stated in its amicus brief before the Eleventh Circuit little to no deference"); *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1315 (10th Cir. 2005) ("[A]micus briefs … do not reflect the deliberate exercise of interpretive authority that regulations and guidelines demonstrate"); *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 927, 929 (6th Cir. 2014) (declining to accord deference to DOL amicus briefs because "the only indication here that the Agency has adopted this particular interpretation of ERISA is the amicus briefs themselves," and condemning "the Secretary's 'regulation by amicus' in this case.").

It has been 44 years since the enactment of DIDMCA, but the FDIC still has yet to propose a regulation setting forth its view as to where a loan is made for purposes of Section 525. According deference to the FDIC's newly-announced views on that issue in its amicus brief would impermissibly allow the agency "to create *de facto* a new regulation." C*hristensen v. Harris County*, 529 U.S. 576,

588 (2000).  *Accord Christopher v. SmithKline Beecham Corp*., 635 F.3d 383, 395 (9th Cir. 2011), *aff'd*, 567 U.S. 142 (2012) (refusing to defer to agency "interpretations of statutes expressed for the first time in case-by-case amicus filings," because that would "sanction bypassing of the Administrative Procedure Act and notice-and-comment rulemaking").

Yet another reason why the FDIC's amicus brief warrants no deference is that it is *completely inconsistent* with an amicus brief the FDIC filed in the *Greenwood Trust* case in the First Circuit.  The issue in that case was the legality of $10 credit card late fees permitted in Delaware, where credit card issuer Greenwood Trust was located, but disallowed by Massachusetts, where many of its customers resided.[6]  In that brief, the FDIC argued as follows:

> [A]s we noted in the Fourth FDIC Opinion, the right to "opt out" of Section 521, by the express terms of Section 525, "belongs to the State where the loan is made."  *Id*. at p. 55,234. There is no suggestion in this case (i) that Greenwood's extensions of credit to Massachusetts residents are "made" in Massachusetts; or (ii) that Delaware has exercised its right to "opt out" of Section 521. *Accordingly, it does not appear that a Massachusetts "opt out" of Section 521 could have any bearing on this case at all*.  For, as we noted in the Fourth FDIC Opinion:
>
> The fact that a State has countermanded under section 525 should not affect the usury preemption of section 521

---

[6]    The late fees were deemed to be "interest" under Section 521 of DIDMCA.

> for a bank not located in that State, so long as the loan is
> not made in the State that has countermanded.
>
> *Id*. Accordingly, *Section 525 clearly does not confer on
> states that elect to opt out of Section 521 extraterritorial
> authority to apply their own lending laws to loans made
> in other states by banks chartered in other states, merely
> because the borrower happens to be a resident*.

FDIC Amicus Brief, *Greenwood Trust Co. v. Massachusetts*, 1992 WL 12577410,

at \*35-36 (Feb. 27, 1992) (emphasis added).

The FDIC's amicus brief in this case does not even acknowledge its

inconsistent amicus brief in *Greenwood Trust*. The Supreme Court and this Court

have long recognized that "[a]n agency interpretation of a relevant provision which

conflicts with the agency's earlier interpretation is entitled to considerably less

deference than a consistently held agency view." *Efagene v. Holder*, 642 F.3d 918,

922 (10th Cir. 2011), quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30

(1987). *See also Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976) (overturning

an agency guideline that was "not a contemporaneous interpretation of Title VII"

and "flatly contradicts the position which the agency had enunciated at an earlier

date, closer to the enactment of the governing statute.").

## IV.  <u>CONCLUSION</u>

For the reasons set forth above and in the Plaintiffs-Appellees' brief,

Amici Curiae American Bankers Association, the Bank Policy Institute, and

Consumer Bankers Association respectfully submit that the decision by the District

Court should be affirmed.

Respectfully submitted,

Dated:  November 22, 2024

/s/ *Burt M. Rublin*

Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record*

Ronald K. Vaske
vasker@ballardspahr.com
Ballard Spahr, LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
612.371.3215

*Attorneys for Amici Curiae American Bankers Association, the Bank Policy Institute, and Consumer Bankers Association*

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32</u>

This brief complies with type-volume limitation of Fed.R.App.P. 32 because this brief contains 5,462 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

November 22, 2024                          */s/ Burt M. Rublin*
                                           Burt M. Rublin

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

(1)  all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)  if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)  the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, and according to the program are free of viruses.


November 22, 2024                    */s/ Burt M. Rublin*                    
                                     Burt M. Rublin

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2024, I electronically filed a copy of the foregoing Brief of Amici Curiae American Bankers Association, Bank Policy Institute, and Consumer Bankers Association using the CM/ECF system, which will send notification of this filing to all counsel of record.

November 22, 2024                             */s/ Burt M. Rublin*
                                              Burt M. Rublin