NO. 24-1293

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
————————————————————

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS et al.,

*Plaintiffs-Appellees,*

v.

PHILIP J. WEISER and MARTHA FULFORD,

*Defendants-Appellants.*
————————————————————

On Appeal from the United States District Court for the District of Colorado
Case No. 1:24-cv-00812-DDD-KAS
Hon. Daniel D. Domenico, District Judge
————————————————————

**BRIEF OF STATE BANKERS ASSOCIATIONS AS *AMICI CURIAE* IN
SUPPORT OF PLAINTIFFS-APPELLEES AND IN FAVOR OF
AFFIRMANCE**
————————————————————

James Kim (*admission pending*)
Caleb N. Rosenberg (*admission pending*)
Nathan R. Marigoni
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
james.kim@troutman.com
caleb.rosenberg@troutman.com
nathan.marigoni@troutman.com

*Counsel for amici curiae State Bankers Associations*

# **FRAP 26.1 CORPORATE DISCLOSURE STATEMENT**

Each of the State Bankers Associations is a non-profit corporation.  None of the State Bankers Associations has a parent corporation, and no publicly held corporation owns 10% or more of any of the State Bankers Associations' stock.

# TABLE OF CONTENTS

Page

FRAP 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... I

TABLE OF CONTENTS ........................................................................................ I

TABLE OF AUTHORITIES ................................................................................ III

GLOSSARY ......................................................................................................... VI

INTERESTS OF AMICI CURIAE ........................................................................ 1

ARGUMENT ......................................................................................................... 2

I.    Interstate banking developed after DIDMCA, so Congress did not intend Section 525 to allow opt-out states to override another state's interest-rate authority. ................................... 2

   A.    The role of state banks as local lenders before DIDMCA .......... 2

   B.    High inflation in the 1970s and its impact on state banks with lower usury limits. ............................................... 3

   C.    DIDMCA and Section 525 must be placed within this historical context. ....................................................... 5

II.   Regulatory stability and parity between state banks and national banks are critical to maintaining the competitive benefits of the nation's "dual banking" system ........................................... 7

   A.    The dual banking system promotes competition and innovation .................................................................... 9

   B.    The dual banking system increases access to credit. ............... 11

   C.    The dual banking system promotes safety-and-soundness and mitigates systemic risk. ...................................... 12

III.    Colorado's opt-out would disrupt comity among the states and create confusion.................................................................13

CONCLUSION .................................................................15

APPENDIX OF *AMICI* SIGNATORIES ...............................16

CERTIFICATE OF SERVICE ..........................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comptroller of Treasury of Maryland v. Wynne*,
    575 U.S. 542 (2015)...............................................................................13

*Marquette Nat'l Bank of Minn. v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978).................................................................................3

**Statutes**

12 U.S.C. § 85.............................................................................................3

12 U.S.C. § 1813.........................................................................................7

Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994,
    Pub. L. No. 103-328, tit. I, 108 Stat. 2338, 2339 (1994)...................3, 5

**Other Authorities**

California Dept. of Fin. Protection and Innovation, *The Dual
    Chartering System and the Benefits of the State Charter*,
    https://dfpi.ca.gov/regulated-industries/commercial-
    banks/california-state-bank-charter-the-charter-of-choice/the-dual-
    chartering-system-and-the-benefits-of-the-state-charter ...............9, 10

Chernoff, Alan & Jagtiani, Julapa, *The Role of Bank-Fintech
    Partnerships in Creating a More Inclusive Banking System*,
    Federal Reserve Bank of Philadelphia (Sept. 1, 2023),
    https://www.philadelphiafed.org/-/media/frbp/assets/working-
    papers/2023/wp23-21.pdf ...............................................................11

Financial Technology Association, *Comment Letter re: Request for
    Information on Bank-Fintech Arrangements Involving Banking
    Products and Services Distributed to Consumers and Businesses*,
    OCC Docket ID OCC-2024-0014; Fed. Res. Docket No. OP-1836;
    FDIC RIN 3064-ZA43 (Oct. 30, 2024),
    https://www.ftassociation.org/wp-content/uploads/2024/10/FTA-
    Letter-on-Fintech-Bank-Arrangements-RFI.pdf ...............................10

Greenspan, Alan, *Financial Reform and the Importance of a Decentralized Banking Structure*, Annual Convention of the Independent Bankers Association of America (March 22, 1999) .....................12

Hearing Before Senate Committee on Banking, Housing and Urban Affairs, 103 Cong., 2d Sess. (1994) (testimony of Alan Greenspan), https://fraser.stlouisfed.org/title/statements-speeches-alan-greenspan-452/testimony-committee-banking-housing-urban-affairs-united-states-senate-8501/fulltext ...........................................12

Neely, Michelle Clark, Fed. Res. Bank of St. Louis, *Going Interstate: A New Dawn for U.S. Banking* (July 1, 1994) ......................................6

OCC, *National Banks and the Dual Banking System* (Sept. 2003) ........................10

*Perspectives on 150 Years of Dual Banking*,  Conference of State Bank Supervisors (May 22, 2012) (remarks of Esther L. George, President and CEO, Federal Reserve Bank of Kansas City), https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf .............................................................10, 14

*Problems Encountered Under State Usury Laws*, Hearing on S. 3817 Before the Senate Subcomm. on Financial Institutions of the Comm. on Banking, Housing and Urban Affairs, 93 Cong., 2d Sess. (1974) .................................................................................3, 4

Rooney, Kate, *PayPal and Square Quietly Grow Small Business Lending Using Data as their Edge Over Banks*, CNBC (Nov. 16, 2018), https://www.cnbc.com/2018/11/16/paypal-and-other-tech-giants-are-quietly-becoming-lenders-of-choice.html .........................................11

Schroeder, John J., *"Duel" Banking System? State Bank Parity Laws: An Examination of Regulatory Practice*, Constitutional Issues, and Philosophical Questions, 36 Ind. L. Rev. 197 (2003)...........................................9

Sykes, Jay B., Cong. Rsch. Serv., *Banking Law: An Overview of Federal Preemption in the Dual Banking System*, R45081 (Jan. 23, 2018) ........................................................................................3

*Usury Lending Limits*, Hearings on S. 1988 Before Senate Committee on Banking, Housing, and Urban Affairs, 96th Cong., 1st Sess. (1979)...........................................................................................4, 5

Wash. State Dept. of Fin. Insts., *Dual Charter and Benefits of State Charter*, https://dfi.wa.gov/credit-unions/dual-charter....................................9, 13

## **GLOSSARY**

| | |
|---|---|
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) |
| OCC | Office of the Comptroller of the Currency |
| Section 525 | DIDMCA, § 525, 94 Stat. 167 (1980) |

## <u>INTERESTS OF AMICI CURIAE[1]</u>

The mission of the undersigned State Bankers Associations is to help provide their member institutions and their communities with a safe and viable financial services industry.  The State Bankers Associations represent the collective interests of their member institutions, who are federally-insured, state-chartered financial institutions.  We believe the United States has the strongest and most innovative banking system in the world, in large part because banks have the choice to be chartered by state governments or the federal government.  To achieve financial well-being for all, especially in the communities we serve, we support the delivery of responsible financial products and the fostering of healthy financial habits.  We serve to protect, preserve, and promote an environment in which banks, and the associations that represent them, continue to thrive.  The State Bankers Associations represent these interests through legislative efforts and, as here, as *amici curiae* in litigation important to the industry.

A full list of all *amici curia* is set forth in the Appendix of Amici Signatories.

---

[1] In accordance with Rule 29 of the Federal Rules of Appellate Procedure, all parties have consented to the filing of this brief.  No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person—other than the amici curiae or their members—contributed money that was intended to fund preparing or submitting the brief.

# ARGUMENT

**I.   Interstate banking developed after DIDMCA, so Congress did not intend Section 525 to allow opt-out states to override another state's interest-rate authority.**

History belies Defendants-Appellants' claim that Colorado's expansive opt-out restores a *status quo ante* permitting Colorado to reach into other states and override their interest-rate authorities.  [Defendants-Appellants' Opening Brief, ECF 41 (hereinafter "CO Brief") at 9, 39–40].  Congress passed DIDMCA in 1980.  State-chartered banks, at that time, operated almost exclusively within their home states.  As a result, reverting to state banking activity as it existed before DIDMCA means intrastate (*i.e.*, local) lending where an opt-out state enforces its interest-rate limits only on loans made by banks physically located within the opt-out state.

**A.   The role of state banks as local lenders before DIDMCA.**

Modern state-chartered banks have a wide variety of business models, ranging from offering deposit accounts and loans in their local communities through brick-and-mortar locations to multi-state, online operations.  It is therefore easy to assume that state banking has always resembled current times.  However, in the 1970s, when Congress drafted DIDMCA and its predecessor bills, state banks focused on operating within their home states for a number of reasons.  First, the internet and digital banking was decades away.  Second, for much of our history, banks were

allowed to operate only as "unit banks" with only one location.[2]  Moreover, banks were generally prohibited from opening branches outside their home state until 1994.[3]  In a pre-internet world, this prohibition meant most banks did not lend to borrowers outside their home state.  Third, state-chartered banks faced macroeconomic challenges and needed assistance to attain parity with national banks.[4]

B.    High inflation in the 1970s and its impact on state banks with lower usury limits.

The country suffered through successive periods of high inflation throughout much of the 1970s.  When the Federal Reserve responded by hiking interest rates, it adversely impacted the cost of funds for banks.  In 1974, for example, the federal funds rate and the interest rates for certificates of deposit offered by larger banks increased to 12% and higher.[5]  That 12% rate was two percentage points *higher* than

---

[2] Sykes, Jay B., Cong. Rsch. Serv., *Banking Law: An Overview of Federal Preemption in the Dual Banking System*, R45081 at 9 (Jan. 23, 2018).

[3] *Id.* at 10; *see* Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, tit. I, 108 Stat. 2338, 2339 (1994).

[4] Under the National Bank Act, national banks had federal authority to charge interest at the higher of either the rate allowed by the laws of the state where the bank is located or at 1% higher than the federal discount rate.  12 U.S.C. § 85.  In 1978, the Supreme Court confirmed that "located" in Section 85 refers to where the bank is chartered or where the bank actually performed its key loan-making functions.  *See Marquette Nat'l Bank of Minn. v. First of Omaha Serv. Corp.,* 439 U.S. 299, 311–12 (1978).

[5] *Problems Encountered Under State Usury Laws*, Hearing on S. 3817 Before the Senate Subcomm. on Financial Institutions of the Comm. on Banking, Housing and Urban Affairs at 17, 93 Cong., 2d Sess. (1974) (statement of Jeffrey M. Bucher,

the usury limits in Tennessee, Arkansas, and Montana.[6]  Naturally, many banks were unwilling to pay interest rates for deposits higher than they could charge on loans, so many banks capped the interest rates they paid to depositors.[7]  Some people responded by moving their deposits to banks in neighboring states, causing an outflow of funds from banks in states with relatively low usury limits.[8]  As a result, banks in lower-usury-limit states had less funding to make loans and credit availability decreased significantly in those states.

The harmful effects of high inflation and high interest rates were particularly acute for state-chartered banks.  State banks operated locally and many served rural areas where the bank was sometimes the only financial institution.[9]  Because state banks were closely connected with their local communities (rather than geographically diversified), the fate of state banks and the local economies they

---

Member, Bd. of Governors of the Fed. Res. Sys.); *see also id.* at 29–31 (statement of Adrian O. McLellan, President, First Nat'l Bank, Great Falls, Mont.).

[6] *Id.*

[7] *Problems Encountered Under State Usury Laws*, Hearing on S. 3817 Before the Senate Subcomm. on Financial Institutions. of the Comm. on Banking, Housing and Urban Affairs at 29–31, 93 Cong., 2d Sess. (1974) (statement of Adrian O. McLellan, President, First Nat'l Bank, Great Falls, Mont.) (providing examples of individual banks seeing outflows of $6 million and $18 million in deposits, when the largest bank in the state had only $140 million in deposits).

[8] *Id*.

[9] *See e.g.*, *Usury Lending Limits*, Hearings on S. 1988 Before Senate Committee on Banking, Housing, and Urban Affairs at 7, 96th Cong., 1st Sess. (1979) (statement of Arkansas State Senator Hendrix).

served were intertwined.  These interest rate shocks to state banks severely harmed their communities.

C.    DIDMCA and Section 525 must be placed within this historical context.

Passed during the highest-ever peacetime inflation, DIDMCA and the opt-out provided in Section 525 must be assessed within their historical context.  In response to the challenges confronting state banks, who were confined inside their state boundaries, Congress enacted DIDMCA to level the playing field between national banks and state-chartered banks by giving state banks the ability to charge the same interest rates as national banks under the National Bank Act.[10]  DIDMCA therefore gave state banks the legal foundation to compete with national banks and expand their activities across state borders.  However, it took another two decades for state-chartered banks to meaningfully compete with their national-bank peers, primarily through opening branches in other states.

Interstate banking did not flourish until fourteen years after DIDMCA with the passage of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 ("Riegle-Neal").  Riegle-Neal removed many of the restrictions preventing

---

[10] In his opening statement during a Senate hearing, Senator Proxmire, then-Chairman of the Senate Committee on Banking, Housing and Urban Affairs stated that "borrowers are hurt, not helped, by unrealistic lending limits and also homebuilding, small business, or agricultural purposes, if they are limited to rates below the market rate."  *Id.* at 1.

banks from branching across state lines and created uniform branching and interstate acquisition rules for the entire country.[11]  Riegle-Neal therefore created the first comprehensive regulatory scheme for interstate branching.[12]  The promotion of interstate branching was intended to help state banks compete with national banks, and to improve the safety-and-soundness of the nation's banking system by increasing geographic diversification, which would mitigate the negative effects of localized economic downturns on state banks.[13]  In sum, interstate banking for state-chartered banks, including interstate consumer lending, developed slowly after DIDMCA, and only expanded into the system we know today following the enactment of Riegle-Neal.

This historical context is significant because it demonstrates that interstate lending by state banks developed many years *after* DIDMCA.  Consequently, it is

---

[11] The branching restrictions were largely the result of the McFadden Act in 1927, which effectively permitted states to forbid interstate branching. Riegle-Neal replaced those restrictions with inter-state branching authority.

[12] *See* Neely, Michelle Clark, Fed. Res. Bank of St. Louis, *Going Interstate: A New Dawn for U.S. Banking* (July 1, 1994).

[13] *See e.g.*, *id.* (discussing that "[m]any of the loan problems suffered by banks in the Southwest in the mid-1980s and in new England in the early 1990s could have been mitigated had these banks had profitable loans in other parts of the country when their regional economies took a nose dive.  Local communities could benefit because geographic diversification should make banks financially stronger and better able to withstand loan losses that could deplete capital and curtail lending activities or, in a worst-case scenario, lead to a failure, which would reduce the banking options in a community").

simply false that Congress envisioned Colorado's expansive interpretation of the opt-out because interstate banking by state banks was essentially non-existent when DIDMCA was passed. Instead, DIDMCA's legislative history cited by Defendants-Appellants discussing a state's ability to "reestablish" its usury limits through Section 525 must be viewed in the appropriate context. [CO Brief at 48]. In 1980, a state enforcing its usury limit could only mean capping interest rates on loans made by banks *operating within its borders*. Congress never contemplated—much less intended—allowing opt-out states to interfere with banking activities regulated by another state. Put another way, the so-called *status quo* before DIDMCA did *not* permit a state to cross borders and restrict loans originated (*i.e.*, made) by banks located in other states.

## II. Regulatory stability and parity between state banks and national banks are critical to maintaining the competitive benefits of the nation's "dual banking" system.

Our banking system mirrors the nation's overall federalist system, spreading power between the federal government and the states. Banks can have national charters or state charters. While national banks are exclusively regulated by a federal banking agency, state-chartered banks are regulated by a federal-banking agency and a state-banking agency where they are chartered.[14] This "dual banking" system provides significant benefits by promoting competition and innovation while also

---

[14] 12 U.S.C. § 1813(q).

reducing systemic risk by spreading it across a broader spectrum of national and state banks.

Colorado's opt-out threatens the sustainability of the dual banking system, because it would disrupt the well-established balance between federal and state laws, including the precedent that loans made by state banks are governed by the bank's home state's interest laws. Defendants-Appellants' misguided interpretation of Section 525 would allow Colorado to extend the opt-out beyond its borders, override another state's laws, and restrict loans made by banks located outside of Colorado. Moreover, if successful, Colorado's interpretation of the opt-out would encourage additional states to enact expansive opt-outs. For example, opt-out legislation has already been introduced in Washington, D.C. and Rhode Island, and a ballot initiative has been proposed in Nevada. *See* Protecting Affordable Loans Amendment Act, B25-0609, D.C. Council, 25th Council (2023–24); House Bill 7941, Rhode Island Gen. Assemb., Jan. Sess. (2024); Senate Bill 2275, Rhode Island Gen. Assemb., Jan. Sess. (2024); Bill 250609; R.I. HB 7941 & SB 22275; Initiative S-01-2024 (Nev. 2024). A critical mass of opt-outs similar to Colorado's would diminish the utility of state bank charters and incentivize banks to switch to national charters, thereby undermining the nation's dual banking system.

A.     <u>The dual banking system promotes competition and innovation.</u>

State-chartered banks continue to play an important role in the banking system and the economy, as they did before DIDMCA, by increasing innovation, expanding availability of credit, and reducing systemic risk.  The competitive nature of the dual banking system "prompt[s] individual states to be responsive to the needs of their constituent bankers and citizens, thereby resulting in new products and powers,"[15] while appropriately regulating these activities.[16]

---

[15]  California Dept. of Fin. Protection and Innovation, *The Dual Chartering System and the Benefits of the State Charter*, https://dfpi.ca.gov/regulated-industries/commercial-banks/california-state-bank-charter-the-charter-of-choice/the-dual-chartering-system-and-the-benefits-of-the-state-charter/      (last visited Nov. 21, 2024); *see also* Wash. State Dept. of Fin. Insts., *Dual Charter and Benefits of State Charter*, https://dfi.wa.gov/credit-unions/dual-charter (last visited Nov. 21, 2024).

[16]  *See* OCC, National Banks and the Dual Banking System, at 10 (Sept. 2003) ("Commentators and state bank supervisors rightly assert, for example, that a separate system of state banks allows the states to serve as laboratories for innovation and change, not only in bank powers and structures, but also in the area of consumer protection." (internal quotation marks and citation omitted)); Schroeder, John J., *"Duel" Banking System? State Bank Parity Laws: An Examination of Regulatory Practice, Constitutional Issues, and Philosophical Questions*, 36 Ind. L. Rev. 197, 201 (2003) ("Historically, the existence of the dual system has provided for innovation in products and services in the industry.  The competitive nature of the dual banking system has prompted individual states to be responsive to the needs of their constituent bankers, thereby resulting in new products and powers.  When these responsive innovations are multiplied by the fifty state chartering authorities, the result actually belies the 'dual' banking system name and creates numerous opportunities for experimentation").

Historically, examples of innovations attributed to state banks include branching, checking accounts, deposit insurance, trust services, home-equity loans, variable-rate mortgages, and interest-bearing transaction accounts.[17] More recently, state banks have improved access to and the quality of services for millions of consumers and small businesses by partnering with financial-technology companies (fintechs) and other service providers to offer new products, typically through the internet and mobile applications.[18]

---

[17] California Dept. of Fin. Protection and Innovation, *The Dual Chartering System and the Benefits of the State Charter*, https://dfpi.ca.gov/regulated-industries/commercial-banks/california-state-bank-charter-the-charter-of-choice/the-dual-chartering-system-and-the-benefits-of-the-state-charter/ (last visited Nov. 11, 2024)*; see also Perspectives on 150 Years of Dual Banking*, Conference of State Bank Supervisors (May 22, 2012) (remarks of Esther L. George, President and CEO, Federal Reserve Bank of Kansas City), https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf ("[A] number of innovations resulted from changes in state banking laws. Most notably, we've seen the development of NOW accounts, adjustable rate mortgages, home equity loans, and interstate banking through the use of regional compacts and nationwide entry laws prior to the eventual passage of national interstate banking."); Schroeder, 36 Ind. L. Rev. 197, 201–02.

[18] *See* Financial Technology Association, *Comment Letter re: Request for Information on Bank-Fintech Arrangements Involving Banking Products and Services Distributed to Consumers and Businesses* [hereinafter "FTA Comment Letter"] at 1, OCC Docket ID OCC-2024-0014; Fed. Res. Docket No. OP-1836; FDIC RIN 3064-ZA43 (Oct. 30, 2024), https://www.ftassociation.org/wp-content/uploads/2024/10/FTA-Letter-on-Fintech-Bank-Arrangements-RFI.pdf.

B.    <u>The dual banking system increases access to credit.</u>

The dual banking system also increases access to credit for consumers and small businesses that have been underserved by larger financial institutions.[19] Traditional lending has relied on physical branch locations and underwriting based on credit scores.  That approach limits access to credit for people living in "banking deserts," people with no or thin credit files, and start-up businesses with limited track records.[20]  The dual banking system allows a more diverse array of banks to offer products and services for underserved populations, who sometimes have higher risk profiles, necessitating higher-cost products.[21]  Although some national banks partner with fintechs, many smaller banks and community banks who partner with fintechs are "responsible for filling gaps in credit markets for underserved consumers and small businesses, reducing or eliminating overdraft fees through greater competition, and reducing friction, time and cost—while enhancing access—to payments services."[22]

---

[19]    *See, e.g.,* Rooney, Kate, *PayPal and Square Quietly Grow Small Business Lending Using Data as their Edge Over Banks*, CNBC (Nov. 16, 2018), https://www.cnbc.com/2018/11/16/paypal-and-other-tech-giants-are-quietly-becoming-lenders-of-choice.html (explaining how tech companies have begun making small business loans that banks are hesitant to make).

[20]    *See* FTA Comment Letter at 3-4.

[21]    *Id.*

[22]    *Id.* at 1-2; *see also* Chernoff, Alan & Jagtiani, Julapa, *The Role of Bank-Fintech Partnerships in Creating a More Inclusive Banking System*, Federal Reserve Bank of Philadelphia (Sept. 1, 2023), https://www.philadelphiafed.org/-

C.    The dual banking system promotes safety-and-soundness and
      mitigates systemic risk.

The dual banking system offers diversity in regulatory approaches, which

mitigates systemic risk and promotes the safety-and-soundness of the banking

system.[23]  Federal Reserve Chairman Alan Greenspan highlighted the importance of

the dual banking system in a March 1994 statement:

> [a] single regulator without the responsibility for the economic
> consequences of its actions would inevitably result in a regulatory
> stance with a long-term bias against risk taking—and, hence, economic
> growth—and with likely shorter-run policy shifts between excess laxity
> and restraint.  Any single regulator, even if it were the Federal Reserve,
> would also have a bias toward arbitrary actions and would eliminate the
> beneficial diversity and pluralism of our dual banking system.[24]

State regulators also recognize the benefits of regulatory diversity.   The Washington

State Department of Financial Institutions notes that:

---

/media/frbp/assets/working-papers/2023/wp23-21.pdf (exploring data related to
bank-fintech partnerships, including partnerships with national banks, and
concluding banks are more likely to offer credit cards and personal loans to "credit
invisible" and "below-prime" consumers after engaging with fintech partners and
that "partnerships between traditional banks and fintech firms have the potential to
move us closer to a more inclusive financial system").

[23]   Greenspan, Alan, *Financial Reform and the Importance of a Decentralized
Banking Structure*, Annual Convention of the Independent Bankers Association of
America (March 22, 1999) (providing specific historical examples of state bank
innovations).

[24] Hearing Before Senate Committee on Banking, Housing and Urban Affairs, 103
Cong.,    2d    Sess.    (1994)    (testimony    of    Alan    Greenspan),
https://fraser.stlouisfed.org/title/statements-speeches-alan-greenspan-
452/testimony-committee-banking-housing-urban-affairs-united-states-senate-
8501/fulltext (last visited Nov. 21, 2024).

[S]tate regulators are made aware of troubling practices, trends, or warning signs before the federal regulators can identify these emerging issues. State regulators and legislatures then respond quickly, which enables federal regulators and Congress to learn from the state experience to develop uniform and nationwide standards or best practices.[25]

When enacting DIDMCA, Congress deliberately maintained parity between state and national banks to promote the competitive benefits of the dual banking system. In the years since, the dual banking system has continued to provide significant benefits to the country, as intended. But Colorado's misguided interpretation of DIDMCA places those benefits at risk by disrupting the dual banking system and undermining Congress' intent to maintain a competitive balance between national banks and state banks.

## III.    Colorado's opt-out would disrupt comity among the states and create confusion.

Comity between the states is a well-established, bedrock principle of our federalist system.[26] In the context of interstate banking by state banks, states have respected each state's authority over their home-state banks, including supervising

---

[25]    Wash. Dept. of Fin. Insts., *Dual Charter and Benefits of State Charter*, https://dfi.wa.gov/credit-unions/dual-charter (last visited Nov. 11, 2024).

[26]    *See e.g.*, *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015) ("By prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval, [the dormant Commerce Clause] strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce").

a bank's cross-border activities.  A state retains regulatory authority over the interstate activities of banks it charters because the home-state regulator is uniquely positioned to have the greatest access to and familiarity with those banks.[27]  If, for example, there is a potential safety-and-soundness concern with a state bank, the home-state regulator would investigate and take appropriate action based on home-state law, regardless of where the activity occurred.

Colorado's interpretation of the DIDMCA opt-out threatens to disrupt this regulatory balance and interfere with each state's authority to regulate its own state-chartered banks engaging in lending with Colorado borrowers.  If permitted, other states may follow Colorado's approach, creating a patchwork of concurrent state laws governing loans to Colorado borrowers made by state banks located outside of Colorado.  For example, under Defendants-Appellants' interpretation of where a loan is made, if a consumer has a credit card issued by a bank located in Delaware and uses the credit card in Colorado, Montana, and New Jersey, the credit transactions would be governed by a combination Delaware-Colorado, Delaware-

---

[27]  George, *supra* Note 17 ("[The dual banking system] has allowed local bankers, state supervisors and state governments to construct a banking system closely attuned to the economic needs of each state and supervised by personnel with a strong knowledge of the structure and condition of the local economy. State legislatures and supervisors have a long history of adopting their own set of prudential laws and regulations, consumer protection statutes, and bank chartering and expansion laws—all of which generally reflect the needs of each state.").

Montana, and Delaware-New Jersey laws, respectively. That outcome is illogical and inconsistent with the plain language and legislative intent of DIDMCA, which sought to prevent discrimination against state-chartered banks by giving them the same interest-rate authority as national banks, while preserving a state's ability to reassert its usury limit for loans made by banks chartered by and located within the opt-out state.

## CONCLUSION

For the reasons set forth above, the *amici curiae* State Bankers Associations respectfully submit that this Court should affirm the District Court's decision to grant a preliminary injunction against the Defendants-Appellants.

Dated: November 22, 2024                    Respectfully submitted,

                                                    s/ Nathan R. Marigoni
                                                    James Kim
                                                    Caleb N. Rosenberg
                                                    Nathan R. Marigoni
                                                    TROUTMAN PEPPER HAMILTON
                                                    SANDERS LLP

                                                    *Counsel for Amici Curiae State*
                                                    *Bankers Associations*

15

## APPENDIX OF *AMICI* SIGNATORIES

Alabama Bankers Association
Alaska Bankers Association
Arizona Bankers Association
Arkansas Bankers Association
California Bankers Association
Colorado Bankers Association
Connecticut Bankers Association
Delaware Bankers Association
Florida Bankers Association
Georgia Bankers Association
Hawaii Bankers Association
Idaho Bankers Association
Illinois Bankers Association
Indiana Bankers Association
Iowa Bankers Association
Kansas Bankers Association
Kentucky Bankers Association
Louisiana Bankers Association
Maine Bankers Association
Massachusetts Bankers Association
Michigan Bankers Association
Mid-Atlantic Bankers Association
(d/b/a/ D.C. Bankers Association,
Maryland Bankers Association, and
Virginia Bankers Association)
Minnesota Bankers Association

Mississippi Bankers Association
Missouri Bankers Association
Montana Bankers Association
Nebraska Bankers Association
New Hampshire Bankers Association
New Jersey Bankers Association
New Mexico Bankers Association
New York Bankers Association
Nevada Bankers Association
North Carolina Bankers Association
North Dakota Bankers Association
Ohio Bankers League
Oklahoma Bankers Association
Oregon Bankers Association
Pennsylvania Bankers Association
Rhode Island Bankers Association
South Carolina Bankers Association
South Dakota Bankers Association
Tennessee Bankers Association
Texas Bankers Association
Utah Bankers Association
Vermont Bankers Association
Washington Bankers Association
West Virginia Bankers Association
Wisconsin Bankers Association
Wyoming Bankers Association

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2024, I caused the foregoing document to be filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filings to the counsel of record in this matter who are registered on the CM/ECF system.

Dated:  November 22, 2024          */s/ Nathan R. Marigoni*

17