**24-1293**

_____

In the United States Court of Appeals
for the Tenth Circuit

_____

National Association of Industrial Bankers, et al.,

*Plaintiffs-Appellees*

v.

Philip J. Weiser, Attorney General of the State of Colorado, et al.

*Defendants-Appellants.*

_____

On appeal from an order granting motion for preliminary injunction
in the United States District Court for the District of Colorado,
Civil Case No. 1:24-cv-812-DDD-KAS, Judge Daniel D. Domenico, presiding

_____

**Amicus Brief of the State of Utah and Eleven Other States in
Support of Appellees and Affirmance**

_____

Sean D. Reyes
Utah Attorney General
Stanford Purser
Utah Solicitor General
Steve Geary
Assistant Utah Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114-0858
(801) 366-0100

*Counsel for Amicus States in
Support of Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................I

TABLE OF AUTHORITIES .........................................................................II

AMICI'S AUTHORITY AND INTEREST ...................................................... 1

ARGUMENT ............................................................................................. 2

    I.     Colorado Interferes with the Competitive Equality of State- and Federally-Chartered Institutions and Preserving the Advantages of the Dual Banking System..................................... 4

    II.    Colorado Interferes with States' Ability to Protect the Interests of Shareholders, Members, Depositors, and Customers of State-Chartered Institutions.................................. 7

CONCLUSION .......................................................................................... 9

ADDITIONAL COUNSEL ......................................................................... 11

# TABLE OF AUTHORITIES

**Cases**

*Cantero v. Bank of Am., N.A.,*
  602 U.S. 205 (2024) ........................................................... 2

*FDIC ex rel. Co-op. Bank v. Rippy,*
  799 F.3d 301 (2015) ........................................................... 7

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
  439 U.S. 299 (1978) ........................................................ 4, 6

**Statutes**

12 U.S.C. § 1817(a)(3) ........................................................... 7

12 U.S.C. § 1831d(a) ............................................................. 4

12 U.S.C. § 1831o(h)(3) .......................................................... 8

12 U.S.C. § 35 .................................................................... 5

12 U.S.C. § 484 ............................................................. 2, 4, 5

Ala. Code § 5-5A-18.1 ........................................................... 3

Colo. Rev. Stat. § 5-13-106 ................................................... 4, 8

Ga. Code § 7-1-3(a)(6) ........................................................... 3

Ga. Code § 7-1-628(c)(2) ......................................................... 3

La. Stat. § 6:121.B(1) ........................................................... 3

La. Stat. § 6:5 ................................................................... 3

Neb. Rev. Stat. § 8-1,140 ........................................................ 3

Ohio Rev. Code § 1101.02 ......................................................... 4

Utah Code, Title 7 ............................................................... 2

Utah Code § 7-1-102(1) ........................................................... 3

Utah Code § 7-1-314 .............................................................. 7

Utah Code § 7-1-323(3) ........................................................... 3

Utah Code § 7-3-25 ............................................................... 7

Utah Code § 7-8-15 ............................................................... 7

Utah Code § 7-9-29 ............................................................... 7

Wyo. Stat. §13-1-603(c)(vi) ...................................................... 4

**Rules**

Fed. R. App. P. 29(a)(2)........................................................................ 1

**Secondary Sources**

2024 Report of the Commissioner of Financial Institutions, State of Utah, (UDFI Annual Report), https://dfi.utah.gov/wp-content/uploads/sites/29/2024/10/Annual.pdf ........................................ 3, 5, 7

Gillian G.H. Garcia, *Failing Prompt Corrective Action*, 11 J. Banking Regul. 171, 180 (2010)............................................................ 8

A<span style="font-variant:small-caps">MICI</span>'<span style="font-variant:small-caps">S</span> A<span style="font-variant:small-caps">UTHORITY AND</span> I<span style="font-variant:small-caps">NTEREST</span>

Amici states of Utah, Alabama, Georgia, Louisiana, Mississippi, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, and Wyoming (Amici States) are all entities listed in the first sentence of Federal Rule of Appellate Procedure 29(a)(2) and are thus authorized to file an amicus brief without the consent of the parties or leave of court. Fed. R. App. P. 29(a)(2).

The financial services industries of these amici states constitute a significant segment of their economies. In Utah, for example, this industry is a leading economic sector, employing about 10% of the working population (almost 200,000 Utah residents) in high-wage jobs. Since the 1980 passage of the Depository Institutions Deregulation and Monetary Control Act (DIDMCA), financial institutions in the Amici States make loans to businesses and consumers not only within these states but nationally, including in Colorado. State-registered institutions are regulated by state legislatures and the appropriate regulatory agencies—the Utah Department of Financial Institution (UDFI) in Utah, for example.

The Amici States support Plaintiffs-Appellees' preliminary injunction because, as correctly noted by the district court, Colorado exceeded its authority contrary to federal law when opting out of DIDMCA by seeking to redefine the definition of where a loan is "made." Colorado's attempt to

interfere in the regulation of state-registered financial institutions in Amici States impairs these states' ability to regulate and manage a significant sector of their economies.

Amici States will not repeat the Appellees' merits arguments. This amicus brief focuses on the ways in which the enjoined Colorado law adversely affects these states, both by incentivizing state-chartered institutions to become federally-chartered, and by impairing regulatory agencies such as UDFI from making accurate examinations of the financial health of these institutions.

ARGUMENT

There is no dispute on the general structure of the U.S. banking system. The United States enjoys a dual banking system, consisting of federally-chartered institutions that are regulated on a federal level and state-chartered institutions that are regulated by their respective states. *See Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209-10 (2024). Federally-chartered financial institutions are regulated by the Office of the Comptroller of the Currency and are not subject to regulation by state entities. *See* 12 U.S.C. § 484. State-chartered banks are regulated by the respective states.

Using Utah as one example, state-chartered institutions are governed by the Financial Institutions Act and are overseen by UDFI. *See* Utah Code, Title 7. Where state-chartered institutions open branches in another state,

state agencies wherever the branches are located cooperate with each other and the FDIC in the regulation and examination of those institutions. *See, e.g.,* Utah Code § 7-1-323(3) (authorizing UDFI to coordinate with agencies of other states or the federal government in the regulation of interstate operations).

UDFI oversees 19 state-chartered banks, 24 credit unions, and 15 industrial banks, with over $400 billion in assets. *See* 2024 Report of the Commissioner of Financial Institutions, State of Utah, (UDFI Annual Report) at 18, 22-23, 52-53, 88.[1] Utah is also home to 6 national banks, 32 national credit unions, and 1 national savings and loan association, with total assets of almost $700 billion. *Id.* at 19, 24, 54-56, 100. Seventeen out-of-state financial institutions—some federal, some state-chartered—maintain branches in Utah. *Id.* at 25-26, 100.

Utah law specifically provides it is in the interest of citizens of Utah to (1) preserve the competitive equality of state- and federally-chartered institutions; (2) preserve the advantages of the dual banking system; and (3) protect the interests of shareholders, members, depositors, and customers in financial institutions operating in Utah. Utah Code § 7-1-102(1). Other amici states joining this brief have similar provisions. *See* Ala. Code § 5-5A-18.1;

---

[1] At https://dfi.utah.gov/wp-content/uploads/sites/29/2024/10/Annual.pdf

Ga. Code §§ 7-1-3(a)(6), -1-628(c)(2); La. Stat. §§ 6:5, 6:121.B(1); Neb. Rev.
Stat. § 8-1,140; Ohio Rev. Code § 1101.02; Wyo. Stat. §13-1-603(c)(vi). The
Colorado law enjoined by the district court—Colorado Revised Statute § 5-13-
106—interferes with each of these objectives.

## I.  Colorado Interferes with the Competitive Equality of State- and Federally-Chartered Institutions and Preserving the Advantages of the Dual Banking System.

In 1978, the Supreme Court held that federal institutions could export
their home-state interest rates. *Marquette Nat'l Bank v. First of Omaha Serv.
Corp.*, 439 U.S. 299, 311-12 (1978). Congress responded in 1980 with the
passage of DIDMCA to extend the same opportunity to state-chartered
institutions. *See* 12 U.S.C. § 1831d(a). The purpose of this provision is
expressly, "to prevent discrimination against State-chartered insured
depository institutions." *Id.* Since then, state and federal financial
institutions have enjoyed an equal playing field, both being able to lend
nationally at the same rates determined by federal law and the state in
which the institution is located.

Colorado law now discriminates against state-chartered institutions
and upsets the balance Congress sought to protect. That's because federally-
chartered financial institutions are unaffected by the law. *See* 12 U.S.C.
§ 484; *Marquette*, 439 U.S. at 301. So federal lenders continue to lend to
Colorado consumers at whatever rate is permitted by the lender's home state

and federal law, regardless of Colorado law. But state-chartered institutions cannot. This overt discrimination squarely violates the intent of DIDMCA.

It's also wrong for Appellants and their amici to claim this discriminatory Colorado law protects Colorado consumers in any way. *See* Aplt. Br. at 14. The only thing the Colorado law accomplishes is eliminating competition from state-chartered institutions.

This discrimination against state-chartered institutions also adversely affects Utah and other Amici States by creating pressure on state-chartered institutions to convert to a federal charter to continue to compete in the Colorado market. Conversion is relatively easy, with no structural barriers for a healthy institution, requiring little more than a vote of the shareholders and approval by the OCC. *See* 12 U.S.C. § 35. And once an institution is federally-chartered, it is no longer subject to state regulation. 12 U.S.C. § 484. Already, almost two-thirds of Utah's financial institution assets are federally-controlled, not state-controlled. UDFI Annual Report at 19 (table showing division of total assets between state and national institutions).

Reversing the judgment below and allowing the Colorado law to take effect will increase and accelerate this federal-state disparity in Utah and elsewhere. Multiply this effect by other states that may adopt the Colorado model if this Court reverses, and the number of state-chartered institutions will likely become trivial. There will no longer be a dual banking system in

the U.S. in any meaningful sense, and the states will have lost control of the financial sector of their economies to the federal government.

That end-game serves no one. It certainly harms these Amici States and also injures the amici states supporting reversal. The bad results will occur in Colorado, too, as other states adopt the Colorado model, creating the same incentive for Colorado's state-chartered institutions.

And there is no benefit to the consumer, either in Colorado or elsewhere. *Marquette* highlights why strategies like Colorado's do not work. Marquette Bank—coincidentally also a national bank—the Minnesota-based bank bringing suit in that case, was part of the same credit card program as the Nebraska bank it was suing. 439 U.S. at 303-04. But the Minnesota bank could not compete for customers, because the interest rate it was allowed to charge was capped by Minnesota law. *Id.* at 304. To make up the difference in costs, the Minnesota bank had to charge a $10 annual fee for use of its credit cards. *Id.* Customers voted with their feet, moving to the Nebraska bank. *See id.*

*Marquette* shows that the consumer finance market is a national one. There is vigorous competition among venders, so the cost of funds is determined by a national market. If a financial institution cannot cover its costs of lending through an appropriate interest rate, it must cover them some other way, such as the fees used by Marquette Bank, or not take that

business at all. But the consumers will pay the same costs of borrowing regardless. Consumers' incentive to borrow is unchanged, so national institutions will move into whatever opportunities are vacated by state institutions.

## II.   Colorado Interferes with States' Ability to Protect the Interests of Shareholders, Members, Depositors, and Customers of State-Chartered Institutions.

In addition to the threat posed to the dual banking system, the Colorado statute, if upheld, threatens the ability of Utah and other states to oversee the financial health of state-chartered institutions. Both the FDIC and the relevant state authority (UDFI in Utah) regularly review the financial well-being of all state-chartered and FDIC-insured institutions. 12 U.S.C. § 1817(a)(3); Utah Code § 7-1-314; *see, .e.g., FDIC ex rel. Co-op. Bank v. Rippy*, 799 F.3d 301, 307-08 (2015) (discussing annual examinations). Most of UDFI's staff consists of examiners and senior examiners, who conduct these reviews. *See* UDFI Annual Report at 13.

These examinations include a review of the loan portfolios. Financial institutions are required by both regulation and good banking practice to maintain an allowance for losses in their loan portfolios. *See, e.g.,* Utah Code §§ 7-3-25, -8-15, -9-29; UDFI Annual Report at 31-39, 41-49, 65-74, 76-85, 90-92, 94-96, 102, 104-05 (noting "Allowance for Losses" on "Loan and Lease Financing Receivables" or "Total Loans").  And an understatement of

potential loan losses can result in a capital crisis for the institution, leading to insolvency and receivership in a worst-case scenario. *See* 12 U.S.C. § 1831o(h)(3).

Moreover, troubled institutions often seek to conceal their condition by understating their expected loan loss allowance. A study of the Great Recession of 2007-2009 found that understating these allowances was the most common accounting ploy banks used to disguise financial problems and to falsely meet regulatory requirements. *See* Gillian G.H. Garcia, *Failing Prompt Corrective Action*, 11 J. Banking Regul. 171, 180 (2010).

The Colorado statute confounds the ability of state banking examiners to adequately assess these loan loss reserves. Normally, small consumer loans such as those governed by the Colorado statute are assessed collectively: the same laws and regulations apply to all loans, and individual variations in the borrowers may be ignored, as these are smoothed out when examined as a whole. But applying Colorado law will require segregating all Colorado borrowers, as loans to these borrowers are uniquely subject to Colorado requirements and limitations. An examining state no longer applies its own law to determine the allowable loan terms but must apply Colorado law for any "consumer credit transactions in" Colorado. *See* Colo. Rev. Stat. § 5-13-106.

8

This creates an unworkable burden for examiners, and the problem proliferates as other states adopt the Colorado model. Examiners must now examine individual loan files to determine the location of the borrower, whether and to what extent the borrower engaged in any consumer credit transactions in Colorado, and then parse nine articles of the Colorado Revised Statutes for the allowable terms of such transactions to assess their impact on collectability and risk. Multiply that effect by each additional state contemplating adopting the Colorado model.

As a result, Utah's ability to regulate its own financial institutions and ensure their viability is impaired by the Colorado law. This endangers the shareholders, members, depositors, and customers of these institutions and increases uncertainty in the financial market. This is contrary to Utah's interest and any state's interest.

## CONCLUSION

In sum, Colorado's law does not achieve its intended purpose—or any useful purpose—while at the same time harming other states' financial institutions and impairing neighboring states' ability to regulate their own institutions. The district court's well-reasoned decision correctly determined that Colorado's attempt to opt out of DIDMCA exceeded the authority granted by Congress to opt out. Utah and other amici tender these additional explanations as to why that was a wise decision and should be affirmed.

Respectfully submitted,

/s/ Steve Geary
STEVE GEARY
Assistant Utah Solicitor General
SEAN D. REYES
Utah Attorney General
STANFORD E. PURSER
Utah Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114-0858
(801) 366-0100

*Counsel for Amicus States in Support of Appellees*

ADDITIONAL COUNSEL

*Counsel for Amici States*

STEVE MARSHALL
Attorney General
State of Alabama

LIZ MURRILL
Attorney General
State of Louisiana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

MARTY J. JACKLEY
Attorney General
State of South Dakota

PATRICK MORRISEY
Attorney General
State of West Virginia

CHRISTOPHER M. CARR
Attorney General
State of Georgia

LYNN FITCH
Attorney General
State of Mississippi

DREW H. WRIGLEY
Attorney General
State of North Dakota

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas