No. 24-1293

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants*,

v.

AMERICAN FINTECH COUNCIL, NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, and AMERICAN FINANCIAL SERVICES ASSOCIATION,

*Plaintiffs-Appellees.*

On Appeal from the U.S. District Court for the District of Colorado
Case No. 1:24-cv-00812-DDD-TPO, Hon. Daniel D. Domenico

## PETITION FOR REHEARING EN BANC

MATTHEW A. SCHWARTZ
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

*Attorneys for American Fintech Council*

DAVID M. GOSSETT
CHAVA BRANDRISS
ANGELENE G. SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com
angelenesuperable@dwt.com

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

*Attorneys for National Association of Industrial Bankers and American Financial Services Association*

*Additional counsel on inside cover*

ED PERLMUTTER
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400
Los Angeles, CA 90017
(213) 633-6800
mattladew@dwt.com

*Attorneys for National Association of Industrial Bankers
and American Financial Services Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

RULE 40(b)(2) STATEMENT....................................................................1

INTRODUCTION.......................................................................................1

BACKGROUND .........................................................................................3

REASONS FOR REHEARING EN BANC ....................................................10

I.    The Decision Creates A Circuit Split Regarding Where Loans Are
      "Made" For Purposes Of Federal Preemption Of State Interest-Rate
      Laws.......................................................................................................11

II.   The Decision Conflicts With Supreme Court And Tenth Circuit
      Precedent By Improperly Applying A Presumption Against
      Preemption To A Statute Containing An Express-Preemption
      Provision...............................................................................................16

III.  This Case Addresses A Question Of Exceptional Importance. .................18

CONCLUSION.........................................................................................21

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..............23

ADDENDUM: PANEL DECISION .............................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
938 F.3d 246 (5th Cir. 2019) ............................................................... 17

*EagleMed LLC v. Cox,*
868 F.3d 893 (10th Cir. 2017) ....................................................... 1, 17

*First Nat'l Bank of Logan v. Walker Bank & Tr. Co.,*
385 U.S. 252 (1966) ......................................................................... 3, 4

*Jessup v. Pulaski Bank,*
327 F.3d 682 (8th Cir. 2003) .................................................... *passim*

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ............................................................................ 14

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
439 U.S. 299 (1978) ................................................................... *passim*

*Puerto Rico v. Franklin California Tax-Free Trust,*
579 U.S. 115 (2016) .............................................................................. 1

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ............................................................................ 14

*Wyeth v. Levine,*
555 U.S. 555 (2009) ..................................................................... 16, 18

## Federal Statutes

Depository Institutions Deregulation and
Monetary Control Act of 1980,
Pub. L. No. 96-221, 94 Stat. 132 (1980) .................................... *passim*

DIDMCA § 521, 12 U.S.C. § 1831d ............................................. *passim*

DIDMCA § 525, 12 U.S.C. § 1831d note .................................... *passim*

Gramm-Leach-Bliley Act,
Pub. L. No. 106-102, 113 Stat. 1338 (1999) ............................... *passim*

12 U.S.C. § 1831u ............................................................. 12, 13, 14, 15

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

National Bank Act, 12 U.S.C. § 21 *et seq.*........................................ *passim*

    12 U.S.C. § 85............................................................................. *passim*

Riegle-Neal Interstate Banking and Branching Efficiency Act,
    Pub. L. No. 103-328, 108 Stat. 2338 (1994)........................................ 12

**Rules**

Fed. R. App. P. 40(b)(2) .............................................................................. 1

**Legislative History**

140 Cong. Rec. S 24487 (Sept. 13, 1994)................................................. 12

*Usury Lending Limits, Hearing on S. 1988 Before the Comm.*
    *on Banking, Hous., & Urb. Affs.*, 96th Cong. 1 (1979)......................... 5

**Other Authorities**

Black's Law Dictionary (5th ed. 1979)....................................................... 8

Office of the Comptroller of the Currency, News Release 2025-
    122, *Comptroller Issues Statement on 10th Circuit Decision*
    (Dec. 9, 2025)................................................................................ 3, 18

## RULE 40(b)(2) STATEMENT

Rehearing en banc is warranted because, in interpreting Section 525 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 123, 167 (1980), 12 U.S.C. § 1831d note, the panel majority:

1. Created a circuit split with *Jessup v. Pulaski Bank*, 327 F.3d 682, 684 (8th Cir. 2003), which adopted a contrary reading of the same language in a related statute. Fed. R. App. P. 40(b)(2)(C).

2. Applied a presumption against preemption, *e.g.*, Op. 33, conflicting with the Supreme Court's decision in *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 124 (2016), and this Court's decision in *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017), which hold that there is no presumption against preemption where a statute contains an express-preemption clause. Fed. R. App. P. 40(b)(2)(A)-(B).

3. Incorrectly decided an issue that is critical to consumer lending in the United States, threatening to "throw into confusion the complex system of modern interstate banking." *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 312 (1978). Fed. R. App. P. 40(b)(2)(D).

## INTRODUCTION

This appeal presents a question critical to the nation's dual-banking system and to the availability of competitive credit. More than 3,000 state-chartered banks depend on DIDMCA to compete on an equal footing with national banks. The panel's 2-1 decision erroneously

eliminates that competitive equality, restricting the ability of state-chartered banks to lend to borrowers in "opt-out states"—thus hurting not only those banks but also consumers, by diminishing credit options.

This is not what Congress intended. Acting during an era of high inflation, Congress enacted DIDMCA to ensure state-chartered banks could charge the same interest rates as national banks. Congress expressly preempted contrary state laws, ensuring state banks retained competitive equality with national banks operating alongside them, thereby preserving the viability of the "dual-banking" system. But Congress recognized that allowing a state-chartered bank to avoid the interest-rate laws of the state that chartered it conflicted with that state's traditional regulatory authority over its own chartered banks. Congress therefore included an "opt-out" provision in DIDMCA, Section 525, allowing a state to reject the offer of state-bank/national-bank parity for its own banks.

Over a well-reasoned dissent, the majority held that Colorado's opt-out strips banks chartered by *other states* of their right under DIDMCA to compete on a level playing field with national banks. This misconstrues the text, undermines congressional intent, and diminishes

credit options for Colorado borrowers. By treating loans as "made" in multiple states at once, and always "made" where the borrower resides, it also creates a square conflict with the Eighth Circuit's interpretation of the same language in a related statute, rejects decades of regulatory guidance, and diverges from Supreme Court precedent. The result, as the Office of the Comptroller of the Currency (OCC) has already warned, "is fundamentally inconsistent with Congress's efforts to create competitive equality between state and federally chartered banks" and "risks undermining state banks' ability to effectively administer multi-state lending programs."[1] This Court's full review is warranted.

## BACKGROUND

The vitality of the United States dual-banking system—where banks choose to be chartered and primarily regulated by either a state or the federal government—depends on the "policy of equalization first adopted in the National Bank Act of 1864 [(NBA)]." *First Nat'l Bank of Logan v. Walker Bank & Tr. Co.*, 385 U.S. 252, 261 (1966). That policy seeks "to place national and state banks on a basis of 'competitive

---

[1] OCC, News Release 2025-122, *Comptroller Issues Statement on 10th Circuit Decision* (Dec. 9, 2025), https://perma.cc/NKW3-ZNSY.

equality'" while allowing state and federal bank regulators to make different policy choices. *Id.*

The NBA sets the interest rates national banks may charge, and preempts conflicting state interest-rate caps. Specifically, NBA Section 85 provides that a national bank "may … charge on any loan … made, … interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] greater." 12 U.S.C. § 85.

In 1978, the Supreme Court addressed how NBA Section 85 applies when a national bank lends across state lines. The *Marquette* Court held that, for these purposes, a national bank is "located" in the state where it is chartered, or alternatively in the state where the bank actually performs its key loan-making functions—*not* in the state where the borrower resides. Thus, a national bank headquartered in Nebraska that performed loan-making functions in Nebraska could extend credit card loans to Minnesota residents at Nebraska interest rates, which were above Minnesota's caps. 439 U.S. at 311-12. The Court reasoned that "Minnesota residents were always free to visit Nebraska and receive

4

loans in that State," and "[i]t has not been suggested that Minnesota usury laws would apply to such transactions." *Id.* at 310-12.

*Marquette* resolved a legal question raised by the relatively new phenomenon of banks lending across state lines. But it also gave national banks an advantage over competing state banks by allowing national banks to lend across state lines at the higher of the interest rates set by the banks' home states or 1% above the federal funds rate. In an era of high inflation—when bank-borrowing rates often exceeded consumer-lending rates allowed under state law—national banks could profitably lend (at 1% above the federal funds rate), while many state-chartered banks could not.

In 1980, Congress enacted Section 521 of DIDMCA to fix this and "provide competitive equality among all financial institutions with respect to State usury lending limits." *Usury Lending Limits, Hearing on S. 1988 Before the Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. 1 (1979). Congress made its preemptive intent express in the statute's text: The law's aim was "to prevent discrimination against State-chartered insured depository institutions … with respect to interest rates … notwithstanding any State constitution or statute[,] which is hereby

5

preempted for the purposes of this section." 12 U.S.C. § 1831d(a). Section 521 followed a series of predecessor statutes, which—to address credit crunches faced by both national and state banks during a decade of soaring inflation—had temporarily preempted certain state interest-rate caps. Resp. Br. 8-19.

Because DIDMCA overrode states' traditional power to set the interest rates charged by their own chartered banks, Congress—in DIDMCA Section 525—allowed states to opt out of that offer of parity (thereby denying their chartered banks access to national bank rates). *See* 94 Stat. 123, 167 ("The amendments made by section[] 521 … apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date … such State adopts a law … which states explicitly … that such State does not want the amendments … to apply with respect to loans made in such State"), *reproduced at* 12 U.S.C. § 1831d note.

Colorado enacted a DIDMCA Section 525 "opt-out" law in 2023. It asserts that by doing so, it overrode federal preemption of interest-rate caps on loans made by all state banks nationwide, if those loans are made to Colorado residents.

6

***Proceedings below.*** Plaintiffs are trade associations representing state-chartered banks across the country. Plaintiffs filed this lawsuit to preserve their member-banks' ability to offer credit to Colorado consumers whose profiles are too risky to lend to at rates lower than Colorado's 21% finance-charge cap but that are lawful pursuant to DIDMCA Section 521.

The district court recognized that Colorado's opt-out swept beyond the boundaries of Section 525 and issued a preliminary injunction.

***The panel majority.*** In a 2-1 decision, the panel reversed. The majority adopted Colorado's novel interpretation that, for purposes of Section 525, loans can be "made in" multiple locations simultaneously and are "made in" an opt-out state if either the bank or the borrower is located there. Op. 35. To reach this conclusion, the majority applied a presumption against preemption and in favor of expanding Colorado's powers over banking and consumer protection, assuming—despite Section 521's express-preemption clause—that there was no "clear intent from Congress to intrude on these police powers." Op. 33-34.

After "acknowledg[ing] that § 1831d is not a beacon of clarity," the majority concluded Section 525 nonetheless "unambiguously" referred to

both parties' states by using "made" not as a participial verb (tying its meaning to "making" a loan) but as a participial adjective (which the majority interpreted as synonymous with "executed," the last of several definitions of that term in Black's Law Dictionary (5th ed.)). Op. 35-39. Thus reading "loans made in" to mean "executed loan[s]," the majority determined that Congress intended a loan to be "made in" any state where anyone "executed" the loan. Op. 38.

Finally, the majority rejected numerous sources pointing to a contrary reading—other provisions of DIDMCA and a dozen other banking statutes using "make" or "made" to refer to banks' actions or location, Op. 47-52; DIDMCA's express non-discrimination purpose, Op. 53-55; DIDMCA's predecessor statutes, Op. 55-59; regulatory interpretations, Op. 59-61; and the Eighth Circuit's interpretation of the same words in a related statute, Op. 61-64.

The majority acknowledged that its decision threatens "immediate uncertainty" to the interstate banking industry. Op. 67 n.37.

***The dissent.*** Judge Rossman explained that the majority's conclusion—that "a loan is 'made in' the opt-out state if either the borrower or the lender is located in that state"—conflicts with the "plain

statutory text" of Section 525. Dissent 7. She stressed that DIDMCA and Title XII of the United States Code "consistently" use "the words 'made' and 'make' … to refer to the *bank's act* of making a loan" and tie that act to the bank's location. *Id.* at 12-15. But rather than read Sections 521 and 525 *in pari materia*, Judge Rossman explained, "the majority seems to mistakenly drive a wedge between" them—interpreting Section 521 to "undermine[] the competitive parity Congress intended and enable[] the very discrimination Section 521 sought to eliminate." *Id.* at 7-12. "[W]here a loan is 'made' under Section 521 should not differ from where it is 'made' under Section 525." *Id.* at 14.

Judge Rossman also rejected the majority's attempt to justify this discrepancy by assuming Section 525 uses "made" as a participial adjective, noting that Section 521 *also* uses "made" as a participial adjective linked to the *bank's* location—and, more importantly, Congress did not "intend[] to inject a novel borrower-focused framework foreign to DIDMCA and Title XII simply by employing 'made' as a participial adjective." Dissent 15-18.

Finally, Judge Rossman explained that DIDMCA's enactment history "reinforces what the text reveals—Section 525 only permits states

to restore their pre-DIDMCA ability to restrict their own state-chartered banks from lending above their own state rate limits, without regard for the federal rate." *Id.* at 19-25. Decades of regulatory history provide further support for that conclusion. *Id*. at 25-29; *see also* Resp. Br. 58-62 & n.15. By rejecting this context and misreading the text, Judge Rossman concluded, the majority adopted a "patchwork approach" under which DIDMCA's application depends on "the nuances" of each state's conflict-of-law principles—producing "a level of disuniformity Congress never intended." Dissent 29-30.

## REASONS FOR REHEARING EN BANC

The decision splits with the Eighth Circuit regarding where loans are "made"; conflicts with Supreme Court and Circuit precedent by improperly applying a presumption against preemption to a statute containing an express-preemption provision; and addresses a question of exceptional importance with far-reaching consequences. The Court should grant en banc review.

## I. The Decision Creates A Circuit Split Regarding Where Loans Are "Made" For Purposes Of Federal Preemption Of State Interest-Rate Laws.

Rehearing en banc is warranted because the majority misconstrued DIDMCA Section 525, creating a split with the Eighth Circuit's decision in *Jessup*, 327 F.3d 682, regarding where loans by state banks are "made" for purposes of federal interest-rate preemption.

First, some background: In *Marquette*, the Supreme Court rejected the notion that, for purposes of determining whether a state's interest-rate caps are preempted by the NBA, courts should look to where borrowers reside. 439 U.S. at 310-13; *supra* pp. 4-5. Following *Marquette*, Congress enacted a series of interest-rate parity statutes modeled on the NBA and DIDMCA predecessor statutes. *See* Resp. Br. 8-19. These included DIDMCA and the Gramm-Leach-Bliley Act (GLBA), Pub. L. No. 106-102, 113 Stat. 1338 (1999). Applying these statutes, courts and regulators have consistently determined which state's interest-rate limits apply by looking to where *banks* performed loan-making functions, Resp. Br. 38-40, 58-62, reflecting "the widespread congressional understanding that … it is the office of the bank or branch making the loan that determines which state's law applies." Comments of Sen. Roth,

11

140 Cong. Rec. S 24487 (Sept. 13, 1994) (explaining where banks make loans for Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108 Stat. 2338 (1994)).

This brings us to Arkansas, *Jessup*, and 12 U.S.C. § 1831u(f). Arkansas's Constitution caps interest rates, and historically, that cap was unusually low. Consequently, Arkansas led the push to enact the interest-rate parity provisions of DIDMCA and its predecessors, to preempt that cap. *See* Resp. Br. 9-15. After Riegle-Neal was enacted in 1994, out-of-state banks opened branches in Arkansas, prompting Arkansas to secure another parity provision: GLBA § 1831u(f). That statute permits Arkansas-chartered state banks (and national banks located in Arkansas) to charge the same interest rates permitted by the home state of any *non*-Arkansas bank with an Arkansas branch, 12 U.S.C. § 1831u(f)(1). This "allow[ed] Arkansas banks to compete with out-of-state banks having branches in Arkansas," *Jessup*, 327 F.3d at 684, which could otherwise lend at higher rates than Arkansas banks under NBA Section 85 and DIDMCA.

In *Jessup*, a Texas resident obtained a credit card from an Arkansas bank. Because the GLBA contained a carve-out from this Arkansas-

specific preemption for "any loan made in any State other than [Arkansas]," 12 U.S.C. § 1831u(f)(2), the borrower argued that his loan was "made in" Texas rather than Arkansas based on choice-of-law principles that he contended favored his location—and thus was subject to Texas's interest-rate cap under § 1831u(f)(2), rather than the rate authorized by § 1831u(f)(1). *Jessup*, 327 F.3d at 684.

The bank responded by tracing federal authority from *Marquette* through DIDMCA, Riegle-Neal, and the judicial and regulatory interpretations of those statutes to show the consistent federal understanding that loans are "made in" the state where banks perform their loan-making functions—not in the borrower's state or according to traditional choice-of-law principles. Brief for Appellee, *Jessup v. Pulaski Bank*, 327 F.3d 682 (8th Cir. 2003), 2002 WL 32375291, at *1-12, *15.

The Eighth Circuit agreed: "[A] loan is made at the location of the branch that approves the loan, extends credit, and disburses the funds"— that is, where the *bank* performs its loan-making functions, not where the *borrower* resides. *Jessup*, 327 F.3d at 685. In so holding, the court endorsed an opinion letter issued by the OCC interpreting the statute. *Id.*

13

The majority downplayed the resulting circuit split. Op. 61-64. But deeming loans to be "made" where the borrower is located directly conflicts with *Jessup*.

First, the majority discounted *Jessup* because the Eighth Circuit deferred to the OCC under *Chevron*. 327 F.3d at 685; *see* Op. 62-63. But the Supreme Court made clear in *Loper Bright Enterprises v. Raimondo* that "we do not call into question prior cases that relied on the *Chevron* framework." 603 U.S. 369, 412 (2024). *Jessup* remains good law, and the panel decision contradicts it. Furthermore, after *Loper Bright*, courts may still give credence to regulatory interpretations that are thoroughly considered, validly reasoned, consistent with other pronouncements, or otherwise have the "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The OCC letter meets this standard. *See* Dissent 26-29.

Second, the majority asserted, "§ 1831u(f) deals with distinct factual circumstances not found in this case: the presence of out-of-state bank branches located in a state with low constitutional interest-rate caps." Op. 62. But the majority did not explain *why* these facts compel construing the statutory phrase "loan[s] made in" differently in the two

14

statutes. The majority offered only that Section 1831u(f) "provides relief to in-state banks that would otherwise suffer a severe disadvantage in relation to out-of-state banks." Op. 62-63. But DIDMCA Section 521 also provides relief to banks suffering a competitive disadvantage (state versus national banks).

Third, the majority observed that "[s]ubsection (f)(1) expressly focuses on where a loan is 'made' in the context of the lender to determine the rate that the lender can legally charge," and does so "based on the bank's 'home State,'" defined by reference to where a bank is "located" or chartered. Op. 63. But again, so does DIDMCA Section 521. *See* 12 U.S.C. § 1831d(a). No surprise, as Section 1831u(f)(1) lifts its language about loans having been "made" by banks "located" in certain states directly from DIDMCA Section 521, which in turn lifted the language from NBA Section 85.

Fourth, the majority tried to distinguish between "made in" in Section 1831u(f)(2) and DIDMCA Section 525's use of the same words, positing that "§ 1831u(f)(2)(A)(i)'s use of 'made' invokes the 'home State' definition from § 1831u(f)(1), which focuses on the bank's location." Op. 63. But DIDMCA Section 525 refers back to "[t]he amendments made by

15

sections 521 through 523 of this title," which *also* focus on the lending bank's location, and include the same "express reference to the lender's location." Op. 63.

The Court should grant rehearing en banc to address this circuit split.

## II. The Decision Conflicts With Supreme Court And Tenth Circuit Precedent By Improperly Applying A Presumption Against Preemption To A Statute Containing An Express-Preemption Provision.

The majority's strained interpretation rested on a critical methodological error warranting rehearing en banc: Although DIDMCA contains an express-preemption provision, the majority improperly applied a presumption against preemption.

The majority began with what it calls "two cornerstones" of preemption analysis, including that "'in all pre-emption cases … we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,'" Op. 33 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); Op. 53 (applying presumption again). This was error: Seven years after *Wyeth*, the Supreme Court clarified—as this Court later acknowledged—that "when a statute contains an express pre-

16

emption clause, 'we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *EagleMed*, 868 F.3d at 903 (quoting *Franklin*, 579 U.S. at 124); *see also Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (collecting cases).

The majority acknowledged that DIDMCA expressly preempts state interest-rate caps. Op. 33. Yet it applied an anti-preemption lens at key steps of its analysis, producing an interpretation of Section 525 that vitiates Congress's explicit preemptive command. *E.g.*, Op. 53-54 ("primed against preemption, we review the purpose of § 1831d and its opt-out provision to gauge congressional intent"); Op. 35 (acknowledging statute "is not a beacon of clarity" but nonetheless calling it "unambiguous"). The panel thus ignored controlling Supreme Court precedent and created an intra-circuit conflict that shaped the outcome in this case, and that will cause confusion about how courts should approach future express-preemption cases.

Beyond that, the majority's analysis demonstrates that applying the presumption to expressly preemptive statutes improperly distorts

their meaning. The presumption led the majority to ignore that Congress's "clear and manifest purpose" in DIDMCA *was*, in fact, to "supersede[]" the "historic … powers of the States [to regulate usury]," *Wyeth*, 555 U.S. at 565—here, "to prevent discrimination against" state-chartered banks, 12 U.S.C. § 1831d. *See* Dissent 12; *cf.* Op. 34 (court must follow Colorado's interpretation of Section 525 "absent clear intent from Congress to intrude on [states'] police powers").

Rehearing en banc is warranted to clarify the appropriate approach to statutory interpretation when statutes contain express-preemption provisions.

## III. This Case Addresses A Question Of Exceptional Importance.

Because DIDMCA's interest-rate parity provision secures state banks' role in the modern interstate banking system, the consequences of the majority's error are severe. *See*, *e.g.*, 12 States' Amicus Br. 5-6, 8-9 (ECF0087); American Bankers Ass'n Amicus Br. 13-17 (ECF0081); State Bankers Ass'ns Amicus Br. 13-15 (ECF0086); *see also* OCC News Release, *supra*.

A.    The majority deprives all state banks in the 48 non-opt-out states of the interest-rate parity DIDMCA has guaranteed for decades,

preventing those banks from competing with national banks as Congress intended. National banks will continue to have access to the rates permitted under the NBA, and will continue to lend to Colorado consumers at those rates. *See* Op. 66. The majority inflicted this damage by misconstruing Section 525 to permit opt-out states to strip *other states'* banks of the preemptive benefits of Section 521 for loans to borrowers in opt-out states. But the opt-out was intended only to allow states to reassert control over the banks they themselves charter. Resp. Br. 35-38.

This does not render Colorado's law a "partial opt-out." *Contra* Op. 58. States have *never* had a traditional right to regulate *other states'* banks. Properly construed, the opt-out fully restores Colorado's power to set the maximum rate its own state banks can charge.

B. The majority's decision is also unadministrable. Plaintiffs have consistently argued that loans are "made," for DIDMCA purposes, where the bank is located. Rejecting even Colorado's two-location interpretation (the location of the bank *or* the borrower; *see* Op. 41; Dissent 18 n.10), the majority adopted an approach where, depending on the circumstances, banks may follow one of *three* distinct limits (including, as determined case-by-case under choice-of-law rules, the

borrower's state even if higher than the rate allowed by the bank's home state). Op. 43-44; *see* Dissent 18 n.10.

The majority's interpretation improperly *expands* the applicable interest rates available to state banks when lending to borrowers in non-opt-out states, and improperly *narrows* the available interest rates when lending to borrowers in opt-out states. In the former instance, the majority's three-rate interpretation would permit state banks to lend at a rate *above* the federal rate or the rate permitted by their home state's regulators, if that higher rate is permitted by the borrower's state. But NBA Section 85 does not permit national banks to do so.[2] And in the latter instance, state banks chartered by states that have chosen *not* to opt out are nevertheless deprived of interest-rate parity with national banks located in those same states. This would mean that the interest-rate caps applicable to every loan a state bank makes to a borrower in an opt-out state must ultimately be determined by applying "the nuances of state … conflict-of-law" rules on a case-by-case basis. Dissent 29-30. As

---

[2] To illustrate, state banks chartered in New Mexico—a non-opt-out state with a flat cap of 36% APR on consumer loans—could now lend at rates higher than that cap to a borrower in Utah, which has no applicable cap. National banks located in New Mexico, however, would continue to be limited to 36%.

Judge Rossman noted, even "[t]he majority … seems to recognize the confusion that awaits." Dissent 29-30.

C.     All of this is unnecessary. As Judge Rossman eloquently explained, *see supra* pp. 8-10, DIDMCA's text supports Plaintiffs' interpretation, which effects Congress's express intent to promote competitive equality.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully Submitted,

/s/ David M. Gossett

CHRIS SWIFT
Davis Wright Tremaine LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
865 S Figueroa Street
Suite 2400
Los Angeles, CA 90017
(213) 633-6800
mattladew@dwt.com

DAVID M. GOSSETT
CHAVA BRANDRISS
ANGELENE G. SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com
angelenesuperable@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com

*Attorneys for the American Fintech Council*

December 9, 2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in 14-point Century Schoolbook.

                                        /s/ David M. Gossett

December 9, 2025

**ADDENDUM: PANEL DECISION**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**November 10, 2025**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

NATIONAL ASSOCIATION OF
INDUSTRIAL BANKERS;
AMERICAN FINANCIAL SERVICES
ASSOCIATION; AMERICAN
FINTECH COUNCIL,

      Plaintiffs - Appellees,

v.

                          No. 24-1293

PHILIP J. WEISER, in his official
capacity as Attorney General of the
State of Colorado; MARTHA
FULFORD, in her official capacity as
Administrator of the Colorado
Uniform Consumer Credit Code,

      Defendants - Appellants.

-------------------------------

STATE OF ARIZONA; STATE OF
CALIFORNIA; STATE OF
CONNECTICUT; STATE OF
HAWAII; STATE OF MAINE;
STATE OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEW
YORK; STATE OF
PENNSYLVANIA; STATE OF
OREGON; STATE OF VERMONT;
STATE OF WASHINGTON;
DISTRICT OF COLUMBIA, CENTER
FOR RESONSIBLE LENDING;
NATIONAL CONSUMER LAW
CENTER; FEDERAL DEPOSIT

INSURANCE CORPORATION; THE
BELL POLICY CENTER;
AMERICAN BANKERS
ASSOCIATION; CONSUMER
BANKERS ASSOCIATION; THE
BANK POLICY INSTITUTE; STATE
BANKERS ASSOCIATIONS; STATE
OF UTAH; STATE OF ALABAMA;
STATE OF LOUISIANNA; STATE
OF MISSISSIPPI; STATE OF
NEBRASKA; STATE OF NORTH
DAKOTA; STATE OF OHIO; STATE
OF SOUTH CAROLINA; STATE OF
SOUTH DAKOTA; STATE OF
TEXAS; STATE OF WYOMING,

     Amici Curiae.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:24-CV-00812-DDD-KAS)**

---

Brian Urankar, Senior Assistant Attorney General (Philip J. Weiser, Attorney
General; Kevin Burns, Senior Assistant Attorney General; Nikolai Frant, First
Assistant Attorney General; Philip Sparr, Assistant Attorney General; Michael
D. McMaster, Assistant Solicitor General, with him on the briefs), State of
Colorado, Denver, CO, for Defendants-Appellants.

David M. Gossett of Davis Wright Tremaine LLP, Washington, DC (Chava
Brandriss, Chris Swift, Christopher M. Walczyszyn, and Matthew E. Ladew, of
Davis Wright Tremaine LLP, Washington, DC, Portland, OR, New York, NY,
and Los Angeles, CA, Ed Perlmutter and Leah E. Capritta, of Holland & Knight
LLP, Denver, CO, Matthew A. Schwartz, Leslie B. Arffa, and Morgan L.
Ratner, of Sullivan & Cromwell LLP, New York, NY and Washington, DC,
with him on the brief), for Plaintiffs-Appellees.

Keith Ellison, Attorney General, and Adam Welle, Assistant Attorney General,
State of Minnesota; Kris Mayes, Attorney General, State of Arizona; Robert
Bonta, Attorney General, State of California; William Tong, Attorney General,
State of Connecticut; Brian L. Schwalb, Attorney General, District of
Columbia; Anne E. Lopez, Attorney General, State of Hawaii; Aaron M. Frey,

2

Attorney General, State of Maine; Andrea Joy Campbell, Attorney General, State of Massachusetts; Dana Nessel, Attorney General, State of Michigan; Letitia James, Attorney General, State of New York; Michelle L. Henry, Attorney General, State of Pennsylvania; Ellen F. Rosenblum, Attorney General, State of Oregon; Charity R. Clark, Attorney General, State of Vermont; and Robert W. Ferguson, Attorney General, State of Washington, filed an amicus curiae brief on behalf of the State of Arizona, the State of California, the State of Connecticut, the State of Hawaii, the State of Maine, the State of Massachusetts, the State of Michigan, the State of Minnesota, the State of New York, the State of Pennsylvania, the State of Oregon, the State of Vermont, the State of Washington, and the District of Columbia in support of Defendants-Appellants.

Andrew Kushner of Center for Responsible Lending, Oakland, CA, filed an amicus curiae brief on behalf of the Center for Responsible Lending and the National Consumer Law Center in support of Defendants-Appellants.

B. Amon James, J. Scott Watson, Minodora D. Vancea, and Michael K. Morelli of the Federal Deposit Insurance Corporation, Arlington, VA, filed an amicus curiae brief on behalf of the Federal Deposit Insurance Corporation in support of Defendants-Appellants.

David H. Seligman of Towards Justice, Denver, CO, filed an amicus brief on behalf of the Bell Policy Center in support of Defendants-Appellants.

Ronald K. Vaske, Burt M. Rublin, and Alan S. Kaplinsky, of Ballard Spahr, LLP, Minneapolis, MN and Philadelphia, PA, filed an amicus brief on behalf of the American Bankers Association, the Bank Policy Institute, and the Consumer Bankers Association in support of Plaintiffs-Appellees.

James Kim, Caleb N. Rosenberg, and Nathan R. Marigoni, of Troutman Pepper Hamilton Sanders LLP, New York, NY, filed an amicus brief on behalf of State Bankers Associations in support of Plaintiffs-Appellees.

Sean D. Reyes, Attorney General, Sanford Purser, Solicitor General, Steve Geary, Assistant Solicitor General, State of Utah; Steve Marshall, Attorney General, State of Alabama; Christopher M. Carr, Attorney General, State of Georgia; Liz Murrill, Attorney General, State of Louisiana; Lynn Fitch, Attorney General, State of Mississippi; Michael T. Hilgers, Attorney General, State of Nebraska; Drew H. Wrigley, Attorney General, State of North Dakota; Dave Yost, Attorney General, State of Ohio; Alan Wilson, Attorney General, State of South Carolina; Marty J. Jackley, Attorney General, State of South Dakota; Ken Paxton, Attorney General, State of Texas; and Bridget Hill,

Attorney General, State of Wyoming, filed an amicus brief on behalf of the State of Utah, State of Alabama, State of Louisiana, State of Mississippi, State of Nebraska, State of North Dakota, State of South Dakota, State of Texas, and the State of Wyoming in support of Plaintiffs-Appellees.

———————————————————

Before **PHILLIPS**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

———————————————————

**PHILLIPS**, Circuit Judge.

———————————————————

Colorado's Attorney General and Administrator of the Colorado Uniform Consumer Credit Code (UCCC), in their official capacities, (collectively, "Defendants") appeal the district court's grant of a preliminary injunction, which enjoins their enforcement of Colorado interest-rate law against certain state-chartered banks. This case concerns the balance of state and federal power over banking. The Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA)[1] sets a national standard for interest rates that state-chartered banks may charge on loans. 12 U.S.C. § 1831d. Through § 1831d, Congress preempted state law that capped interest at lower rates and gave state banks access to the same interest rates set for national banks. But § 1831d contains an important exception: Any state can opt out of this national standard

---

[1] A recent opinion of this court referred to this Act by the acronym of MCA. *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors,* __ F.4th__ (10th Cir. 2025). Although this opinion uses a different acronym and analyzes a different section of the Act, for clarity in our case law we acknowledge that both cases required interpretation of the same Act, Pub. L. 96-221, 94 Stat. 132 (Mar. 31, 1980).

for "loans made in such State." *Id*. § 1831d note (Effective Date). By opting

out, a state reasserts authority to regulate interest rates on these types of loans.

This litigation arises from the meaning of "loans made in such State," as

used in § 1831d's opt-out provision. In 2023, Colorado exercised its opt-out

right and announced its intent to enforce Colorado's interest-rate caps on loans

from state banks to Colorado borrowers. Alarmed by the scope of Colorado's

purported opt-out, three trade associations with state-bank members

(collectively, the "Banks") filed suit and moved to preliminarily enjoin

Defendants from enforcing the state's interest-rate caps against out-of-state

banks lending to Colorado residents.[2] They argued that Colorado's opt out for

"loans made in such State" encompassed only loans made by state banks

located in Colorado. The district court agreed with the Banks and granted the

preliminary injunction.

On appeal, Defendants challenge the preliminary injunction on three

grounds: (1) DIDA provides no cause of action for the Banks to file suit;

(2) Colorado's opt-out for "loans made in such State" includes loans in which

the borrower—but not the lender—is located in Colorado; and (3) the district

court incorrectly balanced the harms to the parties. As a threshold matter, we

---

[2] The three trade associations are the National Association of Industrial Bankers, the American Financial Services Association, and the American Fintech Council. They have state-bank members that extend loans to borrowers in Colorado.

5

agree with the district court that the Banks have a viable cause of action. The remaining arguments turn on the scope of a state's opt-out power under § 1831d. A state may opt out of § 1831d for "loans made in such State," but courts have yet to resolve the meaning of that phrase. So we address that as an issue of first impression.

We hold that "loans made in such State" refers to loans in which either the lender or the borrower is located in the opt-out state.[3] Because Colorado has opted out of § 1831d, that statute no longer preempts Colorado's interest-rate caps for loans from out-of-state banks to Colorado borrowers. Without § 1831d's preemptive force, the rationale for the preliminary injunction falls apart. We have no basis under § 1831d to enjoin Defendants from enforcing Colorado's interest-rate caps, so we reverse.

## BACKGROUND

### I.    The Dual-Banking System

Before delving into DIDA, we provide some context for its passage. The United States employs a dual-banking system, consisting of "parallel federal and state banking systems." *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209 (2024). A bank may opt in to either the federal system or the state system by obtaining a corresponding federal or state charter. *Id.* at 210. A federally chartered bank operates under federal supervision, while a state-chartered bank

---

[3] And of course, a loan is made in the opt-out state if both the borrower and the lender are located in that state.

operates primarily under state regulation. *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 135 (2d Cir. 2021).

This dual-banking system did not exist at the nation's founding. Before the establishment of a federal banking system, banking was "squarely within the ambit of the states' . . . powers[.]" *Greenwood Tr. Co. v. Massachusetts*, 971 F.2d 818, 828 (1st Cir. 1992); *see Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980). Save for a few exceptions, banks were chartered, regulated, and supervised by the states.[4] *See* Benjamin J. Klebaner, *State-Chartered American Commercial Banks, 1781-1801*, 53 Bus. Hist. Rev. 529, 529 (1979). And states have exercised their police power to impose interest-rate caps on loans since the colonial era. *See* Henry Walcott Farnam, Chapters in the History of Social Legislation in the United States to 1860 89 (Carnegie Inst. of Wash., 1938).

The states' dominance over banking began to change during the Civil War, when Congress passed the National Bank Act (NBA) of 1864, 12 U.S.C. § 21 et seq. The NBA established a national banking system by empowering the Office of the Comptroller of the Currency (OCC) to issue federal bank charters.

---

[4] Before the National Bank Act of 1864 (NBA), only two federally chartered banks existed. Congress chartered the First Bank of the United States from 1791 to 1811 and the Second Bank of the United States from 1816 to 1836. These banks differed from the thousands of private commercial banks that chose a federal charter after the NBA's passage. Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 15 (1977). The First and Second Banks of the United States held certain public functions and powers akin to a nascent central bank.

12 U.S.C. § 27(a); *see U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 449 (1993). The national banking system exists in tandem with the state-banking system, forming the operative dual-banking system.

Importantly, the NBA gave national banks a competitive advantage over state banks. *See Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873). Section 85 of the NBA permits a national bank to charge interest on loans at a rate up to the greater of (1) 1% above "the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located" (known as the "discount-plus-one rate"), or (2) the rate allowed by the laws of the state where the bank is located.[5] 12 U.S.C. § 85. By preempting state law, § 85 confers two benefits to national banks. First, § 85 allows a national bank to circumvent state interest-rate caps through access to the national discount-plus-one rate. So if a state caps interest rates at 5% but the discount-plus-one rate is 7%, a national bank located in that state can still charge up to 7% in interest. Second, § 85 allows a national bank to "export" the interest rates permitted by the state "where the bank is located" to out-of-state borrowers, even if the rate charged exceeds the rate permitted by the borrower's state. *See Marquette Nat'l Bank of Minneapolis v. First of*

---

[5] Congress amended the NBA in 1933 to allow national banks to charge up to the discount-plus-one rate. 12 U.S.C. § 85 note (Amendments). Before 1933, the NBA still required national banks to abide by the interest-rate caps of the state where the bank is located. *Id.*; *see Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 30–31 (1875).

8

*Omaha Serv. Corp.*, 439 U.S. 299, 301 (1978). So if State A has an interest-rate cap of 10% and State B has an interest-rate cap of 5%, a national bank located in State A could still charge up to 10% in interest to a borrower located in State B.

This version of the dual-banking system functioned until the 1970s, when inflation led to soaring interest rates and a severe credit crunch. *See* 125 Cong. Rec. 30655 (1979). While national banks sought refuge in the discount-plus-one rate, state banks remained constrained by state interest-rate caps. *Id.* In certain states, these interest-rate caps made it economically unfeasible for state banks to lend money, because the state banks would have to borrow money at rates higher than what they could charge under state law. *Id.* In response, Congress passed DIDA to provide relief to state banks and place them on equal footing with national banks. *Id.*

## II.    DIDA

Central to this appeal are sections 521 and 525 of DIDA, as codified at 12 U.S.C. § 1831d and in the Effective Date note to § 1831d.[6] To start, § 1831d extended the national interest-rate standard to state banks.[7] Using language drawn from § 85, § 1831d(a) permits a state-chartered bank to charge interest

---

[6] Section 521 of DIDA is also located at section 27 of the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq.

[7] For consistency with the district court's opinion, we use § 1831d in this opinion as well.

on loans at a rate up to the greater of (1) the discount-plus-one rate, or (2) the rate allowed by the laws of the state where the bank is located. This standard preempts state law if the interest rate under § 1831d(a) "exceeds the rate" that a state bank "would be permitted to charge in the absence of this subsection[.]" § 1831d(a).

Through § 1831d(a), state banks received two benefits historically relegated to national banks. First, § 1831d(a) allows a state bank to charge up to the discount-plus-one rate and to bypass any lower state interest-rate caps. Second, § 1831d(a) allows a state bank to export the interest rates permitted by the state "where the bank is located" to out-of-state borrowers, even if the rate charged exceeds the rate permitted by the borrower's state.[8] *See Greenwood Tr.*, 971 F.2d at 827 (holding that § 1831d(a) preempted state law, such that a state bank could export favorable interest rates from its home state to the

---

[8] An FDIC opinion letter defines the bank's location in § 1831d(a) as the state where the bank is chartered, unless (1) the bank's branch performs all three "non-ministerial functions" of loan-making in another "host" state when making a loan; or (2) the branch performs at least one non-ministerial function in the host state and "based on an assessment of all of the facts and circumstances, the loan has a clear nexus to the host state." Fed. Deposit Ins. Corp., Opinion Letter No. 11 on Interest Charges by Interstate Banks, 63 Fed. Reg. 27282-01, 1998 WL 243362, at *27286 (May 18, 1998) ("FDIC Op. No. 11"). In these two scenarios, the bank is "located" in the host state for that specific loan. *Id.* The three non-ministerial functions of loan-making are (1) the loan approval, meaning "the decision to extend credit"; (2) the extension of credit, meaning "the first communication of final approval of the loan"; and (3) the loan disbursal, meaning the "actual physical disbursal of the" loan proceeds to the customer. *Id.*

borrower's state). As illustrated, this statute aims "to prevent discrimination against" state-chartered banks, § 1831d(a), by "level[ing] the playing field" for state banks to compete with national banks, *Greenwood Tr.*, 971 F.2d at 826.

But unlike § 85, § 1831d includes an opt-out provision for states to reassert control over their interest-rate regulation.[9] § 1831d note (Effective Date).[10] To opt out, the state must adopt a law asserting that the state "does not want [§ 1831d] to apply with respect to loans made in such State." *Id.* For state banks, any loan "made in" the opt-out state is subject to that state's interest-rate caps, even if the cap is lower than the rate otherwise allowed under § 1831d. *Id.*

## III.    Colorado's Opt-Out Law

In 2023, the Colorado General Assembly passed a law to opt out of § 1831d. Colo. Rev. Stat. § 5-13-106 (effective July 1, 2024). Before the opt-out went into effect, Colorado's UCCC Administrator issued an interpretive opinion letter stating that she "interprets § 5-13-106 to apply only to consumer

---

[9] We refer to § 1831d's Effective Date note as the "opt-out provision" as well.

[10] Congress passed DIDA as Public Law 96-221. Though section 525 of DIDA appears as a statutory note to § 1831d, it still carries the force of law. *See Schwier v. Cox*, 340 F.3d 1284, 1288–89 (11th Cir. 2003) (concluding that the district court erred by disregarding law that appears in only the statutory notes section of the U.S. Code); *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("[T]he [U.S.] Code cannot prevail over the Statutes at Large when the two are inconsistent." (citation modified)); Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the* United States Code, 112 Law Lib. J. 213, 216 (2020).

11

credit transactions 'made in' Colorado in accordance with [§ 1831d]." App. vol. I, at 194. The letter further states that she "understands and interprets § 5-13-106's language of 'in this state' to be wholly congruent and identical with the opt out authorized by [§ 1831d] for loans 'made in' the state." *Id.*

Colorado opted out of § 1831d because of proliferating "rent-a-bank" arrangements. *See* Bell Policy Center Amicus Br. at 7–8, 11. In rent-a-bank arrangements, nonbank lenders partner with banks chartered in states that have high or even no interest-rate caps. Through the state bank, the nonbank lender exports high interest rates to states that would otherwise bar those rates under their own laws. The nonbank lender uses the state bank to circumvent interest-rate caps in the borrower's state via § 1831d.[11] By opting out of § 1831d, Colorado sought to protect its residents from certain abusive financial practices prevalent in rent-a-bank loans. *See* Oral Argument at 00:52–01:14. Colorado joins Iowa and Puerto Rico as the only jurisdictions that currently opt out of § 1831d.[12]

---

[11] A nonbank lender is typically subject to state consumer lending laws, including those that regulate interest rates based on the borrower's location. *See, e.g.*, *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1306–13 (10th Cir. 2008) (upholding the application of a Kansas consumer-lending law to loans from an out-of-state nonbank lender to Kansas residents). Without the bank partnership, the nonbank lender could not avail itself of interest-rate exportation under § 1831d(a).

[12] Soon after Congress passed DIDA, seven states (including Colorado) and Puerto Rico invoked section 525 to opt out of sections 521 to 523 of DIDA. Donna C. Vandenbrink, *Usury ceilings and DIDMCA*, 9 Econ. Persps. 25, 28

(*footnote continued*)

12

## IV.    Procedural History

Before Colorado's opt-out went into effect, the Banks sued to enjoin
Defendants from enforcing Colorado's UCCC against state banks for loans not
"made in" Colorado.[13] § 1831d note (Effective Date). The UCCC contains
interest-rate caps on consumer credit transactions that would apply to state-
bank loans absent § 1831d. Colo. Rev. Stat. § 5-1-201(1)(b) (defining a
"consumer credit transaction" as "made in" Colorado when the consumer is a
resident of Colorado and "enters into the transaction with a creditor who has
solicited or advertised" in Colorado). The Banks claim that any enforcement of
these interest-rate caps for loans made by out-of-state banks would violate the

---

(1985); *see, e.g.*, Colo. Rev. Stat. § 5-13-104 (repealed 1994). Colorado
repealed its first opt-out law in 1994. *See* 1994 Colo. Sess. Laws 1612–13 (An
Act Concerning Regul. of Pers. Issuing Consumer Credit, § 12). Five other
states repealed their opt-outs as well, leaving only Iowa and Puerto Rico. *See*
1980 Iowa Acts 547–48 (Act of Apr. 30, 1980, § 32); P.R. Laws Ann. tit. 10,
§ 998l (1980). Iowa recently enforced its state interest-rate caps against an out-
of-state bank, reaching an agreement that required the bank to stop making
loans in Iowa or to do so in compliance with Iowa law. Assurance of
Discontinuance, *In re Transp. All. Bank, Inc.* (Dec. 6, 2022).

[13] In the complaint, the Banks had also requested that the district court
declare any attempt to enforce § 5-13-106 "with respect to loans not made in
Colorado (as defined by federal law)" as a violation of the Supremacy Clause.
App. vol. I, at 37. The district court correctly noted that "the preempted statute
is actually the Colorado UCCC, and only to the extent the interest-rate caps
therein exceed those in Section 1831d(a) and are applied to loans that are not
'made in' Colorado." *Nat'l Ass'n of Indus. Bankers v. Weiser*, 737 F. Supp. 3d
1113, 1134 (D. Colo. 2024); *see also* Colo. Rev. Stat. § 5-1-201 (defining when
Colorado's UCCC applies to a consumer credit transaction).

Supremacy Clause via sections 521 and 525 of DIDA and the Commerce Clause.

A week after the complaint's filing, the Banks moved to preliminarily enjoin Defendants from enforcing the UCCC for loans made outside of Colorado. They argued that under § 1831d's opt-out provision, "loans made in such State" refers to the state where the lender, not the borrower, is located. Defendants disagreed, reasoning that "loans made in such State" refers to loans in which either the lender *or* the borrower is located in the opt-out state. Under Defendants' interpretation, so long as either the borrower's state or the lender's state has opted out of § 1831d, the loan must conform to the opt-out state's interest-rate caps.

The district court agreed with the Banks and granted the preliminary injunction against Defendants. *Nat'l Ass'n of Indus. Bankers v. Weiser*, 737 F. Supp. 3d 1113, 1121–22 (D. Colo. 2024). Relevant to this appeal, the district court reviewed certain factors to reach its ruling.[14] *Id.* at 1126–34. First, the district court concluded that the Banks were likely to succeed on the merits. *Id.* at 1126–33. For the merits analysis, the district court determined that a claim in equity under *Ex parte Young*, 209 U.S. 123 (1908), provided the cause of action for this case, and that under § 1831d's opt-out provision, "loans made in such

---

[14] The district court also determined that the Banks have standing to file suit and that their claims are ripe. *Weiser*, 737 F. Supp. 3d at 1124–26. Defendants do not challenge these rulings on appeal.

State" refers only to the lender's state. *Id.* Second, the district court concluded that the Banks would suffer irreparable harm without the preliminary injunction. *Id.* at 1133–34. The court reasoned that the Banks would face administrative costs and lost revenue, customers, and goodwill if they were to operate under Colorado's interest-rate caps. *Id.* at 1133. Third, the district court balanced the harm to the Banks without an injunction against the harm to Defendants with an injunction. *Id.* at 1134. The district court determined that the balance of harms favored the Banks, because Defendants' interpretation of the opt-out disadvantaged state banks in relation to national banks and offered minimal protection for consumers. *Id.* Finally, the district court found that the public interest supported enjoining an invalid law. *Id.*

For these reasons, the district court preliminarily enjoined Defendants from enforcing Colorado's UCCC against the Banks' members if the members (1) are located outside of Colorado, and (2) make loans at interest rates exceeding Colorado's interest-rate caps to Colorado borrowers.[15] *Id.* at 1134–35. The district court also specified that Defendants may enforce the UCCC's interest rates against only lenders located in Colorado, regardless of the borrower's location. *Id.*

---

[15] The district court appeared to define where a loan is "made" under § 1831d's opt-out provision based on the definition of where a bank is located under § 1831d(a). *Weiser*, 737 F. Supp. 3d at 1122, 1133–34 (citing FDIC Op. No. 11, 1998 WL 243362, at *27285).

After obtaining the preliminary injunction, the Banks amended their complaint under Federal Rule of Civil Procedure 15(a)(1). The amended complaint contained two major changes: (1) it replaced the first claim's cause of action under the Supremacy Clause with one under *Ex parte Young*, and (2) it removed the second claim, which alleged a violation of the Commerce Clause.

Defendants timely appealed the district court's order granting the preliminary injunction. We have interlocutory jurisdiction under 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

We review a district court's preliminary-injunction grant for an abuse of discretion. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). A district court abuses its discretion if its ruling "rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* We "examine the court's factual findings for clear error and its legal conclusions de novo." *Id.* at 796–97.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). Courts should grant preliminary injunctions "only in cases where the necessity for it is clearly established." *Id.* at 889.

16

The party seeking a preliminary injunction must prove four factors: (1) the party is likely to succeed on the merits; (2) the party will likely suffer irreparable injury without the injunction; (3) the balance of equities favors the injunction, meaning the moving party's threatened injury without the injunction outweighs the nonmoving party's injury with the injunction; and (4) the injunction does not harm the public interest.[16] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Free the Nipple-Fort Collins*, 916 F.3d at 797. If the government opposes the preliminary injunction, the last two factors "merge," such that any harm to the public interest affects the balance of equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022).

## DISCUSSION

Defendants appeal the district court's order granting the preliminary injunction. They challenge the district court's evaluation at three of the four preliminary-injunction factors: the likelihood of success on the merits, the

---

[16] The moving party faces a heavier burden if it requests a "disfavored" preliminary injunction. *Free the Nipple-Fort Collins*, 916 F.3d at 797. Unlike a typical preliminary injunction, which preserves the parties' relative positions pending trial, a disfavored injunction (1) "mandates action (rather than prohibiting it)," (2) "changes the status quo," or (3) "grants all the relief that the moving party could expect from a trial win." *Id.* To receive a disfavored injunction, the moving party must make a "strong showing" that the likelihood-of-success factor and the balance-of-equities factor support the injunction. *Id.* (citation modified). Because we conclude that the Banks fail to meet the standard for even a typical preliminary injunction, we need not resolve this issue.

balance of equities, and the public interest. For the first factor, Defendants disagree with the district court's conclusion that the Banks will likely succeed on the merits. Specifically, they contend that the Banks have no viable cause of action and that a state may opt out of § 1831d for loans in which only the borrower—and not the lender—is in the opt-out state. For the merged third and fourth factors, Defendants argue that the district court incorrectly balanced the harms. They assert that Colorado validly opted out of § 1831d and that the public interest thus counsels against enjoining their proper enforcement of state law. We review each preliminary-injunction factor, while remaining mindful that this appeal largely turns on our interpretation of § 1831d and its opt-out provision.

## I.      First Factor: Likelihood of Success on the Merits

For the first factor, the Banks must show that their claim for equitable relief is likely to succeed on the merits. *Winter*, 555 U.S. at 20. The district court ruled for the Banks on this factor after determining (1) that the Banks have a cause of action through a claim in equity under *Ex parte Young*; and (2) that a loan is "made in" only the lender's state, meaning Colorado can opt out of § 1831d for only loans made by lenders in Colorado. *Weiser*, 737 F. Supp. 3d at 1127–28, 1131. On appeal, Defendants contend that the district court erred on both issues. They assert that these errors, when corrected, flip the first factor in their favor. We take each argument in turn.

18

A.    Cause of Action

To start, Defendants insist that the Banks lack a viable cause of action to maintain their suit. Defendants argue (1) that the Supremacy Clause supplies no cause of action for the Banks, and (2) that Congress intended to foreclose equitable relief under § 1831d. For the first argument, the district court correctly determined that the Banks have no cause of action under the Supremacy Clause, and no party argues otherwise on appeal. *Id.* at 1127 n.3; *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." (citation modified)). But for the second argument, the Banks contend that they have a valid cause of action for a claim in equity under *Ex parte Young*. The district court agreed with the Banks, and Defendants challenge this ruling on appeal.

Under *Ex parte Young*, private parties may sue state officials in federal court to enjoin ongoing violations of federal law. 209 U.S. at 159–60. The scope of this equitable remedy is circumscribed by "express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. To determine whether the Banks have a viable cause of action, we apply a three-step framework. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 899 (10th Cir. 2017) (citing *Armstrong*, 575 U.S. at 322–31). First, we must discern "what alleged substantive rights the plaintiffs [are] seeking to vindicate[.]" *Id.* at 899. Second, we must gauge "what putative causes of action the plaintiffs [are]

19

raising based on those rights[.]" *Id.* And third, we must assess "which, if any, of those causes of action [are] viable, and specifically with respect to the equitable relief requested." *Id.* We review each step below and conclude that the Banks have asserted a viable cause of action.

### 1.    Substantive Right

At step one, the Banks seek to vindicate their members' right to charge interest at rates permitted in § 1831d on loans not "made in" Colorado. *Weiser*, 737 F. Supp. 3d at 1127; *see* § 1831d(a) (allowing state-chartered banks to charge up to the higher of the discount-plus-one rate or the interest rate permitted in the state where the bank is located). They claim that Defendants intend to unlawfully enforce Colorado's interest-rate caps against state banks located outside of Colorado, despite § 1831d's preemption of state law. *See* § 1831d note (Effective Date) (permitting a state to opt out of § 1831d for "loans made in such State"). Defendants allege no error at this step, and we see none. So we adopt the district court's description of the substantive right. *See Safe Streets*, 859 F.3d at 899 (citing *Armstrong*, 575 U.S. at 323–24).

### 2.    Putative Cause of Action Raised

At step two, the Banks' putative cause of action is a claim in equity under *Ex parte Young. Weiser*, 737 F. Supp. 3d at 1127; *see Armstrong*, 575 U.S. at 326 ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."). Defendants contest the

20

sufficiency of the asserted cause of action, noting that the original complaint did not even mention *Ex parte Young*. We deem this argument waived because Defendants raised it for the first time in their reply brief. *See Anderson v. U.S. Dep't of Lab.*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.").

And even if we were to consider Defendants' waived argument, we would find that the Banks included enough information in their original complaint to proceed with a claim in equity. In *Frazier v. Simmons*, we also reviewed whether a complaint sufficiently requested equitable relief through *Ex parte Young*. 254 F.3d 1247, 1253–54 (10th Cir. 2001). We started by "caution[ing] practitioners that a boilerplate recitation of 'just and equitable' relief included in one's prayer for relief is far from an exemplary request for prospective equitable relief under the *Ex parte Young* doctrine." *Id.* at 1254; *see also Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1184 (10th Cir. 1999) (concluding that the complaint failed to state an equitable cause of action under *Ex parte Young* where the plaintiff never alleged a constitutional violation or other grounds for injunctive relief). Yet we ultimately concluded that the complaint adequately sought prospective equitable relief for three reasons. *Frazier*, 254 F.3d at 1255. First, the plaintiff alleged harm from a state official denying him a reasonable accommodation and wrongfully terminating him in violation of federal law. *Id.* We considered his harm "amenable to injunctive relief[.]" *Id.* Second, we cited the district court's pretrial order,

21

which listed "the nature and extent of any equitable relief" as a legal issue for resolution. *Id.* (citation modified) Third, the plaintiff "pray[ed] for 'just and equitable relief'" in both the complaint and pretrial order. *Id.* From these three reasons, we determined that the plaintiff adequately "sought prospective equitable relief against" the state official. *Id.*

Here, Defendants correctly assert that the Banks' original complaint failed to cite *Ex parte Young*. The only claims listed in the complaint are styled as violations of the Supremacy Clause and the Commerce Clause. But following the analysis outlined in *Frazier*, we conclude that the original complaint included sufficient information for a claim in equity under *Ex parte Young*.

First, the complaint alleges that Defendants intended to enforce Colorado's interest-rate caps despite their preemption under § 1831d. Allegations that state officials are unlawfully enforcing a preempted state law amount to a classic claim in equity under *Ex parte Young*. *See Ex parte Young*, 209 U.S. at 133–34, 144–45 (alleging that a state attorney general violated a federal injunction by enforcing an unconstitutional state law); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 510–11 (5th Cir. 2017) (alleging that state officials are unlawfully enforcing a state worker-compensation system that is preempted by federal law). Second, Defendants' response to the preliminary-injunction motion in the district court shows that they were on notice of the claim in equity. App. vol. I, at 180–82. In fact, they had argued in the district court, as they do now on appeal, that the Banks'

"claim is also precluded in equity." *Id.* at 180. Defendants went on to assert that "Congress intended to foreclose private enforcement here," and Defendants then followed the framework set in *Armstrong* for analyzing whether a party can maintain a claim in equity. *Id.*; *see id.* at 181–82. Third, the complaint makes clear that the Banks seek "prospective equitable relief against" Defendants. *Frazier*, 254 F.3d at 1255; *see* App. vol. I, at 14, 17, 37 (requesting that the court enjoin Defendants from enforcing Colorado's state interest-rate caps). These circumstances present an even stronger case than those in *Frazier*, so we have no trouble allowing the Banks' claim to proceed as a claim in equity under *Ex parte Young*.[17]

For these reasons, the Banks have satisfied step two of the *Safe Streets* framework.

### 3.  Viability of the Cause of Action

Last, at step three, we assess the viability of the Banks' claim in equity. *Ex parte Young* permits claims for prospective equitable relief against state officials who violate federal law, as derived from "[t]he power of federal courts of equity to enjoin unlawful executive action[.]" *Armstrong*, 575 U.S. at 327.

---

[17] We note that in *Armstrong*, the Supreme Court analyzed whether the plaintiffs could maintain their claim for a violation of federal law as a claim in equity. 575 U.S. at 327–29. The Court considered this possibility despite the complaint not mentioning *Ex parte Young*. Complaint at 2, 9, *Inclusion, Inc. v. Armstrong*, No. 1:09-CV-00634-BLW (D. Idaho Dec. 7, 2009), ECF No. 1 (requesting "prospective injunctive relief" for state officials to comply with federal law, which "pre-empted" their "rates and methods" for operating Idaho's Medicaid program).

But that power is "subject to express and implied statutory limitations." *Id.*

"Courts of equity can no more disregard statutory and constitutional

requirements and provisions than can courts of law." *Id.* at 327–28 (citation

modified). Therefore, "Congress may displace the equitable relief that is

traditionally available to enforce federal law" if the statute in question displays

an "intent to foreclose" such relief. *Id.* at 328–29 (citation modified).

Defendants argue that § 1831d precludes claims in equity.[18] Their

arguments track the Supreme Court's analysis in *Armstrong*, which guides our

review of this issue. In *Armstrong*, Medicaid providers sued state officials in

Idaho's Department of Health and Welfare. *Id.* at 323–24. They claimed that

Idaho violated section 30(A) of the Medicaid Act by reimbursing providers

below the permitted rates and requested that the court enjoin the state officials

to increase rates. *Id.* The Court reviewed whether the Medicaid providers could

maintain their claim under various potential causes of action, including as an

equitable claim under *Ex parte Young*. *Id.* at 324–31; *see id.* at 331–32 (Scalia,

J., plurality opinion). For the equitable claim, the Court concluded that two

aspects of section 30(A) signaled Congress's intent to foreclose relief: (1) the

---

[18] The First Circuit and Eleventh Circuit previously considered cases in which state banks sued a state or state officials, asserting that § 1831d preempted state law. *See Greenwood Tr.*, 971 F.2d at 821–22 (1st Cir. 1992); *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1292–94 (11th Cir. 2005), *vacated*, 446 F.3d 1358 (11th Cir. 2006) (per curiam). These cases predated *Armstrong* and do not discuss the plaintiffs' causes of action.

statute's provision of a sole remedy, and (2) the judicially unadministrable nature of the statute's text. *Id.* at 328 (majority opinion).

First, the Court determined that the sole remedy under section 30(A) for a state's Medicaid noncompliance "is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* The Court explained that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Second, the Court determined that section 30(A)'s text was "judicially unadministrable," citing the broad requirements, lack of specificity, and "judgment-laden" standards in section 30(A). *Id.* Because Congress explicitly conferred enforcement of section 30(A) to the Secretary, the Court concluded that Congress intended to create an exclusive agency remedy, which "achiev[es] 'the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking[.]'" *Id.* at 328–29 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 292 (2002) (Breyer, J., concurring)). The Court held that these two factors in combination "show[ed] that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.* at 329.

Defendants attempt to analogize this case to *Armstrong*. They likewise contend that § 1831d reflects Congress's intent to foreclose equitable relief. Defendants argue (1) that the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1811 et seq., provides a sole remedy for enforcing § 1831d against the states,

and (2) that the FDIA creates a judgment-laden standard to render the statute judicially unadministrable. We review each factor in turn.

**(1) Sole Remedy:** Defendants claim that various provisions in the FDIA establish Congress's intent to provide a sole remedy, thereby excluding equitable relief. First, Defendants cite § 1831d(b), which expressly authorizes consumers to sue state banks for charging interest above the rate permitted under § 1831d(a). They argue that this method of enforcing § 1831d qualifies as a sole remedy that precludes other enforcement mechanisms. We disagree. In *Armstrong*, the Medicaid providers sought Idaho's compliance with section 30(A) through a claim in equity, even though the sole remedy (withholding federal funds) afforded the same relief. *Id.* at 328. But here, the remedy in § 1831d(b) offers relief to individual customers for a *state bank's* failure to comply with § 1831d, not to state banks for a *state's* failure to comply. Nor do we discern any express remedy for a state's violation of § 1831d in the rest of the statute.[19] We decline to interpret the statute's silence on a remedy for state

---

[19] Defendants' citation to *Coalition for Competitive Electricity v. Zibelman* is unpersuasive as well. 272 F. Supp. 3d 554, 565 (S.D.N.Y. 2017), *aff'd on other grounds*, 906 F.3d 41 (2d Cir. 2018). In *Zibelman*, the district court analyzed whether the plaintiffs could enjoin state officials from enforcing a state order that was allegedly preempted by a federal statute. *Id.* at 559. The district court turned to *Armstrong*'s framework to review for "equity jurisdiction." *Id.* at 563–66; *but see Zibelman*, 906 F.3d at 49 (declining to review equity jurisdiction after determining that the outcome of a separate issue obviated the need to resolve it). On the sole-remedy issue, the district court found that the federal statute expressly provided a private right of action for plaintiffs to challenge state rules like the one at issue, after exhausting

*(footnote continued)*

noncompliance as akin to congressional intent to foreclose equitable relief. *See id.* (requiring an "express provision of one method of enforcing a substantive rule" to demonstrate congressional intent to create a sole remedy (citation modified)); *King v. Youngkin*, 122 F.4th 539, 546–47 (4th Cir. 2024) (concluding that even if the Virginia Readmission Act has an implicit enforcement mechanism (the expulsion of Virginia's delegation from Congress), it does not rise to an "express provision of one method of enforcing a substantive rule" (citation modified)).

Second, Defendants assert that the FDIA assigns exclusive enforcement to a government regulator, the Federal Deposit Insurance Corporation (FDIC), to ensure a single coherent standard. They argue that the FDIC's broad enforcement power signals Congress's intent to foreclose actions by private parties and avoid inconsistencies in the banking system. As an initial matter, we note that Defendants' sole-remedy argument contradicts itself. If we accept Defendants' argument—that § 1831d(b) and the FDIC both provide remedies for a violation of § 1831d—then the existence of two remedies, by definition,

---

administrative remedies. *Zibelman*, 272 F. Supp. 3d at 565. The district court reasoned that this limited private right of action suggested that Congress had intended to preclude other methods of enforcement, including through the court's equitable powers. *Id.* Like the plaintiffs in *Armstrong*, the plaintiffs in *Zibelman* sought the same relief (preventing the enforcement of a state order allegedly preempted by federal law) that the private right of action was designed to facilitate. These features distinguish *Zibelman* from this case, because § 1831d provides no remedy for when a state unlawfully enforces its preempted interest-rate caps against state banks.

fails to qualify as a "sole" remedy. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 145–46 (2d Cir. 2016) (concluding that the existence of a second remedy confirmed that Congress did not intend to create a sole remedy for enforcing the statute's procedural requirements).

And on the merits, Defendants' FDIC argument has no force. The Second Circuit addressed the same issue in *Friends of the East Hampton Airport.* There, the plaintiffs sued for injunctive relief under *Ex parte Young* to prevent local officials from enforcing local laws that restricted operations at an airport. *Id.* at 136. They alleged that the local laws failed to meet procedural requirements under the Airport Noise and Capacity Act of 1990, 49 U.S.C. §§ 47521–47534. *Id.* This federal law conferred broad enforcement authority to a government regulator, the Federal Aviation Administration (FAA), so the local officials argued that this authority implied Congress's intent to foreclose equitable relief. *Id.* at 146. The Second Circuit disagreed and held that the FAA's broad enforcement authority did not preclude the plaintiffs' claim in equity. *Id.* The Second Circuit explained that the plaintiffs sued "not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements." *Id.* Here, the Banks similarly seek to enjoin state officials from enforcing preempted state interest-rate caps. They allege that Defendants' enforcement of the UCCC prevents their state-bank members from charging *lawful* interest rates under § 1831d, not that state banks charged *unlawful* interest rates in violation of

28

§ 1831d. Because the Banks do not encroach on the FDIC's role in enforcing § 1831d, we conclude that any broad enforcement power from the FDIC does not displace the Banks' claim in equity.

Defendants try to avoid this conclusion by arguing that the FDIC is authorized to sue a state for federal violations. They cite 12 U.S.C. § 1819, which contains a general statement that the FDIC may "sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal." Though this provision appears to permit the FDIC's involvement in a wide swath of lawsuits, including in a lawsuit against a state, we decline to read this broad statement as indicative of congressional intent to preclude claims in equity. To do so would unduly foreclose claims in equity to enjoin federal violations, so long as a federal agency has some generalized power to sue other parties. We have found no case that reads a provision about an agency's ability to "sue and be sued" in this way. In fact, the only significance that courts have attached to this language is that it creates a presumptive waiver of the agency's sovereign immunity. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994) ("By permitting [the Federal Savings and Loan Insurance Corporation (FSLIC)] to sue and be sued, Congress effected a 'broad' waiver of FSLIC's immunity from suit."); *Loeffler v. Frank*, 486 U.S. 549, 556 (1988) ("By launching the Postal Service into the commercial world, and including a sue-and-be-sued clause in its charter, Congress has cast off the Service's cloak of sovereignty and given it the status

of a private commercial enterprise." (citation modified)). Far from a preclusion of claims in equity, the sue-and-be-sued clause effectuates Congress's intent to waive the FDIC's sovereign immunity.[20] For these reasons, Defendants fail to show any sole remedy that evinces Congress's intent to preclude claims in equity.

   *(2) Judicially Unadministrable:* Though the absence of a sole remedy sufficiently defeats the argument that Congress intended to preclude claims in equity, we discuss Defendants' judicial administrability argument as well for a complete review. *See Armstrong*, 575 U.S. at 328 (stating that the provision of a sole remedy on its own may not be enough to preclude equitable relief).

---

   [20] Defendants' other citations are also unpersuasive because none explicitly deal with the FDIC's ability to sue a state. *See* 12 C.F.R. §§ 331.1–331.4 (2020) (describing the implementing regulations for various statutes, including § 1831d; defining terms related to state banking; providing that state law applies to out-of-state banks' branches in that state; and delineating the interplay between federal and state law); *California v. Fed. Deposit Ins. Corp.*, 584 F. Supp. 3d 834, 837 & n.1 (N.D. Cal. 2022) (resolving claims brought by seven states and the District of Columbia against the FDIC for an alleged violation of the Administrative Procedure Act).

   We also note that at the preliminary-injunction hearing, an FDIC attorney testified that the "FDIC's enforcement authority under the [FDIA] is limited to banks and those who work for them." App. vol. III, at 580. Though we acknowledge that this statement cannot override law to the contrary, Defendants also have not pointed us to any law that contradicts it. *See* 12 U.S.C. § 1818 (outlining the FDIC's authority to take enforcement action against *insured depository institutions and institution-affiliated parties*); *FDIC Enforcement Decisions and Orders (ED&O)*, FDIC, https://orders.fdic.gov/s/ (last visited June 18, 2025) (listing FDIC enforcement actions as against state banks that are not members of the Federal Reserve System, state savings associations, FDIC-insured branches of foreign banks, and individuals affiliated with these institutions (such as officers, directors, and employees)).

Defendants submit that the FDIA creates a "judgment-laden standard," which renders it "judicially unadministrable." Op. Br. at 61 (citation modified). But they cite no language that resembles the generalized language in the *Armstrong* statute. 575 U.S. at 328 (describing a statute that mandates state-plan payments "consistent with efficiency, economy, and quality of care" while "safeguarding against unnecessary utilization of care and services" as judicially unadministrable (citation modified)). Nor could they. Indeed, the text of § 1831d shows the opposite of a judgment-laden standard. Congress set an "objective benchmark" for the interest rate that state banks may charge—up to the greater of the discount-plus-one rate or the rate permitted by the state where the bank is located. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1227 (10th Cir. 2018). And a state may opt out of this provision for any loans made in that state. § 1831d note (Effective Date). This language provides a clear standard for courts to administer, and any disagreement over the statute's interpretation falls well within the courts' expertise. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57 (1974) ("[T]he resolution of statutory or constitutional issues is a primary responsibility of courts[.]"). We reject Defendants' argument that § 1831d and its opt-out provision are judicially unadministrable.

Finally, Defendants argue that the Banks "are attempting to create an implied private right of action where Congress did not provide one." Reply Br. at 26. This argument confuses a cause of action under a statutory implied right

31

of action with one under a claim in equity. When a plaintiff asserts an implied right of action, we review the statute's language to gauge whether Congress intended to create a private right and a private remedy. *Gonzaga Univ.*, 536 U.S. at 283–84. That inquiry is separate from our review for the viability of an equitable cause of action under *Ex parte Young*, which looks at whether Congress had intended to foreclose equitable relief. *Armstrong*, 575 U.S. at 327–28; *see also Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) ("[The plaintiffs] can rely on the judge-made cause of action recognized in *Ex parte Young*[.]"). So we decline Defendants' invitation to conflate a claim in equity with an implied private right of action.

For these reasons, we conclude that the Banks have a valid cause of action for a claim in equity, as recognized in *Ex parte Young*.

## B.    Loans "Made In" Colorado

Defendants next attack the Banks' likelihood of success on the merits under § 1831d's opt-out provision. On this issue, the district court held that the opt-out provision defined loans as "made in" only the state where the lender is located, regardless of the borrower's location. *Weiser*, 737 F. Supp. 3d at 1130–31, 1133. The district court's interpretation of § 1831d foreclosed Defendants from enforcing Colorado's interest-rate caps on loans made by out-of-state banks to Colorado borrowers. *Id.* at 1134–35. On appeal, Defendants assert that loans are "made in" a state so long as *either* the lender *or* the borrower is located in that state. According to Defendants, by opting out of § 1831d,

32

Colorado can enforce its interest-rate caps for loans to Colorado borrowers,

even if the state-bank lenders are located elsewhere.

Whether § 1831d's opt-out provision includes loans from out-of-state

banks to borrowers in the opt-out state is an issue of first impression. The

thrust of this statutory-interpretation question implicates the preemption of

state law. Central to any preemption case are "two cornerstones" that guide our

analysis:

> First, the purpose of Congress is the ultimate touchstone in every
> pre-emption case. Second, in all pre-emption cases, and particularly
> in those in which Congress has legislated in a field which the States
> have traditionally occupied, we start with the assumption that the
> historic police powers of the States were not to be superseded by the
> Federal Act unless that was the clear and manifest purpose of
> Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation modified). Neither party

disputes the well-established position that § 1831d expressly preempts state

law. *Greenwood Tr.*, 971 F.2d at 823 ("Section 521 boasts an express

preemption clause."); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir.

2005). At play here is the scope of a state's ability to opt out of § 1831d and

therefore the extent to which § 1831d continues to preempt state law even after

a state opts out.

For express preemption, "we focus on the plain wording of the clause,

which necessarily contains the best evidence of Congress' preemptive intent."

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation

modified). Importantly, we recognize that Colorado's decision to opt out of

33

§ 1831d and enforce its interest-rate caps implicates "two areas which are squarely within the ambit of the states' historic powers—banking and consumer protection." *Greenwood Tr.*, 971 F.2d at 828 (citation modified). So absent clear intent from Congress to intrude on these police powers, we decline to read § 1831d as continuing to preempt the laws of an opt-out state. *Id.* at 824; *see also id.* at 823 ("[W]henever Congress includes an express preemption clause in a statute, judges ought to limit themselves to the preemptive reach of that provision without essaying any further analysis under the various theories of implied preemption."). With these principles in mind, we review the statute's text and then discuss other considerations that further support the textual review.

### 1.    Statutory Text

Like any statutory-interpretation case, we "begin and end our inquiry with the text, giving each word its ordinary, contemporary, common meaning." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (citation modified). "The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). And we construe the text "within the context of the [statute] as a whole," because our interpretation "is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Maracich v. Spears*, 570 U.S. 48, 65–66 (2013).

We turn to the text of the statute to determine the meaning of "loans made in such State." § 1831d note (Effective Date). As a reminder, § 1831d(a) permits a state bank to charge on loans an interest rate up to the greater of (1) the rate allowed by the laws of the state where the bank is located, or (2) the discount-plus-one rate. This provision preempts state interest-rate caps. *Greenwood Tr.*, 971 F.2d at 823–24. But the Effective Date note allows states to opt out of § 1831d for "loans made in such State":

> Section [1831d] applicable only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date, on or after April 1, 1980, on which such State adopts a law . . . , which states explicitly and by its terms that *such State does not want this section to apply with respect to loans made in such State*, except that this section shall apply to a loan made on or after the date such law is adopted . . . if such loan is made pursuant to a commitment to make such loan which was entered into on or after April 1, 1980, and prior to the date on which such law is adopted . . . .

§ 1831d note (Effective Date) (emphasis added). The district court held that "loans made in such State" refers to only the lender's state. *Weiser*, 737 F. Supp. 3d at 1129, 1133. On appeal, Defendants argue otherwise, contending that "loans made in such State" can refer to either the lender's state or the borrower's state. We acknowledge that § 1831d is not a beacon of clarity. But we conclude that the statute's text is unambiguous: "loans made in such State" refers to loans in which either the lender *or* the borrower is located in the opt-out state.

35

To start, the meaning of the phrase "loans made in such State" turns on the words "made" and "loans." The district court noted that the "passive past participle of the verb 'to make'" created a harder "interpretive task" but reasoned that in "plain parlance," the lender "*makes* a loan[.]" *Weiser*, 737 F. Supp. 3d at 1129. According to the district court, "nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card." *Id.* The district court therefore read "loans made in such State" to refer to only the *lender's* state. *Id.* But the district court's reasoning assumed without analysis that the definition and function of "made" are synonymous with the definition and function of "make." Rather than focus on the meaning of the word in the statute—"made"—the district court substituted "make" for "made" and proceeded with its analysis from there. *Id.* That deviation from the text was in error.

Though seemingly minor, the difference between "made" and "make" materially affects the outcome, because in the past participle form, "made" can function as either a participial verb *or* a participial adjective. *See* Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 403, 454, 458, 486 (2016). The district court merely assumed that "made" functioned as a passive participial verb, i.e., "loans made [*by the bank*] in such State," and cobbled together extraneous words outside the statute's text to conclude that "made in such State" referred to only the lender's state. *Weiser*, 737 F. Supp. 3d at 1131; *see Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427,

438 (2019) (dismissing the party's attempt to "rearrang[e] the text . . . to create a phrase that does not appear in the statute"). We disagree with the district court's approach, which in our view placed an unwarranted focus on the lender by departing from the statute's text. Instead, we read "made in such State" as a participial adjective phrase that modifies the word "loans." *See* Garner, *supra*, at 458 (stating that a participial phrase may function as an adjective phrase). Our reading comports with the text of the statute as written, without any added or substituted words that the district court used to reach a different interpretation.

With that error corrected, we turn to the definitions of "loan" and "made." *See Esquivel-Quintana v. Sessions*, 581 U.S. 385, 392 (2017) (relying on dictionaries from the year of a statute's enactment for statutory interpretation). In the context of § 1831d's opt-out provision ("loans made in such State"), "loan" refers to a "lending," meaning a "[d]elivery *by one party* to and receipt *by another party* of [a] sum of money upon agreement, express or implied, to repay it with or without interest." *Loan*, Black's Law Dictionary (5th ed. 1979) (emphasis added).[21] And "made" refers to "executed." *Made*,

---

[21] According to Black's Law Dictionary, "loan" has the following definitions:

A lending. Delivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest.

*(footnote continued)*

Black's Law Dictionary (5th ed. 1979).[22] Reading the phrase together, we conclude that "made in such State" functions as a participial adjective phrase to describe the completed state of the loan—an *executed* loan. So in other words, "loans made in such State" refers to loans executed in the opt-out state, and an executed loan necessarily requires at least two parties—a lender and a borrower. *See Loan*, Black's Law Dictionary (5th ed. 1979) (describing a loan as involving two parties). The plain language of the statute therefore shows that a state's decision to opt out of § 1831d for "loans made in such State"

---

    Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use.
*Loan*, Black's Law Dictionary (5th ed. 1979) (citation modified); *see also Loan*, Merriam-Webster, https://www.merriam-webster.com/dictionary/loan (last visited June 18, 2025) (defining "loan" as "a transfer or delivery of money from one party to another with the express or implied agreement that the sum will be repaid regardless of contingency and usually with interest").
    In response brief, the Banks included only the second definition of "loan" from the 1979 edition of Black's Law Dictionary. But in the context of § 1831d, the first definition is the more applicable one. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (2012) (instructing that the reader "should assume the contextually appropriate ordinary meaning" of the word when reviewing dictionary definitions).

  [22] According to Black's Law Dictionary, "made" has the following definitions:
    Filed.
    Produced or manufactured artificially.
    To have required or compelled.
    Executed.
*Made*, Black's Law Dictionary (5th ed. 1979) (citation modified). We selected the definition most applicable to § 1831d's context. *See* Scalia & Garner, *supra* note 19.

encompasses loans in which either the lender *or* the borrower is located in the opt-out state.[23] Because the plain language unambiguously supports Defendants' reading of § 1831d, we need not engage in further analysis. But given the district court's contrary conclusion, we delve deeper.

The district court claimed that the following language supported its interpretation of the opt out as cabined to loans in which the lender is located in the opt-out state: "if such *loan is made* pursuant to a <u>*commitment to make such loan* . . . .</u>" *Weiser*, 737 F. Supp. 3d at 1131 (quoting § 1831d note (Effective Date)). The district court equated a "commitment to make [a] loan" to the loan contract and reasoned that even if the loan contract required two parties (a lender and a borrower), the contract does not determine where the loan is "made" under § 1831d. *Id.* But we disagree with the district court's reading of "commitment to make such loan." This phrase refers not to the loan contract but to a commitment letter in which the lender agrees to certain loan terms in exchange for a commitment fee from the borrower. *See Omega Healthcare Invs., Inc. v. Lantis Enters., Inc.*, 256 F.3d 774, 775–77 (8th Cir.

---

[23] Even if we were to accept the district court's use of "make" in place of "made," we find persuasive the argument that the word "in" creates a focus on both the lender and the borrower. § 1831d note (Effective Date) ("loans made *in* such State" (emphasis added)); *see* Ctr. for Responsible Lending & Nat'l Consumer L. Ctr. Amicus Br. at 12–14, 13 n.5. In plain parlance, if an individual asked, "Does Bank ABC *make* loans *in* Colorado?" the natural understanding of the question posed is whether Bank ABC extended loans *to borrowers in* Colorado. Ctr. for Responsible Lending & Nat'l Consumer L. Ctr. Amicus Br. at 12–13.

2001) (treating the loan commitment letter as separate from the loan agreement). The commitment letter is a contractual prelude to the actual loan contract and signals the parties' intent to execute the loan even if they haven't yet ironed out every term. In the context of § 1831d's opt-out provision, the phrase merely clarifies that a loan made after the opt-out date is still subject to § 1831d if the loan was made using a commitment letter that predated the opt out. The distinction between a "commitment to make such loan" and a loan "made" therefore does not amount to a distinction between the loan contract (which requires two parties) and a loan "made in such State."[24]

---

[24] Along similar lines, the Banks argue that a "loan" differs from a "loan contract." This argument dovetails with the district court's misconception that a loan contract amounts to a loan commitment letter and is therefore separate from the loan. *Weiser*, 737 F. Supp. 3d at 1131. In distinguishing the two, the Banks attempt to artificially detach a document laying out the loan's terms from the act of lending. But the Banks furnish separate definitions for "loan" and "contract" without identifying why the loan itself does not qualify as "[a]n agreement between two or more persons which creates an obligation to do or not to do a particular thing." *Contract*, Black's Law Dictionary (5th ed. 1979); *see* Resp. Br. at 43. Absent a careful description of the mechanics of a loan, the Banks fail to illuminate how the contract exists independent of the loan, rather than as an integral part of the loan. *See Gen. Motors Acceptance Corp. v. Mid-W. Chevrolet Co.*, 66 F.2d 1, 5 (10th Cir. 1933) ("A loan of money involves an absolute agreement to return the sum borrowed at a future time."); *In re Grand Union Co.*, 219 F. 353, 356 (2d. Cir. 1914) ("A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows."). We also note that many states permit certain loan agreements without the type of formal contract that the Banks presume is required of every loan. *Compare* Resp. Br. at 43 (stating that a contract "requires executing, signing, or delivering that contract" (citation modified)), *with* Tex. Bus. & Com. Code § 26.02(b) (West 2025) ("A loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and

*(footnote continued)*

The district court also commented that Congress could have focused on the borrower in § 1831d's opt-out provision yet chose not to do so. *Weiser*, 737 F. Supp. 3d at 1129. But that statement cuts the other way as well. Congress could have focused on the lender through language such as "loans made *by state banks* in such State" or, even better, "loans *originated by state banks* in such State." *See* 12 U.S.C. § 2018(a)(1)(A) (referencing "loans *originated* by a Farm Credit Bank" (emphasis added)). Instead, Congress included no such language. The omission becomes even more salient when we consider that Congress did focus on the lender's location in § 1831d(a). That provision allows a state bank to "charge on any loan or discount made" interest up to the discount-plus-one rate or "the rate allowed by the laws of the State . . . *where the bank is located*, whichever may be greater." § 1831d(a) (emphasis added). Unlike § 1831d(a), the opt-out provision contains no similar language about the bank's location. Under the meaningful-variation canon, "[w]here a document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (citation modified) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)). The express reference to the bank's location in § 1831d(a) reinforces our view that "loans made in such State" does not refer to only the

signed by the party to be bound or by that party's authorized representative."). For these reasons, the Banks' argument is not persuasive.

lender's location.[25] To hold otherwise would treat the express reference as meaningless.

The Banks acknowledge this variation in language but dismiss it as "'defeasible' by other indications of congressional intent[.]" Resp. Br. at 44 (quoting *Pulsifer v. United States*, 601 U.S. 124, 149 (2024)). They argue that § 1831d(a) and the opt-out provision "should be construed consistently, rather than forcing conflict into a statute where none exists." *Id.* at 45. We agree with this general principle. "[S]tatutes should be construed so that their provisions are harmonious with each other." *Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir. 1991). But in construing § 1831d(a) with the opt-out provision, we find that the text of § 1831d(a) supports Defendants' position. Though addressed by no party, § 1831d(a) contains an important caveat about when its interest rates (the discount-plus-one rate and the rate allowed by the state where the bank is located) preempt state law: "if the applicable rate prescribed in [§ 1831d(a)] *exceeds* the rate such State bank . . . would be permitted to charge *in the absence of this subsection*[.]" § 1831d(a) (emphasis added). This provision leaves room for a third category of interest rates that a state bank

---

25 Like § 1831d(a), sections 522 and 523 of DIDA, codified at 12 U.S.C. §§ 1730g (repealed 1989), 1785(g), expressly focus on the lender's location. §§ 1730g (" . . . at the rate allowed by the laws of the State . . . where such [insured savings and loan] institution is located . . . ."); 1785(g) (same but for credit unions); *see* DIDA, Pub. L. No. 96-221, §§ 522, 523, 94 Stat. 132, 165–66 (1980). The opt-out provision at section 525 of DIDA applies to sections 522 and 523 as well. DIDA § 525. These statutes contain language nearly identical to that in § 1831d and therefore help guide our interpretation.

may charge—the rate that would otherwise be available if § 1831d did not

exist. *Greenwood Tr.*, 971 F.2d at 827 (stating that section 521 of DIDA

permits charging the highest of three interest-rate caps, including "the highest

rate lawfully permitted without reference to section 521"); *Gavey Props./762 v.*

*First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 520 (5th Cir. 1988) (same for

§ 1730g (repealed 1989)).

The plain language of § 1831d(a) thus contemplates that "in the absence

of this subsection," a state other than the one where the bank is located could

regulate the interest rates that the bank may charge on its loans. *See Gavey*

*Props./762*, 845 F.2d at 522–23 (describing near-identical language in

§ 1730g(a) as permitting savings and loan associations to *import* the higher

interest rates of the borrower's state, in contrast to *Marquette*'s interest-rate

exportation); *cf. In re Lawson Square, Inc.*, 816 F.2d 1236, 1239–40 (8th Cir.

1987) (concluding that § 1730g does not apply because the rate that a savings

and loan association could charge in the absence of § 1730g exceeds the rate

under § 1730g). This provision makes the Banks' position untenable, because it

would create an absurd result: A bank could charge rates permitted by the

borrower's non-opt-out state "in the absence of" § 1831d(a), but an opt-out

state that "does not want [§ 1831d] to apply" must still abide by § 1831d(a)'s

preemptive force through interest-rate exportation. § 1831d & note (Effective

Date). This outcome would make no sense. So by linking § 1831d(a) to the opt-

out provision, we conclude that the text of § 1831d(a) favors reading "loans made in such State" to include the borrower's state.

The First Circuit's analysis in *Greenwood Trust* aligns with our reading of § 1831d(a) as well. There, a Delaware state bank sued for declaratory and injunctive relief against Massachusetts. *Greenwood Tr.*, 971 F.2d at 821. The state bank argued that Massachusetts (a non-opt-out state) could not enforce its interest-rate caps against the bank for loans made to Massachusetts borrowers, because § 1831d preempted state law. *Id.* at 821 & n.1, 831. The First Circuit agreed and held that the bank could export Delaware's higher interest-rate caps to Massachusetts borrowers through § 1831d. *Id.* at 827, 829–31. As part of its reasoning, the First Circuit outlined three permitted rates, with the highest of the three serving as a state bank's interest-rate cap under § 1831d:

> (1) *the highest rate lawfully permitted without reference to [§ 1831d]*; (2) a rate not more than one percent above the discount rate on 90–day commercial paper in effect at the Federal Reserve Bank in the federal reserve district where the lender is located; or (3) the highest rate allowed by the laws of the state where the lender is located.

*Id.* at 827 (emphasis added). So the First Circuit adhered to § 1831d(a)'s mandate that its rate applies only if it "exceeds the rate such State bank . . . would be permitted to charge in the absence of this subsection[.]" § 1831d(a). In holding that § 1831d preempted state law, the First Circuit specified that Massachusetts law "must yield" because the law "regulates the interest a bank

may charge in a *more restrictive* manner than federal law permits." *Id.* at 831 (emphasis added).

But under the First Circuit's reasoning, had Massachusetts rates been *less restrictive* than both the discount-plus-one rate and the rate permitted under Delaware law, § 1831d would not have necessarily prevented the Delaware bank from availing itself of Massachusetts's higher interest-rate cap. That's because § 1831d(a) does not preempt state law if the state bank could otherwise charge a higher rate. In these circumstances, if Delaware were to enforce its interest-rate caps against the Delaware bank for loans made to Massachusetts borrowers, a court would first need to determine whether Massachusetts law would apply to those loans without reference to § 1831d. The court's review may include, for example, a conflict-of-laws analysis or a Commerce Clause analysis. *Cf. Aldens, Inc. v. Ryan*, 571 F.2d 1159, 1160–62 (10th Cir. 1978) (permitting the application of Oklahoma interest-rate caps to loans by an out-of-state nonbank lender to Oklahoma residents under the Commerce Clause and Due Process Clause). But if Massachusetts law would otherwise apply, then Delaware cannot rely on state interest-rate exportation under § 1831d to enforce its (more restrictive) interest-rate caps on the bank's loans to Massachusetts borrowers.[26] *See Gavey Props./762*, 845 F.2d at 522–23

---

[26] We note that states do not have uniform usury laws—some may apply their usury laws to out-of-state lenders, while others may limit their usury laws to in-state lenders. *Compare* Minn. Stat. § 48.185 (2025) (regulating the

*(footnote continued)*

45

(describing state interest-rate importation under § 1730g). Therefore, the First Circuit's reasoning in *Greenwood Trust* further confirms our reading of § 1831d and its opt-out provision.

Additionally, the differences between § 1831d(a) and the opt-out provision do not create the level of tension portrayed by the Banks.[27] As we discuss later, the language variance reflects the different statutory purposes and legislative histories of the two provisions. And ultimately, the plain language of the statute, which we have construed to include the lender's location and the borrower's location, controls our interpretation. *See Pereira v. Sessions*, 585

---

maximum finance charge for "[a]ny bank organized under the laws of this state"), *with* Mass. Gen. Laws ch. 140, § 114B (2024) (same but for all "creditors").

[27] In fact, the Banks' argument that the phrase "loans made in such State" merely refers to the bank's location, as defined in § 1831d(a), conflicts with their position that a loan is "made" in only the state where a bank performs "key loan-making operations." *See* Resp. Br. at 27, 44–45. For § 1831d(a), an FDIC opinion letter defines a bank's location as the state where it is chartered, unless the bank's branch performs (1) all three non-ministerial functions of loan-making in another host state, or (2) at least one non-ministerial function in the host state and "the loan has a clear nexus to the host state" based on all the facts. FDIC Op. No. 11, 1998 WL 243362, at *27286. But if we were to transfer this definition of the lender's state to § 1831d's opt-out provision, a bank could "make" a loan in a state without performing any loan-making functions there. In the district court, the Banks acknowledged that the definitions in § 1831d(a) and the opt-out provision need not be "coextensive," App. vol. I, at 29, but they never clarify the discrepancy or explain why we should adopt a definition that allows a loan to be "made" in a state where the bank performs no loan-making functions. Defendants appear to contend that the lender's state refers to the state where the bank is chartered. Because the dispute here is whether "loans made in such State" encompasses the borrower's state, we express no view on the exact contours of which state qualifies as the "lender's" state under § 1831d's opt-out provision.

U.S. 198, 219 (2018) ("At the end of the day, given the clarity of the plain language, we apply the statute as it is written." (citation modified)).

The district court also cited other sections of the FDIA and Title 12 more generally to conclude that "loans made in such State" refers to only the state where the lender is located. *Weiser*, 737 F. Supp. 3d at 1129–30. The district court determined that the language in these sections "consistently use 'make' and 'made' in the same way"—that "a loan is 'made' *by* a bank *to* a borrower." *Id.* at 1129. But the cited provisions are unpersuasive for these reasons:

***12 U.S.C. §§ 1828(o)(3), 2610, 4742(4):*** These provisions discuss the lender in the context of a loan "made." That language materially differs from the language in the opt-out provision, which does not reference the lender or the borrower in the text. *Contrast* § 1831d note (Effective Date) ("loans made in such State"), *with* § 1828(o)(3) ("loan made *by an insured depository institution*" (emphasis added)), *and* 2610 ("*by a lender* in connection with a . . . loan made *by it*" (emphasis added)), *and* § 4742(4) ("loan made *by a participating financial institution*" (emphasis added)). In these provisions, the word "by" and the follow-up noun also turn "made" into a participial verb and treat the lender as the actor. That language fails to track the language in our participial adjective phrase, "loans made in such State." We also highlight that § 1828(o)(3) uses "made" with a focus on the borrower as well, stating that "the loan is *made to . . . commercial, residential, or industrial property*" without mention of the lender in that portion of the sentence. So even if we

were to accept the district court's interpretation of "made" as a participial verb in the context of "loans made in such State," we still fail to see how that would imply an exclusive focus on the lender.

*12 U.S.C. §§ 83(a), 143, 371(a), 1757(5), 1785(f)(1), 1831b(a):* In these provisions, the district court's quoted language situates the lender as the subject and "make" or "making" as the verb. But as discussed, the past participle form distinguishes the opt-out provision from other provisions that use the word "make." *Contrast* § 1831d note (Effective Date) ("loans made in such State"), *with* § 83(a) ("No national *bank* shall *make* any loan" (emphasis added)), *and* § 143 ("*association* shall not increase its liabilities by *making* any new loans" (emphasis added)), *and* § 371(a) ("Any *national banking association* may *make* . . . loans or extensions of credit" (emphasis added)), *and* § 1757(5) ("A Federal *credit union* . . . shall have power . . . to *make* loans" (emphasis added)), *and* § 1785(f)(1) ("Every insured *credit union* is authorized to . . . *make* loans" (emphasis added)), *and* § 1831b(a) ("No *insured depository institution* . . . shall *make* any . . . loan" (emphasis added)). We also note that, like § 1828(o)(3), § 1757(5)(A)(x) situates the borrower after the word "made" without any express reference to the lender. § 1757(5)(A)(x) ("no loan may be made to any member").

*12 U.S.C. § 85:* The district court cites part of the provision—"[a]ny association may take, receive, reserve, and charge on *any loan or discount made*"—as evidence that "made" and "make" are synonymous in Title 12. § 85

(emphasis added). But the district court left out the latter part of the sentence: "Any association may take, receive, reserve, and charge on any loan or discount made, . . . interest at the rate allowed by the laws of the State . . . *where the bank is located*[.]" *Id.* (emphasis added). The language here parallels the language in § 1831d(a), which we have already differentiated from the opt-out provision through the meaningful-variation canon. *See Greenwood Tr.*, 971 F.2d at 830 (describing § 85 as the "direct lineal ancestor" of section 521 of DIDA). That same principle differentiates § 85 from § 1831d's opt-out provision.

   ***12 U.S.C. §§ 2279aa(7)(C), 4742(10)(A), 5602(b)(1):*** The district court described the last category of cited provisions as dealing with the borrower. *Weiser*, 737 F. Supp. 3d at 1130. According to the district court, these provisions use the word "receive" or "obtain" when describing the actions that borrowers take in relation to loans. *Id.* The district court contrasts these verbs with other provisions' use of "made" to describe the lender's action. *Id.* But again, this interpretation rests on the assumption that "made" functions as a participial verb and has the same meaning as "make," such that an implied "lender" becomes the unwritten agent in § 1831d's opt-out provision. As discussed earlier, we decline to read "made in such State" that way. So the fact that these listed provisions use other verbs to describe the borrower's action does not convince us that "made in such State" refers to only the lender's state. We also highlight that Title 12 uses other verbs to describe the lender's action,

as well as "made" in connection with other actors. *See* 12 U.S.C.

§§ 1735f-18(b)(1)(B) ("mortgages *originated by such lender*" (emphasis

added)), 1831u(f)(2)(B) ("any loan or discount made, or note, bill of exchange,

financing transaction, or other evidence of debt, *originated by an insured*

*depository institution*" (emphasis added)); *see also* 12 U.S.C.

§§ 1817(b)(3)(A)(ii) ("*made* by the Board of Directors" (emphasis added)),

1817(j)(2)(B)(i) ("a person by whom or for whom such acquisition is to be

*made*" (emphasis added)), 1818(*l*) ("*made* by the appropriate Federal banking

agency" (emphasis added)), 1821(a)(1)(E) ("*made* by the Corporation"

(emphasis added)).

The other Title 12 sections therefore fail to persuade us that "made," as

used in § 1831d's opt-out provision, necessarily implies a focus on only the

lender. Because we reject that premise, we also reject the conclusion that

"made in such State" refers solely to the lender's state. § 1831d note (Effective

Date). Instead, our review of Title 12 shows that various provisions use "made"

in relation to only the borrower,[28] in relation to only the lender,[29] and in

---

[28] Various sections of Title 12 use "made" followed by an express
reference to only the borrower. *See* 12 U.S.C. §§ 1706f(c)(1) ("loan or
extension of credit made to a borrower"), 1715z-13b(c)(1) ("loan is made only
to a borrower"), 1828(o)(3) ("the loan is made to . . . commercial, residential,
or industrial property"), 2202b(a)–(b) ("loan made to any borrower"), 2202d(b)
("loan made to the borrower"), 2202(b)(2) ("loan made to the borrower").

[29] Various sections of Title 12 use "made" followed by an express
reference to only the lender. *See* 12 U.S.C. §§ 2202a(b)(1), (c) ("loan made by
(*footnote continued*)

relation to both the borrower and the lender.[30] Title 12 contains no uniform use of the word "made" that would allow us to infer an exclusive focus on the lender each time "made" is used without any express reference to the lender or the borrower. And even under the district court's determination that *made* in Title 12 means "'made' *by* a bank *to* a borrower," *Weiser*, 737 F. Supp. 3d at 1129, we fail to see how that interpretation of "made" doesn't contemplate both the lender and the borrower.

The Banks then assert that § 1831d(a)'s use of the phrase "any loan or discount made" links that provision's focus on the bank's location to the opt-out provision's use of the phrase "loans made in such State." We disagree. That subsection discusses how a "State bank" may "take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at" the discount-plus-one rate or "the rate allowed by the laws of the State . . . where the bank is located[.]" § 1831d(a). In this context, "take, receive, reserve, and charge" function as verbs in the

---

the lender"), 2610 ("No fee shall be imposed . . . by a lender in connection with a . . . loan made by it"), 4742(4) ("a loan made by a participating financial institution").

[30] Various sections of Title 12 use "made" followed by an express reference to both the borrower and the lender. *See* 12 U.S.C. §§ 3018(c) ("any loan made by any State or federally chartered lending institution to any borrower"), 4745(p)(1)(C)(i) ("loan previously made to the borrower by the participating financial institution"), 5704(e)(7)(A)(iii) ("a loan to a borrower that is a refinancing of a loan previously made to that borrower by the financial institution lender").

51

sentence, while "made" functions as a past participle modifying the nouns "loan" and "discount." *See* Garner, *supra*, at 454. We read "made" as adhering more closely to a participial adjective than a participial verb, which detracts from the Banks' position that "made" implies a relation to only the lender. *Id.* at 403, 486. And regardless of whether "made" functions as an adjective or a verb, we decline to read a phantom reference to just the lender at every use of the word "made."

The Banks also argue that the plain text of § 1831d's opt-out provision counsels against including the borrower's state in "loans made in such State." They contend that the singular "State" supports reading "made in such State" to denote only the lender's state. Again, we disagree. The opt-out provision first discusses the application of § 1831d "to loans made in any State," which ends once "such State adopts a law" to opt out of § 1831d. § 1831d note (Effective Date). The opt-out provision then requires that the law "states explicitly . . . that *such State* does not want this section to apply with respect to loans made in *such State*[.]" *Id.* (emphasis added). "The word 'such' usually refers to something that has already been 'described' or that is 'implied or intelligible from the context or circumstances.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (quoting *Such*, Concise Oxford Dictionary of Current English 1218 (1931)). Used here, the word "such" before the singular "State" demonstrates that "State" refers to a state that has opted out of § 1831d; it does not cabin the opt-out state to only the lender's state.

For these reasons, we conclude that the plain language of § 1831d's opt-out provision is unambiguous: "loans made in such State" refers to any loan in which either the lender or the borrower is located in the opt-out state. Colorado properly opted out of § 1831d for loans from out-of-state banks to Colorado borrowers. Because § 1831d does not prevent Defendants from enforcing the UCCC against out-of-state banks, the Banks failed to show that they are likely to succeed on the merits of this case. The statute's plain language resolves this issue, but we turn to other modes of statutory interpretation as well for a thorough review.

### 2.    Statutory Purpose

Even if we were to assume that the text of § 1831d's opt-out provision was ambiguous, we would still reach the same result. The district court opined that "the opt-out provision uses language inviting uncertainty and disagreement." *Weiser*, 737 F. Supp. 3d at 1128; *see also Tyler v. Cain*, 533 U.S. 656, 662 (2001) ("As commonly defined, 'made' has several alternative meanings, none of which is entirely free from ambiguity."). But "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008) (citation modified). This principle "applies with particular force" when preemption intrudes on "a field traditionally occupied by the States," such as banking and consumer protection. *Id.*; *see Greenwood Tr.*, 971 F.2d at 828. So primed against preemption, we review the purpose of

53

§ 1831d and its opt-out provision to gauge congressional intent. *See Altria Grp.*, 555 U.S. at 76 ("Congress may indicate pre-emptive intent through a statute's . . . purpose."); *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1214 (10th Cir. 2014) (considering the statute's "legislative history and stated purpose to resolve any lingering ambiguity" (citation modified)); *see also* Scalia & Garner, *supra*, at 56 ("[T]he resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose.").

As described, Congress passed § 1831d to "prevent discrimination against" state-chartered banks "with respect to interest rates[.]" § 1831d(a). In the context of rampant inflation and a resulting credit crunch during the 1970s, Congress had intended to place state banks on equal footing with national banks. 125 Cong. Rec. 30655. To ensure "competitive equity" between state and national banks, "Congress engrafted onto DIDA's bare bones, at several points, language taken from the [National] Bank Act," with § 1831d(a) taken directly from § 85. *Greenwood Tr.*, 971 F.2d at 826 (citation modified). "[W]hen Congress adopts the language used in an earlier act, we presume that Congress adopted also the construction given by [the Supreme] Court to such language, and made it a part of the enactment." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020) (citation modified). So we read § 1831d(a) as preempting state law in two respects: (1) A state bank may charge up to the national discount-plus-one rate regardless of any state interest-

54

rate cap; and (2) a state bank may export interest rates permitted by the state where the bank is located to out-of-state borrowers, even if the rate charged exceeds the rate permitted by the borrower's state. *Compare* § 85, *and Marquette*, 439 U.S. at 310 (interest-rate exportation for national banks), *with* § 1831d(a), *and Greenwood Tr.*, 971 F.3d at 827 (interest-rate exportation for state banks).

Though § 1831d(a) draws from the statutory purpose and legislative history of § 85, the opt-out provision is wholly separate from § 85 and its progeny. Instead, the language of the opt-out provision derives from the Brock Bill and the Borrowers Relief Act, two predecessor laws that provided partial relief from prohibitive state interest-rate caps during the 1970s. Both laws allowed state banks to temporarily charge interest up to 5% above the discount rate on ninety-day commercial paper for business and agricultural loans of $25,000 or more.[31] Brock Bill, Pub. L. No. 93-501 § 202, 88 Stat. 1557, 1558 (1974) (expired); Borrowers Relief Act, Pub. L. No. 96-104 § 102, 93 Stat. 789, 789 (1979) (expired).

In drafting these laws to alleviate an emergency credit crisis, several members of Congress recognized the substantial intrusion into "a matter that is customarily left to the States." *State Usury Ceilings: Hearings Before the*

---

[31] For the Borrowers Relief Act, Congress intended to target Arkansas's interest-rate caps and therefore limited its scope to states with constitutional interest-rate caps identical to Arkansas's cap of 10%. Borrowers Relief Act § 301.

*Subcomm. on Fin. Insts. Supervision, Regul. & Ins. of the Comm. on Banking, Fin. & Urb. Affs.*, 96th Cong. 26, at 24 (1979) ("*State Usury Ceilings*") (Rep. Ed Bethune on the Borrowers Relief Act). For the Brock Bill, Congress added an opt-out provision after the Conference of State Bank Supervisors objected to federal encroachment on the states' regulation of interest rates. *Problems Encountered Under State Usury Laws, Hearing on S. 3817 Before the Subcomm. on Fin. Insts. of the Comm. on Banking, Hous. & Urb. Affs.* 93rd Cong. 28 (1974) (testimony by Lawrence E. Kreider). The provision allowed states to opt out of the Brock Bill's higher interest-rate caps in favor of returning to state limits. Brock Bill § 206.

Similar concerns about federal intrusion animated congressional debate on the Borrowers Relief Act. During a hearing for this law, Representative Ed Bethune of Arkansas introduced (and passed) an amendment to "give the States the opportunity to override the bill if they see fit." *State Usury Ceilings* at 13. Under the amendment, a state effects the override by "adopt[ing] a law stating . . . that such State does not want the [Borrowers Relief Act] to apply with respect to loans made in such State[.]" Borrowers Relief Act § 107. Representative Bethune and other congressmembers feared that legislation setting federal interest-rate caps would "encroach[] on the State's prerogative to set usury rates" and therefore provided "an opportunity to reverse" the

legislation through the amendment.[32] *State Usury Ceilings* at 24 (exchange between Rep. Wylie and Rep. Bethune). The language of this amendment mirrors the Brock Bill's opt-out provision and became the statutory blueprint for § 1831d's opt-out provision.

Because Congress adopted language from the Brock Bill and the Borrowers Relief Act for § 1831d's opt-out provision, we presume that Congress had intended for the construction of those laws to apply to the opt-out provision as well. *See Public.Resource.Org, Inc.*, 590 U.S. at 270. So like the Brock Bill and the Borrowers Relief Act, § 1831d's opt-out provision allows states to "override" and "reverse" § 1831d. *State Usury Ceilings* at 13, 24. The plain language of the opt-out provision reflects this statutory purpose too. The opt-out provision starts with, "Section [1831d] *applicable only with respect to loans made* in any State during the period *beginning on April 1, 1980,* and *ending on the date, on or after April 1, 1980, on which such State adopts a law* . . . ." § 1831d note (Effective Date) (emphasis added). The text makes clear that if a state passes an opt-out law under this provision, § 1831d would no

---

[32] The Banks acknowledge that the Borrowers Relief Act's sponsors added the opt-out amendment because of uncertainty about the Act's constitutionality. But they fail to mention that this uncertainty derived from the sponsors' concerns that the Act impermissibly intruded into the states' right to set their own interest-rate caps for state banks. *State Usury Ceilings* at 24 (citing *Stephens Sec. Bank v. Eppivic Corp.*, 411 F. Supp. 61, 65–66 (W.D. Ark. 1976), *aff'd* 553 F.2d 102 (8th Cir. 1977) (unpublished table decision), for the court's "interpretation of the wisdom of Congress to involve itself in a matter that is customarily left to the States").

longer apply, meaning the state's authority to regulate interest rates for state banks reverts to the authority in place before April 1, 1980—the date § 1831d went into effect. The House Conference Report on § 1831d's opt-out provision reinforces this language, stating, "State usury ceilings on all loans made by federally insured depository institutions (except national banks) . . . will be permanently preempted *subject to the right of affected states to override at any time*[.]" H.R. Conf. Rep. 96-842, *as reprinted in* 1980 U.S.C.C.A.N. 298, 1980 WL 13128, at *78 (emphasis added). The plain language and legislative history of § 1831d's opt-out provision make clear that Congress had intended to allow states to override § 1831d and reassert their historic power over interest rates for state banks.

Yet under the Banks' interpretation of the opt-out provision, even if a state opts out of § 1831d, the state can never *fully* opt out. According to the Banks, of the two ways that § 1831d preempts state law, Colorado can opt out of the national discount-plus-one rate for loans in which the lender is located in Colorado but can never opt out of state interest-rate exportation. *See Greenwood Tr.*, 971 F.2d at 827. In short, the Banks advocate for a mere partial opt-out, in which the exportation of interest rates conferred by § 1831d continues to preempt state law despite the state's decision to opt out. This position is not moored to the text, purpose, or legislative history of the statute. Without Congress's "clear and manifest" intent for § 1831d to preempt state law in opt-out states, we refuse to intrude on the states' police powers. *Wyeth*,

555 U.S. at 565. And as Defendants point out, the Banks' interpretation of the opt-out provision betrays common sense—no state would ever opt out of § 1831d if the opt-out meant that the state would only disadvantage its own banks for loans to out-of-state borrowers. We therefore conclude that the statutory purpose establishes Defendants' reading of the opt-out provision—that "loans made in such State" refers to loans in which either the lender or the borrower is located in the opt-out state.[33]

### 3.    Agency Interpretations

The parties also cite agency interpretations of § 1831d and its opt-out provision to bolster their positions. We need not reach these interpretations, because the plain language and statutory purpose sufficiently resolve the scope of Colorado's opt out. Moreover, even if we were to consider agency interpretations, we would give them little to no deference. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (citation modified); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369,

---

[33] The Banks and certain amici claim that this ruling would interfere with § 1831d's purpose of competitive equality between state and national banks. But as discussed above, that statutory purpose never transferred to the opt-out provision, which derived from parallel concerns about federalism and interference with state police powers. Instead, the opt-out provision reflects congressional intent for states to discard the policy of competitive equality should they choose to do so.

386 (2024) (stating that respect is "especially warranted" for interpretations "issued roughly contemporaneously with enactment of the statute and remained consistent over time").

Here, the cited agency interpretations from the FDIC and the Office of Thrift Supervision (OTS) directly contradict each other and reflect inconsistent agency views. *Contrast* Fed. Deposit Ins. Corp., Interpretive Letter No. 83-16, 1983 WL 207393, at *1 (Oct. 20, 1983) (stating that an out-of-state bank may export interest rates from its home state to the opt-out state), *and N.C. S. Banking Comm. Minutes on 1983 HB 336*, 1983 Leg., 136th Sess. 4 (N.C. Mar. 28, 1983) (same), *and* Off. of Thrift Supervision, Opinion Letter, 1986 WL 290314, at *2 (June 27, 1986) (same for insured savings and loan associations under § 1730g (repealed 1989)), *with* Fed. Deposit Ins. Corp., Interpretive Letter No. 88-45, 1988 WL 583093, at *1–2 (June 29, 1988) (stating that where a loan is made is not necessarily based on the bank's location, as defined in § 1831d(a)), *and* Federal Interest Rate Authority, 85 Fed. Reg. 44146-01, 2020 WL 4192852, at *44153 (July 22, 2020) (stating that an out-of-state bank may not export interest rates from its home state to the opt-out state). These conflicting positions provide little value to our review, and no interpretation amounts to a formal agency rule. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (imputing greater deference to notice-and-comment rulemaking

60

than opinion letters and policy statements).[34] So we decline to defer to the agency interpretations, nor do we find them necessary to decipher § 1831d's opt-out provision.

### 4.    Case Law

As a last attempt to salvage their position, the Banks turn to case law. They cite *Jessup v. Pulaski Bank*, 327 F.3d 682 (8th Cir. 2003), for the proposition that "loans made in such State" refers to only the lender's state. In *Jessup*, a Texas resident had applied for a credit card from an Arkansas bank. 327 F.3d at 684. He then sued the bank for charging interest on his credit card debt at a rate higher than permitted under Arkansas law and Texas law. *Id.* at 683. The bank argued that 12 U.S.C. § 1831u(f) preempted state law by permitting "an Arkansas bank to charge interest at a rate allowed by the state of any out-of-state bank with a branch office in Arkansas[.]" *Id.* at 683–84. Relying on § 1831u(f), the bank pointed to an Alabama bank's branch in Arkansas as evidence that Arkansas banks could charge up to Alabama's

---

[34] Though the Federal Interest Rate Authority includes a final agency rule from the FDIC, the relevant information about the effect of a state's opt-out is in the "Supplementary Information" section, which does not have the force of law or require notice-and-comment procedures. *United States v. Caseer*, 399 F.3d 828, 838–39 (6th Cir. 2005) (noting that the "'Supplementary Information' accompanying an agency rule is separate from the text of the rule itself and is not codified in the Code of Federal Regulations"); *Nat'l Indus. Sand Ass'n v. Marshall*, 601 F.2d 689, 711–12 (3d Cir. 1979) (stating that information in the "Supplementary Information" section of an agency rule is not published in the Code of Federal Regulations, is not binding on those otherwise subject to the regulations at issue, and does not qualify as mandatory health or safety standards).

permitted interest rate. *Id.* at 684. The Texas resident contested the application of § 1831u(f), claiming the loan fell within the exception for "when the Arkansas bank has 'made' the loan 'in any State other than [Arkansas].'" *Id.* (quoting § 1831u(f)(2)(A)(i)). He argued that the loan was "made" in Texas and thus exempt under § 1831u(f)(2)(A)(i). *Id.* The Eighth Circuit deferred to an OCC opinion letter and held that the loan was "made" in Arkansas (the lender's state). *Id.* at 684–85.

The Banks argue that we should follow the Eighth Circuit's reasoning in *Jessup* and claim that holding otherwise would create a circuit split. We disagree with the Banks' characterization of *Jessup* and find it inapplicable to this case for several reasons. First, the Eighth Circuit deferred without analysis to the OCC's opinion letter based on the *Chevron* doctrine. *Id.* at 684–85, 685 n.3 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), *overruled by Loper Bright*, 603 U.S. 369 (2024)). The Supreme Court has since overruled *Chevron* and held that we need not defer to an agency interpretation merely because of an ambiguous statutory provision. *Loper Bright*, 603 U.S. at 413. So we reject the Eighth Circuit's mode of analysis under outdated law.

Second, § 1831u(f) deals with distinct factual circumstances not found in this case: the presence of out-of-state bank branches located in a state with low constitutional interest-rate caps. This provision provides relief to in-state banks that would otherwise suffer a severe disadvantage in relation to out-of-state

banks. Subsection (f)(1) expressly focuses on where a loan is "made" in the context of the lender to determine the rate that the lender can legally charge on the loan. § 1831u(f)(1)(A) ("any loan or discount made . . . *by . . . any insured depository institution*" (emphasis added)). This subsection sets the permitted rate based on the bank's "home State," defined as where a national bank's main office is located or where the state bank is chartered. § 1831u(f)(1)(A), (g)(4). Subsection (f)(2)(A)(i) later describes "the authority of any insured depository institution to . . . charge interest on any loan *made in any State* other than the State referred to in [§ 1831u(f)(1).]" § 1831u(f)(2)(A)(i) (emphasis added). Unlike § 1831d and its opt-out provision, § 1831u(f)(2)(A)(i)'s use of "made" invokes the "home State" definition from § 1831u(f)(1), which focuses on the bank's location. That express reference to the lender's location does not exist in § 1831d's opt-out provision—an omission made even more glaring by the express references in § 1831d(a) and § 1831u(f). We therefore decline to transfer § 1831u(f)(2)(A)(i)'s use of "made" to § 1831d's opt-out provision.

Third, as we discuss above, the FDIC and OTS have issued conflicting interpretations of the opt-out provision. *See supra*, Discussion section I(B)(3). Some support the Banks' position, while others support Defendants' position. These interpretations provide little value to our inquiry given that they contradict each other. So even if we were to consider the OCC's 2001 opinion letter, the letter would just join the litany of conflicting agency interpretations

before us. *See* OCC, Opinion Letter at 1 (Aug. 30, 2001). The Eighth Circuit's

decision in *Jessup* is therefore unpersuasive.[35]

*    *    *

For these reasons, we conclude that the district court abused its

discretion at the first preliminary-injunction factor. Under § 1831d's opt-out

provision, a loan is "made in" the opt-out state if either the borrower or the

lender is located in that state. The Banks therefore have a low likelihood of

success on the merits, because § 1831d no longer preempts Colorado's interest-

rate caps for loans from out-of-state banks to Colorado borrowers. The first—

and most important—preliminary-injunction factor favors Defendants.

## II.    Second Factor: Irreparable Injury

At the second factor, the district court determined that the Banks would

suffer irreparable injury without the requested preliminary injunction. *Weiser*,

737 F. Supp. 3d at 1133–34. "To show a threat of irreparable harm, a plaintiff

must demonstrate a significant risk that he or she will experience harm that

---

[35] Defendants also cite various cases about the dormant Commerce Clause
to support their position that a loan is "made" in both the lender's state and the
borrower's state. None are persuasive. The cited cases review whether certain
activity sufficiently affects a state, such that the state can regulate that activity.
*See A.S. Goldmen & Co. v. N.J. Bureau of Secs.*, 163 F.3d 780, 786 (3d Cir.
1999); *Quik Payday*, 549 F.3d at 1306, 1308–09. At most, these cases provide a
framework for determining which loans an opt-out state may regulate without
violating the dormant Commerce Clause. Beyond that proposition, we decline
to transfer analyses on the territorial scope of state regulations under the
dormant Commerce Clause to a statutory-interpretation question dealing with
the preemption of state law. We agree with the district court that these cases
provide limited value to our inquiry. *Weiser*, 737 F. Supp. 3d at 1130–31.

64

cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (citation modified). The district court found that the Banks satisfied this factor, citing "evidence that absent an injunction, they will be forced to stop offering their loan products altogether to certain Colorado consumers" and may permanently lose customers, business, and goodwill. *Weiser*, 737 F. Supp. 3d at 1133. The district court determined that these injuries were "the types of intangible damages that may be incalculable" and therefore inadequately compensated through money damages. *Id.* On appeal, Defendants do not challenge the district court's conclusion, and we detect no obvious error. So we accept that this factor favors the Banks.

## III.    Third & Fourth Factors: Balance of Equities & the Public Interest

Finally, Defendants argue that the district court improperly balanced the harms to the parties. This factor requires showing that the Banks' threatened injury without the injunction outweighs Defendants' injury with the injunction. *Free the Nipple-Fort Collins*, 916 F.3d at 797. And because the government is the opposing party, we consider the fourth factor—harm to the public interest— as part of our balance-of-equities inquiry. *Nken*, 556 U.S. at 435. The district court determined that this factor favored the Banks for three reasons: (1) the harm to Colorado borrowers is minimal given that national banks make loans at rates prohibited by Colorado's interest-rate caps under § 85, (2) the Banks made a strong showing that the interest-rate caps would disadvantage their state-bank members compared to national banks, and (3) the public interest

supports enjoining the enforcement of a preempted state law. *Weiser*, 737 F. Supp. 3d at 1134.

Because we have already concluded that § 1831d does not preempt Colorado's interest-rate caps for loans from out-of-state banks to Colorado borrowers, we find that two of the district court's three reasons no longer suffice for this factor. Even if the Banks made a strong showing that Colorado's interest-rate caps would disadvantage their state-bank members compared to national banks, Colorado can lawfully make this policy choice by opting out of § 1831d. Likewise, the public interest counsels against enjoining a validly enacted law from a democratically elected state legislature. We therefore conclude that the balance of equities favors Defendants.[36]

\*    \*    \*

In sum, two of the three factors support denying the preliminary injunction. The district court incorrectly concluded that "loans made in such State" refers to only the state where the lender is located. That misreading infected its analysis at two of the three preliminary-injunction factors. Instead, we hold that "loans made in such State," as used in § 1831d's opt-out

---

[36] Defendants also argue that the Banks gave insufficient evidence for their claim about the "marginal" protection that Colorado's interest-rate caps would provide for its residents. They cite the lack of information on the number of loans that state and national banks sought to offer Colorado residents (and at rates above Colorado's interest-rate caps). We need not address this argument because our reading of "loans made in such State" sufficiently resolves the balance of equities in Defendants' favor.

provision, refers to loans in which either the lender or the borrower is located in the opt-out state. The district court therefore abused its discretion in granting the preliminary injunction.

## CONCLUSION

For these reasons, we reverse the preliminary injunction. We remand the case to the district court for further proceedings consistent with this opinion.[37]

---

[37] We express no view on whether the Commerce Clause or any other law prevents Defendants' enforcement of Colorado's interest-rate caps against out-of-state banks. Nor do we resolve any conflict-of-law issues that may arise if adhering to interest-rate caps in the borrower's state violates the law in the lender's state. We agree with the district court that "the determination of where any particular loan is made will be a case-by-case factual inquiry[.]" *Weiser*, 737 F. Supp. 3d at 1126. This opinion deals with only the legal scope of a state's statutory right to opt out of § 1831d.

We acknowledge that this decision may cause some immediate uncertainty. Since DIDA's passage, only Iowa and Puerto Rico have consistently maintained their opt-outs, resulting in a dearth of case law interpreting legal issues that may arise from opting out of § 1831d. But the lack of development in this area of law cannot prevail over the statute's text. So we apply § 1831d as written.

*Nat'l Assoc. of Ind. Bankers* v. *Weiser*, No. 24-1293
**ROSSMAN**, J., concurring in part and dissenting in part.

I agree the Banks have stated a viable cause of action, so I concur in Section I.A. I otherwise do not join the majority opinion.

We face an issue of first impression which, as the majority correctly explains, "largely turns on our interpretation of § 1831d and its opt-out provision." Op. at 18. The key questions at the heart of this case are not easy to resolve. The district court observed, "The effect of a state's opt-out of Section 1831d, how to determine where a loan is 'made,' and whether the opt-out provision permits states to reassert control over the interest rates charged by out-of-state banks to borrowers residing in those states have been open questions since the statute's inception, as the opt-out provision uses language inviting uncertainty and disagreement." RII.455 (footnote omitted).

Still, "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 400 (2024). In my view, the best meaning of § 1831d (Section 521 of DIDMCA) and its corresponding opt-out provision (Section 525 of DIDMCA) is the one advanced by the Banks and endorsed by the district court.[1] I therefore would

---

[1] The majority cites to the provisions of Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) found in the United States Code. 12 U.S.C. § 1831; *id.* § 1831d note (Effective Date). But I think it might be more precise to refer to the United States Statutes at Large—

affirm the grant of the preliminary injunction. I respectfully dissent from the majority's contrary conclusion.

## I

In 1980, Congress enacted DIDMCA to ensure competitive equality between state and national banks. Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96-221, sec. 521, § 27, 94 Stat. 132, 164–65 (1980). DIDMCA authorized state-chartered banks to charge on loans the same interest rate used by their national bank counterparts, preempting state laws to the contrary. *Id.* As part of DIDMCA, Congress allowed states to opt out of federal rate preemption. § 525, 94 Stat. at 167.

Colorado opted out.[2] In June 2023, Colorado enacted H.B. 23-1229, opting out of DIDMCA as of July 1, 2024:

---

DIDMCA Sections 521 and 525. Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96-221, sec. 521, § 27, 94 Stat. 132, 164–65 (1980); § 525, 94 Stat. at 167. For one thing, "[t]he United States Statutes at Large . . . [are] legal evidence of [the] law[] . . . ." 1 U.S.C. § 112. And there is a slight difference between Section 525, curiously enacted as an effective date provision, and the note to § 1831d as prepared by the Office of the Law Revision Counsel. *Compare* § 525, 94 Stat. at 167 ("The amendments made by sections 521 through 523 shall apply only . . . .") *with* § 1831d note (Effective Date) ("Section applicable only . . . .").

[2] Shortly after Congress passed DIDMCA, Colorado, Iowa, Maine, Massachusetts, Nebraska, North Carolina, Wisconsin, and the Commonwealth of Puerto Rico, opted out of the rate preemption provisions in Section 521. Then, Colorado, along with most of the other states, opted back in. In 2023,

> In accordance with section 525 of [DIDMCA], the general assembly declares that the state of Colorado does not want the amendments . . . made by sections 521 to 523 of [DIDMCA], prescribing interest rates and preempting state interest rates to apply to consumer credit transactions in this state. The rates established in articles 1 to 9 of this title 5 control consumer credit transactions in this state.

Ch. 375, § 3, 2023 Colo. Sess. Laws 2245 (codified at Colo. Rev. Stat. Ann. § 5-13-106 (West 2025)) (the opt-out). The Colorado Uniform Consumer Credit Code (UCCC) defines a "consumer credit transaction" as "made in" Colorado—and hence subject to Colorado's opt-out—whenever:

> (a) A written agreement evidencing the obligation or offer of the consumer is received by the creditor in this state; or

> (b) A consumer who is a resident of this state enters into the transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means.

Colo. Rev. Stat. Ann. § 5-1-201(1)(a)–(b) (West 2025).[3] Colorado's opt-out is premised on its view that under Section 525 a loan is "made in" both the state

---

Colorado again opted out. Today, only Colorado, Iowa, and Puerto Rico have opted out of DIDMCA.

[3] At first blush, the UCCC appears to suggest a loan could be "made in" any state as long as the creditor advertised in Colorado and the borrower is a "resident of" Colorado. Colo. Rev. Stat. Ann. § 5-1-201(1), (1)(b) (West 2025). But Section 5-1-201(2) clarifies that "[n]otwithstanding paragraph (b) . . . a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state." Colo. Rev. Stat. Ann. § 5-1-201(2) (West 2025).

3

where the bank enters the transaction and the state where the borrower enters the transaction. According to the Administrator of the Colorado UCCC, Colorado understands its opt-out to conform to federal law. *See* RIII.194 (stating in an opinion letter interpreting the scope of § 5-13-106 that the "administrator will limit her enforcement, if any, of violations of this opt out, if any, to loans 'made in' Colorado pursuant to § 5-13-106 and DIDMCA section 525, which she interprets to be identical.").[4]

The majority authorizes the scope of Colorado's opt out, but federal law does not. Colorado seeks to prevent out-of-state, state-chartered banks from lending to Colorado borrowers at rates permitted by the states where the banks are located, but higher than allowed under Colorado law. Colorado certainly has a legitimate interest in protecting Colorado borrowers, but DIDMCA is focused on regulating banks, not protecting borrowers. The best evidence from statutory text, context, and history confirms a consumer loan "made in such State" under Section 525 means the place where the lending bank is chartered or performs its non-ministerial loan making functions—and not, as Colorado

---

[4] The Banks sought to enjoin enforcement of Colorado's opt-out law, but the district court correctly observed that the statute preempted by Section 521 "is actually the Colorado UCCC," which governs interest-rate caps on loans. RII.467. Properly understood, therefore, the preliminary injunction request targeted the UCCC but "only to the extent the UCCC interest-rate caps" conflict with "those in Section 1831d(a) and are applied to loans that are not 'made in' Colorado." RII.467.

and the majority insist, where the borrower is located. Colorado's opt-out thus does not adhere to the federal definition of where a loan is "made" in Section 525, and to that extent, exceeds Colorado's authority under DIDMCA and the Supremacy Clause. § 525, 94 Stat. at 167.

I would affirm essentially for the reasons stated in the district court's well-reasoned order, but I write separately to highlight what I find most persuasively supports the Banks' position and most undermines the majority's.

## A

"We begin with the language of the statute itself," keeping in mind "our primary task is to determine congressional intent." *Potts* v. *Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (citations and quotation marks omitted); *United States* v. *American Trucking Assns., Inc.*, 310 U.S. 534, 542 (1940) (courts' role in interpreting statutes is "to construe the language so as to give effect to the intent of Congress"). "[T]he text of the whole statute gives instruction as to its meaning." *Star Athletica, L.L.C.* v. *Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) (quoting *Maracich* v. *Spears*, 570 U.S. 48, 65 (2013)).

Applying these first principles, we turn to DIDMCA sections 521 and 525. Section 521(a), DIDMCA's preemption provision for state-chartered banks, provides:

5

In order to prevent discrimination against State-chartered insured banks, including insured savings banks and insured mutual savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

Sec. 521, § 27, 94 Stat. at 164–65.

Section 525 is the corresponding provision that permits states to opt out of Section 521. It provides:

The amendments made by sections 521 through 523 of this title shall apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date, on or after April 1, 1980, on which such State adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to loans made in such State, except that such amendments shall apply to a loan made on or after the date such law is adopted or such certification is made if such loan is made pursuant to a commitment to make such loan which was entered into on or after April 1, 1980, and prior to the date on which such law is adopted or such certification is made.

§ 525, 94 Stat. at 167.

Reading Section 521 together with Section 525, I agree with the district court "that the answer to the question of *where* a loan is 'made' [under Section 525] depends on the location of the bank, and where the bank takes certain actions, but not on the location of the borrower." RII.459 (emphasis in original). According to the majority, "Under § 1831d's opt-out provision, a loan is 'made in' the opt-out state if either the borrower or the lender is located in that state," and because Colorado has chosen to opt-out, "§ 1831d no longer preempts Colorado's interest-rate caps for loans from out-of-state banks to Colorado borrowers." Op. at 64. I cannot reconcile the majority's holding with the plain statutory text.

At the outset, I observe the majority seems to mistakenly drive a wedge between Sections 521 and 525. "[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Dole* v. *United Steelworkers*, 494 U.S. 26, 35 (1990) (quoting *Massachusetts* v. *Morash*, 490 U.S. 107, 115 (1989)). "It is well settled that we are obliged to construe cognate statutory provisions harmoniously, if possible." *Fish* v. *Kobach*, 840 F.3d 710, 736 (10th Cir. 2016); *see* 2A Norman Singer & Shambie Singer, *Sutherland Statutory Constr.* § 46.5 (7th ed. 2025) ("[E]ach part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole.").

7

Here, to discern the meaning of "loans made in such State" for purposes of Section 525, we must read that provision together with Section 521. Both statutes address the same subject—namely, the applicable interest rate for state-chartered banks to charge on consumer loans. "[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 315–16 (2006) (quoting *Erlenbaugh* v. *United States*, 409 U.S. 239, 243 (1972)). Sections 521 and 525 were enacted at the same time. Pub. L. 96-221, sec. 521, § 27, 94 Stat. 132, 164–65 (Mar. 31, 1980); Pub. L. 96-221, § 525, 94 Stat. 132, 167 (Mar. 31, 1980); s*ee Erlenbaugh*, 409 U.S. at 244 (reasoning the application of the *in pari materia* canon "certainly makes the most sense when the statutes were enacted by the same legislative body at the same time"). And Section 525 expressly references Section 521 in its text. Sec. 525, § 27, 94 Stat. at 167 ("The amendments made by sections 521 through 523 of this title shall apply. . ." unless a state opts out.); *Panama R. Co.* v. *Johnson*, 264 U.S. 375, 392 (1924) (observing that "reference" to another statute "is a recognized mode of incorporating one statute or system of statutes into another, and serves to bring into the latter all that is fairly covered by the reference." (citing *Kendall* v. *United States*, 37 U.S. (12 Pet.) 524 (1838))). Thus, when interpreting Section 525, we must proceed with the understanding that "considerable light is forthcoming from another provision of the statute itself,"

8

*Costello* v. *Immigr. & Naturalization Serv.*, 376 U.S. 120, 126 (1964)—Section 521.

Reading Sections 521 and 525 harmoniously compels at least two conclusions—each supports the district court's ruling.

*First*, based on the stated statutory purpose, the provisions at issue are about regulating banks, not protecting borrowers. In the first sentence of Section 521, Congress says the statute is intended "to prevent discrimination against state chartered insured banks . . . with respect to interest rates" by granting state banks interest rate parity with national banks. Sec. 521, § 27, 94 Stat. at 164. The purpose is found in the statutory text, so it is strong evidence of Congressional intent. *West Va. Univ. Hosps., Inc.* v. *Casey*, 499 U.S. 83, 98 (1991) (explaining "[t]he best evidence of [a statute's] purpose is the statutory text adopted by both Houses of Congress and submitted to the President"); *see also United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("The intention of the legislature is to be collected from the words they employ."); *Gundy* v. *United States*, 588 U.S. 128, 142 (2019) (plurality opinion) (finding a "statement of purpose" to be "'an appropriate guide' to the 'meaning of the [statute's] operative provisions'" (alteration original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012))).

9

The majority insists the "statutory purpose [in Section 521] never transferred to the opt-out provision [in Section 525], which derived from parallel concerns about federalism and interference with state police powers." Op. at 59 n.33. But I see no textual basis for this reading, which is not in keeping with construing related statutory provisions in harmony. *See Negonsott* v. *Samuels*, 933 F.2d 818, 819 (10th Cir. 1991) (observing "statutes should be construed so that their provisions are harmonious with each other" (citing *United States* v. *Stauffer Chemical Co.*, 684 F.2d 1174, 1184 (6th Cir.1982))). Section 525 is linked substantively, temporally, and textually to Section 521, so there is "a very high probability" that the provisions "are based on the same policy." 2B Norman Singer & Shambie Singer, *Sutherland Statutory Constr.* § 51.3 (7th ed. 2025) ("[T]he rule that statutes *in pari materia* should be construed together has the greatest probative force for statutes relating to the same subject and passed at the same legislative session . . . . Such circumstances indicate a very high probability that acts relating to the same subject matter are based on the same policy.").

Properly construed consistent with its statutory purpose, Section 525 permits states to decline the offer of parity in favor of retaining control over their own banks' interest rate caps. Section 525 restores the pre-DIDMCA ability of state-chartered banks to restrict their own state banks from lending above their own state rate limits, without regard for the federal rate. When a

state opts out of Section 521, it acts only regarding "such State bank[s]" making the loan—i.e., its own state-chartered banks. Pub. L. 96-221, § 525, 94 Stat. 132, 167 (1980). Meanwhile, a state-chartered bank in a non-opt-out state continues to operate under the full force of Section 521 and the preemption it provides.[5] As the Banks correctly observe, "The opt-out was designed to allow states to decline interest-rate parity, not to encroach on other states' interests in regulating their own banks." Resp. Br. at 49; Resp. Br. at 31–32 ("An out-of-state state-chartered bank is unaffected by a state's opt-out unless that out-of-state bank performs its key loan-making functions in the opting-out state.").

The majority says Section 525 has a distinct purpose—it "reflects congressional intent for states to discard the policy of competitive equality should they choose to do so." Op. at 59 n.33. That is true—but only as far as it goes. Nothing in the text suggests—as the majority goes on to hold—that states, by opting out of Section 521, can discard the policy of competitive equality for their state-chartered banks *and also for out-of-state, state-chartered banks*. *See King* v. *Burwell*, 576 U.S. 473, 493 (2015) ("We cannot interpret federal statutes to negate their own stated purposes." (quoting *New York State Dept. of Social Servs.* v. *Dublino*, 413 U.S. 405, 419–420 (1973))).

---

[5] And the state bank does so "notwithstanding any State constitution or *statute*." Sec. 521, § 27, 94 Stat. at 164 (emphasis added). The opt out provision is such a *statute*.

The majority's reading undermines the competitive parity Congress intended and enables the very discrimination Section 521 sought to eliminate. And it cannot withstand scrutiny in context. Recall, the National Bank Act does not contain any opt-out provision with respect to its preemptive federal interest-rate caps. *See* 12 U.S.C. § 85. Colorado's opt-out, therefore, does not affect loans made by national banks or federal thrifts to Colorado consumers.[6] As the amicus brief for the American Bankers Association persuasively points out, authorizing Colorado's opt-out "will place out-of-state state-chartered depository institutions at a pronounced competitive disadvantage compared to out-of-state national banks located in the same state in making loans to Colorado residents, since the national banks will remain free to charge whatever interest rates are permitted by their own states' laws." Brief for American Bankers Association et al. as Amici Curiae Supporting Appellees at 5–6. This outcome make sense because parity, not consumer protection, is the focus of these statutes.[7]

---

[6] The district court made this same observation, reasoning that, because Colorado's opt out "will not be able to prevent national banks from making loans to Coloradans at above-UCCC rates," "Colorado consumers will have only marginally more protection from higher interest rates." RII.466.

[7] Colorado claims "if parity was Congress's only concern, DIDMCA would not have Section 525." Reply Br. at 8. This misunderstands Section 525's purpose and function. States may choose to regulate their chartered institutions more restrictively than federal law permits. But Section 525 does

12

*Second*, as the district court correctly observed, the words "made" and "make" are used consistently throughout DIDMCA—and Title XII of the United States Code—to refer to the *bank's act* of making a loan. RII.458–59. "A term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf* v. *United States*, 510 U.S. 135, 143 (1994) (citing *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)); *Impact Energy Res., LLC* v. *Salazar*, 693 F.3d 1239, 1254 n.1 (10th Cir. 2012) (Seymour, J., concurring) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context." (quoting *Erlenbaugh*, 409 U.S. at 243 (1972))). Section 521 allows state-chartered banks to "charge *on any loan . . . made*" certain rates based on the bank's location. (emphasis added). Section 521 does not implicate the borrower's location. Section 525 similarly applies only "with respect to *loans made* in such State." Under the majority's logic, to determine the interest rates a state-chartered bank can charge on consumer loans, Section 521 ignores the borrower's location but Section 525 depends on it. I respectfully submit that is not the best reading of these provisions. *Ratzlaf*, 510 U.S. at 143 (observing that "reading [a] word differently for each code section" would "render meaning so malleable" as to

---

not authorize extraterritorial regulation that defeats parity for state-chartered banks outside Colorado.

"open Pandora's jar"). Accounting for the clear textual link between the bank's "location" and where a loan is "made," I am more persuaded that where a loan is "made" under Section 521 should not differ from where it is "made" under Section 525.[8]

The provisions throughout Title XII further support the conclusion that loans are *made* by banks, and the bank's location—its place of charter or performance of non-ministerial functions—determines the applicable interest rate. "[I]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Star Athletica*, 580 U.S. at 414 (alteration original) (quoting *Maracich*, 570 U.S. at 65). Title XII regulates "Banks and Banking." 12 U.S.C. (title). As the district court observed, Title XII comprehensively refers to *making* loans *to* borrowers. *See, e.g.*, 12 U.S.C. § 1831b(a) ("No insured

---

[8] The majority finds it significant that, unlike Section 521, "the opt-out provision contains no similar language about the bank's location." Op. at 41. That might be relevant if we were permitted to construe Section 525 in isolation. But "[a] statutory subsection may not be considered in a vacuum." 2A Norman Singer & Shambie Singer, *Sutherland Statutory Constr.* § 46.5 (7th ed. 2025). Sections 521 and 525 are companions and travel together. It follows, therefore, that "where a loan is made for the purposes of interest-rate preemption [under Section 521] is certainly relevant to where a loan is 'made' for purposes of opting out of that preemption [under Section 525]." Resp. Br. at 61. Because Section 521 determines interest rates based on the bank's location, and Section 525 expressly applies to "amendments made by section[] 521," the best reading of the phrase "loans made in such State" is that it means the state where the bank is located.

14

depository institution . . . shall make any federally related mortgage loan . . . ."); *id.* § 83(a) ("No national bank shall make any loan . . . ."); *id.* § 1757(5) ("A Federal credit union . . . shall have power . . . to make loans . . . ."); RII.457–58 (district court cataloging other examples in Title XII). This consistent usage meaningfully informs the best reading of DIDMCA's interest-rate framework—the discrete regulatory context in which Section 525 operates. The majority does not identify any provision in Title XII where the word "made" is used to describe a borrower's conduct in connection with the regulated activities.

In disagreeing with the district court's interpretation, the majority places particular emphasis on whether "made" in Section 525 functions as a participial verb or a participial adjective. Op. at 36–37. Recall, the district court concluded the statutory text was difficult to parse, reasoning,

> the clause in dispute here is "made in such State [in Section 525]" and "made" in this context is a passive past participle of the verb "to make." . . . While a passive past participle makes the interpretive task harder than it might have been, Congress's use of "made" puts the focus on the act of making a loan. In plain parlance, it is the lender who makes a loan.

RII.456–57.

The majority faults the district court for "assum[ing] without analysis that the definition and function of 'made' are synonymous with the definition and function of 'make'" and concludes "[t]hat deviation from the text was in

15

error." Op. at 36. The majority then goes on, "we read 'made in such State' as a participial adjective phrase that modifies the word 'loans.'" Op. at 37; *see* Op. at 36 (citing Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 458 (2016) for the proposition "that a participial phrase may function as an adjective phrase").[9] And then with that so-called "error corrected," the majority turns to dictionary definitions to learn the meanings of the words "loan" and "made." Op. at 37–38. Relying on these definitions, the majority concludes "loans made" means an "executed loan" that "requires at least two parties—a lender and a borrower." Op. at 37–38 (emphasis omitted).

Grammar is not the key that unlocks this case. The Supreme Court has long instructed, when construing statutes, "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States* v. *Whitridge*, 197 U.S. 135, 143 (1905). To be sure, "[w]ords are to be given the meaning that proper grammar and usage would assign them." *Nielsen* v. *Preap*, 586 U.S. 392, 407–08 (2019) (alteration original) (quoting Scalia & Garner, *supra*, at 140). But that principle is not

---

[9] I agree the word "made" as used in Sections 521 and 525 could be understood as a participial adjective. But Sections 521 and 525 are grammatically symmetrical—both provisions use *loan(s) made* as a participial adjective—so it is unclear to me how this point of grammar advances our inquiry. *Compare* sec. 521, § 27, 94 Stat. at 165 (allowing state banks to "charge *on any loan . . . made*" certain rates based on the bank's location (emphasis added)) *with* § 525, 94 Stat. at 167 ("apply[ing] only with respect to *loans made* in such State.").

unbounded. "'[R]ules of grammar govern' statutory interpretation 'unless they contradict legislative intent or purpose.'" *Nielsen*, 586 U.S. at 407–08 (2019) (quoting Scalia & Garner, *supra*, 140). As the majority acknowledges, "the purpose of Congress is the ultimate touchstone in every pre-emption case." Op. at 33 (quoting *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009)). "After all, judges are not charged with grading Congress's grammar but with applying laws in conformance with Congress's manifest purpose." *United States* v. *Hinckley*, 550 F.3d 926, 942 (10th Cir. 2008) (Gorsuch, J., concurring), *abrogated by Reynolds* v. *United States*, 565 U.S. 432 (2012). Here, the majority's semantic precision yields little interpretive insight because it is divorced from the stated statutory purpose.

I also disagree with the majority that "the difference between 'made' and 'make' materially affects the outcome" of this appeal. Op. at 36. In the context of DIDMCA and Title XII, it is far more likely that "make" and "made" are synonymous. *See Johnson* v. *United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning."); *City & Cnty. of San Francisco* v. *EPA*, 604 U.S. 334, 350 (2025) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U.S. 302, 320 (2014))); *Dolan* v. *U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (acknowledging that "[t]he definition of words

in isolation . . . is not necessarily controlling in statutory construction."). Even if "make" and "made" are literally different words, "[a] 'statute's basic purpose' might support the conclusion that 'two sets of different words mean the same thing.'" *DePierre* v. *United States*, 564 U.S. 70, 83 (2011) (quoting *Public Lands Council* v. *Babbitt*, 529 U.S. 728, 746–47 (2000)); *see United States* v. *Theis*, 853 F.3d 1178, 1181 (10th Cir. 2017) (explaining that to determine a word's meaning "we must also consider both the specific context in which the word is used and the broader context of the statute as a whole."). As the Supreme Court has recognized, "We are not aware . . . of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013). Given the text and context highlighted here and discussed by the district court, I doubt Congress intended to inject a novel borrower-focused framework foreign to DIDMCA and Title XII simply by employing "made" as a participial adjective.[10]

---

[10] The majority suggests the conditional clause in Section 521—which states its terms apply only when the rate allowed by Section 521 "exceeds the rate an insured institution would be permitted to charge in the absence of this section"—means borrower-state law could set interest rates on consumer loans. Sec. 521, § 27, 94 Stat. at 165; Op. at 42–43. According to the majority, "The plain language of § 1831d(a) thus contemplates that 'in the absence of this subsection,' a state other than the one where the bank is located could regulate the interest rates that the bank may charge on its loans." Op. at 43. In support, the majority appears to rely on dicta from *Gavey Props./762* v.

## B

The history reinforces what the text reveals—Section 525 only permits states to restore their pre-DIDMCA ability to restrict *their own state-chartered banks* from lending above their own state rate limits, without regard for the federal rate. The majority robustly describes the dual-banking system in the United States and provides relevant historical context. *See* Op. at 6–9. It bears emphasizing why studying DIDMCA's enactment history—including its predecessor statutes—helps resolve the open questions in this appeal.

Traditionally, "banking was 'squarely within the ambit of the states' . . . powers[.]'" Op. at 7 (alteration original) (quoting *Greenwood Tr. Co.* v. *Massachusetts*, 971 F.2d 818, 828 (1st Cir. 1992)).[11] Congress passed the

---

*First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 522–23 (5th Cir. 1988), observing, in the context of a different statute, state banks may "import" rates from borrower states. Op. at 43, 45–46. Importation means the bank could "'import' the favorable interest rate[] of another state to itself"—rather than export an interest rate to borrowers in other states. *Gavey*, 845 F.2d at 523. Even accepting rate importation has any relevance here, it would operate only if the bank's charter state authorized its banks to import other states' rates. Of course, states may regulate their banks. What they cannot do, and what Section 525 does not authorize, is regulate out-of-state, state-chartered banks that have not opted-out under Section 521. Resp. Br. at 48–49. Thus, I do not find the majority's rate importation example—something no party has argued—particularly persuasive.

[11] The majority claims, "states have exercised their police power to impose interest-rate caps on loans since the colonial era." Op. at 7 (citing Henry Walcott Farnam, *Chapters in the History of Social Legislation in the United States to 1860* 89 (Carnegie Inst. of Wash., 1938)). History certainly supports

19

National Bank Act "to shield national banks from state laws that were discriminating against them." *Greenwood Tr.*, 971 F.2d at 826 n.6 (citing *Marquette Nat'l Bank* v. *First of Omaha Serv. Corp.*, 439 U.S. 299, 314–18 (1978)). Section 85 of the National Bank Act ensured national banks retained competitive equality with state banks in the charging of interest. It accomplished this by allowing national banks to charge the greater of one of two interest rates, each addressing different competitive concerns.

*First*, the national bank could charge interest at one percent above "the discount rate . . . at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located"— the so-called "discount-plus rate." 12 U.S.C. § 85. The discount-plus rate preempts the state law where the national bank is located and thus addresses *intrastate* lending. This created a benefit for national banks. When inflation caused the Federal Funds rate to exceed local usury caps—i.e., the Federal Funds rate was 12% but state law bound usury caps at 10%—national banks could rely on preemption and continue to lend at a profitable rate—13%.

---

the conclusion that states had the power to regulate their own state-chartered banks. But the majority has not identified historical evidence suggesting that power extended extraterritorially. I remain unconvinced that the particular aspect of banking at issue in this case—namely, a state's ability to regulate interest rates charged by out-of-state, state-chartered banks—is "a field which the States have traditionally occupied." *Wyeth* v. *Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485 (1996)).

*Second*, under Section 85, national banks could also take advantage of the rate allowed by the state "where the bank is located." *Id.* This provision addresses *interstate* lending through rate exportation. As the majority recognizes, charging the rate "where the bank was located" meant national banks could "'export' the interest rates permitted by the state . . . to out-of-state borrowers, even if the rate charged exceed[ed] the rate permitted by the borrower's state." Op. at 8; *see Marquette*, 439 U.S. at 301.

But "'irony is no stranger to the law'" and the "shield" created by the National Bank Act "bec[a]me a sword wielded by national banks against state-chartered lenders." *Greenwood Tr.*, 971 F.2d at 826 n.6 (quoting *Amanullah* v. *Nelson*, 811 F.2d 1, 18 (1st Cir.1987)). During periods of high inflation, state-chartered banks were constrained by state usury caps, but Section 85 allowed national banks to lend at the discount-plus rate. State banks, lacking any similar mechanism to circumvent their states' usury laws, could not compete with national banks.

Congress responded to this lack of parity by passing temporary measures—the Brock Bill and Borrowers Relief Act—that allowed state banks in states with low usury caps to charge the discount-plus rate and preempted state law. Act of Oct. 29, 1974, Pub. L. 93-501, sec. 202, § 24, 88 Stat. 1557, 1558 (1974) (expired); Act of Nov. 5, 1979, Pub. L. 96-104, sec. 102, § 24, 93 Stat. 789, 789 (expired). This enabled state-chartered banks to remain

competitive with national banks operating within the state. Both bills also provided that states could opt out of the preemption for their state-chartered banks. § 206, 88 Stat. at 1558; § 107, 93 Stat. at 792.

As the majority acknowledges, "the language of the opt-out provision [in Section 525] derives from the Brock Bill and the Borrowers Relief Act." Op. at 55. But the majority does not address that these predecessor bills—and their corresponding opt-outs—were focused on *intrastate* banking, not on interstate consumer lending or rate exportation.[12] The Brock Bill and the Borrowers Relief Act authorized increased interest-rate caps in only a few states, to address credit crunches experienced by state-chartered banks lending to agricultural businesses in those states; their opt-out provisions correspondingly applied only to banks operating in those states. S. Rep. No. 93-1120, at 17 (1974) ("The basic problem [the Brock Bill addresses] is that in Tennessee, Arkansas and Montana, the financial industry has been caught in a pinch because of the high price it must pay for money as opposed to the

---

[12] Both the Brock Bill and the Borrowers Relief Act concerned business and agricultural loans, and only implemented a discount plus-rate preempting local state law. Act of Oct. 29, 1974, Pub. L. 93-501, sec. 202, § 24, 88 Stat. 1557, 1558 (expired) (allowing qualified state banks to charge "interest at a rate of not more than 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located."); Act of Nov. 5, 1979, Pub. L. 96-104, sec. 102, § 24, 93 Stat. 789 (expired) (similar).

22

interest it can earn."). The focus of these bills, therefore, was intrastate—not interstate—lending.

When Congress passed DIDMCA in 1980, state-chartered banks still primarily focused on lending within their home states. Interstate lending by state banks did not mature until years after DIDMCA, in particular with the 1994 passage of Riegle-Neal that allowed for intrastate bank mergers and branching. *See* Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2338 (1994); 12 U.S.C. § 1831u(a)(1) (allowing for merger transactions "between insured banks with different home States[] without regard to whether such transaction is prohibited under the law of any State").

DIDMCA expanded the reach of the precursor acts to include consumer loans and for the first time added language, derived from the National Bank Act, allowing state-chartered banks to charge interest at the "rate allowed by the laws of the State . . . where the bank is located." Sec. 521, § 27, 94 Stat. at 164–65. Like Section 85, this new language allowed state banks to export interest rates in interstate loan transactions. *See Greenwood Tr.*, 971 F.2d at 827. But in drafting Section 525, Congress relied heavily on the opt-out in the Borrowers Relief Act, which allowed states to reject the *intrastate* parity with

national banks afforded by the discount-plus provision.[13] Given this pedigree,

it is hardly surprising the legislative history focuses on intrastate lending;

nowhere do we see discussion of the exportation of interest rates or lending by

out of state banks generally.[14] Brief for American Bankers Association et al. as

Amici Curiae Supporting Appellees at 3 ("There is *nothing* in the legislative

history supporting the notion that Congress had *interstate* lending in mind

when it enacted the 'optout' right in Section 525 of DIDMCA."); *id.* at 11

("Neither Colorado nor any of its amici have cited anything in the legislative

---

[13] The emphasized language in Section 525 is identical to the opt-out in the Borrowers Relief Act: "*The amendments made by* section 521 through 523 *of this title shall apply only with respect to loans made in any State during the period beginning on* April 1, 1980, *and ending on the date*, on or after April 1, 1980, *on which such State adopts a law* … which states explicitly and by its terms *that such State does not want the amendments made by* such sections *to apply with respect to loans made in such State*…." § 107, 93 Stat. at 792; § 525, 94 Stat. at 167.

[14] For example, the House Conference Report focuses exclusively on the discount-plus rate. The Report makes clear that "state usury ceilings . . . will be permanently preempted . . . and a ceiling of 1 percentage point above the appropriate Federal Reserve discount rate will apply" unless the state overrides preemption. H.R. Rep. No. 96-842 (1979) (Conf. Rep.), *as reprinted in* 1980 U.S.C.C.A.N. 298, 1980 WL 13128, at *78. The Report also provides how states effect the opt-out: "Since each of the bill's federal preemptions provides for a separate right of state override, the state's override proposal would be required to refer to the *specific* preemption, such as that on mortgage loans, on business and agricultural loans over $25,000, or that which permits federally-insured depository institutions *to charge 1 percent over the Federal Reserve's discount rate on any loan*." *Id.* at 79 (emphasis added). This suggests Congress did not intend Section 525 to extend to rate exportation or interstate lending.

24

history demonstrating that this opt-out right was intended to apply to interstate loans to borrowers in the opt-out state made in *other* states by out-of-state state banks in compliance with their home states' interest rate ceilings.").

When DIDMCA incorporated the National Bank Act's language allowing state-chartered banks to charge rates from "the State . . . where the bank is located," Congress created, for the first time, an interstate lending provision for state chartered banks. Pub. L. 96-221, § 521, 94 Stat. 164, 164–65. No committee report addressed whether states opting out of DIDMCA also could regulate loans made by out-of-state, state-chartered banks. Given this history, it is difficult to imagine Congress, in enacting DIDMCA, would have intended Section 525 to sweep as broadly as Colorado claims and the majority now holds.[15]

The relevant regulatory history also supports the district court's interpretation of Section 525. The majority claims that "agency interpretations

---

[15] According to the majority, "no state would ever opt out of § 1831d if the opt-out meant that the state would only disadvantage its own banks for loans to out-of-state borrowers." Op. at 59. But the majority offers no support for its premise that halting rate exportation into opting-out states was Congress's purpose when enacting Sections 521 and 525. The majority's position that Section 525 permits Colorado to avoid rate exportation entirely is also undermined by Section 85 of the National Bank Act, which continues to preempt Colorado's interest rate caps for national banks lending to Colorado borrowers.

from the FDIC and the Office of Thrift Supervision (OTS) directly contradict each other and reflect inconsistent agency views." Op. at 60. I agree the guidance is imperfect. But the agency interpretations closer to the time of enactment have the "power to persuade, if lacking the power to control." *Loper Bright Enters.*, 603 U.S. at 388 (quoting *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944)); *id.* at 394 ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." (citing *Skidmore*, 323 U.S. at 140)).

The record before us contains three pieces of regulatory guidance close to the time of enactment: two FDIC Interpretive Letters from 1983 and 1988 and an Opinion Letter from 1988.[16] Fed. Deposit Ins. Corp., Interpretive Letter No. 83-16, 1983 WL 207393 (Oct. 20, 1983) ("1983 Interpretive Letter"); Fed.

---

[16] The 1983 Interpretive Letter addresses whether a bank can rely on "the usury laws of the state 'where the bank is located' . . . when making loans to citizens of states that have rejected the federal preemption." Fed. Deposit Ins. Corp., Interpretive Letter No. 83-16, 1983 WL 207393, at *1 (Oct. 20, 1983). The 1988 Interpretive Letter discusses considerations attendant to "determining where a loan is 'made'" when lending to borrowers in an opt-out state. Fed. Deposit Ins. Corp., Interpretive Letter No. 88-45, 1988 WL 583093, at *2 (June 29, 1988). And the 1998 Opinion Letter provides a post-Riegle Neal framework for determining "the appropriate state law for purposes of [Section 521]" in the context of interstate branching and lending by state-chartered banks. Fed. Deposit Ins. Corp., Opinion Letter No. 11 on Interest Charges by Interstate Banks, 63 Fed. Reg. 27282, 1998 WL 243362, at *27282 (May 18, 1998).

Deposit Ins. Corp., Interpretive Letter No. 88-45, 1988 WL 583093 (June 29, 1988) ("1988 Interpretive Letter"); Fed. Deposit Ins. Corp., Opinion Letter No. 11 on Interest Charges by Interstate Banks, 63 Fed. Reg. 27282, 1998 WL 243362 ("1998 Opinion Letter"). These letters reveal consistent interpretative themes. For four decades, regulators consistently understood: (1) Section 525 demands a uniform federal standard; (2) out-of-state banks do not lose Section 521's protection merely because borrowers reside in opt-out states; and (3) determining where loans are "made" requires a functional analysis of banking operations. The majority's interpretation does not align with these principles.

Admittedly, the FDIC's 2020 "Supplementary Information" to 21 C.F.R. § 331 appears in tension with its longstanding position. Federal Interest Rate Authority, 85 Fed. Reg. 44146, 2020 WL 4192852, at *44153 (July 22, 2020) ("[I]f a State opts out of section 27, State banks making loans in that State could not charge interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate."). But I do not find the 2020 guidance especially useful because it is not close in time to DIDMCA's enactment.[17]

---

[17] I am even more reluctant to depart from the closer-in-time guidance, given the FDIC's inconsistent litigation positions in this case. Recall, in the district court, the FDIC took the position that "loans are made both in the state in which the borrower enters the transaction and the state in which the lender enters into the transaction." RI.153–54. On appeal, the FDIC again took that

On balance, the guidance in the 1988 Interpretive Letter most directly responds to the question in this case: how to interpret the phrase "loans made in such State" in Section 525.[18] There, the FDIC advises that when a state opts out of federal rate preemption for its own state-chartered banks, it does not thereby affect the choices of out-of-state, state-chartered banks who opt in. The FDIC reasons "[t]he State that has the right of countermand is the one in which the loan is 'made'. This is not necessarily the State in which the bank is located; nor is it necessarily the State in which the borrower is located." Interpretive Letter No. 88-45, 1988 WL 583093, at *1. The letter concludes:

> The fact that a state has countermanded under section 525 should not affect the usury preemption of section 521 for a bank not located in that state, so long as the loan is not made in the state that has countermanded. And, since the determination of where a loan is made is factual, such a countermanding State should not be able under section 525 to legislatively extend its reach in order to affect the determination.

---

same position in its amicus brief supporting Colorado. Brief for FDIC as Amicus Curiae Supporting Appellants at 3. Before oral argument, and without explanation, the FDIC withdrew its support of Colorado. Notice Of Withdrawal Of The Federal Deposit Insurance Corporation's Brief As Amicus Curiae, *Nat'l Assoc. of Ind. Bankers* v. *Weiser*, No. 24-1293 (10th Cir. Feb. 24, 2025), ECF No. 115.

[18] I also agree with the district court that the 1998 Opinion Letter further demonstrates that "where a loan is made is where the bank performs its loan-making functions." RII.463.

*Id.* at *2. The FDIC clarifies that "determining where a loan is 'made'" for purposes of Section 525 requires "an analysis of all the facts surrounding a transaction." *Id.* The FDIC also emphasizes that

> Section 525…must be interpreted as having a single meaning throughout the nation. To do otherwise would be both confusing and disruptive to the nation's banking system. *Resort to individual State statutory provisions* in order to determine where a loan is made does not provide a single Federal standard and does not result in the equity or the predictability I believe was intended when sections 521 and 525 were enacted.

*Id.* at 2 (emphasis added) (citation omitted). This guidance well explains why I cannot endorse the majority's holding.

***

While I respect the thoughtful analysis in the majority opinion, I ultimately conclude the disposition is not supported by the best reading of text, context, and history. And there is a practical problem, too. If each opting-out state may apply its own interpretation of "made in" to Section 525, as the majority now authorizes, a single loan could be deemed "made in" multiple states, rendering it unclear which state's rate caps apply. But "federal statutes are generally intended to have uniform nationwide application." *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U.S. 30, 43 (1989). The majority opinion seems to recognize the confusion that awaits. According to the majority, whether a state bank in a non-opt-out state may operate with the preemptive authority afforded by Section 521 will depend, not on what federal

29

law requires, but on the nuances of state law to "resolve any conflict-of-law issues that may arise if adhering to interest-rate caps in the borrower's state violates the law in the lender's state." Op. at 67 n.37. I struggle to see how this patchwork approach—which abides a level of disuniformity Congress never intended—will be administrable in our world of interstate, online banking.