No. 24-1293
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

PHILIP J. WEISER, et al.,

    Defendants-Appellants,

    v.

AMERICAN FINTECH COUNCIL, et al.

    Plaintiffs-Appellees.

---

**On Appeal From the United States District Court for the
District of Colorado, No. 1:24-cv-00812**

---

**BRIEF OF AMICI CURIAE AMERICAN BANKERS ASSOCIATION,
BANK POLICY INSTITUTE, AND 52 STATE BANKERS
ASSOCIATIONS IN SUPPORT OF PETITION
FOR REHEARING EN BANC BY PLAINTIFFS-APPELLEES**

---

Ronald K. Vaske
vasker@ballardspahr.com
BALLARD SPAHR, LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55401-2119
612.371.3215

Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record*

*Attorneys for American Bankers Association,
Bank Policy Institute, and 52
State Bankers Associations*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, each amicus certifies that it does not have a parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Dated:  December 16, 2025                /s/ *Burt M. Rublin*
                                                        Burt M. Rublin

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

I.    INTEREST OF AMICI CURIAE ................................................................. 1

II.   ARGUMENT ............................................................................................... 2

      A.    Congress Contemplated That, Under Section 525, a Loan is "Made" Only in the State Where Lending Functions are Performed ...................................................................................... 2

      B.    The Legislative History of DIDMCA .................................................. 6

      C.    The Majority's Conclusion That a Loan is "Made" in the State Where the Borrower is Located Will Create an Unworkable Morass ................................................................................................ 8

III.  CONCLUSION ........................................................................................... 12

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978)..................................................................................5

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .........................................4

*Fulghum v. Embarq Corp.*,
    785 F.3d 395 (10th Cir. 2015) ..............................................................5

*Garcia v. United States*, 469 U.S. 70 (1984) ............................................ 5

*Lackey v. Stinnie*,
    604 U.S. 192 (2025)..............................................................................4

*Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*,
    596 U.S. 880 (2022)..............................................................................4

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978).......................................................................10, 11

*United States v. Gonzales*,
    456 F.3d 1178 (10th Cir. 2006) ............................................................5

*United States v. Hopson*, 150 F. 4th 1290 (10th Cir. 2025) ....................4

*United States v. Maestas*, 642 F.3d 1315 (10th Cir. 2011)......................5

*Wisconsin Central Ltd. v. United States*,
    585 U.S. 274 (2018)..............................................................................4

**Federal Statutes**

12 U.S.C. § 85 .....................................................................................6, 10

12 U.S.C. § 1709-1a(b) ...........................................................................3, 5

12 U.S.C. § 1735f-7 .................................................................................3, 5

15 U.S.C. § 1691(d)(1)................................................................................9

94 Stat. 165 ..................................................................................5

Act of Dec. 21, 1979, Pub. L. No. 96-153, Title III, § 308, 93 Stat.
      1113-14 ..............................................................................3

Depository Institutions Deregulation and Monetary Control Act of
      1980 §§ 521-523 ..............................................1, 2, 6, 7, 8, 10

Depository Institutions Deregulation and Monetary Control Act of
      1980 § 525...................................................................2, 4, 5, 7

Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, § 8,
      90 Stat. 722-23 ...................................................................3

**State Statutes**

§ 5-1-201(4), C.R.S. ....................................................................8

§ 5-2-213(2), C.R.S. ....................................................................8

**Other Authorities**

125 Cong. Rec. 30655 (Nov. 1, 1979) ....................................6, 7

Black's Law Dictionary (5th ed. 1979) ......................................2

**I.    <u>INTEREST OF AMICI CURIAE</u>** [1]

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States.  Founded in 1875, the ABA is the voice for the nation's $25.1 trillion banking industry and its 2.1 million employees.

The Bank Policy Institute ("BPI") is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to numerous industry concerns.

The 52 State Bankers Associations listed in the Appendix represent the interests of their members at the state and local levels.

The amici's members include state-chartered FDIC-insured depository institutions located outside Colorado that make loans in their states in conformity with their states' laws to borrowers in Colorado. For over 45 years, they have relied upon the preemption provisions in Sections 521-523 of the Depository

---

[1]    No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than the amici contributed money intended to fund the preparation or submission of this brief.

Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA") in making their interstate loans.[2] Their lending programs will be greatly affected by the outcome of this litigation.

## II.  <u>ARGUMENT</u>

### A.  Congress Contemplated That, Under Section 525, a Loan is <u>"Made" Only in the State Where Lending Functions are Performed</u>

In interpreting the case-dispositive phrase, "loans made in such State," as used in Section 525 of DIDMCA, the majority opinion ascribed great significance to the fact that the last of the four alternative definitions of "made" in Black's Law Dictionary (5th ed. 1979) is "executed." Maj. Op. at 37-38 and n. 22. The majority held as follows:

> [W]e conclude that 'made in such State' functions as a participial adjective phrase to describe the completed state of the loan – an *executed* loan. So in other words, 'loans made in such State' refers to loans executed in the opt-out state, and an executed loan necessarily requires at least two parties – a lender and a borrower.

*Id*. at 38 (italics in original).

Significantly, however, the 96th Congress did *not* include the term "executed" in Section 525. In stark contrast, just three months earlier, the same 96th Congress enacted a different statute preempting state usury laws but allowing

---

[2]  Sections 521-523 govern federally-insured state banks, savings and loan associations, and credit unions, respectively.

states to override preemption as to certain FHA loans "made *or executed*" in such

State. On December 21, 1979, it amended the National Housing Act as follows:

EXEMPTION FROM STATE USURY LAWS

> Sec. 308. Title V of the National Housing Act is amended by adding the following new section at the end thereof:

> "Sec. 529.(a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under title I or II of this Act.

> "(b) The provisions of subsection (a) shall apply to loans, mortgages, or advances **made or executed** in any State until the effective date (after the date of enactment of this section) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance."

Act of Dec. 21, 1979, Pub. L. No. 96-153, title III, Sec. 308, 93 Stat.

1113-14, codified at 12 U.S.C. § 1735f-7 (emphasis added).[3]

---

[3] This was very similar to a different amendment to the National Housing Act three years earlier that likewise allowed states to override federal preemption of state law interest limitations with respect to certain "loans, mortgages, or other interim financing **made or executed** in" such State. Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, Sec. 8, 90 Stat. 722-23, codified at 12 U.S.C. § 1709-1a(b). (emphasis added).

Thus, Congress knew full well how to be explicit on this issue, and its choice three months later to use only the lender-centric word "made" in Section 525 without also adding the more bilateral term "executed" is highly significant. The decision in *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 279 (2018) is squarely on point:

> We usually 'presume differences in language like this convey differences in meaning'… And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task … Its choice to use the narrower term [in just one of the statutes] requires respect, not disregard.

*Accord Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc*., 596 U.S. 880, 887 (2022) ("Congress knew how to write such a law. It did not do so in this statute."); *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) ("It is Congress's job to craft policy and ours to interpret the words that codify it. 'A textual judicial supplementation is particularly inappropriate when … Congress has shown that it knows how to adopt the omitted language or provision.'"); *United States v. Hopson*, 150 F. 4th 1290, 1304 (10th Cir. 2025) ("When Congress knows how to achieve a specific statutory effect, its failure to do so evinces an intent *not* to do so") (italics in original), *quoting Fish v. Kobach*, 840 F.3d 710, 740 (10th Cir. 2016).

Moreover, Congress's use of the disjunctive phrase "made *or* executed" in 12 U.S.C. § 1735f-7 and 12 U.S.C. § 1709-1a(b)[4] demonstrates that Congress did *not* view the terms "made" and "executed" as synonymous. *See, e.g., Garcia v. United States*, 469 U.S. 70, 73 (1984) ("Canons of construction indicate that terms connected in the disjunctive in this manner [separated by "or"] be given separate meanings."); *FCC v. Pacifica Found.*, 438 U.S. 726, 739-40 (1978) ("The words 'obscene, indecent, or profane' are written in the disjunctive, implying that each has a separate meaning."); *United States v. Gonzales*, 456 F.3d 1178, 1182 (10th Cir. 2006) ("Gonzales' reading of the statute, however, ignores the inclusion of the term 'or' between 'steals' and 'removes.' The use of the disjunctive 'or' indicates 'steals' and 'removes' are to have different meanings … Otherwise the term 'or' in the statute would be superfluous."); *Fulghum v. Embarq Corp.*, 785 F.3d 395, 415 (10th Cir. 2015) (same); *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011) (same).

In sum, although the 96th Congress chose in Section 529 of the National Housing Act to allow a state to countermand preemption of its usury laws with respect to loans that are either "made or executed in" the state, it decided just three months later that the preemption override in Section 525 of DIDMCA would

---

[4]    These two statutes are part of the National Housing Act, as was Section 522 of DIDMCA. 94 Stat. 165.

be more narrowly confined just to "loans made in such State." Given this legislative context, the majority's treatment of "made" in Section 525 as synonymous with "executed" cannot withstand scrutiny.

B.    The Legislative History of DIDMCA

The legislative history of Sections 521-523 of DIDMCA demonstrates that the entire focus was on creating a level playing field for state-chartered depository institutions and the national banks against which they competed. The sponsors of the usury provisions were Senators Pryor and Bumpers of Arkansas, which had a 10% usury ceiling.  However, notwithstanding that limit, national banks in Arkansas were authorized under Section 85 of the National Bank Act (12 U.S.C. § 85) to make loans to Arkansas residents at 1% above the Federal Reserve discount rate, which was then 12%.  Inflation was soaring, and *state banks in Arkansas* could not afford to make loans to *Arkansas residents* within the 10% ceiling.

Senator Pryor explained the unfair situation confronting Arkansas' state banks and savings and loan associations in competing with national banks in Arkansas:

> We have, as the Senators well know by now, a strict 10-percent interest rate ceiling on all types of loans.  *A customer seeking a loan to buy a car is unlikely to find the funds at a State bank since State banks can charge no more than 10 percent interest*, which is not enough to cover the cost of funds plus service costs.  *This customer*

6

> *is forced to turn to a national bank which can presently*
> *charge 13 percent. That customer is also likely to*
> *deposit his money in that bank.*
>
> *                    *                    *
>
> [W]hen the discount rate is higher than the usury limit,
> the State banks and savings and loans are placed in an
> impossible grossly unfair situation.

125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added).

> Senator Bumpers stated:
>
> We have 210 State banks in my State, and every one of
> them is going to be applying for a Federal charter if
> something is not done.

*Id.*

Congress was mindful of federalism concerns, and thus provided in

Section 525 that states could opt out of the preemption provisions in Sections 521-

523 "with respect to loans made in such State." The opt-out right could be

exercised if states, as sovereign masters over their *own* state-chartered lending

institutions, wanted to reimpose their usury ceilings *on loans made by those*

*institutions in their own states.* The majority opinion did not and indeed could not

cite anything in the legislative history demonstrating that Congress was concerned

about the interest rates charged on *interstate* loans made by *out-of-state* banks.

As correctly pointed out in Judge Rossman's dissent (pp. 22-25),

*nothing* in the legislative history reflects a Congressional intent to allow a state to

utilize its opt-out right to limit the federal interest rate authority conferred by

Sections 521-523 on state depository institutions in *other* states when they made

loans from those states to borrowers in the opt-out state. Indeed, it is hardly

surprising that there is no evidence of such Congressional intent, because state

bank credit card and other interstate consumer lending programs did not take off

until years *after* they obtained the same federal interest rate authority as national

banks through enactment of DIDMCA in 1980. *Id*. at p. 23.

      C.     The Majority's Conclusion That a Loan is "Made" in the State
             Where the Borrower is Located Will Create an Unworkable Morass

        The majority's ruling that a loan is "made" not only in the bank's state

but also in the state where the borrower is located when credit is extended would

create an unworkable morass for state-chartered banks.  It will require state banks

(but not national banks) to apply a multitude of varying interest rates to borrowers

from opt-out states who travel to non-opt-out states, or to borrowers from non-opt-

out states who travel to opt-out states, and use their credit cards or obtain online

loans when they travel.[5]  The banks would have to develop systems to determine

where the borrower was located when an advance was requested and approved

---

[5]    Colorado's UCCC purports to limit creditors' charges and rights as to
consumer credit transactions "made in another state with a person who is a
resident of this state when the consumer credit transaction or modification is
made."  § 5-1-201(4), C.R.S.  Also, although general-purpose credit cards are
exempted from Colorado's usury limits (§ 5-2-213(2), C.R.S.), retailer credit
cards and general-purpose credit cards with fees in excess of 15% of the credit
limit are not exempt.

under a credit card, or where the borrower was located when an online loan was

requested and approved/funded. Interest rates would have to be determined at the

transaction level, rather than account level, so a single credit card statement could

have many different rate plans.  A borrower might apply for an online loan while

located in an opt-out state but it would be approved and funded later when the

borrower is in a non-opt-out state. Although the bank may be able to detect where

the borrower is located when the online loan is requested, if it is not instantly

funded the bank would typically have no idea where the borrower is located when

the loan is approved and provided.

How is the bank supposed to know where the borrower is located

when the credit card is used for an online transaction? The merchant might be able

to detect the cardholder's location, but the bank probably can't. Or when the

cardholder engages in a telephone transaction? The merchant might know the area

code of the phone the cardholder is using, but that doesn't inform where the

cardholder is located when using a mobile phone.  How about when the bank

approves a recurring transaction each month? Neither the merchant nor the bank

has any idea where the cardholder is located when this happens.  In the non-

revolving context, the bank has up to 30 days to approve a loan application. 15

U.S.C. § 1691(d)(1). How can the bank know where the borrower is located 30

days after the application is submitted?

These are but a few examples of the administrative quagmire that would be created by the majority's unwarranted statutory interpretation, which would apply the usury law of any opt-out state where the borrower happens to be located at the time the loan is made by the bank. Moreover, the majority contemplates three possible interest rates for a loan, which creates a conflict-of-laws morass. Maj. Op. at 44-45, 67 n. 37.

The resulting patchwork quilt of varying state interest limits would be inconsistent with the Congressional intent underlying Sections 521-523 of DIDMCA to empower state banks, savings and loan associations, and credit unions, like their national bank counterparts, to charge the same home state interest rate to all of their borrowers nationwide.

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978), was the landmark decision unanimously holding that Section 85 of the National Bank Act authorizes national banks to "export" the interest rates allowed by the laws of the state "where the bank is located" in their interstate loans. Justice Brennan's opinion for the Court rejected the petitioners' argument that allowing exportation would "significantly impair the ability of States to enact effective usury laws," stressing that "state usury laws must, of course, give way to the federal statute." *Id*. at 318 and n. 31. In discussing where a bank is "located," the Court emphasized:

If the location of the bank were to depend on the
whereabouts of each credit card transaction, the meaning of
the term 'located' would be so stretched as to throw into
confusion the complex system of modern interstate banking
…We do not choose to invite these difficulties by rendering
so elastic the term 'located.'

*Id*. at 312.

Similarly, if a loan is deemed to be "made" in each state where the

borrower happens to be located at the time of a credit card or online transaction,

the "complex system of modern interstate banking" would likewise be "throw[n]

into confusion." *Id*. This Court should not "invite these difficulties" by "rendering

so elastic" the term "made" in Section 525.

## III.   <u>CONCLUSION</u>

For the reasons set forth above and in the Plaintiffs-Appellees' brief, the Petition for Rehearing En Banc should be granted.

Respectfully submitted,

Dated:  December 16, 2025

/s/ *Burt M. Rublin*
Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record*

Ronald K. Vaske
vasker@ballardspahr.com
Ballard Spahr, LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
612.371.3215

*Attorneys for Amici Curiae American*
*Bankers Association, Bank Policy Institute,*
*and 52 State Bankers Associations*

**APPENDIX OF AMICI STATE BANKERS ASSOCIATIONS**

Alabama Bankers Association
Alaska Bankers Association
Arizona Bankers Association
Arkansas Bankers Association
California Bankers Association
Colorado Bankers Association
Connecticut Bankers Association
DC Bankers Association
Delaware Bankers Association
Florida Bankers Association
Georgia Bankers Association
Hawaii Bankers Association
Idaho Bankers Association
Illinois Bankers Association
Indiana Bankers Association
Iowa Bankers Association
Kansas Bankers Association
Kentucky Bankers Association
Louisiana Bankers Association
Maine Bankers Association
Maryland Bankers Association
Massachusetts Bankers Association
Michigan Bankers Association
Minnesota Bankers Association
Mississippi Bankers Association
Missouri Bankers Association

Montana Bankers Association
Nebraska Bankers Association
Nevada Bankers Association
New Hampshire Bankers Association
New Jersey Bankers Association
New Mexico Bankers Association
New York Bankers Association
North Carolina Bankers Association
North Dakota Bankers Association
Ohio Bankers League
Oklahoma Bankers Association
Oregon Bankers Association
Pennsylvania Bankers Association
Puerto Rico Bankers Association
Rhode Island Bankers Association
South Carolina Bankers Association
South Dakota Bankers Association
Tennessee Bankers Association
Texas Bankers Association
Utah Bankers Association
Vermont Bankers Association
Virginia Bankers Association
Washington Bankers Association
West Virginia Bankers Association
Wisconsin Bankers Association
Wyoming Bankers Association

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)</u>

This brief complies with type-volume limitation of Fed.R.App.P. 29(b)(4) because this brief contains 2,548 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

December 16, 2025                    */s/ Burt M. Rublin*
                                    Burt M. Rublin

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

(1)  all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)  if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)  the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, and according to the program are free of viruses.

December 16, 2025                             */s/ Burt M. Rublin*
                                              Burt M. Rublin

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2025, I electronically filed a copy of the foregoing Brief of Amici Curiae American Bankers Association and Bank Policy Institute using the CM/ECF system, which will send notification of this filing to all counsel of record.

December 16, 2025                    */s/ Burt M. Rublin*
                                      Burt M. Rublin