No. 24-1293

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS; AMERICAN FINANCIAL SERVICES ASSOCIATION; AMERICAN FINTECH COUNCIL,

Plaintiffs – Appellees,

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado; MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

Defendants – Appellants.

_____

On Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:24-CV-00812-DDD-KAS)
————————————————————

**BRIEF OF AMICUS CURIAE OFFICE OF THE
COMPTROLLER OF THE CURRENCY IN SUPPORT OF
PLAINTIFFS-APPELLEES' PETITION FOR REHEARING EN BANC**
————————————————————

ADAM J. COHEN, Chief Counsel
BRIAN P. HUDAK, Deputy Chief Counsel
PETER C. KOCH, Director for Litigation
KAREN MCSWEENEY, Special Counsel
PRISCILLA BENNER, Counsel
400 7th Street S.W.
Washington, D.C. 20219
(202) 649-6300

Counsel for the Office of the
Comptroller of the Currency

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………..……. ii

GLOSSARY ……………………………………………………….…..……. iv

INTRODUCTION ……………………………………………………..……. 1

STATEMENT OF INTEREST …………………………………..……. 2

ARGUMENT …………………………………………………………..……. 4

CONCLUSION …………………………………………………....…….. 11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Cantero v. Bank of Am., N.A.*, 602 U.S. 205 (2024) ………………….....…….. 1

*Greenwood Tr. Co. v. Com. of Mass.*, 971 F.2d 818 (1st Cir. 1992) …..….... 6, 7, 9

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978) ………………….....………………....………… 1, 5, 6, 9, 10

*Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694
(10th Cir. 2025) ……………….........…………………………………… 7, 8, 9, 10

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ………...…………. 5

**Statutes**

Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 191 (1933) ……………...…. 4

Depository Institutions Deregulation and Monetary Control Act
of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) ………………….…..… passim

Home Owners' Loan Act of 1933, Pub. L. No. 73-43, 48 Stat. 128 (1933) ……… 4

National Bank Act, 12 U.S.C. § 1 *et seq.* ………………………….……… 1, 2, 3, 4

12 U.S.C. § 85 …………………………………………….…….……… passim

12 U.S.C. § 93(d) ……………………………………………………...………… 4

12 U.S.C. § 1463(g) ……………………………………………………….....… 3

12 U.S.C. § 1812(a) ……………………………………………………….……. 3

12 U.S.C. § 1813(q) ……………………………………………………….....… 3

12 U.S.C. § 1831d …………...……………………………………………....… 1, 2

Colo. Rev. Stat. 5-13-106……………………………………………………..… 7

**Regulations**

12 C.F.R. § 7.4001……………………………………..…………………..… 3, 5

12 C.F.R. § 160.110 …………………………………………………………. 3

**Rules**

Federal Rule of Appellate Procedure 29 …………………………………..…… 4

**Other Authorities**

Colo. UCCC Administrator Interpretive Opinion Letter:
Scope of C.R.S. § 5-13-106 (Apr. 22, 2024) ………..…………………..………. 8

Cong. Globe, 38th Cong., 1st Sess., 1451 (1864) …………………….……… 1

OCC News Release 2025-122, Comptroller Issues Statement on 10th Circuit Decision (Dec. 9, 2025), https://www.occ.gov/news-issuances/news-releases/2025/nr-occ-2025-122.html ..................................................................... 4

# GLOSSARY

| | |
|---|---|
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132 (1980) |
| FDIC | Federal Deposit Insurance Corporation |
| OCC | Office of the Comptroller of the Currency |

**INTRODUCTION**

When Congress enacted the National Bank Act over 150 years ago, it "intended to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)). Through this Act, Congress established a dual banking system, in which national banks "co-exist and compete" with state banks. *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209-10 (2024). To ensure that both types of banks can flourish and fuel the American economy, Congress has, at times, acted to ensure an appropriate competitive balance between these entities.

Importantly, in 1980, Congress placed state-chartered insured depository institutions (state banks) on equal footing with national banks with respect to the rate of interest they may charge on loans. *See* Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, § 521, 94 Stat. 132, 164 (1980) (codified at 12 U.S.C. § 1831d); *see also* 12 U.S.C. § 85 (setting forth the permissible rate of interest to be charged by national banks). This federal interest-rate framework enables both national banks and state banks to leverage efficiencies associated with lending under a uniform set of rules, which fosters the development of national products and services and benefits individuals and businesses in every state. In 2023, Colorado exercised its right to "opt-out" of

DIDMCA and asserted an expansive reading of the scope of this right. *See* DIDMCA § 525 (reproduced at 12 U.S.C. § 1831d note).

In reversing the issuance of the District Court's injunction against the Defendants, the panel accepted Colorado's expansive reading. Its holding, if left in place, will almost certainly lead to a decision on the merits that fundamentally alters the application of this federal interest-rate framework for state banks. Such an outcome would inject uncertainty into the framework, undermine the benefits that Congress has sought to provide to state banks in DIDMCA, and create significant challenges for state banks that wish to lend across state lines. This outcome would also advantage national banks over state banks, which is inconsistent with Congress's expressly codified competitive-equality goals. As a result, the panel decision threatens to diminish the vibrancy of the dual banking system and to harm consumers by reducing their access to credit across the country. For these reasons, the panel decision involves a question of exceptional importance, and this Court should grant the petition for rehearing en banc.

## STATEMENT OF INTEREST

The Office of the Comptroller of the Currency (OCC) is an independent bureau of the U.S. Department of the Treasury. The OCC has chartering and supervisory responsibility for national banks under the National Bank Act of 1864, 12 U.S.C. § 1 *et seq.*, as amended, and federal savings associations under the

Home Owners' Loan Act of 1933, Pub. L. No. 73-43, 48 Stat. 128 (codified at 12 U.S.C. § 1461 *et seq.*), as amended.  Among other things, these Acts address the rate of interest that OCC-chartered banks may charge.  *See* 12 U.S.C. § 85; *see also id.* § 1463(g), 12 C.F.R. §§ 7.4001, 160.110.  State banks have parallel interest-rate authority pursuant to section 521 of DIDMCA.

The Comptroller of the Currency is the Chief Officer of the OCC. 12 U.S.C. § 1(b).  In addition, the Comptroller of the Currency is a member of the Board of Directors of the Federal Deposit Insurance Corporation (FDIC). 12 U.S.C. § 1812(a).  The FDIC is the primary federal regulator of state banks that are not members of the Federal Reserve System.  *See* 12 U.S.C. § 1813(q).  It administers the Federal Deposit Insurance Act, where section 521 of DIDMCA is codified.

In both capacities, the Comptroller of the Currency has an interest in ensuring that the federal interest-rate framework in section 521 of DIDMCA, which is interpreted *in pari materia* with section 85 of the National Bank Act, is appropriately understood and applied.  Doing so ensures that state banks receive the full benefits of federal law, thereby enhancing parity between state banks and OCC-chartered banks and strengthening the dual banking system.  As the Comptroller recently stated, the panel decision "risks undermining state banks' ability to effectively administer multi-state lending programs and, perhaps more

3

importantly, disadvantages state banks that wish to lend in Colorado compared to national banks and federal savings associations. Such an outcome is fundamentally inconsistent with Congress's efforts to create competitive equality." OCC News Release 2025-122, Comptroller Issues Statement on 10th Circuit Decision (Dec. 9, 2025), https://www.occ.gov/news-issuances/news-releases/2025/nr-occ-2025-122.html.

The OCC is authorized generally to represent itself in litigation by 12 U.S.C. § 93(d) and to appear as amicus curiae in this Court by Federal Rule of Appellate Procedure 29.

## ARGUMENT

In its enactment of the National Bank Act of 1864, Congress gave national banks the authority to charge "interest at the rate allowed by the laws of the State . . . where the bank is located." 12 U.S.C. § 85. Congress has amended this authority through the years, including during the Great Depression, when it authorized an alternative reference rate based on the Federal Reserve discount rate on ninety-day commercial paper. Banking Act of 1933, Pub. L. No. 73-66, ch. 89, § 25, 48 Stat. 191 (1933) (establishing the alternative reference rate); *see also* 12 U.S.C. § 85. While this national bank authority has evolved over time, it remains a core principle of the federal banking system.

Importantly, section 85 also permits a national bank to export the rate permitted by the laws of the state where it is located when it lends to borrowers located in any other state. *Id.*; *Marquette Nat'l Bank*, 439 U.S. at 313-14. This means that a national bank located in State A may lawfully charge interest at the rate allowed by State A's law on any loan, regardless of the applicable usury cap in the state where the borrower is located. The concept of exportation, which allows a national bank to rely on its location as the pivotal factor for determining the lawful interest rate to be charged on a loan, is a distinguishing feature of section 85. It permits national banks to engage in interstate lending and to meet the credit needs of borrowers in communities throughout the Nation without having to comply with a complex patchwork of state usury caps.[1] Without the clarity and certainty that this interest-rate framework provides, interstate lending would be significantly more difficult to administer. In some cases, it may even be commercially unfeasible, leading to a reduction in available credit.

---

[1] The maximum amount of permissible interest is generally not limited to the numerical periodic rate (which may differ depending on the type and size of a loan) but also includes certain fees and charges (e.g., late fees, overlimit fees). 12 C.F.R. §§ 7.4001(a), 160.110(a); *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 745 (1996). The method by which the permitted interest is calculated generally also varies across states. This complexity compounds the challenges of complying with multiple states' usury laws.

5

For over 100 years, this federal authority gave national banks an advantage over their competitors, including state banks. *Marquette Nat'l Bank*, 439 U.S. at 314 (observing that section 85 and its predecessors "have been interpreted for over a century to give 'advantages to National banks over their State competitors'" (citations omitted)). In the late 1970s, however, economic pressures, including high inflation, exacerbated the effects of this competitive inequality. In certain states, these economic conditions and the relevant usury cap meant that state banks could not lend without losing money. In contrast, national banks continued to lend profitably by relying on the alternative reference rate in section 85, which was often higher than the rate permitted under state usury laws. *See Greenwood Tr. Co. v. Com. of Mass.*, 971 F.2d 818, 826 (1st Cir. 1992) ("As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch. Interest rates soared. . .. Since section 85 authorized national banks to use interest rates set by reference to Federal discount rates, state institutions were at an almost insuperable competitive disadvantage." (citations omitted)).

The competitive disadvantage facing state banks ultimately became untenable, leading Congress to enact DIDMCA. Among other changes, DIDMCA provided state banks with interest-rate authority modeled on national banks' interest-rate authority under section 85. *See* DIDMCA § 521. As a result, since 1980, state banks have been authorized to charge interest at the rate permitted by

6

the laws of the state in which they are located (or the alternative reference rate) and to export this rate to borrowers in any state. *Id.*; *see also Greenwood Tr.*, 971 F.2d at 827 (confirming that DIDMCA should be read *in pari materia* with section 85).[2]

Unlike section 85, however, DIDMCA permits states to opt out of this parity provision for "loans made in such State." *See* DIDMCA § 525. Following its enactment, a few states exercised this opt-out, and most later reversed course, including Colorado. *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694, 702 n.12 (10th Cir. 2025). Reversing course yet again in 2023, however, Colorado once more exercised its DIDMCA opt-out authority, seeking to prevent the provision of certain loans to its residents, including certain higher interest loans originated by out-of-state state banks through partnerships with financial technology companies (fintechs). Colo. Rev. Stat. 5-13-106; *see also Weiser*, 159 F.4th at 702. To effectively achieve this goal, however, Colorado needs the opt-out to apply expansively—not only to the banks located in Colorado but also to banks located in other states that lend or seek to lend to Colorado residents. *See* Administrator, Colo. Uniform Consumer Credit Code, Administrator's Interpretive Opinion Letter: Scope of C.R.S. § 5-13-106 (Apr. 22, 2024), App. vol. I, at 194

---

[2] While sections 522 and 523 of DIDMCA gave comparable authority to insured savings and loan associations and insured credit unions, respectively, this brief focuses on the authority granted to state banks, given the issues before the Court.

(explaining the scope of Colorado's DIDMCA opt-out provision); *see also Weiser*, 159 F.4th at 729 (Rossman, J., concurring in part and dissenting in part) ("Colorado seeks to prevent out-of-state, state-chartered banks from lending to Colorado borrowers at rates permitted by the states where the banks are located, but higher than allowed under Colorado law.").

The effect of Colorado's expansive reading of the DIDMCA opt-out provision, which the panel adopted, is to undermine exportation and its attendant benefits for state banks. State banks located in states other than Colorado will no longer be able to export a permitted interest rate and, therefore, may be disinclined to lend or unable to profitably lend in Colorado. Furthermore, requiring state banks to evaluate a prospective borrower's location introduces an additional layer of complexity to interstate lending. And the effects are not limited to Colorado: a state bank that lends or seeks to lend in Colorado, whether or not it is located in the state, will have to evaluate the location of *every* prospective borrower—if only to rule out the possibility that the borrower is a Colorado resident. This introduction of the borrower's location as a relevant, and in some cases dispositive, factor in determining the permissible rate of interest for a state bank loan renders the core premise of exportation—the focus on the *bank's* location—a nullity for state banks. This result demonstrates the flaws in the panel's decision, which divorces the interpretation of a state's opt-out authority in section 525 of DIDMCA from the

8

exportation authority expressly provided in section 521 of DIDMCA. *Weiser*, 159 F.4th at 730 (Rossman, J., concurring in part and dissenting in part) ("[T]he majority seems to mistakenly drive a wedge between" these provisions.). As a practical matter, this outcome will create significant challenges for state banks' ability to efficiently and effectively administer interstate lending programs, including through partnerships that allow state banks to leverage the expertise and innovative approaches of fintech companies. *See generally Marquette Nat'l Bank*, 439 U.S. at 310-11 (declining to alter the location framework under section 85 simply because "the convenience of modern mail" allowed a national bank in one state to lend more easily to borrowers in another).

Moreover, this approach is fundamentally inconsistent with how section 85 operates for national banks, which is unaffected by Colorado's opt out. As such, the panel's expansive reading of Colorado's opt-out authority places state banks at a significant competitive disadvantage compared to national banks, even though this is precisely what Congress tried to remedy when it enacted DIDMCA. This is clear because the statute itself expressly articulates Congress's purpose: "to prevent discrimination against state [banks]." Section 521 of DIDMCA; *see also Greenwood Tr.*, 971 F.2d at 826 (discussing relevant legislative history and concluding that "Congress tried to level the playing field between federally chartered and state-chartered banks when it enacted [DIDMCA]."). In contrast, a

9

narrower reading of Colorado's opt-out authority would align with Congress's expressly codified goal of competitive equality. *See Weiser*, 159 F.4th at 735 (Rossman, J., concurring in part and dissenting in part) ("Given the text and context highlighted here and discussed by the district court, I doubt Congress intended to inject a novel borrower-focused framework . . . simply by employing 'made' as a participial adjective.").

Ultimately, the panel decision threatens to "throw into confusion the complex system of modern interstate banking," precisely what the Supreme Court declined to do when it considered how to apply section 85 to interstate lending in 1978. *Marquette Nat'l Bank*, 439 U.S. at 312. The harm to consumers, including with respect to the availability of credit in Colorado and across the country, is likely to be profound.

* * *

# CONCLUSION

For these reasons, Amicus respectfully urges the Court to grant the petition for rehearing en banc.

> Respectfully submitted,
>
> ADAM J. COHEN
>   Chief Counsel
> BRIAN P. HUDAK
>   Deputy Chief Counsel
>
> /s/ Peter C. Koch
> PETER C. KOCH
>   Director for Litigation
> KAREN MCSWEENEY
>   Special Counsel
> PRISCILLA BENNER
>   Counsel
> 400 7th Street S.W.
> Washington, D.C. 20219
> (202) 649-6300
>
> Counsel for Amicus Curiae
> Office of the Comptroller of the Currency

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 2,289 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

/s/ Peter C. Koch
Peter C. Koch

Counsel for Amicus Curiae Office of the Comptroller of the Currency

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection (updated 12/16/2025), and according to the program are free of viruses.

/s/ Peter C. Koch
Peter C. Koch

Counsel for Amicus Curiae Office of the Comptroller of the Currency

# CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025 I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system and that a true and correct copy of the foregoing was served on counsel of record via the CM/ECF system.

/s/ Peter C. Koch
Peter C. Koch

Counsel for Amicus Curiae Office of the Comptroller of the Currency