# No. 24-1293

In the United States Court of Appeals
for the Tenth Circuit

National Association of Industrial Bankers, et al.,

*Appellees-Petitioners*,

v.

Philip J. Weiser, Attorney General of the State of Colorado, et al.,

*Appellants-Respondents.*

On appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-812-DDD-KAS, Judge Daniel D. Domenico

**Amicus Brief of the State of Utah and 19 Other States
in Support of the Petition for Rehearing En Banc**

Derek Brown
Utah Attorney General
Stanford Purser
Utah Solicitor General
Steve Geary
Assistant Utah Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114-0858
(801) 366-0533
*Counsel for Amicus Curiae
State of Utah*

Additional Amici Counsel Listed After Signature Page

TABLE OF CONTENTS

Table of Authorities .................................................................................... ii

Amicis' Authority and Interest ..................................................................... 1

DIDA and the Dual-Banking System ........................................................... 2

Argument ...................................................................................................... 5

    I.    Contrary to the Stated Purpose of DIDA, *Weiser* Interferes with the Competitive Equality of State- and Federally-Chartered Institutions and Preserving the Advantages of the Dual Banking System. ............................................................... 5

    II.    *Weiser* Interferes with States' Ability to Protect the Interests of Shareholders, Members, Depositors, and Customers of State-Chartered Institutions ........................................................ 7

Conclusion ................................................................................................... 9

Counsel for Amici States ............................................................................ 11

Certificate of Compliance .......................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Cantero v. Bank of Am., N.A.*,
  602 U.S. 205 (2024) .................................................................................. 2

*FDIC ex rel. Co-op. Bank v. Rippy*,
  799 F.3d 301 (4th Cir. 2015) .................................................................... 8

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
  439 U.S. 299 (1978) ........................................................................... 3, 4, 6

*Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*,
  764 F.3d 1199 (10th Cir. 2014) ................................................................ 6

*National Association of Industrial Bankers v. Weiser*,
  159 F.4th 694 (10th Cir. 2025) ........................................................... 1, 3, 4

**Statutes**

12 U.S.C. § 1817(a)(3) ................................................................................ 8

12 U.S.C. § 1831d ...................................................................................... 3

12 U.S.C. § 1831d(a) .............................................................................. 3, 6

12 U.S.C. § 1831o(h)(3) ............................................................................. 8

12 U.S.C. § 35 ............................................................................................ 7

12 U.S.C. § 484 ................................................................................... 2, 6, 7

Ala. Code § 5-5A-18.1 ............................................................................... 1

Colo. Rev. Stat. § 5-13-106 ....................................................................... 9

Ga. Code §§ 7-1-3(a)(6), -1-628(c)(2) ...................................................... 1

La. Stat. § 6:121.B(1) ................................................................................. 2

La. Stat. § 6:5 ............................................................................................. 2

Neb. Rev. Stat. § 8-1,140 ........................................................................... 2

Ohio Rev. Code § 1101.02 ........................................................................ 2

Utah Code § 7-1-102(1) ............................................................................. 1

Utah Code § 7-1-201 .................................................................................. 3

Utah Code § 7-1-314 .................................................................................. 8

Utah Code § 7-3-25 .................................................................................... 8

Utah Code § 7-8-15 .................................................................................... 8

Utah Code § 7-9-29 ............................................................................................... 8

Wyo. Stat. § 13-1-603(c)(vi) ................................................................................. 2

**Rules**

Fed. R. App. P. 29(b)(2) ........................................................................................ 1

**Other Authorities**

1980 Depository Institutions Deregulation and Monetary Control Act
   (DIDA) ............................................................................................................. 1

2024 Report of the Commissioner of Financial Institutions, State of Utah,
   (UDFI Annual Report) .................................................................................... 7

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
   Legal Texts* (2012) ........................................................................................... 6

Gillian G.H. Garcia, *Failing Prompt Corrective Action*, 11 J. Banking
   Regul. 171 (2010) ............................................................................................. 9

## AMICIS' AUTHORITY AND INTEREST

Amici states of Utah, Alabama, Alaska, Arkansas, Florida, Georgia, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, West Virginia, and Wyoming (Amici States) are authorized to file an amicus brief without the consent of the parties or leave of court. Fed. R. App. P. 29(b)(2).

The Amici States file this brief in support of Appellees' petition for rehearing en banc of *National Association of Industrial Bankers v. Weiser*, 159 F.4th 694 (10th Cir. 2025). This appeal involves an issue of first impression in the interpretation of the 1980 Depository Institutions Deregulation and Monetary Control Act (DIDA).[1] Congress passed DIDA to preserve the balance between federally- and state-chartered financial institutions under the United States' unique dual banking system.

Utah law provides it is in the public's interest to (1) "preserve the competitive equality" of state- and federally-chartered institutions; (2) "preserve the advantages of the dual banking system"; and (3) "protect the interests of shareholders, members, depositors, and other customers in financial institutions operating in" Utah. Utah Code § 7-1-102(1). Other states have similar provisions. *See* Ala. Code § 5-5A-18.1; Ga. Code §§ 7-1-

---

[1] For consistency and regularity, this brief uses the same acronym for the Act as the panel's decision. *See Weiser*, 159 F.4th at 698 & n.1.

1

3(a)(6), -1-628(c)(2); La. Stat. §§ 6:5, 6:121.B(1); Neb. Rev. Stat. § 8-1,140; Ohio Rev. Code § 1101.02; Wyo. Stat. §13-1-603(c)(vi).

The panel majority's decision in *Weiser* harms these state interests and is contrary to the stated purpose of DIDA. The majority interprets the DIDA phrase "loans made in such State" to encompass loans in which the borrower, rather than the lender, is located in the state. This effectively allows one state—like Colorado here—to impose its interest rate regulations on every other state-chartered bank across the nation that loans money to a Colorado resident. That's wrong and if allowed to stand will interfere with state objectives to preserve equality and competition between state- and federally-chartered institutions, preserve the dual banking system, and protect the interests of shareholders, depositors, and customers of the financial institutions in these states.

### DIDA AND THE DUAL-BANKING SYSTEM

The United States has a dual banking system with federally-chartered institutions regulated by federal agencies and state-chartered institutions regulated by their respective states. *See Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209-10 (2024). Federally-chartered financial institutions are regulated by the Office of the Comptroller of the Currency (OCC) and are not subject to regulation by state entities. *See* 12 U.S.C. § 484. State-chartered banks are regulated by the respective states. In Utah, for example, state-

2

chartered institutions are regulated by the Utah Department of Financial Institutions (UDFI). *See* Utah Code § 7-1-201.

After the Supreme Court held that federal institutions could export their home-state interest rates, *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311-12 (1978), Congress enacted DIDA extending the same opportunity to state-chartered institutions. *See* 12 U.S.C. § 1831d(a). The statute was expressly meant "to prevent discrimination against State-chartered insured depository institutions." *Id.* Since then, state and federal financial institutions have enjoyed an equal playing field, both being able to lend nationally at the rates determined by federal law and the state in which the institution is located.

DIDA includes a provision for states to opt out of this arrangement for "loans made in such State" by adopting a law expressly opting out. 12 U.S.C. § 1831d (Historical Notes, Effective and Applicability Provision). When DIDA was first passed, only seven states and Puerto Rico opted out, and all but one state (Iowa) shortly thereafter rescinded those decisions. *See Weiser*, 159 F.4th at 702 & n.12. The stated reason for opting out is to prevent "rent-a-bank arrangements," whereby a local business contracts with an out-of-state bank to make consumer loans to the business's customers that may charge a higher rate of interest than is permitted by state law. *Id.* at 702.

3

But opting out actually does nothing to address the rent-a-bank arrangement. Local businesses can still contract with federally-chartered banks, which can continue to make consumer loans that are not limited by a state's interest rate caps. All that opting out accomplishes is to eliminate one class of financial institutions (state-chartered institutions) in favor of another (federally-chartered institutions).[2]

*Marquette*, the Supreme Court decision that led to the passage of DIDA, highlights why the opt-out strategy does not work to address the rent-a-bank issue. Marquette Bank, the Minnesota-based bank suing in that case, was part of the same credit card program as the Nebraska bank it was suing. *Marquette*, 439 U.S. at 303-04. But the Minnesota bank could not compete for customers because the interest rate it was allowed to charge was capped by Minnesota law. *Id.* at 304. To make up the difference in costs, the Minnesota bank had to charge a $10 annual fee for use of its credit cards. *Id.* Customers voted with their feet, moving to the Nebraska bank. *See id.*

*Marquette* shows that the consumer finance market is national, with vigorous competition among interstate vendors, so the cost of funds is determined by a national market. If a financial institution cannot cover its

---

[2] The district court and the *Weiser* dissent both note that any potential consumer protection is limited for this reason, as federally-chartered banks are unaffected by an opt-out. *See Weiser*, 159 F.4th at 732 & n.6 (Rossman, J., concurring in part and dissenting in part).

costs of lending through an appropriate interest rate, it must cover them some other way, such as the fees used by Marquette Bank, or not take that business at all. Consumers' incentive to borrow is unchanged, so national institutions will move into whatever opportunities are vacated by state institutions. Thus, as of today, only Iowa, Puerto Rico, and (since 2023) Colorado have DIDA opt-out laws.

## ARGUMENT

*Weiser* has far-reaching consequences, affecting states and financial institutions within the Tenth Circuit and throughout the United States. The panel wrongly interpreted "loans made in such State" to include the state where the *borrower* lives rather than only the state where the lender operates and actually made the loan. That undermines DIDA's express purpose to maintain a competitive balance between federal- and state-chartered institutions. And *Weiser*'s interpretation interferes with other states'—including but not limited to the Amici States'—ability to regulate their financial institutions and oversee a significant sector of their economies.

I. **Contrary to the Stated Purpose of DIDA, *Weiser* Interferes with the Competitive Equality of State- and Federally-Chartered Institutions and Preserving the Advantages of the Dual Banking System.**

*Weiser* upsets the balance Congress expressly sought to protect by passing DIDA. Federally-chartered financial institutions are unaffected. *See*

5

12 U.S.C. § 484; *Marquette*, 439 U.S. at 301. So federal lenders continue to lend to Colorado consumers at whatever rate is permitted by the lender's home state and federal law, without regard to Colorado law. But state-chartered institutions in every state must now regulate their conduct according to federal law, the law of the state in which they are located, and Colorado law. This discriminatory impact violates the purpose of DIDA, "to prevent discrimination against State-chartered insured depository institutions." 12 U.S.C. § 1831d(a). That purpose should resolve any possible ambiguity about DIDA's meaning in favor of the Appellee's and panel dissent's interpretation. *See, e.g., Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1214 (10th Cir. 2014) (considering the statute's "stated purpose to resolve any lingering ambiguity" (citation modified)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("[T]he resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose.").

  This discrimination against state-chartered institutions also adversely affects the Amici States (and all states) by creating pressure on state-chartered institutions to convert to a federal charter to continue to compete in the Colorado market. Conversion is relatively easy, with no structural barriers for a healthy institution, requiring little more than a shareholder

6

vote and OCC approval. *See* 12 U.S.C. § 35. And once an institution is federally chartered, it is no longer subject to state regulation. 12 U.S.C. § 484.

The financial services industries of the Amici States constitute a significant segment of their economies. In Utah, for example, this industry employs about 10% of the working population in high-wage jobs (almost 200,000 Utah residents). Already, the majority of Utah's financial institution assets (almost two-thirds) are federally controlled, not state-controlled. 2024 Report of the Commissioner of Financial Institutions, State of Utah, (UDFI Annual Report) at 19 (table showing division of total assets between state and national institutions).[3] Allowing *Weiser* to stand will increase and accelerate this federal-state disparity in Utah and elsewhere. Ultimately, there will no longer be a dual banking system in any meaningful sense, and the states will have lost control of the financial sector of their economies to the federal government.

## II. *Weiser* Interferes with States' Ability to Protect the Interests of Shareholders, Members, Depositors, and Customers of State-Chartered Institutions.

In addition to undermining the dual banking system, *Weiser*, if upheld, threatens the ability of Amici States and other states to oversee the financial health of state-chartered institutions. Both the FDIC and the relevant state

---

[3] Available at https://dfi.utah.gov/wp-content/uploads/sites/29/2024/10/Annual.pdf

authority (UDFI in Utah) regularly review the financial well-being of all state-chartered and FDIC-insured institutions. 12 U.S.C. § 1817(a)(3); Utah Code § 7-1-314; *see, e.g., FDIC ex rel. Co-op. Bank v. Rippy*, 799 F.3d 301, 307-08 (4th Cir. 2015) (discussing annual examinations). Most of UDFI's staff consists of examiners and senior examiners, who conduct these reviews. *See* UDFI Annual Report at 13.

These examinations include a review of the loan portfolios. Financial institutions are required by both regulation and good banking practice to maintain an allowance for losses in their loan portfolios. *See, e.g.,* Utah Code §§ 7-3-25, -8-15, -9-29; UDFI Annual Report at 31-39, 41-49, 65-74, 76-85, 90-92, 94-96, 102, 104-05 (noting "Allowance for Losses" on "Loan and Lease Financing Receivables" or "Total Loans"). And an understatement of potential loan losses can result in a capital crisis for the institution, leading to insolvency and receivership in a worst-case scenario. *See* 12 U.S.C. § 1831o(h)(3).

Troubled institutions often seek to conceal their condition by understating their expected loan loss allowance. A study of the Great Recession of 2007-2009 found that understating these allowances was the most common accounting ploy banks used to disguise financial problems and to falsely meet regulatory requirements. *See* Gillian G.H. Garcia, *Failing Prompt Corrective Action*, 11 J. Banking Regul. 171, 180 (2010).

Interpreting "loans made in such State" to include any state in which the borrower is located, as *Weiser* does, confounds the ability of banking examiners (state and federal) to assess loan loss reserves. Normally, small consumer loans are assessed collectively, because the same state laws and regulations apply to all loans, and individual variations in the borrowers may be ignored, as these are smoothed out when examined as a whole. But under *Weiser*, loans to Colorado consumers must now be separately assessed, as loans to these borrowers are uniquely subject to Colorado requirements and limitations in addition to the requirements of the issuing bank's state. An examining state no longer applies its own law to determine the allowable loan terms but must apply Colorado law for any "consumer credit transactions in" Colorado. *See* Colo. Rev. Stat. § 5-13-106.

So Amici States' ability to regulate their own financial institutions under their own regulations and ensure their viability is impaired by *Weiser*. This endangers the shareholders, members, depositors, and customers of these institutions and increases uncertainty in the financial market.

## Conclusion

*Weiser*'s interpretation of "loans made in such State" is at odds with DIDA's overall purpose and complicates states' oversight of their state-chartered financial institutions. For the foregoing reasons, and those outlined in Appellees' petition, the Court should grant rehearing en banc.

Respectfully submitted,

/s/ Steve Geary
Steve Geary
Assistant Utah Solicitor General
Derek Brown
Utah Attorney General
Stanford Purser
Utah Solicitor General

*Counsel for Amicus Curiae State of Utah*

**COUNSEL FOR AMICI STATES**

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JOHN M. FORMELLA
Attorney General
State of New Hampshire

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) as, excluding the parts of the document exempted by rule, it contains 1,984 words.

This document complies with the typeface requirements of 10th Cir. R. 32(A) as it has been prepared using 13-point Century Schoolbook font, a proportionally spaced typeface.