No. 24-1293

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

*Plaintiffs-Appellees.*

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants*,

On Appeal from the U.S. District Court for the District of Colorado
Case No. 1:24-cv-00812-DDD-TPO, Hon. Daniel D. Domenico

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL EN BANC BRIEF

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
350 S Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800
mattladew@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

DAVID M. GOSSETT
ANGELENE SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
angelenesuperable@dwt.com

TEAL LUTHY MILLER
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
tealmiller@dwt.com

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY ...................................................................................... vii

INTRODUCTION ................................................................................ 1

SUMMARY OF ANSWERS TO THE COURT'S SUPPLEMENTAL QUESTIONS ................................................................................ 2

SUPPLEMENTAL QUESTIONS ........................................................... 5

I.    The phrase "loans made in such State" in Section 525 does not refer to "an executed loan" or encompass "loans in which either the lender or the borrower is located in the opt-out state." ...................................................................................... 5

    A.    "Loans made" does not mean "executed loans." ..................... 6

        1.    The majority's interpretation depends on reading the phrase "executed loans" into Section 525. ............... 6

        2.    "Loans made in any State" is not synonymous with "loans executed in any State." ............................. 8

    B.    Whether used as an adjective or verb, "made" focuses on where the bank performs its loan-making functions, not where the borrower receives the loan ........................... 12

II.   The phrase "the State … where the bank is located" in Section 521 helps demonstrate that the phrase "loans made in such State" in Section 525 refers to loans made in the state where the bank is located. ................................................. 16

III.  DIDMCA's enactment history shows that the phrase "loans made in such State" refers to loans made in the state where the bank is located. ............................................................. 20

IV.   Longstanding regulatory guidance reflects that the phrase "loans made in such State" refers to the state where the bank is located. ............................................................. 24

i

# TABLE OF CONTENTS (continued)

**Page**

V.      The phrase "loans made in such State" unambiguously refers
        to loans made in the state where the bank is located. ...................28

VI.     No presumption against preemption applies here. .......................29

CONCLUSION ...................................................................................30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
        LIMIT ...................................................................................32

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atay v. County of Maui,*
842 F.3d 688 (9th Cir. 2016)...............................................................30

*Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)...........................................................................24

*Buono v. Tyco Fire Prods., LP,*
78 F.4th 490 (2d Cir. 2023).................................................................30

*Carson v. Monsanto Co.,*
72 F.4th 1261 (11th Cir. 2023) (en banc) ...........................................30

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
587 U.S. 262 (2019)...........................................................................17

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
938 F.3d 246 (5th Cir. 2019)...............................................................30

*EagleMed LLC v. Cox,*
868 F.3d 893 (10th Cir. 2017).........................................................5, 29

*Greenwood Tr. Co. v. Commonwealth of Mass.,*
971 F.2d 818 (1st Cir. 1992) ...............................................................26

*Jessup v. Pulaski Bank,*
327 F.3d 682 (8th Cir. 2003).................................................... 14, 15, 16

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
439 U.S. 299 (1978)............................................... 15, 17, 18, 19

*Medicaid & Medicare Advantage Prods. Ass'n v.*
*Hernández,* 58 F.4th 5 (1st Cir. 2023)................................................30

*Nat'l Credit Union Admin. Bd. v. Nomura Home*
*Equity Loan, Inc.,* 764 F.3d 1199 (10th Cir. 2014)............................21

*Negonsott v. Samuels,*
933 F.2d 818 (10th Cir. 1991)..............................................................19

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
579 U.S. 115 (2016)........................................................................5, 29

iii

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Shuker v. Smith & Nephew, PLC,*
885 F.3d 760 (3d Cir. 2018) .......................................................... 30

*United Sav. Ass'n of Tex. v. Timbers of Inwood*
*Forest Assocs., Ltd.,* 484 U.S. 365 (1988) ........................................ 28

*Watson v. Air Methods Corp.,*
870 F.3d 812 (8th Cir. 2017) (en banc) ........................................... 30

*Ye v. GlobalTranz Enters., Inc.,*
74 F.4th 453 (7th Cir. 2023) ......................................................... 30

## Statutes

Borrowers Relief Act of 1979,
Pub. L. No. 96-104, 93 Stat. 789 (1979) ....................................... 4, 22

Brock Bill of 1974,
Pub. L. No. 93-501, 88 Stat. 1557 (1974).......................................... 4

Depository Institutions Deregulation and
Monetary Control Act of 1980,
Pub. L. No. 96-221, 94 Stat. 132 (1980) .................................. *passim*

DIDMCA § 521, 12 U.S.C. § 1831d .......................................... *passim*

DIDMCA § 525, 12 U.S.C. § 1831d note, 94 Stat. 167.............. *passim*

Gramm-Leach-Bliley Act,
Pub. L. No. 106-102, 113 Stat. 1338 (1999)........................... 1, 15, 16

National Bank Act, 12 U.S.C. § 21 *et seq.*.................................... *passim*

12 U.S.C. § 83................................................................................ 14

12 U.S.C. § 85................................................................... *passim*

12 U.S.C. § 143.............................................................................. 14

National Housing Act, 12 U.S.C. § 1701 *et seq.*.............................. 11, 20

12 U.S.C. § 1735f-7 ................................................................. 11, 20

## TABLE OF AUTHORITIES (continued)

**Page(s)**

Riegle-Neal Interstate Banking and Branching Efficiency Act
of 1994, Pub. L. No. 103-328, 108 Stat. 2338 (1994) ......................... 10

12 U.S.C. § 371 .................................................................................. 14

12 U.S.C. § 1715z-13b ....................................................................... 14

12 U.S.C. § 1757 ................................................................................ 14

12 U.S.C. § 1785 ................................................................................ 14

12 U.S.C. § 1828 ................................................................................ 14

12 U.S.C. § 2202 ................................................................................ 14

12 U.S.C. § 2279aa ............................................................................ 14

12 U.S.C. § 2610 ................................................................................ 14

12 U.S.C. § 4742 ................................................................................ 14

12 U.S.C. § 5602 ................................................................................ 14

12 U.S.C. § 5704 ................................................................................ 14

**Regulatory Materials**

FDIC Gen. Counsel's Op. No. 11, Interest Charges
by Interstate State Banks, 63 Fed. Reg. 27,282
(May 18, 1998) ........................................................................ 9, 18, 26

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) .............. 25

FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June 29, 1988) ........... 27

Federal Interest Rate Authority, 85 Fed. Reg. 44,146
(July 22, 2020) ............................................................................ 18, 27

OCC Interp. Ltr. No. 686, 1995 WL 786842 (Sept. 11, 1995) ................. 26

OTS Ltr. from H. W. Quillian, 1986 WL 290314 (June 27, 1986) .......... 25

**Legislative History**

140 Cong. Rec. 24,463 (1994) ................................................................ 10

## TABLE OF AUTHORITIES (continued)

**Page(s)**

N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes
(Mar. 28, 1983) ...................................................................................25

**Treatises**

Black's Law Dictionary (4th ed. 1968) ................................................... 7

Black's Law Dictionary (5th ed. 1979) ................................................... 7

**Other Authorities**

Brief of Appellee, *Jessup v. Pulaski Bank*,
2002 WL 32375291 (8th Cir. Dec. 2, 2002) ........................................ 15

FDIC Amicus Brief in *Greenwood Tr. Co. v. Commonwealth of
Mass.*, 1992 WL 12577410, at *35–36 (Feb. 27, 1992) ....................... 26

## GLOSSARY

| | |
|---|---|
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) |
| FDIC | Federal Deposit Insurance Corporation |
| GLBA | Gramm-Leach-Bliley Act (GLBA), Pub. L. No. 106-102, 113 Stat. 1338 (1999) |
| NBA | National Bank Act, 12 U.S.C. § 21 *et seq.* |
| NHA | National Housing Act, 12 U.S.C. § 1701 *et seq.* |
| OCC | Office of the Comptroller of the Currency |

Note: We cite the panel opinions (ECF 126-1) as Op. __ and Dissent __. We cite the district court's opinion, which is contained in the Appendix at App.Vol.II.P.442-69, as DCt. Op. __. We cite Defendants-Appellants' Opening Brief (ECF 41) as Appellants' Br. __. We cite Plaintiffs-Appellees' Brief (ECF 77) as Appellees' Br. __. We cite the Petition for Rehearing En Banc (ECF 131) as Pet. Rehearing __.

## INTRODUCTION

Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA) "to prevent discrimination against State-chartered insured banks." Pub. L. No. 96-221, § 521, 94 Stat. 132, 164 (1980). Section 521 of DIDMCA, 12 U.S.C. § 1831d, advances that goal by authorizing state-chartered banks to charge the same interest rates that national banks may charge under Section 85 of the National Bank Act, 12 U.S.C. § 85, and by preempting state laws that would otherwise cap those rates.

Section 525 of DIDMCA in turn allows a state to decline the offer of competitive parity for its own banks by enacting an opt-out statute: "The amendments made by section[] 521 … apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date … such State adopts a law … which states explicitly … that such State does not want the amendments … to apply with respect to loans made in such State." 94 Stat. 167; App.Vol.II.P.227. But a state's opt-out authority under Section 525 is limited: Here, Colorado may decline competitive parity for banks chartered by Colorado; Colorado may not eliminate competitive parity for banks chartered by *other* states

1

via regulating the interest rates on loans made by out-of-state banks to Colorado's residents.

The panel majority's contrary rule would allow national banks to continue lending to Colorado borrowers at federally authorized rates while preventing out-of-state state banks from doing the same. That rule would effectively allow Colorado to override other states' decision to accept DIDMCA's competitive-parity regime. Section 525 does not permit that. Instead, an opting-out state may regulate only the interest rates on loans "made" by banks chartered by that state. As the district court and Judge Rossman recognized, the statute's text and context show that a loan is "made" where the bank is located, not where the borrower is.[1]

## SUMMARY OF ANSWERS TO THE
## COURT'S SUPPLEMENTAL QUESTIONS

1. **Does the phrase "loans made in such State" in Section 525 refer to "an executed loan" and encompass "loans in which either the lender or the borrower is located in the opt-out state"?**

No on both counts. "Made" is not interchangeable with "executed."

---

[1] This brief focuses on the specific supplemental questions posed in the Court's briefing order. A more in-depth exposition of the background is included in the petition for rehearing, ECF 131, and plaintiffs-appellees' panel brief, ECF 77.

Executing a loan agreement is not a key loan-making function. Nor is executing a loan agreement the final step before a loan is "made." Rather, the plain meaning of the phrase "loans made in such state"—as confirmed by the use of "made" in surrounding statutes, longstanding federal precedent, and regulatory guidance—is to tie Section 525 to the bank's loan-making functions creating the loan and the state in which that bank undertakes those functions. The location of the borrower is irrelevant.

2.    **How, if at all, should the reference in Section 521 of DIDMCA to "the State … where the bank is located" inform the meaning of "loans made in such State" in Section 525?**

The two provisions should be interpreted consistently, not—as the panel majority did—by "driv[ing] a wedge between" them. Dissent 7. Section 521 ties the allowable interest rate to the location of the bank making the loan. Section 525 authorizes a state to opt out of section 521, but only with respect to "loans made" in the opting-out state. "[W]here a loan is 'made' under Section 521 should not differ from where it is 'made' under Section 525." Dissent 14.

3.    **How, if at all, is DIDMCA's enactment history instructive to interpreting the phrase "loans made in such State"?**

DIDMCA's enactment history reinforces that the lender-focused phrase "loans made" in DIDMCA refers to the state where the bank made

3

a loan. Congress used that same language consistently across a series of related interest-rate preemption opt-out provisions over a 7-year period. *See* Pub. L. No. 93-501, 88 Stat. 1557 (1974) (the "Brock Bill"); Pub. L. No. 96-104, 93 Stat. 789 (1979) (the "Borrowers Relief Act"). In each, Congress was referring to the state where the bank made the loan. None of these statutes was directed at borrowers, and none of their opt-out provisions was designed to allow one state to deprive other states of the federal extension of competitive parity.

**4.    How, if at all, is the regulatory guidance instructive to interpreting the phrase "loans made in such State"?**

Decades of regulatory guidance consistently recognizes that banks make loans by performing specific key loan-making functions. The location where banks perform those functions, in turn, determines where a loan is "made" and therefore where a bank is deemed to be "located" when making that loan. After reviewing that regulatory guidance, Judge Rossman correctly concluded that it supported the district court's interpretation of Section 525. Dissent 25–29; *see also* Appellees' Br. 58–62 & n.15.

**5.    Is the phrase "loans made in such State" ambiguous?**

No. The phrase "loans made in such State" has a single, best

4

meaning. The district court correctly understood that meaning. The statutory context (including the use of the term "loans made" in related provisions), the statement of purpose included in the statute, and the financial crisis that precipitated the enactment of the statute all support that understanding.

**6.      Does a presumption against preemption apply in this case?**

No. Section 521 of DIDMCA contains an express preemption clause, and courts do not apply a presumption against preemption when Congress expressly addresses preemption. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017). The panel majority erred by applying a "clear statement" rule and resolving perceived ambiguity in Section 525 against preemption.

SUPPLEMENTAL QUESTIONS

**I.      The phrase "loans made in such State" in Section 525 does not refer to "an executed loan" or encompass "loans in which either the lender or the borrower is located in the opt-out state."**

The word "State" in the phrase "loans made in such State" refers to the state where the bank made the loan, not the state where the borrower

5

received it. The majority's contrary conclusion depends on a misreading of Section 525.

## A. "Loans made" does not mean "executed loans."

The majority read the phrase "loans made" in Section 525 as if it said "loans executed." But those two phrases do not mean the same thing. A loan agreement is executed when the bank and the borrower sign that loan agreement. But not all loans are made pursuant to executed loan agreements, and even those loans that have an executed loan agreement are *made* when the bank performs a series of actions culminating in the disbursal of the borrowed funds.

### 1. The majority's interpretation depends on reading the phrase "executed loans" into Section 525.

The majority's interpretation of Section 525 rests on the meaning of the word executed. But that word is not in the statute.

The majority starts down the wrong path by declaring that Congress intended the word "made" in Section 525 to function as a participial adjective rather than a participial verb. Op. 36–37. In other words, the majority believes "made" describes the status of the loan (a "made" or "completed" loan) rather than an action taken by the implied subject of the sentence (loans a bank "made"). *Id.*

Next, the majority swaps the word "executed" for "made," citing the last definition of "made" listed in the Fifth Edition of Black's Law Dictionary—a definition pertaining to entering contracts rather than making loans. *See* Op. 37–39 (citing Black's Law Dictionary (5th ed. 1979), in turn citing *Lone Star Gas Co. v. Coastal States Gas Producing Co.*, 388 S.W.2d 251, 255 (Tex. Civ. App. 1965) (holding contract was "made" for purposes of now-repealed Texas statute when the accepting party mailed signed contract to offeror)).[2]

Then, having replaced "loans made in any State" with "[loan contracts executed] in any State," the majority assumes that both the lender and the borrower must execute a (written) loan contract. Since this newly inserted phrase contemplates actions by both parties, the majority concludes that Section 525 must apply to all "loans in which

---

[2] The majority relies on one definition of "made" in the 1979 edition of Black's Law Dictionary to equate "made" to "executed." But as discussed further below, the phrase "loans made in any State" was drawn verbatim from DIDMCA's predecessor statutes. Those statutes predated the 1979 edition of Black's Law Dictionary, and the prior, 1968, edition of Black's Law Dictionary did not include "executed" as a definition of "made." *Made*, Black's Law Dictionary (4th ed. 1968) (defining "Made" as "Filed. Produced artificially. To require or compel") (citations omitted). The absence of any relevant definition of "made" further indicates that Congress intended to refer to a bank's role in making loans rather than adopt a generic dictionary definition of "made."

7

either the lender *or* the borrower is located in the opt-out state." Op. 39.

In sum, the majority starts with a verb ("made") describing action by one party (the bank), converts the verb to an adjective ("loans *made*"), replaces that with a different adjective ("*executed* loans"), and then converts that new adjective back into a verb found nowhere in Section 525 ("executed") describing an action performed by both parties (the bank *and* the borrower). But while Congress could have authorized states to opt out of DIDMCA with respect to loan contracts *executed by any party* located in the opt-out state, it did not do so. The majority opinion's analysis does not shed light on the meaning of Section 525; rather, the court *changes* the meaning of the statute.

### 2.    "Loans made in any State" is not synonymous with "loans executed in any State."

The word "loan" means the lender's "delivery" of money based on a prior agreement to repay it.[3] And a loan is "made" through a loan-making

---

[3] *See* Op. 37–38 n.21 (quoting Black's Law Dictionary (5th ed. 1979) (defining "loan" as "A lending. Delivery by one party to and receipt by another party of [a] sum of money upon agreement, express or implied, to repay it with or without interest. Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use."); Merriam-Webster (defining "loan" as "a transfer or delivery of money

process that is complete only when the bank loans the borrowed money.[4] Accordingly, the final loan-making function banks perform is disbursing funds, not executing a loan agreement. Execution of a loan agreement occurs—if at all, as not all loans involve written agreements—as an interim step during the loan-making process.[5] The majority thus erred by interpreting Section 525 to apply to the location(s) where loan contracts are "executed" rather than where the loan is "made."

Under federal law, state banks generally make loans where they are chartered. A state bank makes a loan outside of its home state only when it performs its key loan-making functions—the decision to lend, the communication of that decision, and the disbursal of funds—in a different state. When describing the operation of interest-rate preemption under

---

from one party to another with the express or implied agreement that the sum will be repaid regardless of contingency and usually with interest")).

[4] *See, e.g.*, FDIC Gen. Counsel's Op. No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27,282, 27,285 (May 18, 1998) (identifying three key loan-making functions as (1) the bank's "decision to extend credit"; (2) the bank's extension of credit in the form of its "first communication of final approval of the loan"; and (3) the bank's "actual physical disbursal of the" loan proceeds).

[5] The majority acknowledges that "many states permit certain loan agreements without … formal contract[s]," Op. 40, n.24—that is, without an "executed" loan agreement.

DIDMCA, Senator Roth reconciled the general rule and the exception, explaining "the widespread congressional understanding" that DIDMCA "applied on the basis of *the branch* making the loan." 140 Cong. Rec. 24,463, 24,487 (1994) (Statement of Sen. Roth) (emphasis added). "[M]aking" a loan entails "the decision to extend credit, the extension of credit itself, and the disbursal of the proceeds of a loan." *Id.*[6] These loan-making functions determine where a loan is made under both DIDMCA and NBA § 85, and they include actions the bank performs both before and after the parties sign a loan agreement. Consistent with this understanding of the loan-making process, DIDMCA Section 521 uses the term a "loan … made" to refer to loaned funds on which a bank may charge interest—and the statute expressly ties the applicable interest rate to the state "where the bank is located" when making the loan. 12 U.S.C. § 1831d(a).

If Congress had intended Section 525 to apply to "loans *executed* in any State," it would have said so—just as it did in the opt-out provisions

---

[6] Senator Roth presented this statement in connection with the DIDMCA "savings clause" in the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, 108 Stat. 2338 (1994), which specifies that the statute does not affect DIDMCA preemption. *See* Riegle-Neal § 111.

for other interest-rate preemption statutes. *See* Brief of Amici Curiae American Bankers Association, *et al.*, at 2–6, ECF 166. Just three months before Congress enacted DIDMCA, it included a broader opt-out provision in the National Housing Act (NHA), which authorized a state to opt out of interest-rate preemption for mortgage "loans … made *or executed*" in that state. Act of Dec. 21, 1979, Pub. L. No. 96-153, title III, Sec. 308, 93 Stat. 1113-14, codified at 12 U.S.C. § 1735f-7 (emphasis added). Consistent with that broader opt-out authority, the NHA also provided that a state could trigger the opt-out provision simply by adopting a new interest-rate cap after the NHA's effective date.

When Congress enacted DIDMCA several months later, however, it limited Section 525's application to loans "made"—not "executed"—in the opt-out state and required states to expressly declare their intent to opt out of interest-rate preemption. Congress's decision *not* to include the word "executed" in Section 525 shows that the majority erred by reading that word into the statute.

Ultimately, the consistent use of the lender-focused term "made" in DIDMCA and its banking statute predecessors—unlike interest-rate preemption statutes covering other types of lenders—reflects that

11

Congress designed DIDMCA to protect the vitality of the dual-banking system by preempting state interest-rate caps that undermined competitive equality between state and national banks. Congress included Section 525 to allow states to reject that offer and maintain control over the banks those states themselves charter, but Congress did not allow opt-out states like Colorado to deprive *other states*' banks of the ability to compete on an equal footing with national banks.

### B. Whether used as an adjective or verb, "made" focuses on where the bank performs its loan-making functions, not where the borrower receives the loan.

More fundamentally, "[g]rammar is not the key that unlocks this case." Dissent 16. Even if "made" functions as a participial adjective or a participial verb in Section 525, it remains inextricably linked to banks' loan-making role. Under either reading, a loan is "made" in the state where the bank makes the loan, not where the borrower receives (or executes) it.

If Congress used "made" as an adjective in Section 525, then the Court should construe it consistently with Section 521 and NBA Section 85, which *also* use "made" as a participial adjective linked to the bank's location. Dissent 16 n.9 ("[B]oth provisions use *loan(s) made* as a

12

participial adjective—so it is unclear to me how this point of grammar advances our inquiry."). Neither provision uses "loan … made" in connection with the *borrower's* location. Nor does any other banking statute in Title XII of the United States Code rely on the unadorned adjectival phrase "loans made" to refer to borrowers. Congress clearly did not "intend[] to inject a novel borrower-focused framework foreign to DIDMCA and Title XII simply by employing 'made' as a participial adjective" in Section 525. Dissent 18.

If, on the other hand, Congress used "made" as a verb, then the Court should construe Section 525 consistently with the numerous other banking statutes surveyed by the district court that use "made" and "make" to describe banks' loan-making role. As Judge Rossman explained—endorsing the district court's similar "observ[ation]"—"the words 'made' and 'make' are used consistently throughout DIDMCA— and Title XII of the United States Code—to refer to the *bank's act* of making a loan." Dissent 12–15 (citing *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears."); *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1253 n.1 (10th Cir. 2012) (Seymour,

13

J., concurring) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context.")).[7] "Congress's use of 'made' puts the focus on the act of making a loan": "In plain parlance, it is the lender who *makes* a loan; nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card." DCt. Op. 16.

That is the conclusion the Eighth Circuit reached when construing the same phrase—"loan made in any State"—as used in another federal interest-rate preemption statute that Congress enacted after DIDMCA. *See Jessup v. Pulaski Bank*, 327 F.3d 682, 684–85 (8th Cir. 2003)

---

[7] *See, e.g.*, 12 U.S.C. §§ 83(a), 143, 371(a), 1757(5), 1785(f)(1), 1828(o)(3), 1831b(a), 2610, 4742(4) (using "made" or "make" to refer to bank's loan-making role). The district court also noted, "In contrast when Title 12 speaks to action by borrowers, it states that borrowers 'receive' or 'obtain'—but not 'make'—loans." DCt. Op. 18; *See, e.g.*, 12 U.S.C. §§ 2279aa(7)(C), 4742(10)(A), 5602(b)(1). Colorado attempts to sidestep this inconvenient fact by citing a handful of provisions that refer to loans "made to a borrower." Appellants' Br. 43–47 (citing 12 U.S.C. § 3018(c) ("the Bank may guarantee … any loan *made by any State or federally chartered lending institution to any borrower*"); 12 U.S.C. § 4745(p)(1)(C)(i) ("a participating financial institution *makes a loan to a borrower*"); 12 U.S.C. §§ 1715z-13b(c)(1), 2202b(a), 2202d(b), 5704(e)(7)(A)). But the phrase "made *to*" reflects that the borrower is the *object* of the active verb "make"—*i.e.*, the recipient of the loan—not the *maker* of the loan. Neither Colorado nor the majority identify a single statute that uses the word "made," standing alone, to describe a *borrower's* conduct.

(construing 12 U.S.C. § 1831u(f)(2)). The Gramm-Leach-Bliley Act (GLBA), Pub. L. No. 106-102, 113 Stat. 1338 (1999), allowed Arkansas banks to make loans at the same interest rates as any out-of-state bank with a branch office in Arkansas. 12 U.S.C. § 1831u(f). The statute's scoping provision states that it does not "supersed[e] or affect[]" preemption under NBA Section 85 or DIDMCA or "the authority of any insured depository institution to take, receive, reserve, and charge interest on any *loan made in any State* other than" Arkansas. 12 U.S.C. § 1831u(f)(2) (emphasis added). In *Jessup*, an Arkansas bank issued a credit card to a Texas borrower who argued that the loan was "made in" Texas, where he received and used the credit card. *Jessup*, 327 F.3d at 684. The bank responded by tracing federal authority from *Marquette* through DIDMCA, Riegle-Neal, and the judicial and regulatory interpretations of those statutes to show the consistent federal understanding that loans are "made in" the state where banks perform their loan-making functions—not in the borrower's state or by applying choice-of-law principles on a state-by-state basis. Brief for Appellee, *Jessup v. Pulaski Bank*, 2002 WL 32375291, at *1–12, *15 (8th Cir. Dec. 2, 2002). The Eighth Circuit agreed: "[A] loan is made at the location of

15

the branch that approves the loan, extends credit, and disburses the funds"—that is, where the bank performs its loan-making functions, not where the borrower resides. *Jessup*, 327 F.3d at 685 (quoting OCC Opinion Letter (Aug. 2001)).

The shared history of Section 525 and the GLBA confirms that their shared text has the same meaning. But the majority refused to follow the Eighth Circuit's interpretation of that shared language, creating an unnecessary circuit split over where a loan is "made" under federal interest-rate preemption statutes. None of the reasons offered by the majority justifies creating that split. *See* Pet. Rehearing 11–16.

The majority erred by concluding that Section 525 alone uses "made" to mean "executed"—distinguishing the use of the same word in Section 521, NBA Section 85, DIDMCA's interest-rate preemption predecessors and successors, numerous other banking statutes, *and* the multiple interest-rate preemption opt-out provisions where (unlike Section 525) Congress actually chose to include the word "executed."

**II.    The phrase "the State … where the bank is located" in Section 521 helps demonstrate that the phrase "loans made in such State" in Section 525 refers to loans made in the state where the bank is located.**

By expressly linking a "loan … made" by a bank to the state "where

16

the bank is located," Section 521 helps show that a loan is "made" in the state where the bank performs its loan-making functions. *See, e.g.*, *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) (courts should "avoid interpretations that would 'attribute different meanings to the same phrase'") (citation omitted). Rather than read Sections 521 and 525 consistently, "the majority drives a wedge between" them—interpreting Section 521 to "undermine[] the competitive parity Congress intended and enable[] the very discrimination Section 521 sought to eliminate." Dissent 7–12. The Court should reject that approach.

Section 521 ties the applicable interest-rate limit on a loan made by a state bank to the state where the bank is located. It provides that a "State bank may … charge on any loan or discount *made* … interest" at the rate authorized for national banks in the State "where the bank is located" (under the National Bank Act, the higher of the state-law rate and 1% more than the federal discount rate in that state). 12 U.S.C. § 1831d(a). Where the bank is "located" is determined in turn by looking to where the loan is made. *Marquette Nat'l Bank v. First of Omaha Serv.*

*Corp.*, 439 U.S.299, 310–13 (1978).[8] That is generally the state where the bank is chartered, but in certain instances—such as banks with operations in multiple states—it can be where the bank performs its loan-making functions with respect to that loan. *See, e.g.*, FDIC Gen. Counsel's Op. No. 11, 63 Fed. Reg. 27,282, 27,285 (explaining banks are located in charter state, except where they perform the "non-ministerial functions" of loan-making "for that specific loan" in a different state); Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,148 ("If all three non-ministerial functions involved in making the loan are performed … in the host State," that state's interest rate provisions apply).

Section 525 ties a state's opt-out authority to the same concept. Like Section 521, it focuses on loans made in a particular state, authorizing a state to opt out of Section 521's offer of parity "with respect to loans made in such State." The provision thus links a state's authority to regulate

---

[8] In *Marquette*, the Supreme Court determined where the bank was "located" under NBA Section 85 by assessing where the bank's lending operations physically occurred, not where the customers lived or used their credit cards. 439 U.S. at 310–13. The Court noted that "the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska," but stressed that "credit on the use of their cards is nevertheless … extended by Omaha Bank *in Nebraska*." *Id.* at 311–12 (emphasis added).

interest rates to where the loan is made. Because interest rates for "any loan … *made*" pursuant to Section 521 are based solely on the bank's location, the phrase "loans *made* in such State" in Section 525 similarly must refer only to the state where the bank is located. Sections 521 and 525 should be read consistently, rather than assigned conflicting meanings. *See Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir. 1991) ("[S]tatutes should be construed so that their provisions are harmonious with each other.").

DIDMCA's enactment history also refutes Colorado's argument that Congress used the word "made" in Section 525 to "pivot away" from the "State … where the bank is located" under DIDMCA Section 521 and NBA Section 85. *See* Appellants' Br. 26–27. Throughout the 1970s, statutes preempting state interest-rate caps for banks allowed states to opt out of a higher federal rate as to loans "made in" that state—beginning before *Marquette* was decided or DIDMCA Section 521 first authorized state banks to lend at the rates in the "State … where the bank is located." The "made in" phrase used in these predecessor statutes could not have been intended to "pivot away" from the Supreme Court's future decision in *Marquette* or the future text of DIDMCA Section 521.

19

Rather, DIDMCA Section 525 retained the language of prior opt-outs because that section provides the same opt-out authority.

By contrast, meaningful variation does exist between Section 525's restriction to "loans *made* in any State" and the NHA's opt-out provision that applies to "loans … made *or executed* in any State," 12 U.S.C. § 1735f-7 (emphasis added). Because Congress chose not to draft Section 525 to encompass loans "executed" in an opt-out state shortly after using that language in the NHA, "made" cannot be deemed to be synonymous with "executed" without subverting Congress's intent. Nor can the slight differences between Sections 521 and 525 justify ignoring the demonstrably greater difference between Section 525 and the NHA.

In short, "where a loan is 'made' under Section 521 should not differ from where it is 'made' under Section 525." Dissent 14.

III. **DIDMCA's enactment history shows that the phrase "loans made in such State" refers to loans made in the state where the bank is located.**

As Judge Rossman recognized, DIDMCA's enactment history "reinforces what the text reveals—Section 525 only permits states to restore their pre-DIDMCA ability to restrict *their own state-chartered banks* from lending above their own state rate limits, without regard for

20

the federal rate." Dissent 19–25; *cf. Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1209–17 (10th Cir. 2014) (examining context of statute, including enactment history). By rejecting this context and misreading the text, the majority adopted a "patchwork approach" under which DIDMCA's application depends on "the nuances" of each state's conflict-of-law principles—producing "a level of disuniformity Congress never intended." Dissent 29–30.

In the 1970s, Congress enacted a series of interest-rate preemption statutes, from the Brock Bill to DIDMCA, to ensure that state banks could maintain parity with national banks in the face of record-high inflation and corresponding record-high interest rates. Congress increased the maximum federal interest rate at which national banks could make certain business and agricultural loans in the affected states, and it then offered parity to state-chartered banks in those same states. To avoid constitutional questions about the extent of federal power to regulate state banks, each DIDMCA predecessor statute allowed the affected states to decline the offer of parity in favor of retaining control over their own banks' interest-rate caps—and each predecessor statute used the same language for these opt-out provisions.

21

These predecessor bills addressed localized credit crises, not interstate consumer lending. Congress temporarily raised interest-rate caps in a small number of states to help banks lending to farms and other businesses there, and the opt-out provisions in these statutes were correspondingly limited to banks operating in those states.

The Borrowers Relief Act, for example, authorized Arkansas state banks to lend at increased rates in Arkansas. *See* Pub. L. No. 96-104 § 301. Its opt-out provision terminating access to those rates for "loans made in such State," *id.* § 107, therefore, could refer only to loans made by Arkansas banks. Congress could not have intended the phrase "loans made in such state" to refer to loans that were merely received in Arkansas (but made by banks operating elsewhere), because no other states were covered by the Borrowers Relief Act in the first place. Nor could the language "loans made in" have reflected a congressional intent to provide opting-out states with a means to "protect" consumers from receiving "predatory" loans—given the language was initially used in the precursor statutes in connection with business and agricultural, not consumer, loans. *See* Appellees' Br. 35–38.

DIDMCA Section 521 made permanent the offer of parity that

22

began with the Brock Bill and Borrowers Relief Act—using the same language—and extended the offer to encompass consumer loans. Because of lingering uncertainty over the constitutionality of federal regulation of state banks' interest rates, DIDMCA Section 525 once again permitted each state to reject the offer of competitive equality and prevent their own state banks from lending at DIDMCA's federal rates. DIDMCA, like its predecessors, necessarily focused on banks *making* loans, not on borrowers *receiving* those loans. DIDMCA's opt-out provision thus focused on mitigating the potential unconstitutionality of federal interference with states' control over their own state banks.

Section 525 does not, however, permit states to interfere with *other* states' regulation of banks operating within *other states'* borders, thus undermining the competitive parity of those institutions with respect to national banks operating in those states. But that is precisely the result of the majority's conclusion that Colorado's DIDMCA opt-out applies to any loan made by an out-of-state bank if it is received by a borrower in Colorado. There is no dispute that NBA Section 85 preempts Colorado's interest-rate caps as applied to a loan made by an out-of-state national bank, even when the borrower is a Colorado resident. Yet under the

23

majority's interpretation, state banks in a state that chose not to opt out will no longer be able to make loans on an equal footing with the national bank next door. Rather than ensure parity between state and national banks, the majority's decision drives a discriminatory wedge between them. This contradicts the purpose of DIDMCA, which is "to prevent discrimination against State-chartered insured … banks," 12 U.S.C. § 1831d(a). The Court should correct the majority's error.

## IV. Longstanding regulatory guidance reflects that the phrase "loans made in such State" refers to the state where the bank is located.

Decades of regulatory guidance—most importantly, opinions issued shortly after DIDMCA's enactment—reinforces the conclusion that loans are "made" where the bank performs its loan-making functions. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (interpretations "issued roughly contemporaneously with enactment of the statute" are entitled to "respect"). After surveying that guidance, Judge Rossman correctly concluded that it confirmed the district court's interpretation of Section 525. Dissent 25–29; *see also* Appellees' Br. 58–62 & n.15. The Court should reach the same conclusion.

The FDIC's early guidance on DIDMCA consistently treated a loan

24

as "made" where the lender is located. Shortly after DIDMCA's enactment, the FDIC advised state banks that they "may rely on the federal law that incorporates the interest provisions of the state where the bank is located in extending credit to the residents of its state *and of other states*"—including "when *making loans to citizens of states that have rejected the federal preemption.*" FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) (emphasis added). That same year, the FDIC's General Counsel advised North Carolina's Commissioner of Banks that "if a State were to override the preemption of Section 521, a State bank located in another State would still be able to charge North Carolina residents the highest rate allowed in the State bank's home state." *See* N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes (Mar. 28, 1983) at 10, https://perma.cc/8M57-U8ER. The Office of Thrift Supervision concurred, explaining that lenders "may offer loans to out-of-state customers at interest rates authorized in the state where the institution is located, even if the state where the borrower lives … has exercised its 'opt out' authority under section 525." OTS Ltr. from H. W. Quillian, 1986 WL 290314, at *2 (June 27, 1986).

The FDIC reiterated this interpretation in its *amicus* brief in

25

*Greenwood Trust Co. v. Commonwealth of Massachusetts*, one of the earliest significant cases applying DIDMCA. 971 F.2d 818 (1st Cir. 1992). In that brief, the agency addressed whether DIDMCA permitted a Delaware state bank to charge late fees—which qualify as a component of interest—even though Massachusetts, the borrower's state, prohibited late fees. The FDIC explained that Massachusetts' opt-out (which was later repealed) did not permit Massachusetts to extend its prohibition on late fees to Delaware state banks because "the right to 'opt out' of Section 521, by the express terms of Section 525, 'belongs to the State where the loan is made.'" FDIC Br. in *Greenwood Tr. Co. v. Commonwealth of Mass.*, 1992 WL 12577410, at *35–36 (Feb. 27, 1992) (quoting FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June 29, 1988)). Because the lender's state had not opted out, Section 525 did not "have any bearing on this case at all." *Id.* "Section 525 clearly does not confer on states that elect to opt out of Section 521 extraterritorial authority to apply their own lending laws to loans made in other states by banks chartered in other states, *merely because the borrower happens to be a resident.*" *Id.* (emphasis added).[9]

---

[9] *See also, e.g.*, OCC Interp. Ltr. No. 686, 1995 WL 786842, at **3 ("[T]he key fact in determining the permissible interest rate applicable to a loan is not where the customer resides"); FDIC Gen. Counsel's Op. No. 11, 63

26

For more than four decades after DIDMCA's enactment, the FDIC's understanding of Sections 521 and 525 remained the same. Indeed, the FDIC's only departure from that understanding occurred early in this litigation when it suggested and briefly supported the novel "both parties" interpretation adopted by the majority. But neither the FDIC nor Colorado could cite any prior regulatory guidance equating the *borrower's* location with where a loan is "made."[10] And the FDIC has since withdrawn that earlier statement and confirmed that the district court's construction of Section 525 is consistent with the FDIC's current and

---

Fed. Reg. at 27,285 (under DIDMCA, a loan is "made" in the bank's home state by default and is only "governed by the usury provisions of the host state" where the bank "performs all" key loan-making functions there); Federal Interest Rate Authority, 85 Fed. Reg. at 44,148 (July 22, 2020) ("If all three non-ministerial functions involved in making the loan are performed by a branch … located in the host State, the host State's interest provisions would apply to the loan[.]").

[10] For example, Colorado's reliance on the FDIC's 1998 interpretative letter is misplaced. That letter merely rejected the suggestion that a loan is necessarily "made" in a bank's "*home state.*" It instead supports a functional approach to determine where a loan is "made" for purposes of DIDMCA Section 525, citing *Marquette*. FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (emphasis added). That approach is consistent with the district court's opinion; while the vast majority of loans are made in a bank's home state, there are circumstances in the modern era when a bank may undertake the key loan-making functions elsewhere. But it cannot be squared with the majority's loan-execution interpretation.

27

longstanding interpretation of the statute. Br. of Amicus Curiae FDIC, ECF 146. The Office of the Comptroller of the Currency (OCC) agrees. Br. of Amicus Curiae OCC, ECF 147.

**V.    The phrase "loans made in such State" unambiguously refers to loans made in the state where the bank is located.**

The differing interpretations of Section 525 offered by the district court, Judge Rossman, and the panel majority illustrate the difficulty courts have encountered in applying the provision. "Still, 'statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning.'" Dissent 1 (quoting *Loper Bright*, 603 U.S. at 400). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Here, the "best meaning" of Section 525 is unambiguous: DIDMCA's text, enactment history, statutory context, and regulatory guidance all confirm that Section 525 authorizes Colorado to opt out of DIDMCA with respect to loans that banks make in Colorado, but not to loans made in other states that are received by Colorado borrowers.

## VI.  No presumption against preemption applies here.

Because DIDMCA contains an express preemption clause, no presumption against preemption applies in this case. The panel majority nevertheless invoked that presumption to review this case "primed against preemption" and resolve perceived ambiguity in Section 525 against Plaintiffs. Op. 53–54.

That approach conflicts with controlling precedent. In *Franklin*, 579 U.S. at 125, the Supreme Court explained that when construing an express-preemption provision, courts "do not invoke any presumption against pre-emption" and instead focus on the statutory text. This Court applies the same rule, holding that "when a statute contains an express preemption clause," no presumption against preemption applies. *EagleMed*, 868 F.3d at 903.

Section 521 of DIDMCA contains an express preemption clause. The statute thus should be interpreted according to ordinary principles of statutory construction, without any thumb on the scale against preemption. The panel majority erred under *Franklin* and *EagleMed* by applying such a presumption.

Nearly every Circuit to have decided this issue agrees: No

29

presumption against preemption applies when construing a statute containing an express-preemption clause. *Medicaid & Medicare Advantage Prods. Ass'n v. Hernández*, 58 F.4th 5, 11–12 & n.5 (1st Cir. 2023); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495–96 (2d Cir. 2023); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019); *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 465 (7th Cir. 2023), *abrogated on other grounds by Montgomery v. Caribe Transp. II, LLC*, 608 U.S. ----, 2026 WL 1336188 (2026); *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (en banc); *Atay v. County of Maui*, 842 F.3d 688, 499 (9th Cir. 2016); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc).[11]

## CONCLUSION

The Court should affirm the district court's preliminary injunction.

---

[11] Only the Third Circuit applies the presumption in express preemption cases. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018). The First and Fifth Circuits have noted the Third Circuit stands alone in this view. *Medicaid & Medicare*, 58 F.4th at 12 n.5; *Dialysis Newco*, 938 F.3d at 258–59.

Respectfully Submitted,

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
350 S Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800
mattladew@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

/s/ David M. Gossett
DAVID M. GOSSETT
ANGELENE SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
angelenesuperable@dwt.com

TEAL LUTHY MILLER
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
tealmiller@dwt.com

*Attorneys for Plaintiffs-Appellees*

May 28, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.    This brief complies with this Court's April 2, 2026, Order, because this brief is fewer than 30 pages long, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and this Court's April 2, 2026, Order because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in 14-point Century Schoolbook.

<u>/s/ David M. Gossett</u>

May 28, 2026

32