No. 24-1293

# United States Court of Appeals for the Tenth Circuit

_____

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, ET AL.,
PLAINTIFFS-APPELLEES,

*v.*

PHILIP J. WEISER, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL
OF THE STATE OF COLORADO, ET AL.,
DEFENDANTS-APPELLANTS.

_____

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLORADO, NO. 24-CV-812, HON. DANIEL D. DOMENICO, PRESIDING*

_____

**BRIEF OF PROFESSORS TODD ZYWICKI AND THOMAS MILLER, JR.
AND THE CENTER FOR INDIVIDUAL FREEDOM AS *AMICI CURIAE*
SUPPORTING APPELLEES AND AFFIRMANCE**

_____

Christopher Mills
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

Counsel for *Amici Curiae*

**TABLE OF CONTENTS**

**Page**

Table of Authorities............................................................................................. ii

Interest of *Amici Curiae* ................................................................................... 1

Introduction ........................................................................................................ 2

Argument ............................................................................................................ 3

    I.   Colorado's interpretation defies DIDA's statutory purpose to enable
        state banks to compete with national banks. ........................................... 3

    II.  Colorado's reading disregards the realities of interstate loans. ............. 6

    III. Expanding the opt-out provision beyond its terms harms consumers. .................. 9

        A.  State-chartered banks provide benefits to consumers. ..................... 9

        B.  Usury restrictions are harmful to consumers. ................................... 13

        C.  Colorado consumers already suffer from less access to credit than
            consumers in other states. ............................................................... 15

Certificate of Compliance

Certificate of Digital Submission

Certificate of Service

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cantero v. Bank of Am., N.A.*,
   602 U.S. 205 (2024).................................................................................................. 3

*Greenwood Tr. Co. v. Com. of Mass.*,
   971 F.2d 818 (1st Cir. 1992)............................................................................. 4, 5, 6

*Indep. Bankers Ass'n of Am. v. Smith*,
   534 F.2d 921 (D.C. Cir. 1976)................................................................................. 3

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
   439 U.S. 299 (1978)............................................................................ 4, 6, 7, 8, 9, 12

*Nat'l Ass'n of Indus. Bankers v. Weiser*,
   159 F.4th 694 (10th Cir. 2025) ................................................................................ 5

*Nat'l Ass'n of Indus. Bankers v. Weiser*,
   737 F. Supp. 3d 1113 (D. Colo. 2024)..................................................................... 5

*Nat'l Soc. of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978).................................................................................................. 3

STATUTES

12 U.S.C. § 1831d ...................................................................................................... 5, 6

OTHER AUTHORITIES

Alan Chernoff & Julapa Jagtiani, *The Role of Bank-Fintech Partnerships in Creating a
   More Inclusive Banking System*, Federal Reserve Bank of Philadelphia Working Paper
   WP 23-21 (Sept. 2023), *available at* https://www.philadelphiafed.org/-
   /media/frbp/assets/working-papers/2023/wp23-21.pdf ........................................... 13

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
   (2012)........................................................................................................................ 5

Brandon Milhorn, *Preserving America's Community Banks*, Remarks at ICBA Capital
   Summit (May 14, 2025), *available at* https://www.csbs.org/newsroom/preserving-
   americas-community-banks ................................................................................... 9, 10

CFPB Office of Markets, *The High Cost of Retail Credit Cards* (Dec. 18, 2024),
   *available at* https://www.consumerfinance.gov/data-research/research-reports/issue-
   spotlight-the-high-cost-of-retail-credit-cards/ ...................................................... 10

Conference of State Bank Supervisors, *Community Banks Play a Critical Role in Providing Credit* (Oct. 30, 2017), *available at* https://www.csbs.org/community-banks-play-critical-role-providing-credit ................................................................................... 10

David Silberman, *The Availability of Safe and Affordable Credit From Non-Depositories in Colorado*, Financial Health Network (Jan. 2023) .............................................. 14, 15

Donald P. Morgan et al., *How Payday Credit Access Affects Overdrafts and Other Outcomes*, 44 J. Money, Credit & Banking 519 (2012) ................................................ 13

Erik Dolson & Julapa Jagtiani, *Which Lenders Are More Likely to Reach Out to Underserved Consumers: Banks versus Fintechs versus Other Nonbanks?*, Federal Reserve Bank of Philadelphia Working Paper 21-17 (Apr. 2021) ............................... 11

Gene C. Lynch, *Consumer Credit at Ten Percent Simple: The Arkansas Case*, 1968 U. Ill. L. Forum 592 (1968) .................................................................................... 7

Gregory Elliehausen & Simona M. Hannon, *FinTech and Banks: Strategic Partnerships That Circumvent State Usury Laws*, Federal Reserve Board Finance and Economics Discussion Series 2023-056 (2023) ................................................................................ 11

Gregory Elliehausen, Simona M. Hannon, & Thomas W. Miller, Jr., *A New Look at the Effects of the Interest Rate Ceiling in Arkansas*, Federal Reserve Board Finance and Economics Discussion Series No. 2021-045 (Mar. 31, 2023)....................................... 13

Holland C. Blades, Jr. & Gene C. Lynch, *Credit Policies and Store Locations in Arkansas Border Cities: Merchant Reactions to a 10 Percent Finance Charge Ceiling*, Credit Research Center Monograph No. 2 (1976).......................................................... 7

J. Brandon Bolen et al., *Credit For Me but Not For Thee: The Effects of the Illinois Rate Cap*, 197 Public Choice 397 (2023) .............................................................................. 14

J. Howard Beales III & Andrew Stivers, *The Impact of Colorado Ending Equal Competition between State and National Banks* (Oct. 18, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4607006 .................................... 15

James R. Barth & Yanfei Sun, *Industrial Banks: Challenging the Traditional Separation of Commerce and Banking*, 77 Quart. Rev. Econ. & Finance 220 (2020) .................... 12

Julapa Jagtiani & Catharine Lemieux, *Do Fintech Lenders Penetrate Areas that are Underserved by Traditional Banks?*, 100 J. Econ. & Business 43 (2018).................... 11

Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1 (1977).............................................................................................. 3

Melinda Huspen, *Fintechs Asking For, and Receiving, Bank Charters in 2026*, Am. Banker (May 21, 2026), *available at* https://www.americanbanker.com/news/fintechs-asking-for-and-receiving-bank-charters-in-2026........................................................... 12

Nancy Fitzgerald, *Highlight: Most Community Banks are State-Chartered and Their Share is Increasing*, Kansas City Federal Reserve Bank Community Banking Bulletin: Highlight (July 31, 2025)..........................................................................................9

Neil Bhutta et al., *Consumer Borrowing after Payday Loan Bans*, 59 J. L. & Econ. 225 (2016) .............................................................................................13

News Release, *FDIC Chairman Says Action at Fed. Level Needed to Pres. Healthy Dual Banking Sys.*, F.D.I.C. PR-94-05 (Sept. 26, 2005) ........................................................10

Online Lenders Alliance, *A New Mexico Consumer Survey* (2023) ..................................15

Onyumbe Enumbe Ben Lukongo & Thomas W. Miller Jr., *The Cost of Rate Caps: Evidence from Arkansas*, 45 J. Fin. Rsch. 881 (2022).........................................................7

Press Release, Nat'l Credit Union Admin., *NCUA Releases Fourth Quarter 2025 Credit Union System Performance Data* (Mar. 5, 2026), https://ncua.gov/newsroom/press-release/2026/ncua-releases-fourth-quarter-2025-credit-union-system-performance-data ..........................................................................................................................................9

Rajashri Chakrabarti et al., *Less for You, More for Me: Credit Reallocation and Rationing Under Usury Limits*, Federal Reserve Bank of New York Staff Reports, No. 1173 (2025)....................................................................................................................14

Randal K. Quarles, Vice Chairman for Supervision, Board of Governors of the Federal Reserve, *Trends in Urban and Rural Community Banks* (Oct. 4, 2018), *available at* https://www.federalreserve.gov/newsevents/speech/quarles20181004a.htm .................3

Stefanie R. Ramirez, *Payday-Loan Bans: Evidence of Indirect Effects on Supply*, 56 Empirical Economics 1011 (2019) .........................................................................13

Thomas A. Durkin et al., *Rate Ceilings and the Distribution of Small Dollar Loans from Consumer Finance Companies: Results of a New Survey of Small Dollar Cash Lenders*, Working Paper (Mar. 29, 2017).........................................................................7

Todd J. Zywicki, *The Economics of Credit Cards*, 3 Chap. L. Rev. 79 (2000)..................4

Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, International Center for Law & Economics, ICLE Financial Regulatory White Paper Series (June 14, 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1624002 ......................................8

## INTEREST OF *AMICI CURIAE*

**Todd Zywicki** is George Mason University Foundation Professor of Law at George Mason University Antonin Scalia School of Law, Co-Founder and Co-Director at the Institute for Consumer Financial Choice, and a Nonresident Scholar of the International Center for Law & Economics. He has served as Chair of the Consumer Financial Protection Bureau Taskforce on Federal Consumer Financial Law and as Director of the Office of Policy Planning at the Federal Trade Commission. In 2021, he was inducted to the American College of Consumer Financial Services Lawyers. Since 2005, he has ranked among the most-cited faculty in commercial law. **Tom Miller, Jr.** is the Jack R. Lee Chair of Financial Institutions and Consumer Finance at Mississippi State University and Co-Founder and Co-Director of the Institute for Consumer Financial Choice. His research includes projects on consumer credit and small-dollar installment loans. He is the author of *How do Small-Dollar Nonbank Loans Work?* and a co-author of *Fundamentals of Investments: Valuation and Management* (11th ed.). **The Center for Individual Freedom** is a non-partisan, non-profit organization established in 1998 to protect and defend individual freedom, economic liberty and fidelity to the rule of law, specifically as it constrains and disperses governmental authority. *Amici* share an interest in this case because of the harmful consequences to competition and consumers that would arise from the panel's broad interpretation of the statutory opt-out provision.[1]

---

[1] All parties consented to this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and, no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

This case involves the question of whether a state, by opting out of a federal law giving its state banks more leeway in providing access to credit, can impose its restrictive access policies on banks in other states. Statutory text, context, and purpose all confirm that the answer is no. The Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA) does not give states a right to impose destructive access limitations on other states' banks. This brief makes three points supporting the district court's injunction.

*First*, DIDA expressly sought to enable state bank competition with larger, national banks. Reading its narrow opt-out provision to let one state undermine the ability of state banks elsewhere to compete contradicts that core purpose.

*Second*, Colorado's expansive view of the opt-out disregards modern realities of interstate lending. For many years, border residents have taken advantage of financial access in neighboring states, and modern interstate financial products have expanded that access. Colorado's view would muddle who can access state-bank products, inevitably contracting the availability and success of such products.

*Third*, Colorado's interpretation harms consumers. State banks have the flexibility and local knowledge to promote credit access, especially to underserved consumers, and companies now working through these banks—including financial technology companies—have amplified that access. By undermining their ability to compete, Colorado would stamp out competition and these beneficial products. What's more, Colorado would expand its usury restrictions outside its borders, even though economic evidence establishes the destructive effects of those restrictions. Colorado residents, especially those with lower

income or limited credit, already suffer from Colorado's usury caps, and the state's expansive interpretation would worsen its anticompetitive environment—hurting consumers.

## ARGUMENT

**I.    Colorado's interpretation defies DIDA's statutory purpose to enable state banks to compete with national banks.**

"The United States maintains a dual system of banking, made up of parallel federal and state banking systems." *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209 (2024). "That dual system allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government." *Id.* at 210. "Those two banking systems co-exist and compete." *Id.* America's dual banking structure is a distinctive feature of the American financial system in comparison to many other countries where commercial banking is dominated by a handful of massive banks.[2] The dual banking system and the variety of banks it serves reflect the economic and socioeconomic diversity of the United States.[3] Naturally, "some inequalities and some competitive differences are to be expected in a dual banking system," *Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 949 (D.C. Cir. 1976), including some that favor state banks and others that advantage national banks.

This competition benefits consumers, as "competition will produce not only lower prices, but also better goods and services." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). In 1978, the Supreme Court in *Marquette National Bank of*

---

[2] *See* Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 41 (1977).

[3] *See* Randal K. Quarles, Vice Chairman for Supervision, Board of Governors of the Federal Reserve, *Trends in Urban and Rural Community Banks* (Oct. 4, 2018), *available at* https://www.federalreserve.gov/newsevents/speech/quarles20181004a.htm.

*Minneapolis v. First of Omaha Service Corp.* held that banks with a national charter would be governed by the interest rate ceilings of the state in which the bank is based instead of the customer's residence. 439 U.S. 299, 301 (1978). This decision transformed the American economy, unleashing unprecedented competition and putting Visa, Mastercard, and other credit cards in the hands of millions of American families who were previously reliant on pawnbrokers, personal finance companies, and store credit to make ends meet.[4]

But this decision also threatened the ability of state banks to meaningfully compete with national banks. As the Supreme Court acknowledged in *Marquette*, interpreting the National Bank Act to permit interest rate exportation provided a competitive "advantage[]" (albeit a congressionally created one) for national banks over state banks. 439 U.S. at 314.[5] In the 1970s, as interest rates soared, "state lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible." *Greenwood Tr. Co. v. Com. of Mass.*, 971 F.2d 818, 826 (1st Cir. 1992). "National banks did not share this inhibition because they could charge whatever interest rates were allowed under" the National Bank Act, including "rates set by reference to federal discount rates," putting state banks "at an almost insuperable competitive disadvantage." *Id.*

So, Congress passed DIDA in 1980, providing that banks chartered under state law would have the same rights to "export" their home state interest rates as national banks. The goal was to enable state-chartered banks to compete on equal terms with nationally

---

[4] *See* Todd J. Zywicki, *The Economics of Credit Cards*, 3 Chap. L. Rev. 79 (2000).
[5] As the Supreme Court also noted, that advantage was beside the point in *Marquette* itself, as both Marquette and First Omaha were nationally chartered banks. 439 U.S. at 308, 314.

chartered banking behemoths. DIDA expressly sought "to prevent discrimination against State-chartered" banks about permissible interest rates, preempting state laws to the contrary. 12 U.S.C. § 1831d(a). Pulling language from the National Bank Act, "Congress tried to level the playing field between federally chartered and state-chartered banks." *Greenwood*, 971 F.2d at 826–27.

At the same time, Congress allowed states to opt out of this permission for state banks to charge higher rates. DIDA provides for a state to enact a law stating that it "does not want [§ 1831d] to apply with respect to loans made in such State." 12 U.S.C. § 1831d note (Effective Date). The district court rightly interpreted this provision to mean that "where a loan is 'made' depends on the location of the bank, and where the bank takes certain actions, but not on the location of the borrower who 'obtains' or 'receives' the loan." *Nat'l Ass'n of Indus. Bankers v. Weiser*, 737 F. Supp. 3d 1113, 1130 (D. Colo. 2024). But the panel held that "'loans made in such State' refers to loans in which either the lender or the borrower is located in the opt-out state"—meaning that Colorado's opt-out imposes "Colorado's interest-rate caps [on] loans from out-of-state banks to Colorado borrowers." *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694, 699 (10th Cir. 2025).

But that interpretation would defeat DIDA's statutory purpose. "[I]nterpretation always depends on context," "context always includes evident purpose," and "evident purpose always includes effectiveness." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). Interpretation should thus "further[], not hinder[]" the text's "manifest purpose." *Id.*

Here, the primary legislative objective was to let state banks meaningfully compete

5

with national banks. *See* 12 U.S.C. § 1831d(a) ("prevent discrimination"); *see also Greenwood*, 971 F.2d at 826 (collecting citations). Letting opt-out states impose lower interest rate ceilings on banks in other states effectively lets a single state negate the competitive field arranged by DIDA between state and national banks. In the National Bank Act, Congress rejected a set national usury ceiling, instead generally allowing states to set their own terms of banking—while giving national banks a release valve to charge higher interest rates. *See Marquette*, 439 U.S. at 318 n.31. DIDA gave that release valve to state banks, too. But in light of this purpose, there's no reason to believe DIDA meant to alter *Marquette*'s definition of where a loan is "made." Colorado's overbroad interpretation of the statute's opt-out provision would let one state impose its terms of banking on banks in other states—defying Congress's refusal to set a uniform usury ceiling and its preservation of state authority over its own banks.

## II.    Colorado's reading disregards the realities of interstate loans.

Colorado's interpretation of where a loan is "made" is also inconsistent with the banking reality that consumers have long been able to travel to other states to obtain loans governed by laws of those states. As *Marquette* noted, "Minnesota residents were always free to visit Nebraska and receive loans in that State. It has not been suggested that Minnesota usury laws would apply to such transactions." 439 U.S. at 310–11. "Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the bank's honoring of the sales drafts of participating Minnesota merchants and banks." *Id.* at 311.

Many studies, including several studies conducted in the period around the *Marquette* decision, confirm the frequency of consumers crossing state lines to enter transactions that were not permitted in their state of residence.[6] For instance, one *amicus* here examined borrowing behavior in Arkansas under the state's 17% interest-rate cap, finding no small-dollar installment lenders operating in Arkansas. Yet 25,000 installment loans to Arkansas residents existed, of which 96.8% were to residents in the counties that border surrounding states, showing that those consumers had crossed to neighboring states to obtain loans not available in Arkansas. Though about 55% of Arkansas's population lives in interior counties, only 3% of the loans outstanding were to residents of those counties.[7]

In *Marquette*, the Supreme Court recognized that this geographic understanding of where loans originate "will significantly impair the ability of States to enact effective usury laws." 439 U.S. at 318. The Court explained that "[t]his impairment . . . has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates." *Id.* And this "impairment" "may in fact be accentuated by the ease with which interstate credit is available by mail"—or now, by the internet. *Id.* at 318–19. "But the protection of state usury laws," the

---

[6] *See, e.g.*, Holland C. Blades, Jr. & Gene C. Lynch, *Credit Policies and Store Locations in Arkansas Border Cities: Merchant Reactions to a 10 Percent Finance Charge Ceiling*, Credit Research Center Monograph No. 2 (1976); Gene C. Lynch, *Consumer Credit at Ten Percent Simple: The Arkansas Case*, 1968 U. Ill. L. Forum 592 (1968); Thomas A. Durkin et al., *Rate Ceilings and the Distribution of Small Dollar Loans from Consumer Finance Companies: Results of a New Survey of Small Dollar Cash Lenders*, Working Paper (Mar. 29, 2017).

[7] Onyumbe Enumbe Ben Lukongo & Thomas W. Miller Jr., *The Cost of Rate Caps: Evidence from Arkansas*, 45 J. Fin. Rsch. 881 (2022).

Court said, "is an issue of legislative policy" for Congress to decide. *Id.* at 319. Rather than reverse that decision with respect to national banks, however, Congress chose to extend the same advantages to state-chartered banks in DIDA.

Given that DIDA merely *extended* the National Bank Act's permission for higher interest rates to state banks, it makes little sense to read DIDA's opt-out provision as conferring a novel power on states to impose their interest rate ceilings on banks in other states, much less to think that DIDA created a novel definition of where a loan is "made" that differs from the National Bank Act. Plus, as the Supreme Court noted in *Marquette*, trying to use any location for the contract other than that of the issuing bank would make the payment and credit system entirely unworkable. Consider the complexities of a routine credit card transaction. A credit card agreement between an issuer and consumer authorizes a line of credit to a consumer in the first instance. But a credit card transaction consists of at least five parties—the consumer, the issuing bank, the merchant, the acquiring bank, and the network provider (i.e., Visa or Mastercard).[8] Consumers can make purchases in-person, through the mail, over the phone or via the internet. Consumers can make purchases in one state while residing in another state from a bank located in a third state with a merchant located in a fourth state. As the Supreme Court observed in *Marquette*, "If the location of the bank were to depend on the whereabouts of each credit-card transaction, the meaning of the term 'located' would be so stretched as to throw into confusion the complex system

---

[8] *See* Todd J. Zywicki, *The Economics of Payment Card Interchange Fees and the Limits of Regulation*, International Center for Law & Economics, ICLE Financial Regulatory White Paper Series (June 14, 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1624002.

of modern interstate banking. A national bank could never be certain whether its contacts with residents of foreign States were sufficient to alter its location for purposes of" the National Bank Act. 439 U.S. at 312. The Court chose not "to invite these difficulties by rendering so elastic the term 'located.'" *Id.*

These practical hurdles illustrate why the Supreme Court in *Marquette* recognized the only workable rule that makes sense is the location of the issuer bank, not the consumer, merchant, or anyone else, much less *multiple* locations simultaneously. Needless to say, these complexities are identical whether it is a state-chartered bank issuing the card or a nationally chartered bank. Understanding DIDA to focus on the location of the bank will help consumers access needed financial products.

## III.    Expanding the opt-out provision beyond its terms harms consumers.

### A.    State-chartered banks provide benefits to consumers.

State banks play an important role in the dual banking system, serving local communities with a knowledge of local industries and needs. 83% of all community banks hold state charters,[9] and 79% of all banks in the United States are state-chartered.[10] A little over one-third of credit unions are state-chartered.[11] State banks are particularly valuable in

---

[9] *See* Nancy Fitzgerald, *Highlight: Most Community Banks are State-Chartered and Their Share is Increasing*, Kansas City Federal Reserve Bank Community Banking Bulletin: Highlight (July 31, 2025).

[10] Brandon Milhorn, *Preserving America's Community Banks*, Remarks at ICBA Capital Summit (May 14, 2025), *available at* https://www.csbs.org/newsroom/preserving-americas-community-banks.

[11] Press Release, Nat'l Credit Union Admin., *NCUA Releases Fourth Quarter 2025 Credit Union System Performance Data* (Mar. 5, 2026), https://ncua.gov/newsroom/press-release/2026/ncua-releases-fourth-quarter-2025-credit-union-system-performance-data.

areas like fintech, private label credit cards,[12] and industrial banks, all of which can be valuable to consumers, especially subprime and traditionally excluded consumers. Community banks are particularly important in the American financial system for serving local communities, including making agricultural and small business loans.[13] According to the Conference of State Bank Supervisors, one in five rural communities in America would have no bank branch but for a community bank.[14] These banks can provide more ready access to credit for consumers than larger, national banks, enabling consumers to obtain the products they want within the regulated banking system instead of driving them to alternative lenders. Thus, competition by state-chartered banks provides benefits to consumers through more choice and access to credit within the regulated financial system.

But unless state banks can meaningfully compete with national banks, they will cease to exist. For decades, smaller state banks have found it difficult to compete, with increased consolidation and elimination of "too small to succeed" banks.[15] Subjecting these

---

[12] State-chartered banks are major issuers of private label or "store brand" credit cards, which extend credit to a deeper pool of borrowers than general-purpose card issuers. As a result of reaching a wider and deeper array of consumers, however, charge-off rates on private label cards are also higher, resulting in higher interest rates and greater fees than general purpose cards. They also typically offer fixed interest rates. *See* CFPB Office of Markets, *The High Cost of Retail Credit Cards* (Dec. 18, 2024), *available at* https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-the-high-cost-of-retail-credit-cards/. Thus, they are more likely to be affected by usury controls and to become unavailable to consumers.

[13] According to the Conference of State Bank Supervisors, 37% of small business loans and 63% of agricultural loans are made by state banks. *See* Milhorn, *supra* note 10.

[14] Conference of State Bank Supervisors, *Community Banks Play a Critical Role in Providing Credit* (Oct. 30, 2017), *available at* https://www.csbs.org/community-banks-play-critical-role-providing-credit.

[15] *See, e.g.*, News Release, *FDIC Chairman Says Action at Fed. Level Needed to Pres. Healthy Dual Banking Sys.*, F.D.I.C. PR-94-05 (Sept. 26, 2005).

smaller state banks to inconsistent, overlapping state regulatory schemes, as Colorado's interpretation would, undermines their ability to compete and imposes significant new administrative burdens on them—contradicting the express purpose of DIDA. Diminishing the viability of state banks would harm consumers in at least three ways.

*First*, as explained above, state banks are important to underserved populations. National banks traditionally have shown little interest in offering financial services to higher-risk and lower-income consumers, a problem that has been exacerbated in recent years by financial regulations that reduce the incentives of large banks to serve these customers.

Financial technology companies have shown a promising way around these problems. Fintech companies have disproportionately partnered with community banks and credit unions to provide innovative services and reach customers traditionally ignored by big banks, and have increased competition and choices available to those consumers.[16] According to a recent study by Federal Reserve economists, fintech partners of state-chartered banks are particularly beneficial to the most hard-pressed consumers ignored by mainstream banks and whom traditional bricks-and-mortar finance companies are unable to serve because of repressive interest rate ceilings.[17] Other state-chartered institutions, including industrial loan companies (like some plaintiffs in this case), also extend access

---

[16] See, e.g., Erik Dolson & Julapa Jagtiani, *Which Lenders Are More Likely to Reach Out to Underserved Consumers: Banks versus Fintechs versus Other Nonbanks?*, Federal Reserve Bank of Philadelphia Working Paper 21-17 (Apr. 2021); Julapa Jagtiani & Catharine Lemieux, *Do Fintech Lenders Penetrate Areas that are Underserved by Traditional Banks?*, 100 J. Econ. & Business 43 (2018).

[17] Gregory Elliehausen & Simona M. Hannon, *FinTech and Banks: Strategic Partnerships That Circumvent State Usury Laws*, Federal Reserve Board Finance and Economics Discussion Series 2023-056 (2023).

to needed financial products to underserved populations.[18]

If state banks are forced to operate under restrictive regulations of other states like Colorado but national banks are not, fintech companies may abandon state banks and switch to national charters to avoid regulatory uncertainty.[19] Others, like industrial banks, may cease operations altogether. That, in turn, will further weaken the dual banking system, reduce competition and access to a range of financial products, and harm consumers.

*Second* and relatedly, preserving state banks and their permissible affiliations with fintech and other products provides more equal access to credit. As noted, consumers in border counties traditionally were able to take better advantage of state competition by going across state lines for needed financial products. But recent fintech offerings equalize credit opportunities for consumers in "credit deserts," such as those located in the geographic interior of a state, giving them the same access as consumers in border counties. According to a 2023 study sponsored by the Philadelphia Federal Reserve, allowing banks to partner with fintech providers increases access to both credit cards and mortgages for subprime and "credit invisible" consumers, especially in areas with less competition from incumbent providers.[20] Just as the Supreme Court recognized in *Marquette* that entering a

---

[18] *See* James R. Barth & Yanfei Sun, *Industrial Banks: Challenging the Traditional Separation of Commerce and Banking*, 77 Quart. Rev. Econ. & Finance 220 (2020).

[19] That trend is already occurring as the Office of the Comptroller of the Currency has signaled greater openness to chartering fintechs, and some fintech companies have acquired national banks. *See* Melinda Huspen, *Fintechs Asking For, and Receiving, Bank Charters in 2026*, Am. Banker (May 21, 2026), *available at* https://www.american-banker.com/news/fintechs-asking-for-and-receiving-bank-charters-in-2026.

[20] *See* Alan Chernoff & Julapa Jagtiani, *The Role of Bank-Fintech Partnerships in Creating a More Inclusive Banking System*, Federal Reserve Bank of Philadelphia Working Paper

contract by mail with a Nebraska bank is functionally identical to driving from Minnesota, it is senseless to allow only those within driving distance of a state border to obtain desired financial products that are less convenient for those living in a state's interior.

*Third*, state bank competition keeps consumers within the regulated banking system if they would like, letting them use fintech or other accessible products, instead of relying on non-bank lenders. Pushing consumers out of the organized bank financial system—as eliminating state banks would tend to do—does not get rid of the demand for credit. Rather, consumers—especially younger people, immigrants, and those with poor credit—are left to rely on an assortment of less preferred and more expensive financial products to make ends meet, including finance companies, payday loans, overdrafts, and pawn shops.[21]

### B. Usury restrictions are harmful to consumers.

Colorado's interpretation effectively imposes new usury restrictions by imposing one state's interest rate rules on loans made in other states. Usury restrictions are harmful to consumers and imposing them via a novel interpretation of DIDA is no exception.

An avalanche of evidence shows that usury restrictions—like price ceilings more

---

WP 23-21 (Sept. 2023), *available at* https://www.philadelphiafed.org/-/media/frbp/assets/working-papers/2023/wp23-21.pdf.

[21] *See, e.g.*, Gregory Elliehausen, Simona M. Hannon, & Thomas W. Miller, Jr., *A New Look at the Effects of the Interest Rate Ceiling in Arkansas*, Federal Reserve Board Finance and Economics Discussion Series No. 2021-045 (Mar. 31, 2023) (finding that subprime consumers in Arkansas are more likely to obtain credit from a finance company (as opposed to a bank) than in surrounding states); Stefanie R. Ramirez, *Payday-Loan Bans: Evidence of Indirect Effects on Supply*, 56 Empirical Economics 1011 (2019); Neil Bhutta et al., *Consumer Borrowing after Payday Loan Bans*, 59 J. L. & Econ. 225 (2016); Donald P. Morgan et al., *How Payday Credit Access Affects Overdrafts and Other Outcomes*, 44 J. Money, Credit & Banking 519 (2012).

broadly—harm consumers, especially underserved ones. For instance, after Illinois imposed an all-in rate cap of 36% APR, a rigorous analysis found that the cap "decreased the number of loans to subprime borrowers by 38% and increased the average loan size to subprime borrowers by 35%."[22] A recent study published by the New York Federal Reserve similarly found that the presence of usury ceilings led to "sharp[]" contraction of credit availability for riskier borrowers with no reduction in delinquencies.[23] Surveys of small-dollar-credit borrowers who lost credit access suggested that the cap "worsened the financial well-being of many of these borrowers."[24] And even as usury ceilings restricted access for higher-risk borrowers, they were associated with an *increase* in credit access for lower risk borrowers, a particularly regressive and perverse result of usury ceilings. [25]

According to a report commissioned by the Colorado Attorney General and authored by former CFPB Acting Deputy Director David Silberman, a similar cap in Colorado led to a collapse in access to small-dollar credit for consumers, especially those with weaker credit, and drastically reduced competition.[26] In Iowa, the only previous state to combine strict interest-rate caps with DIDA's opt-out, a mere 0.16% of residents could

---

[22] J. Brandon Bolen et al., *Credit For Me but Not For Thee: The Effects of the Illinois Rate Cap*, 197 Public Choice 397 (2023).

[23] Rajashri Chakrabarti et al., *Less for You, More for Me: Credit Reallocation and Rationing Under Usury Limits*, Federal Reserve Bank of New York Staff Reports, No. 1173 (2025) (finding 16.9% reduction in debt balances and 20% reduction in the number of accounts for riskier borrowers).

[24] *See* Bolen et al., *supra* note 22.

[25] *See id.* (finding that Illinois's interest-rate cap increased the number of loans to prime borrowers by 16% and the average loan size to prime borrowers by 7%); Chakrabarti et al., *supra* note 23 (finding increased credit for lower-risk borrowers).

[26] David Silberman, *The Availability of Safe and Affordable Credit From Non-Depositories in Colorado*, Financial Health Network (Jan. 2023).

obtain small-dollar loans—a fraction of those in less-regulated states like Missouri.[27] And

lending price controls in New Mexico had similar effects.[28] By expanding one state's usury

laws to loans in other states, Colorado's interpretation magnifies the harm that those laws

cause consumers, especially those with lower credit scores and less access to credit.

### C. Colorado consumers already suffer from less access to credit than consumers in other states.

All these problems are especially severe because Colorado consumers already face

reduced access to credit. As noted above, Colorado's rate cap has had that effect, with the

attorney general-commissioned report finding that "for subprime and deep subprime con-

sumers and those with insufficient credit history to generate a credit score, reported small-

dollar loans appear to be less available for such consumers in Colorado than in these other

states."[29] Under Colorado's expansive interpretation of DIDA, Colorado consumers would

suffer from even less access to credit, as "[s]tate-chartered banks outside of Colorado that

currently compete to provide credit for Colorado customers will be highly restricted to do

so, and new potential competitors will face likely insurmountable new barriers to entry."[30]

Especially given Colorado's already-uncompetitive regulatory environment that harms

consumers, imposing further restrictions via an expansive statutory reading is unwarranted.

---

[27] *Id.* at 40.

[28] Online Lenders Alliance, *A New Mexico Consumer Survey* (2023).

[29] Silberman, *supra* note 26, at 5.

[30] J. Howard Beales III & Andrew Stivers, *The Impact of Colorado Ending Equal Competition between State and National Banks*, at 1 (Oct. 18, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4607006.

Respectfully submitted,

_s/ Christopher Mills_

Christopher Mills
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law

Counsel for _Amici Curiae_

JUNE 2, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the page limit of 10th Cir. R. 29.1 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it is 15 pages.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 13-point Times New Roman font.

Dated:  June 2, 2026

*s/ Christopher Mills*
Christopher Mills

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed; and (3) the electronic submission was scanned for viruses using Microsoft Defender and, according to that program, this document is virus free.

Dated:  June 2, 2026

_s/ Christopher Mills_
Christopher Mills

**CERTIFICATE OF SERVICE**

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  June 2, 2026

*s/ Christopher Mills*
Christopher Mills
