No. 24-1293

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

NATIONAL ASSOCIATION OF
INDUSTRIAL BANKERS, et al.,

     Plaintiffs-Appellees,

     v.

PHILIP J. WEISER, in his official capacity as
Attorney General of the State of Colorado, et al.,

     Defendants-Appellants.

_____

**On Appeal From the United States District Court for the
District of Colorado, No. 1:24-cv-00812-DDD-KAS**

_____

**SUPPLEMENTAL BRIEF OF AMICI CURIAE AMERICAN
BANKERS ASSOCIATION, BANK POLICY INSTITUTE,
CONSUMER BANKERS ASSOCIATION, AMERICA'S CREDIT
UNIONS, AND 52 STATE BANKERS ASSOCIATIONS
IN SUPPORT OF PLAINTIFFS-APPELLEES**

_____

Ronald K. Vaske
vasker@ballardspahr.com
BALLARD SPAHR, LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55401-2119
612.371.3215

Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record

*Attorneys for American Bankers Association,
Bank Policy Institute, Consumer Bankers Association,
America's Credit Unions, and 52 State Bankers Associations*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, each amicus certifies that it does not have a parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Dated: June 4, 2026

*/s/ Burt M. Rublin*
Burt M. Rublin

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

I.   INTEREST OF AMICI CURIAE ................................................................. 1

II.  ARGUMENT ............................................................................................. 2

    A.   Congress Contemplated That, Under Section 525, a Loan is
          "Made" Only in the State Where Lending Functions are
          Performed ........................................................................................ 2

    B.   The Legislative History of DIDMCA ................................................. 6

    C.   Holding That a Loan is "Made" in the State Where The
          Borrower is Located Will Create an Administrative Morass ............. 10

    D.   The FDIC Has Long Recognized That a State's Opt-Out Cannot
          Affect State Banks Located in Other States ....................................... 14

III. CONCLUSION ........................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*FCC v. Pacifica Found.*,
   438 U.S. 726 (1978)..................................................................................5

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .......................................4

*Fulghum v. Embarq Corp.*,
   785 F.3d 395 (10th Cir. 2015) ............................................................5

*Garcia v. United States*, 469 U.S. 70 (1984) ..........................................5

*Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir. 1992).............13, 14

*Lackey v. Stinnie*,
   604 U.S. 192 (2025)..............................................................................4

*Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*,
   596 U.S. 880 (2022)...................................................................4, 11, 12

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
   439 U.S. 299 (1978)..................................................................12, 13

*Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161 (2014)...........................11

*Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694 (10th Cir.
   2025), *vacated*, 2026 U.S. App. LEXIS 9563 (10th Cir. April 2,
   2026) ................................................................................2, 5, 12

*Smith v. Berryhill*, 587 U.S. 471 (2019) ...................................................6

*Stoorman v. Greenwood Trust Co.*, 908 P.2d 133 (Colo. 1995) ...........................13

*United States v. Gonzales*,
   456 F.3d 1178 (10th Cir. 2006) ..........................................................5

*United States v. Hopson*, 150 F. 4th 1290 (10th Cir. 2025) .....................................4

*United States v. Maestas*, 642 F.3d 1315 (10th Cir. 2011)......................................5

**Page(s)**

*Wisconsin Central Ltd. v. United States*,
   585 U.S. 274 (2018)............................................................................4

**Federal Statutes**

12 U.S.C. § 85 ...............................................................6, 7, 8, 12, 13

12 U.S.C. § 1709-1a(b) ...................................................................3, 4

12 U.S.C. § 1735f-7 .........................................................................3, 4

12 U.S.C. § 1785(g) ............................................................................8

15 U.S.C. § 1691(d)(1).......................................................................11

94 Stat. 165 .......................................................................................4

Act of Dec. 21, 1979, Pub. L. No. 96-153, Title III, § 308, 93 Stat.
   1113-14 .......................................................................................3

Depository Institutions Deregulation and Monetary Control Act of
   1980 §§ 521-523 ....................................................................*passim*

Depository Institutions Deregulation and Monetary Control Act of
   1980 § 525.............................................................................*passim*

Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, § 8,
   90 Stat. 722-23 ...........................................................................3

**Page(s)**

**State Statutes**

63 Del. Laws ch. 2 §§ 2-23 (1981) ....................................................................9

§ 5-1-201(4), C.R.S. ......................................................................................10

§ 5-2-213(2), C.R.S. ......................................................................................10

1980 South Dakota Session Laws chap. 335 (HB 1046) and chap. 331
 (H.B. 1370) ...............................................................................................9

**Legislative History**

125 Cong. Rec. 30655 (Nov. 1, 1979) ..............................................................7

**Other Authorities**

Eleanor Erdevig, *Small States Teach a Big Banking Lesson*, Chicago
 Fed. Letter, No. 10, June 1988 ...................................................................9

FDIC Amicus Brief, *Greenwood Trust Co. v. Massachusetts*, 1992
 WL 12577410 (1st Cir. Feb. 27, 1992) ...............................................14, 15

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) ................13, 14

North Carolina State Banking Comm., Special Mtg. Minutes
 (March 28, 1983) .......................................................................................14

## I. INTEREST OF AMICI CURIAE[1]

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $25.1 trillion banking industry and its 2.1 million employees. The Bank Policy Institute ("BPI") is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to numerous industry concerns. The Consumer Bankers Association ("CBA") is the only national trade association focused exclusively on retail banking. Established in 1919, the CBA is a leading voice in the banking industry, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans. America's Credit Unions represents our nation's nearly 5,000 federally and state-chartered credit unions that collectively serve over 146 million consumers with personal and small business financial service products. America's Credit Unions delivers strong advocacy, resources, and services to protect, empower, and

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than the amici contributed money intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

advance credit unions and the people they serve. The 52 State Bankers Associations listed in the Appendix represent the interests of their numerous members at the state and local levels.

Amici's members include many state-chartered federally insured depository institutions located outside Colorado that make loans in their states in conformity with their states' laws to Colorado borrowers. Their interstate lending programs will be greatly affected by the outcome of this litigation.

## II.    **ARGUMENT**

### A.    Congress Contemplated That, Under Section 525, a Loan is "Made" Only in the State Where Lending Functions are Performed

In interpreting the case-dispositive phrase, "loans made in such State," as used in Section 525 of DIDMCA, the panel's now-vacated majority opinion stated that "'loans made in such State' refers to loans executed in the opt-out state, and an executed loan necessarily requires at least two parties – a lender and a borrower." *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694, 714 (10th Cir. 2025) (italics in original), *vacated*, 2026 U.S. App. LEXIS 9563 (10th Cir. April 2, 2026).

Significantly, however, the 96th Congress did *not* include the term "executed" in Section 525. In stark contrast, just three months earlier, the same 96th Congress enacted a different statute preempting state usury laws but allowing states to override preemption as to certain FHA loans "made *or executed*" in such State. On December 21, 1979, it amended the National Housing Act as follows:

2

EXEMPTION FROM STATE USURY LAWS

Sec. 308. Title V of the National Housing Act is amended by adding the following new section at the end thereof:

"Sec. 529.(a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under title I or II of this Act.

"(b) The provisions of subsection (a) shall apply to loans, mortgages, or advances *made or executed* in any State until the effective date (after the date of enactment of this section) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance."[2]

This was very similar to a different amendment to the National Housing Act three years earlier that likewise allowed states to override federal preemption of state law interest limitations with respect to certain "loans, mortgages, or other interim financing *made or executed* in" such State.[3]

Thus, Congress knew full well how to be explicit on this issue, and its decision to use only the lender-centric word "made" in Section 525 without also adding the more bilateral term "executed" as it had done just three months earlier

---

[2]    Act of Dec. 21, 1979, Pub. L. No. 96-153, title III, Sec. 308, 93 Stat. 1113-14, codified at 12 U.S.C. § 1735f-7 (emphasis added).

[3]    Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, Sec. 8, 90 Stat. 722-23, codified at 12 U.S.C. § 1709-1a(b) (emphasis added).

in 12 U.S.C. § 1735f-7 and three years earlier in 12 U.S.C. § 1709-1a(b) is highly

significant. The decision in *Wisconsin Central Ltd. v. United States*, 585 U.S. 274,

279 (2018) is squarely on point:

> We usually 'presume differences in language like this convey differences in meaning'… And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task … Its choice to use the narrower term [in just one of the statutes] requires respect, not disregard.

*Accord Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*, 596 U.S. 880,

887 (2022) ("Congress knew how to write such a law. It did not do so in this

statute."); *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) ("It is Congress's job to craft

policy and ours to interpret the words that codify it. 'A textual judicial

supplementation is particularly inappropriate when … Congress has shown that it

knows how to adopt the omitted language or provision.'"); *United States v. Hopson*,

150 F. 4th 1290, 1304 (10th Cir. 2025) ("When Congress knows how to achieve a

specific statutory effect, its failure to do so evinces an intent *not* to do so") (italics in

original), *quoting Fish v. Kobach*, 840 F.3d 710, 740 (10th Cir. 2016).

Moreover, Congress's use of the disjunctive phrase "made *or*

executed" in both 12 U.S.C. § 1735f-7 and 12 U.S.C. § 1709-1a(b)[4] demonstrates

that Congress did *not* view the terms "made" and "executed" as synonymous. *See,*

---

4    These two statutes are part of the National Housing Act, as was Section 522 of DIDMCA. 94 Stat. 165.

*e.g., Garcia v. United States*, 469 U.S. 70, 73 (1984) ("Canons of construction indicate that terms connected in the disjunctive in this manner [separated by "or"] be given separate meanings."); *FCC v. Pacifica Found.*, 438 U.S. 726, 739-40 (1978) ("The words 'obscene, indecent, or profane' are written in the disjunctive, implying that each has a separate meaning."); *United States v. Gonzales*, 456 F.3d 1178, 1182 (10th Cir. 2006) ("Gonzales' reading of the statute, however, ignores the inclusion of the term 'or' between 'steals' and 'removes.' The use of the disjunctive 'or' indicates 'steals' and 'removes' are to have different meanings … Otherwise the term 'or' in the statute would be superfluous."); *Fulghum v. Embarq Corp.*, 785 F.3d 395, 415 (10th Cir. 2015) (same); *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011) (same).

In sum, although the 96th Congress chose in Section 529 of the National Housing Act to allow a state to countermand preemption of its usury laws with respect to loans that are either "made or executed in" the state, it decided just three months later that the preemption override in Section 525 of DIDMCA would be more narrowly confined just to "loans made in such State." Given this legislative context, there is no basis to conclude that "'loans made in such State' refers to loans executed in the opt-out state.'" *NAIB*, 159 F.4th at 714.

Section 521 of DIDMCA allows state banks to "charge on any loan or discount made" by them the interest rates allowed by the law of the state "where the bank is located," and makes no reference to the borrower's location. There is

5

nothing in Section 521 or Section 525 to support the illogical notion that although a state bank's permissible interest rates are dependent solely on the bank's location for purposes of Section 521, they also depend on the borrower's location if the borrower resides in an opt-out state. Because permissible interest rates on "any loan or discount *made*" pursuant to Section 521 are based solely on the bank's location, the phrase "loans *made* in such State" in Section 525 similarly must refer only to the state where the bank is located. Stated differently, where a loan is "made" under Section 521 should not differ from where that loan is "made" under Section 525. *See Smith v. Berryhill*, 587 U.S. 471, 479 (2019) ("the normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning").

It also bears emphasis that Section 525 refers just to a *single* state where a loan is "made" ("loans made in *such State*"). This belies the notion that, under Section 525, a loan is "made" in both the lender's state and the borrower's state.

B. The Legislative History of DIDMCA

The legislative history of DIDMCA demonstrates that the entire Congressional focus was on creating a level playing field for state-chartered depository institutions and the national banks against which they competed in their home state. The sponsors of the usury provisions were Senators Pryor and Bumpers of Arkansas, which had a 10% usury ceiling. However, notwithstanding that limit, national banks in Arkansas were authorized under Section 85 of the

6

National Bank Act, 12 U.S.C. § 85, to make loans to Arkansas residents at 1%

above the Federal Reserve discount rate, which was then 12%. Inflation was

soaring, and *state banks in Arkansas* could not afford to make loans to *Arkansas*

*residents* within the 10% ceiling.

Senator Pryor explained the unfair situation confronting Arkansas'

state banks and savings and loan associations in competing with national banks in

making *intrastate* loans to borrowers in Arkansas:

> We have, as the Senators well know by now, a strict 10-
> percent interest rate ceiling on all types of loans. *A
> customer seeking a loan to buy a car is unlikely to find
> the funds at a State bank since State banks can charge no
> more than 10 percent interest*, which is not enough to
> cover the cost of funds plus service costs. *This customer
> is forced to turn to a national bank which can presently
> charge 13 percent. That customer is also likely to deposit
> his money in that bank*.
>
>      *       *      *
>
> [W]hen the discount rate is higher than the usury limit,
> the State banks and savings and loans are placed in an
> impossible grossly unfair situation.

125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added).

Sections 521-523 created parity by conferring on federally insured

state banks, savings and loans, and credit unions, respectively, the same interest

rate authority exercised by national banks under Section 85 of the National Bank

Act, namely, the right to charge either the lender's home state's rates or 1% above the Federal Reserve discount rate, whichever was greater.[5]

Congress was mindful of federalism concerns, and thus it provided in Section 525 that states could opt out of the preemption provisions in Sections 521-523 "with respect to loans made in such State." The opt-out right could be exercised if a state, as sovereign master over its *own* state depository institutions, wanted to reimpose its usury ceilings *on loans made by those institutions*. For example, Arkansas could opt out under Section 525, and thereby once again restrict Arkansas state depository institutions to the Arkansas 10% usury ceiling, eliminating their right under Sections 521-523 to charge 1% above the discount rate. *Nothing* in the legislative history demonstrates that Congress enacted Section 525 for the purpose of enabling an opt-out state to interfere with *other* states' sovereign powers to regulate the interest rates charged on interstate loans made in those states by their own state depository institutions. Congress enacted DIDMCA at a time of rampant inflation to assist state depository institutions in states with low interest rate ceilings by allowing them to *increase* their interest rates to 1% above the discount rate – there was no discussion about a need to *lower* the interest rates that could be charged by *any* state depository institution.

---

[5]    The Federal Credit Union Act was amended by DIDMCA to provide this right to federally insured credit unions. 12 U.S.C. § 1785(g).

Also, an interpretation of Section 525 that would allow an opt-out state to limit the interest rates charged by out-of-state state depository institutions would obviously disadvantage them vis-à-vis out-of-state national banks, whose ability under Section 85 of the National Bank Act to export their home states' interest rates in making loans to opt-out state borrowers would be unaffected. This flies in the face of the overriding Congressional intent to create parity between state depository institutions and national banks, which is expressly set forth in the preamble of Section 521.

Nor is there anything in the legislative history reflecting any Congressional concern about the interest rates charged by out-of-state state depository institutions on their interstate loans. Indeed, that is hardly surprising, because state bank credit card and other interstate consumer lending programs did not take off until *after* they obtained the same federal interest rate authority as national banks through enactment of DIDMCA in March 1980.

That delay resulted from the fact that most of the state banks desiring to expand their interstate consumer lending programs were then located in states like New York that had relatively low usury ceilings and there were severe restrictions on a bank chartered in one state being affiliated with a bank chartered in another state. Those hurdles were not overcome until after DIDMCA's enactment, when South Dakota and Delaware enacted legislation deregulating their usury laws and authorizing out-of-state banks to establish affiliated credit card

9

banks in their states. 1980 South Dakota Session Laws chap. 335 (H.B. 1046) and chap. 331 (H.B. 1370); 63 Del. Laws, ch. 2, §§ 2-23 (1981).[6] Various other states then followed suit in ensuing years.

C.    Holding That a Loan is "Made" in the State Where
The Borrower is Located Will Create an Administrative Morass

Holding that a loan is "made" not only in the lender's state but also in the state where the borrower is located when credit is extended would create an unworkable morass for state-chartered depository institutions. It will require them (but not national banks) to apply a multitude of varying interest rates to borrowers from opt-out states who travel to non-opt-out states, or to borrowers from non-opt-out states who travel to opt-out states, and use their credit cards or obtain online loans when they travel.[7] The state depository institutions would have to develop systems to determine where the borrower was located when an advance was requested and approved under a credit card, or where the borrower was located when an online loan was requested and approved/funded. Interest rates would have

---

[6]    *See* Eleanor Erdevig, *Small States Teach a Big Banking Lesson*, Chicago Fed. Letter, No. 10, June 1988. https://www.chicagofed.org/publications/chicago-fed-letter/1988/june-10.

[7]    Colorado's UCCC purports to limit creditors' charges and rights as to consumer credit transactions "made in another state with a person who is a resident of this state when the consumer credit transaction or modification is made." § 5-1-201(4), C.R.S.  Also, although general-purpose credit cards are exempted from Colorado's usury limits (§ 5-2-213(2), C.R.S.), retailer credit cards and general-purpose credit cards with fees in excess of 15% of the credit limit are *not* exempt.

to be determined at the transaction level, rather than account level, so a single credit card statement could have many different rate plans. A borrower might apply for an online loan while located in an opt-out state but it would be approved and funded later when the borrower is in a non-opt-out state. Although the lender may be able to detect where the borrower is located when the online loan is requested, if it is not instantly funded the lender would typically have no idea where the borrower is located when the loan is approved and provided.

How is the lender supposed to know where the borrower is located when the credit card is used for an online transaction? The merchant might be able to detect the cardholder's location, but the lender probably can't. Or when the cardholder engages in a telephone transaction? The merchant might know the area code of the phone the cardholder is using, but that doesn't inform where the cardholder is located when using a mobile phone. How about when the lender approves a recurring transaction each month? Neither the merchant nor the lender has any idea where the cardholder is located when this happens. In the non-revolving context, the lender has up to 30 days to approve a loan application. 15 U.S.C. § 1691(d)(1). How can the lender know where the borrower is located 30 days after the application is submitted?

These are but a few examples of the administrative quagmire that would be created by a statutory interpretation that would apply the usury law of any opt-out state where the borrower happens to be located at the time the loan is

made by the lender. *See Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 171 (2014) (rejecting proposed statutory interpretation that would lead to "an administrative nightmare that Congress could not possibly have intended"); *Marietta Mem'l Hosp.*, 596 U.S. at 887 (holding that "DaVita's disparate-impact theory is not a correct interpretation of the statute" because it is "a prescription for judicial and administrative chaos").

Judge Rossman's dissenting opinion correctly observed that it was difficult "to see how this patchwork approach – which abides a level of disuniformity Congress never intended – will be administrable in our world of interstate, online banking." *NAIB*, 159 F.4th at 740 (Rossman, J., dissenting). Judge Rossman's concern echoes Justice Brennan's opinion for the unanimous Supreme Court in *Marquette Nat'l Bank v. First Omaha Serv. Corp.*, 439 U.S. 299 (1978), which resolved the question of where a bank is "located" for purposes of Section 85 of the National Bank Act when it makes a credit card loan:

> If the location of the bank were to depend on the whereabouts of each credit card transaction, the meaning of the term 'located' would be so stretched as to throw into confusion the complex system of modern interstate banking …We do not choose to invite these difficulties by rendering so elastic the term 'located.'

*Id*. at 312.

Similarly, if a loan is deemed to be "made" in each state where the borrower happens to be located at the time of a credit card or online transaction,

12

the "complex system of modern interstate banking" would likewise be "throw[n] into confusion." *Id*. This Court should not "invite these difficulties" by "rendering so elastic" the term "made" in Section 525 of DIDMCA.

It also bears emphasis that *Marquette* specifically rejected the argument that "the 'exportation' of interest rates … will significantly impair the ability of States to enact effective usury laws." *Id*. at 318. The Court acknowledged that "[t]his impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards." *Id*. However, it emphasized that "state usury laws must, of course, give way to the federal statute," and "the protection of state usury laws is an issue of legislative policy, and any plea to alter section 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." *Id*. and n. 31.[8]

---

[8]  It is well-established that since Congress incorporated into Section 521 of DIDMCA the same language long used in Section 85 of the National Bank Act, as well as an express preemption clause, in order to create parity between state and national banks, Section 521 has the same preemptive force as Section 85 of the National Bank Act. *See Greenwood Trust v. Massachusetts*, 971 F.2d 818, 826-27 (1st Cir. 1992); *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133, 135 (Colo. 1995) (holding that a Colorado law prohibiting credit card late fees that were allowed in the out-of-state state bank's home state was preempted by Section 521 of DIDMCA, Court stressed that "because section 521 of the DIDA incorporates its language from section 85 of the NBA, the statutory language should be given the same interpretation").

D.    The FDIC Has Long Recognized That a State's Opt-Out
Cannot Affect State Banks Located in Other States

In 1983, just three years after the enactment of DIDMCA, the FDIC advised state banks that they "may rely on the federal law that incorporates the interest provisions of the state where the bank is located in extending credit to the residents of its state *and of other states*," including "when *making loans to citizens of states that have rejected the federal preemption*." FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) (emphasis added).[9]

The FDIC took that same position in an amicus brief it filed in 1992 in the *Greenwood Trust* litigation in the First Circuit. That case involved exportation of credit card late fees by Greenwood Trust, a state bank located in Delaware, to its cardholders in Massachusetts. The FDIC argued as follows:

> There is no suggestion in this case (i) that Greenwood's extensions of credit to Massachusetts residents are "made" in Massachusetts; or (ii) that Delaware has exercised its right to "opt out" of Section 521.

---

[9]    The FDIC said the same thing in 1983 to the North Carolina Commissioner of Banks when North Carolina was considering opting-out pursuant to Section 525:

> The General Counsel of the FDIC has told the Commissioner of Banks' office that, in his opinion, if a State were to override the preemptions of Section 521, a State bank located in another State would still be able to charge North Carolina residents the highest rate allowed in the State bank's home state.

*See* North Carolina State Banking Comm., Special Mtg. Minutes (Mar. 28, 1983), at p. 10 of 27, https://perma.cc/8M57-U8ER.

14

> *Accordingly, it does not appear that a Massachusetts "opt out" of Section 521 could have any bearing on this case at all.* For, as we noted in the Fourth FDIC Opinion:

> *The fact that a State has countermanded under section 525 should not affect the usury preemption of section 521 for a bank not located in that State,* so long as the loan is not made in the State that has countermanded.

> *Id.* Accordingly, *Section 525 clearly does not confer on states that elect to opt out of Section 521 extraterritorial authority to apply their own lending laws to loans made in other states by banks chartered in other states, merely because the borrower happens to be a resident.*

FDIC Amicus Brief, *Greenwood Trust Co. v. Massachusetts*, 1992 WL 12577410, at *35-36 (1st Cir. Feb. 27, 1992) (emphasis added).

## III.    <u>CONCLUSION</u>

For the reasons set forth above and in the Plaintiffs-Appellees' brief, the ruling of the District Court should be affirmed.

Respectfully submitted,

Ronald K. Vaske
vasker@ballardspahr.com
BALLARD SPAHR, LLP
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
612.371.3215

/s/ *Burt M. Rublin*
Burt M. Rublin*
rublin@ballardspahr.com
Alan S. Kaplinsky
kaplinsky@ballardsphar.com
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
215.864.8116
*Counsel of Record*

*Attorneys for Amici Curiae American Bankers Association, Bank Policy Institute, Consumer Bankers Association, America's Credit Unions, and 52 State Bankers Associations*

15

## APPENDIX OF AMICI STATE BANKERS ASSOCIATIONS

Alabama Bankers Association
Alaska Bankers Association
Arizona Bankers Association
Arkansas Bankers Association
California Bankers Association
Colorado Bankers Association
Connecticut Bankers Association
DC Bankers Association
Delaware Bankers Association
Florida Bankers Association
Georgia Bankers Association
Hawaii Bankers Association
Idaho Bankers Association
Illinois Bankers Association
Indiana Bankers Association
Iowa Bankers Association
Kansas Bankers Association
Kentucky Bankers Association
Louisiana Bankers Association
Maine Bankers Association
Maryland Bankers Association
Massachusetts Bankers Association
Michigan Bankers Association
Minnesota Bankers Association
Mississippi Bankers Association
Missouri Bankers Association

Montana Bankers Association
Nebraska Bankers Association
Nevada Bankers Association
New Hampshire Bankers Association
New Jersey Bankers Association
New Mexico Bankers Association
New York Bankers Association
North Carolina Bankers Association
North Dakota Bankers Association
Ohio Bankers League
Oklahoma Bankers Association
Oregon Bankers Association
Pennsylvania Bankers Association
Puerto Rico Bankers Association
Rhode Island Bankers Association
South Carolina Bankers Association
South Dakota Bankers Association
Tennessee Bankers Association
Texas Bankers Association
Utah Bankers Association
Vermont Bankers Association
Virginia Bankers Association
Washington Bankers Association
West Virginia Bankers Association
Wisconsin Bankers Association
Wyoming Bankers Association

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the page limitations set forth by this Court in its April 2, 2016 Order grating rehearing en banc, which provided that the parties' briefs were limited to thirty (30) pages, meaning that amici briefs would be limited to half that amount, fifteen (15) pages, under Fed.R.App.P. 29(a)(5).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

June 4, 2026

*/s/ Burt M. Rublin*
Burt M. Rublin

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)  all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)  if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)  the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, and according to the program are free of viruses.


June 4, 2026                                    */s/ Burt M. Rublin*
                                                Burt M. Rublin

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2026, I electronically filed a copy of the foregoing Supplemental Brief of Amici Curiae American Bankers Association, Bank Policy Institute, Consumer Bankers Association, America's Credit Unions, and 52 State Bankers Association in Support of Plaintiffs-Appellees using the CM/ECF system, which will send notification of this filing to all counsel of record.

June 4, 2026

/s/ Burt M. Rublin
Burt M. Rublin