No. 24-1293

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

*Plaintiffs-Appellees*,

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Colorado, No. 1:24-cv-00812-DDD-KAS, Hon. Daniel D. Domenico

## BRIEF OF FEDERAL DEPOSIT INSURANCE CORPORATION AS AMICUS CURIAE IN SUPPORT OF APPELLEES ON REHEARING EN BANC

DOMINIC A. ARNI
J. SCOTT WATSON
MICHELLE OGNIBENE
Federal Deposit Insurance
 Corporation
3501 Fairfax Drive, D-7144
Arlington, VA 22226
(703) 562-2121
mognibene@fdic.gov

June 4, 2026　　　　　　　　　　　　*Attorneys for Amicus FDIC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

GLOSSARY...................................................................................iv

INTEREST OF THE AMICUS AND SUMMARY OF ARGUMENT....................1

ARGUMENT .................................................................................2

    I.      In this context, the phrase "loans made in such State" is best understood to refer to the state where the bank making the loan is located..................................................................................4

    II.    Regulatory guidance provides no support for Colorado's interpretation...7

CONCLUSION .............................................................................10

CERTIFICATE OF COMPLIANCE

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Edwards' Lessee v. Darby*,
   12 Wheat. 206 (1827)......................................................................................9

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)....................................................................... 8-9

*Minn. Bankers Ass'n v. FDIC*,
   152 F.4th 893 (8th Cir. 2025) ........................................................8

*Nat'l Ass'n of Indus. Bankers v. Weiser*,
   737 F. Supp. 3d 1113 (D. Colo. 2024)...........................................5

*Tyler v. Cain*,
   533 U.S. 656 (2001)........................................................................4

*Watters v. Wachovia Bank, N.A.*,
   550 U.S. 1 (2007)............................................................................2

**Statutes**

Depository Institutions Deregulation and Monetary Control
   Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) ..................................*passim*

12 U.S.C. § 1831d(a) ..............................................................................4

**Rules**

10th Cir. R. 29.1......................................................................................1

Fed. R. App. P. 29(a)(2)..........................................................................1

**Other Authorities**

OCC, National Banks and the Dual Banking System (Sept. 2003).........................3

FDIC General Counsel's Opinion No. 11,
   63 Fed. Reg. 27282 (May 18, 1998).....................................................9

FDIC Interp. Ltr. No. 83-16,
1983 WL 207393 (FDIC Oct. 20, 1983).................................................................7

FDIC Interp. Ltr. No. 88-45,
1988 WL 583093 (FDIC June 29, 1988) ...............................................................8

Fed. Interest Rate Auth.,
85 Fed. Reg. 44146-01 (July 22, 2020) ..............................................................10

H.R. Conf. Rep. 96-842,
1980 U.S.C.C.A.N. 298 (Mar. 21, 1980).............................................................5

OCC Interp. Ltr. No. 822 (Feb. 17, 1998) ...........................................................9

Proceedings of the 96th Congress,
126 Cong. Rec. 7070 (1980) ...............................................................................6

## GLOSSARY

DIDMCA……………………………. Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980)

FDIC………………………………… Federal Deposit Insurance Corporation

OCC………………………………… Office of the Comptroller of the Currency

## INTEREST OF THE AMICUS AND SUMMARY OF ARGUMENT

As a federal agency, *amicus curiae* the Federal Deposit Insurance Corporation (FDIC) is authorized to file this brief under 10th Circuit Rule 29.1 and Federal Rule of Appellate Procedure 29(a)(2).  The FDIC's interest in this matter springs from its role as the primary federal regulator for over 2,700 state-chartered insured banks that are not members of the Federal Reserve System.  The FDIC has a vital interest in maintaining a strong and vibrant dual-banking system, which requires a level playing field for state-chartered institutions to compete with national banks.

Allowing Colorado to effectively prescribe the interest rate that state-chartered banks located outside Colorado can charge borrowers in Colorado would radically alter the interest-rate parity approach established by Congress in Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA).[1]  Section 521 helps ensure that state-chartered banks can compete with national banks by allowing state-chartered institutions the same right to export their state's interest rates as national banks enjoy when serving out-of-state borrowers.  As a result, consumers have more choices in the marketplace.

Although Section 525 of DIDMCA authorizes a state to opt out of Section 521 for loans "made" in that state, Colorado's expansive interpretation of

---

[1] Pub. L. No. 96-221, 94 Stat. 132, 164 (1980) (codified at 12 U.S.C. § 1831d).

1

when a loan is "made" in Colorado is inconsistent with the statutory framework

and is unnecessary to achieve the federalism-protective goal that motivated

Congress to enact Section 525. The FDIC's position, which is consistent with the

FDIC's historical approach as evidenced by decades-old agency opinions, is that

the best interpretation of Section 525 would adopt a bank-focused view of where a

loan is made. Colorado's position that a borrower's location can dictate where a

loan is made for purposes of Section 525 does not reflect the most natural reading

of the text and its statutory context and would impose significant financial and

operational burdens on state-chartered institutions that seek to offer loans to

consumers in Colorado. This would unduly frustrate state-chartered banks' ability

to compete with national banks, which conflicts with Congress's core purpose in

enacting DIDMCA's interest-rate exportation regime.

## ARGUMENT

Since recognition of the first national banks over 160 years ago, the nation

has had a dual banking system in which banks may choose to be chartered and

primarily regulated by either a state or the federal government. *See Watters v.*

*Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007). The dual banking system gives each

chartering authority the ability to make different policy choices and is a significant

contributor to the dynamism of the U.S. banking industry.[2]

Over time, Congress has enacted essential measures, including Section 521 of DIDMCA, to ensure the vitality of this system by supporting competitive equality between national banks and state-chartered banks. While Section 525 allows a state to opt out of the interest rate parity established by Section 521, Congress limited the opt-out's reach to "loans made in such State." Contrary to Colorado's position, the historical statutory and regulatory focus on *banks*' activities in the context of interest-rate exportation—buttressed by a common-sense understanding of how loans are "made"—favors reading Section 525 as applying only when the *bank* is deemed located in the opt-out state for purposes of the subject loan.

Allowing an opt-out to apply based solely on the borrower's location also would contravene the fundamental benefits Congress intended Section 521 to afford to state-chartered banks located in states that have *not* elected to opt out of that section's protections. Most glaringly, Colorado and the panel majority's borrower-focused interpretation would imbue a lone state's opt-out decision with

---

[2] *See* OCC, National Banks and the Dual Banking System 10 (Sept. 2003), https://www.occ.treas.gov/publications-and-resources/publications/banker-education/files/pub-national-banks-and-the-dual-banking-system.pdf ("[A] separate system of state banks 'allows the states to serve as laboratories for innovation and change.'"); *see also* Br. of State Bankers Associations as *Amici Curiae* at 9-10, ECF 88.

an outsize effect on core operational aspects of the national lending market by *curtailing* a non-opt-out state's ability to regulate the interest terms applicable to certain lending arrangements within its historical regulatory authority. DIDMCA intended no such result; its interest-rate exportation regime sought to keep the national lending market resilient and the dual banking system competitive. *See* 12 U.S.C. § 1831d(a) (establishing interest-rate exportation for banks "[i]n order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates"). As a result, under Colorado's interpretation, a Section 525 opt-out would not simply restore the interest rate regime to the one that would apply in the absence of Section 521, it would effectively override other states' decisions *not* to opt-out of Section 521 for banks located in their borders that lend to Colorado borrowers. This does not respect federalism, it contravenes it. This Court should affirm the district court's preliminary injunction order and reject Colorado's effort to extend the effect of its Section 525 opt-out beyond its own borders.

I.    **In this context, the phrase "loans made in such State" is best understood to refer to the state where the bank making the loan is located.**

Section 525 gives states the ability to opt out of Section 521 for "loans made in such State." Pub. L. No. 96-221, 94 Stat. 132 (March 31, 1980). The word "made" is not a term of art in statutory construction and does not have a fixed meaning. *Tyler v. Cain*, 533 U.S. 656, 662 (2001) ("to make" can alternatively

4

mean "to cause to happen," "to cause to exist, occur or appear," "to lay out and construct," and "to cause to act in a certain way").  Accordingly, the term "made" cannot be interpreted "in a vacuum," but must be interpreted in "context" and "with a view to [its] place in the overall statutory scheme."  *Id*.

Common understanding of how loans are made focuses on the bank's actions.  As the district court noted, "nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card."  *Nat'l Ass'n of Indus. Bankers v. Weiser*, 737 F. Supp. 3d 1113, 1129 (D. Colo. 2024).  Indeed, both in Section 521 and other provisions where Congress used "made" in connection with loans, its focus was on the lender and its location, not the borrower.  *See* Appellees' Supp. Br. at 14 n.7, ECF 183.

Limiting the reach of a Section 525 opt-out to situations where the lending bank is located in the opt-out state also is consistent with the context in which DIDMCA was enacted.  DIDMCA was the culmination of a series of legislative fixes to give state banks parity with national banks in their own states.  *See* Appellees' Supp. Br. at 21-23, ECF 183.  Interstate banking was not a focus of these measures, and neither was consumer protection.  *Id*. at 22.  Rather, the legislative history shows that Section 525 was intended only to restore the rights of states affected by Section 521's preemption, should they so choose.  H.R. Conf. Rep. 96-842, 1980 U.S.C.C.A.N. 298, 308-309 (Mar. 21, 1980) (explaining that

5

"[s]tate usury ceilings . . . will be permanently preempted subject to the right of affected states to override at any time . . . .  In order for a state to override a federal preemption of state usury laws provided for in this title the override proposal must explicitly and by its terms indicate that the state is overriding the preemption."); 126 Cong. Rec. 7070 (1980) ("Under the usury provisions, each State may reimpose its usury limits, if it so desires. We do not take that away from the States. They can put those usury laws back into effect.").  A state that chooses to opt out could thus restore its own usury regime, and banks located in that state would not benefit from the parity with national banks that Section 521 provides those banks when making loans in that state.

Colorado's interpretation does more, aggrandizing its rights at the expense of other states that have chosen a different interest-rate regime.  In Colorado's view, Section 525 gives it the power to override parity not just for its own banks, but also for banks located in other states whose legislatures may have purposefully chosen to preserve Section 521's interest-rate regime.  Nothing in the text or context suggests that states, "by opting out of Section 521, can discard the policy of competitive equality for their state-chartered banks *and also for out-of-state, state-chartered banks*."  Dissent at 11, ECF 126-1 (emphasis in original).  Otherwise, Section 525 would no longer exist as a limited exception to Section 521; rather, it would evolve into a means for empowering any state to effectively

6

dictate the usury policies of its neighbors.  As the Appellees' brief ably demonstrates, neither the statue's text, structure, context, or purpose support that result.

## II.    Regulatory guidance provides no support for Colorado's interpretation.

Colorado's argument that a loan is necessarily "made" where the borrower is located is unsupported by any authoritative regulatory interpretation.  While the FDIC briefly changed its view of Section 525's reach,[3] its current position is consistent with informal positions it has historically taken that the borrower's location is not determinative for purposes of the opt-out provision.  Shortly after DIDMCA's enactment, the FDIC advised a state bank that it could "rely on the federal law that incorporates the interest provisions of the state where the bank is located in extending credit to the residents of its state and of other states" in response to an inquiry regarding "loans to citizens of states that have rejected the federal preemption."  FDIC Interp. Ltr. No. 83-16, 1983 WL 207393, at *1 (Oct. 20, 1983).  Similarly, in *Greenwood Trust Co. v. Commonwealth of Massachusetts*, the FDIC as *amicus* opined that "Section 525 clearly does not confer on states that elect to opt out of Section 521 extraterritorial authority to apply their own lending

---

[3] The FDIC previously submitted an amicus brief in this appeal and in the district court expressing a different view of Section 525, but, on further reflection, the FDIC withdrew its brief on appeal (ECF 115) because it did not reflect the best reading of the statute and was inconsistent with the FDIC's historical approach to considering where a loan is made.

laws to loans made in other states by banks chartered in other states, merely because the borrower happens to be a resident." FDIC Amicus Br., *Greenwood Trust Co. v. Commonwealth of Mass.*, No. 91-2205, 1992 WL 12577410, at *36 (1st Cir. Feb. 27, 1992). The FDIC's current position is consistent with its historical stance.

To the extent Colorado may rely on FDIC Interpretive Letter 88-45[4] to support an argument that the borrower's location may determine whether an opt-out applies, that reliance is misplaced. While the letter opines that the bank's location alone may not determine where the loan is "made" for purposes of Section 525, it also states that the borrower's location is not controlling. FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *2.

Moreover, to the extent the letter could be read to support Colorado's position, it was a letter issued by a Deputy General Counsel of the FDIC, was not subjected to notice-and-comment rulemaking, and was not intended to have the force of law. *See Minn. Bankers Ass'n v. FDIC*, 152 F.4th 893, 898-99 (8th Cir. 2025) (holding that an FDIC Financial Institution letter was non-binding guidance not reviewable as a final agency action). The FDIC's 1983 letter, though similarly informal, was issued closer in time to enactment, and contemporaneous constructions of statutes generally are afforded "great respect." *See Loper Bright*

---

[4] 1988 WL 583093 (FDIC June 29, 1988).

*Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *Edwards' Lessee v. Darby*, 12 Wheat. 206 (1827)).

Rejecting Colorado's interpretation also avoids driving an unnecessary wedge between Sections 521 and 525. The FDIC has long taken the position that a bank's location for purposes of Section 521 is where the bank "makes" the loan. FDIC General Counsel's Opinion No. 11, 63 Fed. Reg. 27282, 27286 (May 18, 1998). For loans by state banks operating interstate branches, the FDIC has defined the circumstances under which a bank may export another state's interest rate even when it operates a branch in the borrower's state. Exportation is allowed unless a branch in a single host state performs all "non-ministerial" functions related to a loan. In such cases, the bank is deemed to "make" the loan in the host state. *Id*. The functions that the FDIC deems relevant for determining where a bank makes a loan in this context are: (1) loan approval ("where the person is located who is charged with making the final judgment of approval or denial of credit"); (2) extension of credit ("the site from which the first communication of final approval of the loan occurs"); and (3) disbursement of loan proceeds ("actual physical disbursal of the proceeds of a loan, as opposed to delivery of previously disbursed funds to the customer"). *Id*. (citing OCC Interp. Ltr. No. 822). Because these factors determine where a loan is made for purposes of preemptive

9

exportation rights, the same factors should be relevant for determining whether an opt-out applies to avoid that preemption.

Section 525 directs that only loans "made" in an opt-out state are subject to the opt-out. The borrower's location, alone, does not dictate where a loan is made. Instead, the primary indicators of where a loan is made depend on the location in which the *bank* performs certain key lending-related actions. The FDIC has issued no contrary guidance. While the panel majority pointed to a statement in a 2020 rulemaking describing the effect of Section 525 as indicating that "an out-of-state bank may not export interest rates from its home state to the opt-out state" (Op. at 60, ECF 126-1), the FDIC was addressing only loans that had already been deemed "made" in the opt-out state. Fed. Interest Rate Auth., 85 Fed. Reg. 44146-01, 44153 (July 22, 2020). That rulemaking did not address the factors necessary to determine when a loan is "made" in the opt-out state, and did not disturb longstanding prior FDIC guidance that a bank "makes" a loan where it performs the three non-ministerial functions.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's preliminary injunction order.

10

Date: June 4, 2026

Respectfully submitted,

DOMINIC A. ARNI
Acting Deputy General Counsel
J. SCOTT WATSON
Senior Counsel
s/Michelle Ognibene
MICHELLE OGNIBENE
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 N. Fairfax Drive, VS-D-7144
(703) 562-2121
mognibene@fdic.gov

*Attorneys for Amicus Curiae Federal
Deposit Insurance Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the page limit in 10th Cir. R. 29.1 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 10 pages.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

Date: June 4, 2026                           s/Michelle Ognibene