24-1293

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,<br><br>　　　Defendants – Appellants,<br><br>v.<br><br>AMERICAN FINTECH COUNCIL, NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, and AMERICAN FINANCIAL SERVICES ASSOCIATION,<br><br>　　　Plaintiffs – Appellees. | |

On Appeal from the United States District Court, District of Colorado
The Honorable Daniel D. Domenico
District Judge

District Court Case No. 1:24-cv-00812-DDD-KAS

## DEFENDANTS-APPELLANTS' EN BANC SUPPLEMENTAL RESPONSE BRIEF

PHILIP J. WEISER
Attorney General
RUSSELL D. JOHNSON*
Deputy Solicitor General
MICHAEL D. McMASTER*
Assistant Solicitor General
KEVIN BURNS*
Senior Assistant Attorney General
PHILIP SPARR*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
720-508-6000
*Counsel of Record
*Attorneys for Defendants-Appellants*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................i

TABLE OF AUTHORITIES............................................................... iii

GLOSSARY ...................................................................................vii

INTRODUCTION.................................................................................. 1

ARGUMENT ......................................................................................2

I.    DIDMCA's plain language shows Section 525's "loans made in such State" refers unambiguously to completed loans, so a State's opt-out of Section 521 applies when either the lender or the borrower is located in the opt-out State...............................................................3

    A.      The ordinary meaning of "loans made in such State" refers to a completed loan because a loan cannot be "made" without the agreement of both parties, making both parties' locations relevant to the scope of Section 525's opt-out provision. ......................................3

    B.      The contrast between Section 521 and Section 525 shows that "made in such State" must include the State where the borrower is located...................................................................................6

    C.      Language from the other statutes the Banks identify do not support narrowly interpreting Section 525. ....................................10

    D.      The Banks' narrow interpretation of Section 525 is inconsistent with DIDMCA's text. ....................................................13

    E.      The straightforward application of DIDMCA's plain language does not create an absurd result or practical difficulties that suggest Congress intended something other than what it said. ...................18

II.     Even if Section 525 is ambiguous—which it is not—other interpretive tools show that Colorado's reading of Section 525 best effectuates Congress's intent. ...........................................................20

    A.      DIDMCA's enactment history demonstrates that Congress intended to give the States the right to fully reject Section 521's

preemptive effect as to state-chartered banks, which Colorado's interpretation of Section 525 accomplishes. ....................................21

B.    The regulatory guidance regarding Section 525 is conflicting and provides little assistance when interpreting the phrase "laws made in such State." .......................................................................24

C.    While a presumption against preemption would apply and support Colorado's position if DIDMCA was ambiguous and Congress's intent was not otherwise discernable, the Court need not address that issue here. ...............................................................28

CONCLUSION ..................................................................................30

CERTIFICATE OF COMPLIANCE......................................................32

# TABLE OF AUTHORITIES

**Cases**

*Aldens, Inc. v. Ryan,*
571 F.2d 1159 (10th Cir. 1978) ........................................................ 20

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008) ..................................................................... 29, 30

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005) ....................................................................... 29

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011) ....................................................................... 12

*Calcasieu-Marine Nat'l Bank of Lake Charles v. Am. Emps. Ins. Co.,*
533 F.2d 290 (5th Cir. 1976) ............................................................ 4

*Council for Responsible Nutrition v. James,*
159 F.4th 155 (2d Cir. 2025) ........................................................... 29

*DePierre v. United States,*
564 U.S. 70 (2011) ........................................................................... 7

*EagleMed LLC v. Cox,*
868 F.3d 893 (10th Cir. 2017) ..................................................... 28, 30

*Gavey Props./762 v. First Fin. Sav. & Loan Ass'n,*
845 F.2d 519 (5th Cir. 1988) .......................................................... 14

*Gen. Motors Acceptance Corp. v. Mid-W. Chevrolet Co.,*
66 F.2d 1 (10th Cir. 1933) ................................................................ 6

*Greenwood Tr. Co. v. Mass.,*
971 F.2d 818 (1st Cir. 1992) ........................................... 10, 11, 14, 27

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ....................................................................... 30

*In re Doll,*
57 F.4th 1129 (10th Cir. 2023) .......................................................... 3

*In re Geneva Steel Co.*,
281 F.3d 1173 (10th Cir. 2002) .......................................................3

*In re Lawson Square, Inc.*,
816 F.2d 1236 (8th Cir. 1987) ........................................................15

*In re Mallo*,
774 F.3d 1313 (10th Cir. 2014) .......................................................4

*In re Wise*,
346 F.3d 1239 (10th Cir. 2003) .......................................................2

*Jessup v. Pulaski Bank*,
327 F.3d 682 (8th Cir. 2003) ..........................................................13

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020) ......................................................12

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................24, 27

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978) ..................................................................9, 21

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
579 U.S. 115 (2016) ...........................................................28, 29, 30

*Pulsifer v. United States*,
601 U.S. 124 (2024) ....................................................................7, 8

*Quik Payday, Inc., v. Stork*,
549 F.3d 1302 (10th Cir. 2008) ......................................................20

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .........................................................................2

*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) ..........................................................................30

*Sosa v. Alvarez–Machain*,
542 U.S. 692 (2004) .........................................................................7

iv

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
  580 U.S. 405 (2017) ...................................................................2

*Thornton v. Tyson Foods, Inc.*,
  28 F.4th 1016 (10th Cir. 2022)........................................... 29, 30

*Tiffany v. Nat'l Bank of Mo.*,
  85 U.S. 409, 18 Wall. 409, 21 L. Ed. 862 (1873) ....................9

*United States v. Metzener*,
  584 F.3d 928 (10th Cir. 2009) ............................................3

## Statutes

12 U.S.C. § 1757(5)(A)(x) (2025)..............................................13

12 U.S.C. § 1828(o)(3) (2025)...................................................13

Borrower's Bill of Rights, Pub. L. 96-104, 93 Stat. 789 (1979)..............23

Brock Bill, Pub. L. 93-501, 88 Stat. 1557 (1974) ....................23

Hous. & Cmty. Dev. Amends. of 1979, Pub. L. No. 96-153, 93 Stat. 1101
  (1979) ...................................................................... 11, 12

National Bank Act, 12 U.S.C. § 21, et seq. ........................... 9, 10, 11, 21

## Other Authorities

126 Cong. Rec. 6900 (1980) ....................................................22

Assurance of Discontinuance, *In re Transp. All. Bank, Inc.* (Dec. 6,
  2022) ....................................................................................20

Black's Law Dictionary (5th ed. 1979) ...................................... 4, 5, 6, 12

Brief for FDIC as Amicus Curiae, *Greenwood Trust Co. v.
  Massachusetts* (1992) (Nos. 91-2205, 91-8096, 92-1065), 1992 WL
  12577410..............................................................................28

FDIC Interp. Ltr. 83-16, 1983 WL 207393 (Oct. 20, 1983) ....................27

FDIC Interp. Ltr. 88-45, 1988 WL 583093 (June 29, 1988) . 16, 24, 25, 26

FDIC Opinion Letter No. 11 on Interest Charges by Interstate Banks, 63 Fed. Reg. 27282 (May 18, 1998) ..................................................... 17

Federal Interest Rate Authority, 85 Fed. Reg. 44146 (July 22, 2020) ... 28

H.R. Rep. No. 96-842 (1980) (Conf. Rep.) ............................................. 21

N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes (Mar. 28, 1983) ..................................................................................................... 27

OTS Ltr. from H. W. Quillian, 1986 WL 290314 (June 27, 1986) ......... 27

## GLOSSARY

DIDMCA        Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980)

FDIC          Federal Deposit Insurance Corporation

NBA           National Bank Act, 12 U.S.C. § 21, *et seq.*


Note: We cite the panel opinions (ECF 126-1) as Op. __ and Dissent __. We cite Defendants-Appellants' Opening Brief (ECF 41) as Appellants' Br. __. We cite Appellees' Supplemental Brief as Supp. Appellees' Br. __. When citing documents filed in this Court, we cite the page number appearing at the bottom of the page on which the material appears.

## INTRODUCTION

Without both a borrower and a lender, no loan could ever be made. Yet, when determining whether a loan has been made in a State that has opted out of DIDMCA's preemptive effects, the Appellees ("Banks") posit that only the bank's location matters—"the borrower is irrelevant."

Nothing in DIDMCA's text supports such a narrow reading. Instead, Section 525's "loans made in such State" unambiguously refers to loans where either the borrower or the lender is in a State that has opted out of DIDMCA Sections 521 through 523. *See infra*, pp. 3-20.

The Court need look no further than dictionary definitions, which show that for a loan to be made, the transaction must be completed, something that occurs only through the actions of both the borrower and the bank. The contrast between Section 521, which applies based on "the State … where the bank is located," and Section 525, which applies based on whether a "loan is made" in a State that has opted out of Section 521 only further confirms that reading. Had Congress intended those phrases to mean the same thing, it would have used the same language.

It did not. To give effect to Congress's intent, the Court should reject treating them as if they were the same. *See infra*, pp. 6-10.

Because Section 525's plain and ordinary meaning is unambiguous, the Court need not examine other materials. But if the Court finds the text is ambiguous, the relevant enactment history (*see infra*, pp. 21-24), relevant and reasoned regulatory history (*see infra*, pp. 24-28), and cases guiding the interpretation of ambiguous express preemption clauses (*see infra*, pp. 28-30) all support Colorado's position.[1]

## ARGUMENT

This matter presents a classic question of statutory interpretation: what was Congress's intent when it gave States the right to opt-out of Section 521's preemptive effects? The standards for that analysis are well established. Begin with the text at issue to determine if the language is ambiguous. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017). This includes examining "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *In re Wise*, 346 F.3d 1239, 1241 (10th Cir. 2003) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). If the

---

[1] This brief addresses the questions the Court posed in its April 2, 2026 Order. Additional background and argument are contained in Colorado's briefing before the panel, ECF 41 and 109, and its response to the petition for rehearing, ECF 158.

language is unambiguous, it must be enforced according to its "plain meaning." *In re Geneva Steel Co.*, 281 F.3d 1173, 1178 (10th Cir. 2002).

But if a statute "is capable of being understood by reasonably well-informed persons in two or more different senses," *id.*, it is ambiguous, and the Court can turn to other aids. These include legislative history and agency interpretations. *In re Doll*, 57 F.4th 1129, 1140 (10th Cir. 2023). Certain interpretive presumptions may also impact a court's statutory analysis. *See, e.g.*, *United States v. Metzener*, 584 F.3d 928, 934-35 (10th Cir. 2009) (discussing the rule of lenity). Here, the plain language answers the question before the Court.

I. **DIDMCA's plain language shows Section 525's "loans made in such State" refers unambiguously to completed loans, so a State's opt-out of Section 521 applies when either the lender or the borrower is located in the opt-out State.**

DIDMCA's text has a single, best meaning: when Congress authorized States to opt out of Section 521's preemptive effect as to "loans made in such State," it intended the opt out to apply "to loans in which either the lender or the borrower is located in the opt-out state." Op. 6.

A. The ordinary meaning of "loans made in such State" refers to a completed loan because a loan cannot be "made" without the agreement of both parties, making both parties' locations relevant to the scope of Section 525's opt-out provision.

Courts give "words used by Congress their ordinary and common

3

meanings," typically applying dictionary definitions. *In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014). Here, dictionary definitions show that a State's decision to opt out of Section 521's preemptive effects applies when either the borrower or the lender is located in the opt-out State.

The majority opinion, for example, cited Black's Law Dictionary's definition of "loan" in effect at the time Congress passed DIDMCA: "Delivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest." Op. 37-38 n.21 (quoting *Loan*, Black's Law Dictionary (5th ed. 1979)). Similarly, the FDIC previously cited the "classic definition" of a loan: "'A loan of money is a *contract* by which [1] one delivers a sum of money to another and [2] the latter agrees to return at a future time a sum equivalent to that which he borrows.'" FDIC Amicus Br., ECF 69 at 7 (quoting *Calcasieu-Marine Nat'l Bank of Lake Charles v. Am. Emps. Ins. Co.*, 533 F.2d 290, 296-97 (5th Cir. 1976) (emphasis added)).

Both definitions, as well as those the Banks cite,[2] recognize that a

---

[2] The Banks cite some of the same sources as the majority but reach the wrong conclusion by focusing only on the lender's actions and not the full scope of the transaction. *See* Supp. Appellees' Br. 8-9 n.3 (citing the majority's references to Black's Law Dictionary (defining "loan" as "A

4

loan has two necessary actors: the lender and the borrower. The lender must deliver the loan proceeds *and* the borrower must receive and agree to repay the funds. Without both parties' actions, the loan does not exist.

This concept should not be controversial. Yet, the Banks assert the flawed assumption that "made" describes the actions of only one party: the lender. Supp. Appellees' Br. 6; *see also* App. Vol. I p. 213 (Banks arguing a lender creates a loan like a baker bakes a cake).

But as the majority recognized, "made" in this context refers to the idea of the transaction being complete. Op. 38 n.22 (citing *Made*, Black's

---

lending. *Delivery by one party to and receipt by another party* of [a] sum of money upon agreement, express or implied, to repay it with or without interest. Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use." (emphasis added)) and Merriam-Webster (defining "loan" as "a transfer or delivery of money *from one party to another* with the express or implied agreement that the sum will be repaid regardless of contingency and usually with interest" (emphasis added)). Neither definition supports the proposition that the lender's mere sending of funds is sufficient to make a loan; the borrower must receive them. That could be read to suggest that the *borrower's* location is paramount, not the lender's. Colorado's position, however, recognizes that the core of a loan is the agreement—written or not—where one party agrees to provide something to the other in exchange for the promise of repayment in return. Colorado's position is also the most consistent with each State's regulatory authority prior to DIDMCA and the reassertion of that authority that Section 525 allows. Appellants' Br. 9, 40-43.

Law Dictionary (5th ed. 1979)).[3] Far from being overly reliant on grammar rules or changing the meaning of words, Supp. Appellees' Br. 6-12, the majority correctly applied dictionary definitions to conclude a loan is a two-party transaction, "made" upon the parties' agreement.

And as both the lender and the borrower are necessary to the loan's completion—to the loan being "made"—then, so are both of their locations when determining where the loan is made for purposes of Section 525's opt-out provision. It would be inconsistent with Section 525's text to focus on one party's location to the exclusion of the other because until both of them act, a loan has not been made.

Yet that is what the Banks ask this Court to do. In advocating for their lender-centric reading, however, the Banks' interpretation runs afoul of the statute's plain text.

B.     <u>The contrast between Section 521 and Section 525 shows that "made in such State" must include the State where the borrower is located.</u>

Congress could have written a statute that does exactly what the

---

[3] The Banks criticize the majority for adopting "a definition pertaining to entering contracts rather than making loans." Supp. Appellees' Br. 7. But a loan *is* a type of contract. *See Gen. Motors Acceptance Corp. v. Mid-W. Chevrolet Co.*, 66 F.2d 1, 5 (10th Cir. 1933) (defining a loan as a contract). Applying a contract-focused definition is appropriate.

Banks seek here. Instead of requiring a State to say it "does not want the amendments made by [DIDMCA Section 521 through 523] to apply with respect to loans made in such State," Congress could have repeated Sections 521 through 523's lender-focused language and required a State to declare it "does not want the amendments made by [DIDMCA Sections 521 through 523] to apply with respect to State-chartered insured banks, insured institutions, and insured credit unions *located in such State*."

It did not. This Court should give meaning to that choice, which Colorado's interpretation does. "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *DePierre v. United States*, 564 U.S. 70, 83 (2011) (quoting *Sosa v. Alvarez–Machain,* 542 U.S. 692, 711 n.9 (2004)). This meaningful-variation canon of construction "is mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize," as here where Section 521's operative language refers to where a bank is located but Section 525's opt out refers to where a loan is made. *Pulsifer v. United*

7

*States*, 601 U.S. 124, 149 (2024).[4]

To adopt the Banks' position would require this Court to ignore Congress's choice to use different words and override Section 525's plain text with Section 521's language instead. There is no reason to do so.

First, as discussed above, Section 525's plain language does not support the Banks' reading. Nor does Section 525 otherwise suggest that these different phrases should be interpreted the same way.

Second, although Section 521 includes a preamble about preventing discrimination against State-chartered banks, this is no reason to import that same purpose into Section 525 and then read these different phrases to mean the same thing. *Contra* Dissent 5-12. In Section 525, Congress expressly authorized States to reject the interest-rate-parity policy Congress imposed in Section 521. Using that same policy to interpret the scope of the opt-out is inconsistent with the structure Congress created.

---

[4] To be sure, Section 521 states "such bank … may, notwithstanding any State constitution or statute … take, receive, reserve, and charge on any loan or discount made . . . [the federal discount rate] or at the rate allowed by the laws of the State … where the bank is located." But that language indicates nothing about where the loan is "made"; it specifies only the permissible rates that can apply *when* a loan is made. Section 521's use of "made" is not part of the test for applicability of the provision, and its use there has no bearing on the question here.

Congress adopted an interest-rate-parity policy in Section 521 but then permitted States to opt-out of that policy for those loans in which that State had an interest: the loans made in the opt-out State, not solely the loans made by banks located in the opt-out State.

Indeed, if preventing discrimination against State-chartered banks is the overriding purpose of both sections, Section 525 should not exist. Even under a narrow reading of Section 525, banks in the opted-out State would face some discrimination. And while it is true that under Colorado's reading of Section 525 state-chartered banks will be at some disadvantage compared to national banks, Dissent 12, that is the policy that Congress chose and that it allowed the States to opt back into with Section 525. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314 (1978) (noting the NBA has "been interpreted for over a century to give 'advantages to National banks over their State competitors'" as "National favorites") (quoting *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413, 18 Wall. 409, 21 L. Ed. 862 (1873)).

Moreover, Section 525 allows a State to opt-out not just of Section 521 but Sections 521 through 523. But neither Section 522 nor Section 523 have the same statement of purpose that Section 521 included. Any

9

interpretation of Section 525 will apply equally to all three sections, however, rendering statements made in only one of the sections unhelpful in discerning Section 525's meaning.

At bottom, Section 521 refers to where a bank is located. Section 525 does not. Congress used different words in these sections, and those different words should be given effect. Colorado's interpretation accomplishes that goal. The Banks' does not.

C.    Language from the other statutes the Banks identify do not support narrowly interpreting Section 525.

The Banks point to other statutes to argue for their narrow interpretation of Section 525's opt-out authority. But none of those overcome the statute's plain meaning.

For example, the Banks point to the NBA, arguing that interpreting Section 525 to apply to loans where either the lender or the borrower is located in the opt-out State is inconsistent with that law. But while the Banks are correct that *Section 521* should be interpreted the same as Section 85 of the NBA, the same is not true of Section 525. *Greenwood Tr. Co. v. Mass.*, 971 F.2d 818, 827 (1st Cir. 1992) ("The historical record clearly requires a court to read *the parallel provisions* of DIDA and the Bank Act *in pari materia*." (emphasis added)).

10

Section 525 is not a "parallel provision" because, critically, the NBA contains no similar opt out provision. *Id.* The First Circuit instead described Section 525 as giving a State the right to "opt out of section 521's preemptive grasp." *Id.* at n.4. DIDMCA has an opt-out provision in Section 525. The NBA does not. Far from "driving a wedge" between the sections, the better reading is that parity is a purpose of Section 521, but that purpose does not extend to Section 525.

The Banks also point to a separate law: the National Housing Act. Supp. Appellees' Br. 11, 20. There, Congress used the phrase "shall apply to loans, mortgages, or advances *made or executed* in any State." Hous. & Cmty. Dev. Amends. of 1979, Pub. L. No. 96-153, 93 Stat. 1101, § 308 (1979). The Banks argue that the Housing Act's use of "made or executed" means that "made" and "executed" mean different things.

Even if the Housing Act could be informative of DIDMCA's meaning over the plain meaning of DIDMCA's own language—a questionable proposition—the Banks miss the critical point. "Made or executed" both reflect a focus on a completed, bilateral transaction: a loan can neither be made nor executed without both a borrower and a lender. So viewed, Colorado's interpretation of DIDMCA is consistent with the Housing Act.

11

And while a loan can be made without a written document, *see* Supp. Appellee Br. 9, execution refers to the more formal process of both parties signing the documents. *Executed*, Black's Law Dictionary (5th ed. 1979).[5] The more natural understanding of "made or executed" then is that the Housing Act used more expansive phrasing where "made" looks to where the borrower and lender are located and "executed" adds the location where the loan is physically signed. So, while Congress has used even more capacious phrasing at times, the provision does not undermine the majority's reading of Section 525.[6]

The Banks also comb through Title 12 for other references to "loans made" or similar phrases. Supp. Appellees' Br. 13-16. But what Title 12 shows is that Congress regularly uses "loans made" in relation to: (1) only

---

[5] Notably, the Housing Act applies to "loans, mortgages, or advances" whereas Sections 521 and 525 apply only to "loans." Section 521 reflects less formality, as it recognizes that interest may apply to loans taking multiple forms—"note, bill, or other evidence of debt." The variation in breadth of applicability and formality also explains why Congress added "executed" in the Housing Act and not in DIDMCA.

[6] The Banks also cite legislative statements from 1994, *fourteen years* after DIDMCA passed. Supp. Appellees' Br. 10. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1237 n.10 (10th Cir. 2020) (quoting *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011)).

12

the borrower, (2) only the lender, and (3) *both* the borrower and lender. Op. 48 (highlighting 12 U.S.C. § 1757(5)(A)(x) and § 1828(o)(3) which focus on the borrower without any express reference to the lender); Appellants' Br. 43-47. The Banks concede that Title 12's examples of loans "made" to a borrower show the borrower is the object of the phrase. Supp. Appellees' Br. 14 n.7. Since Section 525 contains neither "to the borrower" nor "by the bank," the majority's reasoning that "made" contemplates both the bank and borrower is supported by Title 12.[7]

D.   The Banks' narrow interpretation of Section 525 is inconsistent with DIDMCA's text.

Under the Banks' view, Section 525 will impact only banks located

---

[7] The Banks' reliance on *Jessup v. Pulaski Bank*, 327 F.3d 682 (8th Cir. 2003) is unavailing and does not create a circuit split. The majority distinguished the Eighth Circuit's interpretation of a different statute, passed nearly 20 years after DIDMCA. The majority correctly concluded that the Eighth Circuit's method of analysis (deferring completely to an agency opinion) was out of date. Op. 61-62. The factual circumstances, statutory structure, and purpose all differed, and the litany of conflicting agency opinions all warranted distinguishing *Jessup*. *See* ECF 158 at 5-11; *see also* FDIC Amicus in District Court, App. Vol. I pp. 142, 162-63 (noting the Eighth Circuit did not grapple with the potential result of its holding that "where all three functions were performed at offices (not branches) outside Arkansas would lead to the untenable result that a loan is 'made' in Arkansas even if the bank performed all three lending functions outside of Arkansas and the borrower entered into the transaction outside of Arkansas").

in an opt-out State and only when they want to lend above the federal rate. Op. 58. Otherwise, the Section 525 opt-out right that Congress created is worthless.

But nothing in the phrase "loans made in such State" suggests such a narrow interpretation. As the majority observed, that creates no more than a partial opt-out, where States can opt out of only their State-chartered banks being able to use the federal rate. Op. 58. That does not opt States out of the interest rate exportation that occurs under the Banks' interpretation and that would allow out-of-state lenders to prey on in-state borrowers because of Section 521, regardless of the State's statement that it does not want Section 521 to apply.

Further, the Banks ignore DIDMCA's recognition that an interest rate *other than the one where the bank is located* could apply, necessarily implying a more expansive concept of where a loan could be made than the Banks suggest. Supp. Appellees' Br. 19-24. *But see* Op. 42-45; *see also Gavey Props./762 v. First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 522-23 (5th Cir. 1988); *Greenwood*, 971 F.2d at 827 (finding Section 521 permits "three interest rate ceilings: (1) the highest rate lawfully permitted without reference to section 521; (2) a rate not more than one percent

14

above the discount rate on 90–day commercial paper in effect at the Federal Reserve Bank in the federal reserve district where the lender is located; or (3) the highest rate allowed by the laws of the state where the lender is located."); *cf. In re Lawson Square, Inc.*, 816 F.2d 1236, 1239-40 (8th Cir. 1987). Thus, Section 521's text itself recognizes that a rate set by a State other than where the bank is located may apply. The Banks' assertion that DIDMCA does not permit another State's laws to apply to out-of-state state-chartered banks is belied by Section 521's text.

A hypothetical illustration of state caps shows the statute's full effect, as compared to the Banks' narrower position:

|  | NJ Bank → NJ borrower | NJ Bank → CO borrower | NJ Bank → MA borrower | NJ Bank → DE borrower | CO Bank → CO borrower |
|---|---|---|---|---|---|
|  | *NJ max rate 30%* <br><br> *NJ not opted out (Section 521 rate)* | *CO max rate 21%* <br><br> *CO opted out (Section 525 rate)* | *MA max rate 20%* <br><br> *MA not opted out (Section 521 rate)* | *DE no max rate* <br><br> *DE not opted out ("applicable rate")* | *CO max rate 21%* <br><br> *CO opted out (Section 525 rate)* |
| **Banks position** | 30% or federal rate | 30% or federal rate | 30% or federal rate | 30% or federal rate | 21% |
| **Colorado position** | 30% or federal rate | 21% under Colorado law | 30% or federal rate | No cap under Delaware law | 21% |

15

Colorado's position gives full effect to Section 521's language, including the "applicable rate" clause (for Delaware residents), and to Colorado's opt-out. The Banks' position reads out the "applicable rate" clause (negating Delaware's choice for loans made in its jurisdiction) and leads to an incomplete opt out for Section 525, where the opt-out's only effect is that in-state Colorado banks cannot lend at the federal rate.

The Banks' restrictive reading is inconsistent with the federalism purpose apparent from Section 525's text. *See* Op. 59 n.33. Section 521 preempts state law by permitting banks to lend at the federal rate, the rate where the bank is located, or the highest lawful rate permitted without Section 521. Section 525 permits a State to say it "does not want" Section 521. *See also* FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *1 (June 29, 1988) ("Congress adopted section 525 in an effort to preserve principles of federalism. Recognizing that section 521 deprived States of authority over matters traditionally committed to State control, Congress enacted section 525 in order to enable States to recover authority that section 521 had taken away."). Colorado's interpretation of DIDMCA gives full effect to that intent. The Banks' does not.

Instead, the Banks' interpretation requires reading into Section

16

525 a narrow and exclusive focus on in-state banks that does not flow from Section 525's text. Indeed, the Banks assert that "loans made in such State," should mean only the place where a bank is located, determined by where a bank performs three non-ministerial functions: (1) loan approval, "the decision to extend credit"; (2) extending of credit, the "first communication of final approval of the loan"; and (3) the loan disbursal, the "actual physical disbursal of the" loan proceeds to the customer. Supp. Appellees' Br. 9 n.4, 10; FDIC Opinion Letter No. 11 on Interest Charges by Interstate Banks, 63 Fed. Reg. 27282, 27286 (May 18, 1998).

Nothing in the text supports interpreting "loans made in such state" to be solely and specifically where these functions occur. Indeed, the test the Banks would apply—the FDIC's non-ministerial function test— arises from the interpretation of statutes enacted over a decade after DIDMCA, analyzing how to resolve when a bank can be located in more than one State. *Id.* at 27284. To adopt the Banks' approach would wholly depart from Section 525's text.

17

E.  <u>The straightforward application of DIDMCA's plain language does not create an absurd result or practical difficulties that suggest Congress intended something other than what it said.</u>

In enacting Section 525, Congress necessarily embraced some additional complication when it comes to lending. Some States will remain opted in to Section 521, and some States will opt out of Section 521, and lenders will need to address those different approaches. That is the logical outgrowth of allowing individual State policy choices.

But financial institutions can manage these differences, and that practical reality does not come close to justifying departing from DIDMCA's plain text. To determine what law applies to a loan under Colorado's interpretation requires answering three questions:

1. Has the borrower's or lender's State opted out of Section 521? If not, any of the three permissible interest rates in Section 521 can apply.

2. If the borrower's or lender's State has opted out of Section 521, what is the scope of that opt out? If a loan is not within the scope of the opt out, Section 521 applies.

3. If the loan is within the opt out's scope, which State's law applies?

Through step two, there is no lack of uniformity because DIDMCA will be interpreted consistently nationwide: if a State opts out, the opt

18

out's scope depends on the location of the borrower and the bank.[8]

The final step in an opt-out situation is the consequence of Congress's decision to permit opt outs at all: other normal rules will step in to determine which interest rate limits apply to the loan, exactly as they would have before Section 521's enactment. That result follows directly from Congress's design.

That does not mean that state law would impermissibly apply "extraterritorially." *Contra* Dissent 19-20 n.11. Often the law of the borrower's State will apply—which a lender soliciting business from that borrower in that State should expect, *see* Appellants' Br. 9, 36-38—but edge cases may require a conflict of laws analysis. And in extreme cases, the Dormant Commerce Clause may limit the reach of State law.

But there is nothing catastrophic about that result. As the majority noted, nonbank lenders are subject to state interest rate caps. Op. 12 n.11. And nonbank lenders maintain national lending programs in

---

[8] The majority interpreted DIDMCA's text itself to determine when a loan is "made in" an opt-out state. That interpretation would be controlling if adopted by the Court, and States would not have separate authority to provide different interpretations of Section 525's "made in." *Contra* Dissent 29-30. DIDMCA will continue to have a uniform, nationwide meaning.

compliance with state laws. *Quik Payday, Inc., v. Stork*, 549 F.3d 1302 (10th Cir. 2008); *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir. 1978). Similarly, Iowa opted out soon after DIDMCA's passage and has remained opted out since. Iowa enforces its state law against out-of-state, state-chartered banks. Op. 12-13 n.12 (citing Assurance of Discontinuance, *In re Transp. All. Bank, Inc.* (Dec. 6, 2022)).

This Court must give effect to Congress's choice to allow States to opt out of Section 521 for loans made in their States. The best way to do that is to hold that Section 525's opt-out provision applies when either the borrower or the lender are located in the opt-out State.

## II. Even if Section 525 is ambiguous—which it is not—other interpretive tools show that Colorado's reading of Section 525 best effectuates Congress's intent.

The majority correctly held that the plain meaning of "made in such State" is unambiguous. This Court need not resort to other interpretive aids. But if the Court determines "made in such State" is ambiguous, it should still hold that Section 525's opt-out provision applies to loans where the lender or the borrower is located in an opt-out State.

20

A. <u>DIDMCA's enactment history demonstrates that Congress intended to give the States the right to fully reject Section 521's preemptive effect as to state-chartered banks, which Colorado's interpretation of Section 525 accomplishes.</u>

The most salient fact of DIDMCA's enactment history is the Supreme Court's decision in *Marquette* just over a year before DIDMCA's enactment. Following *Marquette*, Congress used the "location" language of Section 85 of the NBA that *Marquette* interpreted to permit interest-rate exportation in Section 521. But in DIDMCA, critically, Congress included the opt-out provision, which used different language.

Section 521's use of the same language as the NBA demonstrates that Section 521 was similarly intended to permit interest-rate exportation, which *Marquette* had blessed for national banks. The inclusion of Section 525, however, allowed States to reject interest-rate exportation. To hold that Section 525 was somehow intended to be limited solely to in-state lenders, while still allowing out-of-state, state-chartered banks to export their interest rates into the opt-out State makes no sense. As the majority noted, no State would choose to hobble its state-chartered banks that way. Op. 59.

Relevant additional history supports the majority's holding. H.R. Rep. No. 96-842 at 78-79 (1980) (Conf. Rep.) (providing that Section 521

21

preempted "State usury ceilings on all loans made by Federally insured depository institutions" but was "subject to the right of affected states to override [preemption] at any time."). Senator William Proxmire, Chairman of the Senate Committee on Banking, Housing, and Urban Affairs, was clear that Section 525 gave "each State the opportunity to reestablish its usury limitations if it desires to do so," remarking that a state override was "one of the most important parts of [DIDMCA]" and that Section 521's preemptive effect "does not derogate State authority" because "each State may reimpose its usury limits …. We do not take that away from the States." 126 Cong. Rec. 6900, 6906, 7069-70 (1980). Yet, that is precisely what the Banks' interpretation of Section 525 would do.

Nor can discussions about Section 525 be divorced from the impacts Section 521 was intended to have. Section 521 focuses on interstate lending and permits interest-rate exportation. So, regardless of whether Section 525 was expressly discussed in the context of interstate lending or not, Dissent 22-25, the only way to allow a State "to reestablish its usury limitations" and "reimpose" them is to allow a State's opt-out to apply when either the lender or the borrower is in the State.

Finally, the enactment history, particularly of so-called predecessor

22

bills, sheds little light on the proper interpretation of Section 525 but is consistent with the majority's holding. Section 521 varies significantly from its predecessors in the Brock Bill, Pub. L. 93-501, 88 Stat. 1557 (1974), and the Borrower's Bill of Rights, Pub. L. 96-104, 93 Stat. 789 (1979), because it includes preemption with interest-rate exportation, not just preemption to lend at a federal rate. Section 521 also applies more broadly (including consumer loans), is permanent, and applies nationwide. This is significantly *unlike* the Brock Bill and the Borrower's Bill of Rights, which applied to specific loans, were intended to address problems arising in specific States, and only permitted using a federal rate, not the interest-rate exportation that Section 521 allows.

Despite their narrow application, the Brock Bill and Borrower's Bill of Rights opt-outs are consistent with the majority's holding to the extent they speak to it at all. Op. 57-58. While Congress's focus in those prior statutes may have been on *intra*state lending, it is consistent with the text of both to interpret "a loan made in [the opt-out] State" to mean a loan where either the bank or borrower are located, even if that was generally going to be the same State. When Congress broadened its focus in Section 521 to address *inter*state lending, nothing in the prior opt outs

23

foreclosed the idea that a loan made in the opt-out state meant a loan where either the borrower or the bank was located. That Congress used the opt out language from prior bills does not negate the import of *what* Congress was permitting States to opt out of in Section 525.

B. <u>The regulatory guidance regarding Section 525 is conflicting and provides little assistance when interpreting the phrase "laws made in such State."</u>

The FDIC and other agency interpretations have varied widely and generally do not provide statutory analysis that warrants this Court's even limited deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386-88 (2024). The 1988 letter is the only one that grapples with the statutory text, and, although not a model of clarity, is best read to support Colorado's position. There, the FDIC specifically rejected the Bank's position that "the State where the loan is made must be the same, as a matter of law, as the State where the bank is located," and that "only a bank's home State has any right to countermand Federal preemption with respect to loans made by that bank." FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *1.

Instead, the FDIC explained, "Section 525 uses plain language … [that] differs considerably from that of section 521." *Id*. The FDIC letter

24

recognized, "There is nothing on the face of the statute to indicate [Section 521 and Section 525] are meant to say the same thing." *Id.* Further, the FDIC also rejected importing Section 521's purpose statement into Section 525, concluding instead that the two sections served different purposes: Section 521 enabled state banks to compete with national banks, but Section 525 "preserve[d] principles of federalism" to "enable States to recover authority that section 521 had taken away." *Id.*

Nor does the letter's call for uniformity contradict the majority's decision. *Contra* Dissent 27. The majority's decision established a single, uniform standard for Section 525's application; there is no need to look to "individual State statutory provisions in order to determine where a loan is made." FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *2. Instead, where a loan is made under Section 525 is a factual question under federal law of where the bank *and* the borrower are located. And consistent with the FDIC's position, the bank's loan-making functions remain relevant to that analysis—they are simply not determinative, as the Banks would have them be. *Id.*

The only potential tension between the majority and the 1988

25

Letter is the assertion that the 1988 letter understands Section 521 to guarantee out-of-state banks an absolute right to export their interest rates, even when lending to borrowers in an opt-out State. Dissent 28-29. But that is not the conclusion the FDIC reached in 1988. Instead, its analysis of Section 525's preemptive effect remained focused on the concept of where a loan is "made" without providing a definitive test. FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *2 ("The fact that a State has countermanded under section 525 should not affect the usury preemption of section 521 for a bank not located in that State, *so long as the loan is not made in the State that has countermanded*." (emphasis added)); *see also id.* at *1 (stating "[t]he State that has the right of countermand is the one in which the loan is 'made.'"). As to where the loan is made, the letter equivocated, asserting, that it "is not necessarily the State in which the bank is located; nor is it necessarily the State in which the borrower is located." *Id.* Instead, the letter suggested a fact-specific inquiry would be necessary, but declined to engage in the factual analysis, referring the inquiry back the standards previously laid out in the letter, including rejecting the position that Section 525 should be read the same as Section 521. So, to the extent it is helpful, the 1988 letter

asserted that a bank's location was not controlling, undermining the Banks' position here.

Other regulatory history does not warrant deference because it has no underlying reasoning. *Loper Bright*, 603 U.S. at 386. The 1983 letter is a conclusory statement that even the FDIC has described as "misunderstood." FDIC Interp. Ltr. 83-16, 1983 WL 207393 (Oct. 20, 1983); FDIC Interp. Ltr. 88-45, 1988 WL 583093, at *1.

A 1986 letter on this issue also contains no analysis and simply follows the 1983 letter. OTS Ltr. from H. W. Quillian, 1986 WL 290314, at *2 (June 27, 1986). The Banks cite legislative history from North Carolina, but this is a second-hand recitation of the FDIC General Counsel's view, with no analysis of Section 525. N.C. S. Banking Comm., 1983 HB 336, Special Mtg. Minutes (Mar. 28, 1983), at 10, https://perma.cc/8M57-U8ER. The quoted portion from the FDIC brief in *Greenwood Trust*, from 1992, twelve years after DIDMCA, is the final section of the brief, titled "The Provision Allowing States To 'Opt Out' Of Section 521 Is Not Relevant To The Interpretation Of The Statute In This Case" and contains no analysis of the statutory text. Brief for FDIC as Amicus Curiae, *Greenwood Trust Co. v. Massachusetts* (1992) (Nos. 91-

27

2205, 91-8096, 92-1065), 1992 WL 12557410, at *36.

Other interpretations support the majority's holding. *See* Federal Interest Rate Authority, 85 Fed. Reg. 44146, 44153 (July 22, 2020) ("If a State opts out of [Section 521], State banks making loans in that State could not charge interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate."); FDIC Dist. Ct. Amicus Br., App. Vol. I pp. 142-66; FDIC Amicus Br., ECF 59. But now, the FDIC has again changed its position "on further reflection." ECF 195 at 7 n.3. Overall, the tortured regulatory record offers little meaningful guidance.

C.  <u>While a presumption against preemption would apply and support Colorado's position if DIDMCA was ambiguous and Congress's intent was not otherwise discernable, the Court need not address that issue here.</u>

This Court need not reach the presumption against preemption because, as the majority correctly held, the statute's plain language resolves the issue. That approach is consistent with *Franklin* and its progeny. *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016); *EagleMed LLC v. Cox*, 868 F.3d 893, 904 (10th Cir. 2017). The Court can and should stop with the plain language.

If the Court determines Section 525 is ambiguous, however, it

should apply the presumption against preemption, even though there is some confusion about *Franklin*'s impact on prior Supreme Court case law. *Compare Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023-25 (10th Cir. 2022) (majority holding statutory language is plain and criticizing dissent's analytic approach using the presumption) with *id.* at 1029 (dissent would hold when "express preemption language is susceptible to equally 'plausible alternative reading[s],' we 'have a duty to accept the reading that disfavors pre-emption.'" (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

This is the approach the Second Circuit has taken following *Franklin. Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025) (applying *Franklin* to conclude that no presumption applies when the text is "plain," but "[w]here the preemptive force of the text is ambiguous—as it is here—we resolve that ambiguity against preemption" (citing *Bates*, 544 U.S. at 449)), *cert. petition pending on other grounds* Case No. 24-1145 (Mar. 30, 2026).

It is also the approach that best harmonizes *Franklin* with other Supreme Court cases that *Franklin* neither considered nor expressly overruled. *See, e.g., Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)

29

("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." (quotations omitted)); *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991); *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 3 (2000) ("This Court does not normally overturn … earlier authority *sub silentio*."). And while this Court has adopted *Franklin*'s language, *see, e.g.*, *EagleMed*, 868 F.3d at 903 (quoting *Franklin*, 579 U.S. at 125), its cases do not clearly address whether the presumption applies when the statutory text remains ambiguous after other analysis.[9] As a result, if the Court concludes Section 525 is ambiguous and cannot otherwise discern Congress's intent, it should apply a presumption against preemption and interpret "loans made in such State" to refer to loans where either the borrower or the lender is located in the opt-out State.

## CONCLUSION

The District Court's decision should be reversed.

Dated: July 8, 2026.

---

[9] *Tyson Foods*, for example, did not need to address the issue because the majority concluded the statutory text's plain meaning answered the question. 28 F.4th at 1023-25.

PHILIP J. WEISER
Attorney General

/s/ *Russell D. Johnson*

RUSSELL D. JOHNSON*
Deputy Solicitor General
MICHAEL D. McMASTER*
Assistant Solicitor General
KEVIN BURNS*
Senior Assistant Attorney General
PHILIP SPARR*
Assistant Attorney General
Telephone: 720-508-6000
E-Mail: russell.johnson@coag.gov
Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203


*Counsel of Record for Defendants-Appellants*

31

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing *En Banc* Supplemental Response Brief does not exceed 30 pages in accordance with the briefing order entered on April 2, 2026 (Dkt. 161), Fed. R. App. P. 32(f), and 10th Cir. R. 32(B).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook except for the caption page and the table on page 15, which use 13-point Century Schoolbook, as permitted by 10th Cir. R. 32(A) and this Court's briefing order.

PHILIP J. WEISER
Attorney General

/s/ *Russell D. Johnson*
RUSSELL D. JOHNSON*
Deputy Solicitor General
MICHAEL D. McMASTER*
Assistant Solicitor General
KEVIN BURNS*
Senior Assistant Attorney General
PHILIP SPARR*
Assistant Attorney General
Telephone: 720-508-6000
E-Mail: russell.johnson@coag.gov

Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203


*Counsel of Record for Defendants-
Appellants*

33