No. 24-1293

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS et al.,
*Plaintiffs-Appellees*,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA
FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
The Honorable Daniel D. Domenico, Judge
No. 1:24-CV-00812-DDD-KAS

**SUPPLEMENT BRIEF OF *AMICI CURIAE* CENTER FOR RESPONSIBLE
LENDING AND NATIONAL CONSUMER LAW CENTER
IN SUPPORT OF APPELLANTS**

Katelin Shaw Kaiser
CENTER FOR RESPONSIBLE LENDING
302 West Main Street
Durham, NC 27510
katelin.kaiser@responsiblelending.org

*Attorney for* Amici Curiae *Center for Responsible Lending and National
Consumer Law Center*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, National Consumer Law Center certifies that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock. The Center for Responsible Lending is controlled by the Center for Community Self-Help ("CCSH"), a North Carolina non-profit corporation. CCSH itself does not have a parent company. In neither case is there any stock interest in these nonprofit corporations.

Dated: July 15, 2026

*/s/ Katelin Shaw Kaiser*
Katelin Shaw Kaiser

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF AMICI CURIAE .........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT .........................................................................................................3

    I.    The Historical Background of DIDMCA. ......................................................3

        A.    Usury Policy Has Been a Quintessential Domain of State Authority..........3

        B.    Congress Extended Rate Preemption to State Banks While Preserving States' Ability to Reassert Usury Laws. ...................................................5

    II.    Section 525's Ordinary Meaning and Structure Encompass Loans Made to Borrowers in the Opt-Out State. .......................................................................7

        A.    In Ordinary Usage, a Loan Is Not Made Until the Borrower Receives the Money Being Lent............................................................................8

        B.    Congress's Different Phrasing in Sections 521 and 525 Must Be Given Effect. ........................................................................................9

        C.    Section 525's Effective-Date Structure Makes Section 521 Inapplicable to Loans Made in the Opt-Out State...............................................10

    III.    Section 525's Legislative History Confirms Congress Preserved State Opt-Out Authority..............................................................................12

CONCLUSION ...................................................................................................15

CERTIFICATE OF SERVICE ............................................................................16

CERTIFICATE OF COMPLIANCE...................................................................17

CERTIFICATE OF DIGITAL SUBMISSION ....................................................18

# TABLE OF AUTHORITIES

## CASES

*Aldens, Inc. v. Ryan*,
571 F.2d 1159 (10th Cir. 1978) ...................................................................................4

*Beneficial Nat'l Bank v. Anderson*,
539 U.S. 1 (2003).........................................................................................................5

*Griffith v. Connecticut*,
218 U.S. 563 (1910).....................................................................................................4

*Hengle v. Treppa*,
19 F.4th 324 (4th Cir. 2021) ........................................................................................4

*Hibbs v. Winn*,
542 U.S. 88 (2004).....................................................................................................10

*Kaneff v. Delaware Title Loans*,
587 F.3d 616 (3d Cir. 2009) ........................................................................................4

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978).....................................................................................................6

*Nichols v. Fearson*,
32 U.S. 103 (1833).......................................................................................................3

*Quik Payday, Inc. v. Stork*,
549 F.3d 1302 (10th Cir. 2008) ...................................................................................4

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)...................................................................................................10

*United States v. Moseley*,
980 F.3d 9 (2d Cir. 2020) ............................................................................................4

*United States v. Naftalin*,
    441 U.S. 768 (1979)..................................................................................11

## STATUES

12 U.S.C. § 1831d ....................................................................... 6, 7, 10, 11

12 U.S.C. § 85 ..........................................................................................5

## OTHER

125 Cong. Rec. 30,655 (1979) ..................................................................13

126 Cong. Rec. 6,965 (1980) ....................................................................14

126 Cong. Rec. 7,070-71 (1980)................................................................15

*A Bill to Equalize Competition Between State and National Banks, and for
    Other Purposes*, S. 1988, 96th Cong. (1979) ...................................13

Black's Law Dictionary (5th ed. 1979) .....................................................8

Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22, 2020).......................9

*In re Transportation Alliance Bank, Inc. d/b/a TAB Bank*, Assurance of
    Discontinuance (Iowa Att'y Gen. & Iowa Div. of Banking Dec. 12,
    2022) ................................................................................................5

James Ackerman, Note, *Interest Rates and The Law: A History of Usury,*
    1981 Ariz. St. L.J. 61 (1981) .........................................................3, 4

Merriam-Webster.com Dictionary .............................................................8

Nat'l Consumer Law Ctr., *Fact Sheet: State Annual Percentage Rate (APR) Caps for $500, $2,000, and $10,000 Installment Loans* (Dec. 18, 2025) ......................................................................5

Nat'l Consumer Law Ctr., *High-Cost Rent-a-Bank Loan Watch List* (Feb. 26, 2026)........................................................................4

Nat'l Consumer Law Ctr., *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (2016).....................3

*Restatement (Second) of Conflict of Laws* § 188 ........................................................8

S. Conf. Rep. No. 96-640 (1980) .........................................................................14

Steven Mercatante, *The Deregulation of Usury Ceilings, Rise of Easy Credit, and Increasing Consumer Debt*, 53 S.D. L. Rev. 37 (2008)...............6

*Usury Lending Limits: Hearing on S. 1988 Before the S. Comm. on Banking, Hous. & Urb. Affs.*, 96th Cong. (1979) ................................... 13, 14

# INTEREST OF AMICI CURIAE[1]

*Amici* are non-profit, non-partisan consumer advocacy organizations dedicated to protecting consumers from abusive lending practices and preserving states' longstanding authority to enact and enforce usury laws. *Amici* submit this brief in support of Appellants' interpretation of DIDMCA Section 525. The Center for Responsible Lending ("CRL") is a research and policy organization promoting financial fairness and economic opportunity for all. CRL is an affiliate of Self-Help, a non-profit with retail credit union branches across the country. The National Consumer Law Center ("NCLC") has advocated for economic justice for low-income and other disadvantaged people since 1969. NCLC has extensive expertise in consumer lending and state and federal credit regulation. Its publications include Consumer Credit Regulation (4th ed. 2025), which addresses federal preemption of state interest-rate laws and bank-enabled predatory lending.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Usury laws are among the oldest and most fundamental forms of consumer protection. For centuries, states have used interest-rate limits to protect borrowers from loans that exploit financial distress rather than relieve it.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than *amici curiae*, its members, or its counsel has made a monetary contribution to this brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E). Both parties consented to the filing of this brief.

This case asks whether Colorado's exercise of the opt-out Congress provided in Section 525 permits it to apply its usury laws to loans made by out-of-state state-chartered banks and their non-bank partners to Colorado borrowers—including loans carrying rates approaching 200% APR. The answer is yes.

Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA") displaced state usury laws by allowing state-chartered banks to charge a federally defined rate or export the rate permitted by the bank's home state. But Section 525 gave states the right to negate DIDMCA's preemptive effect. Appellees contend that Section 525 permits only a partial opt-out—of the federal-rate option and only for state-chartered banks located within the state. Under that reading, Colorado could prevent its banks from lending at the federal rate to residents of other states, but could not protect its own residents from loans it deems usurious. Another state's rate policy could thus override the rate ceilings of Colorado and every other state, including those that opted out.

Section 525's plain language, structure, and history foreclose the partial-opt-out reading. A loan is not made until the borrower receives the funds, and ordinary usage treats a bank as making a loan in the state where the borrower is located. Section 521 focuses on where a bank is "located," while Section 525, housed in the effective-date provision, addresses whether loans are "made in" the opt-out state and determines whether Section 521 applies at all. Congress likewise described the opt-

2

out as restoring state usury laws, not merely turning off one part of Section 521.

Section 525 therefore restores an opt-out state's authority to apply its usury laws to loans made to its residents, and the District Court's decision should be reversed.

## ARGUMENT

## I.     The Historical Background of DIDMCA.

### A.     Usury Policy Has Been a Quintessential Domain of State Authority.

Since antiquity, policymakers have recognized the unequal bargaining power between consumers and lenders. Interest-rate caps have long prevented lenders from exploiting consumers through high-cost loans that may provide temporary relief but deepen long-term distress. *Nichols v. Fearson*, 32 U.S. 103, 111 (1833) ("The acts against usury were intended to protect the needy[.]"). Predatory lending can become a set-up-to-fail model in which high rates allow lenders to profit even when borrowers ultimately are unable to repay their loans. Nat'l Consumer Law Ctr., *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (2016).[2]

American usury law "represents a venerable body of legal, ethical, religious, and (sometimes) economic thought, reaching back through the Middle Ages to the foundations of western civilization." James Ackerman, Note, *Interest Rates and The Law: A History of Usury,* 1981 Ariz. St. L.J. 61, 62-63 (1981). The thirteen American

---

[2] https://www.nclc.org/resources/misaligned-incentives-why-high-rate-installment-lenders-want-borrowers-who-will-default/.

colonies regulated consumer loans by capping annual interest rates. By 1886, every state had some usury limit. *Id.* at 85.

As the Supreme Court has stated, "It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a State for the use of money loaned within the jurisdiction of the State is one within the police power of such State." *Griffith v. Connecticut*, 218 U.S. 563, 569 (1910). Federal courts likewise regard state usury prohibitions as strong or fundamental public policies. *See, e.g.*, *United States v. Moseley*, 980 F.3d 9, 21-22 (2d Cir. 2020); *Kaneff v. Delaware Title Loans*, 587 F.3d 616, 623 (3d Cir. 2009); *Hengle v. Treppa*, 19 F.4th 324, 352 (4th Cir. 2021). This Court has also upheld states' application of their usury and consumer-credit laws to transactions involving out-of-state lenders and in-state residents. *See Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1307-08 (10th Cir. 2008) (Kansas laws applied to an internet lender that made loans to Kansas residents); *Aldens, Inc. v. Ryan*, 571 F.2d 1159, 1161-62 (10th Cir. 1978) (Oklahoma's rate limits applied to an Illinois mail-order retailer).

In recent years, however, state usury authority has been undermined through partnerships between non-bank internet lenders and state-chartered banks located in states with no usury caps, resulting in loans at 100% to 200% APR. Nat'l Consumer Law Ctr., *High-Cost Rent-a-Bank Loan Watch List* (Feb. 26, 2026).[3] Iowa exercised

---

[3] https://www.nclc.org/resources/high-cost-rent-a-bank-loan-watch-list/.

the opt-out right at issue in this case, consistent with Colorado's interpretation, and has enforced its usury laws against triple-digit loans made to Iowa residents by out-of-state state-chartered banks.[4] Appellees' interpretation, by contrast, would protect loans prohibited in as many as 45 states, depending on the size of the loan. Nat'l Consumer Law Ctr., *Fact Sheet: State Annual Percentage Rate (APR) Caps for $500, $2,000, and $10,000 Installment Loans* (Dec. 18, 2025).[5]

**B.      Congress Extended Rate Preemption to State Banks While Preserving States' Ability to Reassert Usury Laws.**

The National Bank Act ("NBA") created a limited exception by allowing national banks to charge the higher of a federally defined rate or the rate permitted in the state where the bank was located. 12 U.S.C. § 85. Both rate options operated as true usury caps. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9 (2003) ("[Section 85] sets forth substantive limits on the rates of interest that national banks may charge."). Before modern credit cards and, later, interstate bank branches made consumer lending across state lines commonplace, the bank's home-state rate ordinarily corresponded to the borrower's state usury law because national banks generally lent to consumers within their home states.

---

[4] *See, e.g., In re Transp. Alliance Bank, Inc. d/b/a TAB Bank*, Assurance of Discontinuance (Iowa Att'y Gen. & Iowa Div. of Banking Dec. 12, 2022), https://www.iowaattorneygeneral.gov/media/cms/TAB_Bank__SOI_Assurance_of _Disconti_92D5556A9591B.pdf.
[5] https://www.nclc.org/resources/fact-sheet-state-annual-percentage-rate-apr-caps-for-500-2000-and-10000-installment-loans/.

That practical alignment began to change in the 1960s with "the ease with which interstate credit [became] available by mail through the use of modern credit cards." *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 318-19 (1978). In 1978, the Supreme Court held that a national bank could offer credit cards nationwide at its home-state rate. Responding to the concern that this would "significantly impair the ability of States to enact effective usury laws," the Court stated that "the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress." *Id.*

While the NBA remained a usury statute, one effect of *Marquette* was the emergence of competitive pressure on states to loosen their usury laws to attract or retain national banks. Steven Mercatante, *The Deregulation of Usury Ceilings, Rise of Easy Credit, and Increasing Consumer Debt*, 53 S.D. L. Rev. 37, 41 (2008).

Within two years, Congress enacted DIDMCA. To "prevent discrimination against State-chartered insured banks," Section 521 preempts state usury laws by giving state-chartered banks two interest-rate options: (1) the federal rate set forth in the NBA or (2) the "rate allowed by the laws of the State…where the bank is located," thereby allowing state banks to export their home-state rates as national banks could under *Marquette*. 12 U.S.C. § 1831d(a). Sections 522 and 523 do the same for insured savings and loan associations and credit unions.

6

However, unlike in the NBA, Congress expressly allowed states to reassert their traditional usury authority. Section 525—the "effective-date" provision—provides that Sections 521 through 523 apply beginning April 1, 1980, but cease to apply with respect to loans made in a state once it adopts a law or certifies that its voters approved a provision stating that the state "does not want the amendments…to apply with respect to loans made in such State." 12 U.S.C. § 1831d note.

Appellees contend that Section 525 permits a state to opt out of only one part of Section 521—the federal-rate option—and only for state-chartered banks located within the opt-out state. Under this reading, Colorado could restrict a Colorado state-chartered bank's reliance on the federal rate even with respect to loans made to residents of other states, but Colorado could not prevent an out-of-state state-chartered bank from exporting into Colorado a rate it has deemed usurious. Appellees offer no theory for why Congress would have enacted such a self-defeating policy.

## II. Section 525's Ordinary Meaning and Structure Encompass Loans Made to Borrowers in the Opt-Out State.

Appellants explain why the plain language of Section 525, in contrast to Section 521, unambiguously encompasses loans made to borrowers in the opt-out state and forecloses Appellees' bank-location-only interpretation. Appellants' Supp. Resp. Br. 3-20. Three additional textual points reinforce Appellants' argument.

**A.**  **In Ordinary Usage, a Loan Is Not Made Until the Borrower Receives the Money Being Lent.**

To determine where a loan is made, it is first necessary to define what constitutes a loan. As the dictionary definitions quoted by both parties establish, a loan is the "[d]elivery by one party to *and receipt by* another party" of money pursuant to an agreement to repay. Black's Law Dictionary 844 (5th ed. 1979) (emphasis added). Merriam-Webster similarly defines a loan as a "transfer or delivery of money from one party *to another*" subject to repayment. *Loan*, Merriam-Webster.com Dictionary (emphasis added).[6] Indeed, Appellees rely on these definitions, yet ignore the words "receipt by" and focus exclusively on the lender's delivery of funds. Appellees' Supp. Br. 8 n.3. But these definitions make clear that a loan does not come into existence when or where a lender merely decides to extend or disburse credit. Rather, a loan exists only when a borrower receives money pursuant to an agreement to repay. Thus, the place of receipt is necessarily at least one place where a loan is made.[7]

This understanding of the phrase "made in" becomes even more apparent from ordinary usage. As the Panel recognized, if someone asked, "Does Bank of America make loans in Colorado?" most would understand the question to mean whether

---

[6] https://www.merriam-webster.com/dictionary/loan.

[7] *Cf. Restatement (Second) of Conflict of Laws* § 188 cmt. e (Am. L. Inst. 1971) (identifying the place of contracting as the place where the last act necessary to give the contract binding effect occurred).

Bank of America lends to borrowers located in Colorado. Few would understand the question as asking whether Bank of America maintains its underwriting department or other loan-making functions in Colorado. And no ordinary speaker would understand the question as referring solely to the location of the bank's activities, while excluding all consideration of the borrower's location. Panel Op. at 39 n.23 (finding this example persuasive).

The FDIC used the same ordinary distinction in a 2020 rule intended to clarify "the law that governs the interest rates State-chartered banks…may charge." *Federal Interest Rate Authority*, 85 Fed. Reg. 44,146 (July 22, 2020).[8] In response to comments on the proposed rule, the FDIC stated that if a state opted out under Section 525, "State banks making loans in that State could not charge interest at a rate exceeding the limit set by the State's laws, *even if the law of the State where the State bank is located would permit a higher rate*." *Id.* at 44,153 (emphasis added).

### B. Congress's Different Phrasing in Sections 521 and 525 Must Be Given Effect.

Appellees' interpretation cannot be reconciled with Congress's decision to use different language in Sections 521 and 525. Section 521 authorizes a state-chartered bank to charge the rate permitted by the state "where the bank is located" or the

---

[8] https://www.govinfo.gov/content/pkg/FR-2020-07-22/pdf/2020-14114.pdf. The FDIC's interpretations of Section 525 have varied. *See* Appellants' Supp. Resp. Br. 24-28. *Amici* cite the 2020 formulation only as an illustration of ordinary usage, not as an authoritative agency interpretation.

federal rate applicable in the Federal Reserve district where the "bank is located." 12 U.S.C. § 1831d(a). Sections 522 and 523 similarly refer to where savings and loan associations and credit unions are "located." Section 525, by contrast, permits a state to opt out "with respect to loans made in such State." 12 U.S.C. § 1831d note. Congress's use of materially different terms in adjacent provisions must be given effect. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022).

Section 525's passive phrasing reinforces that distinction by focusing on whether loans are "made in" the opt-out state, not on who makes them or where the lender is located. The Dissent's reliance on the *in pari materia* canon does not justify erasing that difference. Diss. Op. at 8-10. Sections 521 and 525 should be read together, but each must perform the function Congress assigned it. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004). Section 521 defines permissible rates by reference to a bank's location; Section 525 allows states to opt out of Section 521 for loans made in that state. Had Congress intended the opt-out to depend on a bank's location, it knew how to say so. Indeed, Congress repeatedly used that bank-location language in Sections 521 through 523 but omitted it from Section 525. Panel Op. at 41-42.

### C. Section 525's Effective-Date Structure Makes Section 521 Inapplicable to Loans Made in the Opt-Out State.

Section 525 sets the effective date for Sections 521 through 523 as April 1, 1980. 12 U.S.C. § 1831d note. Before that date, those provisions did not apply; after that date, they did. Importantly, the same sentence that made those provisions

applicable also provided that they would cease to apply when a state opted out "with respect to *loans made in such State*." *Id.* (emphasis added). The opt-out appears in the very provision that determines when Sections 521 through 523 apply.

That structure is significant. Enacted on March 31, 1980, DIDMCA turned Section 521 on for loans made beginning the next day, allowing state-chartered banks to charge either the federal rate or the rate permitted by the bank's home state. But the same effective-date sentence also specified how Section 521 could be turned off: when a state enacted a law declaring that it did not want the provisions to preempt its laws. Section 525 performs a gatekeeping function, determining whether Section 521's two overrides of state usury law—the federal-rate option and home-state rate exportation—*apply at all*. Appellees' reading would instead turn off only the federal-rate option while leaving home-state rate exportation in effect, a limitation that appears nowhere in Section 525. *See United States v. Naftalin*, 441 U.S. 768, 773 (1979).

The 1970s pre-DIDMCA statutes, on which Appellees rely, do not support their narrower reading. Appellees argue that because those statutes addressed localized credit crises and used substantially the same opt-out language as Section 525, the opt-out provisions operated only locally by restricting banks located within the opt-out state from charging the federal rate. Appellees' Supp. Br. 19-23. But the earlier statutes did not define loans "made in" a state by reference to the bank's

11

location. Rather, they temporarily displaced state usury caps for limited classes of loans and provided two ways for that displacement to end: expiration on a date certain or enactment of a state opt-out. The opt-out had the same effect as expiration because either event ended the federal override in full and reinstated the state usury caps it had displaced. DIDMCA broadened preemption by expanding the types of loans covered and authorizing home-state rate exportation. By incorporating the same opt-out language and effective-date structure, Section 525 likewise permits a state to terminate that broader preemption and reassert its traditional usury authority over loans made in the opt-out state. The earlier statutes, therefore, confirm that the scope of an opt-out corresponds to the scope of the federal override it terminates.[9]

## III. Section 525's Legislative History Confirms Congress Preserved State Opt-Out Authority.

The text and structure of Sections 521 and 525 resolve this case. Even if the Court looks beyond the text, the legislative history compels the same conclusion.

Section 521's roots date to a November 1979 bill to address the competitive disadvantage that state-chartered institutions faced after *Marquette*, while allowing states to preserve their usury laws through overriding legislation. S. 1988, 96th

---

[9] Carried to its logical conclusion, Appellees' reasoning would limit Section 525's opt-out to the federal-rate override for business or agricultural loans of $25,000 or more—the scope of the predecessor statutes' preemption. Appellees do not take their argument that far.

Cong. (1979)[10]; 125 Cong. Rec. 30,655 (1979).[11] Senator Proxmire, Chairman of the Senate Banking Committee, recognized that the proposal would "override all State laws as far as State banks are concerned." 125 Cong. Rec. 30,655 (1979). He cautioned that Congress should be "very chary about overriding State usury laws." *Id.* Senator Bumpers acknowledged that it was not "particularly healthy, to be overriding State law." *Id.*

During a hearing on S. 1988, Federal Reserve Vice Chairman Frederick Schultz explained that the opt-out "would honor State prerogatives by enabling legislatures to reject the rate flexibility *provisions* of this bill"—not only some of them—"through passage of a new State law reaffirming existing regulations." *Usury Lending Limits: Hearing on S. 1988 Before the S. Comm. on Banking, Hous. & Urb. Affs.*, 96th Cong. 35 (1979) (emphasis added).[12] "In the view of the majority of the Board…this approach would provide adequate preservation of State authority to regulate lending practices." *Id.* Schultz emphasized that, out of concern for "States rights" and federalism, the bill would "say that these usury laws will be preempted but you can reinstate them, you can override, if you wish to do so." *Id.* at 48. Senator Proxmire agreed: "[W]e provide this override until *such* State legislatures adopt laws

---

[10] https://www.congress.gov/bill/96th-congress/senate-bill/1988.
[11] https://www.govinfo.gov/content/pkg/GPO-CRECB-1979-pt23/pdf/GPO-CRECB-1979-pt23-6-2.pdf.
[12] https://www.govinfo.gov/content/pkg/CHRG-96shrg56265O/pdf/CHRG-96shrg56265O.pdf.

stating in substance that *such State* does not want such amendment or amendments made to the statute with respect to this." *Id.* at 48-49 (emphasis added).

Although the Bumpers-Pryor bill did not reach the Senate floor, the Conference Committee incorporated its provisions into H.R. 4986, which Congress ultimately enacted as DIDMCA. The Senate Conference Report confirms the previously expressed understanding of Section 525, stating "[s]tate usury ceilings on all loans made by Federally insured depository institutions (except national banks)…will be permanently preempted subject to the right of affected states to override at any time[.]" S. Conf. Rep. No. 96-640, at 78-79 (1980).[13] The Report further explained that a state could "override a federal preemption of state usury laws provided for in this title" by expressly indicating its intent to do so. *Id.* at 79.

The House and Senate debates on the Conference Report reflected the same understanding. Representative Reuss, the Chair of the House Banking, Finance, and Urban Affairs Committee and floor manager for H.R. 4986, explained that the bill would preempt state usury ceilings while simultaneously "protect[ing] States' rights by allowing States to restore the usury ceiling promptly if they wish to do so." 126 Cong. Rec. 6,965 (1980).[14] Senator Proxmire explained, "Under the usury

---

[13] https://fraser.stlouisfed.org/title/depository-institutions-deregulation-monetary-control-act-1980-6067.

[14] https://www.govinfo.gov/content/pkg/GPO-CRECB-1980-pt6/pdf/GPO-CRECB-1980-pt6-1-2.pdf.

provisions, each State may reimpose its usury limits, if it so desires. We do not take that away from the States. They can put those usury laws back into effect." 126 Cong. Rec. 7,070-71 (1980).[15]

That legislative history focuses on preserving states' ability to fully restore their usury laws, rather than on a state's authority to regulate banks chartered within its borders. Congress's repeated references to restoring state usury laws encompass both Section 521's federal-rate option and rate exportation, and nothing in the record supports the partial opt-out Appellees propose.

## CONCLUSION

Section 525 restores states' traditional usury powers over loans made to their residents, regardless of where the bank is located. The District Court's decision should be reversed.

Dated: July 15, 2026

Respectfully submitted,

 /s/ Katelin Shaw Kaiser
Katelin Shaw Kaiser
CENTER FOR RESPONSIBLE LENDING
302 West Main Street
Durham, NC 27701
katelin.kaiser@responsiblelending.org

*Attorney for* Amici Curiae *Center for Responsible Lending and National Consumer Law Center*

---

[15] https://www.govinfo.gov/content/pkg/GPO-CRECB-1980-pt6/pdf/GPO-CRECB-1980-pt6-2.pdf.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2026, I electronically filed a copy of the foregoing Supplemental Brief of Amici Curiae Center for Responsible Lending and National Consumer Law Center with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system, which will send electronic notification of this filing to all counsel of record.


Dated: July 15, 2026                          */s/ Katelin Shaw Kaiser*
                                              Katelin Shaw Kaiser

                                              *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of this Court's April 2, 2026 Order and Fed. R. App. P. 29(a)(5) (providing that an amicus brief may be no more than one-half the maximum length of a party's principal brief) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this text of the document is in 14-point font and the document is 15 pages in length.

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: July 15, 2026

*/s/ Katelin Shaw Kaiser*
Katelin Shaw Kaiser

*Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program and, according to the program, are free of viruses.


Dated: July 15, 2026

*/s/ Katelin Shaw Kaiser*
Katelin Shaw Kaiser

*Counsel for Amici Curiae*

18