**No. 24-1293**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS et al.,
*Plaintiffs-Appellees*,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA
FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
No. 1:24-CV-00812-DDD-KAS
The Honorable Daniel D. Domenico, Judge

**SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* THE BELL POLICY
CENTER IN SUPPORT OF DEFENDANTS-APPELLANTS**

David H. Seligman
Brianne Power
TOWARDS JUSTICE
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO, 80203-1994
(720) 441-2236
david@towardsjustice.org
brianne@towardsjustice.org

*Attorneys for Amicus Curiae*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, The Bell Policy Center certifies that it does not have a parent corporation and no publicly held corporation owns 10 percent or more of the stock of the organization.

Dated: July 15, 2026 <u>*/s/ Brianne Power*</u>
Brianne Power

*Counsel for Amicus Curiae*

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT......................................................i

TABLE OF CONTENTS .............................................................. ii

TABLE OF AUTHORITIES.......................................................... iii

INTEREST OF AMICUS CURIAE................................................1

INTRODUCTION ...................................................................2

ARGUMENT ........................................................................4

    I.    Colorado has long been interested in protecting its residents from predatory or usurious interest rates..............................................................4

    II.   Preemption under DIDMCA left Colorado insufficient tools to protect its residents..........................................................................7

    III.  Opting out of DIDMCA was the logical next step in Colorado's work to protect vulnerable residents from predatory or usurious loans. ...........................12

CONCLUSION .....................................................................14

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022)..........................................12

*Community State Bank v. Knox*, 523 Fed. Appx. 925 (4th Cir. 2013) ....................10

*Easter v. Am. W. Fin.,* 381 F.3d 948, 957 (9th Cir. 2004).....................................10

*Eul v. Transworld Sys.,* 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017)....................10

*Fulford v. Avant of Colorado, LLC*, Case. No. 17CV30377 (Colo. Dist. Ct.
   Denver County) ...............................................................................................11

*Fulford v. Marlette Funding*, LLC, Case No. 17CV30376 (Colo. Dist. Ct.
   Denver County) ...............................................................................................11

*Georgia Cash America v. Greene*, 734 S.E.2d 67 (Ct. App. Ga. 2012).................10

*Meade v. Avant of Colorado, L.L.C*., 307 F. Supp. 3d 1134 (D. Colo. 2018).........10

*Meade v. Marlette Funding, LLC,* 2018 WL 1417706 (D. Colo. 2018) ................11

*Nat'l Ass'n of Industrial Bankers v. Weiser*, No. 24-812 (D. Colo. June 18,
   2024), Dkt. No. 69.......................................................................................3

*Spitzer v. County Bank of Rehoboth*, 846 N.Y.S.2d 436 (N.Y. App. Div.
   2007).................................................................................................................10

*State Bank v. Strong*, 651 F.3d 1241 (11th Cir. 2011)...........................................10

*West Virginia v. CashCall*, 605 F. Supp. 2d 781, 787 (S.D. W.Va. 2009) .............10

**Statutes**

Pub. L. No. 96-221, 94 Stat. 132, 164-65 (1980) (DIDMCA) ..............................3, 4

**Rules**

Federal Rule of Appellate Procedure 29(a)(4)(E) ......................................................1

OCC, National Banks and Federal Saving Associations as Lenders, 85 Fed.

Reg. 68,742 (to be codified at 12 C.F.R. pt. 7)......................................................8

**Bills**

H.B 16-185, 70th Gen. Assemb., 2nd Reg. Sess. (Colo. 2016) (amending

Colo. Rev. Stat. § 5-2-201) ....................................................................................5

H.B. 15-1390, 70th Gen. Assemb., Reg. Sess. (Colo. 2015) (amending Colo.

Rev. Stat. § 5-2-201) ..............................................................................................5

H.B. 21-148, 73rd Gen. Assemb., Reg. Sess. (Colo. 2021) (amending Colo.

Rev. Stat. §§ 24-31-1001-1002; 24-31-102)..........................................................7

H.B. 22-1359, 73rd Gen. Assemb., Reg. Sess. (Colo. 2022) (amending Colo.

Rev. Stat. §§ 24-36-301 *et. seq.*)...........................................................................7

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023) (amending

Colo. Rev. Stat. § 5-2214)................................................................................1, 3, 6

**Other Authorities**

Adam J. Levitin*, Rent-A-Bank: Bank Partnerships and The Evasion of

Usury Laws,* 71 Duke .............................................................................................8

Andrea Kuwik, *Alternative Charge Loans Overview*, The Bell Policy

Center, Feb. 7, 2023 ..............................................................................6

*Assurance of Discontinuance in the Matters of Avant of Colorado, LLC,*

*and Marlette Funding, LLC*, Aug. 7, 2020.........................................11

Carolyn Carter, Lauren Saunders and Margot Saunders, *Predatory*

*Installment Lending in the States: How Well Do the States Protect*

*Consumers Against High-Cost Installment Loans? (2023),* National

Consumer Law Center, 2023 ................................................................5

Center for Responsible Lending, *Testimony of Lisa F. Stifler before the*

*Senate Committee on Banking, Housing, and Urban Affairs on The*

*Reemergence of Rent-a-Bank?,* Apr. 2021 ..........................................9

Consumer Financial Protection Bureau, *What is a Payday Loan?* ..........6

Initiative #121, 2017-2018 (amending Colo. Rev. Stat. §§ 5-3.1-105, 108,

and 121).................................................................................................6

Jackie Veling, *How to Get Out of a Payday Loan Nightmare*,

NERDWALLET, Fox4, Apr. 30, 2023 ...............................................13

National Consumer Law Center, *High-Cost Rent-a-Bank Loan Watch List,*

Jan. 2024................................................................................................8

National Consumer Law Center, *Testimony of Lauren Saunders before the U.S. House Financial Services Committee on Rent-a-Bank Schemes and New Debt Traps*, Feb. 2020.................................................................................9

Office of Financial Empowerment, Colorado Attorney General.............................7

Pat Ferrier, *Colorado Election: Proposition 111, Capping Interest on Payday Loans, Passes*, THE COLORADOAN, Nov. 7, 2018...............................6

Press Release, *New Senate Bill to Curb High-Cost Loans, Junk Fees by Capping Interest Rates*, Center for Responsible Lending, Dec. 15, 2023............14

Ramenda Cyrus, *Predatory Lending's Prey of Color*, THE AMERICAN PROSPECT, Jun. 5, 2023...............................................................................13

The Bell Policy Center, *Protecting Colorado's Financial Security*, 2023 ..............6

## INTEREST OF AMICUS CURIAE

The Bell Policy Center ("The Bell") works to advance economic mobility in Colorado.[1] Through its research and advocacy, The Bell provides policymakers, advocates, and the public with reliable resources to create a practical policy agenda that raises the economic floor, builds a diverse and thriving middle class, and sparks innovative ideas to prepare Colorado for the future. In 2023, The Bell partnered with a broad coalition of advocates to support Colorado House Bill 2023-1229 concerning changes to consumer lending laws to limit charges to consumers. H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023) (amending Colo. Rev. Stat. § 5-2214).

The Bell submits this brief supporting the position of Defendants-Appellants Attorney General of the State of Colorado Philip J. Weiser and Administrator of the Colorado Uniform Consumer Credit Code Martha Fulford. The Tenth Circuit panel correctly interpreted DIDMCA's opt-out provision and reversed the preliminary injunction barring the full implementation of H.B. 23-1229. H.B. 23-1229 is essential to protecting the state's most vulnerable consumers from predatory and usurious loans. Predatory lending undermines economic mobility in Colorado by trapping vulnerable borrowers in a vicious debt cycle.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no person other than The Bell or its counsel made a monetary contribution to its preparation or submission. Fed. R. App. Pro. 29(a)(4).

1

The Bell submits this brief to provide the Court with a full understanding of the consequences its decision will have on vulnerable borrowers in Colorado. All parties consent to the filing of this amicus brief.

## INTRODUCTION

Colorado has a strong interest in protecting its residents from predatory and usurious lending. Over the past decade, Colorado voters, and state lawmakers from both parties have enacted several constraints on interest rates and fees that can be charged on consumer credit transactions in the state. Meanwhile, public enforcers have dedicated substantial resources to ensuring that Colorado's consumers are protected from predatory lending and that lenders operating in accordance with state law are not put at a competitive disadvantage by those seeking to skirt Colorado's consumer lending protections.

These efforts have too often been subverted by lenders exploiting a loophole in federal law that allows out-of-state banks to make loans in Colorado to borrowers at whatever interest rate is allowed in their own state, even if the loan violates Colorado law. This loophole has given rise to an industry of so-called "rent-a-bank" lenders that make loans to Coloradans through state-chartered banks from other states and thus purport to be able to ignore Colorado's rate caps. Consequently, thousands of Coloradans have been subject to predatory interest rates, and Colorado

2

lenders playing by the rules have been put at a disadvantage. The federal loophole has substantially undermined Colorado's ability to protect its residents.

In 2023, Colorado lawmakers sought to do something about the problem. The General Assembly passed House Bill 2023-1229, which, in relevant part, required that loans made in Colorado by out-of-state banks comply with Colorado's interest rate and fee restrictions for consumer credit transactions. H.B. 23-1229 § 3. House Bill 23-1229 took advantage of section 525 of the Depository Institutions Deregulation and Monetary Control Act (DIDMCA), which explicitly allows states to opt-out of the federal loophole that permits state-chartered banks to export their state interest rates to other states (§§ 521-523). Pub. L. No. 96-221, 94 Stat. 132, 164-65 (1980) (DIDMCA).

As the State of Colorado and the Federal Deposit Insurance Corporation (FDIC) have reinforced, the logical reading of the statutory provision permitting states to opt-out of the federal loophole is that it allows Colorado to regulate loans from out-of-state banks made to individuals in Colorado in the same way that it regulates loans by Colorado lenders. But the District Court adopted a strained and illogical reading of the word "made" in section 525, and preliminarily enjoined enforcement of Colorado interest rates caps on loans extended by Appellee's members that are located outside of Colorado. *Nat'l Ass'n of Industrial Bankers v. Weiser*, No. 24-812 (D. Colo. June 18, 2024), Dkt. No. 69. In issuing this injunction,

3

the District Court concluded that only the location of the bank, not of the borrower, is relevant to where loans are "made." *Id.* at 23. That conclusion conflicts with the plain language of section 525, the Federal Deposit Insurance Corporation (FDIC)'s reading of that provision, and the purpose of the opt-out provision. The Tenth Circuit panel correctly reversed it.

The District Court's holding also hurt Coloradans and undermined the state's interest in protecting consumers and fair competition. While Plaintiffs-Appellees urge an atextual reading of the law to protect a profitable business model that depends on their subversion of state interest rate caps, The Bell writes to uplift the voices of vulnerable Coloradans. If the Panel's decision is not affirmed, the state will have to spend even more resources protecting Colorado's low-income borrowers from predatory interest rates, imposed by Plaintiffs-Appellee's members, in direct conflict with Colorado law.

## **ARGUMENT**

**I.     Colorado has long been interested in protecting its residents from predatory or usurious interest rates.**

Colorado has a long history of protecting its residents from usurious lending. State laws limiting interest rates on consumer loans have been passed by members of both parties in the General Assembly and resoundingly adopted by Coloradans through the initiative process. The purpose of these regulations has been to protect consumers of this state and preserve fair competition. While policies limiting interest

4

rates may appear complex, Colorado's lending laws have "reflect[ed] [our] collective judgment about moral and ethical behavior"[2] in the marketplace. In other words, interest rate caps have been a fundamental exercise of the state's core police powers.

For many years, Colorado has applied interest rate caps on supervised installment loans and has consistently rejected efforts over the past decade to amend these protections. *See e.g.,* H.B. 15-1390, 70th Gen. Assemb., Reg. Sess. (Colo. 2015) (amending Colo. Rev. Stat. § 5-2-201) (vetoed by Gov. Hickenlooper, this bill would have increased allowable APR for mid-size installment loans by increasing maximum APRs at certain dollar amounts); *see also*, H.B 16-185, 70th Gen. Assemb., 2nd Reg. Sess. (Colo. 2016) (amending Colo. Rev. Stat. § 5-2-201) (proposed to tie increases in APR for installment loans to inflation).

Then, in 2018, Colorado passed Proposition 111, capping interest rates on payday loans: Short-term, high-cost loans, generally for $500 or less, that are typically due on the borrower's next payday. Initiative #121, 2017-2018 (amending

---

[2] Carolyn Carter, Lauren Saunders and Margot Saunders, *Predatory Installment Lending in the States: How Well Do the States Protect Consumers Against High-Cost Installment Loans? (2023),* National Consumer Law Center, 2023, https://www.nclc.org/resources/predatory-installment-lending-in-the-states-how-well-do-the-states-protect-consumers-against-high-cost-installment-loans-2023/.

Colo. Rev. Stat. §§ 5-3.1-105, 108, and 121).[3] Proposition 111 passed with 73% of the vote, making it the most popular ballot initiative in the state's history.[4] That initiative, supported by a bipartisan coalition of advocates and voters, capped payday loans at 36% APR. Initiative #121, 2017-2018. After Proposition 111, payday loan utilization dropped off, but alternative charge loans increased significantly. "Alternative charge loans are short-term, small-dollar loans, limited to $1,000. While lenders don't assess interest on these products, they do place a variety of high cost 'charges' on them. When calculated as an equivalent APR, these 'charges' averaged an annual 114 percent in 2019."[5] The Colorado legislature responded in 2023 by capping total allowable costs on alternative charge loans and reaffirming the state's commitment to rooting out high-cost lending. H.B. 23-1229 § 2.

Colorado has also worked to provide Coloradans with better tools and resources to stay out of high-cost debt. In 2021, the state created—with bipartisan

---

[3] *Available at* https://leg.colorado.gov/sites/default/files/initiative%2520referendum_126final.pdf; *see also*, Consumer Financial Protection Bureau, *What is a Payday Loan?*, https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/.

[4] Pat Ferrier, *Colorado Election: Proposition 111, Capping Interest on Payday Loans, Passes*, THE COLORADOAN, Nov. 7, 2018, https://www.coloradoan.com/story/news/politics/elections/2018/11/06/colorado-election-proposition-111-passes-limits-interest-payday-loans/1890551002/.

[5] The Bell Policy Center, *Protecting Colorado's Financial Security*, 2023, https://www.bellpolicy.org/wp-content/uploads/Installment-Alternative-Charge-Loans.pdf; *see also* Andrea Kuwik, *Alternative Charge Loans Overview*, The Bell Policy Center, Feb. 7, 2023, https://www.bellpolicy.org/2023/02/07/alternative-charge-loans/.

support—the Office of Financial Empowerment within the Department of Law, which aims to grow the financial resilience of Colorado's most vulnerable communities. H.B. 21-148, 73rd Gen. Assemb., Reg. Sess. (Colo. 2021) (amending Colo. Rev. Stat. §§ 24-31-1001-1002; 24-31-102). A central focus for the Office is expanding access to safe, affordable credit.[6] Meanwhile, Colorado created a pilot Household Financial Recovery Program in 2022, which created new affordable credit products and used state funds to buy down interest rates on loans made to individuals and households impacted by the COVID-19 pandemic. H.B. 22-1359, 73rd Gen. Assemb., Reg. Sess. (Colo. 2022) (amending Colo. Rev. Stat. §§ 24-36-301 *et. seq.*). While the Household Financial Recovery Program was discontinued due to the state's ongoing budget crisis, these efforts reflect our state policymakers' ongoing concern about high-cost loans and the extraordinary impact they can have on Colorado families' financial well-being.

## II.    Preemption under DIDMCA left Colorado insufficient tools to protect its residents.

Despite Colorado's focus on capping interest rates and expanding access to responsible lending products, the state has struggled to protect its residents from some predatory lending products. The combination of DIDMCA preemption, the proliferation of rent-a-bank schemes, and the legal ambiguity inherent in the true

---

[6] Office of Financial Empowerment, Colorado Attorney General, https://coag.gov/resources/ofe/ (*last accessed* Sept. 12, 2024).

7

lender framework,[7] undermined these hard-fought Colorado protections for vulnerable borrowers.

Preemption under DIDMCA theoretically only prevents Colorado from applying its predatory lending protections to loans provided by another state's state-chartered banks. However, in recent years we have seen the proliferation of non-bank lenders—often marketing themselves as sophisticated FinTech companies—affiliating themselves with state-chartered banks to piggyback on the bank's ability to lend at interest rates above those allowed by Colorado. These so-called "rent-a-bank" schemes have allowed high-cost loans to proliferate in Colorado, led by non-bank lenders who are associated with a few rogue state-chartered banks from states like Utah that have no interest rate caps.[8] These entities offer installment loans and lines of credit at 99% to 225% APR, rates far above Colorado's caps.[9]

In a rent-a-bank scheme, the bank is designated as the "lender" but has only a

---

[7] This discussion will focus on common law true lender tests, not the repealed regulation proposed by the Office of the Comptroller of the Currency under President Trump that defined when a national bank was the true lender: OCC, National Banks and Federal Saving Associations as Lenders, 85 Fed. Reg. 68,742 (to be codified at 12 C.F.R. pt. 7).

[8] *See* National Consumer Law Center, *High-Cost Rent-a-Bank Loan Watch List,* Jan. 2024, https://bit.ly/2JCGf2c; *see also* Adam J. Levitin*, Rent-A-Bank: Bank Partnerships and The Evasion of Usury Laws,* 71 Duke L.J. 329, 349-52 (2021).

[9] *Id.*

minor role in a lending program run almost entirely by a non-bank. Typically, the non-bank bears most of the risk, takes most of the profit, and effectively designs, runs, and controls the program. After designing and marketing the loan, setting pricing and underwriting criteria (nominally approved by the bank), and processing applications, the non-bank sends the loan to a bank for approval and funding. The bank then immediately sells the loan (or the bulk of the receivables or participation interests) back to the non-bank (or a related entity), which charges interest, collects payments, bears the primary risk of nonpayment, and typically receives most of the revenues. In many cases, the non-bank covers most of the bank's costs, has a right to buy the loans or receivables, and protects the bank from the risk of loss through indemnity agreements, required deposits, or other arrangements. Even though the bank's role is only a minor part of the lending program, the non-bank claims that the loans are bank loans immune from state rate caps.[10]

Rent-a-bank schemes are of questionable legality given the limited role of the state-chartered bank, but they are often effective at insulating non-bank lenders from state interest rates. The state simply does not have the resources to prosecute every

---

[10] *See* National Consumer Law Center, *Testimony of Lauren Saunders before the U.S. House Financial Services Committee on Rent-a-Bank Schemes and New Debt Traps*, Feb. 2020, http://bit.ly/debt-trap-schemes; *see also,* Center for Responsible Lending, *Testimony of Lisa F. Stifler before the Senate Committee on Banking, Housing, and Urban Affairs on The Reemergence of Rent-a-Bank?,* Apr. 2021, https://bit.ly/3IjIIZu.

rent-a-bank scheme, especially in light of the fact-specific inquiry that courts have adopted for determining the identity of the "true" lender.[11] This framework requires extensive litigation—sometimes through trial—to determine whether a loan made by an out-of-state bank was in fact made by a third-party lender that should be subject to state rate caps. *See, e.g., Georgia Cash America v. Greene*, 734 S.E.2d 67 (Ct. App. Ga. 2012) (finding triable issue about whether payday lender or bank was the true lender).

Colorado has invested substantial resources in enforcing Colorado law and litigating against out-of-state lenders seeking to bypass Colorado's rate caps. In 2017, Colorado Attorney General Cynthia Coffman initiated litigation against Avant and Marlette Funding, two non-banks that offered high-cost loans to Colorado consumers pursuant to an association with banks in New Jersy and Utah. Colorado alleged that the primary purpose of the banks' involvement in the loan transactions was to allow the non-banks to circumvent state laws, including Colorado limits on interest rates and other finance charges. *Meade v. Marlette Funding, LLC,* 2018 WL

---

[11] *See e.g., Meade v. Avant of Colorado, L.L.C.*, 307 F. Supp. 3d 1134 (D. Colo. 2018); *West Virginia v. CashCall*, 605 F. Supp. 2d 781, 787 (S.D. W.Va. 2009); *Easter v. Am. W. Fin.,* 381 F.3d 948, 957 (9th Cir. 2004); *State Bank v. Strong*, 651 F.3d 1241 (11th Cir. 2011); *Community State Bank v. Knox*, 523 Fed. Appx. 925 (4th Cir. 2013); *Eul v. Transworld Sys.,* 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017); *Spitzer v. County Bank of Rehoboth*, 846 N.Y.S.2d 436 (N.Y. App. Div. 2007).

1417706 (D. Colo. 2018); *Avant,* 307 F. Supp. 3d 1134. Colorado argued that although the banks were able to use the interest rates of their home states pursuant to DIDMCA, the on-line lenders were the true-lenders, and they could not escape Colorado usury laws. *Id., see also Fulford v. Avant of Colorado, LLC*, Case. No. 17CV30377 (Colo. Dist. Ct. Denver County); *Fulford v. Marlette Funding*, LLC, Case No. 17CV30376 (Colo. Dist. Ct. Denver County).

Ultimately, facing potentially years more of litigation and potential litigation risk, Colorado settled these cases in August 2020. *Assurance of Discontinuance in the Matters of Avant of Colorado, LLC, and Marlette Funding, LLC*, Aug. 7, 2020.[12] This agreement achieved substantial protections for consumers of future loans made by the defendant financial service providers and defined when the entities subject to the agreement would be the true lender. *Id*. But holding other non-banks accountable for usurious loans issued through illegal rent-a-bank schemes may require a similarly large investment of Colorado's enforcement resources. Even where a court ultimately finds that the non-bank was the "true lender" and borrowers therefore protected by state usury laws, it may take years to get to that result. *See e.g., CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022). During that time, consumers will continue to suffer and lenders behaving lawfully will be put at a disadvantage.

---

[12] *Available at* https://coag.gov/app/uploads/20 20/08/Avant-Marlette-Colorado-Fully-Executed-AOD.pdf.

11

**III.    Opting out of DIDMCA was the logical next step in Colorado's work to protect vulnerable residents from predatory or usurious loans.**

In this context, the Colorado legislature took the logical next step in 2023 of opting out of DIDMCA to ensure that both state-chartered banks and non-bank lenders that lend to Colorado borrowers can be held accountable under Colorado law (regardless of the identity of the true lender). Plaintiffs-Appellees' attempt to evade the requirements of Colorado law despite the opt-out is a naked attempt to continue profiting off our state's most vulnerable residents through predatory and usurious loans. The District Court's decision allowing this behavior to continue undermined Colorado's ability to regulate loans made to borrowers within its borders and left the state unable to protect itself from other states' decisions about how to regulate consumer financial products. The Tenth Circuit panel correctly reversed it.

Leaving Coloradans without the protections of our state's laws creates real consequences for vulnerable residents. Colorado's subprime and deep subprime consumers, as well as residents with limited credit history, are uniquely vulnerable to predatory lending. High-cost lending services target "people who have been otherwise shut out of traditional financial markets, through years of systemic discrimination."[13]

---

[13] Ramenda Cyrus, *Predatory Lending's Prey of Color*, THE AMERICAN PROSPECT, Jun. 5, 2023, https://prospect.org/economy/2023-06-05-predatory-lendings-prey-of-color/.

Key components of the predatory lending "industry, from geography to marketing, take aim at Black and Latino borrowers in need."[14] And lenders explicitly offer high-cost credit to desperate and marginalized consumers even when they don't anticipate that the borrower will be able to pay it off. That's because high-cost loans are so lucrative that lenders know they "will be made whole even if the borrower defaults, or that it can recoup defaults from exorbitant rates on others[.]"[15] In this way, high-cost loans saddle borrowers with debt they cannot afford, leading them into a cycle of debt and financial stress. Constant rollovers into new loans are not a symptom of financial irresponsibility on the part of the borrower, but instead, an intentional profit-generating feature of high-cost loans. "According to 2014 research from the [Consumer Financial Protection Bureau], four out of every five payday loans are reborrowed after the initial two- week term."[16] The human consequences of this predatory behavior are that "families saddled with predatory loans are unable to afford basic living expenses, are subject to vehicle repossessions, abusive debt collections, bank account closures, bankruptcy, and other financial harm."[17]

---

[14] *Id.*

[15] Carter, *et al.*, *supra* n. 2.

[16] Jackie Veling, *How to Get Out of a Payday Loan Nightmare*, NERDWALLET, Fox4, Apr. 30, 2023, https://fox4kc.com/news/national/how-to-get-out-of-a-payday-loan-nightmare/.

[17] Press Release, *New Senate Bill to Curb High-Cost Loans, Junk Fees by Capping Interest Rates*, Center for Responsible Lending, Dec. 15, 2023,

Colorado policymakers have sought to prevent this kind of suffering and to ensure that high-cost predatory lending does not exacerbate existing disparities in our state. The District Court's reading undermined the state's ability to protect its residents from usurious lending. The Tenth Circuit panel's interpretation should be affirmed.

## **CONCLUSION**

The Bell urges this Court to affirm the Tenth Circuit panel decision.

Dated:  July 15, 2026    Respectfully submitted,

 */s/ Brianne Power*
David H. Seligman
Brianne Power
TOWARDS JUSTICE
1580 N Logan Street
Ste 660 PMB 44465
Denver, CO, 80203-1994
(720) 441-2236
david@towardsjustice.org
brianne@towardsjustice.org

*Attorneys for Amicus Curiae*

---

https://www.responsiblelending.org/media/new-senate-bill-curb-high-cost-loans-junk-fees-capping-interest-rates.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type face requirements specified in Fed. R. App. P. 32(a)(5)(A) and is written in Microsoft Word using proportionally spaced 14-point Times New Roman font.

This brief complies with the type-volume limitations specified in this Court's April 2, 2026, Order and Fed. R. App. P. 29.1(a)(5) because, excluding the sections exempted by Fed. R. App. P. Rule 32(f), the text of the document is in 14-point font, and the document is 14 pages in length.

Dated: July 15, 2026                          */s/ Brianne Power*
                                              Brianne Power

                                              *Counsel for Amicus Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to filed additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program and according to the program are free of viruses.

Dated: July 15, 2026                                  */s/ Brianne Power*
                                                      Brianne Power

                                                      *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.

Dated: July 15, 2026                    <u>*/s/ Brianne Power*</u>
                                        Brianne Power

                                        *Counsel for Amicus Curiae*