**No. 24-1293**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL SERVICES ASSOCIATION, AMERICAN FINTECH COUNCIL,

*Plaintiffs-Appellees*.

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants*,

---

On Appeal from the United States District Court for the District of Colorado, The Honorable Daniel D. Domenico, District Court Case No. 1:24-cv-00812-DDD-KAS

---

**BRIEF OF AMICUS CURIAE THOMAS J. MILLER,
FORMER ATTORNEY GENERAL OF IOWA,
IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

---

Amanda J. Krause
Deputy Litigation Director
National Association of Consumer Advocates
1629 K St NW, Suite 604
Washington, DC 20006
(202) 984-7706

*Attorney for Amicus Curiae
Thomas J. Miller*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTEREST OF AMICUS ........................................................................................1

ARGUMENT ..........................................................................................................2

CONCLUSION .......................................................................................................7

CERTIFICATE OF COMPLIANCE .......................................................................9

## TABLE OF AUTHORITIES

**Cases**

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................2, 7

*Marquette National Bank v. First of Omaha Service Corp.*, 439 U.S. 299 (1978)...3

*Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694 (10th Cir. 2025).............2, 3

*State ex rel. Turner v. First of Omaha Service Corp.*, 269 N.W.2d 409

    (Iowa 1978) .................................................................................................3

**Statutes**

12 U.S.C. § 1831d note (Effective Date) ...................................................................4

12 U.S.C. § 21 *et seq.*................................................................................................3

12 U.S.C. § 85 ...........................................................................................................3

1980 Iowa Acts, ch. 1156, § 32 .............................................................................4, 5

**Other Authorities**

126 Cong. Rec. 7069 (1980) ......................................................................................4

Assurance of Discontinuance, *In re Transp. All. Bank, Inc.* (Dec. 13, 2022) ...........6

Linda Thomas Lowe, Assistant Att'y Gen. & Deputy ICCC Adm'r, Iowa

    Consumer Credit Code Advice on Whether Issuance of Lender Credit Cards

    to Iowans Requires a License (Sept. 23, 1986)..................................................5

Rulings on Whether Loans at Issue are Subject to Iowa Law, *In re: Cashcall, Inc.*,

    Nos. 12IDB002, 13IDB001 (Sept. 26, 2013)....................................................7

Tam B. Ormiston, Assistant Att'y Gen., Opinion No. 80-3-11, 1980 Iowa Op. Atty.

Gen. 624, 1980 WL 25948 (Iowa A.G. Mar. 14, 1980).....................................4

Testimony of Jessica Whitney in Support of H.B. 4116 Before the S. Comm. on

Lab. and Bus., 83d Or. Legis. Assemb., 2026 Reg. Sess. (Feb. 25, 2026)........6

**INTEREST OF AMICUS**

Amicus curiae Thomas J. Miller became Attorney General of Iowa in 1979 and served in that capacity until 2022 (except for the four-year period from 1991 to 1995). As Attorney General, Amicus was responsible for enforcing Iowa's consumer credit laws. Amicus was the Attorney General when Congress passed the Depository Institutions Deregulation and Monetary Control Act (DIDMCA) in 1980 (and when Iowa exercised its right to opt-out of DIDMCA's interest rate provision that same year), and he is intimately familiar with Iowa's enforcement of its usury laws in the years thereafter. As Attorney General of Iowa for over four decades, Amicus is the only person with first-hand knowledge of what DIDMCA's opt-out provision meant from the time of its enactment and in the decades since, as Iowa is the only State to have opted out right after DIDMCA was enacted and to have remained opted-out since. Amicus is interested in this case because Plaintiffs-Appellees' interpretation of Section 525 of DIDMCA conflicts with Iowa's longstanding interpretation of that provision and Iowa's enforcement of its usury laws.

All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amicus curiae or his counsel made a monetary contribution to its preparation or submission.

# ARGUMENT

The Panel's majority correctly concluded that DIDMCA's plain language means what it says: where DIDMCA provides that a State may opt-out of its preemptive effect "with respect to loans made in such a State," it means that a loan made to a consumer in the opted-out State must comply with that State's interest rate laws. The Panel's decision and Defendant-Appellants' briefing in this case comprehensively explain how DIDMCA's text supports this commonsense conclusion. *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694, 712–21 (10th Cir. 2025); Defs.-Appellants' Opening Br. at 25–47, ECF No. 41, Defs.-Appellants' En Banc Supp. Resp. Br. at 3–20, ECF No. 224.

To the extent the Court nevertheless believes that DIDMCA's opt-out provision is ambiguous (it is not), Iowa's application of its statutory opt-out of DIDMCA's preemptive provision is instructive. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024) ("In the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect.") (cleaned up). Iowa has a long history of protecting its citizens from usury by out-of-state banks. That history demonstrates that DIDMCA's opt-out provision has long been understood to refer to loans made by out-of-state lenders to consumers located in an opt-out State.

2

Before the establishment of the national banking system, banking regulation was "squarely within the ambit of the states' powers," *Weiser*, 159 F.4th at 699 (cleaned up), and one quintessential aspect of that State power was the power to prohibit usurious lending. *See id.* at 700; *see also* Br. of Amici Curiae Ctr. for Resp. Lending and Nat'l Consumer L. Ctr. in Supp. of Defs.-Appellants and for Reversal at 5–9, ECF No. 55. When Congress first established the national banking system through the passage of the National Bank Act of 1864, 12 U.S.C. § 21 *et seq.*, States, including Iowa, continued to exercise their police power to prohibit usurious lending to consumers in their states, including with respect to nationally chartered banks. *See State ex rel. Turner v. First of Omaha Service Corp.*, 269 N.W.2d 409, 416 (Iowa 1978).

In *Marquette National Bank v. First of Omaha Service Corp.*, 439 U.S. 299 (1978), the Supreme Court interpreted the National Bank Act's preemption provision, which allows federally chartered banks to charge rates "allowed by the laws of the State … where the bank is located" or one percent above the federal discount rate, 12 U.S.C. § 85. The Supreme Court held that the National Bank Act allows a federally chartered bank to "'export' the interest rates permitted by the state 'where the bank is located' to out-of-state borrowers, even if the rate charged exceeds the rate permitted by the borrower's state." *Weiser*, 159 F.4th at 700 (citing *Marquette*, 439 U.S. at 301). Because the National Bank Act does not permit states

3

to opt-out of its preemptive effect, *Marquette* precluded Iowa from further efforts to stop interest rate exportation by national banks lending to Iowans. But after *Marquette*, Iowa officials confirmed that, while national banks may charge Iowa borrowers rates allowed by their home state, "[i]f the lender institution is other than a national bank, Iowa law would control."[1] Tam B. Ormiston, Assistant Att'y Gen., Opinion No. 80-3-11, 1980 Iowa Op. Atty. Gen. 624, 1980 WL 25948 (Iowa A.G. Mar. 14, 1980).

When Congress enacted DIDMCA two years after *Marquette* and extended to state-chartered banks the right of interest rate exportation, it provided an important exception not present in the National Bank Act: Recognizing that "[u]sury laws have historically been the prerogative of the States," 126 Cong. Rec. 7069 (1980) (statement of Sen. Robert Morgan), Congress allowed "each State the opportunity to reestablish its usury limitations [with respect to state-chartered banks] if it desires to do so[.]" *Id.* at 6900. Thus, DIDMCA provides that its preemption of state interest rate laws will not apply to loans made in a State where such State opts out "with respect to loans made in such State[.]" 12 U.S.C. § 1831d note (Effective Date).

Iowa immediately opted out of DIDMCA. 1980 Iowa Acts, ch. 1156, § 32.

---

[1] The Amici States in support of Plaintiffs-Appellees are accordingly mistaken when they argue that state regulation of out-of-state banks was "virtually non-existent" when Congress passed DIDMCA. Amicus Br. of the States of Utah and 20 Other States in Support of Appellees and Affirmance at 10, ECF No. 201.

The Iowa General Assembly stated that it "does not want any of the provisions of [DIDMCA] to apply with respect to loans … made in this state" and that its intent was to render DIDMCA "inapplicable" in Iowa. *Id.*

Because Iowa had long made clear that loans made to Iowans by out-of-state lenders (other than national banks) must follow Iowa law, when the Iowa legislature exercised its right to render DIDMCA "inapplicable" in the State, there was no question that it restored to the State the power to enforce its usury laws against out-of-state banks. That understanding is reflected in guidance issued by Iowa officials after Iowa's DIDMCA opt-out. In 1986, the Iowa Consumer Credit Code (ICCC) Administrator considered whether a New York state-chartered bank could make loans to Iowa residents without complying with Iowa law. *See* Linda Thomas Lowe, Assistant Att'y Gen. & Deputy ICCC Adm'r, Iowa Consumer Credit Code Advice on Whether Issuance of Lender Credit Cards to Iowans Requires a License at 4–5 (Sept. 23, 1986).[2] The bank argued that Iowa's DIDMCA opt-out did not permit Iowa to regulate loans made by out-of-state state-chartered banks. *Id.* at 4. The ICCC Administrator expressly rejected that position, concluding that Iowa's opt-out preserved Iowa's authority to apply its consumer credit laws to loans made to Iowa residents. *See id.* (rejecting argument that DIDMCA "preempted any state law … that attempts to restrict or otherwise burden

_____

[2] https://www.iowaattorneygeneral.gov/media/cms/39_B85D4255F6821.pdf.

5

the right of non-Iowa state-chartered banks to impose interest charges at a rate permitted by the state where the bank is located"); *cf. also* Testimony of Jessica Whitney in Support of H.B. 4116 Before the S. Comm. on Lab. and Bus., 83d Or. Legis. Assemb., 2026 Reg. Sess. at 1 (Feb. 25, 2026)[3] (testimony of former ICCC Deputy Administrator that Iowa's DIDMCA opt-out "has protected Iowa consumers … by enforcing state usury limits, *preventing out-of-state banks from charging triple-digit interest*, and ensuring Iowa can set its own lending standards") (emphasis added).

In accordance with Iowa's DIDMCA opt-out, state-chartered banks have generally complied with Iowa law when lending to Iowa consumers. But when they failed to do so, they were required to cease and desist their violations. On some occasions, Iowa sent informal warning letters to urge compliance when it learned that out-of-state lenders were lending to Iowans in violation of its usury law. But the State has also taken public enforcement action to stop usurious lending and to remediate consumers who received loans with interest rates that exceeded Iowa law. Recently, Iowa enforced its usury law against a Utah-based bank and its service provider when they imposed finance charges on Iowa consumers that violated Iowa

---

[3] https://olis.oregonlegislature.gov/liz/2026R1/Downloads/PublicTestimony
Document/253826.

law. Assurance of Discontinuance, *In re Transp. All. Bank, Inc.* (Dec. 13, 2022).[4]

And in general over the decades, Iowa has required out-of-state lenders to comply

with Iowa law when issuing loans to Iowans. *See* Rulings on Whether Loans at

Issue are Subject to Iowa Law, *In re: Cashcall, Inc.*, Nos. 12IDB002, 13IDB001, at

5 (Sept. 26, 2013)[5] (loans by out-of-state non-bank lender are subject to Iowa law).

Defendants-Appellants' interpretation of DIDMCA Section 525 comports

with the interpretation Iowa has long understood and applied since its opt-out in

1980. From that time forward, Iowa's usury laws have applied to loans made to

Iowa residents by banks operating across state lines. Though DIDMCA's text

provides reason alone to reverse the district court's preliminary injunction, the

consistent interpretation of that statute by the only State to have remained opted out

of DIDMCA from its inception also supports reversal. *Cf. Loper Bright*, 603 U.S. at

386 ("The longstanding practice of the government—like any other interpretive

aid—can inform a court's determination of what the law is.") (cleaned up).

## CONCLUSION

For the reasons set forth above and in the Defendants-Appellants' brief, this

Court should reverse the district court's preliminary injunction order.

---

[4] https://www.iowaattorneygeneral.gov/media/cms/TAB_Bank__SOI_Assurance_ of_Disconti_92D5556A9591B.pdf.
[5] https://www.iowaattorneygeneral.gov/media/cms/Ruling_re_Loans_Subject_to_ Iowa_Law_377F6E0B070A6.pdf.

July 15, 2026

Respectfully submitted,

/s/ *Amanda J. Krause*
Amanda J. Krause
Deputy Litigation Director
National Association of Consumer
Advocates
1629 K St NW, Suite 604
Washington, DC 20006
amanda@consumeradvocates.org
(202) 984-7706 ext. 113

*Attorney for Amicus Curiae*
*Thomas J. Miller*

8

## CERTIFICATE OF COMPLIANCE

1.　　This document complies with the type-volume limitations of this Court's April 2, 2026 Order (ECF No. 161) and Federal Rule of Appellate Procedure 29(a)(5) (providing that an amicus brief may be no more than one-half the maximum length of a party's principal brief) because, excluding the parts of the document exempted by Rule 32(f), this text of the document is in 14-point font and the document is 7 pages in length.

2.　　This document complies with the typeface requirements of this Court's April 2, 2026 Order and Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

Dated: July 15, 2026　　　　　　　　　/s/ *Amanda J. Krause*　　　　
　　　　　　　　　　　　　　　　　　Amanda J. Krause

　　　　　　　　　　　　　　　　　　*Attorney for Amicus Curiae*
　　　　　　　　　　　　　　　　　　*Thomas J. Miller*

9