No. 24-1293

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, et al.,
*Plaintiffs-Appellees*,

v.

PHILIP J. WEISER, Attorney General of the State of Colorado, and MARTHA FULFORD, Administrator of the Colorado Uniform Consumer Credit Code,
*Defendants-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
No. 1:24-CV-00812-DDD-KAS
The Honorable Daniel D. Domenico, Judge

_____

**SUPPLEMENTAL BRIEF OF *AMICI CURIAE*
FORMER FDIC BOARD MEMBERS
MARTIN J. GRUENBERG AND RICHARD CORDRAY
IN SUPPORT OF DEFENDANTS-APPELLANTS**

_____

Daniel J. Vedra
VEDRA LAW LLC
1444 Blake Street
Denver, Colorado 80202
dan@vedralaw.com

*Attorney for* Amici Curiae *Martin J. Gruenberg and Richard Cordray*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), amici curiae are individuals and file this brief in their individual capacities.

Dated: July 17, 2026

*/s/ Daniel J. Vedra*
Daniel J. Vedra
*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ ii

TABLE OF CONTENTS ............................................................................................... iii

TABLE OF AUTHORITIES ......................................................................................... iv

INTEREST OF THE AMICI CURIAE ........................................................................ 1

SUMMARY OF ARGUMENT ..................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.     The Text, Structure, Purpose, and History of DIDMCA Demonstrate that
       the State Where a Loan Is Made Cannot Be Equated with the State Where
       the Lending Bank Is Located................................................................................. 3

       A.     Statutory Text and Structure. ....................................................................... 4

              1.     The premise that a loan is made only by a bank is incorrect. ............ 5

              2.     The premise that a loan is only made where a bank is located is
                     wrong. ................................................................................................ 7

                     (a)     The statutory structure indicates that the state where a
                             loan is made under Section 525 cannot be equated with
                             the state where the bank is located under Section 521............ 7

                     (b)     The statutory text reinforces the difference between
                             the terms. .............................................................................. 9

                     (c)     Even if a loan were made only by the bank, it would not
                             follow that the loan is made where the bank is "located.".... 11

       B.     The Purpose and History of Section 525................................................... 12

II.    Plaintiffs-Appellees' Remaining Authorities Are Inapposite. ............................. 13

III.   If Any Ambiguity Were Found in Construing the Statute, the Presumption
       Against Preemption Would Dictate the Same Result............................................ 14

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**

*Abramski v. United States*, 573 U.S. 169 (2014) ................................................................ 4

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) ................................................................ 14

*A.S. Goldmen & Co. v. New Jersey Bureau of Securities*,
   163 F.3d 780 (3d Cir. 1999) ................................................................................................ 9

*Bates v. United States*, 522 U.S. 23 (1997) .................................................................... 7, 8

*Boston Univ. v. Mehta (In re Mehta)*, 310 F.3d 308 (3d Cir. 2002) ................................. 5

*Calcasieu-Marine National Bank v. American Employers' Insurance Co.*,
   533 F.2d 290 (5th Cir. 1976) ................................................................... 5, 6, 7, 11

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103 (1983) ............................................... 4

*Gen.l Motors Acceptance Corp. v. Mid-West Chevrolet Co.*,
   66 F.2d 1 (10th Cir. 1933) .................................................................................... 5

*Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir. 1992) .......................... 14

*Holmes, Booth & Haydens v. Willard*, 5 N.Y.S. 610 (S. Ct. N.Y. 1889) ........................ 7

*Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195 (10th Cir. 2000) ............... 10

*In re Chambers*, 348 F.3d 650 (7th Cir. 2003) .................................................................. 5

*In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914) ........................................................... 5

*Jessup v. Pulaski Bank*, 327 F.3d 682 (8th Cir. 2003) .................................................... 14

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*,
   439 U.S. 299 (1978) ........................................................................................ 3, 13

*Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658 (D.C. Cir. 1994) ................................... 7

*Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) .................................... 9

*NLRB v. Nat. Gas Util. Dist.*, 402 U.S. 600 (1971) .......................................................... 4

*Profetto v. Lombardi*, 137 A.3d 922 (Conn. App. 2016) .................................................. 7

*Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir. 2008) ................................. 7, 10, 11

*Russello v. United States*, 464 U.S. 16 (1983) ................................................................... 8

*South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018)........................................................ 12

*Tyler v. Cain*, 533 U.S. 656 (2001) .................................................................... 4

*United Va. Factors Corp. v. Aetna Cas. & Sur. Co*., 624 F.2d 814 (4th Cir. 1980) ........... 5

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................ 12

**FEDERAL STATUTES**

12 U.S.C. § 85 ................................................................................................ 3, 4

12 U.S.C. § 4742 ............................................................................................. 6

**Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA)**

Pub. L. No. 96-221, 94 Stat. 132 .................................................................... 1

Section 521 (codified at 12 U.S.C. § 1831d)............................. 1, 2, 3, 4, 7, 8, 9, 11, 12, 13

Section 525 (codified at 12 U.S.C. § 1831d note)............. 1, 2, 4, 6 ,7, 8, 11, 12, 13, 14, 15

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

**Federal Deposit Insurance Corporation (FDIC)**

FDIC Advisory Opinion No. 88-45, Relationship of State Usury Preemption Laws, 1988 WL 583093 (June 29, 1988) ................................................................. 8

FDIC General Counsel's Opinion No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27,282 (May 18, 1998) .......................................................... 14

Federal Interest Rate Authority (Final Rule), 85 Fed. Reg. 44,146 (July 22, 2020)........... 8

**COURT RULES**

**Federal Rules of Appellate Procedure**

Fed. R. App. P. 26.1 ........................................................................................ii

Fed. R. App. P. 29 ........................................................................................... 1

Fed. R. App. P. 32 .......................................................................................... 17

**Tenth Circuit Rules**

10th Cir. R. 25.5 ............................................................................................. 18

**INTEREST OF THE AMICI CURIAE**

Amici curiae Martin J. Gruenberg and Richard Cordray are former members of the Federal Deposit Insurance Corporation (FDIC) Board of Directors. Mr. Gruenberg served from 2005 to 2025, was the Chairman twice (2012-2018 and 2023-2025), and was the Acting Chairman on three other occasions. Mr. Cordray served on the Board and as the Director of the Consumer Financial Protection Bureau from 2012 to 2017.[1]

The amici curiae are interested in this case because the FDIC's former interpretation of Section 525 of the Depository Institutions Deregulation and Monetary Control Act (DIDMCA)[2] has now been abandoned without explanation by the FDIC's current political leadership. Its newly minted interpretation conflicts with its prior interpretation and is inconsistent with Section 525's text, structure, purpose, and history.

**SUMMARY OF ARGUMENT**

In 1980, Congress enacted DIDMCA by adding Section 521 to the Federal Deposit Insurance Act, which permits state banks to charge interest not to exceed the highest of two different rates: a federal rate, and the rate permitted by the state where the "bank" is "located." Congress also added Section 525, which permits a state to opt out of Section 521's interest-rate regime with respect to "loans made" in that state. The district court incorrectly interpreted Section 525 to mean that a loan is made in the state where the bank is located under Section 521, premised on the notion that a loan is only made by the bank, without any contribution from the borrower. On appeal, the panel correctly interpreted the statute to conclude that where a loan is made under Section 525 cannot be equated *solely* with where a bank is located under Section 521.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae or their counsel has made a monetary contribution to its preparation and submission. Fed. R. App. P. 29(a)(4)(E). Both parties consented to the filing of this brief.
[2] Pub. L. No. 96-221, § 525, 94 Stat. 132, 167 (1980).

First, the text belies any claim that the plain meaning of "loans made in such State" is that a loan is made solely in the state where the bank is located. The phrase has two key terms: "loans" and "made." The notion that a loan is made *only* by the bank flouts the accepted meaning of both terms. A "loan" is a contract between a lender and a borrower; both are necessary co-participants. To "make" is defined as to "cause to exist, occur, or appear." The bank is not the only "cause" that brings a loan into existence; a borrower is essential as well. The district court erred by unduly relying on the fact that a loan is made "by" a bank, yet Section 525 never uses the word "by" to modify the verb "made." As the panel noted, it is common to say that a loan is made by a bank to a borrower, but just as common to say that a "loan" is "made between" a bank and a borrower – a contract between two parties with specific legal obligations on both sides.

Second, the statutory structure undercuts the claim that the state where a "loan" is made under Section 525 is the state where the "bank" is located under Section 521. The statutes use different language, and basic principles of statutory construction require the two distinct usages – "loans made in such State" and "the bank is located" – to be given different meanings. Congress could have referred in Section 525 to the state where the bank is located, as it did in Section 521. But Congress did not write the law that way, and courts should refrain from equating the distinct terms used in the two provisions.

Third, even if the premise that a loan is made only by the bank were correct, the conclusion that a loan is only made where the bank is located does not follow, since the location of the "maker" is not dispositive of where something is "made." Decisions interpreting the dormant Commerce Clause confirm by analogy that interstate loans are made in *both* the borrower's state *and* the lender's state.

Fourth, the court's interpretation also conflicts with the statute's purpose and

2

history, which afford all affected states a meaningful right of opt-out from the rate available under the law of the state where the lending bank is located.

Even if the statute were ambiguous (which it is not), the presumption against preemption, which governs federal-state relations under the Constitution, yields the same outcome – here reinforced by Congress's explicit decision to preserve the ability of the states to opt out from the cap on interest rates otherwise provided by federal law.

In sum, this amici curiae brief addresses four of the six questions directly posed by the *en banc* court. The first two questions, when properly analyzed, support the panel's conclusion that "loans made in such state" unambiguously refers to any loan in which *either* the lender *or* the borrower is located in the opt-out state. As for the fifth and sixth questions, even if the court were to find some ambiguity here, the well-established constitutional presumption against preemption dictates the same result.

## ARGUMENT

I. **The Text, Structure, Purpose, and History of DIDMCA Demonstrate that the State Where a Loan Is Made Cannot Be Equated with the State Where the Lending Bank Is Located.**

National banks can charge interest on their loans at a specific federal rate or at the maximum rate allowed by the state where the bank is "located," whichever is greater. 12 U.S.C. § 85. Before 1980, national banks had a competitive advantage because they could charge a higher rate than most state banks. In 1978, the Supreme Court also allowed national banks to "export" the interest rate of the state where the bank is "located" to loans made to borrowers residing in states with lower interest-rate caps. *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978).

In 1980, Congress enacted Section 521 of DIDMCA to end this competitive advantage and ensure parity between state and national banks. Section 521 permits

state banks to charge the same rates as national banks can charge under Section 85. Section 521 also expressly preempts any contrary state law. But DIDMCA was not concerned solely with parity between state and national banks. To preserve principles of federalism, Congress enacted Section 525, enabling each state to render Section 521 inapplicable with respect to any "loans made in such State." By contrast, states may not opt out of Section 85. Congress thus expressly created a system where parity can be eliminated by a state deciding to invoke its statutory opt-out rights under Section 525.

This case concerns the scope of those opt-out rights, which depends on *where* "loans" are "made." The phrase "loans made in such State" is interpreted as a matter of federal law.[3] The tools guiding that statutory interpretation (text, structure, purpose, and history) contradict the claim that the state where a loan is made under Section 525 is the state where the lending bank is located under Section 521.

A.      **Statutory Text and Structure.**

The statutory text and structure do not support the proposition that the plain and ordinary meaning of "loans made in such State" is that a loan can *only* be made in the state where the bank is located. To begin, the phrase "loans made in such State" has two key terms: "loans" and "made." While courts agree on the definition of "loans" (discussed more fully below), the term "'made' has several alternative meanings," which must be interpreted in "context" and "with a view to [its] place in the overall statutory scheme." *Tyler v. Cain*, 533 U.S. 656, 662 (2001). When courts interpret terms in their statutory "context," they must look to the surrounding words and to the statute's "structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169,

---

[3] *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *NLRB v. Nat. Gas Util. Dist.*, 402 U.S. 600, 603 (1971). The parties agree on this point.

179 (2014). Here, all textual and contextual clues contradict the two flawed premises that the loan is made only by the bank and is made only where the bank is located.

> 1.     **The premise that a loan is made only by a bank is incorrect.**

As the district court noted, it is common to say that a loan is made by a bank, but that does not support the further gloss that a loan is *only* made by a bank, without any contribution from the borrower. To the contrary, the "classic definition of a loan" adopted by virtually all courts to address the issue (including this Court) is "a *contract* by which [1] one delivers a sum of money to another and [2] the latter agrees to return at a future time a sum equivalent to that which he borrows." *Calcasieu-Marine Nat'l Bank v. Am. Emp. Ins. Co.*, 533 F.2d 290, 296-97 (5th Cir. 1976) (emphasis added). A loan is thus a "contract" between a lender (who delivers money to another) and a borrower (who agrees to repay it). The borrower's role is essential, as it alone can perform the second action – *i.e.*, make the "agree[ment] to return" the sum borrowed. *Id*. These principles have deep roots in the law. *See Gen. Motors Acceptance Corp. v. Mid-W. Chevrolet Co.*, 66 F.2d 1, 5 (10th Cir. 1933) ("A loan of money involves *an absolute agreement to return* the sum borrowed.") (emphasis added).[4]

Under this definition, the borrower is not a mere passive recipient of money but an active participant in contract formation. Without a borrower, there is no agreement to repay, and therefore no loan. Focusing solely on the bank erroneously equates the loan with lending (*i.e.*, with the first part of the definition of a loan),

---

[4] *Calcasieu-Marine* adopted the "classic" definition of a "loan" from *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914). This Court adopted the same definition in *Gen. Motors Acceptance Corp.*, as have other courts. *See, e.g., In re Chambers*, 348 F.3d 650, 656-57 (7th Cir. 2003) (adopting *Grand Union*'s definition); *Boston Univ. v. Mehta (In re Mehta)*, 310 F.3d 308, 313 (3d Cir. 2002) (same); *United Va. Factors Corp. v. Aetna Cas. & Sur. Co.*, 624 F.2d 814, 816 (4th Cir. 1980) (same).

overlooking the equally necessary second component of that definition focused on the borrower's part in the making of the loan.

To be sure, as the district court noted, Congress often refers to banks making loans. But those references do not preclude the existence of an indispensable co-maker (the borrower). They thus are fully consistent with the classic definition of a "loan," under which both the bank and the borrower must participate in the making of the loan. Furthermore, as the definition of "loan" shows, "[a] loan of money is a contract." *Calcasieu-Marine,* 533 F.2d at 296-97. Under legal usage or simple common sense, a contract – including a loan – is "made" by both parties, not one party alone. It is not "common" – indeed it is impossible – to have a loan of money without a borrower.

The meaning of "made" reinforces the conclusion compelled by the meaning of "loan." A loan is "made" by a bank, which "cause[s]" it "to happen," "to exist, occur or appear." *Tyler*, 533 U.S. at 662. But the bank is not the only "cause" necessary to bring the loan into existence; a loan has *two* causal agents – the bank and the borrower – and both are necessary to produce a loan. Thus, a loan is also made by a borrower because the borrower "cause[s]" it "to happen," "to exist, occur or appear." *Id.* As the panel observed, the word "made" here most naturally functions as a participial adjective phrase that modifies the word "loans." See Op. at 36-37, 47, 52.

The district court stated that a loan is made "by a bank to a borrower," and pointed to other provisions in Title 12, such as 12 U.S.C. § 4742(4), where Congress referred to loans made "by" a bank. But as the panel noted, Section 525 does not use the word "by" to modify the verb "made." The other provisions cited thus actually undermine reliance on the word "by" because they underscore the fact that Congress omitted that modifier in Section 525. Therefore, it would be error to add a limitation

6

that Congress did not impose. *See, e.g.*, *Bates v. United States*, 522 U.S. 23, 29-30 (1997) (courts presume that Congress did not intend for omitted language to apply).

While it is common to say that a loan is made *by* a bank to a borrower, it is just as common to say that a "loan" is made "between" a lender and a borrower. For example, courts have referred to "loans made between the parties during [their] marriage,"[5] to "loans made between 'related' organizations,"[6] or to "a loan made between the plaintiff and the carbon company."[7] Congress's omission of a "by" modifier for the term "loans made" in Section 525 renders the term equally capable of being read with a "between" modifier – fully consistent with the definition of a loan as a "contract" between a lender and a borrower. *Calcasieu-Marine,* 533 F.2d at 296-97.

Just like the modifier "between," the modifier "with" confirms that the borrower is a co-participant in the making of the loan. For example, this Court referred to an online lender who "choose[s] to make payday loans *with* Kansas consumers." *Quik Payday Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008). The lender thus does not make the loans in isolation but rather does so together "with" the borrower.

      2.     **The premise that a loan is only made where a bank is located is wrong.**

          **(a)**    **The statutory structure indicates that the state where a loan is made under Section 525 cannot be equated with the state where the bank is located under Section 521.**

The statutory structure rebuts the claim that the state where a "loan" is "made" under Section 525 is only the state where the "bank" is located under Section 521. As the FDIC explained as amicus below, the two statutes use very different language, and established principles of statutory construction require that their distinct terms – "loans

---

[5] *Profetto v. Lombardi*, 137 A.3d 922, 924 (Conn. App. 2016).
[6] *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994).
[7] *Holmes, Booth & Haydens v. Willard*, 5 N.Y.S. 610, 611-12 (S. Ct. N.Y. 1889).

made in such State" and "the bank is located" – cannot be equated but must be given different meanings. *Russello v. United States*, 464 U.S. 16, 23 (1983). Had Congress intended to refer in Section 525 to the state where the bank was located, it presumably would have done so, as it did in Section 521. "The short answer is that Congress did not write the statute that way," and courts should thus "refrain from concluding ... that the differing language in the two subsections has the same meaning." *Id.* "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates*, 522 U.S. at 29-30.

The FDIC addressed this issue in 1988 and reached the same conclusion as the panel did here, on the same grounds: use of different terms in the two sections compels the conclusion that the state where a loan is made under Section 525 cannot be equated with the state where a bank is located under Section 521. *See* FDIC Advisory Opinion 88-45, *Relationship of State Usury Preemption Laws*, 1988 WL 583093 (June 29, 1988) (1988 Interpretive Letter). The FDIC specifically considered, and rejected, the construction proposed by a bank that the state where a loan is made under Section 525 is the state where a bank is located under Section 521. *See id.*

In 2020, the FDIC also distinguished between the state where a bank is located and the state where a loan is made. In the preamble to a final rule, the FDIC explained that a bank would not be permitted to charge the "higher" rate permitted by the state where the bank is located for loans made in a state that has opted out, which indicates that the opting-out state can be distinct from the state where the bank is located. *See* Federal Interest Rate Auth., 85 Fed. Reg. 44,146, 44,153 (July 22, 2020) (Final Rule) ("if a State opts out …, State banks making loans in that State could not charge [under

8

federal law] interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate").

### (b) The statutory text reinforces the difference between the terms.

The statutory text reinforces the distinction between the two terms suggested by the structure of the statute, indicating that the location of the bank is not the sole determinant of where a loan is made.

First, because a loan is a "contract" between a lender and a borrower, it follows that the borrower's location determines where the loan is made just as much as the bank's location. Indeed, the courts find the bank's location relevant precisely because the bank is involved in making the loan. But as shown above, both borrower and lender are actively involved in – and necessary for – creating a loan. So, both parties' locations matter and it would be artificial (and wrong) to select just one location.

Second, cases examining where loans are made confirm that the borrower's location informs where a loan is made just as much as the bank's location. When parties enter into a loan transaction in the same state, the loan is "made" in that state. *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010) (where Indiana borrower traveled to lender's state (Illinois) to enter into the loan, "contract was, in short, made and executed in Illinois"). But when the parties enter into a loan transaction in two states – as when a borrower physically present in one state transacts by mail, phone, or internet with an out-of-state lender – such transaction is made in both states, and both can regulate it: "When an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract." *A.S. Goldmen & Co. v. N. J. Bur. of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999).

In *Quik Payday*, an online lender located in Utah argued that Kansas could not regulate its loans to Kansas residents where it had no physical presence. *See* 549 F.3d at 1308. This Court expressly rejected that argument because out-of-state internet lenders "choose to make payday loans with Kansas consumers while [the consumers] are in Kansas," thus the transaction at least partly happens in Kansas, negating any violation of the dormant Commerce Clause. *Id*. As this Court explained, the "controlling" fact was that Kansas law only applied if the borrower was located in Kansas at the time it entered into the loan. *Id*.

Plaintiffs-Appellees seek to distinguish *Quik Payday* and other cited cases on the ground that they concern the separate issue of when one state can constitutionally regulate an activity involving conduct that occurs in another state. But the distinction is flawed because the conduct alleged to have occurred in another state was *precisely* the making of the loan. Therefore, these cases do inform *where* loans are made. They establish that in interstate transactions, the making of a loan does not occur solely in the out-of-state lender's state, but also in the borrower's state, which thus can regulate it. There is no basis to distinguish the reasoning in those cases from the analysis here.

It has been suggested that even if a contract is made "where the lender and the borrower are located," that principle does not apply because a loan is not a contract. The district court noted, for example, that "the contract or 'commitment to make [a] loan' may be entered into at a different time than the 'loan is made,'" implying that the commitment to lend is "the contract" and the loan is not. *See* App. 460 (Vol. II). This view is incorrect: a "commitment to make a loan" is an agreement to lend, not the loan itself, nor is it the "loan contract." It is just a different contract. *See Homestead Golf Club, Inc. v. Pride Stables*, 224 F.3d 1195, 1200-01 (10th Cir. 2000) (where "letter of

10

commitment" "stated explicitly the parties' intent to document the details of their arrangement in writing at a later time," it was not the loan contract itself). Far from establishing that a loan is not a contract, the "commitment" language in Section 525 merely reflects the unremarkable distinction between two *different* contracts: the commitment to lend and the actual loan itself.

Second, the notion that a loan is not a contract is mistaken. Nothing in Section 525 shows Congress to be deviating from the settled understanding of a loan as a contract. *See Calcasieu-Marine*, 533 F.2d at 296-97 ("loan of money is a contract"). In any event, *Quik Payday* and its ilk involved actual loans, not mere loan commitments; their holdings apply to the loans themselves, not just the contract to enter into a loan.

Moreover, under Section 521, a bank can be "located" in a state even if it performs *none* of the three lending functions related to making the loan in that state. For example, where the three functions (loan approval, extension of credit, and disbursal of loan proceeds) occur in three different states, the bank can be deemed to be located in any of *four* states: the states where a lending function is performed *and* its home state (even if no lending function occurs there). Regulators permit banks to charge the highest rate permitted by any of the states; three have some connection to the making of the loan, but the fourth (the bank's home state) has none. Although the bank remains located in its home state, under any definition the loan is not made there.

**(c)** **Even if a loan were made only by the bank, it would not follow that the loan is made where the bank is "located."**

Most importantly, even accepting *arguendo* the premise that a loan is made *only* by the bank, that premise does not support the conclusion that the bank's location determines where the loan is made. The realities of modern commercial life reject the

11

court's inference that things are necessarily "made" in the place where their maker is located. Take sellers for example. In ordinary parlance, sellers make a sale and buyers make a purchase. But the Supreme Court has held that a sale occurred in the buyer's state even if the seller was an online retailer with no physical presence there, which allows the buyer's state to regulate it without violating the dormant Commerce Clause. *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 176-77 (2018). Thus, just as a seller can make sales in the buyer's state even if the seller is not located there, so can a lender make loans in the borrower's state even if the lender is not located there.

B.      **The Purpose and History of Section 525.**

Plaintiffs-Appellees' interpretation also conflicts with DIDMCA's purpose and history. Congress enacted Section 521 to enable state banks to compete with national banks by allowing them to charge the same rates as national banks, including the rate permitted by the state where the lending bank is "located," and preempting potentially applicable state laws imposing lower rates. But Congress balanced that economic objective with Section 525 and its federalism objective of enabling states to maintain a meaningful measure of control over usury rates by opting out of the preemption imposed by Section 521. An interpretation depriving borrowers' states of the ability to regulate interest rates would conflict with the federalism concerns of Section 525.

The legislative history of Section 525 confirms that Congress wanted to provide all states "affected" by Section 521 with a meaningful opportunity to override Section 521's preemption of their state "usury ceilings." Affected states include not only the state where the lender is located (whose usury caps can be exceeded when the federal rate is greater), but also the state where the borrower is located (whose caps can be exceeded through the federal rate and by exporting the lender's state's rate). It would

12

be odd to permit opt-out rights only for *some* states affected by preemption – *i.e.*, the state where the lender is located – that have the *least* interest in protecting borrowers in other states, whereas the core purpose of state usury ceilings is to protect borrowers.

The argument that Section 525 was not intended as a tool to enable opt-out states to reach into other states is also unavailing. Opting out does not enable a borrower's state to apply its laws extraterritorially: instead, it simply renders Section 521 inapplicable to loans made within the borrower's state. Under the dormant Commerce Clause, a loan transaction between a borrower that is physically present in the state and an out-of-state lender occurs at least partially in the borrower's state, and hence does not reach extraterritorially into other states.

## II.    Plaintiffs-Appellees' Remaining Authorities Are Inapposite.

Plaintiffs-appellees' other authorities fail because they address where a bank is located under Section 521, not where a loan is made under Section 525.

The Supreme Court's pre-DIDMCA decision in *Marquette* is inapposite because it did not assess where the loan was made – it did not use that term or address that concept. Rather, *Marquette* addressed where a national bank is located for purposes of Section 85 (after which Section 521 was later patterned). *See* 439 U.S. at 310.

Like *Marquette*, FDIC General Counsel's Opinion 11 is inapposite because it addressed where a *bank* is "located" for purposes of Section 521, not where a *loan* is "made" for purposes of Section 525. *Marquette* suggested that a bank is located in the state named in its certificate of incorporation, but other courts had held that it is also located wherever it has a branch, and it was unclear which location should govern under Section 521. Opinion 11 thus devised a test to determine a bank's location for purposes of Section 521 based on where it performs the three lending "functions"

related to the making of a loan. *See* 63 Fed. Reg. at 27,283-86. But Opinion 11 did not even address Section 525, and the word "made" has a different context there.[8]

The FDIC's strenuous gymnastics in its about-face brief filed at this *en banc* stage undermine its reliability. It tries and fails to wave away the FDIC's 1988 reversal of its 1983 interpretation of the statute, which was prompted not by a change of administration but rather by a more careful and thoughtful analysis of the statutory text, structure, and purpose. And it seizes on a stray comment from a 1992 FDIC amicus brief without addressing the more thorough analysis from the FDIC briefs filed earlier in this case, which it makes little effort to refute. Its rendering of the text of Section 525 ("loans made in such State") simply assumes its desired conclusion by smuggling in nonexistent language (loans that "banks make"), and is devoid of any textual support.

III.    **If Any Ambiguity Were Found in Construing the Statute, the Presumption Against Preemption Would Dictate the Same Result.**

Finally, even if the statute here were ambiguous, the presumption against preemption would dictate the same outcome. *See Altria Grp. v. Good*, 555 U.S. 70, 77 (2008). Moreover, when "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 565 (2009). As the panel noted, the statute here implicates two areas "'squarely within the ambit of the states' historic powers – banking and consumer protection.'" Op. at 33-34 (quoting *Greenwood Tr. Co. v. Massachusetts*, 971 F.2d 818, 828 (1st Cir. 1992)).

---

[8] *Jessup v. Pulaski Bank*, 327 F.3d 682, 685 (8th Cir. 2003), involved a different statute (12 U.S.C. § 1831u(f)) enacted long after DIDMCA, with a distinct structure and serving a distinct purpose. That court did not analyze the term "made," cite the 1988 Interpretive Letter, or address any of the arguments made in this brief showing why the state where the loan is made cannot be equated with the state where the lending bank is located.

Here Congress reinforced the presumption against preemption by explicitly preserving the states' ability to take subsequent action to opt out from the cap on interest rates otherwise provided by federal law and preserve their traditional authority over interest rate caps.[9] Colorado did so here, and even if the court were to find any ambiguity in the statute, then the state's choice, expressly reserved by Congress, reinforces the bedrock presumption against preemption to affirm the panel's decision.

## CONCLUSION

For the reasons stated, the *en banc* court should adopt the most natural textual interpretation of Section 525, which the FDIC initially rendered in this case before changes in agency personnel led to an unexplained departure from that interpretation, and should reverse the ruling issued by the district court.

Dated:  July 17, 2026                                           Respectfully submitted,

                                    */s/ Daniel J. Vedra*
                                    Daniel J. Vedra
                                    VEDRA LAW LLC
                                    1444 Blake Street
                                    Denver, Colorado
                                    Dan@vedralaw.com
                                    303-937-6540

                                    *Attorney for Amici Curiae*
                                    *Former FDIC Members*

---

[9] The panel also noted that alternative readings urged by Plaintiffs-Appellees as potential limitations on the opt-out provision produce absurdities, such as disfiguring the provision into an oddly truncated rump measure and empowering the state only to disadvantage its own banks for loans made to out-of-state borrowers. *See* Op. at 43-44, 58-59.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2026, I electronically filed a copy of the foregoing Supplemental Brief of Amici Curiae Martin J. Gruenberg and Richard Cordray with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: July 17, 2026                          */s/ Daniel J. Vedra*
                                              Daniel J. Vedra
                                              *Counsel for Amici Curiae*

16

## CERTIFICATE OF COMPLIANCE

This brief complies with the amici curiae type-volume limitation of Fed. R. App. P. 32 because it contains 15 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 13-point font.

Dated: July 17, 2026                          */s/ Daniel J. Vedra*
                                              Daniel J. Vedra
                                              *Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to filed additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, and according to the program are free of viruses.


 Dated: July 17, 2026                    */s/ Daniel J. Vedra*
                                          Daniel J. Vedra
                                          *Counsel for Amici Curiae*