No. 24-1293

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, AMERICAN FINANCIAL SERVICES ASSOCIATION, and AMERICAN FINTECH COUNCIL,

*Plaintiffs-Appellees,*

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado, and MARTHA FULFORD, in her official capacity as Administrator of the Colorado Uniform Consumer Credit Code,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Colorado
Case No. 1:24-cv-00812-DDD-TPO, Hon. Daniel D. Domenico

### PLAINTIFFS-APPELLEES' SUPPLEMENTAL EN BANC REPLY BRIEF

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
350 S Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800
mattladew@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

DAVID M. GOSSETT
ANGELENE SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
angelenesuperable@dwt.com

TEAL LUTHY MILLER
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
tealmiller@dwt.com

*Attorneys for Plaintiffs-Appellees*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

GLOSSARY ..................................................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I. The phrase "loans made in such State" in Section 525 does not refer to "an executed loan" or extend to "loans in which either the lender or the borrower is located in the opt-out state." ........................... 2

  A. A loan is "made" at the bank's location, not wherever the borrower executes loan documents. .................................................3

  B. Loans are not "made" where the borrower is located merely because borrowers are involved in the transaction. .......................5

  C. Redefining where loans are "made" to include the borrower's location undermines DIDMCA's purpose.....................6

II. The phrase "the State … where the bank is located" in Section 521 helps demonstrate that "loans made in such State" in Section 525 refers to loans made in the state where the bank is located. ........... 8

III. DIDMCA's enactment history shows that "loans made in such State" refers to loans made in the state where the bank is located...... 11

IV. Longstanding regulatory guidance reflects that "loans made in such State" refers to the state where the bank is located. .................... 13

V. The phrase "loans made in such State" unambiguously refers to loans made in the state where the bank is located, and no presumption against preemption applies here. ................................... 15

CONCLUSION.................................................................................................. 15

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ............. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*EagleMed LLC v. Cox,*
   868 F.3d 893 (10th Cir. 2017) .................................................................... 15

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ........................................................................... 13, 15

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
   439 U.S. 299 (1978) ........................................................................ 2, 3, 11

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
   579 U.S. 115 (2016) ................................................................................. 15

**Federal Statutes**

Depository Institutions Deregulation and Monetary Control Act of
   1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132 (1980) ...................*passim*

   DIDMCA § 521, 12 U.S.C. § 1831d .....................................................*passim*

   DIDMCA § 525, 12 U.S.C. §1831d note, 94 Stat. 167 .........................*passim*

National Bank Act, 12 U.S.C. § 85 ...........................................................*passim*

National Housing Act, 12 U.S.C. § 1701 *et seq.* ....................................... 1, 4, 5

   12 U.S.C. § 1735f-7a .............................................................................1

**Regulations**

FDIC Opinion Letter No. 11 on Interest Charges by Interstate Banks,
63 Fed. Reg. 27282 (May 18, 1998) ..................................................... 15

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) ...................... 14

FDIC Interp. Ltr. No. 88-45, 1988 WL 583093 (June 29, 1988) .................... 14

OTS Ltr., 1986 WL 290314 (June 27, 1986) ................................................ 14

**Legislative History**

*Usury Lending Limits, Hearing on S. 1988 Before the Comm. on
   Banking, Hous. & Urb. Affs.,* 96th Cong. 1, 5 (1979) ................................ 13

**GLOSSARY**

| | |
|---|---|
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) |
| FDIC | Federal Deposit Insurance Corporation |
| NBA | National Bank Act, 12 U.S.C. § 21 *et seq.* |
| NHA | National Housing Act, 12 U.S.C. § 1701 *et seq.* |
| OCC | Office of the Comptroller of the Currency |

Note: We cite documents in this litigation as follows:

- The panel opinions (ECF 126-1) as Op. __ and Dissent __.
- The district court's opinion, App.Vol.II.P.442-69, as DCt. Op. __.
- Plaintiffs-Appellees' Opening Brief (ECF 77) as Appellees' Br. __.
- Plaintiffs-Appellees' Supplemental Brief (ECF 183) as Supp. Br. __,
- Defendants-Appellants' Supplemental Brief (ECF 224) as Colo. Supp. Br. __.
- *En banc* amicus briefs:
  o American Bankers Association, Bank Policy Institute, Consumer Bankers Association, America's Credit Unions, and 52 State Bankers Associations (ECF 194) as Indus. Amici Br. __.
  o Federal Deposit Insurance Corporation (ECF 197) as FDIC Br. __;
  o Office of the Comptroller of the Currency (ECF 205) as OCC Br. __;
  o States in Support of Appellants (ECF 230) as Colo. States Br. __;
  o Bell Policy Center (ECF 248) as Bell Br. __
  o Former FDIC board members Martin J. Gruenberg and Richard Cordray (ECF 256) as Gruenberg Br. __

All page numbers are to #s at the bottom of the page, not ECF numbering.

**INTRODUCTION**

Colorado's supplemental brief confirms the fundamental flaws with its argument—that it reads Sections 521 and 525 differently despite their overlapping language; and that, under any reading of Section 525, Colorado cannot restrict the interest rates charged by out-of-state *national* banks to borrowers in Colorado. Read correctly, Section 525 does not give Colorado authority to prevent out-of-state *state* banks from charging the same rates as out-of-state *national* banks when lending to Colorado borrowers. It allows Colorado to decline the parity regime for loans made by its own state-chartered banks—not to deny competitive parity to state banks chartered elsewhere.

That understanding flows from the text and structure of DIDMCA, as well as federal banking law's longstanding understanding of where loans are made. Section 521 ties the permissible rate on a loan to the State "where the bank is located." Section 525 does not create a free-standing borrower-based limitation on that rule; it allows a State to reject "the amendments made by section[] 521" only "with respect to loans made in such State." Read together, these provisions refer to the same loans and the same geographic concept— loans made by banks in the state where those banks make them. If Congress had intended Section 525 to turn on where a borrower signs papers or receives credit, it knew how—it did so in the National Housing Act's opt-out for loans "made or executed" in a State, 12 U.S.C. § 1735f-7a, enacted shortly before.

1

Federal banking law has long provided that a loan is made where the bank makes it—whether the borrower applies in person, by mail, or electronically. In *Marquette*, the Supreme Court recognized that interstate lending allows borrowers to obtain credit remotely. But it made no suggestion that remote borrowing changes where the loan is made. To the contrary, the Court explained that although Minnesota customers could obtain credit while physically outside Nebraska, the credit was nevertheless "extended by Omaha Bank in Nebraska." *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311–12 (1978). DIDMCA did not alter that settled understanding.

Section 525 does not change where a loan is made, and it does not authorize an opt-out state to regulate the interest rates charged by either state or national banks *in other states*. A state may decline parity for its own state banks; it may not use Section 525 to deny state banks in other states competitive parity with national banks in those states. Colorado concedes that its opt-out cannot restrict out-of-state national banks. Its contrary reading of Section 525 would therefore only serve to discriminate against out-of-state state banks. The Court should reject that interpretation.

## ARGUMENT

**I.    The phrase "loans made in such State" in Section 525 does not refer to "an executed loan" or extend to "loans in which either the lender or the borrower is located in the opt-out state."**

As Plaintiffs' supplemental brief demonstrates (at 2–16), Congress

understood that a loan is "made" in the same place under Section 525 of DIDMCA as it is under Section 521 of that statute, under Section 85 of the NBA, under countless other banking statutes in Title 12, and in common parlance: At the bank. The term "loans made" is not synonymous with the phrase "executed loans," and Congress did not use that phrase in Section 525 in order to drastically redefine where (and by whom) a loan is made. The State's fragmented responses are unpersuasive.

### A. A loan is "made" at the bank's location, not wherever the borrower executes loan documents.

A loan is "made" where the bank makes the loan—namely, *at the bank's location*. *See* Supp. Br. 9–10. This is true whether the borrower walks into the bank and signs a loan application and other required loan documents in person, mails those documents to the bank (as in *Marquette*), or sends them to the bank electronically through a mobile app or website. In each case, the bank performs a series of loan-making functions at the bank's location that culminate in the bank disbursing the loaned funds. The borrower's location is irrelevant to where the bank performs these loan-making functions and, thus, to where the loan is made. The fact that a loan is made at (and by) the bank is precisely why the bank's location determines the applicable interest rate under federal banking statutes stretching back more than 150 years.

Brushing aside that history, Colorado begins by endorsing the majority's

3

reliance on dictionary definitions to argue that "loans made" as used in Section 525 should be read to mean "executed loans" and that a loan is therefore "made" (for purposes of Section 525 alone) in any state where either the bank *or the borrower* executes loan documents. *See* Colo. Supp. Br. 3–6; Op. 36–39.

But Congress knows how to refer to loans "executed" in a state, and it does not treat "executed" as synonymous with "made." The NHA interest-rate preemption opt-out Congress enacted months before DIDMCA applied to loans "made *or executed*" in the opt-out state. *See* Supp. Br. 10–11.[1] Unable to deny that this example proves that "made" and "executed" have different meanings, Colorado attempts to distinguish between the state(s) where the parties are "located" (which it asserts is where the loan is "made") and the state(s) where the loan is "executed." Colo. Supp. Br. 12. But under Colorado's interpretation of "made," borrowers are located where they execute the loan agreement; if "made" includes the borrower's location, the inclusion of "executed" in the NHA is surplusage. Recognizing that loans are "made" by and at the bank— regardless where the borrower executes loan documents—avoids this.[2]

---

[1] Colorado attempts to distinguish the NHA from DIDMCA based on the type and "formality" of loans issued by banks versus mortgage lenders. *See* Colo. Supp. Br. 12 n.5. Regardless why Congress decided a different opt-out standard should apply to the NHA, Section 525 does not look to where loans are "executed"—and the majority erred by concluding otherwise.

[2] Dormant commerce clause cases Colorado's amici cite, *e.g.*, Gruenberg Br. 10; Colo. State Amicus 6–7, shed no light on the meaning of *statutory* text. *See* DCt. Op. 19; Appellees' Br. 52–57.

**B.　Loans are not "made" where the borrower is located merely because borrowers are involved in the transaction.**

After abandoning the majority's assumption that "made" and "executed" are synonymous, Colorado retreats to arguing that both terms refer to "completed" loans that require two parties and therefore both words should be deemed to refer to the location of both parties. *See* Colo. Supp. Br. 5–6, 12–13. It is of course true that every loan involves a lender and a borrower, and that any verb or adjective modifying an existing loan (rather than, say, a hypothetical future one) contemplates a "completed" loan, *see id.* at 3. But it does not follow that every verb or adjective therefore refers simultaneously to both parties to a loan, as Colorado's interpretation assumes.

The NHA's opt-out provision, for example, looks to where the borrower "executed" the loan because that is what the text expressly states, not because all loans involve borrowers. So too, an opt-out provision covering "loans received" in a state would not depend on the bank's location—even though that too would refer to completed loans, which necessarily involved a lender.

But Congress chose to omit "executed" or "received" from DIDMCA, and the mere fact that a borrower is on the receiving end of a loan does not mean the loan is "made" wherever the borrower happens to be.[3] Nor does assuming

---

[3] The district court and Judge Rossman surveyed numerous statutes in Title 12 and concluded that they uniformly use "make" or "made" to refer to the lender's role in the loan-making process, except where the statute *expressly*

5

that Section 525 refers to a "completed" loan change this fact. Terminology acknowledging that a loan has been completed places no special emphasis on the borrower. To the contrary, the loan-making process is not "completed" until the bank disburses funds—*after* any documents are executed. *See* Supp. Br. 8–10. If Congress intended to permit a state to opt out of DIDMCA with respect to loans "executed" by a borrower in that state, it would have said so.

## C.  Redefining where loans are "made" to include the borrower's location undermines DIDMCA's purpose.

Reinterpreting the location where loans are "made," as Colorado urges, conflicts with the purpose of DIDMCA while also failing to advance any of Colorado's purported justifications.

To start, Colorado and its amici completely ignore the fundamental problem with its position: Its interpretation does nothing to "protect" Colorado borrowers, who will continue to obtain loans from out-of-state *national* banks at rates above Colorado's caps. *See* Supp. Br. 2, 22–23; Bell Br. 8 n.7.[4] All Colorado's interpretation would achieve is to discriminate against out-of-state *state* banks attempting to compete with national banks in their home states.

---

shifts the focus to the borrower. *See* Supp. Br. 13–14 & n.7; Dissent 12–15. In responding to this (Section I.C, p.13), Colorado elides the critical fact that it cannot identify a single exception to this consistent congressional drafting.

[4] Colorado does not deny this. It instead urges the Court to ignore the effect of NBA Section 85 for the circular reason that NBA Section 85 contains no opt-out provision and is incompatible with Colorado's arguments about the intended purpose of DIDMCA Section 525. *See* Colo. Supp. Br. 10–11.

Colorado's approach undermines DIDMCA's promise to "prevent discrimination against State-chartered" banks in states that decline to opt out, in pursuit of purported consumer protection goals that cannot be achieved and are incompatible with DIDMCA's text and purpose.

Because Colorado misconstrues DIDMCA's text and purpose, it insists that Section 525 should do more than allow Colorado to opt out of the federal authorization for Colorado state banks to lend at the federal discount rate plus 1%. Colorado objects it is left with only a "partial opt-out" unless it can also prohibit *other states'* state banks from lending at the same rates as *those same states'* national banks. *See* Colo. Supp. Br. 13–14. This is not a "partial opt-out"; it is in line with the expressly stated purpose of DIDMCA of preventing discrimination against state banks. And Colorado's "partial opt-out" framing ignores that Section 525 *fully* resolves Congress's constitutional concerns about imposing federal interest-rate caps on a state's state-chartered banks over the state's objection. *See* Appellees' Br. 8–14, 50–51. Finally, because Colorado admits it cannot extend its interest-rate restrictions to national banks, its own interpretation *also* results in a "partial opt-out." Under the district court's interpretation, New Jersey national and state banks would continue to be able to make loans at 30% nationwide in accordance with New Jersey's laws, including to borrowers residing in Colorado. But under Colorado's interpretation, Colorado's 21% cap would supersede New Jersey's

7

own laws as to New Jersey state banks, while New Jersey national banks could continue to lend to Colorado residents at 30%.

Colorado's interpretation does not protect Colorado borrowers from out-of-state rates; it merely strips out-of-state state banks of parity with out-of-state national banks in those same states. What Colorado mistakes as a "partial opt-out" simply reflects that opting out of DIDMCA does not and cannot prevent borrowers in the opt-out state from obtaining loans at rates above the opt-out state's interest-rate caps.[5] Section 525 is intended to allow Colorado to reject federal interference with its *own* state banks, not to impose its own interference on *other states'* state banks.[6]

## II. The phrase "the State … where the bank is located" in Section 521 helps demonstrate that "loans made in such State" in Section 525 refers to loans made in the state where the bank is located.

Congress understood that a loan is "made" for purposes of Section 525 in

---

[5] Further undermining Colorado's theory, it concedes that its 21% cap only applies if a Colorado borrower transacts with a New Jersey bank remotely. In the district court, Colorado clarified that despite the broad language of its interest-rate law, Colorado's cap does not apply if a Colorado borrower visits a New Jersey bank in person. But a loan is made in the same place regardless of the method (physical, mail, electronic) the borrower uses to visit the bank.

[6] Colorado also misconstrues dicta in *Greenwood* to suggest (at 15) Section 521 authorizes state banks to lend at three rates. In reality, Section 521 authorizes state banks to lend at the *two* rates permitted under NBA Section 85—the federal rate and the bank's home state rate. *Greenwood* merely acknowledges that Section 521 expressly preempts state statutes—like Colorado's—that attempt to impose a lower rate than those authorized under Section 521. State rate caps *higher* than those permitted under DIDMCA are not preempted, but nothing in Section 521 affirmatively authorizes banks to lend at those rates.

8

the same place where it is "made" under Section 521—the state where the bank makes the loan. *See* Supp. Br. 16–19. Rather than read these sections consistently, Colorado insists Section 525 must be construed in the manner that does the greatest violence to DIDMCA's express purpose because there are slight differences in phrasing between the two sections. Colo. Supp. Br. 6–10. The Court should reject this attempt to inject inconsistency into the statute.

Section 521 regulates the interest rates available to state banks and expressly links a "loan … made" by a bank to the state "where the bank is located." This reflects the commonplace that a loan is "made" at the bank that makes it. In turn, Section 525 refers to the same "loans made" by the same state banks and allows the state where a loan is "made" to reject DIDMCA's offer of federal parity for that loan. Nothing in the statute indicates that the relevant "State" where a loan is "made" under Section 521—the state "where the bank is located"—differs from the relevant "State" under Section 525.

Footnote 4 in Colorado's supplemental brief confirms the defect in its contrary reading. Colorado acknowledges that Section 521 authorizes a state bank to charge interest "on any loan … made" at the rate allowed by the laws of the State "where the bank is located," but asserts that Section 521's use of "made" has "no bearing" on Section 525. Colo. Supp. Br. 8 n.4. But Section 525 is not a free-standing provision; it modifies the parity regime created by Section 521. Colorado can prevail only by isolating Section 525 from the lender-

9

centered framework of the very provision it modifies and by treating the same concept—where a loan is "made"—as effectively irrelevant in Section 521 but borrower-centered in Section 525. Nothing in the text supports that shift.[7]

Rather, the scope of Section 525 is defined by the preemption sections—including Section 521—that it expressly modifies, and cannot be read in isolation. When Section 525 refers to "loans made in any State," it is not referencing "loans" in a vacuum, but specifically loans made by State-chartered insured banks under Section 521, and state institutions covered by Sections 522 and 523—because Section 525 can only be construed in the context of the provisions it modifies. By the same token, the singular "State" referred to without elaboration in Section 525 is the same "State" where loans are made by each of the lenders covered by Sections 521 to 523—the state where the lender is located. *See also* Indus. Amici Br. 6 (explaining Section 525's singular phrasing indicates Congress understood a loan is "made" in one State, not two).

Colorado fails to recognize this interconnection between Section 525 and Sections 521–523 when it insists (at 9–10) that Congress must have intended to create textual conflicts solely because it did not maintain rigid parallelism between each of these provisions and Section 525. *See also id.* (arguing that

---

[7] There is also no merit to Colorado's argument (at 8 n.4) that Section 521 is different because it uses "made" to refer to *when* a loan is made rather than *where*. Section 525 is an "Effective Date" provision that expressly addresses when a loan is "made"—indeed arguably that is its primary focus.

Sections 522 & 523 have a different statutory purpose than the nearly identical Section 521 because only Section 521 expressly states that it seeks to prevent discrimination). Congress expressly tied Section 525 to Sections 521–523 so that they would be construed consistently without Congress needing to stuff Section 525 with every potentially relevant word from the other provisions.[8]

The Court should not disregard the express purpose of DIDMCA's interest-rate preemption provisions when interpreting the effect of opting out of those provisions. Only by erroneously driving a wedge between these is it possible to conclude that Congress designed Section 525 to allow opt-out states to trample on *other states'* sovereignty.

III. **DIDMCA's enactment history shows that "loans made in such State" refers to loans made in the state where the bank is located.**

DIDMCA's enactment history confirms what its plain language states: Section 525 allows states to reassert their interest-rate caps on the loans their own state banks make, but not those made by out-of-state banks.

For all the weight Colorado places on the variation between Sections 521 and 525 (Colo. Supp. Br. 6–10), Section 525's language was not drafted to distinguish Section 521. Nor was it drafted in response to *Marquette, see* Colo.

---

[8] By Colorado's logic, courts should conclude that Congress intended the opt-out to apply to "loans" but not to "discounts, notes, bills of exchange, or other evidences of debt" because it did not expressly refer to every type of instrument covered by Sections 521. *Compare* DIDMCA § 521 (applicable to "any loan or discount made, or upon any note, bill of exchange, or other evidence of debt") *with* DIDMCA § 525 (applicable to "loans made").

11

Supp. Br. 21. It was instead drawn nearly verbatim from the opt-out provisions of predecessor interest-rate preemption statutes. *See* Supp. Br. 21–22. The purpose of those opt-out provisions was not to broadly advance consumer protection goals—the earlier statutes did not even cover consumer loans—or to allow states to subvert congressional intent, but rather to address the specific constitutional concerns arising from preempting states' interest-rate restrictions on their own state banks. DIDMCA Section 525 had the same purpose. *See id.* at 21–23; Appellees' Br. 13–19.

Colorado contends (at 22–23) that the development of interstate banking altered the meaning of this preexisting language. But it presents zero evidence of that—and indeed, Section 521's primary effect when enacted was on *intra*state lending in states (like Arkansas) with interest rate caps below the federal rate. *See* Appellees' Br. 50–51. Beyond that, Congress has clear constitutional authority to regulate *inter*state commerce, including the rates state banks may charge customers who obtain loans across state lines. The point of the legislative history Colorado and its amici quote (Colo. Supp. Br. 22; Colo. States Br. 10-11), then, is that Section 525, like its predecessors, was directed at avoiding constitutional doubt by ensuring that states could choose to continue regulating the banks they themselves charter (primarily when those banks are lending within that state).

Accordingly, DIDMCA's legislative history explains that "[e]ach State is

12

given a chance to decide whether or not it desires to receive *the benefits* which this legislation will confer." *Usury Lending Limits, Hearing on S. 1988 Before the Comm. on Banking, Hous. & Urb. Affs.*, 96th Cong. 1, 5 (1979) (emphasis added). Section 525 does not allow a state to mandate that *another state* not receive those benefits for *its* banks.[9]

## IV.     Longstanding regulatory guidance reflects that "loans made in such State" refers to the state where the bank is located.

Regulatory opinions predating this lawsuit consistently reflect that "(1) Section 525 demands a uniform federal standard; (2) out-of-state banks do not lose Section 521's protection merely because borrowers reside in opt-out states; and (3) determining where loans are 'made' requires a functional analysis of banking operations." Dissent 27; *see* Supp. Br. 24–28. And federal regulators now confirm that Plaintiffs' interpretation is correct. *See* OCC Br. 7–8; FDIC Br. 5–6.

This regulatory guidance is not "conclusory," Colo. Supp. Br. 27. It was first announced shortly after the statute's enactment and has been consistent, the qualities that make guidance "especially useful." *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 386, 394 (2024). Within six years of DIDMCA's

---

[9] Indeed, when Congress was drafting DIDMCA, the Conference of State Bank Supervisors proposed eliminating NBA Section 85's federal rate and restricting *both* national *and* state banks to the interest caps in the "State … where the borrower resides." Congress did not do so. *See* Appellees' Br. 19.

enactment, the FDIC and OTS each answered the question presented here the same way: Banks may charge home-state rates "when making loans to citizens of states that have rejected the federal preemption." FDIC Interp. Ltr. No. 83-16, 1983 WL 207393, at *1 (Oct. 20, 1983); OTS Ltr., 1986 WL 290314, at *2 (June 27, 1986). The FDIC soon reiterated this position as amicus in *Greenwood Trust*, explaining that because the opt-out applied in "the State where the loan is made," Massachusetts' opt out had no "bearing" on a Delaware bank's loans "*merely because the borrower happens to be a resident*" of Massachusetts. Supp. Br. 26.

Against this tide, Colorado stakes its position on the FDIC's 1988 Letter, which it claims is "best read to support Colorado's position." Colo. Supp. Br. 24; *see also* Gruenberg Br. 8. But that letter's own words foreclose Colorado's reading three times over:

- Colorado argues that the borrower's location determines where a loan is made. The letter, by contrast, states that where a loan is made is *not* "necessarily the State in which the borrower is located." FDIC Interp. Ltr. No. 88-45, 1988 WL 583093, at *1 (June 29, 1988).

- The letter states that an opt-out "should not affect" Section 521's preemption for an out-of-state bank "so long as the loan is not made in the [opt-out] state." *Id.* at *2. This can never be the case under Colorado's rule.

- The letter explains that because the determination "is factual," an opting-out state "should not be able under section 525 to legislatively extend its reach in order to affect the determination." *Id.* That is precisely what Colorado's rule attempts to do.

What the letter actually says is narrower: The bank's home State is not *dispositive* as a matter of law. That fits Plaintiffs' functional test, under which a loan is made where the bank performs its loan-making functions—which is ordinarily, though not invariably, in its home state. Supp. Br. 27 n.10; FDIC Br. 8–10 (citing 85 Fed. Reg. 44,146 (July 22, 2020)); 63 Fed. Reg. 27,282, 27,285 (May 18, 1998).

## V. The phrase "loans made in such State" unambiguously refers to loans made in the state where the bank is located, and no presumption against preemption applies here.

Both parties agree that "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning," and that Section 525 is no exception. *Loper Bright*, 603 U.S. at 400; *see* Supp. Br. 28; Colo. Supp. Br. 2–3. Colorado's argument that this Court may apply a presumption against preemption to resolve ambiguity is therefore irrelevant. But it is also incorrect. The Supreme Court announced its rule in categorical terms: Where a statute "contains an express pre-emption clause," courts "do not invoke any presumption against pre-emption" and instead focus on the clause's plain wording without putting an anti-preemption thumb on the scale. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see also EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017).

## CONCLUSION

The Court should affirm the district court's preliminary injunction.

15

Respectfully Submitted,

/s/ David M. Gossett

CHRIS SWIFT
Davis Wright Tremaine, LLP
560 SW 10th Avenue Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

DAVID M. GOSSETT
ANGELENE SUPERABLE
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
angelenesuperable@dwt.com

MATTHEW E. LADEW
Davis Wright Tremaine LLP
350 S Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800
mattladew@dwt.com

TEAL LUTHY MILLER
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
tealmiller@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street, Suite 5000
Denver, CO 80202
(303) 974-6552
ed.perlmutter@hklaw.com

*Attorneys for Plaintiffs-Appellees*

July 22, 2026

16

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This brief complies with this Court's April 2, 2026, Order, because it is 15 pages long, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and this Court's April 2, 2026, Order because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in 13-point Century Schoolbook.

/s/ David M. Gossett

July 22, 2026

17